# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| ALLEGHENY COUNTY EMPLOYEES' RETIREMENT SYSTEM, on behalf of itself and all others similarly situated,<br><br>Plaintiff,<br><br>v.<br><br>ADAPTHEALTH CORP., LUKE MCGEE, JOSHUA PARNES, STEPHEN P. GRIGGS, JASON A. CLEMENS, FRANK J. MULLEN, RICHARD BARASCH, ALAN QUASHA, TERENCE CONNORS, DR. SUSAN WEAVER, DALE WOLF, BRADLEY COPPENS, DAVID S. WILLIAMS III, DEUTSCHE BANK SECURITIES INC., JEFFERIES LLC, BOFA SECURITIES, INC., TRUIST SECURITIES, INC., ROBERT W. BAIRD & CO. INCORPORATED, RBC CAPITAL MARKETS, LLC, STIFEL, NICOLAUS & COMPANY, INCORPORATED, UBS SECURITIES LLC, CANACCORD GENUITY LLC, and LEERINK PARTNERS LLC,<br><br>Defendants. | Civ. A. No.<br><br>CLASS ACTION<br><br>**COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS**<br><br>JURY TRIAL DEMANDED<br><br>**ECF CASE** |

Plaintiff Allegheny County Employees' Retirement System ("Plaintiff"), by and through its counsel, alleges the following upon information and belief, except as to those allegations concerning Plaintiff, which are alleged upon personal knowledge. Plaintiff's information and belief is based upon, *inter alia*, counsel's investigation, which includes review and analysis of: (i) regulatory filings made by AdaptHealth Corp. ("AdaptHealth" or the "Company") with the United States Securities and Exchange Commission ("SEC"); (ii) press releases, presentations, and media reports issued by and disseminated by the Company; (iii) analyst and media reports concerning the Company; and (iv) other public information regarding the Company.

## I.     INTRODUCTION

1.      Plaintiff brings this securities class action on behalf of all persons or entities who purchased or otherwise acquired: (i) AdaptHealth common stock between August 4, 2020 and February 27, 2023, inclusive (the "Class Period"); and/or (ii) AdaptHealth common stock pursuant and/or traceable to the Company's secondary public offering conducted on or around January 5, 2021 (the "SPO").

2.      The claims asserted herein are alleged against AdaptHealth, certain of the Company's current and former senior executives, Directors of the Company that signed the registration statement for the SPO, and certain underwriters of the SPO (collectively, "Defendants"), and arise under Sections 11, 12(a)(2), and 15 of the Securities Act of 1933 (the "Securities Act"), and Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act") and SEC Rule 10b-5, promulgated thereunder.

3.      Headquartered in Plymouth Meeting, Pennsylvania, AdaptHealth is a distributor of home medical equipment.  AdaptHealth principally provides home medical supplies for chronic health conditions including diabetes, sleep apnea, and wound care.  AdaptHealth's diabetes supply segment now constitutes more than a third of the Company's net sales revenue.

4.      AdaptHealth sells medical equipment to patients, and bills patients' insurance providers in order to receive reimbursements.  AdaptHealth works with private insurance providers as well as Centers for Medicare and Medicaid Services ("CMS").  Indeed, AdaptHealth receives a "substantial" portion of its revenues from CMS.

5.      CMS, and many other private insurance companies, determine reimbursement rates based on what codes are used when a claim is submitted.  Depending on the technology involved, diabetes devices are billed using either "A-codes" or "K-codes."  Older, traditional finger stick

diabetes monitors are billed using A-codes, and qualify for monthly reimbursements of $400, in addition to a one-time sensor reimbursement of $900 to $1200.  In contrast, newer devices that are constantly worn by patients, known as continuous glucose monitors ("CGM") are billed using K-codes, and qualify for significantly lower monthly reimbursements of just $250 to $270.

6.     On January 4, 2021, AdaptHealth issued a press release announcing the SPO.  The next day, AdaptHealth issued a press release announcing the pricing for the SPO.  In the press release, the Company announced that it would sell 7,250,000 shares of AdaptHealth common stock and a selling stockholder would sell an additional 750,000 shares of AdaptHealth common stock at a price of $33 per share.  The Company also announced that it would grant the underwriters a 30-day option to purchase up to 1,200,000 additional shares of AdaptHealth common stock.

7.     On or around January 5, 2021, AdaptHealth conducted the SPO.  Pursuant to the SPO Offering Materials (as defined herein), the Company sold 8,450,000 shares of AdaptHealth common stock, including the full exercise of the underwriters' option to purchase an additional 1,200,000 shares, and a selling stockholder sold an additional 750,000 shares of AdaptHealth common stock.

8.     All sales in the SPO were issued pursuant to the SPO Offering Materials.  However, the SPO Offering Materials and documents incorporated by reference therein contained untrue statements of material fact and omitted to state material facts that were required by applicable law and necessary to make the statements therein not misleading.  In particular, the SPO Offering Materials stated the Company's organic growth was driven by "maintaining and broadening" AdaptHealth's "strong network of highly diversified referral relationships."  The SPO Offering Materials also stated that the Company's "Business Strategy" was to "grow its revenue while expanding margins through targeted strategies for organic growth."

9.     Throughout the Class Period, AdaptHealth attributed its record growth to, among other things, its growing client base and the fact that its diabetes business was centered on providing products that patients must constantly resupply.  For example, Defendant McGee stated that AdaptHealth's diabetes business was experiencing "record-month-after-record-month" as a result of the Company "taking share" and "Medicare relaxations opening up the number of eligible patients."

10.     These and similar statements made by Exchange Act Defendants (as defined herein) during the Class Period were materially false and misleading.  In reality, AdaptHealth's record sales and substantial growth were driven by improper upcoding and other illicit billing practices.

11.     The truth emerged on February 27, 2023, when AdaptHealth announced a loss of $0.02 per share for the fourth quarter of 2022, substantially lower than the gain of $0.27 per share that analysts and investors were led to expect.  AdaptHealth also reduced its guidance for 2023, lowering revenue expectations the Company had provided just seven weeks earlier by over 1.5%.  The Company attributed the poor financial results and lowered guidance to "lower diabetes growth in the second half than [] anticipated."  These disclosures caused the Company's share price to decline by $5.99 per share, or 27%, from $21.98 per share to $15.99 per share.

12.     As a result of Defendants' wrongful acts and omissions, and the precipitous decline in the market value of AdaptHealth common stock, Plaintiff and other Class members have suffered significant losses and damages.

## II.     JURISDICTION AND VENUE

13.     The claims asserted herein arise under Sections 11, 12(a)(2), and 15 of the Securities Act, 15 U.S.C. §§ 77k, 77l(a)(2), and 77o, and Sections 10(b) and 20(a) of the Exchange

Act, 15 U.S.C. §§ 78j(b) and 78t(a), and Rule 10b-5 promulgated thereunder by the SEC, 17 C.F.R. § 240.10b-5.

14.     This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §§ 1331 and 1337, Section 22 of the Securities Act, 15 U.S.C. §§ 77v, and Section 27 of the Exchange Act, 15 U.S.C. § 78aa.

15.     Venue is proper in this District under 28 U.S.C. § 1391(b), Section 22 of the Securities Act, 15 U.S.C. § 77v, and Section 27 of the Exchange Act, 15 U.S.C. § 78aa(c), because AdaptHealth maintains its headquarters in this District and many of the acts giving rise to the violations complained of in this action, including the preparation and dissemination of materially false and misleading statements, occurred in substantial part in this District.

16.     In connection with the acts alleged herein, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including but not limited to the mails, interstate telephone communications, and the facilities of the national securities markets.

## III.     PARTIES

### A.     Plaintiff

17.     Plaintiff Allegheny County Employees' Retirement System is a single employer defined benefit, contributory retirement benefit plan covering substantially all employees of the County of Allegheny, Pennsylvania.  As of December 31, 2022, Plaintiff managed approximately $936 million in assets on behalf of approximately 12,000 participants.  As set forth in the accompanying certification, Plaintiff purchased AdaptHealth common stock at artificially inflated prices during the Class Period and suffered damages as a result of the violations of the securities laws alleged herein.

**B.    Defendants**

18.    Defendant AdaptHealth is a home medical equipment supplier providing devices for diabetes, sleep apnea, and wound care.  The Company maintains its principal executive offices at 220 West Germantown Pike Suite 250, Plymouth Meeting, Pennsylvania.  AdaptHealth's common stock trades on NASDAQ under the symbol "AHCO."  As of August 4, 2023, AdaptHealth had over 136 million shares of common stock outstanding.

19.    Defendant Luke McGee ("McGee") served as AdaptHealth's Chief Executive Officer ("CEO") beginning in 2012, when AdaptHealth was still a private company.  Defendant McGee served as sole CEO until February 2, 2021, and as Co-CEO from February 2, 2021 until June 11, 2021.  He also served as a Director of the Company from when AdaptHealth became publicly traded in November 2019 until June 11, 2021.  Defendant McGee reviewed and signed the SPO Registration Statement (as defined herein).

20.    Defendant Joshua Parnes ("Parnes") is, and was at all relevant times, AdaptHealth's President and a Director of the Company.  Defendant Parnes reviewed and signed the SPO Registration Statement.

21.    Defendant Stephen P. Griggs ("Griggs") served as AdaptHealth's Co-CEO from February 2, 2021 until June 14, 2021, and as CEO from June 14, 2021 until June 30, 2023.

22.    Defendant Jason A. Clemens ("Clemens") is, and was at all relevant times, AdaptHealth's Chief Financial Officer.  Defendant Clemens reviewed and signed the SPO Registration Statement.

23.    Defendants McGee, Parnes, Griggs, and Clemens are collectively referred to herein as the "Individual Exchange Act Defendants."  The Individual Exchange Act Defendants, because of their positions with the Company, possessed the power and authority to control the contents of

AdaptHealth's reports to the SEC, press releases, and presentations to securities analysts, money and portfolio managers, and institutional investors. The Individual Exchange Act Defendants were provided with copies of the Company's reports and press releases alleged in this complaint to be misleading before, or shortly after, their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected. Because of their position and access to material non-public information available to them, the Individual Exchange Act Defendants knew that the adverse facts and omissions specified in this complaint had not been disclosed to, and were being concealed from, the public, and that the positive representations and omissions which were being made were then materially false and misleading. AdaptHealth and the Individual Exchange Act Defendants are collectively referred to herein as the "Exchange Act Defendants."

24. Defendant Frank J. Mullen ("Mullen") served as AdaptHealth's Chief Accounting Officer in December 2020. Defendant Mullen reviewed and signed the SPO Registration Statement.

25. Defendant Richard Barasch ("Barasch") served as a Director of AdaptHealth in December 2020. Defendant Barasch reviewed and signed the SPO Registration Statement.

26. Defendant Alan Quasha ("Quasha") served as a Director of AdaptHealth in December 2020. Defendant Quasha reviewed and signed the SPO Registration Statement.

27. Defendant Terence Connors ("Connors") served as a Director of AdaptHealth in December 2020. Defendant Connors reviewed and signed the SPO Registration Statement.

28. Defendant Dr. Susan Weaver ("Weaver") served as a Director of AdaptHealth in December 2020. Defendant Weaver reviewed and signed the SPO Registration Statement.

29. Defendant Dale Wolf ("Wolf") served as a Director of AdaptHealth in December 2020. Defendant Wolf reviewed and signed the SPO Registration Statement.

30.     Defendant Bradley Coppens ("Coppens") served as a Director of AdaptHealth in December 2020.  Defendant Coppens reviewed and signed the SPO Registration Statement.

31.     Defendant David S. Williams III ("Williams") served as a Director of AdaptHealth in December 2020.  Defendant Williams reviewed and signed the SPO Registration Statement.

32.     Defendants McGee, Parnes, Clemens, Mullen, Barasch, Quasha, Connors, Weaver, Wolf, Coppens, and Williams are collectively referred to herein as the "Individual Securities Act Defendants."  Each of the Individual Securities Act Defendants signed the SPO Registration Statement.  In addition, as directors and/or executive officers of the Company, the Individual Securities Act Defendants participated in the solicitation and sale of AdaptHealth common stock to investors in the SPO.  The Individual Securities Act Defendants, because of their positions with AdaptHealth, possessed the power and authority to control the contents of the SPO Offering Materials.

33.     Defendant Deutsche Bank Securities Inc. ("Deutsche Bank") served as a lead book-running manager and underwriter for the SPO, and sold millions of AdaptHealth shares in the SPO.  As an underwriter of the SPO, Deutsche Bank was responsible for ensuring the truthfulness and accuracy of the various statements contained in or incorporated by reference into the SPO Offering Materials.

34.     Defendant Jefferies LLC ("Jefferies") served as a lead book-running manager and underwriter for the SPO, and sold millions of AdaptHealth shares in the SPO.  As an underwriter of the SPO, Jefferies was responsible for ensuring the truthfulness and accuracy of the various statements contained in or incorporated by reference into the SPO Offering Materials.

35.     Defendant BofA Securities, Inc. ("BofA") served as a lead book-running manager and underwriter for the SPO, and sold hundreds of thousands of AdaptHealth shares in the SPO.

As an underwriter of the SPO, BofA was responsible for ensuring the truthfulness and accuracy of the various statements contained in or incorporated by reference into the SPO Offering Materials.

36.     Defendant Truist Securities, Inc. ("Truist") served as a lead book-running manager and underwriter for the SPO, and sold hundreds of thousands of AdaptHealth shares in the SPO. As an underwriter of the SPO, Truist was responsible for ensuring the truthfulness and accuracy of the various statements contained in or incorporated by reference into the SPO Offering Materials.

37.     Defendant Robert W. Baird & Co. Incorporated ("Baird") served as a joint book-running manager and underwriter for the SPO, and sold hundreds of thousands of AdaptHealth shares in the SPO.   As an underwriter of the SPO, Baird was responsible for ensuring the truthfulness and accuracy of the various statements contained in or incorporated by reference into the SPO Offering Materials.

38.     Defendant RBC Capital Markets, LLC ("RBC") served as a joint book-running manager and underwriter for the SPO, and sold hundreds of thousands of AdaptHealth shares in the SPO.  As an underwriter of the SPO, RBC was responsible for ensuring the truthfulness and accuracy of the various statements contained in or incorporated by reference into the SPO Offering Materials

39.     Defendant Stifel, Nicolaus & Company, Incorporated ("Stifel") served as a joint book-running manager and underwriter for the SPO, and sold hundreds of thousands of AdaptHealth shares in the SPO.  As an underwriter of the SPO, Stifel was responsible for ensuring the truthfulness and accuracy of the various statements contained in or incorporated by reference into the SPO Offering Materials

40.     Defendant UBS Securities LLC ("UBS") served as a joint book-running manager and underwriter for the SPO, and sold hundreds of thousands of AdaptHealth shares in the SPO. As an underwriter of the SPO, UBS was responsible for ensuring the truthfulness and accuracy of the various statements contained in or incorporated by reference into the SPO Offering Materials.

41.     Defendant Canaccord Genuity LLC ("Canaccord") served as a co-manager and underwriter for the SPO, and sold hundreds of thousands of AdaptHealth shares in the SPO. As an underwriter of the SPO, Canaccord was responsible for ensuring the truthfulness and accuracy of the various statements contained in or incorporated by reference into the SPO Offering Materials.

42.     Defendant Leerink Partners LLC ("Leerink") is the successor entity of SVB Leerink, LLC ("SVB Leerink"). SVB Leerink served as a co-manager and underwriter for the SPO, and sold hundreds of thousands of AdaptHealth shares in the SPO. As an underwriter of the SPO, SVB Leerink was responsible for ensuring the truthfulness and accuracy of the various statements contained in or incorporated by reference into the SPO Offering Materials. Following the March 2023 collapse of Silicon Valley Bank, SVB Leerink's parent company filed for bankruptcy. SVB Leerink was excluded from the bankruptcy. In July 2023, SVB Leerink was purchased and renamed Leerink Partners.

43.     Defendants Deutsche Bank, Jefferies, BofA, Truist, Baird, RBC, Stifel, UBS, Canaccord, and Leerink are collectively referred to herein as the "Underwriter Defendants." AdaptHealth, the Individual Securities Act Defendants, and the Underwriter Defendants are collectively referred to herein as the "Securities Act Defendants."

IV.    **MATERIALLY FALSE AND MISLEADING STATEMENTS ISSUED DURING THE CLASS PERIOD CAUSED SUBSTANTIAL LOSSES TO INVESTORS**

    A.    **Background**

44.    AdaptHealth sells medical equipment to patients, and bills patients' insurance providers, including CMS, directly.  As a result, AdaptHealth is responsible for ensuring the correct insurance reimbursement codes are used.

45.    Prior to the start of the Class Period, AdaptHealth acquired Solara Medical Supplies ("Solara"), then the largest independent distributor of CGMs.  AdaptHealth went on to acquire several other diabetes equipment suppliers throughout the Class Period.

46.    As a result of those acquisitions, AdaptHealth became one of the largest suppliers of home medical equipment in the country, and its diabetes supply segment now constitutes more than a third of the Company's net sales revenue.  CGMs account for 76% of sales within AdaptHealth's diabetes supply segment.

47.    Diabetes technology has improved rapidly in recent years.  Previously, patients would use a stand-alone transmitter and a monitor, which required a monthly supply of finger prick sensors.  These devices are billed to CMS using "A-codes" and can qualify for monthly sensor reimbursements of $400, in addition to the one-time reimbursement of between $900 and $1,200 for the transmitter and monitor.

48.    As a result of technology improvements, patients no longer need to rely on antiquated finger prick tests.  Instead, newer CGM devices bundle the transmitter, monitor, and sensor into one small device that is constantly worn by the patient.  Under CMS billing policy— which is adopted by the majority of private insurance providers—CGM devices should only be billed using "K-codes," which qualify for a reimbursement of just $250 to $270 per month.

**B.      AdaptHealth Misrepresents The Success And Growth Of Its Diabetes Segment**

49.      The Class Period begins on August 4, 2020, to coincide with AdaptHealth's announcement of its second quarter 2020 financial results.  On that day, AdaptHealth issued a press release, which was also filed with the SEC on Form 8-K.  The press release, among other things, reported net revenue of $232.1 million, which the Company attributed to its "scalable growth model focused on organic sales."  The press release also highlighted the Company's acquisition of Solara, claiming it "make[s] [AdaptHealth] a national leader in distribution of CGMs and other diabetes supplies."

50.      The same day, AdaptHealth hosted a conference call with analysts and investors to discuss the Company's earnings and operations for its second quarter of 2020.  During that call, Defendant McGee discussed the Company's July 1, 2020, acquisition of Solara, describing it as a "transformative transaction that will establish AdaptHealth as a leader in the fast-growing diabetes management business."  On the same call, Defendant Parnes stated that CGM was "largely a resupply business that generates recurring revenue and is very well suited to our core competencies in resupply, billing and referral relationships" that would "drive down healthcare costs associated with diabetes."

51.      Later on that same call, in response to a question regarding how AdaptHealth was continuing to see strength in CGM resupply when the Company was seeing slowdowns in other segments, Defendant McGee responded that the "CGM business also continues to have record-month-after-record-month" and attributed the increase to "a combination of us taking share, a combination of the Medicare relaxations opening up the number of eligible patients."  Defendant McGee also claimed that the recently acquired diabetes companies "combined with the existing CGM business . . . saw just an absolutely strong Q2."

52.     On August 7, 2020, AdaptHealth filed with the SEC its Form 10-Q for the second quarter of 2020.  The Form 10-Q was signed by Defendants McGee and Clemens and contained certifications from Defendants McGee and Clemens attesting the accuracy of the Company's financial statements.  In addition, the Form 10-Q stated that "AdaptHealth could be adversely affected in some of the markets in which it operates if the auditing payor alleges substantial overpayments were made to AdaptHealth due to coding errors" and that "AdaptHealth cannot currently predict the adverse impact these measures might have on its financial condition and results of operations, but such impact could be material."

53.     On August 13, 2020, Defendant McGee represented AdaptHealth at the Canaccord Genuity Growth Conference.  At that conference, Defendant McGee stated that the "next-gen[eration] diabetes technology" including CGMs were "in its infancy in terms of growth" and that "it's going to be a growth market for us."  Defendant McGee also stated that the overall "CGM market is growing 20%-plus."  At that same conference, when discussing the Solara acquisition, Defendant McGee stated that "if you look at the Solara, which was the diabetes business that we acquired in July, if you looked at that plus the business that we . . . have owned since the beginning here on CGM, we're seeing just spectacular growth" and "the Solara acquisition it sort of opened up a new frontier for us on the CGM side."

54.     On November 4, 2020, AdaptHealth issued a press release announcing its third quarter 2020 financial results, which was also filed with the SEC on Form 8-K.  The press release, among other things, reported net revenue of $284.4 million, which the Company attributed to "the tremendous efforts of our employees and their dedication to patients and healthcare partners."  The press release also highlighted the Company's "opportunistic" acquisition of several diabetes management companies.

55.     That same day, AdaptHealth hosted a conference call with analysts and investors to discuss the Company's earnings and operations for its third quarter of 2020.  On that call, Defendant McGee noted the "continued market growth in continuous glucose monitors and insulin pumps and believe adoption rates will accelerate."

56.     On November 6, 2020, AdaptHealth filed with the SEC its Form 10-Q for the third quarter of 2020.  The Form 10-Q was signed by Defendants McGee and Clemens and contained certifications from Defendants McGee and Clemens attesting the accuracy of the Company's financial statements.  The Form 10-Q stated that "AdaptHealth could be adversely affected in some of the markets in which it operates if the auditing payor alleges substantial overpayments were made to AdaptHealth due to coding errors" and that "AdaptHealth cannot currently predict the adverse impact these measures might have on its financial condition and results of operations, but such impact could be material."

57.     The statements set forth above in ¶¶ 49-56 were materially false and misleading because: (i) AdaptHealth misstated the Company's true ability to generate organic growth in its diabetes segment; (ii) AdaptHealth engaged in improper upcoding and other illicit billing practices; (iii) that, as a result of the foregoing, the Exchange Act Defendants' statements about the Company's business, operations, and prospects were materially misleading and/or lacked a reasonable basis.  Moreover, AdaptHealth's purported warnings that the Company "could be adversely affected" if it was found to engage in overbilling as a result of "coding errors" were misleading because those warnings omitted that the risk presented by overbilling had already materialized due to the Company's fraudulent scheme.

58.     On January 4, 2021, AdaptHealth issued a press release announcing the SPO.  The next day, AdaptHealth issued a press release announcing the Company would sell 7,250,000 shares

of AdaptHealth common stock and a selling stockholder would sell an additional 750,000 shares of AdaptHealth common stock at a price of $33 per share. The Company also announced that it would grant the underwriters a 30-day option to purchase up to 1,200,000 additional shares of AdaptHealth common stock.

59.     On or around January 5, 2021, AdaptHealth conducted the SPO. Through the SPO, and through the underwriters' decision to exercise their option to purchase additional shares, the Company sold 8,450,000 shares of AdaptHealth common stock, resulting in net proceeds of approximately $264.4 million. In addition, a selling stockholder sold an additional 750,000 shares of AdaptHealth common stock to the public in the SPO.

60.     The SPO was conducted pursuant to a Form S-3 filed by the Company with the SEC on December 18, 2020 (the "SPO Registration Statement"), a Prospectus on Form 424B5 filed by the Company with the SEC on January 4, 2021, which incorporated and formed part of the SPO Registration Statement, and a Prospectus on Form 424B5 filed by the Company with the SEC on January 7, 2021, which incorporated and formed part of the SPO Registration Statement (collectively, the "SPO Offering Materials").

61.     The SPO Offering Materials contained untrue statements of material fact, omitted material facts necessary to make the statements contained therein not misleading, and failed to make adequate disclosures required under the rules and regulations governing the preparation of such documents.

62.     The SPO Offering Materials stated "we believe that CGM and diabetes represent a $16 billion market segment" and that "the CGM market could grow by 18% to $3.4 billion by 2022." The SPO Offering Materials also stated that the Company's "Business Strategy" was to "grow our revenue while expanding margins through targeted strategies for organic growth as well

as opportunistic acquisitions" and that its organic growth was driven by "maintaining and broadening" the Company's "strong network of highly diversified referral relationships."  The SPO Offering Materials later reiterated that AdaptHealth's "strong referral relationships and broad product portfolio will help drive market share growth."

63.     On January 14, 2021, Defendant McGee represented AdaptHealth at the JP Morgan Healthcare Conference.  During the conference, Defendant McGee stated that "CGM [] and diabetes management products" were "a very, very stable and attractive growth business."

64.     On February 25, 2021, Defendants McGee and Griggs represented AdaptHealth at the SVB Leerink Global Healthcare Conference.  At that conference, Defendant McGee stated that the diabetes business "has been a huge growth engine" and that "to be honest the growth that we're seeing far transcends any headwinds."

65.     On March 3, 2021, Defendants Parnes, Clemens, and Griggs represented AdaptHealth at the JP Morgan Global High Yield & Leveraged Finance Conference.  At that conference, Defendant Parnes stated, "CGM in diabetes . . . is really growing very, very rapidly" and that "diabetes is growing at 70%."  Defendant Parnes also highlighted that "the diabetes markets . . . have much faster organic growth as a market."

66.     On March 4, 2021, AdaptHealth issued a press release announcing its fourth quarter and year-end financial results for 2020, which was also filed with the SEC on Form 8-K.  The press release, among other things, reported net revenue of $348.4 million, which the Company attributed to "our diabetes business [driving] substantial growth."

67.     That same day, AdaptHealth hosted a conference call with analysts and investors to discuss the Company's earnings and operations for its fourth quarter and year end for 2020.  On that call, in response to an analyst question regarding "the dynamic between diabetes patient

growth and unit growth versus the pricing," Defendant McGee stated that "not only are we seeing kind of growth in new starts, but we are seeing compounding in the sensors which should persist for years."

68.     On March 16, 2021, AdaptHealth filed with the SEC its Form 10-K Annual Report for the fiscal year ending 2020.  The Form 10-K was signed by Defendants McGee, Griggs, and Clemens and contained certifications from Defendants McGee, Griggs, and Clemens attesting the accuracy of the Company's financial statements.  In addition, the Form 10-K stated that "AdaptHealth could be adversely affected in some of the markets in which it operates if the auditing payor alleges substantial overpayments were made to AdaptHealth due to coding errors" and that "AdaptHealth cannot currently predict the adverse impact these measures might have on its financial condition and results of operations, but such impact could be material."

69.     On May 6, 2021, AdaptHealth issued a press release announcing its first quarter 2021 financial results, which was also filed with the SEC on Form 8-K.  The press release, among other things, reported net revenue of $482.1 million, which the Company attributed to its "growing diabetes product line" as well as its "strong organic growth for the quarter and the continued strength of our M&A pipeline."

70.     That same day, AdaptHealth hosted a conference call with analysts and investors to discuss the Company's earnings and operations for its first quarter of 2021.  On that call, Defendant Griggs stated with the "current organic growth in diabetes and resupply, we feel confident that the balance of 2021 will meet our organic growth expectations."  On that same call, Defendant Clemens noted the Company's organic growth was up significantly "led by new starts in our diabetes product line."

71.     On May 10, 2021, AdaptHealth filed with the SEC its Form 10-Q for the first quarter of 2021.  The Form 10-Q was signed by Defendants Griggs and Clemens and contained certifications from Defendants Griggs and Clemens attesting the accuracy of the Company's financial statements.  In addition, the Form 10-Q stated that "AdaptHealth could be adversely affected in some of the markets in which it operates if the auditing payor alleges substantial overpayments were made to AdaptHealth due to coding errors" and that "AdaptHealth cannot currently predict the adverse impact these measures might have on its financial condition and results of operations, but such impact could be material."

72.     On June 2, 2021, Defendants Griggs, Parnes, and Clemens represented AdaptHealth at the Jefferies Healthcare Conference.  At that conference, Defendant Clemens stated that diabetes was "beating our internal expectations for that business line" and Defendant Parnes stated that "our diabetes business today is growing extremely quickly."

73.     On August 5, 2021, AdaptHealth issued a press release announcing its second quarter 2021 financial results, which was also filed with the SEC on Form 8-K.  The press release, among other things, reported net revenue of $617 million, which the Company attributed to "the outstanding efforts of our combined team" and continued execution of the Company's "strategy of organic growth, improving operations, and closing accretive acquisitions."

74.     That same day, AdaptHealth hosted a conference call with analysts and investors to discuss the Company's earnings and operations for its second quarter of 2021.  On that call, Defendant Parnes stated that "we are accelerating growth in all of our product categories most dramatically in diabetes, our fastest growing product category."

75.     On August 6, 2021, AdaptHealth filed with the SEC its Form 10-Q for the second quarter of 2021.  The Form 10-Q was signed by Defendants Griggs and Clemens and contained

certifications from Defendants Griggs and Clemens attesting the accuracy of the Company's financial statements.  In addition, the Form 10-Q stated that "AdaptHealth could be adversely affected in some of the markets in which it operates if the auditing payor alleges substantial overpayments were made to AdaptHealth due to coding errors" and that "AdaptHealth cannot currently predict the adverse impact these measures might have on its financial condition and results of operations, but such impact could be material."

76.    On August 11, 2021, Defendants Clemens, Griggs, and Parnes represented AdaptHealth at the Canaccord Genuity Growth Conference.  At that conference, Defendant Clemens stated that offsetting a lag in the Company's sleep business "is the terrific growth we're seeing in the diabetes product line, frankly beating our own view of kind of end market growth. And we're just very, very pleased with the business.  So, overall we did raise guidance."

77.    On November 4, 2021, AdaptHealth issued a press release announcing its third quarter 2021 financial results, which was also filed with the SEC on Form 8-K.  The press release, among other things, reported net revenue of $653.3 million, and raised its full-year 2021 guidance, which the Company attributed to the "outstanding efforts of our team members."  The press release also highlighted AdaptHealth's ability to "continue to drive organic growth."

78.    That same day, AdaptHealth hosted a conference call with analysts and investors to discuss the Company's earnings and operations for its third quarter of 2021.  On that call, Defendant Griggs stated, "[m]ore than a year ago, we entered the diabetes business with the acquisition of Solara, and we remain very pleased with its performance, which continues to exceed our expectations for 2021.  We continue to grow this business with strategic acquisitions."  Later on that call, in response to a question asked by an analyst comparing the organic growth of diabetes to a pre-pandemic environment, Defendant Clemens stated, "I think that over the last several years,

you know, the end market just continues to grow, you know, very rapidly, you know, we think we're right in line with end market growth and diabetes and 2022, frankly, we think we're capturing a couple of points of shares as well."

79.     On November 9, 2021, AdaptHealth filed with the SEC its Form 10-Q for the third quarter of 2021.  The Form 10-Q was signed by Defendants Griggs and Clemens and contained certifications from Defendants Griggs and Clemens attesting the accuracy of the Company's financial statements.  In addition, the Form 10-Q stated that "AdaptHealth could be adversely affected in some of the markets in which it operates if the auditing payor alleges substantial overpayments were made to AdaptHealth due to coding errors" and that "AdaptHealth cannot currently predict the adverse impact these measures might have on its financial condition and results of operations, but such impact could be material."

80.     On February 18, 2022, Defendants Griggs, Clemens, and Parnes represented AdaptHealth at the SVB Leerink Global Healthcare Conference.  At that conference, Defendant Parnes stated, "we're seeing steady growth that I was actually surprised that wasn't as impacted by COVID is the diabetes division, just really strong organic growth over the last year in general, and that market obviously is continuing to grow for us."

81.     On May 10, 2022, AdaptHealth issued a press release announcing its first quarter 2022 financial results, which was also filed with the SEC on Form 8-K.  The press release, among other things, reported net revenue of $706.2 million, which the Company attributed to "continued strength in our diabetes product line."

82.     That same day, AdaptHealth hosted a conference call with analysts and investors to discuss the Company's earnings and operations for its first quarter of 2022.  On that call, Defendant Parnes stated that AdaptHealth was "constantly assessing strategic opportunities to . . .

increase our revenue" and claimed the Company's "expansion into CGM supply and diabetes services in 2020 is a good example of a strategic expansion into a new market."  Defendant Parnes also stated that AdaptHealth had "integrated Solara and our other diabetes supply acquisitions."

83.     On May 11, 2022, Defendants Griggs and Clemens represented AdaptHealth at the Bank of America Healthcare Conference.  At that conference, in response to a question regarding what was driving AdaptHealth's growth, Defendant Griggs stated that the "growth rates are going to be pretty strong for certainly the foreseeable future" and "we're very, very comfortable with that high teens growth rate right now."

84.     On June 8, 2022, Defendant Parnes represented AdaptHealth at the Jefferies Healthcare Conference.  At that conference, Defendant Parnes stated, "we feel very comfortable with that as we stand here today . . . when we think about the product lines, first is diabetes.  I mean, very high growth."

85.     At that same conference, in response to a question by an analyst regarding the sustainability of the growth of AdaptHealth's CGM market, Defendant Parnes responded, "one of the interesting things we thought about strategically that would be a good fit for us was the resupply component of a CGM . . . that played itself out where we've done a very, very nice job . . . where we've been able to grow their resupply footprint consistently, steadily."

86.     On August 9, 2022, AdaptHealth issued a press release announcing its second quarter 2022 financial results, which was also filed with the SEC on Form 8-K.  The press release, among other things, reported net revenue of $727.6 million and "double-digit growth" in its diabetes product line, which the Company attributed to its "important investments in technology."

87.     On November 8, 2022, AdaptHealth issued a press release announcing its third quarter 2022 financial results, which was also filed with the SEC on Form 8-K.  The press release,

among other things, reported "record" net revenue of $756.5 million with its "diabetes product line once again posting double-digit growth", which the Company attributed to its "operational excellence initiatives," and the "resilience of our business."

88.     That same day, AdaptHealth hosted a conference call with analysts and investors to discuss the Company's earnings and operations for the third quarter of 2022.  On that call, Defendant Griggs stated, "[w]e continue to be confident in the sustained growth potential in Diabetes, given the expanding acceptance of CGM as a critical component in managing diabetes and related comorbidities."

89.      On the same call, in response to a question from an analyst regarding the impact of a proposed expansion by CMS to provide coverage for CGM devices for patients with type II diabetes, Defendant Griggs stated, "everybody believes that the growth rates that we've seen in the past two or three years on the CGMs will, maybe not quite as high, but they'll still continue throughout the next two or three years."

90.     The statements set forth above in ¶¶ 62-89 were materially false and misleading because: (i) AdaptHealth misstated the Company's true ability to generate organic growth in its diabetes segment; (ii) AdaptHealth engaged in improper upcoding and other illicit billing practices; (iii) that, as a result of the foregoing, the Exchange Act Defendants' statements about the Company's business, operations, and prospects were materially misleading and/or lacked a reasonable basis.  Moreover, AdaptHealth's purported warnings that the Company "could be adversely affected" if it was found to engage in overbilling as a result of "coding errors" were misleading because those warnings omitted that the risk presented by overbilling had already materialized due to the Company's fraudulent scheme.

91.    The truth emerged on February 27, 2023, after the market closed, when AdaptHealth announced a surprise loss of $0.02 per share for the fourth quarter of 2022, which was significantly lower than the gain of $0.27 per share that analysts had been led to expect.  The Company also reduced its guidance for 2023, lowering revenue expectations the Company had provided just seven weeks earlier by over 1.5%.  AdaptHealth attributed the poor financial performance and lowered guidance to "tempered expectations on diabetes."  On this news, the price of AdaptHealth stock declined by $5.99 per share, or 27%, from $21.98 per share to $15.99 per share.

92.    As a result of Defendants' wrongful acts and omissions, and the precipitous decline in the market value of the Company's securities, Plaintiff and other Class members have suffered significant losses and damages.

**V.    LOSS CAUSATION**

93.    During the Class Period, as detailed in this complaint, Defendants made materially false and misleading statements and omissions, including statements regarding AdaptHealth's diabetes segment and its continued organic growth, and engaged in a scheme to deceive the market.  This artificially inflated the price of AdaptHealth common stock and operated as a fraud or deceit on the Class.  Later, when Defendants' prior misrepresentations and risks concealed by the fraudulent conduct alleged in this complaint materialized and were disclosed to the market, the price of AdaptHealth common stock fell precipitously.  As a result of their acquisition of AdaptHealth common stock during the Class Period—and Defendants' material misstatements and omissions—Plaintiff and other members of the Class (as defined herein) suffered economic loss, *i.e.*, damages, under the federal securities laws.

## VI.    CLASS ACTION ALLEGATIONS

94.    Plaintiff brings this action as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure on behalf of all persons or entities who purchased or otherwise acquired: (i) AdaptHealth common stock during the Class Period; and/or (ii) AdaptHealth common stock pursuant and/or traceable to the Company's SPO (the "Class").  Excluded from the Class are Defendants and their families, directors, and officers of AdaptHealth and their families and affiliates.

95.    The members of the Class are so numerous that joinder of all members is impracticable.  The disposition of their claims in a class action will provide substantial benefits to the parties and the Court.  AdaptHealth has over 136 million shares of stock outstanding, owned by at least hundreds or thousands of investors.

96.    There is a well-defined community of interest in the questions of law and fact involved in this case.  Questions of law and fact common to the members of the Class, which predominate over questions which may affect individual Class members, include:

(a)    Whether Defendants violated the Securities Act and/or the Exchange Act;

(b)    Whether the SPO Offering Materials were negligently prepared and contained inaccurate statements of material fact and omitted material information required to be stated therein;

(c)    Whether Exchange Act Defendants omitted and/or misrepresented material facts;

(d)    Whether Exchange Act Defendants' statements omitted material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading;

(e)     Whether Exchange Act Defendants knew or recklessly disregarded that their statements and/or omissions were false and misleading;

(f)     Whether the Individual Exchange Act Defendants and Individual Securities Act Defendants are personally liable for the alleged misrepresentations and/or omissions described herein;

(g)     Whether Defendants' conduct impacted the price of AdaptHealth common stock;

(h)     Whether Defendants' conduct caused the members of the Class to sustain damages; and

(i)     The extent of damages sustained by Class members and the appropriate measure of damages.

97.     Plaintiff's claims are typical of those of the Class because Plaintiff and the Class sustained damages from Defendants' wrongful conduct.

98.     Plaintiff will adequately protect the interests of the Class and has retained counsel experienced in class action securities litigation.  Plaintiff has no interests which conflict with those of the Class.

99.     A class action is superior to other available methods for the fair and efficient adjudication of this controversy.

## VII.    INAPPLICABILITY OF STATUTORY SAFE HARBOR

100.     The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the false statements described in this complaint.  Many of the specific statements described in this complaint were not identified as "forward-looking" when made.  To the extent that there were any forward-looking statements, there was no meaningful

cautionary language identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements.  Alternatively, to the extent that the statutory safe harbor does apply to any forward-looking statements described in this complaint, Defendants are liable for those false forward-looking statements because at the time each was made, the particular speaker knew that the particular forward-looking statement was false or misleading, or the forward-looking statement was authorized or approved by an executive officer of AdaptHealth who knew that the statement was false or misleading when made.

**VIII.   PRESUMPTION OF RELIANCE**

101.    At all relevant times, the market for AdaptHealth common stock was an efficient market for the following reasons, among others:

(a)    AdaptHealth common stock met the requirements for listing and was listed and actively traded on the NASDAQ stock market, a highly efficient and automated market;

(b)    AdaptHealth filed periodic public reports with the SEC and NASDAQ;

(c)    AdaptHealth regularly and publicly communicated with investors via established market communication mechanisms, including through regular dissemination of press releases on the national circuits of major newswire services and through other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services; and

(d)    AdaptHealth was followed by securities analysts employed by numerous major brokerage firms, who wrote reports that were distributed to the sales forces and certain customers of their respective brokerage firms.  Each of these reports was publicly available and entered the public marketplace.

102.    As a result of the foregoing, the market for AdaptHealth common stock promptly digested current information regarding AdaptHealth from all publicly available sources and reflected that information in the price of AdaptHealth common stock.  Under these circumstances, all purchasers of AdaptHealth common stock during the Class Period suffered similar injury through their purchase of AdaptHealth common stock at artificially inflated prices, and the presumption of reliance applies.

103.    A Class-wide presumption of reliance is also appropriate in this action under the Supreme Court's holding in *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128 (1972), because the Class' claims are grounded on Defendants' material omissions.  Because this action involves Defendants' failure to disclose material adverse information regarding AdaptHealth's business operations—information that was required to be disclosed—positive proof of reliance is not a prerequisite to recovery.  All that is necessary is that the facts withheld be material in the sense that a reasonable investor might have considered them important in making investment decisions.  Given the importance of AdaptHealth's diabetes business and its impact on the Company's business as a whole, as alleged above, that requirement is satisfied here.

## IX.    CAUSES OF ACTION

### COUNT I

**For Violations of Section 11 of the Securities Act**
**Against the Securities Act Defendants**

104.    Plaintiff repeats, incorporates, and realleges every allegation above as if fully alleged in this count.

105.    This Count is brought pursuant to Section 11 of the Securities Act, 15 U.S.C. § 77k, on behalf of all members of the Class who purchased or otherwise acquired AdaptHealth common stock in and/or traceable to the SPO and who were damaged thereby.

106.    This Count expressly excludes and disclaims any allegation that could be construed as alleging fraud or intentional or reckless conduct, as this Count is solely based on claims of strict liability and/or negligence under the Securities Act.  For purposes of asserting this Count, Plaintiff does not allege that the defendants named in this Count acted with scienter or fraudulent intent, which are not elements of a Section 11 claim.

107.    AdaptHealth is the registrant for the SPO.  The defendants named in this Count were responsible for the contents and dissemination of the SPO Offering Materials.

108.    As the issuer of the shares, AdaptHealth is strictly liable to Plaintiff and the Class for the misstatements and omissions contained in the SPO Offering Materials.

109.    Liability under this Count is predicated on the Individual Securities Act Defendants having signed the SPO Registration Statement, and the respective participation by all the defendants named in this Count in the SPO, which was conducted pursuant to the SPO Offering Materials.

110.    The SPO Offering Materials contained untrue statements of material facts, omitted to state other facts necessary to make the statements not misleading, and omitted to state material facts required to be stated therein.

111.    Plaintiff and the Class have suffered damages.  The value of AdaptHealth common stock has declined substantially as a result of the Securities Act Defendants' violations.

112.    Less than one year has elapsed from the time that Plaintiff discovered or reasonably could have discovered the facts upon which this Complaint is based to the time that Plaintiff commenced this action.  Less than three years has elapsed between the time that the securities upon which this Count is brought were offered to the public through the SPO and the time Plaintiff commenced this action.

113.    By reason of the foregoing, the defendants named in this Count are each jointly and severally liable for violations of Section 11 of the Securities Act to Plaintiffs and the other members of the Class.

## COUNT II

**For Violations of Section 12(a)(2) of the Securities Act
Against the Underwriter Defendants**

114.    Plaintiff repeats, incorporates, and realleges each and every allegation set forth above as if fully set forth herein.

115.    This Count is brought pursuant to Section 12(a)(2) of the Securities Act, 15 U.S.C. §77l(a)(2), on behalf of all members of the Class who purchase or otherwise acquired AdaptHealth common stock in and/or traceable to the SPO and who were damaged thereby.

116.    This Count expressly excludes and disclaims any allegation that could be construed as alleging fraud or intentional or reckless conduct, and this Count is solely based on claims of strict liability and/or negligence under the Securities Act.  For purposes of asserting this Count, Plaintiff does not allege that the Underwriter Defendants acted with scienter or fraudulent intent, which are not elements of a Section 12(a)(2) claim.

117.    The Underwriter Defendants were statutory sellers of AdaptHealth shares that were registered in the SPO pursuant to the SPO Registration Statement and sold by means of the SPO Offering Materials.  By means of the SPO Offering Materials, the Underwriter Defendants sold millions of shares of AdaptHealth common stock through the SPO to members of the Class.  The Underwriter Defendants were at all relevant times motivated by their own financial interests. In sum, the Underwriter Defendants were sellers, offerors, and/or solicitors of sales of the stock that was sold in the SPO by means of the materially false and misleading SPO Offering Materials.

118.   The SPO Offering Materials contained untrue statements of material fact and omitted other facts necessary to make the statements not misleading, and failed to disclose material facts, as set forth above.

119.   Less than one year has elapsed since the time that the Plaintiff discovered, or could reasonably have discovered, the facts upon which this Complaint is based.  Less than three years has elapsed since the time that the securities at issue in this Complaint were bona fide offered to the public.

120.   By reason of the foregoing, the Underwriter Defendants are liable for violations of Section 12(a)(2) of the Securities Act to Plaintiff and the other members of the Class who purchased AdaptHealth common stock in and/or traceable to the SPO, and who were damaged thereby.

## COUNT III

**For Violations of Section 15 of the Securities Act
Against the Individual Securities Act Defendants**

121.   Plaintiff repeats, incorporates, and realleges each and every allegation set forth above as if fully set forth herein.

122.   This Count is brought pursuant to Section 15 of the Securities Act, 15 U.S.C. § 77o, on behalf of all members of the Class who purchased or otherwise acquired AdaptHealth common stock in and/or traceable to the SPO and who were damaged thereby.

123.   This Count expressly excludes and disclaims any allegation that could be construed as alleging fraud or intentional or reckless conduct, as this Count is solely based on claims of strict liability and/or negligence under the Securities Act.  For purposes of asserting this Count, Plaintiff does not allege that the defendants named in this Count acted with scienter or fraudulent intent, which are not elements of a Section 15 claim.

124.    As set forth in Count One above, AdaptHealth is strictly liable under Section 11 of the Securities Act for untrue statements and omissions of material fact in the SPO Offering Materials.

125.    The Individual Securities Act Defendants, by virtue of their positions as senior officers and/or directors at AdaptHealth, were controlling persons of AdaptHealth within the meaning of Section 15 of the Securities Act.  The defendants named in this Count had the power and influence, and exercised the same, to cause AdaptHealth to engage in the acts described herein, including by causing AdaptHealth to conduct the SPO pursuant to the SPO Offering Materials.

126.    By reason of the foregoing, the defendants named in this Count were culpable participants in the violations of Sections 11 and 12(a)(2) of the Securities Act as alleged in Counts One and Two above, based on their having signed the SPO Registration Statement and having otherwise participated in the process that allowed the SPO to be successfully completed.  The defendants named in this Count are liable for the aforesaid wrongful conduct and is liable, to the same extent AdaptHealth is liable under Section 11 of the Securities Act, to Plaintiff and members of the Class who purchased or otherwise acquired AdaptHealth common stock pursuant and/or traceable to the SPO, and who were damaged thereby.

## **COUNT IV**

### **For Violations of Section 10(b) of the Exchange Act and SEC Rule 10b-5 Against the Exchange Act Defendants**

127.    Plaintiff repeats, incorporates, and realleges every allegation above as if fully alleged in this count.

128.    During the Class Period, the Exchange Act Defendants carried out a plan, scheme, and course of conduct that was intended to and, throughout the Class Period, did (i) deceive the investing public, including Plaintiff and other Class members, as alleged in this complaint; and (ii)

cause Plaintiff and other members of the Class to purchase AdaptHealth common stock at artificially inflated prices.

129.     The Exchange Act Defendants: (i) employed devices, schemes, and artifices to defraud; (ii) made untrue statements of material fact and omitted to state material facts necessary to make the statements made not misleading; and (iii) engaged in acts, practices, and a course of business that operated as a fraud and deceit upon the purchasers of the Company's common stock in an effort to maintain artificially high market prices for AdaptHealth common stock in violation of Section 10(b) of the Exchange Act and SEC Rule 10b-5.

130.     The Exchange Act Defendants, individually and in concert, directly and indirectly, by the use, means or instrumentalities of interstate commerce and of the mails, engaged and participated in a continuous course of conduct to conceal adverse material information about the Company's financial well-being, operations, and prospects.

131.     During the Class Period, the Exchange Act Defendants made the false statements specified above, which they knew or recklessly disregarded to be false or misleading in that, in light of the circumstances under which they were made, the statements contained misrepresentations and failed to disclose material facts necessary in order to make the statements not misleading.

132.     The Exchange Act Defendants had actual knowledge of the misrepresentations and omissions of material facts alleged in this complaint, or recklessly disregarded the true facts that were available to them.  The Exchange Act Defendants engaged in this misconduct to conceal AdaptHealth's true condition from the investing public and to support the artificially inflated prices of the Company's common stock.

133.     Plaintiff and the Class have suffered damages in that, in reliance on the integrity of the market, they paid artificially inflated prices for AdaptHealth common stock.  Plaintiff and the Class would not have purchased the Company's common stock at the prices they paid, or at all, had they been aware that the market prices for AdaptHealth common stock had been artificially inflated by Exchange Act Defendants' fraudulent course of conduct.

134.     As a direct and proximate result of the Exchange Act Defendants' wrongful conduct, Plaintiff and the other members of the Class suffered damages in connection with their respective purchases of the Company's common stock during the Class Period.

135.     By virtue of the foregoing, the Exchange Act Defendants violated Section 10(b) of the Exchange Act and SEC Rule 10b-5.

### COUNT V

**For Violations of Section 20(a) of the Exchange Act
Against the Individual Exchange Act Defendants**

136.     Plaintiff repeats, incorporates, and realleges every allegation above as if fully alleged in this count.

137.     As alleged above, AdaptHealth violated Section 10(b) of the Exchange Act and SEC Rule 10b-5 by its acts and omissions as alleged in this complaint.

The Individual Exchange Act Defendants acted as controlling persons of AdaptHealth within the meaning of Section 20(a) of the Exchange Act, 15 U.S.C. § 78t(a).  By virtue of their high-level positions, participation in and awareness of the Company's operations, direct involvement in the day-to-day operations of the Company, and intimate knowledge of the Company's actual performance, and their power to control public statements about AdaptHealth, the Individual Exchange Act Defendants had the power and ability to control the actions of AdaptHealth and its

employees.  By reason of this conduct, the Individual Exchange Act Defendants are liable under Section 20(a) of the Exchange Act.

## X.    PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for judgment as follows:

A.    Determining that this action is a proper class action under Rule 23 of the Federal Rules of Civil Procedure;

B.    Awarding compensatory damages in favor of Plaintiff and other Class members against all Defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including interest;

C.    Awarding Plaintiff and the Class their reasonable costs and expenses incurred in this action, including attorneys' fees and expert fees; and

D.    Awarding any equitable, injunctive, or other further relief that the Court may deem just and proper.

## XI.   JURY DEMAND

Plaintiff demands a trial by jury.

Dated: October 24, 2023                          Respectfully submitted,

**KASKELA LAW LLC**

*/s/ D. Seamus Kaskela*
D. Seamus Kaskela (No. 204351)
Adrienne Bell (No. 202231)
18 Campus Boulevard, Suite 100
Newtown Square, PA 19073
Telephone: (484) 258-1401
skaskela@kaskelalaw.com
abell@kaskelalaw.com

*Liaison Counsel for Plaintiff Allegheny
County Employees' Retirement System*

**BERNSTEIN LITOWITZ BERGER
   & GROSSMANN LLP**
Hannah Ross
Avi Josefson
Scott R. Foglietta
1251 Avenue of the Americas
New York, New York 10020
Telephone: (212) 554-1400
Facsimile: (212) 554-1444
hannah@blbglaw.com
avi@blbglaw.com
scott.foglietta@blbglaw.com

*Counsel for Plaintiff Allegheny County
Employees' Retirement System*

## CERTIFICATION PURSUANT TO
## THE FEDERAL SECURITIES LAWS

I, John K. Weinstein, on behalf of Allegheny County Employees' Retirement System ("ACERS"), hereby certify, as to the claims asserted under the federal securities laws, that:

1. I am the Treasurer of Allegheny County. I am fully authorized to enter into and execute this Certification on behalf of ACERS. I have reviewed the complaint and authorize its filing.

2. ACERS did not purchase the securities that are the subject of this action at the direction of counsel or in order to participate in any action arising under the federal securities laws.

3. ACERS is willing to serve as a representative party on behalf of the Class, including providing testimony at deposition and trial, if necessary.

4. ACERS's transactions in the AdaptHealth Corp. securities that are the subject of this action are set forth in the chart attached hereto.

5. ACERS has sought to serve as a lead plaintiff and representative party on behalf of a class in the following action under the federal securities laws filed during the three-year period preceding the date of this Certification:

   *Winter v. Stronghold Digital Mining, Inc.*, No. 22-cv-3088 (S.D.N.Y.)

6. ACERS has served as a representative party on behalf of a class in the following action under the federal securities laws filed during the three-year period preceding the date of this Certification:

   *Allegheny County Employees' Retirement System v. Palantir Technologies Inc.*, No. 22-cv-2805 (D. Colo.)

7. ACERS will not accept any payment for serving as a representative party on behalf of the Class beyond ACERS's pro rata share of any recovery, except such reasonable costs and expenses (including lost wages) directly relating to the representation of the Class, as ordered or approved by the Court.

I declare under penalty of perjury that the foregoing is true and correct. Executed this _10_ day of October, 2023.

John K. Weinstein
*Treasurer of Allegheny County, on behalf of*
*Allegheny County Employees' Retirement System*

**Allegheny County Employees' Retirement System**
**Transactions in AdaptHealth Corp.**

| Transaction | Date | Shares | Price |
|---|---|---|---|
| Purchase | 1/6/2021 | 1,300 | 33.0000 |
| Purchase | 1/14/2021 | 350 | 37.2623 |
| Purchase | 1/15/2021 | 520 | 37.4305 |
| Purchase | 1/19/2021 | 270 | 37.3112 |
| Purchase | 1/20/2021 | 740 | 37.7050 |
| Purchase | 2/8/2021 | 1,030 | 35.3277 |
| Purchase | 8/23/2022 | 867 | 20.9086 |
| Purchase | 8/24/2022 | 690 | 20.6020 |
| Purchase | 8/31/2022 | 670 | 18.1342 |
| Purchase | 9/16/2022 | 422 | 20.1525 |
| Purchase | 9/19/2022 | 43 | 21.3484 |
| Purchase | 9/19/2022 | 979 | 21.7911 |
| Purchase | 9/22/2022 | 393 | 20.0412 |
| Purchase | 9/23/2022 | 320 | 19.4092 |
| Purchase | 9/26/2022 | 647 | 19.7161 |
| Purchase | 9/30/2022 | 800 | 18.8043 |
| Purchase | 10/3/2022 | 530 | 19.3550 |
| Purchase | 10/12/2022 | 360 | 21.0172 |
| Purchase | 10/13/2022 | 100 | 21.5534 |
| Sale | 9/14/2020 | (1,796) | 22.1150 |
| Sale | 7/19/2021 | (60) | 23.9803 |
| Sale | 7/21/2021 | (780) | 22.4711 |
| Sale | 3/1/2022 | (658) | 15.9295 |
| Sale | 3/2/2022 | (1,010) | 15.5927 |
| Sale | 3/3/2022 | (1,274) | 15.0322 |
| Sale | 3/4/2022 | (428) | 15.0023 |