## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| *In re AdaptHealth Corp. Securities Litigation* <br><br> *vs.* <br><br> *AdaptHealth Corp., Luke McGee, Stephen P. Griggs, Joshua Parnes, Jason A. Clemens, Shaw Rietkerk, Wendy Russalesi, Rodney Carson, Alan Quasha, Frank J. Mullen, Richard Barasch, Terence Connors, Dr. Susan Weaver, Dale Wolf, Bradley Coppens, David S. Williams III, Deutsche Bank Securities Inc., Jefferies LLC, BofA Securities, Inc., Truist Securities, Inc., Robert W. Baird & Co. Incorporated, RBC Capital Markets, LLC, Stifel, Nicolaus & Company, Incorporated, UBS Securities LLC, Canaccord Genuity LLC, and Leerink Partners LLC,* <br><br> Defendants. | Case No. 2:23-cv-04104-MRP <br><br> **AMENDED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS** <br><br> <u>JURY TRIAL DEMANDED</u> |

# TABLE OF CONTENTS

**Page**

THE EXCHANGE ACT CLAIMS ................................................................................. 2

I.    INTRODUCTION .......................................................................................... 2

II.   JURISDICTION AND VENUE ..................................................................... 9

III.  THE VITAL IMPORTANCE OF THE SECURITIES LIABILITY REGIME IN THE UNITED STATES ............................................................ 9

THE EXCHANGE ACT CLAIMS ............................................................................... 11

IV.   THE EXCHANGE ACT PARTIES ............................................................. 11

    A.    Lead Plaintiffs ................................................................................... 11

    B.    The Exchange Act Defendants ......................................................... 12

V.    OVERVIEW OF THE FRAUD ................................................................... 16

    A.    Background On AdaptHealth's Business And The Investment Thesis For Its Stock ...................................................................................... 17

    B.    Defendants Falsely Claimed That AdaptHealth's Growth Was Sustainable And Driven By Systems That Limited Fraud, Improved Accuracy, And Ensured Patients Received Needed Supplies ......................................... 21

        1.    Defendants Falsely Portrayed AdaptHealth As Having Unique Advantages In Ensuring Compliance With Critical Regulations To Prevent Fraud and Abuse ......................................... 21

        2.    AdaptHealth Falsely Portrayed Its Technology Platform As Improving Compliance, As Well As The Patient And Provider Experience ......................................................................... 23

        3.    Defendants Made False Or Misleading Statements Regarding AdaptHealth's Acquisition Integration .............................. 25

    C.    In Reality, AdaptHealth Pressured Employees To Meet Unrealistic Revenue Targets Without Regard For Regulatory Compliance Or Technological Integration ....................................................................... 28

    D.    Defendants Utilized Fraudulent Billing Practices To Make Sales Quotas And To Boost Revenue ................................................................. 34

i

1.  AdaptHealth Knowingly Used Incorrect Billing Codes To Boost Sales ................................................................. 35

    a)  Former Employees And An Industry Watchdog Confirm AdaptHealth Used Improper Billing Codes To Boost Revenue ............................................................. 35

    b)  AdaptHealth Management Did Not Put Systems In Place To Check The Use Of Improper Billing Codes And Ignored Complaints From Employees ......................... 40

    c)  Claims Data From Around The Country Confirm AdaptHealth's Improper Billing Practices. .................. 42

    d)  AdaptHealth Was On Notice Of The Risks Of Not Complying With CMS's Billing Code Requirements. ................ 44

2.  Defendants Shipped Unwanted And Unnecessary Supplies, Forcing Patients To Foot The Bill ............................. 45

3.  Employees Falsified Medical Records And Shipped Orders Without Required Documentation ............................ 50

E.  For Months Or Years, AdaptHealth Did Not Even Attempt To Successfully Integrate Its Many Acquisitions, Which Were Riddled With Problems ............................................... 55

1.  Rather Than Increasing Compliance, AdaptHealth Actually Cut Compliance Systems And Controls At Acquired Companies ................ 56

2.  AdaptHealth Did Not Otherwise Actually Integrate Acquisitions Onto Its Supposedly Technologically Superior Systems ......................... 58

3.  AdaptHealth's Belated Integration Efforts Led To Major Problems ........ 62

F.  AdaptHealth's Failure To Integrate Acquisitions And Implement Adequate Controls Led To Significant Increases In Patient Complaints And A State Investigation ....................................... 67

VI.  THE TRUTH EMERGES ................................................. 73

A.  On March 1, 2022, AdaptHealth Reveals It Has Virtually No Controls Over Its Financial Reporting ....................................... 73

B.  On February 27, 2023, AdaptHealth Discloses Q4 And Full-Year 2022 Earnings And Revenue Miss And Lowered Guidance ......................... 78

C.      On May 9, 2023 AdaptHealth Announced Q1 2023 Results And The
        Departure of CEO Stephen Griggs ....................................................... 83

D.      On November 7, 2023, AdaptHealth Announced Q3 Losses Resulting
        From A Massive Goodwill Impairment Charge ................................... 84

VII.    DEFENDANTS'     FALSE     AND     MISLEADING     STATEMENTS     AND
        OMISSIONS ..................................................................................................... 86

A.      Defendants Misstated AdaptHealth's Revenue and EBITDA Throughout
        the Class Period............................................................................................ 86

B.      Defendants Falsely Portrayed AdaptHealth As Possessing Critical
        Compliance Infrastructure ....................................................................... 90

C.      AdaptHealth Falsely Claimed That Its Technology Improved The Patient
        And Provider Experience And Drove AdaptHealth's Revenue And
        Earnings Growth ..................................................................................... 102

D.      Defendants Made False Or Misleading Statements Regarding
        AdaptHealth's Acquisition Integration ................................................. 112

E.      Defendants Made Materially False Or Misleading Statements Regarding
        Risks......................................................................................................... 115

VIII.   ADDITIONAL ALLEGATIONS OF SCIENTER............................................ 117

A.      Defendants Knew They Had Not Integrated Acquisitions And Were
        Warned Of Rampant Improper Billing Practices.................................. 117

B.      Defendants Were Made Aware Of Material Weaknesses In The
        Company's Internal Control Over Financial Reporting ...................... 118

C.      Improper Billing Practices Were Dictated By Management And Were
        Done To Achieve Revenue Targets .................................................... 122

D.      Defendants Stated They Oversaw AdaptHealth's Compliance Program
        And Had Real-Time Access To Any Billing Trends That Required
        Correction ............................................................................................ 125

E.      Defendants Frequently Spoke With Specificity And In Response To Direct
        Analyst Questions About The Topics Of Their False Statements ..................... 126

F.      Defendants' Statements Concerned Matters Critical To The Success Of
        The Company.......................................................................................... 129

G.  Defendants Were Well Aware Of The Risks Of Failing To Integrate Acquisitions And Policing Improper Billing Practices And Had Received Suspension Notices From Medicare For Improper Billing Practices ................ 130

H.  The Magnitude, Extent, And Pervasiveness Of AdaptHealth's Improper Billing Practices Supports Scienter .................................................... 131

I.  During The Class Period, AdaptHealth Was Subject To A *Qui Tam* Complaint And Government Investigation Into Its Improper Billing Practices ............................................................................................ 133

J.  AdaptHealth Faced A Class Action Lawsuit Regarding Issues With Its Technology Platform ................................................................... 134

K.  The Sudden Departure Of AdaptHealth's CEO Supports Scienter ................... 135

L.  Officers And Directors Personally Benefitted From Incentive Compensation Tied To AdaptHealth's Ability To Achieve Revenue Growth .......................................................................................... 135

IX.  LOSS CAUSATION ................................................................................ 137

X.  INAPPLICABILITY OF STATUTORY SAFE HARBOR .......................................... 140

XI.  PRESUMPTION OF RELIANCE ................................................................... 140

COUNT I ................................................................................................ 142

For Violations of Section 10(b) of the Exchange Act and SEC Rule 10b-5 Against the Exchange Act Defendants ................................................. 142

COUNT II ............................................................................................... 144

For Violations of Section 10(b) of the Exchange Act and SEC Rule 10b-5(a) and (c) Against the Exchange Act Defendants .......................................... 144

COUNT III .............................................................................................. 147

For Violations of Section 20(a) of the Exchange Act  Against the Individual Exchange Act Defendants and Defendant Quasha ............................... 147

THE SECURITIES ACT CLAIMS ..................................................................... 148

XII.  JURISDICTION AND VENUE .................................................................... 149

XIII.  THE SECURITIES ACT PLAINTIFFS .......................................................... 150

XIV.  SECURITIES ACT DEFENDANTS .............................................................. 150

A.      Securities Act Officer Defendants ........................................................ 150

B.      Director Defendants ............................................................................... 151

C.      Underwriter Defendants ......................................................................... 152

XV.    BACKGROUND OF THE SECURITIES ACT CLAIMS ............................................. 154

XVI.   THE   SPO   OFFERING   MATERIALS   CONTAINED   MATERIAL
       MISSTATEMENTS AND OMISSIONS ......................................................................... 157

A.      Untrue Statements Regarding AdaptHealth's Revenue And EBITDA ............. 157

B.      The SPO Offering Materials Contained Untrue Statements Regarding
        AdaptHealth's Abilities To Bill Clients Accurately. ........................................... 160

C.      The SPO Offering Materials Contained Untrue Statements Regarding The
        Strength Of AdaptHealth's Internal Controls. .................................................... 162

D.      The SPO Offering Materials Contained Untrue Statements Regarding
        AdaptHealth's Integration Of Acquisitions. ....................................................... 164

E.      The SPO Offering Materials Contained Untrue Statements Regarding
        Risks That Had Already Manifested. ................................................................... 165

        1.      The Risk Disclosures Treated Realized Risks As Contingent And
                Hypothetical ............................................................................................ 165

        2.      Defendants Violated Regulation S-K By Failing To Disclose
                Material Adverse Trends And The Risks Facing AdaptHealth .............. 167

XVII.  THE   SECURITIES   ACT   DEFENDANTS   FAILED   TO   EXERCISE
       REASONABLE CARE OR CONDUCT A REASONABLE INVESTIGATION IN
       CONNECTION WITH THE SPO. ................................................................................. 169

XVIII. SECURITIES ACT CAUSES OF ACTION ................................................................. 171

COUNT III .......................................................................................................................... 171

       For Violations of Section 11 of the Securities Act  Against the Securities Act
               Defendants ............................................................................................... 171

COUNT IV ........................................................................................................................... 172

       For Violations of Section 12(a)(2) of the Securities Act  Against the Underwriter
               Defendants ............................................................................................... 172

COUNT V ............................................................................................................................. 173

For Violations of Section 15 of the Securities Act  Against the Individual
Securities Act Defendants .................................................................................. 173

XIX.   CLASS ACTION ALLEGATIONS ............................................................. 174

XX.    PRAYER FOR RELIEF ............................................................................. 176

XXI.   JURY DEMAND .......................................................................................... 176

Plaintiffs Allegheny County Employees' Retirement System ("ACERS"), International Union of Operating Engineers, Local No. 793, Members Pension Benefit Trust of Ontario ("Local 793"), and City of Tallahassee Pension Plan ("Tallahassee") (collectively, "Lead Plaintiffs") by and through their counsel, bring claims under Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act"), and U.S. Securities and Exchange Commission ("SEC") Rule 10b-5(a), (b), and (c) promulgated thereunder on behalf of themselves and all other similarly situated persons who purchased or otherwise acquired the common stock of AdaptHealth Corp. ("AdaptHealth" or the "Company") between August 4, 2020 and November 7, 2023, inclusive, (the "Class Period"), and were damaged thereby (the "Class"). Lead Plaintiffs ACERS and Tallahassee separately bring claims under Sections 11, 12(a)(2), and 15 of the Securities Act of 1933 (the "Securities Act") on behalf of themselves and all other similarly situated persons who purchased AdaptHealth common stock at artificially inflated prices in or traceable to a secondary public offering ("SPO") during the Class Period and suffered damages as a result.

Lead Plaintiffs allege the following upon information and belief, except as to those allegations concerning Lead Plaintiffs, which are alleged upon personal knowledge. Lead Plaintiffs' information and belief is based upon, *inter alia*, Lead Counsel's investigation, which includes review and analysis of: (i) regulatory filings made by AdaptHealth with the SEC; (ii) press releases, presentations, and media reports issued by and disseminated by the Company; (iii) analyst and media reports concerning the Company; (iv) interviews with former employees of AdaptHealth; and (v) other public information regarding the Company.

Lead Counsel's investigation into the factual allegations contained in this Complaint is continuing, and many of the relevant facts are exclusively within the custody or control of

Defendants. Lead Plaintiffs believe that substantial additional support will exist for the allegations set forth in this Complaint after a reasonable opportunity for further investigation or discovery.

<u>**THE EXCHANGE ACT CLAIMS**</u>

## I.    INTRODUCTION

1.    This case arises from materially false and misleading statements made by AdaptHealth and its senior executives. For over three years, these executives reported revenue figures that they knew, or were reckless in not knowing, were inflated by a series of illicit billing practices that bilked Medicare, Medicaid, and other insurance payors while "balance billing" innocent patients for medical supplies they did not order or need. Instead of correcting these practices and acknowledging the source of AdaptHealth's outwardly impressive revenue growth, Defendants attributed the Company's apparent success to purportedly legitimate factors and its supposed "competitive strengths" within the home medical device industry. Defendants claimed that AdaptHealth differentiated itself from its competitors through the Company's systems to comply with critical federal regulations; its unique technology that drove a far better patient experience; and its speedy and effective integration of its many acquisitions. In an industry riddled with, as Defendants acknowledged, "fraud, waste, [and] abuse" and a "graveyard" of companies that imploded after going on acquisition sprees, Defendants' representations that AdaptHealth was an industry disrupter were particularly important to investors. But Defendants' statements were at odds with reality: According to more than a dozen AdaptHealth former employees who spoke with Lead Counsel and industry watchdog The Capitol Forum, AdaptHealth routinely engaged in improper and unethical tactics to inflate sales numbers, including using improper billing codes, submitting claims without proper documentation, altering doctor prescriptions, shipping unwanted and unnecessary equipment, and, finally, balance billing patients when insurance would not pay

phony claims. Moreover, AdaptHealth gutted compliance efforts, never effectively implemented its supposedly vaunted technology, and delayed integration efforts for months or years.

2.    Lead Plaintiffs were investors in AdaptHealth and are responsible for safeguarding the retirements of working people in Allegheny County, Ontario, and Tallahassee. Like other AdaptHealth investors, Lead Plaintiffs were entitled to rely on Defendants' representations about AdaptHealth's supposed competitive advantages. And from August 4, 2020, through November 7, 2023, the market *did* rely on those representations. Lead Plaintiffs suffered significant losses on the retirement assets they manage for their beneficiaries when the truth about AdaptHealth's business emerged.

3.    Throughout the Class Period, AdaptHealth sold investors on a strategy of acquiring and integrating dozens of home medical equipment suppliers, particularly in growth industries like sleep aid machines and diabetes monitoring devices. Investors questioned whether this strategy would be successful because other companies had failed at this strategy, either because they did not implement the tools and systems to comply with federal regulations governing insurance reimbursement, or they were unable to integrate the companies they acquired. In response to questions from wary securities analysts, Defendants repeatedly stated that AdaptHealth's ability to produce increased revenue from the companies it acquired was simply a matter of good business, strong compliance, and better technology. For example, in August 2020, Defendant and former CEO Luke McGee—who was shortly thereafter criminally charged in a massive tax fraud— claimed that AdaptHealth's technological innovations "alone" were responsible for the "revenue bump" that AdaptHealth reported at its acquired companies.

4.    Significantly, Defendants reassured investors that the Company had a uniquely effective ability to comply with regulations governing reimbursement in the historically "dirty"

home medical device industry. They touted the clean implementation of specific AdaptHealth auditing and billing systems (such as "Audit Share") as reducing both fraud and errors, stating that those systems provided a "good check on fraud, waste and abuse." As Defendant and Chief Compliance Officer Russalesi told investors in detail, AdaptHealth claimed to have developed a compliance program that "prevent[ed] misconduct, which allows us to achieve our goal of delivering the best patient care, while minimizing business risk." And when Medicare changed the regulatory regime for devices sold by AdaptHealth to make them less profitable, Defendants claimed the switch was "nothing that we're concerned about whatsoever."

5.     Finally, Defendants assuaged concerns from investors and analysts about AdaptHealth's ability to do what other healthcare companies on acquisition binges could not—smoothly integrate different companies into a single entity, all while increasing revenue. Defendants assured investors they had already integrated the dozens of companies AdaptHealth had acquired and had successfully deployed its cutting-edge technology throughout the Company. For instance, Defendant CFO Jason Clemens told investors that "what we're seeing as we exit 2021 is *the full integration of technology across the company*….*We fully integrated it.*"

6.     These representations—and many others like them—were highly important to investors. Not only did investors gain comfort that AdaptHealth could appropriately "navigate" the critical billing environment for healthcare companies, but they also understood that patients' experiences would improve, driving customer satisfaction and future organic growth. For example, Deutsche Bank recommended that investors buy AdaptHealth stock, noting that "by all accounts AHCO's compliance program remains robust by industry standards" and that "[we] feel comfortable with AHCO's compliance program and the people running it." In a November 5, 2021 report, analysts at SVB Leerink wrote, "We sense tremendous enthusiasm and progress to leverage

AHCO's internal technology into power connected care patient engagement strategies." Propelled by Defendants' statements, AdaptHealth's stock price soared from $20.43 at opening on August 4, 2020, the first day of the Class Period, to a Class Period high of ***$40.15***, nearly doubling in price.

7.      Unbeknownst to investors, however, Defendants' statements were misleading. In truth, the Company ***gutted*** compliance efforts at its acquired companies and pressured employees to resort to numerous illicit billing practices to achieve revenue "bumps." A former senior manager at Solara Medical Supplies ("Solara"), AdaptHealth's largest diabetes acquisition, described AdaptHealth's practices as the "wolf guarding the henhouse." AdaptHealth imposed new, unrealistic sales quotas, which they incentivized employees to meet by, for example, improperly "upcoding" patient transactions to obtain higher reimbursements from insurers for life-saving diabetes devices. Medicaid claims data from states around the country confirms that AdaptHealth used improper codes to bill insurance for the vast majority claims for diabetes supplies. In Louisiana, where the Attorney General has opened a criminal investigation of AdaptHealth for its billing practices, claims data shows that AdaptHealth used improper codes in 97% of its reimbursement claims.

8.      AdaptHealth encouraged employees to engage in other illicit practices to meet the unrealistic sales quotas. When claims for reimbursement did not meet documentation requirements, employees altered doctor's prescriptions and notes to make the sale. Former employees at Pinnacle Medical Solutions ("Pinnacle"), another large AdaptHealth acquisition, stated that as much as 50% of all shipments were to patients who did not have proper paperwork or did not meet the medical requirements for insurance coverage. Even when patients did not want and did not request AdaptHealth products, employees frequently sent them unwanted medical equipment and supplies, draining patients' much-needed insurance coverage—or auto-billing

patients' credit cards without consent if insurance refused to pay. As explained below, these practices had a disastrous effect: customer complaints skyrocketed, driving patient attrition and crippling sales growth.

9.    Moreover, other than squeezing the acquired companies for every penny of revenue possible—allowing the executive Defendants to obtain significant "synergy" bonuses—Defendants ignored their own statements that they immediately and smoothly integrated AdaptHealth's acquisitions. As detailed by former employees, AdaptHealth's integration efforts did not truly *begin* for months or years after an acquisition was completed. This was well after investors had been led to believe that the acquisitions had already been efficiently subsumed into AdaptHealth. When AdaptHealth did belatedly attempt to integrate acquired companies into AdaptHealth's centralized systems, those integration efforts blew up—exactly the risks that investors believed the Company had already avoided.

10.    AdaptHealth's illicit billing practices allowed the Company to, at least for some time, inflate its revenue. Because AdaptHealth calculated its revenue based on what the Company *sought* to receive in reimbursements from insurers and not revenue the Company has *actually* received, AdaptHealth used illicit billing practices, such as upcoding, and shipped unwanted and unordered products to patients, to report higher revenue numbers quarter after quarter—without any regard as to whether the Company would actually realize the inflated numbers that it reported. Multiple former employees described AdaptHealth's reckless practices as "insane" and "crazy" and confirmed that AdaptHealth was more concerned with "getting numbers on the books" than patient care. One former employee at an acquired company stated that, before AdaptHealth, "We had pretty high reviewing standards for our orders, going back to doctors to make sure what was ordered was what was needed." "AdaptHealth came in and shut down a lot of that," the former

employee said, because "[i]t was now all about the speed of turning orders around, not the quality. More and more quotas, higher quotas. It just got insane."

11.    In March 2022, the market began to get some inkling of the impact from AdaptHealth's failure to comply with reimbursement requirements and integrate its multiple acquisitions. On March 1, 2022, in its first independently audited annual report as a public company, AdaptHealth admitted that the Company suffered from materially ineffective "process level controls" in "***substantially all processes***" that underlay the Company's financial reporting—which would include the auditing and billing processes that the Company had touted as a competitive strength. AdaptHealth's stock price declined materially in response, dropping 12% by the next day. But Defendants asserted that these weaknesses were limited and simultaneously announced significant new technological developments that would supposedly remediate any possible weaknesses.

12.    The full consequences of AdaptHealth's undisclosed actions—and the resulting impairment of the Company's diabetes device practice—did not begin to publicly manifest until February 2023. Following quarter after quarter of the Company trumpeting its diabetes division as a major growth driver, the Company suddenly reversed course, admitting that its diabetes business had grown far more slowly than expected, and disclosing total 2022 net revenue $50 million below the guidance the Company had previously provided to the market. On this negative news, the price of AdaptHealth stock declined ***27%***. Defendants told analysts that the earnings miss was due to a "lack of visibility" driven by its admitted internal controls weakness, not the destruction brought by the Company's undisclosed practices. However, Defendants claimed that this lack of visibility had been addressed by a rigorous internal audit, preventing such surprises in the future.

13.     Despite the Company's assurances, more surprises remained. On May 9, 2023, before the market opened, the Company issued earnings results for the first quarter that were far below expectations based on Defendants' prior statements. AdaptHealth admitted that its lower earnings were attributable to "a decline in our Diabetes business," as the Company's patients fled AdaptHealth. In response, AdaptHealth stock fell 6.4%, but analysts, believing in the Company's longstanding claims about the underlying strength of AdaptHealth's business, continued to recommend the stock as they "expect[ed] sequential improvement in the diabetes business" following the announcement.

14.     On the heels of the May 9 disclosure, the Company also disclosed that Defendant Griggs would be leaving the Company, without any explanation or identified permanent replacement.

15.     On November 7, 2023, investors finally learned the full extent of AdaptHealth's failure to fully integrate its acquisitions, as the Company wrote down hundreds of millions of dollars in accounting "goodwill" that was recorded as a result of the acquisitions. AdaptHealth announced fourth quarter results for 2023 and disclosed a net loss of $454.1 million, "largely resulting from a $511.9 million pre-tax write down of goodwill." Goodwill is meant to reflect the expected growth and synergies that result from combining two companies—in other words, the whole is more than the sum of its parts. AdaptHealth's major writedown of goodwill notified the market that its acquisition strategy had ***not*** produced the synergies and growth Defendants had claimed. As discussed below, AdaptHealth had never actually integrated its acquired companies and when it belatedly tried, the attempts were massive failures. Following this disclosure, AdaptHealth's stock dropped ***23%*** over two days as investors received and digested the news.

16.     In all, Defendants' materially false and misleading statements concealing AdaptHealth's true ability to successfully integrate its acquisitions and the impact illicit business practices—and the market's realization of the truth—led AdaptHealth stock to fall *83.8%* from its Class Period high of $40.15. In the process, investors lost hundreds of millions of dollars.

## II.    JURISDICTION AND VENUE

17.     The claims asserted herein arise under Sections 10(b) and 20(a) of the Exchange Act, 15 U.S.C. §§ 78j(b) and 78t(a), and Rule 10b-5 promulgated thereunder by the SEC, 17 C.F.R. § 240.10b-5.

18.     This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §§ 1331 and 1337 and Section 27 of the Exchange Act, 15 U.S.C. § 78aa.

19.     Venue is proper in this District under 28 U.S.C. § 1391(b) and Section 27 of the Exchange Act, 15 U.S.C. § 78aa(c), because AdaptHealth maintains its headquarters in this District and many of the acts giving rise to the violations complained of in this action, including the preparation and dissemination of materially false and misleading statements, occurred in substantial part in this District.

20.     In connection with the acts alleged herein, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including but not limited to the mails, interstate telephone communications, and the facilities of the national securities markets.

## III.    THE VITAL IMPORTANCE OF THE SECURITIES LIABILITY REGIME IN THE UNITED STATES

21.     Congress passed its first securities laws in the midst of the Great Depression following the stock market crash of 1929, including the Securities Act of 1933 and the Securities Exchange Act of 1934, with the aims of ensuring that investors receive sufficient and accurate information and protecting the investing public from fraud and financial manipulation.

22.     In addition to creating the SEC and other reforms, the securities laws permit private actions, such as this one. The Supreme Court has "long recognized . . . [that] meritorious private actions to enforce federal antifraud securities laws are an essential supplement to criminal prosecutions and civil enforcement actions." *Tellabs, Inc. v. Makor Issues & Rts.*, *Ltd.*, 551 U.S. 308, 313 (2007). The Supreme Court has also recognized that these private fraud actions provide a "most effective weapon in the enforcement" of securities law and are "a necessary supplement to [SEC] action." *Bateman Eichler, Hill Richards, Inc. v. Berner*, 472 U.S. 299, 310 (1985).

23.     Among other things, the securities laws govern communications by public company executives and other spokespeople with investors, including communications made in SEC filings, earnings calls, and any other public statements. During the Class Period, AdaptHealth and its executives communicated with the market through required filings with the SEC, including Forms 10-K (annual reports), Forms 10-Q (quarterly reports), and Forms 8-K (interim reports). They also communicated through earnings calls with securities analysts, who are market experts focused on developing their investment thesis and providing recommendations to investors. These calls are highly important forums for market participants to ask critical questions, hear from the executives about what they view as the most material aspects of their business, and, ultimately, determine how the business should be valued.

24.     In addition to these regular communications with investors that are governed by the anti-fraud provisions of the securities laws, Congress passed legislation to offer heightened protection to purchasers of securities in public offerings. Specifically, Congress enacted the Securities Act of 1933 to ensure that investors receive financial and other significant information concerning new securities. As the Supreme Court has recognized, Congress intended to provide with the 1933 Act "greater protection to purchasers of registered securities," in other words,

"purchasers in a registered offering." *Herman & Maclean v. Huddleston*, 459 U.S. 375, 383 (1983). In particular, Section 11 of the Securities Act is "designed to assure compliance with the disclosure provisions of the Act by imposing a stringent standard of liability on the parties who play a direct role in a registered offering." *Id.* at 381-82. To protect purchasers, "[l]iability against the issuer of a security is ***virtually absolute***, even for innocent misstatements." *Id.* at 382. The SEC requires companies issuing new shares in a public offering to disclose key information in the documents and other communications through which securities are registered and through which investors are solicited to purchase in the offering.

25.    AdaptHealth conducted a registered offering on or around January 5, 2021, when it made a SPO of 8 million common shares. In connection with the SPO, AdaptHealth made various representations concerning its business in materials filed with the SEC discussed further below in Section XVI. The disclosures in those filings are subject to a "stringent standard of liability" in order to protect innocent investors, like Lead Plaintiffs, who purchased securities in or traceable to the SPO.

## THE EXCHANGE ACT CLAIMS

## IV.    THE EXCHANGE ACT PARTIES

### A.    Lead Plaintiffs

26.    The Lead Plaintiffs in this action are three pension funds that collectively serve over 35,000 active and retired members. Plan members and their families rely on the retirement benefits offered by the plans, and in order to grow and provide those benefits, the plans all trade in public securities. During the Class Period, Lead Plaintiffs all purchased AdaptHealth common stock at inflated prices due to the misrepresentations alleged in this Complaint, then saw the value of that stock fall when the truth emerged. As reflected in the previously filed certifications (ECF

No. 17), each of the Lead Plaintiffs suffered substantial losses as a result of its investments in AdaptHealth common stock during the Class Period.

27.    Plaintiff Allegheny County Employees' Retirement System is a single employer defined benefit, contributory retirement benefit plan covering substantially all employees of the County of Allegheny, Pennsylvania, including, among others, police officers, firefighters, and other emergency service workers, as well as employees at the county's health department, public parks, and community living centers for the elderly and disabled. ACERS provides retirement, disability, and death benefits for employees and their families and has nearly 12,000 active and retired members.

28.    Plaintiff International Union of Operating Engineers Local No. 793, Members Pension Benefit Trust of Ontario is a Canadian Registered Pension Plan that provides retirement benefits to crane and heavy equipment operators, other skilled workers, and their families. As of December 31, 2022, Local 793 manages retirement assets for the benefit of more than 18,000 active and retired members.

29.    Plaintiff City of Tallahassee Pension Plan is a defined benefit plan for active and retired government employees of the City of Tallahassee, Florida. As of September 30, 2022, Tallahassee managed retirement assets on behalf of over 5,100 participants, including policemen, firefighters, and general employees.

**B.    The Exchange Act Defendants**

30.    Defendant AdaptHealth is a home medical equipment supplier providing devices for diabetes, sleep apnea, and wound care. The Company maintains its principal executive offices at 220 West Germantown Pike Suite 250, Plymouth Meeting, Pennsylvania. AdaptHealth's common stock trades on NASDAQ under the symbol "AHCO." As of August 4, 2023, AdaptHealth had over 136 million shares of common stock outstanding.

31.     Defendant Luke McGee ("McGee") served as AdaptHealth's Chief Executive Officer ("CEO") beginning in 2012, when AdaptHealth was still a private company named QMES, LLC. Defendant McGee also served as a Principal of Quadrant Management, a private equity firm, which owned QMES. Defendant McGee served as sole CEO until February 2, 2021, and as Co-CEO beginning on February 2, 2021. Defendant McGee also served as a Director of the Company from when AdaptHealth became publicly traded in November 2019 until June 11, 2021. Defendant McGee received at least $500,000 in cash bonuses during the Class Period, equal to 100% of his base salary.

32.     On April 13, 2021, AdaptHealth announced that Defendant McGee had been criminally charged with a massive tax fraud in Denmark and was placed on administrative leave; he formally resigned on June 11, 2021. Less than two months before his leave began, Defendant McGee received a $2 million cash bonus "in recognition of his role in the successful close of the AeroCare transaction."[1]

33.     Defendant Stephen P. Griggs ("Griggs") served as AdaptHealth's Co-CEO from February 2, 2021, until June 14, 2021, and as CEO beginning June 14, 2021. Defendant Griggs founded AeroCare Holdings and served as CEO of that company until AdaptHealth acquired AeroCare in 2021. During the Class Period, Defendant Griggs received at least $1,048,398 in cash

---

[1] Following McGee's sudden departure, investors brought a lawsuit against AdaptHealth, McGee, and other executives and board members for violations of the federal securities laws, for materially false and misleading statements and omissions regarding the methodology used to calculate the Company's organic growth and Defendant McGee's involvement in the alleged foreign tax fraud. *See Delaware County Employees Retirement System, et al. v. AdaptHealth Corp. f/k/a DFB Healthcare Acquisitions Corp., et al.*, No. 2:21-cv-03382-HB (E.D. Pa). The Honorable Harvey Bartle III sustained plaintiffs' securities fraud complaint, and rejected Defendants' arguments in favor of dismissal, on June 9, 2022. The same Defendants at issue here recently agreed to settle those claims for $51 million in cash ($1 million personally paid by Defendant McGee), 1 million shares of AdaptHealth common stock, and certain corporate governance reforms.

bonuses. These cash bonuses include a $225,000 bonus for AdaptHealth's supposedly achieving certain "synergies" in connection with the AeroCare acquisition, in addition to equity incentive compensation with a grant date value of $187,655 for AeroCare acquisition synergies. The Company announced Griggs' departure from AdaptHealth on May 9, 2023, which became effective June 30, 2023.

34.     Defendant Joshua Parnes ("Parnes") was at all relevant times AdaptHealth's President and a Director of the Company. Defendant Parnes joined AdaptHealth following the acquisition of Ocean Home Health in 2013; he has been President of AdaptHealth Holdings since August 2017. From 2020 to 2022, Defendant Parnes received at least $1,548,938 in cash bonuses. These cash bonuses include a $225,000 bonus for AdaptHealth's supposedly achieving cost "synergies" in connection with the AeroCare acquisition, in addition to equity incentive compensation with a grant date value of $187,655 for AeroCare acquisition synergies.

35.     Defendant Jason A. Clemens ("Clemens") is, and was at all relevant times, AdaptHealth's Chief Financial Officer and, until March 10, 2023, he also served as the Company's principal accounting officer. Prior to joining AdaptHealth on May 21, 2020, Defendant Clemens served as Senior Vice President and Operations Chief Financial Officer of MEDNAX, Inc. From 2020-2022, Defendant Clemens received at least $974,541 in cash bonuses. These cash bonuses include a $191,250 bonus for AdaptHealth's supposedly achieving cost "synergies" in connection with the AeroCare acquisition, in addition to equity incentive compensation with a grant date value of $159,519 for AeroCare acquisition synergies.

36.     Defendant Shaw Rietkerk ("Rietkerk") is, and was at all relevant times, AdaptHealth's Chief Operating Officer. Defendant Rietkerk joined AdaptHealth in 2018. During

14

the Class Period, Defendant Rietkerk received at least $162,500 in cash bonuses, half of his base salary, in addition to equity incentive compensation.

37.    Defendant Wendy Russalesi ("Russalesi") is, and was at all relevant times, AdaptHealth's Chief Compliance Officer. Defendant Russalesi joined AdaptHealth in 2013. AdaptHealth did not disclose Russalesi's compensation information.

38.    Defendant Rodney Carson ("Carson") is, and was at all relevant times, AdaptHealth's President and Chief Operating Officer, Diabetes. Defendant Carson joined AdaptHealth in January 2020 as the President of AdaptHealth Patient Care Solutions. Prior to joining AdaptHealth, he served as President and CEO of CCS Medical, a home medical supplies provider. AdaptHealth did not disclose Carson's compensation information.

39.    Defendants McGee, Parnes, Griggs, Clemens, Rietkerk, Russalesi, and Carson are collectively referred to in this Complaint as the "Individual Exchange Act Defendants." The Individual Exchange Act Defendants, because of their positions with the Company, possessed the power and authority to control the contents of AdaptHealth's reports to the SEC, press releases, and presentations to securities analysts, money and portfolio managers, and institutional investors. The Individual Exchange Act Defendants were provided with copies of the Company's reports and press releases alleged in this complaint to be misleading before, or shortly after, their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected. Because of their position and access to material non-public information available to them, the Individual Exchange Act Defendants knew that the adverse facts and omissions specified in this complaint had not been disclosed to, and were being concealed from, the public, and that the positive representations and omissions which were being made were then materially false and misleading.

40.    AdaptHealth and the Individual Exchange Act Defendants are collectively referred to herein as the "Exchange Act Defendants."

41.    Defendant Alan Quasha ("Quasha") is a Defendant under Section 20(a) of the Exchange Act, which holds individuals and entities who "control" a violator of Section 10(b) liable. Quasha served as a Director of AdaptHealth from the start of the Class Period through September 1, 2021. Quasha is CEO of Quadrant Management Inc., a principal investment management firm he founded. Prior to being acquired by a Deerfield Management private equity fund (as described further below) and becoming a public company, AdaptHealth was a portfolio company of Quadrant Management, Inc. Following that acquisition, Quasha has had a significant oversight ownership interest in AdaptHealth. Specifically, throughout the Class Period Quasha, through various entities, controlled between 13.5 and 16 million shares of AdaptHealth common stock, which represented between 9.73% and 17.9% of AdaptHealth common stock and commensurate voting power, which afforded him, through those entities, "significant influence" over the Company. Quasha, through the entities he controlled, offered 750,000 shares of AdaptHealth Class A Common Stock for sale in the SPO at $33 per share, for total proceeds of $24,750,000.

## V.    OVERVIEW OF THE FRAUD

42.    The following section details the background of the Company, its fraudulent scheme and false and misleading statements, and the results of Lead Counsel's investigation into AdaptHealth's business practices. Section V.A. explains AdaptHealth's background, its business model, and the central investment thesis that AdaptHealth presented. Section V.B. summarizes how Defendants conveyed that investment thesis during the Class Period in multiple public statements. Section V.C. discusses the reports of multiple AdaptHealth former employees, who detailed how AdaptHealth imposed unrealistic revenue targets on its employees while at the same

time—and in direct contradiction to Defendants' statements—failing entirely to develop an effective compliance and audit system that would prevent and report compliance failures. Section V.D. explains AdaptHealth's illicit billing and sales practices and the independent data demonstrating the same. Section V.E. details how, despite Defendants' claim that "Proven M&A Success" was a "Competitive Strength" for the company, AdaptHealth actually did not integrate its acquisitions' operations for months and even years. Finally, Section V.F. explains how all of these practices led to an onslaught of patient complaints and an investigation by the Louisiana Attorney General.

**A.    Background On AdaptHealth's Business And The Investment Thesis For Its Stock**

43.    AdaptHealth is a provider of home medical equipment, medical supplies, and related services, specializing in sleep therapy equipment, medical devices and supplies for treatment of diabetes. The Company services beneficiaries of Medicare, Medicaid, and commercial insurance payors.

44.    AdaptHealth began as a special purpose acquisition company ("SPAC"). SPACs are entities without commercial operations that are formed strictly to acquire or merge with an existing business or businesses. In 2017, private equity fund Deerfield Management formed the SPAC with the purpose of effecting healthcare mergers, acquiring businesses, or reorganizing and combining similar businesses. On July 8, 2019, DFB announced that it had agreed to acquire AdaptHealth Holdings, LLC (formerly QMES, LLC), a portfolio company of Quadrant Management, Inc. Defendant Quasha was CEO of Quadrant Management, and Defendant McGee

was CEO of AdaptHealth Holdings and a principal at Quadrant.[2] On November 8, 2019, AdaptHealth began trading to investors on the public markets under the symbol "AHCO."

45.    In just a few short years, AdaptHealth became the third largest supplier of home medical equipment in the country through **84** acquisitions of smaller medical supply companies. These acquisitions included its December 2020 acquisition of AeroCare Holdings, Inc. ("AeroCare"), a respiratory and home medical equipment distribution platform; its October 2020 acquisition of Pinnacle Medical Solutions ("Pinnacle"), a major distributor of diabetes medical devices and supplies, including insulin pumps and continuous glucose monitors ("CGMs"); and, as discussed below, Solara Medical Supplies, LLC ("Solara"), the nation's leading distributor of CGMs.

46.    AdaptHealth rewarded its executives well for the apparent success of its acquisition strategy. Defendant McGee received a bonus of **$2 million** for closing the AeroCare acquisition, setting a precedent that acquisitions would lead to lucrative payouts for executives.[3] Indeed, with

---

[2] Following the acquisition and prior to the Class Period, Defendant Quasha's various interests in entities he controlled gave him approximately 20% voting control over the Company, while Defendant McGee's shares gave him 7% voting control. Defendant Quasha, through various entities, offered 750,000 shares of AdaptHealth common stock in the SPO, for proceeds of $24,750,000.

[3] In April 2021, shortly after Defendant McGee received this $2 million bonus, AdaptHealth disclosed that authorities in Denmark had formally charged McGee with "gross fraud," in what one German newspaper termed "one of the biggest tax scandals in Europe." Specifically, the Danish State Prosecutor for Serious Economic and International Crime criminally charged McGee with falsifying trades to secure billions of dollars tax refunds from the Danish government. The Danish State Prosecutor called the scheme the "biggest fraud case in Danish history." The Company placed McGee on unpaid leave, and he ultimately resigned from his position in June 2021. AdaptHealth's Board appointed Defendant Griggs as CEO.

Analysts maintained a positive outlook on the Company, even in the face of those charges. For example, analysts at Jeffries wrote that, although they were disappointed that McGee was going on leave, they believed that their "bull thesis for the company should be unaffected" and that they continued "to see meaningful upside to earnings expectations."

respect to the AeroCare acquisition, more than 80 employees, including named Defendants Clemens, Griggs, and Parnes, received substantial bonuses, with those three receiving hundreds of thousands of dollars in additional cash and equity compensation. The bonuses were based on cutting costs from those acquisitions—without any regard for improving compliance, integrating the companies, or increasing customer satisfaction.

47.    AdaptHealth's strategy of mass acquisitions carried risks. For example, when the acquirer and the acquired company use different technology systems, failure to merge those systems can lead to serious operational disruptions. Additionally, companies often have different operational styles, cultures, and processes. Failure to address those differences can lead to sharply increased customer dissatisfaction and additional operational disruptions. Ultimately, if companies on acquisition binges fail to properly integrate acquired businesses, they risk being unable to reach the cost-savings and revenue increases and may ***reduce***, rather than increase, shareholder value.

48.    These risks were far from abstract. AdaptHealth was undertaking this strategy against a history that caused investors to question whether it would be successful. As Deutsche Bank analysts wrote in a December 3, 2020 report, the healthcare services market had "a graveyard littered with companies that grew rapidly from acquisitions and then imploded" due to their failures to successfully integrate acquired businesses. In fact, in a November 17, 2020 report, Deutsche Bank analysts wrote that the "biggest risk" to AdaptHealth's future success was "the wheels falling off from too many acquisitions, which healthcare service investors [had] seen many times over the years." In light of this history, analysts awaited a "clear picture" of "how they should value AHCO."

49.    Given this backdrop, from its inception, AdaptHealth and the Individual Exchange Act Defendants made a series of statements designed to assuage any investor concern, inspire

investor confidence that AdaptHealth would succeed where others had failed, and thus attract investments in the Company's securities by Lead Plaintiffs and other members of the Class. AdaptHealth differentiated itself from its failed predecessors and struggling peer firms by making three sets of statements about its business (as set forth in detail below). AdaptHealth assured investors that: (1) it had significant experience and proficiency in navigating and complying with applicable healthcare regulations, which reduced regulatory risks; (2) it had a unique "technology platform" that was purportedly far superior to those of its competitors and through which the Company could identify and fulfill critical resupply needs, efficiently and accurately bill patients, and provide an accurate and transparent audit record; and (3) it had already immediately and effectively integrated its dozens of acquisitions, including acquisitions of some of the largest home medical businesses in the country.

50.    Analysts (who are sophisticated market observers) and investors credited AdaptHealth's assurances that it was unique in its industry. For example, analysts at SVB Leerink remarked in August 2020, "AHCO's proven platform for acquiring and integrating businesses supports our estimates calling for rapid revenue and earnings growth." Analysts at Canaccord further commented that AdaptHealth, "has a technology backbone that we believe will support an accelerating organic growth profile." And, similarly, analysts at Bank of America wrote in January 2021: "Through its acquisition-heavy growth strategy, Adapt has proven that its business model is scalable and *it knows how to integrate deals*."

51.    Consequently, in its first year, AdaptHealth's stock experienced skyrocketing growth. At the beginning of 2020, AdaptHealth's stock price hovered between $10 and $12. But by February 1, 2021, AdaptHealth's stock soared to a Class Period high of $40.15.

    **B.**    **Defendants Falsely Claimed That AdaptHealth's Growth Was Sustainable And Driven By Systems That Limited Fraud, Improved Accuracy, And Ensured Patients Received Needed Supplies**

52.    Prior to and during the Class Period, AdaptHealth reported record revenue and strong growth quarter after quarter. In SEC filings, press releases, earnings calls, and investor presentations, Defendants attributed this apparent success to three primary attributes that purportedly set AdaptHealth apart from its competitors.[4]

    **1.**    **Defendants Falsely Portrayed AdaptHealth As Having Unique Advantages In Ensuring Compliance With Critical Regulations To Prevent Fraud and Abuse**

53.    AdaptHealth's experience and protocols for ensuring regulatory compliance was a critical area of focus for investors—and the subject of the Company's public statements. Because AdaptHealth derives nearly a third of its revenue from Medicare and Medicaid, its compliance practices and program were critical to its business. Indeed, violations of some federal and state laws and regulations could result in exclusion from participation in Medicare and Medicaid. The Office of the Inspector General ("OIG") of the Department of Health and Human Services ("HHS") has extensive authority to seek permissive exclusions from Medicare or Medicaid under wide-ranging circumstances—including if a provider or supplier improperly bills either program. *See* 42 U.S.C. § 1320a-7(a)-(b).

54.    Defendants recognized the importance of regulatory compliance to investors from the outset. At a January 2020 investor conference, Defendant and former CEO McGee noted that DME (Durable Medical Equipment)—or Home Medical Equipment as Defendants preferred—had been a "dirty word in healthcare" with "***fraud, waste, abuse***, and competitive bidding, keeping

---

[4] The Class Period statements that Lead Plaintiffs allege were false and misleading are set forth in full below at Section VIII.

investors away." By contrast, according to Defendant McGee, AdaptHealth provided "***absolutely critical***" care to "needy, expensive patient populations" with chronic conditions, including "sleep apnea, diabetes, hypertension, COPD, [and] CHF."

55.    At the beginning of the Class Period in August 2020, AdaptHealth's ability to independently ensure compliance was all the more important to investors because, with the onset of the COVID-19 pandemic in the first half of 2020, CMS had imposed a pause on governmental audits on Medicare regulatory compliance. Because CMS had historically conducted audits, the audit suspension gave AdaptHealth an unprecedented amount of flexibility and independence over its auditing and compliance functions as the Company was continuing to acquire dozens of healthcare businesses and break into the diabetes market. That flexibility and independence remained intact even as the public health emergency came to a close in August of 2020. As Defendant and Chief Compliance Officer Russalesi observed at a September 2022 conference, as of that time Medicare had still not fully resumed audits of AdaptHealth's product lines, and Russalesi did not expect "routine widespread audit activity" until 2023.

56.    Since investors could not rely on CMS to ensure compliance, Defendants recognized the key importance of this attribute for investors and focused on reassuring investors that AdaptHealth had specific systems to comply with federal regulations.

57.    On May 26, 2020, Defendant McGee assured analysts that the Company "know[s] how to bill the federal government" and that billing the federal government was a "nuts and bolts competency" at AdaptHealth. Later during that same conference, Defendant McGee added that AdaptHealth's competitors **"**may not want to deal with federal government because when you screw it up, ***the consequences for screwing and billing up—not billing Medicare correctly are extremely high. And so we invest in audit function.***"

58.    Then, at the same September 2022 conference referenced above, Russalesi provided detailed reassurance to investors that—through a Company-wide emphasis on technology adaptation—AdaptHealth's compliance program was driving a "compliance first culture" even without the stick of Medicare audits. According to Russalesi, "Our program incorporates all of the required elements from the Office of the Inspector General Guidance, as well as factors from the Department of Justice's evaluation of corporate compliance programs." Russalesi also highlighted the Company's "comprehensive education program," as well as AdaptHealth's purportedly "very rigorous internal monitoring program" that gave the Company "pretty much real-time visibility into the business practices and helps us identify any types of trends that need immediate correction."

59.    Similarly, when Medicare changed its guidelines for billing CGM devices—requiring those devices to be billed a "K-codes" rather than more profitable "A-codes"—Defendants claimed that the switch was "***nothing that we're concerned about whatsoever***" and that compliance risks were "nothing that keeps [us] up at night."

60.    Analysts credited Defendants' claims that AdaptHealth had unique strengths in its compliance infrastructure. For example, Deutsche Bank recommended that investors buy AdaptHealth stock, noting that "by all accounts AHCO's compliance program remains robust by industry standards" and that "[we] feel comfortable with AHCO's compliance program and the people running it."

### 2.    AdaptHealth Falsely Portrayed Its Technology Platform As Improving Compliance, As Well As The Patient And Provider Experience

61.    AdaptHealth's "technology platform"—through which the Company identified and fulfilled critical resupply needs, efficiently and accurately billed patients, and provided an accurate and transparent audit record—was purportedly far superior to its competitors. In SEC filings and

other investor communications throughout the Class Period, AdaptHealth insisted that its "Differentiated Technology-Enabled Platform" was one of AdaptHealth's principal "Competitive Strengths."

62.    Defendants further emphasized that AdaptHealth's technology enabled the Company's supposed ability to comply with healthcare regulations and deliver a better patient experience. The Company's annual report filed with the SEC specifically emphasized this business strength, stating that "***AdaptHealth's technology enables automated, compliant, and integrated work flow into patients' delivery of care***," that "its integrated systems and the automated, integrated work flow it provides for patients' delivery of care" enabled "***improved compliance***."

63.    Similarly, at an August 13, 2020 investor conference, noting that Defendants had "talked a lot about [AdaptHealth's] technology platform," an analyst asked Defendant McGee to discuss "the technologies that you're using to improve workflow, supply, supply chain, revenue cycle and whatnot in terms of . . . the resupplies." Defendant McGee responded by claiming that "***just with [AdaptHealth's call center] technology alone, [we] do better than a lot of the companies we acquire and so there's a nice little revenue bump from just more proactive outreach***."

64.    Defendants further asserted that the "efficiencies" offered by its e-prescribing technology benefited doctors and other prescribers. On an August 5, 2021 earnings call, Defendant Parnes claimed that e-prescribing permitted some "***efficiencies on intake technology***" that were "***really allowing our prescribing partners and physicians to really get a much more efficient experience***," and had also secured "***efficiencies . . . in the documentation process***."

65.    At the January 14, 2021 JP Morgan Health Care conference, Defendant McGee and AdaptHealth continued to portray the Company as dedicated to improving the patient experience.

Defendant McGee, in reviewing the slides, highlighted AdaptHealth's resupply capability, claiming: "***This isn't a business where we're just shipping boxes and then hoping to get paid or getting paid upfront. We are managing these patients' lives***. ***We're making sure that they're resupplying***. We're teaching. We're navigating the maze of reimbursement from thousands of insurance companies." AdaptHealth's presentation slides that were distributed at the conference stated that AdaptHealth used "[r]eal time, actionable data ***to drive cost and outcome improvement***" and that the Company was a "[v]alue-add partner to payors, providers, and patients."

66.     Then, at a February 2021 conference, in response to a question about patient acceptance of telemedicine, Defendant and former CEO McGee again asserted vigorously that AdaptHealth was not "just sending boxes" to patients but instead "doing a hell of a lot more than that," and added:

> I want to make sure we remind sort of everyone listening and everyone paying attention. We're not just sending the stuff and sending a bill and getting paid on a credit card, ***not only do we have all the competency to navigate the complex reimbursement environment, we're getting these patients adhering to the therapy***.

67.     Consistent with these claims of superior technology, Defendants McGee, Griggs, and Clemens—in their roles as CEO and CFO—certified that AdaptHealth had, under their supervision, designed systems of "internal control over financial reporting" that would lead to reliable outside financial reporting. In the wake of accounting standing at WorldCom and Enron, Congress required in the Sarbanes-Oxley Act that management report on a company's internal controls over financial reporting. The role of audit, compliance, and billing technology is critical to a company's adequacy of internal controls.

### 3.     Defendants Made False Or Misleading Statements Regarding AdaptHealth's Acquisition Integration

68.     AdaptHealth was purportedly laser-focused on immediately and effectively integrating its dozens of acquisitions, including the major Pinnacle, AeroCare, and Solara

acquisitions. For example, in SEC filings throughout the Class Period, AdaptHealth asserted that, alongside technology, one of AdaptHealth's "Competitive Strengths" was its "Proven M&A Success," whereby AdaptHealth purportedly possessed "scalable and centralized front-end and back office processes that facilitate the effective onboarding of potential acquisitions[.]" In other words, the Company differentiated itself from its competitors—that had fallen apart after failing to integrate acquired companies—based on its ability to effectively and timely integrate its many acquisitions onto its sophisticated technology platforms.

69.    Defendants emphasized their unique strengths in quickly and effective integrations in communications with investors before and throughout the Class Period. At a January 2020 conference, Defendant McGee emphasized the vital importance of AdaptHealth's successful integration of its many acquisitions to date, stating that he "***can't stress enough, these businesses are integrated on our platforms***" and that "***[e]very single acquisition we've done is on our platform, on our RCM [revenue cycle management] systems***. We get these things on our platform in 30 to 90 days." Later on that call, a Jeffries analyst quizzed Defendant McGee on AdaptHealth's ability to integrate its acquisitions, asking "[h]ow do you get investors comfortable that you can integrate that many deals and bigger deals going forward?" McGee responded by assuring investors that they had nothing to worry about, claiming: "all of those deals that we did in 2019, ***they're all integrated on our platforms***." Defendant McGee further boasted that "100%" of AdaptHealth's business was "on a common billing platform," and explained that "We're fortunate to use a billing system that is commonplace throughout the industry and allows us due diligence, integration even more quickly."

70.    During the Class Period, Defendants continued with these same assurances, emphasizing, as Defendant McGee did on the first day of the Class Period, AdaptHealth's "strategy

of growing organically and ***integrating accretive acquisitions onto our technology platform***." When Defendant Griggs came over from AeroCare, he leveraged his credibility as someone who had come in from a company AdaptHealth acquired to tout AdaptHealth's supposed integration ability. On March 4, 2021, Defendant Griggs explained that management "spent time learning the details of our respective businesses, processes and systems" and "it resulted in detailed operating plans to implement best practices, accelerate growth, and drive cost savings." For example, AdaptHealth "***installed common reporting and visibility across the enterprise***," and also "focused on implementing the best practices at the very beginning of the patient setup process to ensure auto pay is enabled and monitored over our [Revenue Cycle Management ("RCM")] lifecycle," to improve collections.

71.     Defendant Griggs highlighted the RCM process again nearly a year later. When an analyst asked Defendant Griggs at a February 2022 conference to compare performance and expectations for integrating AeroCare, Defendant Griggs claimed that a "big initiative was the RCM system" and trumpeted "the growth potential of that and the efficiencies we've been doing there."

72.     At that same conference, Defendant Jason Clemens, AdaptHealth's CFO, reiterated that AdaptHealth was "***seeing . . . the full integration of technology across the company***. And so we're seeing that across the revenue cycle platform. We've got a common revenue cycle platform now. ***We fully integrated it***."

73.     Beyond RCM, Defendant Griggs also claimed that AdaptHealth had implemented best practices overall at AeroCare. On May 4, 2021, Griggs (who was about to take over as sole CEO following Defendant McGee's being charged with a fraudulent tax scheme) again extolled the supposed virtues of his new Company's integration ability, claiming that "***the speed at which***

*we are adopting organizational best practices*" had "exceeded [his] expectations." Defendant Griggs continued by claiming that AdaptHealth and AeroCare had "***made significant progress implementing each organization's strengths across the entire organization***."

74.    Analysts believed that AdaptHealth had successfully integrated its many acquisitions and that this was a strength for the Company. For example, analysts at Bank of America wrote in January 2021, "Through its acquisition-heavy growth strategy, Adapt has proven that its business model is scalable and ***it knows how to integrate deals***."

C.    **In Reality, AdaptHealth Pressured Employees To Meet Unrealistic Revenue Targets Without Regard For Regulatory Compliance Or Technological Integration**

75.    In reality, the only significant change AdaptHealth ***did*** consistently apply to its acquired companies was to lavishly reward executives for rapid extraction of revenue from acquired companies by any means, legitimate or not. Defendant McGee, shortly before his indictment necessitated his leave of absence and eventual resignation, received a $2 million bonus for his role in closing the AeroCare transaction—without regard to compliance or patient care. Similarly, more than 80 executives, including at least Defendants Griggs, Parnes, and Clemens, received substantial bonuses because AdaptHealth achieved $100 million in "gross savings and synergies" by the end of 2021.

76.    In order for executives to obtain these and other extravagant bonuses, they immediately imposed onerous and unrealistic revenue goals and unachievable sales quotas on the employees of acquired companies. Former employees ("FEs") from across AdaptHealth's many acquired businesses uniformly reported that sales quotas and revenue goals were dramatically increased post-acquisition by AdaptHealth, that it drove bad behavior that was repeatedly reported, and that AdaptHealth did not care. A former Human Resource Business Partner who worked at Solara and then AdaptHealth (after the acquisition) from July 2018 to August 2023 (FE 1) stated

that employees routinely complained that AdaptHealth's newly imposed sales goals were unrealistic and were leading to "insurance fraud." FE 1 oversaw human resources for the Company's diabetes division, which consisted of approximately 1,000 employees, and as part of her duties handled formal complaints from employees and communicated them to corporate executives who regularly met with the Defendants.

77.    According to FE 1, within two months after AdaptHealth acquired Solara, employees, including mid-level managers, and even their supervisors, regularly complained that senior management set totally unrealistic goals for sales and instructed employees to "do whatever it takes, whatever makes money" and bill as much as they could. Employees were at their wits end trying to meet the sales goals. FE 1 recalled that these post-acquisition complaints occurred *daily*— in direct contrast to the infrequent complaints she received pre-acquisition—and included repeated concerns that AdaptHealth was double billing insurance, pressuring patients to accept products they did not need, and shipping products they did not order. FE 1 stated that certain of these complaints even stated explicitly that the Company was engaged in insurance fraud. FE 1 explained that before the acquisition, Solara employees' complaints concerned mundane issues such as parking spots. FE 1 confirmed that *all* of the pressure from management to meet unrealistic goals and the resulting complaints of insurance fraud came after AdaptHealth bought Solara.

78.    FE 1 explained that the compensation of all of the managers, including Defendants, were tied to bonus incentives and share deals that depended on the Company hitting performance goals.[5] FE 1 stated that senior managers got "huge six figure bonuses" and specifically recalled that Hector Mendoza, the Vice President of Inside Sales, was "super incentivized" by

---

[5] These performance goals would include the Synergy Bonuses, discussed above at ¶76.

AdaptHealth's bonus structure and was the subject of complaints. FE 1 recalled one complaint that Mendoza told an employee that if she did not do her job, "people will die."

79.    FE 1 recalled how these complaints were reported to the highest executives in the Company, including the Individual Exchange Act Defendants. FE 1 met with her boss "Senior Director 1," a Senior Director of Human Resources, once a week and they went over employee complaints. According to FE 1, Senior Director 1, who came from Solara but was promoted to the corporate level, was responsible for handling and reporting "corporate" complaints, such as claims of fraud, double billing insurance companies, and any compliance complaints against AdaptHealth, like the ones they regularly received from employees (after the acquisition). Other Human Resources executives who were located at AdaptHealth's Pennsylvania headquarters, including "Senior Director 2," another Senior Director of Human Resources, were made aware of the complaints, which were known throughout the department.

80.    According to FE 1, Senior Director 1 and Senior Director 2 were "powerful" executives, "had a place at the table," and had standing weekly meetings with AdaptHealth's executive team in which they reviewed Human Resource department issues affecting AdaptHealth's business. FE 1 knew of the meetings because they appeared on their calendars, to which she had access. She also stated that, in addition to the standing meetings, Senior Director 1 and Senior Director 2 met with executives almost daily, and that these meetings included AdaptHealth's CEO Defendant Griggs, and AdaptHealth's President and Director Joshua Parnes, whose name "came up quite a bit" with Senior Director 1. FE 1 believed that Chief Compliance Officer Defendant Russalesi was also involved in meetings. FE 1 believed it was impossible for Senior Director 1 and Senior Director 2 to have not discussed the complaints with executives

because the issues were so "prevalent" and raised "red flags," and it was Senior Director 1's and Senior Director 2's job to bring these issues to the attention of executives.

81.     According to FE 1, nothing was done at the corporate level about the complaints. During FE 1's weekly meetings with Senior Director 1 in which they went over the complaints, Senior Director 1 regularly told her, "That is the Adapt way, they sell things." Eventually, FE 1 felt that was just the way things would be at AdaptHealth and the Company was willing to tolerate complaints of fraud to hit its unrealistic revenue targets. FE 1 added that after the acquisition Solara lost its "transparent feel" and that executives and managers were incentivized through bonuses tied to performance goals to tolerate bad behavior and not do the right thing. Prior to the acquisition, FE 1 stated that Solara "would never have tolerated" the complaints of fraud that AdaptHealth received.

82.     FE 2, who was a Location Manager at Solara's Michigan location from September 2019 to September 2021, confirmed that when AdaptHealth took over, they set unrealistic sales goals and employees "had to cheat" to achieve management's goals, which stayed the same or increased every quarter—no matter what. As location manager, FE 2 was responsible for all aspects of the diabetes supply business including customer service, patient intake, inside sales (*i.e.*, resupply sales), and shipping. He and his team leaders met at least weekly with executives Jim Vainio, Regional Vice President of Operations, and Hector Mendoza, Vice President of Inside Sales, to review revenue targets and sales numbers that needed to be met to hit the goals. FE 2 stated that if goals were not met, there was "a lot of angry yelling" by Vainio, which came from the executives of AdaptHealth. When FE 2 pushed back about the unrealistic goals, Vainio and Mendoza said, "If we say jump, you should ask how high, and that's it."

83.     FE 3, who worked at Pinnacle and then AdaptHealth from March 2019 to April 2023, confirmed that when AdaptHealth took over, the ***only*** immediate change was to set unrealistic targets and constantly pressure employees to meet those targets by any means necessary. FE 3 worked as an Intake and Inside Sales Specialist and team leader and regularly met at least once a week with her boss Senior Manager 1, and Jim Vainio, Regional Vice President of Operations, to discuss revenue goals and sales targets. FE 3 stated employee bonuses depended on hitting the targets, and management pressured employees to hit targets at month and quarter-end meetings, telling employees the exact number they needed to hit to reach the target. FE 3 confirmed that AdaptHealth's targets for intake and resupply were unrealistic. Employees hit the targets only by resorting to improper billing practices, such as sending orders without documentation. Another former employee who worked as a Diabetes Care Specialist at Pinnacle (FE 4) and then AdaptHealth from July 2020 to July 2021, was responsible for contacting patients and placing resupply orders for diabetes testing equipment. FE 4 stated that Pinnacle's sales goals prior to the acquisition were achievable and realistic, but when AdaptHealth took over they quickly instituted "steep goals" that were "very difficult" to meet. FE 4 recalled that after Pinnacle's acquisition was finalized in January 2021, her sales goals immediately jumped 25% and within two months had doubled.

84.     FE 5, who also worked at Pinnacle and then AdaptHealth as an Inside Sales Specialist from July 2019 to July 2022, confirmed that employee bonuses depended on meeting unrealistic sales goals. FE 5, who worked on intake and resupply orders and verified proper documentation for shipping, explained that when AdaptHealth took over, Senior Manager 1 and Vainio, who was installed by AdaptHealth as Regional Vice President of Operations after the acquisition, started counting the number of phone calls employees made each day. Senior Manager

1 and Vainio communicated goals to employees daily and sometimes hourly during team meetings, through emails, and via Slack instant message. FE 5 described it as "harassing" and if you were not hitting your goals, "you would never hear the end of it." According to FE 5, even if she hit her goals, AdaptHealth would just increase the numbers even when they were not seeing an increase in new patients.

85.    Another Pinnacle employee lamented that patients could not afford the bills that AdaptHealth foisted upon them just to meet its sales goals. In an article entitled "AdaptHealth: Former Employees Say Company Altered Prescriptions and Shipped Unnecessary Diabetes Supplies in Order to Meet High Quotas," published by The Capitol Forum, a subscriber-based investigative news organization and industry watchdog, the Pinnacle employee stated, "When I started, it was very one on one with your patients. We took care of people, helped people get better." But when AdaptHealth took over, things changed, and she explained that "then it just became sales, sales, sales, don't care if the patients are mad or they can't afford to pay, just make as much money as possible."

86.    Other AdaptHealth former employees confirmed that the Company's sales requirements were destructive to patient trust and relationships. FE 6 worked as a Billing Clerk at AeroCare and AdaptHealth from May 2021 until February 2022. According to FE 6, during her tenure and after the acquisition, AdaptHealth implemented unrealistic sales goals and changed the call script with patients to force representatives to pressure patients to accept supplies—even if the patient stated that they did not want a resupply. FE 6 stated that pressure to meet sales was so great that employees regularly shipped product to patients who did not want—and did not ask for—resupplies. FE 6's team leads regularly pressured her to increase her sales to meet AdaptHealth's metrics. But when FE 6 explained that her customers stated that they already had enough supplies,

her managers pushed back and instructed her to mislead patients by telling them old supplies could become unhygienic and needed to be replaced. FE 6 eventually left AdaptHealth because of the pressure to increase her sales unethically.

87.    One former AdaptHealth employee told The Capitol Forum that before AdaptHealth acquired their company, "We had pretty high reviewing standards for our orders, going back to doctors to make sure what was ordered was what was needed." "AdaptHealth came in and shut down a lot of that," the former employee said, because "[i]t was now all about the speed of turning orders around, not the quality. More and more quotas, higher quotas. It just got insane."

### D.    Defendants Utilized Fraudulent Billing Practices To Make Sales Quotas And To Boost Revenue

88.    While AdaptHealth repeatedly claimed throughout the Class Period that its diabetes supply business was experiencing incredible growth because of its supposed success at integrating acquisitions and implementing its state-of-the art technology, in truth, the Company's growth was fueled by improper billing and sales tactics. According to former AdaptHealth employees who spoke with Lead Counsel and industry watchdog The Capitol Forum, AdaptHealth routinely engaged in improper and unethical tactics to inflate sales numbers, including using improper billing codes, submitting claims without proper documentation, altering doctor prescriptions, and shipping unwanted and unnecessary equipment. Additionally, CMS issued suspension notices to two AdaptHealth businesses based on its determination that they "had billed for services which were not rendered and/or were medically unnecessary, and improperly solicited beneficiaries."

89.    As discussed above in Section V.C., AdaptHealth incentivized these practices by imposing onerous sales quotas and enormous perks for managers to meet these quotas. At the same time, as discussed in Section V.E., AdaptHealth deliberately removed any compliance guardrails

that would have prevented these improper practices from taking place. The results were predictable, well-known in the Company, and are described in detail below.

1.     **AdaptHealth Knowingly Used Incorrect Billing Codes To Boost Sales**

a)     **Former Employees And An Industry Watchdog Confirm AdaptHealth Used Improper Billing Codes To Boost Revenue**

90.     Accurate medical billing and proper coding, including the Healthcare Common Procedure Coding System ("HCPCS"), are critical for reimbursement. HCPCS provides a standardized coding system for describing the specific items and services provided in healthcare and dictates the billing codes in the claims that physicians, healthcare providers and suppliers, like AdaptHealth, submit to CMS. Depending on the technology involved, HCPCS provides that diabetes devices are billed using either "A-codes" or "K-codes." Older, traditional finger stick diabetes monitors are billed using A-codes, and qualify for monthly reimbursements of $400, in addition to a one-time sensor reimbursement of $900 to $1200. In contrast, newer devices that are constantly worn by patients, known as continuous glucose monitors ("CGM") are billed using K-codes, and qualify for significantly lower monthly reimbursements of just $250 to $270. After the provider or supplier submits the claims to CMS, CMS then begins processing the claim and, if the correct documents were submitted, distributes payment to AdaptHealth based on rates and coverage policies. If applicable, AdaptHealth will bill the patient for any required co-pays or deductibles.

91.     When AdaptHealth reports its revenue to investors (and evaluates revenue for purposes of employee bonuses), the revenue number that the Company uses is an estimate calculated based on the revenue that it ***sought*** to receive from reimbursements—even if those claims are later rejected and AdaptHealth does not, in fact, ever receive the reimbursements.

AdaptHealth bases its expected reimbursement revenue on fee schedules from insurers, including the HCPCS system.

92.    Former employees reported that AdaptHealth did not adhere to the appropriate fee schedules set by Medicare and Medicaid. Instead, throughout the Class Period, the Company submitted reimbursement claims for CGMs using more expensive A-codes, inflating reimbursements amounts, and thereby allowing AdaptHealth to report higher amounts of expected revenue to investors and for employees to hit their sales quotas and bonus targets. When those claims were ultimately denied, AdaptHealth kept the revenue on their books by passing the bill to patients.

93.    In a November 3, 2022 investigative report by The Capitol Forum, titled "AdaptHealth: Company Inflating Reimbursement from State Medicaid Programs Through Use of Inappropriate Billing Codes for Diabetes Supplies," former employees recounted how "the company pushed its newly acquired subsidiaries to use older and more expensive billing codes, known as 'A-codes' to bill for newer and cheaper CGMs, which should be billed with 'K-codes'."

94.    According to The Capitol Forum, FE 3, who worked at Pinnacle and then AdaptHealth after the acquisition, and who confirmed her account with Lead Counsel, stated that "[w]hen it was just Pinnacle . . . we had a compliance team that made sure we did all of our billing correctly and we never used A-codes." When AdaptHealth took over, that changed. FE 3 confirmed that "once we became Adapt, the rule was to check both codes [A-codes and K-codes] whenever we could and hope that insurers wouldn't notice." FE 3 additionally confirmed that the CGMs AdaptHealth sold were "supposed to be billed with K-Codes" and that Medicare and Medicaid did not reimburse CGMs under A-codes. However, once AdaptHealth took over, management instructed employees to "manually override the system in order to bill with A-codes."

As FE 3 told The Capitol Forum, AdaptHealth employees "were now supposed to push, push, push those A-codes every time."

95.     FE 3 stated that AdaptHealth purposefully delayed implementing code changes on its billing system so that it could book more revenue and meet sales targets. According to FE 3, Medicare asked AdaptHealth to bill CGMs using only K-codes. Nevertheless, management told representatives to use A-codes "for now." During the Class Period, FE 3 attended weekly managers' meetings run by Jim Vainio, Regional Vice President of Operations, attended by team leaders and managers in AdaptHealth's intake, documentation, billing, re-order, and customer service departments, including "Regional Director 1," AdaptHealth's Regional Director of Customer Service, and Senior Manager 1. During these meetings managers raised concerns about billing codes and specifically complained that AdaptHealth was using the wrong codes to bill for CGMs. During one meeting, FE 3 recalled that a manager stated that AdaptHealth should not be billing A-codes because they were outdated. Regional Director 1 candidly responded that the reason AdaptHealth used A-codes was because "well, it pays more."

96.     FE 3 confirmed that AdaptHealth engaged in improper billing to boost revenue, explaining that AdaptHealth based revenue on "everything they billed out" without regard to whether the Company could collect on the full amount. In other words, employees were encouraged to bill whatever they could to hit revenue targets even if they knew that the use of A-codes or other improper practices meant that it was unlikely AdaptHealth would ever be reimbursed. As an example, FE 3 stated that AdaptHealth might have billed $5 million worth of product knowing that insurance would only cover $1 million. Nevertheless, the full $5 million would be booked as revenue.

97.     National employees also confirmed the improper use of A-codes at the direction of the Company's management. A former employee who worked at AdaptHealth's national diabetes division and oversaw the acquisition of several diabetes equipment supply companies, told The Capitol Forum that AdaptHealth knew that it should be using K-codes to bill for the CGMs, because it did not sell many older CGMs that would have qualified for A-codes. The former employee stated that AdaptHealth "pretty much only sold Dexcom and Freestyle Libre, and the FDA guidelines specifically says these products are therapeutic, indicating they should be billed with K-code, but they did it with the A-code . . . because K-codes only reimburse for $258 a month, and they could get a lot more with the A-codes." FE 7, a Reimbursement Manager who worked at AdaptHealth from June 2018 to April 2021, confirmed that senior management encouraged the use of A-codes because AdaptHealth could charge more for CGMs using those codes. FE 7 covered the region of North Carolina, South Carolina, Virginia, Florida, and parts of Texas, and managed a team of approximately 30 specialists who reviewed and addressed problems with claims, and his duties included reporting denial trends to senior leaders. According to FE 7, his team of about 30 specialists were told that since "A-codes would probably pay more, use an A-code." FE 7 confirmed that AdaptHealth did not have an automated system to ensure that the correct codes were used and did not provide any formal guidance to employees. FE 7 explained that when his team had questions about which code to apply, his boss Senior Vice President 1, AdaptHealth's Senior Vice President of Revenue Management would "run it up the chain" and confer with "Customer Relations Officer 1." Senior Vice President 1 would relay instructions to use A-codes, which "will pay the amount we want."

98.     According to FE 5, an Inside Diabetes Specialist at Pinnacle and then AdaptHealth from approximately July 2020 to July 2022, A-codes should never have been used to bill for

CGMs, but AdaptHealth frequently used them to get around limits on the use of K-codes. FE 5 worked directly with AdaptHealth's billing platform Brightree and personally saw that CGMs were frequently billed using A-codes. According to FE 5, Medicare and Medicaid patients could only use a K-code to obtain a new monitor once every 5-6 years. AdaptHealth used A-codes as a loophole to get around the limit. FE 5 added that AdaptHealth billed A-Codes without regard to insurer or government reimbursement policies because if the bills using A-Codes were rejected, AdaptHealth would simply pass the bill the patients, who had been told that insurance would cover the costs. FE 5 told The Capitol Forum and confirmed to Lead Counsel that patients often called and said, "I've got a bill for this now from my company and you told me it would be covered." According to FE 5, AdaptHealth would tell the patient, "Sorry, that's on you to pay it now" and told patients to work it out with their insurance provider. But AdaptHealth knew that patients would not be able to figure out the difference between A-codes and K-codes and that navigating coding issues was "basically impossible" for patients. FE 5 stated that AdaptHealth did not care whether patients would actually pay in the long run, because it was just about trying to make the revenue numbers look good, stating "I don't even think they thought twice about it."

99.    Former employees who had worked at Solara, another one of AdaptHealth's major acquisitions, confirmed similar upcoding practices. A former Solara sales representative told The Capitol Forum that "I would often get calls from patients complaining about these huge bills, and it would turn out that was because we had been using A-codes on them and insurance refused to pay." The former employee emphasized that this was standard practice at AdaptHealth, saying "Bill A-codes no matter what, if insurance rejects, balance bill the patient, that was what we did."[6]

---

[6] Balancing billing is "[w]hen a provider bills [a patient] the difference between the provider's charge    and    the    allowed    amount."    *Balancing    Billing*,    HealthCare.gov,

**b) AdaptHealth Management Did Not Put Systems In Place To Check The Use Of Improper Billing Codes And Ignored Complaints From Employees.**

100.    Former employees additionally confirmed that AdaptHealth did nothing to stop the improper billing practices, despite the Company's repeated representations that its unique technology platform would reduce both fraud and the billing errors—the very errors AdaptHealth claimed were fatal to its competitors. For instance, FE 2, a Solara employee who worked in the Michigan market and continued to work for AdaptHealth after the acquisition as a Patient Acquisition Manager until September 2021 confirmed AdaptHealth improperly upcoded diabetes equipment "to get paid more." FE 2 was the head manager for the Michigan location, oversaw customer service, inside sales, and shipping, and reported directly to Jim Vainio, Vice President of Operations and Hector Mendoza, Vice President of Inside Sales. FE 2 stated that when AdaptHealth took over, they "gutted everything," there was no oversight of billing codes, and employees could "put in whatever they wanted" to hit their sales numbers. According to FE 2, AdaptHealth "higher ups"—Vice Presidents and Directors, including Vainio and Mendoza— would instruct employees about which codes would generate the most revenue, regardless of whether they were the appropriate codes to use, and instruction and protocol changes were "constant" and "overwhelming."

101.    FE 8, another former Inside Sales Specialist who worked at Solara and then AdaptHealth from November 2020 to August 2021, confirmed that AdaptHealth "primarily" used A-codes rather than K-codes to bill for CGMs. FE 8 was responsible for setting up orders in Solara's Salesforce system, which auto-populated the codes he could select for each order from a

---

https://www.healthcare.gov/glossary/balance-billing/#:~:text=When%20a%20provider%20bills%20you,you%20for%20the%20remaining%20%2430 (last visited May 13, 2024).

drop-down menu. However, there were often multiple codes, including A-codes and K-codes, and sales representatives had to know which codes to select. In other words, contrary to Defendants' statements in SEC filings and on earnings calls that AdaptHealth's technology enabled "automated and compliant" workflow, there was no automated system that ensured that the correct codes were used. Moreover, FE 8 said that AdaptHealth did not provide any formal training regarding the appropriate codes to use. Instead, he had to ask his supervisor, FE 9, which codes to use. According to FE 8, those instructions about which codes to use were ad hoc, never clear, and constantly changing. According to FE 8, approximately 70-80% of the orders he processed were billed using A-codes. FE 8 confirmed that he was pressured to end calls with patients and his boss FE 9 stated that "I know it's bullshit, but we need to get these numbers out." According to FE 8, AdaptHealth was more focused on meeting numbers than meeting patient needs.

102.    Moreover, AdaptHealth management routinely ignored warnings from employees that AdaptHealth was engaged in overbilling. FE 2 stated that his employees pushed back about the use of improper codes at weekly team meetings with management, and the response from Vainio and Mendoza was always "don't question us, don't challenge us." According to FE 2, it was clear to all involved that management was changing codes to meet unrealistic revenue targets that were also discussed at the weekly meetings. FE 2 confirmed that the Company was "trending downward" and they "had to cheat" to achieve management's goals, which stayed the same or increased every quarter. If goals were not met, there was "a lot of angry yelling" by Vainio, which came from the executives of the Company. When FE 2 pushed back about the unrealistic goals, Vainio and Mendoza said "if we say jump, you should ask how high, and that's it."

103.    FE 5 also confirmed that A-codes should never have been used to bill for CGMs and supplies, and when she tried to push them back as improper, the claims were taken away from

her and given to someone else. FE 5 tried to talk to her supervisor, Senior Manager 1, several times, but each time she was shut down and told that management would "handle it" but nothing ever happened. Senior Manager 1 spoke about FE 5's complaints with her boss Kevin Wood, Senior Vice President of Sales and Business Development, and during one meeting between FE 5 and Senior Manager 1, Regional Director 2 was present. But instead of addressing the problem, management told FE 5 that she was being moved to a different department.

### c) Claims Data From Around The Country Confirm AdaptHealth's Improper Billing Practices.

104.    Medicaid claims data obtained via FOIA from around the country corroborates the former employees' accounts. Claims submitted to state Medicaid programs by Diabetes Management Supply, a Louisiana-based company acquired by AdaptHealth in 2020, demonstrate AdaptHealth's rampant overbilling practices. For instance, claims submitted to Louisiana's Medicaid program from July 2020 to November 2022, long after CMS mandated the use of K-codes for CGMs, show that AdaptHealth used A-codes to bill for CGMs and monthly supplies 107,688 times, while it billed under the relevant K-codes just 3,323 times. In other words, AdaptHealth used A-codes more than 30 times as much as K-codes, even though the newer, proper K-codes had been in the market for more than three years. The improper use of outdated A-codes from just one small subsidiary resulted in millions of dollars in improper revenue. AdaptHealth received approximately $9.3 million for Louisiana Medicaid bills using A-codes but should have only received approximately $5.5 million if the proper K-codes were used, a 69% inflation of revenue.

105.    AdaptHealth's billing practices with respect to Louisiana Medicaid were not an outlier. Indeed, data from other state Medicaid programs shows that AdaptHealth used similar tactics to boost its revenue in other states. Medicaid records from Massachusetts show that New

England Home Medical Equipment, another AdaptHealth acquisition, used far more A-codes than K-codes to bill for CGM devices and supplies during and before the Class Period. Based on the Medicaid data, New England Home Medical Equipment billed Massachusetts nearly $20 million dollars under A-codes. Again, because AdaptHealth sold mostly the Dexcom G6 or Freestyle Libre, nearly all of those sales should have been billed under the cheaper K-codes.

106.    AdaptHealth deployed the same scheme in Nebraska. Medicaid payment data show that payments to subsidiary Diabetes Supply, which AdaptHealth acquired at the start of the Class Period in the summer of 2020, totaled approximately $3.5-$5 million for claims billed using A-codes. Meanwhile claims for K-codes earned less than one-tenth as much over the same period. In addition, the number of A-codes used by Diabetes Supply shot up by approximately *50%* the year after AdaptHealth acquired the company and increased each year thereafter. Moreover, The Capitol Forum spoke with an employee in AdaptHealth's diabetic division who confirmed that the bulk of those sales in Nebraska were for the Dexcom G6, which should have been billed using the cheaper K-codes.

107.    AdaptHealth's Michigan subsidiary, Healthy Living Medical Supply, which it acquired in August of 2021, engaged in similar practices. While Healthy Living used K-codes more frequently than other subsidiaries, approximately one third of its Class Period sales, amounting to approximately $4 million, were billed using the older, more expensive, A-codes. This was so despite the fact, as confirmed to The Capitol Forum by former AdaptHealth employees, AdaptHealth sold primarily Dexcom and Abbott CGMs in Michigan that should have been billed with K-codes.

### d) AdaptHealth Was On Notice Of The Risks Of Not Complying With CMS's Billing Code Requirements.

108.    AdaptHealth was well aware of the risks of not complying with CMS regulations. Among other things, in January 2017, a former employee of QMES, LLC (AdaptHealth's predecessor company where Defendant McGee was CEO), filed a *qui tam* complaint, alleging that QMES violated the False Claims Act by knowingly and willfully billing federal payors for products that patients were not prescribed.[7] Specifically, the complaint alleged that employees at QMES were directed to "upcode" medical equipment to obtain higher reimbursement payments—including directly by Defendant McGee, who instructed employees "not to notify the payors" of this fraudulent practice. The complaint further details how Defendant Russalesi personally fielded multiple reports of upcoding, told the whistleblower directly that Defendant McGee had directed her "not to disclose" the issue, and directed the whistleblower to "let it go" because the Company had determined not to self-report. The allegations in the complaint were later the subject of a coordinated effort among the law enforcement and regulators, and AdaptHealth ultimately settled those claims for $5.3 million in 2022. In announcing the settlement, an Assistant United States Attorney for the Eastern District of Pennsylvania noted that AdaptHealth has "an obligation to ensure that the equipment and devices they rent to patients are medically necessary and properly billed" and further warned that if AdaptHealth and similar providers "disregard[ed] that obligation to maximize their profits, this Office will hold them accountable."

109.    Additionally, AdaptHealth has admitted that at least two of AdaptHealth's businesses have received suspension notices from CMS due to improper billing practices. Specifically, CMS issued the suspension notices in 2020 and 2021 based on its determination that

---

[7] The case is captioned *United States ex rel. Kelly v. QMES LLC, d/b/a Tricounty Medical Equipment and Supply, LLC,* No. 17-cv-0199 (E.D. Pa.).

two of its businesses "had billed for services which were not rendered and/or were medically unnecessary, and improperly solicited beneficiaries." While AdaptHealth minimized the consequences as affecting "less than 2%" of the Company's revenue, those AdaptHealth businesses were temporarily prohibited from receiving reimbursements from Medicare.

### 2. Defendants Shipped Unwanted And Unnecessary Supplies, Forcing Patients To Foot The Bill

110.    To boost its sales and revenue numbers and convince the market of the success of its acquisition-based strategy, AdaptHealth engaged in other fraudulent billing practices, including shipping CGMs and monthly supplies that patients did not order and were not needed or covered by insurance. As with AdaptHealth's upcoding practices, these additional improper billing practices allowed AdaptHealth to inflate its reported revenue quarter after quarter—without regard as to whether AdaptHealth would ever actually receive reimbursements for improperly billed medical devices and supplies and without regard to the "patient experience" that AdaptHealth touted as a key advantage. These practices also directly contradict Defendants' Class Period statements that they had implemented sophisticated software to ensure that documentation from the patient and doctor was correct and that the patient was getting exactly what they needed, and nothing more.

111.    Former employees that spoke to Lead Counsel affirmed that shipments of unwanted and unnecessary supplies were a matter of Company *policy*. A former employee who worked at AdaptHealth's Pennsylvania headquarters during the Class Period recounted how it was Company policy to "batch bill" equipment and supplies to patients with credit card information on file, without first contacting the patients about the shipments. AdaptHealth's former Director of Training & Implementation, Operations (FE 10), worked at the Company from January 2018 to June 2021 as a director of customer service and was responsible for analyzing trends in the

lifecycle of claims. FE 10 explained that Medicare and Medicaid patients should not have been asked for credit card information at all, since the insurance payors directly reimbursed their claims. FE 10 described AdaptHealth's policy of obtaining credit card information as a "red flag," because any products not covered by insurance should only have been shipped and billed to patients with their express consent. However, according to FE 10, AdaptHealth's official training instructed employees to withhold processing claims and life-saving equipment from patients covered by Medicare and Medicaid and insist that patients provide credit card information before the claims could be processed. AdaptHealth instructed employees to demand credit card information three times. Only if a patient declined to provide credit card information after the third attempt could the sales representative process the claim without a credit card. AdaptHealth's Vice President of Customer Service Operations personally okayed the training. According to FE 10, AdaptHealth then routinely "auto billed" and "batch ran" orders denied by insurance with cards on file without patient consent. She described the practice as "crazy" and said that it was the Company's preference to "do damage control rather than preventative maintenance."

112.    Former employees who spoke with The Capitol Forum made clear that similar tactics were a matter of Company policy. For instance, a former Pinnacle employee told The Capitol Forum that, at AdaptHealth's direction, she intentionally misled Medicare patients about their obligations to pay for supplies upfront. The former employee stated that a Company script popped up on her screen and "was full of scare tactics to get patients to pay up front." The former employee stated that AdaptHealth created a training video to show employees how to use the script to scare patients into paying upfront and added that the script "made it seem like they had no choice, but they didn't know their Medicare rights, and they have every right to wait for us to bill

Medicare before we could get payment from them." For the former employee, the script and scare tactics were the "straw that broke the camel's back," and she quit.

113.    Other former employees at AdaptHealth's various acquisitions described similar tactics and practices sanctioned by management. FE 11, who worked as a CGM Sales Manager at Pumps It and then AdaptHealth, stated that as part of her training, she and others were instructed to obtain credit card information, and bill patients automatically, *without their consent*. As a matter of policy, AdaptHealth placed every patient that provided their credit card information on autopay, *i.e.*, any bill AdaptHealth issued would be automatically billed to the patient credit card. Moreover, the moment credit card information was entered, Brightree enrolled patients in autorenewal for supplies, which would also be subject to autopay. Patients were not asked for their consent and were enrolled in the autopay and autorenewal processes unknowingly. According to FE 11, AdaptHealth did not get required patient consent because the Company was "focused on money, not patients."

114.    According to former employees of Solara, another AdaptHealth acquisition, the Company policy was to continue to bill as much as possible to insurance even when a customer switched from AdaptHealth to a different supplier. A former Solara salesperson told The Capitol Forum that "Medicare would only allow a certain number of sensors and monitors in a given time frame. If a patient switched to another equipment supplier, [we] would try to use that allotment before their new supplier could." Ignoring Medicare rules, and contrary to Defendants' statements that they were careful to check with patients about their actual needs, the former employee added that "we are still going to just bill, bill, bill until we can't. Bill to our hearts' content."

115.    Another former Solara employee who is still in the diabetes supply business told The Capitol Forum that his patients complained that they could not get their supplies because

Solara was still improperly billing them and using up their insurance coverage. The former employee stated that "A patient recently switched to getting supplies through her regular pharmacy, and Solara was still billing her. She went to go pick supplies from the pharmacy and the pharmacy said 'We can't bill for this because Solara is still billing insurance for it.' And the patient isn't getting anything from Solara."

116.    FE 12, who was a Quality Assurance Specialist at Solara and then AdaptHealth during the Class Period, recalled that many orders were processed without documented patient consent forms. According to FE 12, many orders noted only "verbal consent," which led to many returns because patients had not actually ordered the medical products AdaptHealth shipped. In addition, FE 12 noted a regular practice of double billing patients that got their medical supplies from other providers. She stated that medical offices would provide AdaptHealth with patient leads who already received medical equipment from other suppliers. To meet sales quotas, sales employees pushed through orders from these patients with little or no consent documentation, relying on "very gray" verbal consent that did not even list a date and time for the call. FE 12 reported these issues to her supervisors, but nothing was ever done about the problem.

117.    FE 9, who was a Senior Manager of Patient Acquisition at Solara and then AdaptHealth, confirmed similar improper practices of shipping unwanted and unordered product. According to FE 9, starting in March or April of 2021, Vice President of Inside Sales, Hector Mendoza, directed employees to ship orders without proper patient authorization. FE 9 stated that once a Medicare referral came into their system, they were supposed to contact the patient and get confirmation before shipping the order, but Mendoza allowed employees to ship product if they merely attempted to contact the patient once and left a voicemail. When patients called to complain about the unordered and unwanted product and asked how they could send it back, employees

were instructed to pressure patients to accept the order and to tell patients that the products were 100% covered by Medicare. According to FE 9, this was highly improper because not only did it constitute Medicare fraud, even if Medicare would pay the fraudulent orders, the practice drained patients' insurances coverage, and if the patient tried to switch products or get supplies elsewhere, their future claims would be denied. Mendoza communicated his instructions to FE 9's team of twenty-five representatives at weekly sales meetings. After FE 9 left the Company in October 2022, he filed a complaint with Medicare stating that AdaptHealth's practice of shipping unauthorized orders amounted to insurance fraud.

118.    According to FE 2, the head manager of Solara's Michigan location, AdaptHealth shipped diabetes supplies to customers who did not need them. Customers were constantly complaining about that as well, leading to an influx of calls each month which exacerbated the wait times. FE 2 explained that AdaptHealth "text blasted" patients that were due for more supplies. Patients were supposed to respond yes or no prior to being sent any supplies, but AdaptHealth sent supplies to patients even if they did not confirm they wanted those supplies. The patients who received the texts were a combination of active customers and customers who no longer used AdaptHealth. Customers called to complain and asked, "What are you doing? You billed my insurance for this, but I never asked for it." FE 2 said that in 90% of cases, AdaptHealth did not rectify the billing customers to whom they sent supplies but who had not consented. Corroborating FE 2's account, a class of patients brought a class action against AdaptHealth in the state of Florida alleging that AdaptHealth continued to send text messages to customers who asked not to be contacted and made robocalls without patient consent. AdaptHealth recently settled the claims for approximately $5 million.

119.    One former executive recounted how AdaptHealth shipped resupply orders that they knew insurance would not cover. FE 13, who was a high-level executive at Pumps It and then AdaptHealth, recounted how AdaptHealth tried to "stack" resupply orders at the end of 2022 so that AdaptHealth could maximize the amount they could bill insurance. FE 13 explained that his direct report Kevin Wood, AdaptHealth's Senior Vice President of Sales and Business Development, devised a scheme to improperly load patients up with four months of supplies at the end of 2022 to boost revenue numbers, even though Wood knew insurance would ultimately reject the claims. Wood told FE 13 about the scheme in person during a conversation in August of 2022 and stated that Wood's boss, Defendant COO Rodney Carson, was aware of the plan, as were executives Senior Vice President 3, AdaptHealth's Senior Vice President of Revenue Cycle Management, and Jim Vainio, Vice President of Operations. However, FE 13 knew that insurance companies had cracked down on the practice of shipping bulk supplies and would not cover the shipments. FE 13 stated that this was well known throughout the organization and should have been known to management because all they had to do was look at the billing trends showing that insurance companies were no longer allowing bulk shipments. In September or October 2022, FE 13 specifically warned Wood that insurance would not cover the shipments and his plan to "stack" resupply orders would not work. When FE 13 left AdaptHealth in October 2022, he saw that the stacking problem was getting worse and he told his superiors that AdaptHealth was "going to get killed on that" once insurance companies eventually denied the claims.

### 3.    Employees Falsified Medical Records And Shipped Orders Without Required Documentation

120.    AdaptHealth's former employees reported additional widespread improper billing practices, including altering doctor prescriptions and shipping unwanted and unnecessary equipment and supplies.

121.    According to former employees at Pinnacle, these practices started once AdaptHealth took over operations. FE 5 was an Inside Sales Specialist and processed patient claims for Pinnacle and then AdaptHealth from July 2019 to July 2022. She told The Capitol Forum, and confirmed to Lead Counsel, that "We had pretty high reviewing standards for our orders, going back to doctors to make sure what was ordered was what was needed." "AdaptHealth came in and shut down a lot of that," FE 5 said, because "[i]t was now all about the speed of turning orders around, not the quality. More and more quotas, higher quotas. It just got insane."

122.    Medicare and Medicaid programs have strict documentation and eligibility requirements for CGMs and supplies, including physician diagnosis of Type 1 diabetes and the number of times per day the patient is required to take insulin and check their blood sugar levels. To get around these strict requirements, AdaptHealth employees stated that they would regularly alter physician notes and prescriptions to make patients eligible for CGMs and supplies who would not otherwise qualify under their insurance. FE 5 told The Capitol Forum and confirmed to Lead Counsel that:

> A doctor would prescribe something, but the way they prescribed it didn't meet the standard we could bill for. We turn a three months' supply of sensors into a six months' supply or forge a doctors' signature if they hadn't signed a prescription. If the patient didn't have the correct diagnosis, we would forge that as well.

FE 5 continued, "If insurance said they would only cover CGM Type 1 diabetics, but the doctor diagnosed them with Type 2, you would change it to Type 1. If insurance required three finger stick checks a day, and the patient was only doing two, we'd change it to three." FE 5 added, "plenty of times a patient did not meet the requirements for CGM, but we would just keep calling and calling so that the doctor would change the notes so we could bill or just change it ourselves."

123.    FE 5 witnessed management alter doctors' notes and prescriptions to hit AdaptHealth's unrealistic sales quotas. The former employee stated that,

> I did most of the building of orders, talking to doctors and patients, and our manager wanted us to hit our numbers. A patient wouldn't qualify for a CGM based on needs and medical issues, and instead of sending it back to the doctor, she would say "just send it to me, I'll take care of it for you." And she would send it back a minute later with her own handwriting having changed it.

FE 5 also stated that to meet documentation requirements for daily testing, her manager would simply make the testing log up or call patients and tell them the answers they needed to get coverage. FE 5 stated that 50% of AdaptHealth's diabetes patients did not qualify for CGMs under their insurance, but AdaptHealth billed insurance anyway by altering patient documentation.

124.    FE 5 stated that some of these issues happened before the acquisition, but she saw them far more often when AdaptHealth took over. "It was so much more blatant in your face after," she said. "Their guard kind of went down," and they didn't "give a crap," she continued. According to FE 5, employees wanted to push out as many orders as they could to qualify for bonuses for hitting revenue goals. "People were so crazed about that," she said. The sentiment was that they didn't care. It was always, "we'll deal with that later; just get it done." "That's where it started to become more in your face," she explained. As with AdaptHealth's improper use of A-codes, FE 5 reported these issues to her supervisors, but nothing was done except to move FE 5 to a different department.

125.    Besides altering medical records, AdaptHealth simply shipped and billed products without proper documentation. FE 3, who worked as an Inside Sales Specialist at Pinnacle and then AdaptHealth and who managed a team of specialists who checked required documentation for orders, stated that AdaptHealth routinely billed claims without paperwork. According to FE 3, in the first weeks of a billing month, AdaptHealth would put claims without paperwork on hold. However, if revenue goals were not met, they billed the deficient claims anyway. FE 3 estimated that 40% of the claims on the re-order team were sent out prior to having obtained the required paperwork. AdaptHealth's tactics "bothered" FE 3 because they always picked up at the end of

month or the end of quarter. FE 3 explained that managers reviewed the numbers that needed to go out at managers meetings, and they specified how many orders needed to be shipped to achieve revenue goals each month. Then, employees were pressured to send out claims without paperwork to "just to meet goals."

126.    A former high-level executive who worked at Pumps It and then AdaptHealth from August 2012 to October 2022 (FE 13) stated that after AdaptHealth took over, Pumps It routinely shipped orders without proper documentation to "make their numbers." According to FE 13, obtaining proper documentation could delay orders for weeks, so orders were shipped without proper documentation and without doctor prescriptions. FE 13 stated that it was a "dumb business practice" to ship orders without valid prescriptions. Once those claims were denied, AdaptHealth could not go back to them and ask to backdate the prescription—that would have been illegal. Patients were under no obligation to pay for the orders AdaptHealth shipped without valid prescriptions because they were illegal orders. CGMs cannot be returned because of complications with heat and shipping; they cannot be resold. According to FE 13, orders without proper documentation and prescriptions would eventually be denied by insurance, but AdaptHealth managers intentionally engaged in the practice and kept orders on their accounts receivable book to maintain the Company's revenue numbers. FE 13 believed that AdaptHealth's accounts receivable is "highly inflated" and the Company was keeping money on the books to make the financials look better.

127.    Employees from Solara confirmed similar practices of sending orders out without proper documentation. FE 12, a former Quality Assurance specialist who worked at Solara and then AdaptHealth from August 2018 to January 2022, confirmed that as much as 25% of orders were shipped to patients that did not qualify for coverage because they did not have the required

paperwork. FE 12 reviewed orders and made sure the quantity matched what had been requested, the required documents were on file, the prescription was valid, chart notes were in place, and that patient consent had been acquired. According to FE 12, because management pressured sales employees to meet daily and monthly sales targets, employees were routinely qualifying patients that did not have proper chart notes based on a pandemic-era loophole that relaxed certain doctor-visit requirements. But in many cases that FE 12 saw being authorized, the chart notes explicitly said, "patient does not qualify." FE 12 stated that this practice started by July 2020 and continued throughout her tenure at AdaptHealth. She conservatively estimated that at least twenty-five out of every 100 orders were sent out without proper documentation or chart notes during that time.

128.    When FE 12 flagged these orders as improper, her supervisors told her not to worry and to process the orders. When she insisted that the orders lacked proper documentation, her supervisors would override her objection, or the orders would simply be sent to another specialist who would "okay" the order. No later than July 2020, FE 12 started reporting her concerns about the Company and the sales practices in emails, to her direct report Director 2, a Director of Quality Assurance and Revenue Cycle Management at AdaptHealth, and cc'd Hector Mendoza, Vice President of Inside Sales. Occasionally, she also cc'd "Director 3," a Director of Revenue Cycle at AdaptHealth. In her emails, which she first sent after observing a huge influx of orders for patients that did not qualify for coverage, and then continued sending once or twice a week and sometimes daily, she identified particular sales representatives who were sending orders without documentation or patient consent. The response from Director 2 was typically, "Oh, that is fine," or they were looking into, but nothing was done, and FE 12 felt that her bosses were giving her the "run around." At times, Hector Mendoza specifically instructed her to push patients that did not qualify through the system, using the emergency pandemic authorization as an excuse, but FE

12 refused to do it, saying that her "conscience won't let her do it." Other times, they simply reassigned the order to another specialist to okay the order. FE 12 stated that her bosses communicated their responses in various ways, through emails, calls, in person, through Microsoft Teams, or in text messages.

### E. For Months Or Years, AdaptHealth Did Not Even Attempt To Successfully Integrate Its Many Acquisitions, Which Were Riddled With Problems

129. As discussed above, Defendants repeatedly told investors throughout the Class Period that the successful integration of acquisitions was key to AdaptHealth's success. Quarter after quarter, Defendants assured investors that the Company was in fact delivering on that strategy. In reality, except for imposing onerous sales quotas, AdaptHealth did nothing of the kind.

130. Instead, AdaptHealth actually *cut* compliance efforts and standards—and *never* implemented the Company's supposed technological solutions and comprehensive compliance systems to ensure that appropriate billing procedures were being followed, proper documentation was in place, and patients were receiving the equipment they ordered. When efforts to integrate the acquired companies were eventually made (months or years after investors were led to expect that the acquisitions had been smoothly completed), the results were typically disastrous, resulting in improper billing, a lack of oversight, and ultimately a litany of patient complaints. Multiple former employees stated that Hector Mendoza, AdaptHealth's Vice President of Inside Sales, and Jim Vainio, AdaptHealth's Regional Vice President of Operations, were in charge of integrating diabetes companies, including Solara and others. They attended regular meetings with sales executives, where all of the issues the employees discussed in this Complaint were fully discussed and fleshed out. This was the best and only way for employees to elevate these problems.

### 1.    Rather Than Increasing Compliance, AdaptHealth Actually Cut Compliance Systems And Controls At Acquired Companies

131.    Former employees stated that, contrary to Defendants' Class Period statements, AdaptHealth actually *cut* compliance at acquired companies—and certainly did not implement a Company-wide compliance system to catch and correct improper billing practices. Indeed, there was *never a working audit system* in place for employees to report abuses. FE 9, who was a former Senior Manager of Patient Acquisitions at Solara and then AdaptHealth from June 2019 to October 2022, confirmed that when AdaptHealth took over, they stripped away the "checks and balances" by making all employees' compensation dependent on processing orders—not on any compliance. As a result, departments that were supposed to be checking documentation and validating insurance were just letting orders go through unchecked. It was, according to FE 9, the "wolf guarding the henhouse."

132.    Other former employees throughout the Company confirm that—contrary to Defendants' public assurances—AdaptHealth did not implement a compliance system to deal with reported billing problems, and, in fact, compliance efforts deteriorated dramatically post-acquisition. A former AdaptHealth Quality Assurance Manager, who worked from August 2018 to January 2022 (FE 12) confirmed that when AdaptHealth acquired Solara, management did *not* implement a system for employees to report improper billing practices and ignored repeated warnings of wide-spread billing abuses. FE 12 confirmed that "there was no channel to blow the whistle," other than emailing her supervisors, including Mendoza, who ignored her warnings. Moreover, AdaptHealth never implemented an automated systems to check claims, and FE 12 stated that there were no automated flags and "everything was manual." FE 12 also stated that the compliance training was "a joke" and essentially non-existent and consisted of short YouTube

56

videos that were meant for CVS pharmacy and other industries and did not apply to AdaptHealth's business.

133.    Similarly, FE 14, a former Senior PAP specialist who handled and reviewed orders for sleep machines at AeroCare and then AdaptHealth after the acquisition from March 2020 to January 2024, stated that AdaptHealth failed to implement a compliance system. FE 14's regular complaints to management about improper billing practices after the acquisition—which included billing patients for more expensive machines than they received, or improperly billing replacement machines as "new" to avoid having to provide required documentation for replacements—went unanswered. According to FE 14, she was the *only* one checking if the proper code was being billed, and she was the "first and last check"—there were no automated and integrated "systems" to confirm that appropriate billing procedures were implemented.

134.    In addition, FE 5 confirmed that AdaptHealth ***never*** implemented its vaunted compliance and audit system at Pinnacle. They did not have any resources—and certainly not a sophisticated audit system—to report the many billing problems she encountered.[8] When asked about "Audit Share," the system Defendant Russalesi claimed AdaptHealth implemented in 2016 as a Company-wide compliance tool that gave executives "real time access" to billing trends, FE 5 responded that she had never even heard of the system, even though she worked in the billing department and should have been aware of any internal audits, and should have been one of the primary consumers and sources of information for the supposed compliance tool. But there were no internal audits, and no compliance system to speak of. FE 5 stated that prior to the acquisition, Pinnacle had a compliance team in place that would prevent issues like using the wrong billing

---

[8] As noted above, FE 5 worked at Pinnacle and then AdaptHealth's Medicare diabetes division from approximately July 2020 to July 2022. During her tenure, her primary responsibility was to input diabetes orders into the Company's billing systems.

code. When AdaptHealth took over, they got rid of the compliance function that limited employees' ability to engage in improper billing practices. To the contrary, as discussed above in Sections V.C.-D., AdaptHealth encouraged employees to use the wrong code and engage in other improper practices to boost sales and meet revenue targets.

135.    In sum, FE 9 and FE 12 confirmed that AdaptHealth failed to implement a compliance system at Solara for employees to report billing problems. FE 14 confirmed that AdaptHealth did not implement such a system at AeroCare. FE 5 confirmed that AdaptHealth failed to implement Audit Share or any other compliance system at Pinnacle.

### 2.    AdaptHealth Did Not Otherwise Actually Integrate Acquisitions Onto Its Supposedly Technologically Superior Systems

136.    Beyond decimating the compliance functions across AdaptHealth's acquired companies, multiple former employees of AdaptHealth recounted how the Company did not otherwise integrate acquisitions as the Individual Defendants claimed to have done. Instead, directly contrary to Defendants' public statements, AdaptHealth simply allowed acquisitions to operate as a series of independent companies rather than a cohesive enterprise. For example, FE 9, a former Senior Manager of Patient Acquisitions at Solara and then AdaptHealth from June 2019 to October 2022, stated that AdaptHealth did not truly ***start*** to integrate Solara until 2021, even though AdaptHealth entered an agreement to acquire Solara in May of 2020, and formally closed the deal on July 2, 2020. According to FE 9, both AdaptHealth and Solara used Brightree as their main RCM and patient management platform.[9] Instead of integrating the systems,

---

[9] Brightree is a commonly used cloud-based platform designed to handle many of the various workflows for HME companies like AdaptHealth, including interfacing with doctors (*i.e.*, referral sources), patients, manufacturers, distributors, and insurance companies (*i.e.*, payors).

Brightree was used by many of the companies AdaptHealth acquired. However, each company that AdaptHealth acquired that used the Brightree platform maintained separate profiles for

AdaptHealth simply kept Solara's separate Brightree system in place. Contrary to Defendants' Class Period statements that they had a "common RCM platform" that was "fully integrated," in truth, Solara's Brightree system was operated and maintained entirely separately and was ***never*** integrated before FE 9 left in October 2022, over two years after the acquisition.

137.    AdaptHealth also failed to integrate its Brightree system with AeroCare's. FE 14, who was employed by AeroCare and then AdaptHealth from May 2017 until January 2024 as a Senior PAP Specialist, stated that after AdaptHealth acquired AeroCare and took over operations in early 2021, AdaptHealth ***never*** integrated the two companies' Brightree RCM systems for processing bills and keeping track of patient information. Instead, FE 14, who used Brightree to initiate orders and make sure that orders were correct, described the integration as "very painful," "messy across the board" and stated that the merger "brought out the worst in both companies." FE 14 confirmed that AdaptHealth did not integrate AeroCare's legacy Brightree systems, which were already fractured into four separate Brightree platforms for different regions of the country, with AdaptHealth's own Brightree system, all of which required separate logins and contained different policies, patients, and payor information. According to FE 14, AdaptHealth tried to integrate AeroCare's Brightree system for Colorado patients, but the integration was so painful that AdaptHealth stopped trying and "told Colorado to do whatever they wanted." Instead of integrating the systems, AdaptHealth ran the five platforms separately (four for AeroCare and one for AdaptHealth) over her entire tenure and the "left hand did not know what the right hand was doing." Moreover, far from creating synergies and adopting common best practices, FE 14 stated

---

doctors, patients, manufacturers, distributors, and payors, and all of that information would have to be cross-walked and reconciled on AdaptHealth's Brightree platform. For companies like Pumps It that did not use Brightree, the integration of all of the information would be even more complicated.

that AdaptHealth's fractured system created confusion and employees did not know which policies to follow. AdaptHealth failed to provide guidance and training on the systems and when FE 14 and her colleagues complained, to their team leaders and mangers, they too were in the dark and did not know which policies to follow. All managers could offer were platitudes like "hang in there" and "do your best." As a result of the fractured systems and lack of guidance, FE 14 stated customer service declined dramatically, and employee workload tripled.

138.    Like Solara and AeroCare, former employees from other diabetes supply acquisitions confirmed that the integration did not happen for months, years, or at all. Two former Pinnacle employees recalled that when AdaptHealth acquired the company at the end of 2020, other than increased sales quotas (as discussed above in Sections V.C.-D.), there were **no** integration changes for more than a year. FE 5's primary responsibility as an Inside Diabetes Specialist was to enter, review, and identify any issues with diabetes orders at Pinnacle and then AdaptHealth.[10] Both companies relied on the Brightree billing system, but their databases were completely different. FE 5 stated that AdaptHealth made **no effort** to integrate the companies until early 2022, more than one year after the acquisition. For instance, AdaptHealth did not even attempt to integrate Pinnacle's Brightree database until February 2022. Even then, the integration never worked, and FE 5 used the legacy database until she left in July of 2022. Moreover, FE 5 stated that AdaptHealth did not even attempt to implement its "e-Prescribe" system, known as Parachute, until mid-2022, 18 months after the acquisition, and like Brightree it never worked. FE 5 did not get a single patient finalized through Parachute before she left in July 2022. FE 5's team leader, FE 3, was an Inside Sales Specialist at Pinnacle and then AdaptHealth from March 2019 to

---

[10] As noted above, FE 5 worked at Pinnacle and then AdaptHealth's Medicare diabetes division from approximately July 2020 to July 2022.

April 2023, who was responsible for ensuring that patient documentations was correct. FE 3 also confirmed that AdaptHealth let Pinnacle "do their own thing" and the integration did not really begin until February of 2022, more than a year after the acquisition.

139.    A former employee of acquired company, Diabetes Supply Company, told Lead Counsel that AdaptHealth never integrated the companies' billing systems. FE 15, a former account executive who visited clinics in Nebraska, Iowa, and South Dakota on behalf of AdaptHealth from April 2022 to January 2024, confirmed that AdaptHealth did not attempt to integrate Diabetes Supply into its "master" Brightree patient billing system until June 2023—almost *three years* after AdaptHealth acquired the company in the fall of 2020. According to FE 15, the integration was scheduled to conclude in July 2023, but in June 2023, a noticeable uptick in problems with the integration, including double billing patients, led management to call the integration off altogether. FE 15 stated that by December 2023, more than three years after the acquisition, AdaptHealth still had not merged the systems, and both companies still had totally different documentation processes. FE 15 recalled that, as a result of AdaptHealth's undisclosed failure to integrate the two companies, she had to log into multiple Brightree systems each day, which ate into her time for caring for patients. FE 15 complained about it to her boss, who explained that AdaptHealth shut down integration because the integration of another acquisition, Healthy Living, was "horrifically painful" and AdaptHealth could not take on another disruption within the same fiscal year.

140.    In sum, multiple former employees—FEs 5, 9, and 15—confirmed that AdaptHealth *never* implemented and integrated its RCM system, called Brightree, with Solara's, AeroCare's, Pinnacle's, and Diabetes Supply's RCM systems, respectively. FE 5 further confirmed that AdaptHealth did not even attempt to implement its e-Prescribe system (Parachute)

for eighteen months after the acquisition closed and integration supposedly completed—and even then it was unable to do so successfully.

### 3.   AdaptHealth's Belated Integration Efforts Led To Major Problems

141.   When AdaptHealth did eventually try to integrate its systems for billing and tracking patient information, corporate executives knew there were major problems. Former employees from acquired companies confirmed that AdaptHealth's efforts to implement its software did not work and management was aware of the problems. For instance, FE 9, a former Senior Manager of Patient Acquisitions at Solara and then AdaptHealth, stated AdaptHealth ***never*** merged its Brightree database with Solara's, which the companies used to track patient orders and billing. When AdaptHealth then tried to merge other diabetes supply acquisitions with Solara's system (instead of AdaptHealth's system), those efforts were a "cluster" and led to errors including a "massive duplication" of accounts in the system, and patients being billed multiple times or not at all. According to FE 9, Hector Mendoza, AdaptHealth's Vice President of Inside Sales and who was the executive in charge of Solara's integration, was regularly informed of these issues during meetings with FE 9 and the twenty-five sales employees he oversaw. According to FE 9, Mendoza worked closely with Jim Vainio, AdaptHealth's Regional VP of Operations on the integration of other acquired diabetes companies, and they reported up to Defendant Rodney Carson, AdaptHealth's Chief Operating Officer and President of Diabetes.

142.   AdaptHealth's former Director of Training & Implementation, Operations (FE 10), who worked at the Company from January 2018 to June 2021, reported similar issues and stated that, while AdaptHealth raced to acquire companies, it failed to integrate them properly. FE 10 worked as a director of customer service and utilized the Company's Brightree system to create reports to analyze trends in the lifecycle of claims.

143.    Former employees from other acquired companies reported similar problems. FE 5, who worked at Pinnacle, recalled that when AdaptHealth belatedly tried to integrate Pinnacle into its system for billing and tracking patient information sometime in early 2022, more than a year after the October 1, 2020 acquisition, the new system failed to properly keep track of prescriptions and other paperwork. As a result, management told employees to just use the old Pinnacle system. FE 5 stated that AdaptHealth's new system caused problems and confusion by creating two account numbers and double billing patients. In addition, according to FE 5, AdaptHealth's system did not fully integrate the acquired companies who continued to operate as separate, competing entities. FE 5 explained that AdaptHealth's system gave information about patients who had already signed up with Pinnacle to other suppliers that AdaptHealth had acquired and were supposedly integrated under AdaptHealth's umbrella. These companies would use this information to ship products to—and double bill—patients who were already receiving supplies from Pinnacle. According to FE 5, when she left in July 2022, the system had never worked properly, and Pinnacle was forced to rely on its older system to access patient information.

144.    FE 3 also recalled AdaptHealth's failure to integrate Pinnacle. FE 3 and her team of about fifteen specialists reviewed and gathered paperwork from patients so that orders could be processed correctly. FE 3 recalled that, in February 2022, AdaptHealth finally tried to migrate Pinnacle's Brightree billing and patient tracking software, but the systems became mixed up, supplies were double shipped, and patients were double billed. Like FE 5, FE 3 stated that patients got double billed because the new system created two account numbers for each patient. When AdaptHealth introduced its system to track patient information, the systems did not work, and "nothing came across as it should have." According to FE 3, Jim Vainio, AdaptHealth's Regional Vice President of Operations "ran the show" for the system conversion and his boss Kevin Wood,

AdaptHealth's then Vice President of Operations was involved. Kevin Wood reported to Defendant Rodney Carson, AdaptHealth's Chief Operations Officer, who oversaw integrating all of AdaptHealth's acquisitions and reported directly to then-CEO, Defendant Griggs.

145.    FE 3 stated that Wood was directly involved with the integration and was in multiple meetings where problems with the integration were discussed. FE 3 recalled that she suggested to Wood that they try to move only a small set of patient information to the new system as a test, but Wood overruled her and insisted that they convert all of the data at once, which was a "disaster." FE 3 participated in meetings with Wood, Vainio, and her immediate boss Senior Manager 1 in February 2022 around the time the conversion went live. During the meetings Senior Manager 1 "very aggressively" described the issues concerning the system conversion, and she told the executives that she was very concerned about patient information. According to FE 3, through the day she left in April 2023, AdaptHealth's new patient tracking system never properly worked. As a result, Pinnacle employees were instructed by AdaptHealth executives to rely on Pinnacle's legacy systems to look up patient information.

146.    FE 11 worked as a CGM Sales Manager at acquired diabetes supply company Pumps It and then AdaptHealth from February 2019 to June 2022. FE 11 told Lead Counsel that the conversion from the billing system Pumps It used to AdaptHealth's Brightree system was fraught with problems. FE 11 was a manager of the CGM sales team at the time AdaptHealth acquired Pumps It in February 2021. According to FE 11, Pumps It used a billing platform called Total Information Management System (TIMS), and AdaptHealth's Brightree platform was totally foreign to Pumps It employees. AdaptHealth did not begin the conversion to Brightree until early 2022, more than six months after AdaptHealth acquired Pumps It.

147.    FE 11 recounted that, once AdaptHealth did attempt to convert Pumps It to Brightree, AdaptHealth's Brightree was immediately "not right" and did not process orders correctly. Patients were double and sometimes ***triple*** billed and, as a result, often received large bills for products they did not order. According to FE 11, Brightree "flipped" already billed orders back to the beginning of the billing process and some orders went through two or three times. FE 11 complained to the AdaptHealth employees who trained her, but they were no help. When asked about the Brightree problems, including double and triple billing, AdaptHealth told FE 11, "That's just how the system works." FE 11 complained to her superiors Sales Manager 1 and FE 13, General Manager, but they only told her not to worry about the problems and that they would eventually get better. But nothing did get better. According to FE 11, nothing was done, and the problems persisted until she left in June 2022. FE 11 stated that a lot of former Pumps It employees left post-acquisition because the new culture under AdaptHealth was "horrible."

148.    FE 11's boss, FE 13, who was a high-level executive[11] of Pumps It before the acquisition and "ran the company," confirmed that the integration of Pumps It to AdaptHealth's Brightree system was "painful" and that the process was riddled with errors. FE 13 explained that Defendant Rodney Carson, AdaptHealth's President and Chief Operating Officer of the Diabetes Division, was responsible for executing the "crosswalk" of the payor and billing code information in the legacy system to AdaptHealth's Brightree system. However, FE 13 stated that the information was never properly entered into Brightree, which led to patients getting double billed or claims being denied because incorrect codes were used.

---

[11] FE 13 asked Lead Counsel not to use their full title because their title would reveal their identity and they desire to remain anonymous. Lead Counsel can provide their full title to the Court upon request.

149.    Employee complaints about AdaptHealth's myriad failures to integrate acquisitions were reported to Human Resources and the Company's top executives, including the Individual Exchange Act Defendants. According to FE 1, who was a Human Resource Business Partner at Solara and then AdaptHealth from July 2018 to August 2023, employee complaints about AdaptHealth's failure to integrate its various acquisitions came in daily. Starting in or around August of 2020, employees began to complain because acquired companies' billing and documentation systems, like Brightree, were not properly integrated with AdaptHealth's Brightree system. The systems did not work properly, but management still expected employees to meet the onerous, unrealistic sales goals.

150.    In addition, FE 1 stated that employees from acquired companies complained daily that they were not provided with adequate training on AdaptHealth's systems. FE 1 stated that when AdaptHealth tried to get everyone on the same platform, thousands of employees from acquired companies had never used Brightree before. However, AdaptHealth did not provide adequate training, nor user or operating manuals, nor the tools to instruct employees on how to properly process claims. Yet, employees were still expected to meet impossible sales goals. FE 1 stated that the level of employee frustration was "unbelievable," and employees were "at the end of their rope." The situation directly led to high employee turnover, but executives did not care.

151.    As discussed above at ¶¶79-81, as with employee complaints concerning management's constant pressure to meet unrealistic sales goals, during weekly meetings FE 1 regularly discussed complaints about AdaptHealth's failure to integrate with Senior Director 1, an AdaptHealth Senior Director of Human Resources. Senior Director 1, along with Senior Director 2, another AdaptHealth Senior Director of Human Resources, knew of the "prevalent" employee complaints concerning AdaptHealth's failures to integrate its acquisitions. Senior Director 1 and

Senior Director 2 regularly met with AdaptHealth's executive team, including Defendants Griggs and Parnes, to discuss Human Resource issues that affected AdaptHealth's business and would have necessarily included employee complaints about AdaptHealth's failure to integrate, and the high rate of employee attrition. Once again, management response to the complaints was underwhelming. According to FE 1, management never took steps to address the issues, and when she discussed the complaints with Senior Director 1, she was told over and over, "it is what it is."

F.    **AdaptHealth's Failure To Integrate Acquisitions And Implement Adequate Controls Led To Significant Increases In Patient Complaints And A State Investigation**

152.    Consumer reports and former employee accounts demonstrate the myriad ways in which AdaptHealth's failure to integrate acquisitions and implement adequate controls over improper billing practices ***harmed***, rather than enhanced, the superior "patient experience" that AdaptHealth had promised. Scores of reports to the Better Business Bureau detail how AdaptHealth's improper billing and shipping practices adversely impacted patients who relied on AdaptHealth for critical medical supplies. As one patient described, AdaptHealth was "charging me for medical equipment I have never ordered." Another patient reported that AdaptHealth was sending billing statements "that fail to identify the supplies billed for or the specific amounts charged for each product" and that, despite numerous attempts to resolve the issue with AdaptHealth's customer service team, AdaptHealth continued to send demands for payment, ultimately threatening to sue. AdaptHealth received over 600 complaints from patients to the Better Business Bureau in its first three years alone and maintained an overall F-rating—the lowest possible rating.

153.    Additionally, Yelp reviews of AdaptHealth's acquired businesses demonstrate tremendous dissatisfaction among customers after the acquisitions took place. For example, Pumps It customers recounted how issues dramatically increased after AdaptHealth completed its

acquisition. As one customer wrote, "[Pumps It] used to be great but ever since [AdaptHealth] took over its gone DOWNHILL." Another wrote, "It used to be so easy to get…CGM supplies…. Now I get to wait on hold for the [privilege] of making an order that the new company [AdaptHealth] eventually screws up." Another wrote, "I loved using Pumps It for years. Then they were bought out / merged with AdaptHealth. All went to hell after that point."

154.    Moreover, countless Solara customers described how, after AdaptHealth took over, they were billed for supplies never ordered or never received, with one writing, "My account was also on auto-pay UNTIL they kept repeatedly double billing me after the third time of them pulling money from my account, I cancelled the auto-pay." Another wrote, "Do not give this company your credit card number. You will regret it for the rest of your mercifully short life." And one customer described his experience never receiving supplies—that he did order and that Medicare paid AdaptHealth for—writing, "[W]e confirmed with Medicare that Solara had been paid by them but never shipped the diabetes supplies. That's actually illegal, as you might guess. We are looking for a different supplier."

155.    AdaptHealth claimed to be aware of customers' complaints reflected in these online forums. As Defendant McGee noted at conference in January 2021, AdaptHealth "read the forums online" and was purportedly investing in addressing customers' complaints. But the accounts of former employees tell a different story. Former employees from AdaptHealth subsidiaries around the country who spoke with Lead Counsel confirmed that patient complaints similar to those mentioned above **spiked** after AdaptHealth acquired their former employers and that complaints from patients consistently identified issues directly resulting from AdaptHealth's failures to integrate acquisitions and implement adequate controls over improper billing practices.

156.    FE 15, who was an account executive at Diabetes Supply and then AdaptHealth, stated that the acquisition was "painful" and led to a noticeable uptick in patient complaints. Double billing was a major problem, and it took AdaptHealth's billing department weeks and sometimes months to reverse claims in those instances. In other cases, patients received bills a full year after their claim had processed because AdaptHealth had not properly billed the patients the first time. FE 15 saw an increase in complaints from patients who were told their supplies would be covered by insurance but were sent bills when their claims were denied because insurance did not cover the billing codes AdaptHealth applied or AdaptHealth did not even attempt to bill insurance because they knew the claims would not be covered. Instead of fixing the problem, AdaptHealth passed the bill onto the patient.

157.    Although FE 15 tried to resolve these issues with the billing department, AdaptHealth lacked an effective process for escalating billing problems. According to FE 15, the process was drawn out and messy and she could not keep up with the number of complaints. Almost every time FE 15 attempted to escalate a complaint, she heard back from patients that their problem had not been taken care of and she had to reach out to the billing department multiple times. At minimum, it took a month for AdaptHealth to resolve denied claims, and sometimes it took up to a year to resolve. FE 15 sent emails to her bosses flagging the "trends" of improperly passing bills to patients and the billing department's failure to address complaints. However, nothing was done about her complaints by the time she left the Company in January 2024. FE 15 stated that AdaptHealth's treatment of patients with life threatening illnesses like Type 1 diabetes was "insane," and even with her extensive prior work experience and nursing background, AdaptHealth's process was impossible to navigate.

158.     FE 11, who worked as a CGM Sales Manager at Pumps It and then AdaptHealth, recounted how patient complaints exploded immediately after AdaptHealth took over her former employer in early 2022. FE 11 explained that prior to the acquisition, Pumps It checked patient benefits with insurance first, determined the patients' deductible, calculated the out-of-pocket estimate, and explained it all to the patient. Only after they confirmed the patient was okay with the costs did they process the order. Once payment was collected, they sent the order to the billing department for shipment. Pumps It had virtually no bad customer reviews prior to the AdaptHealth acquisition.

159.     FE 11 confirmed that once AdaptHealth took over Pumps It, patient complaints skyrocketed for multiple reasons, all demonstrating that AdaptHealth had failed to deploy its supposedly superior technology to enhance the patient experience. According to FE 11, AdaptHealth just billed credit cards on file, it did not confirm anything with the patient, nor did it check what the potential costs might be to the patient. Many times, AdaptHealth shipped the wrong supplies to patients or sent supplies the patient did not need. Patients called and screamed at her because AdaptHealth was behind on orders or because they double billed insurance and shipped supplies without patient consent. Patients complained all the time about not being contacted to confirm their order or method of payment. Sometimes patients continued to receive orders to addresses they no longer lived at. AdaptHealth never confirmed anything with the patients. FE 11 stated that patient complaints increased "significantly" after the acquisition, going from "0 to 9 on a scale of 10."

160.     AdaptHealth managers did not seem to care about the patient complaints. When FE 11 discussed the complaints with the AdaptHealth managers who trained her on Brightree, as well as Pumps It managers FE 13 and Sales Manager 1, she was told to inform patients that some

problems could not be fixed. Her managers also told her to refer the patient over to the billing department and let that department handle it. But according to FE 11, AdaptHealth's billing department was "crap" and they never responded to patients. FE 11 explained to Lead Counsel that with Pumps It, as long as they were upfront about the process, patients always understood. They made sure to communicate and patients appreciated that. But with AdaptHealth, patients just "blew in the wind."

161.    FE 11 described AdaptHealth's failure to implement systems to deal with patient complaints as like "blowing flour into the air," or in other words, a situation waiting to blow up in AdaptHealth's face. After multiple complaints and suggestions went unheeded for months on end, FE 11 realized that nothing would change, so she stopped trying. Management did not seem concerned about patient complaints or the problems with Brightree. Because of these problems, in June 2022, FE 11 quit her job.

162.    FE 7, a Reimbursement Manager who worked at Advanced Home Care and then AdaptHealth from 2014 to April 2021, stated that after the acquisition of Advanced Home Care patient complaints "spiked," and he estimated that they doubled or tripled in volume. FE 7 managed a team of approximately 30 employees that analyzed reimbursement and denial trends for management. FE 7 recalled that during meetings with other managers and high-ranking executives involved in the claims process, including Senior Vice President 1, AdaptHealth's Senior Vice President of Revenue Cycle, who reported to the CFO, customer service managers discussed the dramatic increase in customer complaints and their causes. FE 7 stated that customers complained about being double billed, billed for products they never received, or for receiving shipments that they did not order.

163.    According to FE 3, acquired company Pinnacle also experienced an increase in patient complaints following the acquisition by AdaptHealth. Despite the increase in complaints, AdaptHealth moved the majority of the customer support team to call centers in India and the Philippines. However, AdaptHealth did not provide these international teams with proper training, and limited their customer calls to 2-3 minutes, which was not enough time to deal with customer issues. As a result, many of the calls came to FE 3, who had to deal with patients who were not even under her purview. Many of the patients tried to leave AdaptHealth, but they had no choice, because AdaptHealth "bought everyone." AdaptHealth was "more concerned about getting stuff on the books," *i.e.*, booking revenue, versus getting patients the supplies they needed.

164.    Patient complaints about AdaptHealth's improper billing practices were escalated to two state attorneys general, at least one of which has apparently launched an investigation into AdaptHealth as a result of the Company's improper billing practices. Patient complaints in Michigan obtained by Capitol Forum and shared with Lead Counsel corroborate Capitol Forum's finding that AdaptHealth was upcoding patients' diabetes supplies. A consumer submitted a complaint to the Michigan Attorney General's office regarding Healthy Living Medical Supply, another AdaptHealth acquisition, and stated that his personal portion of a bill for a Dexcom G6 CGM was $1,873.50. The large amount of the bill meant that it was billed using an A-code, even though the Dexcom G6 is required to be billed using K-codes. Moreover, the consumer complained that he discovered that his insurance had covered the full cost of the device, but he had given his credit card information to AdaptHealth, was double billed, and never contacted about the charge.

165.    Additionally, AdaptHealth's improper billing practices led the Louisiana Attorney General to open a criminal investigation. As part of its investigation into AdaptHealth's use of improper billing codes, Capitol Forum sought consumer complaints from the Louisiana Attorney

General's office regarding AdaptHealth and three subsidiaries that operate in the Company's diabetes medical supply division, including a New Orleans-based subsidiary. In response to that record request, the Louisiana Attorney General's office stated that such records exist, but they pertained to a "pending criminal litigation which can be reasonably anticipated," and the records could not be released until "such litigation has been finally adjudicated or otherwise settled."

## VI.   THE TRUTH EMERGES

166.   Investors learned the truth behind Defendants' fraudulent scheme over a series of partial corrective disclosures, each of which led to a significant stock price decline and caused investors losses. Each of these events disclosed a part of the relevant truth, but not the entire truth. AdaptHealth and its executives also accompanied each of these disclosures with further soothing statements meant to assuage any investor concerns about the sustainability of AdaptHealth's growth and future success. As such, the full scope of the fraud was only revealed over the course of all of the disclosures discussed below.

### A.   On March 1, 2022, AdaptHealth Reveals It Has Virtually No Controls Over Its Financial Reporting

167.   Investors began to learn the truth on March 1, 2022, when AdaptHealth filed its annual report on Form 10-K for fiscal year 2021 (the "2021 Form 10-K"). In this annual report, AdaptHealth revealed for the first time that the Company's internal controls over financial reporting were virtually non-existent. Incredibly, and contrary to Defendants' repeated assertions throughout the Class Period that it had implemented adequate controls, including sophisticated audit, compliance, and business management technology to minimize any inaccuracies or errors in its billing process, Defendants revealed that the Company suffered from ineffective "process level controls" in "***substantially all processes*** that support our financial statements and reporting."

73

168.    In other words, in the 2021 Form 10-K, Defendants admitted that they had not implemented controls over all systems that "support financial statements and reporting," which necessarily would include its supposedly sophisticated compliance, audit, and billing software. Indeed, Defendants further admitted that the "ineffective risk assessment also resulted in ***ineffective general information technology controls due to an incomplete understanding of the risks associated with information technology systems relevant to our financial reporting processes***." Up until March 1, 2022, other than relatively minor and narrow weaknesses related to "non-routine" transactions, accounts payable approval processes, and user-access to certain IT systems, Defendants McGee, Griggs, and Clemons had each certified—as they were required to do by law—the design and effectiveness of AdaptHealth's internal controls in all other respects. On March 1, 2022, however, the Company conceded that "the Company's internal control over financial reporting was not effective as of December 31, 2021."

169.    The new and sudden admission about enterprise-wide weaknesses in virtually ***all*** of the Company's systems and processes came about after AdaptHealth's outside auditor KPMG assessed AdaptHealth's controls for the first time and issued an "adverse" report into the Company's internal controls. In prior years, given AdaptHealth's position as an "emerging growth company," the Company was not required to obtain a certification from their outside auditor regarding internal controls. Thus, KPMG did not assess and issue an opinion on AdaptHealth's internal controls until the issuance of the 2021 Form 10-K.

170.    KPMG's report and assessment of AdaptHealth's internal control over financial reporting reiterated management's finding of ineffective risk assessment as of December 31, 2021 that permeated "substantially all processes that support the Company's financial statements and reporting." Moreover, KPMG flagged "implicit price concessions" from Medicare, Medicaid, and

other third-party payors as a "critical auditor matter." As KPMG explained in its report, AdaptHealth recorded revenues based on reimbursement rates in effect or contractually agreed by Medicare, Medicaid, and other third-party payors, which are then adjusted for estimated "implicit price concessions." KPMG further noted that to make the adjustments, AdaptHealth uses "historical reimbursement experience" to make estimated implicit price concessions. In other words, KPMG highlighted these adjustments to expected reimbursements as a critical area of concern, and these adjustments would be necessarily directly impacted by any improper billing practices.

171.    Defendants, however, significantly downplayed the importance of these findings and did not report the full true financial impact from the Company's lack of controls. In the annual report, Defendants claimed that the material weakness did not result in any misstatements to financial statements. Defendants also asserted that these weaknesses in internal controls over financial reporting did not concern the significant acquisitions of AeroCare or certain other acquisitions completed in 2021, stating that SEC guidance permitted management to exclude acquisitions made that year in evaluating internal controls.

172.    Further, they stated that AdaptHealth had *already* implemented remedial steps including the deployment of "an enterprise resource planning system which went live in the first quarter of 2022, [which] impacted a variety of AdaptHealth's processes and its review and approval of journal entries." In addition, Defendants promised to implement a slew of other remedial measures, including:

- establishing an executive steering committee to monitor the remediation of the material weaknesses;

- adding professionals to the executive team with expertise in process mapping and internal controls;

- process mapping each business cycle to identify relevant process risk points, service and sub-service organizations, information technology systems and information, and designing and implementing responsive manual and automated controls; and

- engaging third-party consultants to assist management in this effort.

173.    Even before Defendants issued the annual report and disclosed the pervasive material weakness, Defendants sought to soften the blow by preemptively (a week earlier) announcing the deployment of the "enterprise resource planning system" ("ERP") and billed it not as a remedial measure but, rather, as a significant enhancement of the Company's already sophisticated business-tracking technology.

174.    During the call on February 24, 2022 with analysts, without disclosing the material weakness findings, Defendant President Joshua Parnes stated that "we're excited to have also launched our enterprise-wide Oracle ERP system on February 1st, which will dramatically improve visibility into our business and its trends." In discussing the new technology, Parnes added that "there's inherent opportunity for more efficiencies in what we do, particularly the back office revenue cycle management claims, processing, customer engagement type of technologies, which are going kind of more digital and more automated and kind of we're at the forefront of that." Parnes then passed the call off to Defendant CFO Jason Clemens, who added that, "what we're seeing as we exit 2021 is *the full integration of technology across the company. And so we're seeing that across the revenue cycle platform. We've got a common revenue cycle platform now. We fully integrated it*." Parnes also added that:

> Oracle is fully live and enabled at all 750 plus locations as we stand here today, requisitions are being placed there electronically. POs are getting matched electronically. It's all flowing downstream. And, payments grow electronically. I mean it's *just a new day in the company* in terms of the way we work, particularly in the back office.

175.    Defendant Parnes also announced on the February 24, 2022 call that AdaptHealth had "implemented an enterprise-wide delivery tracking system that allows for real-time updates to patients waiting for their equipment, as well as a consolidated sales reporting platform, which gives our sales teams continuously updated patient order statuses that are vital to our physicians and facility referral partners."

176.    Notably, Defendants made no mention on the call of the material weakness or the fact the at the new Oracle system was in truth a remedial measure to fix a significant material weakness in internal control—a fact they tried to bury in AdaptHealth's annual filing a week later.

177.    Despite Defendants' efforts to obfuscate and downplay the material weakness both before and within the announcement, the market nevertheless reacted negatively to the news. On March 1, 2022, the day AdaptHealth issued its 2021 Form 10-K disclosing the material weakness, AdaptHealth common stock dropped 8.7% from $17.43 to $15.92. The following day, the market continued to digest and react to the negative news, and AdaptHealth's common stock slid down another 4% to a close of $15.28 on March 2, 2022. Because AdaptHealth had issued its fourth quarter and year end results the week before, there was no other news in its 2021 Form 10-K besides the surprise of the significant material weakness in internal controls that could have affected the price of the stock on these days.

178.    Analysts picked up on the news and factored the Company's lack of controls into its potential risks. For instance, SVB Leerink issued a report on March 2, 2022, and among the "key risks" to its valuation, including "integration issues" and "regulatory and reimbursement" risks, the analyst also identified, "[i]nternal process and controls" as a key risk and commented that "AHCO is working through internal controls and process issues." Defendants' spin and downplaying of the issue, however, blunted the impact, as SVB Leerink added that "[n]ew

additions to compliance, auditing, and finance should materially enhance the span of control the company has over operations."

179.    While AdaptHealth repeated its material weakness in its quarterly SEC filings during 2022, AdaptHealth continued to assure investors that the weakness had no impact on the Company's financial condition. Moreover, as set forth in Section VI.B., during 2022 Defendants continued to actively mislead investors about the Company's longstanding failure to deploy compliance and billing systems, that it was not overbilling patients or sending products that they did not need, and that it had integrated its acquisitions.

**B.    On February 27, 2023, AdaptHealth Discloses Q4 And Full-Year 2022 Earnings And Revenue Miss And Lowered Guidance**

180.    At the end of February 2023, the market finally started to learn of the impact from AdaptHealth's improper and deceptive billing practices and the true, much slower growth of the Company's diabetes medical supply business. On February 27, 2023, after the market closed, AdaptHealth announced its full-year 2022 results, disclosing a surprise loss of $0.02 per share for the fourth quarter of 2022. This was significantly lower than the ***gain*** of $0.27 per share that analysts had been led to expect. In addition, the Company announced total 2022 net revenue $50 million below guidance, with almost all of the revenue growth from 2021 coming from acquisitions and just 3.5% from "non-acquired growth," *i.e.*, organic growth. Moreover, AdaptHealth also announced 2022 Adjusted EBITDA $40 million below guidance. Defendant Griggs admitted that "Adjusted EBITDA fell short of our full year guidance due primarily to larger impacts from revenue mix and cost pressures than we previously expected." Finally, AdaptHealth lowered the guidance for 2023 it had provided just seven weeks earlier, dropping revenue guidance by over 1.5%, and lowering 2023 Adjusted EBITDA by more than 5.3%.

181.    AdaptHealth's Form 10-K for the same period further disclosed that the Company's accounts receivable ("AR") reserve ballooned to $38.6 million, a $15.7 million or nearly **69% increase** from the prior quarter reserve of $22.9 million. This represented a substantial increase in the amount that the Company did not expect to collect from its outstanding bills, which had to be written off from revenue and that contributed to the quarter's revenue miss. The AR reserve represented the portion of AdaptHealth's accounts receivable that the Company had already booked as revenue, which it no longer believed could be collected and therefore had to be written off.

182.    The dramatic increase in AR reflected the fact that insurers like Medicare and Medicaid would not reimburse claims improperly billed using more expensive A-codes or claims that were not properly documented or not authorized by the patient. Analysts made the connection. For example, Deutsche Bank referred to the large AR increase as the "canary in the coal mine" and stated that "[b]ears continue to focus on issues like over reimbursement on CGM from Medicaid."

183.    On the earnings call the following morning before the market opened, in response to an analyst question about "organic diabetes growth you had in 2022" and whether "diabetes is tracking lower in '23 versus '22," Defendant Clemens admitted that the lower guidance was because "we are responding to lower diabetes growth in the second half than we anticipated." Clemens continued that "I'll remind everyone that at the beginning of '22, we had pegged expectation for our diabetes product line to grow 18%, around mid-'22, we tempered that expectation to the mid-teens, and in fact, diabetes nonacquired growth landed in the low teens. So we are responding to that shift." Clemens further admitted that "***We are under pressure from payer mix, essentially lower price points depending on the payer***, and we're accounting for that in our

guidance for 2023. So some of the $50 million revenue guide down for '23, it is in response to tempered expectations on diabetes." In other words, AdaptHealth admitted that the reimbursement rates that it actually collected were much lower than it had anticipated. Lower overall reimbursement rates reflect the fact that AdaptHealth's improper billing practices led to claims that actually paid at lower rates—or did not pay at all.

184.    Analysts were disappointed by the Company's stark change of tune about the lower diabetes growth and the unexpected pricing pressure and resulting higher AR reserve. For instance, on February 27, 2023, RBC focused on the "weaker than expected 4Q22 results and lowered guidance," and pointed to the fact that AdaptHealth "incurred a $10MM unfavorable AR reserve adjustment related to revenue cycle headwinds." RBC recounted that "Management noted worse collection activity than they had anticipated, some of which was related to system conversions and some simply to the write-off of aged receivables. ***The AR issue accounted for essentially all of the quarter's revenue shortfall and dropped straight to EBITDA***." Notably, AdaptHealth's struggles were unique, as neither of AdaptHealth's publicly traded national competitors Owens & Minor Inc. or Cardinal Health, Inc. reported headwinds stemming from revenue cycle, collections, or aged receivables.

185.    Following the earnings call, BofA Securities noted the "Big Miss" and that "organic revenue growth decelerated to +5.3%," attributing the poor performance in part to the fact that "diabetes revs were $19m or 9% below our est[imate.]" In a separate report BofA further noted that "Diabetes revs increased low-teens organically, below the prior guide for mid-teens" and management lowered guidance as "it expects the Q4 trends to continue: shift towards government payors, lower price points. . . . The lower diabetes outlook is reflected in the $50m rev guide cut."

186.    The same day Canaccord published a report and stated that "today's conference provided more details on what was undoubtedly a very disappointing quarter," and pointed to "pronounced weakness" in diabetes, stating that "Diabetes non-acquired growth was in the low teens, below previous expectations of mid-teens growth, with notable pressure from payer mix in the segment. From management commentary, Diabetes growth is expected to be tempered going forward."

187.    On this negative news, the price of AdaptHealth stock declined by $5.99 per share, or 27%, from $21.98 per share to a close of $15.99 per share on February 28, 2023. The following day, AdaptHealth's common stock continued to react to the negative news and fell an additional 5.4% to a close of $15.13 per share on March 1, 2023.

188.    However, Defendants continued to affirmatively mislead investors about the nature of the AR reserve adjustment and the full impact of the Company's undisclosed improper billing practices and failures to fully integrate its acquisitions. Defendants falsely assured investors that there would be no more guidance surprises going into 2023. For instance, on the earnings call Clemens offered soothing language downplaying the severity of the AR reserve hit, describing it as merely transitory, stating that "the size and timing of this activity was unexpected and very recent," and assured investors that "we believe that we have appropriately accounted for general refund and recoupment activity in our 2023 guidance."

189.    Then, on March 3, 2023, RBC reported that AdaptHealth's management disclosed that the fourth quarter revenue and earnings miss announced just days earlier was attributable to a continued "material weakness" in the Company's internal controls. In its report headlined, "4Q miss is troubling, though we expect an extensive audit process has improved visibility," RBC explained that AdaptHealth's reported fourth quarter EBITDA fell 15% below the low end of its

2022 guidance range, despite the fact that management had just affirmed the low end of the guidance in January 2023, *after* the fourth quarter books had closed. In other words, the miss particularly troubled analysts because the Company appeared not to have adequate visibility into fourth quarter revenue numbers that it had already booked. RBC then provided management's explanation for the apparent lack of visibility:

> The ~$26MM miss versus the $620MM low-end of 2022 guidance reflects a $10MM unfavorable AR adjustment, $10MM of higher than expected COGS, and $6MM of higher labor costs. Management attributes the lack of visibility to material weaknesses in the company's control environment. To fully assess and cure the material weakness, AHCO has undergone a substantive audit with KPMG, which helped to uncover the receivables, COGS, and higher than expected labor expenses. In response the audit findings, the company has implemented Oracle on an enterprise-wide basis, completely overhauling its accounting and finance infrastructure.

190.    This marked a significant escalation of the Company's previously disclosed material weakness in internal controls. Investors learned for the first time that AdaptHealth's previously admitted material weakness in its internal controls over financial reporting was in fact impacting the Company's financial results and its ability to accurately report those results. The next trading day after this shocking disclosure to analysts, AdaptHealth's stock slid another $1.05, or 6.6%, to close at $14.95 on March 6, 2023.

191.    However, the full truth still had not been revealed because AdaptHealth had convinced RBC that it had fully addressed the weaknesses in its financial controls. RBC wrote, "We are maintaining our Outperform rating on Adapt Health, despite a disconcerting 4Q22 miss, as we believe management is addressing the material weaknesses in controls that clouded operating cost visibility and led to an EBITDA print well below recently revised 2022 guidance. Looking ahead to 2023, we expect business process and controls, along with added technology and human capital, implemented following an extensive internal audit significantly curbs the risk of forecasting error on the magnitude of the 4Q miss."

**C.    On May 9, 2023 AdaptHealth Announced Q1 2023 Results And The Departure of CEO Stephen Griggs**

192.    Despite its assurances, AdaptHealth continued to surprise the market with weaker-than-expected diabetes growth in the first quarter of 2023. On May 9, 2023, before the market opened, the Company announced earnings results for the first quarter ended March 31, 2023, including net revenue of $744.6 million, which represented an increase of only 5.4% and organic or "non-acquired" growth of just 4.7%, far below expectations. The Company also reported Adjusted EBITDA of $134 million, which was 2.7% lower than the first quarter of 2022, contrary to the market's expectations of growth. In the press release announcing earnings, Defendant Griggs acknowledged that "a decline in our Diabetes business, largely driven by the pump and supplies categories" hurt growth.

193.    On the heels of this negative announcement, AdaptHealth issued a separate announcement disclosing the sudden departure of CEO Stephen Griggs, who would be stepping down on June 30, 2023.

194.    On the earnings call later that morning, Griggs acknowledged that Diabetes was "the biggest surprise to people" and "without the reduction, the quarter would have looked much different." Defendant Clemens stated diabetes revenues were down $9 million year-over-year and revealed that "the shortfall in non-acquired net revenue growth reflects the acceleration of the headwinds affecting our diabetes product line that we had previously discussed." Clemens blamed the shortfall on patients shifting away from AdaptHealth into the pharmacy channel. In other words, payors and patients were opting to get their CGMs and supplies elsewhere, reflecting payor and patient exasperation with AdaptHealth's billing practices.

195.    Analysts were surprised by the news and reacted negatively. RBC noted that "results came in below expectations, primarily driven by unexpected weakness in diabetes." RBC

pointed out that patients were leaving AdaptHealth in droves, opting instead to obtain their supplies through alternative channels, writing that "diabetes pumps and supplies were down $9MM as more pumps are sold to patients through pharmacy." In a report titled "Three strikes and you are out; downgrading to Hold," Deutsche Bank noted that the market had bought into the Company's acquisition and superior technology story but were disappointed by the shrinking diabetes growth and highlighted the fact that management had "back[ed] away from [its] growth targets when the books closed due to poor financial controls." Deutsche Bank further noted that "continued material weakness" in the Company's reporting controls posed a downside risk.

196.    Defendant Griggs' resignation came without warning, and analysts like Jeffries noted about the resignation that managements' credibility "was impaired" by the "weakness in the diabetes business." Deutsche Bank pointed to Griggs' departure as s sign of troubles at AdaptHealth noting that that "bears will point to the CEO's departure as a sign that things aren't getting better anytime soon."

197.    On May 9, 2023, AdaptHealth stock fell 6.4% to close at $11.30. Defendants still did not disclose the full extent of the fraud and maintained guidance for 2023 and claimed that the difficulties were behind them. RBC kept its "outperform" rating, noting that "Management maintained 2023 guidance" and that it "believes that most of the [patient] shift has already occurred and expects sequential improvement in the diabetes business through the balance of the year."

**D.    On November 7, 2023, AdaptHealth Announced Q3 Losses Resulting From A Massive Goodwill Impairment Charge**

198.    Prior to and during the Class Period, AdaptHealth "completed numerous acquisitions to strengthen its current market share in existing markets or to expand into new markets." As a result of these acquisitions, AdaptHealth's reported goodwill, which represents the difference between an acquisition's purchase price and the fair value of the net assets acquired,

increased from $267 million as of December 31, 2019 to $3.5 billion by December 31, 2022. In fact, AdaptHealth's goodwill comprised more than two-thirds of its reported total assets by December 31, 2022. AdaptHealth attributed the increase to its goodwill from these acquisitions "to expected growth and cost synergies and the expected contribution of each acquisition to the Company's overall strategy."

199.    On November 7, 2023, investors finally learned the full extent of AdaptHealth's failure to fully integrate its acquisitions, as the Company wrote down hundreds of millions of dollars in goodwill, resulting in a net loss on the Company's books. AdaptHealth's press release announcing fourth quarter results for 2023 disclosed a net loss of $454.1 million, "largely resulting from a $511.9 million pre-tax write down of goodwill."

200.    The Company's Form 10-Q, filed the same day, stated that the impairment was triggered by AdaptHealth's declining stock price and listed factors considered in the assessment which were necessarily impacted by the Company's inability to execute on its promised integration of its acquisitions. As the Company explained, the value of goodwill on the Company's balance sheet was the direct result of the "***business acquisitions the Company has made***." Thus, the value of the Company's goodwill was largely dependent on its ability to successfully integrate the acquired companies into AdaptHealth's operations.

201.    In addition, the Company explained that a goodwill impairment assessment would be triggered as a result of "declines in historical or projected revenue, operating income or cash flows, and sustained decreases in the Company's stock price or market capitalization." Once triggered, the assessment factored in "changes in circumstance" including "changes in the legal environment, reimbursement environment, operating performance, and/or future prospects." Each of these triggering events and changes in circumstance was impacted by AdaptHealth's inability

to successfully integrate acquisitions, which led to rampant improper billing, increased legal and regulatory risk, worsening reimbursement environment, lower operating performance, dissatisfied patients, and lower future prospects. Indeed, AdaptHealth repeatedly made the connection between goodwill and integration, as it stressed to investors that its value proposition over its competition stemmed largely from its ability to quickly integrate acquisitions and deploy the Company's sophisticated technology to enhance the patient experience. Thus, as a result of AdaptHealth's inability to successfully integrate its acquisitions, the Company was forced to take a massive goodwill impairment of $511.9 million for the nine months ended September 30, 2023.

202.    Following this disclosure, AdaptHealth's stock dropped 9.9% on November 7, 2023 to a closing price of $7.69. The next day, as investors continued to digest the news, the stock dropped another 15.5% to a close of $6.50.

203.    By the end of the Class Period, AdaptHealth stock had fallen 83.8% from its Class Period high of $40.15, and, in the process, investors lost hundreds of millions of dollars.

## VII.    DEFENDANTS' FALSE AND MISLEADING STATEMENTS AND OMISSIONS

204.    Throughout the Class Period, Defendants made a number of statements regarding compliance, technology, and integration that were either affirmatively false by misrepresenting AdaptHealth's actual business practices and policies, or were misleading "half truths" by omitting material information necessary to make the statements not misleading. Both are equally actionable under the federal securities laws.

### A.    Defendants Misstated AdaptHealth's Revenue and EBITDA Throughout the Class Period

205.    For each quarter throughout the Class Period, starting with AdaptHealth's financial results for the second quarter of 2020, reported on August 7, 2020, and each quarter thereafter, Defendants reported ever increasing revenues and EBITDA. Investors relied on the accuracy of

these results and the purported growth they represented to value the Company, assess the Company's guidance, and make decisions about whether to purchase AdaptHealth's common stock. AdaptHealth's reported financial results during the Class Period, however, were materially inflated by AdaptHealth's undisclosed illicit billing practices, including AdaptHealth's widespread practice of shipping orders without proper prescriptions, documentation, or patient authorization, falsifying prescriptions and patient notes, and utilizing incorrect, more expensive billing codes.

206.    AdaptHealth's reported revenue and EBITDA for each quarter during the Class Period is set forth in the Table 1 below. Each of the reported financial results below were materially false when made and were included in the Company's Form 10-Q and Form 10-K financial statements filed throughout the Class Period and signed by Defendants McGee, Griggs and/or Clemens.

| Quarter | Report | Signatory | Revenue | EBITDA |
|---|---|---|---|---|
| Second Quarter, 2020 | August 7, 2020 10-Q | McGee, Clemens | $232,100,000 | $42,600,000 |
| Third Quarter, 2020 | November 6, 2020 10-Q | McGee, Clemens | $284,400,000 | $30,700,000 |
| Fourth Quarter, 2020 | March 6, 2021 10-K | McGee, Griggs, Clemens | $348,400,000 | $79,400,000 |
| First Quarter, 2021 | May 10, 2021 10-Q | McGee, Griggs, Clemens | $482,100,000 | $104,200,000 |
| Second Quarter, 2021 | August 6, 2021 10-Q | Griggs, Clemens | $617,000,000 | $147,400,000 |
| Third Quarter, 2021 | November 9, 2021 10-Q | Griggs, Clemens | $653,300,000 | $156,300,000 |
| Fourth Quarter, 2021 | March 1, 2022 10-K | Griggs, Clemens | $702,100,000 | $158,100,000 |
| First Quarter, 2022 | May 10, 2022 10-Q | Griggs, Clemens | $706,200,000 | $137,600,000 |
| Second Quarter, 2022 | August 9, 2022 10-Q | Griggs, Clemens | $727,600,000 | $150,000,000 |
| Third Quarter, 2022 | November 8, 2022 10-Q | Griggs, Clemens | $756,500,000 | $160,200,000 |
| Fourth Quarter, 2022 | February 28, 2023 10-K | Griggs, Clemens | $780,300,000 | $146,000,000 |

| First Quarter, 2023 | May 9, 2023 10-Q | Griggs, Clemens | $744,600,000 | $134,000,000 |
| Second Quarter, 2023 | August 8, 2023 10-Q | Richard Barasch,[12] Clemens | $793,300,000 | $171,000,000 |

Table 1 – AdaptHealth's reported revenue and EBITDA throughout the Class Period.

207.    The financial results in Table 1 were materially false and misleading when reported because AdaptHealth booked a material portion of its revenue and achieved operating earnings as a result of the Company's illicit billing practices including:

b.    using outdated, more expensive billing codes to bill for newer and cheaper CGMs (*supra* Section V.D.1.);

c.    shipping CGMs and monthly supplies that patients did not order, were not needed, or were not covered by insurance (*supra* Section V.D.2.);

d.    misleading Medicare patients about their obligations to pay for supplies upfront (*supra* Section V.D.2.);

e.    continuing to bill as much as possible to insurance even when a customer switched from AdaptHealth to a different supplier, draining the patients' insurance coverage (*supra* Section V.D.2.); and

f.    altering doctors' prescriptions and notes in order to provide CGM and other supplies that patients would otherwise not receive and should not receive (*supra* Section V.D.3.).

208.    Moreover, accounts from former employees located throughout the Company's operations stated that these illicit practices affected a substantial percentage of claims that the Company used to book revenue and earnings. For instance, FE 8, who served as an inside sales specialist for both resupply and new diabetic patients at Solara, which was by far AdaptHealth's largest diabetes supply subsidiary, estimated that ***70-80% of all shipments*** that he processed were billed under improper A-codes. Medicaid claims from around the country corroborates this

---

[12] Richard Barasch was and is AdaptHealth's Interim Chief Executive Officer and Chairman of the Board, and took over duties as CEO when Griggs stepped down on June 30, 2023.

conclusion. Medicaid claims data from Louisiana showing that out of approximately 111,000 CGM claims submitted from July 2020 to November 2022, more than 107,000, or 97%, of all CGM claims were submitted using A-codes rather than the proper K-codes. This trend was not isolated to a single subsidiary or geographic area of the country. Data from Massachusetts and Nebraska also show that the vast majority of claims were billed under A-codes. In Michigan, approximately one third of all CGM claims were improperly billed under A-codes. Each of these claims using improper codes generated revenue and earnings AdaptHealth did not properly earn and should not have booked.

209.    AdaptHealth's other improper practices of submitting claims without proper documentation and billing insurance and patients for products that were never ordered or shipped were also widespread and resulted in material misstatements of revenue and earnings. FE 5 (at Pinnacle in Mississippi) estimated that as many as 50% of all AdaptHealth's patients did not qualify for insurance coverage for their devices, and AdaptHealth managers qualified them by altering prescription and patient notes. FE 3 who also worked for Pinnacle, similarly estimated that 40% of re-order claims were sent without obtaining proper documentation. FE 12 (at Solara's office in Chula Vista, California) conservatively estimated that 25% of orders were shipped without proper documentation. All of the claims that were improperly submitted generated revenue and earnings AdaptHealth did not properly earn and should not have booked.

210.    Even if AdaptHealth's illicit practices were limited to the Company's diabetes business, and there is no indication that they were, every quarter during the Class Period AdaptHealth separately reported revenue from the diabetes segment, which represented 20% or more of AdaptHealth's total revenues. Thus, even the most conservative estimate concerning the

pervasiveness of AdaptHealth's illicit practices (25% of shipments), would have represented a material impact on the Company's reported revenue and earnings.

## B. Defendants Falsely Portrayed AdaptHealth As Possessing Critical Compliance Infrastructure

211.    Throughout the Class Period, Defendants highlighted AdaptHealth's supposed ability to comply with healthcare regulations and payors' billing requirements. In announcing its entry into the diabetes space at the August 4, 2020 earnings call, Defendants identified "billing" as one of the Company's "core competencies." Throughout the Class Period, Defendants claimed that the Company was well situated to navigate the "complex reimbursement environment," claimed the change in billing codes for CGM (from A-codes to K-codes) was "***nothing that we're concerned about whatsoever***," and when asked about compliance risks, claimed that there was "nothing that keeps [us] up at night." These statements concealed a reality where AdaptHealth engaged in a variety of illicit billing practices, including improperly using more lucrative billing codes, altering prescriber prescriptions, and shipping supplies that patients did not order or need, and forcing those patients to foot the bill when insurers inevitably refused to pay.

212.    Many of Defendants' statements regarding compliance and billing were rendered false by the same facts and the same pattern of conduct that is set forth above in Section V. Thus, to avoid unnecessary repetition, many of the statements below are grouped together, and the allegations summarizing their falsity are then set forth afterwards.

213.    The Class Period begins on August 4, 2020, to coincide with AdaptHealth's announcement of its second quarter 2020 financial results that beat the Company's previous quarterly guidance to investors. Discussing the recent Solara purchase and consequent entry into the diabetes space, McGee told analysts and investors that "the current provision of CGM sensors and transmitters fits in well with our ***core competency around resupply to patients with chronic***

*conditions*." Defendant Parnes reiterated this claim, claiming that diabetes was "largely a resupply business that generates recurring revenue and is ***very well suited to our core competencies in resupply, billing and referral relationships***."

214.    On August 13, 2020, Defendant McGee was interviewed by an analyst from Canaccord Genuity at an analyst conference. The analyst noted that AdaptHealth had "talked a lot about your technology platform at the company" and how, with some acquisitions and the resupply business, AdaptHealth was able to "go in and get a bump in terms of some of your processes." He requested that McGee "spend a little bit of time on that, the technologies that you're using to improve workflow, supply, supply chain, revenue cycle and whatnot in terms of . . . the resupplies."

215.    In response, Defendant McGee explained that AdaptHealth had implemented call centers to conduct outreach to their Medicare-aged population. According to McGee, these call centers had "the nicest people in the world, calling and doing outbound and we're using technology to make that really efficient. . . . And so*, we do, just with that technology alone, do better than a lot of the companies we acquire and so there's a nice little revenue bump from just more proactive outreach*."

216.    Defendant McGee then discussed the purported fact that AdaptHealth was not able to auto-ship supplies to patients and was required to confirm patient need for each shipment:

> In some respects, it is frustrating at times because a lot of payers necessarily put speed bumps. They don't want the patient—if you ask the patient, patients say, I want my stuff every quarter, please just send it to me. And unfortunately, a lot of payers don't allow that to happen including Medicare, which is [why] we need contact with the patient, ***we need to affirm if they're using their supplies and they need them***, which is, as I said, ***probably a good check on fraud, waste and abuse.*** And ***we never want to be tarred with that***. And so, what we have to do is we have to make it feel to the patient like they are getting it every quarter. We have to interact with them in ways they want to be interacting with to let them get their stuff, eliminate that and kind of accede to their wishes of the frictionless experience, [while] ***complying with all the rules that the healthcare system has put in place to make sure that there's not overutilization***.

217.    On January 14, 2021, Defendant McGee represented AdaptHealth at the JP Morgan Healthcare Conference. At that conference, McGee explained that AdaptHealth had "built [its] business with a focus on technology, both more efficient ways to interface with our provider partners and better ways to interact with our patients who have chronic supply needs." Later in the presentation, McGee elaborated on AdaptHealth's patient interaction capabilities, saying:

> Now we're providing the product to these patients, getting it into their homes, teaching them how to use it, resupplying them, making sure they're adhering to the therapy. ***This isn't a business where we're just shipping boxes and then hoping to get paid or getting paid upfront. We are managing these patients' lives.*** We're ***making sure that they're resupplying***. We're teaching. ***We're navigating the maze of reimbursement from thousands of insurance companies***.

218.    Defendant McGee reiterated AdaptHealth's supposed ability to navigate the "reimbursement environment" on February 25, 2021, when he represented AdaptHealth at the SVB Leerink Global Healthcare Conference. At the conference, the SVB Leerink analyst asked about "telemedicine," or remote diagnosing using telecommunications technology. When the analyst suggested that many patients "don't like to use [telemedicine] at all," McGee reiterated that AdaptHealth was not "just sending boxes" to patients but instead "doing a hell of a lot more than that," and added:

> I want to make sure we remind sort of everyone listening and everyone paying attention. ***We're not just sending the stuff and sending a bill and getting paid on a credit card, not only do we have all the competency to navigate the complex reimbursement environment, we're getting these patients adhering to the therapy***.

219.    On March 4, 2021, AdaptHealth announced its fourth quarter and year-end financial results for 2020. At an analyst call that day, Defendant McGee specifically addressed AdaptHealth's ability to adapt to changing Medicare reimbursement practices. In response to an analyst question on "the dynamic between diabetes patient growth and unit growth versus the pricing," McGee noted that "advanced diabetes, primarily CGM…was approved by Medicare…in 2017 for reimbursement" and responded, "We've seen some payers switch to with the Medicare

92

payment methodology, not necessarily the rate, but the K-codes versus A-code" and "we continue to see this as we've been underwriting these acquisitions" but "***nothing that we're concerned about whatsoever***, and I think we're just really excited because we're still early in the compounding of the [CGM] sensors."

220.    On March 16, 2021, AdaptHealth filed its Form 10-K for Fiscal Year 2020, which was signed by Defendants McGee, Griggs, and Clemens, with the SEC. On March 1, 2022, AdaptHealth filed its Form 10-K for Fiscal Year 2021, which was signed by Defendants Griggs and Clemens. On February 28, 2023, AdaptHealth filed its Form 10-K for Fiscal Year 2022, which was signed by Defendant Griggs and Clemens. The Form 10-Ks all specifically discussed, in substantially identical language, how AdaptHealth's technology ensured improved compliance, telling investors:

> AdaptHealth has established an integrated, technology-enabled, centralized platform, distinguishing itself from many of its competitors who traditionally use less automated processes that are typically complex, can be prone to mistakes and are inefficient. ***AdaptHealth's technology enables automated, compliant, and integrated work flow into patients' delivery of care.*** AdaptHealth believes that this advanced technology platform provides it with a competitive advantage through its unique components that cater to patients and physicians. AdaptHealth believes that its technology platform has several characteristics that appeal to physicians, including its ease of use, ***the improved compliance it enables through its integrated systems and the automated, integrated work flow it provides for patients' delivery of care. Additionally, AdaptHealth's e-prescribing capabilities enhance transparency and reduce transcription and other errors.*** AdaptHealth believes that patients are also better served due to the efficiency from time of order to delivery and the seamless integration across points of care enabled by AdaptHealth's platform. ***The integrated system also provides AdaptHealth management with critical information in a timely manner, allowing them to track performance levels company wide.***

221.    On June 2, 2021, Defendants Griggs, Parnes, and Clemens represented AdaptHealth at the Jefferies Healthcare Conference. One analyst noting that there was "a lot of debate" and "a lot of confusion" in the "discussion on pharmacy versus the medical benefit," before asking Defendants, "anything you can share in terms of how you view that business?" Parnes

reassured analysts, and through them investors, by claiming that AdaptHealth's technology offered it a "competitive advantage" by reducing "overutilization" and offering a more "efficient" experience for providers that gave AdaptHealth a "competitive advantage." Parnes explained:

> [O]ur diabetes business today is growing extremely quickly. We're also very excited about kind of what we've been able to do on e-prescribing for diabetes. Diabetes, just as a little bit of a background . . . had a very antiquated order process, which led to really, really long cycle times to get an order from the physician to the patient. . . . Now for a payer, a medical benefit has a significant advantage for the payer, because there's a utilization management aspect of that. ***So there's essentially a healthy roadblock that prevents kind of overutilization of the product. And the doctor having to document that properly, albeit with our e-prescribing technology, allows the doctor to do that in a very efficient and quick way that there is a compliant order,*** they documented the need for it and then there's extreme visibility both to the patient, to us and the physician about getting that order out in a very quick cycle time. So that's something that has been growing really nicely for us. . . . Doctors are extremely excited about it. . . . what we're seeing is mass adoption of this digital technology. And that kind of led us to where we're going next on diabetes is really similar to what we're doing on the sleep side. . . . ***And I think what's important to that is obviously in the short term, we'll be able to win additional organic business in terms of a competitive advantage***. . .

222.    On September 16, 2022, AdaptHealth hosted a Capital Markets Day conference for analysts attended by Defendants Griggs, Parnes, Clemens, Russalesi, Rietkerk, and Carson. During the conference, Defendant Russalesi, AdaptHealth's Chief Compliance Officer, provided an overview of AdaptHealth's compliance program and told investors, "Our program has a strong foundation in ethics and integrity, ***raises a consistent awareness of compliance throughout the business, and prevents misconduct, which allows us to achieve our goal of delivering the best patient care, while minimizing the business risk***[.]" Russalesi continued to explain that "We created a comprehensive education program, and ***we also developed a very rigorous internal monitoring program, which gives us pretty much real-time visibility into the business practices and helps us identify any types of trends that need immediate correction***."

223.    Later during the conference, Defendant Rodney Carson, AdaptHealth's Chief Operations Officer, told analysts that "***Wendy [Russalesi] and her organization does an***

*exhaustive review of charts and chart notes to make sure there are no regulatory compliance issues.*"

224.    The statements set forth in ¶¶211-223 above were materially false or misleading, and omitted facts necessary to make them not materially misleading. It was materially false and misleading for McGee and Parnes to claim that "billing" and "resupply" were among the Company's "core competencies" (¶213); for McGee to represent that AdaptHealth achieved a "revenue bump" purely by implementing a proactive, patient-focused outreach and for McGee to represent that AdaptHealth was "better" than the companies it acquired using technology to facilitate resupply (¶215); for McGee to represent that AdaptHealth "affirm[ed]" that patients needed their supplies (¶216); and for McGee to represent that AdaptHealth was not "just shipping boxes" or "just sending" the supplies but was "managing these patients' lives," "making sure that they're resupplying, and "getting these patients adhering to the therapy (¶¶217-18). By the time of these statements, AdaptHealth had an established but undisclosed history of violating medical regulations and permitting upcoding and other illicit billing practices, including:

    b.    using outdated, more expensive billing codes to bill for newer and cheaper CGMs (*supra* Section V.D.1.);

    c.    shipping CGMs and monthly supplies that patients did not order, were not needed, or were not covered by insurance (*supra* Section V.D.2.);

    d.    misleading Medicare patients about their obligations to pay for supplies upfront (*supra* Section V.D.2.);

    e.    continuing to bill as much as possible to insurance even when a customer switched from AdaptHealth to a different supplier, draining the patients' insurance coverage (*supra* Section V.D.2.-3.); and

    f.    altering doctors' prescriptions and notes in order to provide CGM and other supplies that patients would otherwise not receive and should not receive (*supra* Section V.D.3.).

225.    In addition, it was materially false and misleading for McGee and Parnes to claim that "billing" and "resupply" were among the Company's "core competencies" (¶213); for McGee to state that AdaptHealth "compl[ied] with all the rules that the healthcare system has put in place to make sure there's not overutilization" (¶216); for McGee to state that AdaptHealth's systems provided any kind of "check" on "fraud, waste, and abuse," (¶216); for McGee to represent that AdaptHealth was "navigating the maze of reimbursement" and had "the competency to navigate the complex reimbursement environment" (¶¶217-18); for McGee to represent that the change in billing codes was "nothing that we're concerned about whatsoever" (¶219); for AdaptHealth, in its Form 10-Ks for Fiscal Year 2020, 2021, and 2022, as well as Defendants McGee (for the 2020 10-K), Griggs, and Clemens to claim that its "technology enables . . . compliant . . . work flow," that the technology enables "improved compliance," that its "e-prescribing capabilities enhance transparency and reduce transcription and other errors, and that its "integrated system also provides AdaptHealth management with critical information in a timely manner, allowing them to track performance levels company-wide" (¶220); for Parnes to claim that AdaptHealth's technology allows doctors to go through the ordering process, which was designed to "prevent . . . overutilization of the product," in a "very efficient and quick way" that still resulted in a "compliant order" and that this technology provided AdaptHealth with a "competitive advantage" (¶221); for Russalesi to claim AdaptHealth's program contained a "consistent awareness of compliance throughout the business" and a "very rigorous internal monitoring program" (¶222), and for Carson to claim that the compliance team "does an exhaustive review . . . to make sure there are no regulatory compliance issues (¶223). These statements were false for the additional reasons that multiple former employees confirmed that, far from billing being a "core competency" at the Company, AdaptHealth *never* implemented an audit or compliance system to ensure proper

billing practices and that warnings to management about improper billing practices either went unheeded or were met with orders to continue the practices. For instance, FE 12 confirmed that when AdaptHealth closed the Solara transaction on July 2, 2020, management did ***not*** implement a system for employees to report improper billing practices and ignored repeated warnings of wide-spread billing abuses. Likewise, FE 9 confirmed that when AdaptHealth took over Solara in July 2020, departments that were responsible for checking orders no longer did so. FE 2 stated that when AdaptHealth took over Solara in July 2020 they "gutted everything," and there was no oversight of claims. For the statements by Defendants McGee, Parnes, Russalesi, and Carson following the Pinnacle acquisition on January 1, 2021 (¶¶217-19, 221-23), as well as the statements in AdaptHealth Form 10-Ks for Fiscal Year 2020, 2021, and 2022 (¶220), these statements are false for the additional reason that, as FE 5 reported, AdaptHealth actually ***shut down Pinnacle's existing compliance system***.

226.    Later during the September 16, 2022 conference, Defendant Russalesi stated, "So through the enterprise program, we have a consistent framework that helps us influence the compliance first culture, empower the businesses success and focus on technology not only within our program, but also within the business. ***Our program incorporates all of the required elements from the Office of the Inspector General Guidance, as well as factors from the Department of Justice's evaluation of corporate compliance programs***. Our team is led by professionals that are certified in healthcare compliance, HIPAA privacy and security, ***and also billing and coding practices***.

227.    The Office of Inspector General Guidance for the Durable Medical Equipment, Prosthetics, Orthotics and Supply Industry identifies "seven effective elements to an effective compliance program." Those elements are: (1) "implementing written policies, procedures and

standards of conduct"; (2) "[d]esignating a compliance officer and compliance committee"; (3) "[c]onducting effective training and education"; (4) "[d]eveloping effective lines of communication"; (5) enforcing standards through well-publicized disciplinary guidelines"; (6) "[c]onducting internal monitoring and auditing"; and (7) "[r]esponding promptly to detected offenses and developing corrective action."

228.    The DOJ's evaluation of corporate compliance programs asks three overarching questions, which are: (1) [i]s the corporation's compliance program well designed"; (2) "[i]s the program being applied earnestly and in good faith? In other words, is the program adequately resourced and empowered to function effectively?"; and (3) "[d]oes the corporation's compliance program work in practice?"

229.    Providing a specific example of AdaptHealth's supposed compliance framework, Defendant Russalesi asserted that since 2016, AdaptHealth had implemented a comprehensive audit function called "Audit Share" that purportedly provided executives with "real time visibility into what's happening with our audits. ***We can see our audit outcomes. We understand what are the trends and what are the emerging risks that are coming out of this audit activity***." Russalesi added that management was "monitoring the enforcement trends that are coming out in the industry" and that monitoring these items "helps us set our priorities to move the program forward and to achieve our goals, ***to drive better patient care, to mitigate emerging fraud and abuse risk, and again to support the company growth strategy***."

230.    The statements set forth in ¶¶226-29 above were materially false or misleading, and omitted facts necessary to make them not materially misleading, because AdaptHealth had not implemented an effective compliance program with features such as "effective lines of communication," "internal monitoring and auditing," and "[r]esponding promptly to detected

offenses and developing corrective action," and it was materially false and misleading for Defendant Russalesi to claim that AdaptHealth implemented an "Audit Share" program that allowed it to "track audit outcomes," to "understand what are the trends and what are the emerging risks that are coming out of this audit activity," and to "mitigate emerging fraud and abuse risk." As stated in ¶¶131-35 above, multiple former employees confirmed that AdaptHealth never implemented an audit or compliance system and that warnings to management about improper billing practices either went unheeded or were met with orders to continue the practices. FE 5, who input diabetes orders into the Company's billing systems and worked at Pinnacle and then AdaptHealth's Medicare diabetes division from approximately July 2020 to July 2022, reported that AdaptHealth actually shut down Pinnacle's existing compliance system and reported that Audit Share was never implemented or available.

231.    Russalesi's statements about compliance were also contradicted by AdaptHealth's true practices, which included:

g.    using older, more expensive billing codes to bill for newer and cheaper continuous glucose monitors (*supra* Section V.D.1.);

h.    shipping CGMs and monthly supplies that patients did not order and were not needed or covered by insurance (*supra* Section V.D.2.);

i.    misleading Medicare patients about their obligations to pay for supplies upfront (*supra* Section V.D.2.);

j.    continuing to bill as much as possible to insurance even when a customer switched from AdaptHealth to a different supplier, draining the patients' insurance coverage (*supra* Section V.D.2.-3.); and

k.    altering doctors' prescriptions and notes in order to provide CGM and other supplies that patients would otherwise not receive (*supra* Section V.D.3.).

232.    During the September 16, 2022 conference, an analyst noted that "this sector historically has had a lot of issues with compliance. We've seen the OIG reports over my lifetime

around . . . compliance, obviously, we've never seen any issues with you guys," before asking

Defendant Russalesi, "can you sort of refresh us on how many audits you guys this year, what's

your success rates of these audits, the process you have to go through these audits? Have you guys

ever had a whistleblower complaint? And then what keeps you up at night?" Russalesi explained:

> But what I want to add on to that is our hotline is an independently managed hotline,
> and we promote that throughout the company. There's company-wide postings. It's
> in all of our compliance communication, all of our training. Basically, we're telling
> the business if you see something, say something. . . . So I think we really have
> established a very open line of communication with the business, and I think that
> helps sort of drive down that potential for people feeling like we're not doing
> something right and we're not correcting it and going to talk to someone else about
> it.

233.    The statements set forth in ¶232 above were materially false or misleading, and

omitted facts necessary to make them not materially misleading, because AdaptHealth had not

adopted a policy of "if you see something, say something" and had not "established a very open

line of communication." As stated in ¶131-35 above, multiple former employees confirmed that

AdaptHealth never implemented an audit or compliance system, that AdaptHealth actually shut

down Pinnacle's existing compliance system, and that warnings to management about improper

billing practices either went unheeded or were met with orders to continue the practices.

Additionally, during the Class Period, each Form 10-Q or Form 10-K contained Certifications

pursuant to the Sarbanes-Oxley Act of 2002 ("SOX") signed by Defendants McGee, Clemens,

and/or Griggs. Each SOX Certification signed by Defendants McGee, Clemens, and Griggs stated,

"Based on my knowledge, this report does not contain any untrue statement of a material fact or

omit to state a material fact necessary to make the statements made, in light of the circumstances

under which such statements were made, not misleading with respect to the period covered by this

report." In their SOX Certifications, McGee, Clemens, and Griggs further stated that they were

responsible "for establishing and maintaining disclosure controls and procedures . . . and internal control over financial reporting . . . and have:

    a.  Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

    b.  Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of the financial statements for external purposes in accordance with generally accepted accounting principles; and

    c.  Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation[.]

234.    These statements were materially false and misleading when made because, in truth, as Defendants later admitted in AdaptHealth's annual report for fiscal year 2021, which was filed on March 1, 2022, the Company's internal controls were virtually nonexistent, and there was a "lack of implementation and ineffectiveness of process level controls *in substantially all processes that support our financial statements and reporting.*"

235.    Defendants' certifications regarding internal controls were further false and misleading because Defendants did not design and evaluate effective internal controls and instead allowed AdaptHealth to engage in illicit billing practices, which included:

    l.  using older, more expensive billing codes to bill for newer and cheaper continuous glucose monitors (*supra* Section V.D.1.);

    m.  shipping CGMs and monthly supplies that patients did not order and were not needed or covered by insurance (*supra* Section V.D.2.);

    n.  misleading Medicare patients about their obligations to pay for supplies upfront (*supra* Section V.D.2.);

o.    continuing to bill as much as possible to insurance even when a customer switched from AdaptHealth to a different supplier, draining the patients' insurance coverage (*supra* Section V.D.2.-3.); and

p.    altering doctors' prescriptions and notes in order to provide CGM and other supplies that patients would otherwise not receive (*supra* Section V.D.3.).

236.    Moreover, as stated in ¶¶131-35 above, multiple former employees confirmed that AdaptHealth never implemented an audit or compliance system, that AdaptHealth actually shut down Pinnacle's existing compliance system, and that warnings to management about improper billing practices either went unheeded or were met with orders to continue the practices.

**C.    AdaptHealth Falsely Claimed That Its Technology Improved The Patient And Provider Experience And Drove AdaptHealth's Revenue And Earnings Growth**

237.    Consistent with AdaptHealth's identification of its unique technological platform as a competitive strength, throughout the Class Period, Defendants stressed the theme that this platform reduced waste, fraud, and abuse and lead to more efficient and accurate processing of claims. This, in turn, purportedly led to greater patient retention, and fueled AdaptHealth's reported revenue, earnings, and future guidance. Throughout the Class Period, Defendants fell back on AdaptHealth's technology, and its capacity to engender a more efficient and effective experience for patients and providers, in response to any analyst inquiries about where AdaptHealth wanted to, and could, continue to grow. As set forth below, each of these statements was materially false and misleading.

238.    Many of Defendants' statements regarding the benefits of its technology were rendered false by the same facts and the same pattern of conduct that is set forth above in Section V.D. Thus, to avoid unnecessary repetition, many of the statements below are grouped together, and then the allegations summarizing their falsity are then set forth afterwards.

239.    On December 1, 2020, AdaptHealth held a conference call to announce their acquisition of AeroCare Holdings, Inc. During the call, Defendant Griggs said that AdaptHealth's success was fueled by "key investments in technology and efficient operational workflows."

240.    In the proxy solicitation for the SPO, which was filed with the SEC on December 22, 2020, and the Form 10-K for Fiscal Year 2020,[13] which was filed with the SEC on March 16, 2021, and signed by Defendants McGee, Griggs, and Clemens, AdaptHealth highlighted the Company's "Competitive Strengths" for investors, and expanded upon its theme of technological investment. AdaptHealth claimed that "the following strengths will continue to enable it to provide high-quality products and services to its customers and to create value." In the first example of such a strength, AdaptHealth identified its "Differentiated Technology-Enabled Platform" as a strength, and claimed that platform offered it a "competitive advantage" compared to other home medical equipment companies by automating "processes that can be complex, prone to mistakes and inefficient" and offering "ease of use, improved compliance and automated, integrated workflow for delivery of care," saying:

> ***Differentiated technology-enabled platform:*** Over the last five years, we have developed an integrated technology system (based upon leading third-party applications and proprietary software products), which we believe provides a competitive advantage within the HME industry. ***Our integrated platform distinguishes itself from other industry participants by automating processes that can be complex, prone to mistakes and inefficient. We believe that our platform's ease of use, improved compliance, and automated, integrated workflow for delivery of care appeals to physicians and payor*s**. Additionally, we believe our adoption of e-prescribing solutions enhances transparency and reduces clinical errors and delays. We believe such systems provide better patient service by reducing the time between an order's receipt and the delivery of the products to the patient. We believe our model is scalable, supporting future organic growth while also allowing ***for timely on-boarding of acquisitions***. We believe that this differentiated technology platform will help generate business from new clients, as

---

[13] Substantially identical statements appeared in AdaptHealth's Form 10-K for Fiscal Year 2019, which was incorporated by reference into the Prospectus filed with the SEC on January 4, 2021 in connection with the SPO.

other competitors either lack the resources to modernize their infrastructure or utilize systems which do not easily allow for changes from traditional, less automated models.

241.    AdaptHealth buttressed these points elsewhere in the same SEC filings when it identified the "most important competitive factors in the regional and local markets" for home medical equipment and claimed the Company "competes favorably with competitors on the basis of these and other factors." The factors identified included a "[d]ifferentiated technology platform that provides a superior physician and patient experience" as well as "[s]ervice quality," "[o]verall ease of doing business," and "[q]uality of patient care."

242.    As discussed in ¶220, Defendants filed Form 10-Ks on March 16, 2021, March 1, 2022, and February 28, 2023 that were signed by Defendants McGee (for 2020), Griggs, and Clemens. The Form 10-Ks stated:

> AdaptHealth has established an integrated, technology-enabled, centralized platform, ***distinguishing itself from many of its competitors who traditionally use less automated processes that are typically complex, can be prone to mistakes and are inefficient***. AdaptHealth's technology ***enables automated, compliant, and integrated workflow into patients' delivery of care. AdaptHealth believes that this advanced technology platform provides it with a competitive advantage through its unique components that cater to patients and physicians***. AdaptHealth believes that its technology platform has several characteristics that appeal to physicians, ***including its ease of use, the improved compliance it enables through its integrated systems and the automated, integrated workflow it provides for patients' delivery of care.*** Additionally, AdaptHealth's e-prescribing capabilities ***enhance transparency and reduce transcription and other errors***. AdaptHealth believes that patients are also better served due to the efficiency from time of order to delivery and the seamless integration across points of care enabled by AdaptHealth's platform. The integrated system also provides AdaptHealth management with critical information in a timely manner, allowing them to track performance levels company wide.

243.    Following the AeroCare acquisition, Defendants, including the newly joined Defendant Griggs, continued to stress the benefits of AdaptHealth's technology in improving the patient experience. On May 25, 2021 Defendants Griggs, Parnes, and Clemens represented AdaptHealth at the UBS Global Healthcare Conference. At that conference, in response to a

question on the integration of AeroCare and AdaptHealth, [Defendant Griggs] discussed combining the companies' complimentary technologies, stating "[t]he RCM function that Adapt had" been working on in prior years "truly just makes us more efficient. ***We're able to process claims faster, quicker, better, and more accurate***. . . . At AeroCare, we're very proud of our billing operation, but [integrating with AdaptHealth] already made ours better."

244.    Later during the conference, an analyst raised potential market confusion around diabetes and asked, "Are we still comfortable with diabetes that are contributing the 10% to 15% of revenue despite the weakness, quote unquote, we saw at the beginning of the year?" Defendant [Griggs] responded, "Yeah, sure. So diabetes, we got into diabetes in June of last year and primarily we got in because number one, it's a very fast growing, organically growing market":

> [P]articularly with the resupply component of it . . . there's actual sensors that get resupplied on a regular basis, it fits the model of how we're doing this on the sleep side with our CPAP. And we kind of have expertise with that and also both at the distribution side of it, ***but also in the markets with the doctors, the relationships, how to get the patients set up, getting them qualified for their CGM. So, really, that part of the business has been growing really, really well. We're very committed to it. We're excited about . . . driving technology adoption there, particularly e-Prescribe***."

245.    On an August 5, 2021 earnings call, Defendant Parnes again highlighted the "efficiencies" offered by AdaptHealth's technology, specifically e-prescribe, saying:

> But diabetes . . . we've been in it for about a year now and it's been great, out of the gate, we've been pushing e-prescribe and all the things that we've learnt on the [home medical equipment] side of the business. ***So think about resupply, e-prescribing some efficiencies on intake technology, and that's really allowing our prescribing partners and physicians to really get a much more efficient experience, and also under the medical benefit as well to really derive efficiencies in that process and the documentation process. So that's been allowed us really to grow with the market.***

246.    On August 11, 2021, Defendants Clemens, Griggs, and Parnes represented AdaptHealth at the Canaccord Genuity Growth Conference. At that conference, in response to another analyst question on the significance of "e-prescribing on the diabetes side in terms of . . .

the positives," and "the longer term opportunity," Defendant Parnes explained, "e-prescribing is
something that started on the [home medical equipment] side of the business and continues to
make progress" and "it's relatively new to the diabetes business mostly because we've only owned
the diabetes business since July of 2020," further telling investors:

> And it's taken off like wildfire. We work very closely with the software provider to
> roll it out across providers. Now approximately 40% of orders are coming in now
> through that e-prescribed channel. Now why that's significant is not just the fact of
> the matter that it's easier for the doctor to use. It's less friction in the channel. **It
> essentially alleviates a lot of the roadblocks that typically the medical benefit had
> historically**. It makes it much more seamless for an insurer or a doctor to get CGM
> onto their patient. And I think that's significant. **It's significant because it offers
> the insurance company the benefits of at least a utilization or prior authorization
> function**. At the same time, it allows it to be seamless and transparent and quick,
> which doesn't impede kind of getting the chronic disease care out to that patient.
> I'd say that's number one. Number two, **briefly it also reduces audit exposure, so
> it allows the audit to be documented appropriately . . . and really it differentiates
> us from our competitors out in the market.**

247.    On November 4, 2021, AdaptHealth issued a press release announcing its third
quarter 2021 financial results. On that day's earnings call, Defendant Parnes told investors:

> [M]ore than half of our CGM orders are now coming in via e-prescribe, up from
> zero just a year ago. **We believe that in addition to helping drive better operating
> efficiencies, e-prescribe helps facilitating easier referring physician experience
> by dramatically shortening the cycle time to get diabetic patients on CGM therapy
> and a rapid uptake of this technology in the physician community is reflected in
> our strong growth rates.**

248.    On May 11, 2022, Defendants Griggs and Clemens represented AdaptHealth at the
Bank of America Healthcare Conference. At that conference, an analyst noted that AdaptHealth's
stated "long-term organic growth rate [has] always been higher than . . . that mid-single-digits that
[they] used to always guide to," and asked, "how do you reconcile that? What's the driver, why is
your growth going to be higher?" Defendant Griggs responded:

> Well, we're a sales organization and that's been from day one. We go out there sell.
> And we believe, and it's built in our culture, it's built in every person in there, the
> addressable need is up here, what's being delivered is down here. There's more
> people with COPD that are getting oxygen. There's more people with sleep apnea

that are getting CPAPs. There's more people that have problems ventilating their oxygen that need ventilation that are getting it. There's more people that need CGMs and diabetes treatment that are getting it today. So that addressable need is significantly higher, and our people are trained and motivated to get the patients, show the quality and . . . what our treatment's done for that patient and to be able to show that doctor how they should be not waiting . . . this far into the cycle to identifying those patients and *identify those patients earlier, better for the patients, better for the system, better for their employer and better for the insurer*. So, that's how we live and breathe every day and it just pays dividends for us.

249.    On May 25, 2022, Defendant Parnes and Clemens represented AdaptHealth at the UBS Global Healthcare Conference. Discussing the diabetes segment, an analyst noted that "[p]eople pointed to the shift from medical into the pharmacy as being a risk to" AdaptHealth before asking, "Have you seen it impact your business in any way, shape, or form as pharmacies are now selling some of the products that you also?" Defendant Parnes responded by claiming that AdaptHealth was able to identify the patients that needed its supplies most, explaining:

> [T]he added benefit of the medical channel, both for payers and for the manufacturers from the payer perspective is, when a patient gets on therapy with us, the doctor document it really well why the patient needs it, *we screen patients that really shouldn't be on the therapy, and we're really filtering out the ones that are going to benefit the most from it*.

250.    On August 9, 2022, AdaptHealth announced "double-digit growth" in its diabetes product line, which the Company attributed to its "*important investments in technology*." On a call announcing those results, Defendant Parnes told investors:

> We remain committed to investments in technology that transform the [home medical equipment] experience for our patients, payors and referring physicians. For example, *our e-prescribe platform continues to make home health easier for our referring providers by allowing them to eliminate the hassle and paperwork of outdated and error-prone ordering methods such as fax*. We continue to see greater than 50% adoption in the regions where this technology is rolled out, as well as quarter-over-quarter growth of 7.5%.
>
> *Our new e-ordering capabilities are improving patient experience by providing channel of choice communication.* Approximately 50% of all PAP and diabetes resupply orders in Q2 were processed electronically via our digital patient portal. Our e-delivery platform greatly increases transparency for order delivery, enabling

every customer to rate interactions in real time and by providing real-time order tracking. . . .

We continue to believe that these technologies will allow us to keep our costs in line, even as we scale and continue to grow. ***By making home health easier and more accessible for payors, patients and providers, we can continue to gain share and volume within the broader home health industry***.

As we look down the road, these proprietary tools are the foundations for both improving our patient satisfaction as well as operating efficiencies, and will help open the door to greater collaboration with our payors on alternative payment arrangements.

251.    On September 16, 2022, Defendants Griggs and Parnes represented AdaptHealth at the Capital Markets Day Conference. During the conference, AdaptHealth's Chief Operating Officer, Defendant Rietkerk, once again highlighted AdaptHealth's technology system as a key strength, stating:

What I want to do is actually take you through a journey of our ***tech-enabled intake process and revenue cycle workflows that drive the better outcomes for the patient. Let us expand our resupply revenue and fuel growth for the organization***. Let's start at the beginning of the process, which is the referral. So e-prescription is definitely the top way to get an order today, not just for AdaptHealth and [home medical equipment], but healthcare in general, it's a higher quality order. It requires less touch points back to the physician and allows you to expedite delivery of that service. . . . Once the order has been delivered, we look at claims submission. ***So we have custom-built technology that looks at every claim prior to being submitted to the clearinghouse. This monitors payors rules. It monitors rules by product, by patient type, by service orientation. So, through that whole process, this engine lets us know that we are delivering a clean claim to the clearinghouse***. . . So looking in general, the tech-driven workflow that we have today, our patient-centric processes that are built around that workflow, and then our RCM expertise ***has driven us for the success that we have moving forward both in driving patient outcomes, growing resupply revenue, and fueling growth for the future***.

252.    On a November 8, 2022 call with analysts and investors to discuss the Company's earnings and operations for the third quarter of 2022, after reporting positive quarterly revenue trends, Defendant Clemens claimed that "***The technology and workflow investments we made over the past year are driving these results***. We continue to increase adoption of e-prescribe and we made additional investments in hardening our claims editor engines. ***These changes are***

*resulting in cleaner claims*, lower denial rates and more cash. Additionally, our patient pay collection rates continue to improve as we deploy our e-ordering and e-delivery workflow to get more accounts on AutoPay."

253.    The statements set forth in ¶¶239-52 above were materially false or misleading, and omitted facts necessary to make them not materially misleading. It was false and misleading for Defendant Griggs, at an AdaptHealth conference call announcing the AeroCare transaction, to attribute AdaptHealth's success to its "key investment[] in technology" (¶239); for AdaptHealth, in its proxy solicitation for the SPO and its Form 10-K for Fiscal Year 2020, to claim that it "distinguishes itself from other industry participants" by eliminating processes that were "prone to mistakes and inefficient" and by offering "improved compliance" and to claim it "competes favorably" with its competitors on the basis of its "differentiated technology platform" (¶¶240-41); for AdaptHealth, in its Form 10-Ks for 2020, 2021, and 2022, to have a technology system that enables "improved compliance" and "enhances transparency" (¶242); for Defendant Parnes to claim that AdaptHealth's platform "reduces audit exposure" and "allows the audit to be documented appropriately" which "distinguishes us from our competitors out in the market" (¶246); for Defendant Griggs to state that AdaptHealth's systems helped the Company "identify those patients earlier" and was "better for the patients, better for the system, better for their employer and better for the insurer" (¶248); for Defendants Griggs, Parnes, and Rietkerk to state that AdaptHealth "looks at every claim prior to being submitted to the clearinghouse" and that its systems "monitors payors rules" and ensures AdaptHealth was "delivering a clean claim to the clearinghouse" (¶251); and for Defendant Clemens to state that AdaptHealth's results were the result of "technology and workflow investments" that resulted in "cleaner claims" (¶252). Multiple former employees confirmed that AdaptHealth *never* implemented an audit or compliance system

to ensure proper billing practices and that warnings to management about improper billing practices either went unheeded or were met with orders to continue the practices. For instance, FE 12 worked in Solara's Quality Assurance department from August 2018-January 2022 and confirmed that when AdaptHealth closed the Solara transaction on July 2, 2020, management did **not** implement a system for employees to report improper billing practices and ignored repeated warnings of wide-spread billing abuses. Likewise, FE 9 was a former Senior Manager of Patient Acquisitions at Solara and then AdaptHealth from June 2019 to October 2022, confirmed that when AdaptHealth took over in July 2020, departments that were responsible for checking orders were incentivized by AdaptHealth management to no longer do so. FE 2, who worked for Solara and then AdaptHealth as a Patient Acquisition Manager from September 2019 to September 2021 stated that when AdaptHealth took over in July 2020 they "gutted everything," and there was no oversight of claims. The statements made following the Pinnacle acquisition on January 1, 2021 (¶¶240-52) are false for the additional reason that, as FE 5 reported, AdaptHealth actually **shut down Pinnacle's existing compliance system.**

254.    Moreover, it was materially false and misleading for AdaptHealth, in its proxy solicitation for the AeroCare transaction and its Form 10-K for Fiscal Year 2020 to claim that that its platform "distinguishes itself from other industry participants" by eliminating processes that were "prone to mistakes and inefficient" and by offering "improved compliance" (¶240); for AdaptHealth, in its Form 10-Ks for 2020, 2021, and 2022, as well as Defendants McGee (for the 2020 10-K), Griggs, and Clemens, to state that AdaptHealth's platform was "automated, compliant, and integrated" and that it "distinguishes itself from other industry participants" by eliminating processes that were "prone to mistakes and inefficient" and by offering "improved compliance" (¶242); for Defendant Griggs to claim that due to AdaptHealth's technology it was

able to "process claims, faster, quicker, better, and more accurate[ly] (¶243); for Defendant Griggs to credit AdaptHealth's supposed expertise with "***the doctors, the relationships, how to get the patients set up, getting them qualified for their CGM***" and to claim AdaptHealth was "driving technology adoption there" (¶244); for Defendant Parnes to claim that AdaptHealth's technology permitted the Company's "prescribing partners and physicians to really get a much more efficient experience" (¶245); for Defendant Parnes to assert that AdaptHealth's e-prescribe system eliminated "roadblocks," "offer[ed] the insurance company the benefits of at least a utilization or prior authorization function" (¶246); for Defendant Parnes to state that AdaptHealth's e-prescribe system helped "drive better operating efficiencies" and facilitated "easier referring physician experience" (¶247); for Defendants Griggs and Clemens to state that AdaptHealth was poised to continue growing because it was able to "identify . . . patients earlier" and that its practices were "better for the patients, better for the system, better for their employer and better for the insurer" (¶248); for Defendant Parnes to state that AdaptHealth's systems identified patients that "really shouldn't be on the therapy" and filtered out the patients that would "benefit the most from it" (¶249); for Defendant Parnes to insist that AdaptHealth was able to allow providers to avoid "more error prone" methods of prescribing and that it would "make home health easier and more accessible for payors, patients and providers" (¶250); and for Defendants Griggs, Parnes, and Rietkerk to state that AdaptHealth was "driving patient outcomes" (¶251). In reality, the Company violated medical regulations and permitted upcoding and other illicit billing practices including:

> b.    using older, more expensive billing codes to bill for newer and cheaper continuous glucose monitors (*supra* Section V.D.1.);
>
> c.    shipping CGMs and monthly supplies that patients did not order and were not needed or covered by insurance (*supra* Section V.D.2.);
>
> d.    misleading Medicare patients about their obligations to pay for supplies upfront (*supra* Section V.D.2.);

e.      continuing to bill as much as possible to insurance even when a customer switched from AdaptHealth to a different supplier, draining the patients' insurance coverage (*supra* Section V.D.2.); and

f.      altering doctors' prescriptions and notes in order to provide CGM and other supplies that patients would otherwise not receive (*supra* Section V.D.3.).

255.    It was materially false and misleading for AdaptHealth to state in its proxy solicitation for the AeroCare transaction and its Form 10-K for Fiscal Year 2020 that its technology allowed for the "timely onboarding of acquisitions" when AdaptHealth's technology led to delays and failures to integrate acquisitions and *increased* issues at acquired companies, including AeroCare. For example, FE 9, a former Senior Manager of Patient Acquisitions at Solara and then AdaptHealth from June 2019 to October 2022, recalled that the attempt to combine AdaptHealth and Solara's Brightree systems led to a "massive duplication" of accounts, and AdaptHealth's former Director of Training & Implementation, Operations (FE 10) reported that AdaptHealth's attempt to integrate acquisitions to its Brightree systems did not work and led to information from different patients being incorrectly merged into one patient profile and other problems.

**D.      Defendants Made False Or Misleading Statements Regarding AdaptHealth's Acquisition Integration**

256.    Throughout the Class Period, in addition to discussing AdaptHealth's technologies and capacity to improve patient outcomes, Defendants returned to the concept that a key competitive advantage of AdaptHealth enjoyed was its acquisition capability. Speaking both generally and with regard to specific acquisitions, Defendants reiterated that AdaptHealth quickly and effectively integrated the operations of its acquisitions. These statements concealed a reality where AdaptHealth dragged its feet, sometimes for years, in undertaking the hard work of integration operations—except of course, to the extent that AdaptHealth readily foisted its revenue boosting, but illicit and error-prone, practices on its acquisitions.

257.    In Class Period SEC filings and communications to investors, including the proxy solicitation for the SPO, which was filed with the SEC on December 22, 2020, and the Form 10-K for Fiscal Year 2020,[14] which was filed with the SEC on March 16, 2021, AdaptHealth highlighted the Company's "Competitive Strengths" for investors. AdaptHealth claimed to have a record of "Proven M&A Success," telling investors that:

> AdaptHealth's integrated technology platform includes scalable and centralized front-end and back office processes ***that facilitate the effective onboarding of potential acquisitions and help achieve cost synergies***. AdaptHealth and AeroCare have demonstrated their ability to execute upon acquisitions, completing over 230 transactions on a pro forma basis from their respective dates of founding through November 30, 2020.

258.    On March 4, 2021, Defendant Griggs (having newly arrived at AdaptHealth) explained that management "spent time learning the details of our respective businesses, processes and systems" and "it resulted in detailed operating plans to implement best practices, accelerate growth, and drive cost savings." For example, AdaptHealth "***installed common reporting and visibility across the enterprise, so we make efficient decisions to train and educate our teams to drive improvement***," and also "focused on implementing the best practices at the very beginning of the patient setup process to ensure an auto pay is enabled and monitored over our [Revenue Cycle Management ("RCM")] lifecycle," to improve collections.

259.    On a May 6, 2021 earnings call, Defendant Griggs falsely claimed that:

> [The] integration of AdaptHealth and AeroCare organizations is proceeding quite well . . . In particular, the alignment of our management teams and the speed at which we are adopting organizational best practices stand out as areas that have exceeded my expectations. We've made significant progress implementing each organization's strengths across the entire organization. And as a result, we are seeing improvements in important areas of the business.

---

[14] Substantially identical statements appeared in AdaptHealth's Form 10-K for Fiscal Year 2019, which was incorporated by reference into the Prospectus filed with the SEC on January 4, 2021 in connection with the SPO.

260.    On that same call, Defendant Parnes added that leadership "***have already been leveraging this technology*** across our combined business."

261.    On February 18, 2022, Defendants Griggs, Clemens, and Parnes represented AdaptHealth at the SVB Leerink Global Healthcare Conference. Later during the conference, in response to an analyst asking how "performance has been versus the expectations" for integrating AeroCare and deploying "best practices," Defendant Griggs noted:

> [One] big initiative was the RCM system. We love the way that the RCM they adapted to how it's being done and the growth potential of that and the efficiencies we've been doing there. So, we put that through both systems. . . . pretty much everybody now knows, okay, this is how we process claims, follow up on claims, get documentation, get stuff to work with insurance companies . . .. That's fantastic. We work with Autopay in compliance and all these other functions . . . .

262.    At the same conference, Defendant Clemens claimed that AdaptHealth was "seeing . . . the full integration of technology across the company. And so we're seeing that across the revenue cycle platform. We've got a common revenue cycle platform now. We fully integrated it."

263.    On February 24, 2022, AdaptHealth hosted a conference call with analysts and investors to discuss the Company's earnings and operations for its fourth quarter of 2021. On that call, Defendant CFO Jason Clemens claimed that who stated that "what we're seeing as we exit 2021 is ***the full integration of technology across the company. And so we're seeing that across the revenue cycle platform. We've got a common revenue cycle platform now. We fully integrated it.***" On the same call, Defendant Parnes added, "Over the past 12 months, the AeroCare and AdaptHealth teams have worked side by side to ***integrate our businesses, bring together our best-in-class technologies,*** and maximize financial and operational synergies," which "produces immeasurably better customer service experience for our patients."

264.    The statements set forth above in ¶¶256-63 were materially false or misleading, and omitted facts necessary to make them not materially misleading. These statements were false or misleading given that, as explained in Section V.E.-F., and as attested to by multiple former employees, AdaptHealth actually ***cut*** compliance efforts and standards—and never implemented the Company's supposed technological solutions and comprehensive compliance systems to ensure that appropriate billing procedures were being followed, proper documentation was in place, and patients were receiving the equipment they ordered. When efforts to integrate the acquired companies were eventually made (months or years after investors were led to expect that the acquisitions had been smoothly completed), the results were disastrous, resulting in improper billing, a lack of oversight, and ultimately a litany of patient complaints. Moreover, as explained in Section V.C., former employees confirmed that AdaptHealth adopted unrealistic sales quotas and spread illicit billing practices to AeroCare, Solara, and AdaptHealth's other acquisitions, while ignoring complaints by employees about the sales quotas, lack of integration and illicit billing practices.

**E.    Defendants Made Materially False Or Misleading Statements Regarding Risks**

265.    Given all of the issues identified in Section V. with regard to its billing practices, shipping practices, and stalled integration efforts, AdaptHealth faced various risks to its business that had already materialized. However, despite this, in multiple SEC filings, AdaptHealth portrayed these risks as hypothetical future events. In statements to analysts, Defendants went even further—and explicitly ***denied*** that the risks had materialized. These statements were materially false and misleading.

266.    On August 7, 2020, AdaptHealth filed with the SEC its Form 10-Q for the second quarter of 2020. The Form 10-Q was signed by Defendants McGee and Clemens and contained certifications from McGee and Clemens attesting the accuracy of the Company's financial

statements. In addition, the Form 10-Q stated that "AdaptHealth **could be** adversely affected in some of the markets in which it operates if the auditing payor alleges substantial overpayments were made to AdaptHealth due to coding errors" and that "AdaptHealth cannot currently predict the adverse impact these measures **might have** on its financial condition and results of operations, but such impact could be material." (emphasis added.) AdaptHealth repeated the statement in its quarterly reports on Form 10-Q, and its annual reports on Form 10-K filed with the SEC during the remainder of the Class Period. These reports were signed by Defendants McGee, Griggs and/or Clemens.

267.    At the June 2, 2021 Jeffries Healthcare Conference, in response to an analyst question concerning AdaptHealth "saying that for the next five years you're expecting north of 20% volume growth and your guidance for diabetes is 10% to 12% organic," Defendant Clemens responded, "There is a bit of conservatism in our 10% to 12% estimate. That's a net growth number. And so that accounts for any risk around pricing, reimbursement, channel mix, et cetera. . . . **those risks have just not materialized**."

268.    AdaptHealth's purported warnings that the Company "could be adversely affected" if it was found to engage in overbilling as a result of "coding errors" were misleading, because those warnings omitted that the risk presented by overbilling had **already** materialized due to the Company's fraudulent scheme.

269.    It was also materially false and misleading for Defendant Clemens to state that AdaptHealth's guidance accounted for "risk factors" that had **not** materialized when various factors that, when exposed, would impact AdaptHealth's revenue and reputation already existed at the Company, including:

        b.    using older, more expensive billing codes to bill for newer and cheaper continuous glucose monitors (*supra* Section V.D.1.);

     c.       shipping CGMs and monthly supplies that patients did not order and were not needed or covered by insurance (*supra* Section V.D.2.);

     d.       misleading Medicare patients about their obligations to pay for supplies upfront (*supra* Section V.D.2.);

     e.       continuing to bill as much as possible to insurance even when a customer switched from AdaptHealth to a different supplier, draining the patients' insurance coverage (*supra* Section V.D.2.); and

     f.       altering doctors' prescriptions and notes in order to provide CGM and other supplies that patients would otherwise not receive (*supra* Section V.D.3.).

## VIII.   ADDITIONAL ALLEGATIONS OF SCIENTER

### A.   Defendants Knew They Had Not Integrated Acquisitions And Were Warned Of Rampant Improper Billing Practices

270.   Defendants were repeatedly and directly warned that AdaptHealth had not successfully integrated acquired businesses into the Company's technology platform and that improper billing practices were pervasive throughout the Company. ***Ten*** former employees from across the Company who spoke with Lead Counsel, including FE 2, FE 3, FE 5, FE 9, FE 11, FE 12, FE 13, FE 14, and FE 15, on multiple occasions warned their supervisors of rampant improper billing practices.

271.   Additionally, executives directly involved with integrating certain acquisitions were regularly informed of issues with integrations during meetings and reported directly to Defendants. For example, FE 9 recalled that Hector Mendoza, AdaptHealth's Vice President of Inside Sales, was regularly informed in meetings of problems with "massive duplication" of accounts in AdaptHealth's Brightree billing system. Mendoza worked closely with Jim Vainio, AdaptHealth's Regional Vice President of Operations and a direct report of Kevin Wood, AdaptHealth's Vice President of Operations. Kevin Wood's boss, Defendant Carson, oversaw

integrating all of AdaptHealth's acquisitions, and reported directly to then-CEO, Defendant Griggs.

272.    FE 1 likewise recalled that she received regular complaints from employees regarding senior management's unrealistic sales goals and the attendant pressure to meet them—including concerns that AdaptHealth was committing "insurance fraud" by double billing insurance providers and pushing devices that patients did not need—and routinely elevated those complaints. FE 1 also fielded daily complaints about AdaptHealth's integration failures and the total lack of training employees from acquired companies. FE 1 relayed all of these complaints at weekly meetings with her supervisor and other Human Resources executives at AdaptHealth's headquarters, who regularly met Defendants Griggs, Parnes, Russalesi, and other members of the executive team to discuss issues in the Human Resources department—which would have included employee complaints.

273.    Defendants also claim to have been aware of customer complaints related to integration failures. As Defendant McGee stated at a January 14, 2021 healthcare conference, AdaptHealth "***read the forums online***," in which customers indicated their frustrations with AdaptHealth's purportedly easy-to-use platform when there were delays in receiving their equipment and when they could not track and see availability of their equipment.

**B.    Defendants Were Made Aware Of Material Weaknesses In The Company's Internal Control Over Financial Reporting**

274.    Throughout the Class Period, Defendants were aware of and personally involved in identifying and supposedly remediating several material weaknesses in AdaptHealth's internal control over financial reporting. As discussed below, this identification and remediation highlights the role and responsibilities of Defendants McGee, Griggs, and Clemons with respect to internal

controls, which supports a strong inference of their scienter with respect to those misstatements and the statements regarding billing and audit technology.

275.    In its Form 10-K for fiscal year 2019, filed on March 6, 2020, before the Class Period, AdaptHealth acknowledged that it had a—limited—material weakness in its internal controls for financial reporting. AdaptHealth admitted that the "timeliness of our review controls over non-routine transactions . . . did not operate as designed." AdaptHealth reported that Defendant CEO McGee and then-CFO Gregg Holst supervised and participated in the finding of the material weakness and both executives received information concerning disclosure controls ahead of AdaptHealth's reporting requirements under the Exchange Act. Moreover, as part of their certifications under §906 of the Sarbanes-Oxley Act of 2002, both executives certified that they had designed the Company's internal controls and evaluated the effectiveness of the disclosure controls and procedures.

276.    In response to the identification of the material weakness in the 2019 10-K, AdaptHealth promised investors to be "actively engaged in the development and implementation of its remediation plan." As part of the remediation process, AdaptHealth claimed that it was implementing new processes, assigning dedicated and technical resources, including the hiring of a third-party consultant and additional qualified personnel to "improve overall efficiency and accuracy of accounting," "enhanc[e] controls associated with complex accounting matters," "evaluate the adequacy of our accounting personnel," and "ensure that the key controls over the financial reporting oversight process are operating effectively and are sustainable." In addition, AdaptHealth promised investors that it would "devote a substantial amount of time" to develop compliance initiatives, including evaluating the effectiveness of the Company's internal controls over financial reporting.

277.    On August 8, 2020, AdaptHealth filed its quarterly 10-Q financial report for the second quarter of 2020. In this report, AdaptHealth disclosed a continued material weakness with respect to the timeliness of the Company's review controls over non-routine transactions and identified a new—limited—material weakness relating to "the design and maintenance of certain information technology ("IT") general controls for certain information systems and applications that are relevant to the preparation of the financial statements." Defendant CEO McGee and Defendant CFO Jason Clemens were involved in identifying the material weaknesses and certified that they had designed and evaluated the Company's internal controls.

278.    With respect to the material weakness regarding non-routine transactions, Defendants repeated that they were implementing the same remediation steps they announced on March 6, 2020. The Company claimed it had made significant progress addressing the issue but that it could not be considered remediated until the "enhanced controls have operated effectively for a sufficient period of time."

279.    Regarding the IT-related material weakness, AdaptHealth stated that it had failed to restrict access to its financial applications, programs, and data to appropriate personnel, and as result all process-level controls that depended on information from these systems were determined to be ineffective. AdaptHealth stated that it commenced remediation by restricting access to these systems and data.

280.    On March 16, 2021, in connection with the Company's annual 10-K report for fiscal year 2020, AdaptHealth disclosed yet another material weakness in its controls over financial reporting. In addition to the two prior material weaknesses concerning non-routine transactions and IT systems access, AdaptHealth stated that it identified a material weakness relating to its "accounts payable process, specifically relating to the maintenance and approvals of vendors and

the invoice approval process." Once again, AdaptHealth stated that Defendant and then Co-CEO McGee, and Defendant Co-CEO Stephen Griggs, and Defendant CFO Clemens were actively involved in evaluating and identifying the material weakness, and all three Defendant executives certified that they had designed and evaluated the Company's controls.

281.   AdaptHealth promised to take immediate action to remediate the accounts payable material weakness, including implementing a new controls and review processes, creating new policies, and engaging a third-party consulting firm to overhaul the accounts payable process. AdaptHealth repeated its material weaknesses with respect to non-routine transactions and accounts payable processes in its quarterly 10-Q reports filed for the first, second, and third quarters for 2021.

282.   Finally, on March 1, 2022, as discussed above, AdaptHealth issued its 10-K annual report for fiscal year 2021 and revealed that the Company's internal controls were virtually non-existent, and that there was a "***lack of implementation and ineffectiveness of process level controls in substantially all processes that support our financial statements and reporting***." This was the first independently audited assessment of the Company's internal control over financial reporting, since AdaptHealth was not required to, and did not, obtain an outside auditor opinion during its first two years as a public company. Again, Defendants Griggs and Clemens personally certified that they designed and evaluated the Company's internal control of financial reporting.

283.   To remediate the stated material weakness in risk assessment that impacted substantially all of the Company's reporting processes, AdaptHealth promised to undertake sweeping reforms. The changes AdaptHealth promised to address the material weakness included:

- establishing an executive steering committee to monitor the remediation of the material weaknesses;

- adding professionals to the executive team with expertise in process mapping and internal controls;

- process mapping each business cycle to identify relevant process risk points, service and sub-service organizations, information technology systems and information, and designing and implementing responsive manual and automated controls;

- engaging third-party consultants to assist management in this effort; and

- implementing an enterprise resource planning system which went live in the first quarter of 2022, and impacted a impacted a variety of AdaptHealth's processes and its review and approval of journal entries.

284.    The broad scope of the material weakness in internal controls identified on March 1, 2022, as well as the personal involvement and attention of Defendants McGee, Griggs, and Clemon in these issues throughout the Class Period, supports a strong inference of their scienter. Moreover, if AdaptHealth actually undertook the remediation steps it proposed, there is no question that Defendants would have learned or had access to the facts that AdaptHealth had not implemented effectively—or at all—the systems-wide billing and audit systems that it claimed to have implemented.

### C.    Improper Billing Practices Were Dictated By Management And Were Done To Achieve Revenue Targets

285.    Former employees working in multiple different AdaptHealth subsidiaries located throughout the country all attested that when AdaptHealth took over operations, management dictated the use of improper billing codes and tolerated other improper billing practices all in an effort to meet unrealistic revenue targets. In other words, the improper billing activity was not the result of a handful of rogue low-level employees, but rather came from a coordinated effort from above and an improper tone at the top.

286.    For instance, FEs 3 and 5 both stated that management, including Jim Vainio, AdaptHealth Vice President of Operations, instructed employees to use older defunct A-codes to

bill Medicare and Medicaid, despite knowing that K-codes should have been used. Both former employees confirmed management pressured employees to meet sales targets, and the purpose of such instructions were so that AdaptHealth could bill larger amounts to help meet revenue goals. Both former employees were also instructed to tell patients that they were responsible for bills that Medicare and Medicaid ultimately rejected because AdaptHealth used the wrong code. When FE 5 flagged improperly coded claims, management simply gave the claims to someone else who would approve the claim for shipment. When she reported the activity to Senior Manager 1, Regional Director 2, and Adapt Health Senior Vice President of Sales and Business Development, Kevin Wood, the only action taken was to move FE 5 to a different department.

287. Former Solara employees also confirmed that upcoding was dictated from management to meet the Company's unrealistic revenue targets. FE 2 stated that code changes were dictated from Jim Vainio and Hector Mendoza, AdaptHealth's Vice President of Inside Sales, and other "higher ups" to hit sales revenue targets. When employees pushed back, the managers insisted that employees not question their orders, and Vainio and Mendoza were pressured by the Company's most senior executives to meet sales goals. Another former Solara employee told Capitol Forum that upcoding was standard Company policy, stating that "Bill A-codes no matter what, if insurance rejects, balance bill the patient, that was what we did." FE 8 worked at Solara and stated that 70-80% of all CGMs were billed using the wrong A-codes.

288. A former employee at the national level in charge of overseeing the acquisition of several diabetes supply companies, confirmed that AdaptHealth knew K-Codes should have been used for nearly all of its CGMs, but mandated the use of A-codes anyway, because "they could get a lot more with the A-codes." FE 7 who covered much of the Southeast United States and reported denial trends to senior executives stated that his team of 30 specialists would often be instructed

to use A-codes because they pay more, and that those instructions were given by AdaptHealth senior managers, Senior Vice President 1, Senior Vice President of Revenue Management and Customer Relations Officer 1. Moreover, Medicaid claims data from diverse locations including Massachusetts and Nebraska demonstrate that when AdaptHealth took over acquired companies, the use of A-Codes skyrocketed, clearly showing that the practice was company-wide and not the result a few one-off instances.

289.    Managements' unrelenting pressure to meet sales goals led to other widespread billing misconduct besides upcoding, including changing prescriptions and patient notes, shipping products without proper documentation, and shipping products that were not requested by patients. FE 5 recounted how AdaptHealth employees routinely changed prescriptions and notes so that patients could qualify for insurance coverage for CGMs and AdaptHealth could book more revenue. FE 3 and FE 12 each stated how AdaptHealth sent claims without proper documentation that they knew would be rejected. Former employees at Solara, including FE 2 and FE 12, recounted how AdaptHealth regularly billed insurance and sent patients products that they did not need or order, by relying on unverified "verbal consent" and text blasts. At best, management turned a blind eye, and complaints from employees about these practices went unheeded. At worst, as FE 3 a documentation specialist from Pinnacle's Mississippi location, explained, management coordinated shipping orders without documentation at the end of each month and quarter to help hit targets. FE 3 explained that at the beginning of a given month, managers set aside claims missing documentation. Then, at the end of the month, management would encourage employees to ship the defective claims so they could meet monthly and quarterly metrics and employees and managers could receive bonuses. FE 3 explained that managers discussed the metrics at managers' meetings, discussing what the goals were and comparing the goals to the current numbers for that

month, specifying how many orders they would need to ship or process to achieve the metrics each month.

**D.     Defendants Stated They Oversaw AdaptHealth's Compliance Program And Had Real-Time Access To Any Billing Trends That Required Correction**

290.     Scienter is further supported because Defendants stated that AdaptHealth had implemented a rigorous compliance program that was directly overseen by the Company's Board and top executives, who actively participated regular compliance meetings. Throughout the Class Period, the Company's Form 10-K stated:

> [The] Company's chief operating decision-makers are its Chief Executive Officer and President, who make resource allocation decisions and assess performance based on financial information presented on an aggregate basis. There are no segment managers who are held accountable by the chief operating decision-makers, or anyone else, for any planning, strategy, and key decision-making regarding operations. ***The corporate office is responsible for . . . corporate compliance with healthcare laws and regulations, and revenue cycle management, among other corporate supporting functions.*** Accordingly, the Company has a single reportable segment and operating segment structure.

291.     Moreover, Defendants affirmed that they were personally responsible for overseeing compliance. For instance, on September 16, 2022, Defendant Russalesi stated that:

> [O]ur compliance first culture ***starts at the top*** and we benefit significantly from strong support from our board of directors and our executive leadership team. The compliance program is independent, but yet it incorporates reporting lines into the board Compliance Committee as well as the company's Chief Executive Officer. The board and the executive leadership team, they're active and they're engaged in monthly and quarterly meetings. They're making the appropriate inquiries as to if our program is adequate and they're always ensuring that we have the appropriate resources.

292.     Defendant Russalesi also stressed that since 2016, AdaptHealth had implemented a comprehensive audit function called "Audit Share" that purportedly gave executives up-to-the-minute access to billing trends. Specifically, Russalesi stated that Audit Share "gives us real time visibility into what's happening with our audits. We can see our audit outcomes. We understand what are the trends and what are the emerging risks that are coming out of this audit activity."

Russalesi added that management was "monitoring the enforcement trends that are coming out in the industry" and that monitoring these items "helps us set our priorities to move the program forward and to achieve our goals, to drive better patient care, to mitigate emerging fraud and abuse risk, and again to support the company growth strategy."

293.    Defendant Carson stated that "[Defendant Russalesi] and her organization does an exhaustive review of charts and chart notes to make sure there are no regulatory compliance issues. And we also do require a third-party QoE to evaluate the quality of our earnings."

294.    Given Defendants' statements that that they personally oversaw the compliance function, that they had "real time" access to billing trends, and that they did an "exhaustive review of charts and chart notes," they either knew their Class Period statements misrepresented and omitted AdaptHealth's rampant improper billing practices, or they were reckless in not knowing.

## E.    Defendants Frequently Spoke With Specificity And In Response To Direct Analyst Questions About The Topics Of Their False Statements

295.    As discussed above, analysts carefully monitored AdaptHealth's acquisition growth throughout the Class Period and consistently reported on and questioned what AdaptHealth's growth would look like after the Company's acquisition spree. Specifically, and against the backdrop of healthcare companies that "imploded" after acquisition sprees, analysts wondered about AdaptHealth's "wheels falling off from too many acquisitions." As a result, many of Defendants' alleged false statements came in response to direct and repeated questions from analysts about AdaptHealth's platform, its acquisition strategy, and the risks facing the Company. Given the specificity and repetition of these questions, the fact that the Defendants who responded to these questions with the alleged false statements were highly placed executive officers, and the inconsistency between the statements and the true state of AdaptHealth's business, these interactions contribute to a strong inference of scienter.

296.    Even before the Class Period, at AdaptHealth's first-ever earnings call, several analysts asked about the sustainability of AdaptHealth's acquisition strategy and about how investors could "get comfortable" with AdaptHealth's ability to integrate these acquired companies. Defendant McGee responded to these questions by repeatedly insisting that the acquisitions had been integrated onto the platform.

297.    Throughout the Class Period, Defendants consistently told investors that AdaptHealth's "scalable, integrated technology platform" would ensure that the Company could absorb and integrate acquired business. Defendants further assured investors that AdaptHealth's integrated platform would distinguish the Company "from other industry participants by automating processes that can be complex, prone to mistakes and inefficient" and that the platform would lead to "improved compliance." In fact, Defendants promoted their "improved compliance" and ability to utilize their technology platforms to navigate complex billing processes as part of AdaptHealth's "nuts and bolts competency that [we] have."

298.    Defendants also were at the least reckless in not informing themselves about AdaptHealth's platform and its capacity to prevent fraud, given that they regularly fielded question about the platform. As early as August 13, 2020, an analyst noted that AdaptHealth management had "talked a lot about your technology platform" and asked that Defendant McGee "spend a little time" discussing "the technologies that you're using to improve workflow, supply, supply chain, revenue cycle and whatnot in terms of . . . the resupplies."

299.    Defendant McGee responded to this question by claiming that AdaptHealth was developing its technology "to interact with patients in ways that would "let them get their stuff. . . and kind of accede to their wishes of the frictionless experience, [while] complying with all the rules that the healthcare system has put in place to make sure that there's not overutilization." This

statement could not be true, as AdaptHealth engaged in several practices that caused "overutilization," such as by changing prescriptions to ensure patients were eligible for supplies that would not have ordinarily received and by shipping medical supplies that the patients did not need.

300.    A few months later, during a November 4, 2020 earnings call, an analyst asked Defendant Parnes "what percent of all your sales patients go through e-prescribing today and where do you think that goes in 2021?" Defendant Parnes claimed to be "excited" about the potential for e-prescribing growth, particularly in diabetes, and asserted that "we feel like cycle times, automation and improvement, and kind of both customer and referring provider experience will help us also drive additional organic growth there on the diabetes line." This statement could not have been true, however, as AdaptHealth actively undermined both the patient and provider experience through illicit practices such as altering prescriptions and shipping unnecessary goods.

301.    On March 3, 2021, Defendant Griggs fielded an analyst question as to whether the "really high margins" AdaptHealth reported were sustainable. Defendant Griggs responded to this concern by claiming that "the technology is going to continue to improve our efficiencies and we're just going to keep getting better and better and better at how we onboard a patient, how we take care of our patient, and how we interact with that patient. And so, those are going to allow our margins to continue to improve." This statement could not have been true, given that AdaptHealth's practices undermined patient care by altering prescriptions and by shipping goods that plaintiffs did not need and might ultimately pay for.

302.    Throughout the Class Period, Defendants faced these and other specific and repeated questions about AdaptHealth's acquisition strategy, its technology platform, and its diabetes business growth. In response, Defendants, high-placed executives of AdaptHealth,

offered detailed responses to all, representing themselves as knowledgeable about AdaptHealth's platform, the success of its acquisitions, and its growth in the diabetes space.

303.    Either Defendants were as well-informed about the state of the business as they claimed and therefore knew about AdaptHealth's various illicit practices, or they made these statements without informing themselves on subjects that they knew were the focus of analyst concern, meaning that they were at the least severely reckless in making the alleged false statements.

**F.    Defendants' Statements Concerned Matters Critical To The Success Of The Company**

304.    That Defendants' false and misleading statements concerned the most critical components of AdaptHealth's growth strategy and sources of revenue further supports an inference of scienter. From its inception, AdaptHealth made clear to investors that acquisitions were a key component of its growth strategy. Indeed, for the year ending in December 2020, acquisitions accounted for $450 million in revenue—nearly half of the Company's total revenue that year. In its first three years, AdaptHealth acquired over 80 home medical businesses.

305.    Furthermore, AdaptHealth's compliance with federal and state laws and regulations was highly significant from both a legal and financial standpoint. As discussed above, AdaptHealth's revenue was heavily dependent on its ability to obtain reimbursements from Medicare and Medicaid—with reimbursements from those programs comprising at least a third of the Company's revenue throughout the Class Period. Thus, AdaptHealth's ability to utilize its technology platform to ensure that the Company properly billed insurers to obtain reimbursements was critical to the Company's success.

306.    Finally, Defendants' false statements regarding technology and integration dealt with two of the four "Competitive Strengths" that the Company had identified for investors as

driving the Company's growth and to differentiate it from its competitors. Thus, these topics were critical to the Company's future.

### G. Defendants Were Well Aware Of The Risks Of Failing To Integrate Acquisitions And Policing Improper Billing Practices And Had Received Suspension Notices From Medicare For Improper Billing Practices

307.    Prior to and throughout the Class Period, Defendants professed to be aware of the risks posed by AdaptHealth's acquisition strategy, reimbursement issues, and improper billing practices, and even claimed to have accounted for those risks in its guidance.

308.    AdaptHealth's ability to integrate the businesses that it acquired was among the most important—if not the most important—factors monitored by investors and analysts from the Company's start. Specifically, analysts and investors were concerned in the light of the "graveyard" of healthcare companies that "grew rapidly from acquisitions and then imploded" due to their failure to successfully integrate acquisitions. As early as December 2020, analysts noted that "the biggest risk factor" for AdaptHealth was "integration." As early as January 16, 2020, Defendant McGee claimed that AdaptHealth was "very cognizant of the risks that come in growing through acquisition." Throughout the Class Period, integration remained the subject of numerous investor and analysts calls, as well as analyst reports.

309.    Likewise, AdaptHealth's compliance with federal and state laws and regulations was, on numerous occasions, the subject of analyst questions and addressed on calls with investors and analysts throughout the Class Period. Defendants publicly acknowledged the importance of compliance, noting that "the consequences for screwing up and billing up" were "extremely high." Defendants repeatedly emphasized that they utilized their technology platforms and their internal compliance program to ensure against "business risks" by complying with the OIG's guidance and billing and coding practices. Moreover, Defendants touted their compliance programs as a distinguishing factor among AdaptHealth's competitors in the "dirty world of healthcare."

310.    The Company acknowledged the possibility of coding issues in its August 7, 2020 Form 10-Q for the second quarter of 2020, which Defendants McGee and Clemens signed. This Form 10-Q stated that "AdaptHealth could be adversely affected in some of the markets in which it operates if the auditing payor alleges substantial overpayments were made to AdaptHealth due to coding errors." The November 6, 2020 Form 10-Q for the third quarter of 2020, which Defendants McGee and Clemens also signed, contained the same statement.

311.    Notably, the Company acknowledged that it had received suspension notices from CMS and that at least two of AdaptHealth's businesses were prohibited from receiving reimbursements from Medicare because those AdaptHealth businesses were engaged in illicit billing practices. Specifically, the suspension notices were based upon determinations by CMS that two of AdaptHealth's businesses "had billed for services which were not rendered and/or were medically unnecessary, and improperly solicited beneficiaries." While AdaptHealth attempted to minimize these notices to affecting "less than 2%" of the Company's revenue, these highly important notices—highlighting fraudulent practices CMS had detected even while overall audit activity was largely halted—should have prompted Defendants to investigate the Company's billing practices overall.

312.    Taking Defendants at their word, therefore, AdaptHealth considered the risks posed by its business practices. They either engaged in such practices and learned about AdaptHealth's practices, were reckless in not learning of these practices when considering the risk factors, or else their statements that AdaptHealth considered the relevant risk factors were false and misleading.

### H.    The Magnitude, Extent, And Pervasiveness Of AdaptHealth's Improper Billing Practices Supports Scienter

313.    The sheer magnitude and pervasive extent of AdaptHealth's improper billing practices made it highly unlikely that Defendants were not aware of them, or were reckless in

disregarding them. For instance, FE 8, who served as an inside sales specialist for both resupply and new diabetic patients at Solara, which was by far AdaptHealth's largest diabetes supply subsidiary, estimated that ***70-80% of all shipments*** that he processed were billed under improper A-codes.

314.    Independent data corroborates this conclusion. Former employees confirmed to Capitol Forum that nearly all of the CGMs sold by AdaptHealth during the Class Period should have been billed using the less expensive K-Codes. However, The Capitol Forum obtained Medicaid claims data from Louisiana showing that out of approximately 111,000 CGM claims submitted from July 2020 to November 2022, more than 107,000, or 97%, of all CGM claims were submitted using A-codes rather than the proper K-codes. This trend was not isolated to a single subsidiary or geographic area of the country. Data from Massachusetts and Nebraska also show that the vast majority of claims were billed under A-codes. In Michigan, approximately one third of all CGM claims were improperly billed under A-codes.

315.    AdaptHealth's other improper practices of submitting claims without proper documentation and billing insurance and patients for products that were never ordered or shipped were also widespread. FE 5 (at Pinnacle in Mississippi) estimated that as many as 50% of all AdaptHealth's patients did not qualify for insurance coverage for their devices, and AdaptHealth managers qualified them by altering prescription and patient notes. FE 3, who also worked for Pinnacle, similarly estimated that 40% of re-order claims were sent out without obtaining proper documentation. FE 12 (at Solara's office in Chula Vista, California) conservatively estimated that 25% of orders were shipped without proper documentation. These estimates from multiple witnesses located in different parts of the country distributed throughout the Company's operations is no fluke or coincidence. Moreover, FE 2 (at Solara's Michigan facility) stated that re-supply

orders were routinely shipped to customer who did not order products by text-blasting all patients

due for more supplies to ask if those customers required extra supplies but still "shipped everything

out," even if those customers did not respond to the texts. FE 2 stated that in 90% of cases where

customers complained that their insurance should not have been billed, AdaptHealth did not

reverse the charges.

316.    Particularly given Defendants' repeated assurances that they closely monitored

such trends, there is simply no plausible scenario in which they were not aware of these wide-

spread practices.

### I.    During The Class Period, AdaptHealth Was Subject To A *Qui Tam* Complaint And Government Investigation Into Its Improper Billing Practices

317.    Scienter is further supported by the fact that, during the Class Period, AdaptHealth

was under investigation by the U.S. Department of Justice ("DOJ") for improper billing

practices—specifically, upcoding. In January 2017, a former employee of QMES, LLC

("QMES"), AdaptHealth's predecessor company and for which Defendant McGee served as CEO,

filed a *qui tam* complaint, in which it alleged that QMES violated the False Claims Act by

knowingly and willfully billing federal payors for non-invasive ventilators when a patient was

instead prescribed and used a BiPAP machine—for which federal payors reimburse suppliers

thousands of dollars per year.

318.    Specifically, the complaint alleged that employees of QMES were directed to "up-

code" COPD and sleep apnea equipment. The complaint also alleged that, after a whistleblower

notified management of the improper billing practices, employees were instructed to "continue

improperly billing for those patients who had already received treatment from a particular device

using the incorrect codes." The complaint further detailed how Defendant Russalesi personally

fielded multiple reports of upcoding, told the whistleblower directly that Defendant McGee had

directed her "not to disclose" the issue, and directed the whistleblower to "let it go" because the Company had determined not to self-report.

319.    The allegations in the complaint were later the subject of a coordinated effort by the U.S. Attorney's Office for the Eastern District of Pennsylvania; the Department of Health and Human Services, Office of Counsel to the Inspector General and Office of Investigations; and the Office of Personnel Management, Office of the Inspector General. AdaptHealth settled the claims in 2023, agreeing to pay $5.3 million dollars.

320.    That AdaptHealth was defending a false claims act in federal court for similar practices at issue in this case strongly supports an inference that Defendants were well aware of the serious consequences of upcoding and other improper billing practices.

### J.    AdaptHealth Faced A Class Action Lawsuit Regarding Issues With Its Technology Platform

321.    That AdaptHealth faced a lawsuit directly related to failures in the technology systems—systems Defendants alleged would enhance the patient experience as discussed in Section VII.C.—supports an inference of scienter. On June 14, 2022, a class of 32,035 consumers sued AdaptHealth for blasting approximately 220,000 unwelcome text messages. Consumers sued AdaptHealth in Florida over its practice of contacting patients with phone numbers on the National Do-Not-Call Registry in violation of the Telephone Consumer Protection Act. Additionally, plaintiffs alleged that AdaptHealth continued to send text messages to patients that had asked AdaptHealth to stop sending texts, and that AdaptHealth used an automated system for the dialing and messaging of patients without their prior express written consent, in violation of the Florida Telephone Solicitation Act. In April 2023, AdaptHealth settled the claims for approximately $5

million. Thus, Defendants were put on notice during the Class Period that their automated patient contact system, which they touted to investors, was not working as promised.[15]

### K.    The Sudden Departure Of AdaptHealth's CEO Supports Scienter

322.    Defendant Griggs' sudden resignation of his role as CEO as the consequences of the fraud came to light strengthens the inference of Defendants' scienter. On May 9, 2023, before the market opened, the Company announced earnings results for the first quarter ended March 31, 2023, and revealed the second straight quarter of revenue and EBITDA results far below analyst expectations. In the press release announcing earnings, Defendant Griggs acknowledged that "a decline in our Diabetes business, largely driven by the pump and supplies categories" hurt growth.

323.    On the heels of this negative announcement, AdaptHealth issued a separate press release announcing Griggs resignation. The resignation came without warning, and analysts like Jeffries noted that managements' credibility "was impaired" by the "weakness in the diabetes business." Deutsche Bank pointed to Griggs departure as sign of troubles at AdaptHealth noting that that "bears will point to the CEO's departure as a sign that things aren't getting better anytime soon."

### L.    Officers And Directors Personally Benefitted From Incentive Compensation Tied To AdaptHealth's Ability To Achieve Revenue Growth

324.    Leading up to and throughout the Class Period, Defendants McGee, Parnes, Griggs, Clemens, and Rietkerk had motive to pursue short-term revenue growth at acquired companies at all costs—and without regard for compliance or patient satisfaction.

---

[15] The case is captioned *DeSouza v. AeroCare Holdings LLC*, Docket No. 6:22-cv-01047 (M.D. Fla. Jun 14, 2022).

325.    **Defendant McGee** received a ***$2 million*** bonus for closing the AeroCare acquisition. The promise of such lucrative rewards incentivized closing an acquisition, regardless of whether the acquisition's operations could successfully be integrated.

326.    **Defendant Clemens** received incentive compensation under a Synergy Bonus Program AdaptHealth's Compensation Committee approved in May 2021 "[t]o align AdaptHealth employees with measures of acquisition success." Under this program "[b]onuses in the form of cash payments and shares of performance-based [restricted shares] could be earned based on gross pre-tax annual run-rate cost savings and revenue synergy goals related to the AeroCare acquisition. AdaptHealth's 2022 Definitive Proxy further explained that the target performance was "$75 million of gross savings and synergies" and "[f]or performance above target up to maximum (gross savings and synergies of up to $100 million, inclusive of purchase synergies with respect to capitalized equipment), additional cash bonuses would be earned." This compensation component incentivized Defendants to maximize short term cost savings, even at the cost of compliance and otherwise successfully integrating operations. The Compensation Committee, assessing performance through December 31, 2021, determined "that the maximum goals were attained," and so approved the commencement of vesting for the restricted share awards and the cash bonus payments. As a result, Defendant Clemens received a cash bonus of ***$191,250, as well as 6,503 shares of stock with a grant date value of $159,519***.

327.    **Defendant Griggs** joined AdaptHealth following the AeroCare acquisition, and was eligible for a cash bonus and equity grant under the Synergy Bonus Plan. Pursuant to that plan, which awarded the achievement of a threshold amount of revenue synergies as described above in ¶320, Defendant Griggs received a cash bonus of $225,000, as well as 7,650 shares of restricted stock with a grant date value of $187,655.

328.    ***Defendant Parnes*** was eligible for a cash bonus and equity grant under the Synergy Bonus Plan. Pursuant to that plan, which awarded the achievement of a threshold amount of revenue synergies as described above in ¶320, Defendant Parnes received a cash bonus of $225,000, as well as 7,650 shares of restricted stock with a grant date value of $187,655.

329.    Given these incentives, which formalized the Company's commitment to acquisitions and immediate cost savings (above compliance and patient care), Defendants McGee, Clemens, Griggs, and Parnes were incentivized to close the AeroCare transaction (and other transactions) and quickly achieve cost synergies at all costs.

330.    The Definitive Proxy Statement describing the synergy bonuses does not disclose whether Defendants Rietkerk, Russalesi, and Carson received synergy bonuses in connection with the AeroCare transaction (or generally provide compensation information for those Defendants) and therefore Lead Plaintiffs are unable to definitively determine whether those Individual Defendants received the same incentive. However, the Definitive Proxy clarifies that 80 employees total received such bonuses, and therefore it is likely that these high-ranking executives (Defendant Rietkerk was AdaptHealth's Chief Operating Officer, Defendant Russalesi was AdaptHealth's Chief Compliance Officer, and Defendant Carson was AdaptHealth's President and Chief Operating Officer, Diabetes) received these bonuses. Regardless, given the number of employees involved, the bonuses were a widespread motivator to cut costs and achieve apparent synergies with the AeroCare acquisition, even at the cost of compliance and effective integration.

## IX.    LOSS CAUSATION

331.    Defendants' wrongful conduct, as alleged herein, directly and proximately caused the economic loss suffered by Plaintiffs and the Class. During the Class Period, Plaintiffs and the Class purchased AdaptHealth common shares at artificially inflated prices and were damaged thereby when the price of AdaptHealth common stock declined when the truth was revealed.

Throughout the Class Period, the price of AdaptHealth common stock was artificially inflated because of Defendants' materially false and misleading statements and omissions. The price of AdaptHealth common stock significantly declined (causing investors to suffer losses) when Defendants' materially false and misleading statements, alleged herein to have been concealed from the market, and/or the effects thereof, were revealed, and/or the risks that risks that had been fraudulently concealed by Defendants' misconduct materialized.

332.    During the Class Period, as detailed in this complaint, Defendants made materially false and misleading statements and omissions, including statements and omissions regarding (i) AdaptHealth's revenue and EBITDA; (ii) AdaptHealth's critical compliance infrastructure; (iii) AdaptHealth's technology systems and their improving the patient and provider experience; (iv) the Company's acquisition integration; and (v) risks to AdaptHealth's business. This artificially inflated the price of AdaptHealth common stock and operated as a fraud or deceit on the Class. Later, when Defendants' prior misrepresentations and risks concealed by the fraudulent conduct alleged in this complaint materialized and were disclosed to the market, the price of AdaptHealth common stock fell precipitously. As a result of their acquisition of AdaptHealth common stock during the Class Period—and Defendants' material misstatements and omissions—Lead Plaintiffs and other members of the Class (as defined herein) suffered economic loss, *i.e.*, damages, under the federal securities laws.

| Date* | Corrective Event Summary | Closing Stock Price | Common Stock Price Change |
|---|---|---|---|
| March 1, 2022<br><br>(March 1-2, 2022) | During market hours, when AdaptHealth filed its annual report on Form 10-K for fiscal year 2021, the Company revealed for the first time that its internal controls over financial reporting were virtually non-existent. | $17.43 | -8.7% on March 1, 2022<br><br>-4% on March 2, 2022 |

| February 27, 2023 (February 28, 2023-March 1, 2023) | After the market closed, AdaptHealth announced its full-year results for the year 2022 and disclosed a surprise loss of $0.02 per share for the fourth quarter of 2022, which was significantly lower than the gain of $0.27 per share that analyst expected. | $21.98 | -27% on February 28, 2023  -5.4% on March 1, 2023 |
|---|---|---|---|
| March 3, 2023 (March 6, 2023) | During market hours, AdaptHealth management disclosed to analysts that the revenue and earnings miss was attributable to a continued "material weakness" in the Company's internal controls. | $16.00 | -6.6% |
| May 9, 2023 (May 9, 2023) | Before the market opened, AdaptHealth issued an earnings announcement with results for the first quarter of 2023, which showed declining EBITDA, rather than growth, which Griggs attributed to "a decline in our Diabetes business, largely driven by the pump and supplies categories."  AdaptHealth issued a separate announcement disclosing the sudden departure of CEO Stephen Griggs. | $12.07 | -6.4% |
| November 7, 2023 (November 7-8, 2023) | During market hours, AdaptHealth filed a Form 8-K announcing fourth quarter results for 2023 disclosed a net loss of $454.1 million, "largely resulting from a $511.9 million pre-tax write down of goodwill." | $8.45 | -9.9% on November 7, 2023  -15.5% on November 8, 2023 |
| *Date of stock price drop is in parentheses.* | | | |

333.    It was entirely foreseeable that Defendants' materially false and misleading statements and omissions discussed herein would artificially inflate the price of AdaptHealth common stock. It was also foreseeable to Defendants that AdaptHealth's statements of inflated revenue numbers, claims to have sufficient internal controls, inability to integrate acquisitions, and its rampant improper billing practices would increase undisclosed risks that could aversely effect AdaptHealth's financial condition and that the materialization of those risks would cause the price

of the Company's securities to fall as the artificial inflation caused by Defendants' misstatements and omissions was removed. Thus, the fall in AdaptHealth's stock price were directly and proximately caused by Defendants' materially false and misleading statements and omissions.

## X.   INAPPLICABILITY OF STATUTORY SAFE HARBOR

334.   The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the false statements described in this complaint. Many of the specific statements described in this complaint were not identified as "forward-looking" when made. To the extent that there were any forward-looking statements, there was no meaningful cautionary language identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements.

335.   Alternatively, to the extent that the statutory safe harbor does apply to any forward-looking statements described in this complaint, Defendants are liable for those false forward-looking statements because at the time each was made, the particular speaker knew that the particular forward-looking statement was false or misleading, or the forward-looking statement was authorized or approved by an executive officer of AdaptHealth who knew that the statement was false or misleading when made.

## XI.   PRESUMPTION OF RELIANCE

336.   At all relevant times, the market for AdaptHealth common stock was an efficient market for the following reasons, among others:

      b.      AdaptHealth common stock met the requirements for listing and was listed and actively traded on the NASDAQ stock market, a highly efficient and automated market;

      c.      AdaptHealth filed periodic public reports with the SEC and NASDAQ;

      d.      AdaptHealth regularly and publicly communicated with investors via established market communication mechanisms, including through regular dissemination of press releases on the national circuits of major newswire

services and through other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services; and

e.    AdaptHealth was followed by securities analysts employed by numerous major brokerage firms, who wrote reports that were distributed to the sales forces and certain customers of their respective brokerage firms. Each of these reports was publicly available and entered the public marketplace.

337.   As a result of the foregoing, the market for AdaptHealth common stock promptly digested current information regarding AdaptHealth from all publicly available sources and reflected that information in the price of AdaptHealth common stock. Under these circumstances, all purchasers of AdaptHealth common stock during the Class Period suffered similar injury through their purchase of AdaptHealth common stock at artificially inflated prices, and the presumption of reliance applies.

338.   A Class-wide presumption of reliance is also appropriate in this action under the Supreme Court's holding in *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128 (1972), because the Class's claims are grounded on Defendants' material omissions. Because this action involves Defendants' failure to disclose material adverse information and active concealment of regarding AdaptHealth's business operations—information that was required to be disclosed—positive proof of reliance is not a prerequisite to recovery. All that is necessary is that the facts withheld be material in the sense that a reasonable investor might have considered them important in making investment decisions. Given the importance of AdaptHealth's acquisitions, compliance program, technology for billing and tracking patient information, and their impact on the Company's business as a whole, as alleged above, that requirement is satisfied here.

## COUNT I

### For Violations of Section 10(b) of the Exchange Act and SEC Rule 10b-5
### Against the Exchange Act Defendants

339.    Plaintiffs repeat, incorporate, and reallege every allegation above as if fully alleged in this count.

340.    This Count is asserted on behalf of all members of the Class against Defendant AdaptHealth and the Individual Defendants for violations of Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5(b) promulgated thereunder, 17 C.F.R. § 240.10b-5.

341.    During the Class Period, Defendant AdaptHealth and the Individual Exchange Act Defendants violated Section 10(b) of the Exchange Act and Rule 10b-5(b) in that they made untrue statements of material fact and/or disseminated and/or approved and/or omitted to state material facts necessary to make the false or misleading statements specified above not misleading. Defendants' actions did: (i) deceive the investing public, including Plaintiffs and other Class members, as alleged herein; and (ii) cause Plaintiffs and other members of the Class to purchase AdaptHealth common stock at artificially inflated prices.

342.    Defendant AdaptHealth and the Individual Exchange Act Defendants, individually and in concert, directly and indirectly, by the use, means, or instrumentalities of interstate commerce and/or of the mails, made various untrue and/or misleading statements of material facts and omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; made the above statements intentionally or with a severely reckless disregard for the truth; which did: (i) deceive the investing public, including Plaintiffs and the Class, regarding, among other things, the magnitude and source of AdaptHealth's revenue and earnings results, the degree to which AdaptHealth used its technology platform to provide a more accurate system of prescribing that was less prone to waste,

fraud, and abuse and better able to identify patient needs compared to competing offerings, the existence and sufficiency of internal controls, and AdaptHealth's ability to integrate its acquisitions' operations quickly and efficiently; (ii) artificially inflate and maintain the market price of AdaptHealth common stock; and (iii) cause Plaintiffs and other members of the Class to purchase AdaptHealth common stock at artificially inflated prices and suffer losses when the true facts became known.

343. During the Class Period, the Exchange Act Defendants made the false statements specified above, which they knew or recklessly disregarded to be false or misleading in that, in light of the circumstances under which they were made, the statements contained misrepresentations and failed to disclose material facts necessary in order to make the statements not misleading.

344. The Exchange Act Defendants had actual knowledge of the misrepresentations and omissions of material facts alleged in this complaint, or recklessly disregarded the true facts that were available to them. The Exchange Act Defendants engaged in this misconduct to conceal AdaptHealth's true condition from the investing public and to support the artificially inflated prices of the Company's common stock.

345. Plaintiffs and the Class have suffered damages in that, in reliance on the integrity of the market, they paid artificially inflated prices for AdaptHealth common stock. Plaintiffs and the Class would not have purchased the Company's common stock at the prices they paid, or at all, had they been aware that the market prices for AdaptHealth common stock had been artificially inflated by Exchange Act Defendants' fraudulent course of conduct.

346.     As a direct and proximate result of the Exchange Act Defendants' wrongful conduct, Plaintiffs and the other members of the Class suffered damages in connection with their respective purchases of the Company's common stock during the Class Period.

347.     By virtue of the foregoing, the Exchange Act Defendants violated Section 10(b) of the Exchange Act and SEC Rule 10b-5(b).

## COUNT II

### For Violations of Section 10(b) of the Exchange Act and SEC Rule 10b-5(a) and (c) Against the Exchange Act Defendants

348.     Plaintiffs repeat and re-allege each and every allegation set forth above as if fully set forth herein.

349.     This Count is asserted on behalf of all members of the Class against the Exchange Act Defendants for violations of Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5(a) and (c) promulgated thereunder, 17 C.F.R. § 240.10b-5.

350.     Defendant AdaptHealth and the Individual Exchange Act Defendants violated Section 10(b) of the Exchange Act and Rules 10b-5(a) and (c) in that they (1) employed devices, schemes, and artifices to defraud; and (2) engaged in acts, practices, and a course of business that operated as a fraud and deceit upon Plaintiffs and others similarly situated in connection with their purchases of AdaptHealth common stock during the Class Period in an effort to maintain artificially high market prices for AdaptHealth common stock.

351.     Defendant AdaptHealth and the Individual Exchange Act Defendants, individually and in concert, directly and indirectly, by the use, means, or instrumentalities of interstate commerce and/or of the mails, employed devices, schemes, and artifices to defraud and engaged and participated in a continuous course of conduct that operated as a fraud and deceit upon Plaintiffs and the Class in connection with the purchase and sale of AdaptHealth common stock;

which did: (i) deceive the investing public, including Plaintiffs and the Class, regarding, among other things, the degree to which AdaptHealth used its technology platform to provide a more accurate system of prescribe that was less prone to waste, fraud, and abuse and better able to identify patient needs compared to competing offerings, and AdaptHealth's ability to integrate its acquisitions' operations quickly and efficiently and the existence and sufficiency of internal controls; (ii) artificially inflate and maintain the market price of AdaptHealth common stock; and (iii) cause Plaintiffs and other members of the Class to purchase AdaptHealth common stock at artificially inflated prices and suffer losses when the true facts became known.

352.   As part of their scheme to defraud investors in violation of Rule 10b-5(a) and (c), AdaptHealth and the Individual Exchange Act Defendants engaged in the following course of conduct in furtherance of their scheme, as revealed by the reports of former employees as described above.

    a)   Knowingly using older and more expensive billing codes, known as A-codes, to bill for CGMs instead of more recent, and less lucrative, A-codes;

    b)   Altering prescriber prescriptions in order to make patients eligible for treatments they were not entitled to under their insurance plans;

    c)   shipping CGMs and monthly supplies that patients did not order and were not needed or covered by insurance;

    d)   misleading Medicare patients about their obligations to pay for supplies upfront;

    e)   continuing to bill as much as possible to insurance even when a customer switched from AdaptHealth to a different supplier, draining the patients' insurance coverage; and

    f)   claiming to quickly integrate acquired companies on its platform while in reality delaying doing so for extended periods of up to a year or more.

353.   These deceptive acts were part of a course of conduct that operated as a fraud and deceit upon Plaintiffs and others similarly situated in connection with their purchases of

AdaptHealth common stock during the Class Period in an effort to maintain artificially high market prices for AdaptHealth common stock.

354.    As described above, AdaptHealth and the Individual Exchange Act Defendants acted with scienter throughout the Class Period, in that they either had actual knowledge of the misrepresentations or omissions of material facts set forth herein, or acted with reckless disregard for the truth in that they failed to ascertain and to disclose the true facts, even though such facts were available to them. AdaptHealth and the Individual Exchange Act Defendants engaged in this misconduct to conceal AdaptHealth's true condition from the investing public and to support the artificially inflated prices of the Company's common stock.

355.    Plaintiffs and the Class have suffered damages in that, in direct reliance on the integrity of the market, they paid artificially inflated prices for AdaptHealth common stock, which artificial inflation was removed from the stock when true facts became known. Plaintiffs and the Class would not have purchased AdaptHealth common stock at the prices they paid, or at all, had they been aware that the market prices for AdaptHealth common stock had been artificially inflated by the Exchange Act Defendants' fraudulent course of conduct. It was also foreseeable to these Defendants that misrepresenting and concealing these material facts from the public would artificially inflate the price of AdaptHealth's securities and that the ultimate disclosure of this information, or the materialization of the risks concealed by their material misstatements and omissions, would cause the price of AdaptHealth securities to decline.

356.    As a direct and proximate result of these Defendants' wrongful conduct, Plaintiffs and the other members of the Class suffered damages attributable to the fraud alleged herein in connection with their respective purchases of the Company's common stock.

357.    By virtue of the foregoing, Defendants violated Section 10(b) of the Exchange Act and Rule 10b-5(a) and (c), promulgated thereunder.

### COUNT III

**For Violations of Section 20(a) of the Exchange Act
Against the Individual Exchange Act Defendants and Defendant Quasha**

358.    Plaintiff repeats, incorporates, and realleges every allegation above as if fully alleged in this count.

359.    As alleged above, AdaptHealth violated Section 10(b) of the Exchange Act and SEC Rule 10b-5 by its acts and omissions as alleged in this complaint.

360.    The Individual Exchange Act Defendants acted as controlling persons of AdaptHealth within the meaning of Section 20(a) of the Exchange Act, 15 U.S.C. § 78t(a). By virtue of their high-level positions, participation in and awareness of the Company's operations, direct involvement in the day-to-day operations of the Company, and intimate knowledge of the Company's actual performance, and their power to control public statements about AdaptHealth, the Individual Exchange Act Defendants had the power and ability to control the actions of AdaptHealth and its employees. By reason of this conduct, the Individual Exchange Act Defendants are liable under Section 20(a) of the Exchange Act.

361.    Additionally, Defendant Quasha acted as a controlling person of AdaptHealth within the meaning of Section 20(a) of the Exchange Act, 15 U.S.C. § 78t(a). By virtue of his 9.73-17.9% ownership stake throughout the Class Period in various entities that owned AdaptHealth common stock, as well as his role as a Director of the Company, Defendant Quasha possessed the ability to control and influence the Company. By reason of this conduct, Defendant Quasha is liable under Section 20(a) of the Exchange Act.

## THE SECURITIES ACT CLAIMS

362.    Plaintiffs' claims under the Securities Act do not sound in fraud, and Plaintiffs expressly disavow and disclaim any allegations of fraud, scheme, or intentional conduct as part of their claims under the Securities Act, which do not have scienter, fraudulent intent, or motive as required elements.

363.    On or around January 5, 2021, AdaptHealth conducted the SPO. Pursuant to the SPO Offering Materials (as defined herein), the Company sold 8,450,000 shares of AdaptHealth common stock, including the full exercise of the underwriters' option to purchase an additional 1,200,000 shares, and a selling stockholder—Quadrant Management LLC, where Defendant McGee was a principal and which Defendant Quasha controlled as CEO—sold an additional 750,000 shares of AdaptHealth common stock for proceeds of $24.5 million.

364.    The SPO Offering Materials incorporated revenue and earnings statements from the third and fourth quarter of 2020 and underscored the strength of AdaptHealth's "revenue cycle management and billing processes," its "industry-leading technology platform[]," and its "adoption of e-prescribing solutions" which "enhances transparency and reduces clinical errors and delays." In reference to the AeroCare acquisition, AdaptHealth announced plans to "reduce costs and improve operational efficiency in our current business and the businesses we acquire." In particular, the SPO Offering Materials informed investors that AdaptHealth's "revenue cycle management and billing processes have both manual and computerized elements that are ***designed to maintain the integrity of revenue and accounts receivable***."

365.    These statements among others, set forth further below, contained untrue statements of material fact, and omitted to disclose material facts, that were either required to be disclosed or that needed to be disclosed to make the statements not misleading. The Securities Act Defendants, defined below, failed to exercise reasonable care and did not conduct a reasonable

investigation or possess reasonable grounds to believe these Statements were true. The statements in the SPO Offering Materials were materially untrue and misleading, because they misrepresented or concealed that AdaptHealth regularly engaged in improper billing practices, pursuant to which AdaptHealth used inappropriate billing codes to artificially inflate the reimbursements from state Medicaid programs and other insurance providers and, when insurance would not pay, passed those costs on to the patients it claimed to serve. AdaptHealth had engaged in these practices for at least a year prior to the SPO and, contrary to its claim to "improve operational efficiency" in the businesses it acquired, AdaptHealth management negligently failed to institute safeguards, including adequate audit and compliance procedures, to prevent these the same improper practices.

366.    More than a year after the SPO took place, the truth started to emerge through revelations that AdaptHealth had failed to implement any internal controls over its financial reporting, and then the disclosure of unfavorable financial results caused by the undisclosed illicit billing practices and AdaptHealth's failure to integrate the companies it acquired and implement reasonable internal controls across its operations. Only then did the investors who purchased shares in the SPO learn the extent to which AdaptHealth's revenue depended on improper billing practices at the expense of patients, including those in vulnerable populations served by Medicare and Medicaid.

## XII.    JURISDICTION AND VENUE

367.    The claims asserted herein arise under Sections 11, 12(a)(2), and 15 of the Securities Act, 15 U.S.C. §§ 77k, 77*l*(a)(2), and 77o.

368.    This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §§ 1331 and 1337 and Section 22 of the Securities Act, 15 U.S.C. § 77v.

369.    Venue is proper in this District under 28 U.S.C. § 1391(b) and Section 22 of the Securities Act, 15 U.S.C. § 77v, because AdaptHealth maintains its headquarters in this District

and many of the acts giving rise to the violations complained of in this action, including the preparation and dissemination of materially false and misleading statements, occurred in substantial part in this District.

370.    In connection with the acts alleged herein, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including but not limited to the mails, interstate telephone communications, and the facilities of the national securities markets.

## XIII.   THE SECURITIES ACT PLAINTIFFS

371.    Lead Plaintiff Allegheny County Employees' Retirement System purchased 1,300 shares of AdaptHealth common stock in the SPO from Underwriter Defendant Jeffries LLC at artificially inflated prices and suffered damages as a result of the violations of the Securities Act alleged in this Complaint.

372.    Lead Plaintiff City of Tallahassee purchased 6,830 shares of AdaptHealth common stock in the SPO from Underwriter Defendant Jeffries LLC at artificially inflated prices and suffered damages as a result of the violations of the Securities Act alleged in this Complaint.

## XIV.   SECURITIES ACT DEFENDANTS

373.    Defendant AdaptHealth was the issuer responsible for the SPO.

### A.    Securities Act Officer Defendants

374.    Defendant McGee, who served as AdaptHealth's Chief Executive Officer (beginning in February 2021, co-Chief Executive Officer) from 2012 until June 11, 2021, and a director from November 2019 until June 11, 2021. Defendant McGee reviewed and signed the SPO Registration Statement (as defined herein).

375.    Defendant Parnes, AdaptHealth's President and a Director of the Company, reviewed and signed the SPO Registration Statement.

376.    Defendant Clemens, AdaptHealth's Chief Financial Officer, reviewed and signed the SPO Registration Statement.

377.    Defendant Frank J. Mullen ("Mullen") served as AdaptHealth's Chief Accounting Officer in December 2020. Defendant Mullen reviewed and signed the SPO Registration Statement.

**B.    Director Defendants**

378.    Defendant Richard Barasch ("Barasch") served as a Director of AdaptHealth in December 2020. Defendant Barasch reviewed and signed the SPO Registration Statement.

379.    Defendant Quasha served as a Director of AdaptHealth in December 2020. As of January 4, 2021, shortly before the SPO, Defendant Quasha, through various entities, controlled over 16 million shares of AdaptHealth common stock, 17.9% of the total shares and commensurate voting power, and therefore possessed, as the Company admitted, "significant influence" over AdaptHealth. Defendant Quasha, through various entities he controls, also offered for sale 750,000 units of AdaptHealth Class A Common Stock in the SPO, for total proceeds of $24,750,000. Defendant Quasha reviewed and signed the SPO Registration Statement.

380.    Defendant Terence Connors ("Connors") served as a Director of AdaptHealth in December 2020. Defendant Connors reviewed and signed the SPO Registration Statement.

381.    Defendant Dr. Susan Weaver ("Weaver") served as a Director of AdaptHealth in December 2020. Defendant Weaver reviewed and signed the SPO Registration Statement.

382.    Defendant Dale Wolf ("Wolf") served as a Director of AdaptHealth in December 2020. Defendant Wolf reviewed and signed the SPO Registration Statement.

383.    Defendant Bradley Coppens ("Coppens") served as a Director of AdaptHealth in December 2020. Defendant Coppens reviewed and signed the SPO Registration Statement.

384.    Defendant David S. Williams III ("Williams") served as a Director of AdaptHealth in December 2020. Defendant Williams reviewed and signed the SPO Registration Statement.

385.    Defendants McGee, Parnes, Clemens, Mullen, Barasch, Quasha, Connors, Weaver, Wolf, Coppens, and Williams are collectively referred to herein as the "Individual Securities Act Defendants." Each of the Individual Securities Act Defendants signed the SPO Registration Statement. In addition, as directors and/or executive officers of the Company, the Individual Securities Act Defendants participated in the solicitation and sale of AdaptHealth common stock to investors in the SPO. The Individual Securities Act Defendants, because of their positions within AdaptHealth, possessed the power and authority to control the contents of the SPO Offering Materials.

### C.    Underwriter Defendants

386.    Defendant Deutsche Bank Securities Inc. ("Deutsche Bank") served as a lead book-running manager and underwriter for the SPO, and sold millions of AdaptHealth shares in the SPO. As an underwriter of the SPO, Deutsche Bank was responsible for ensuring the truthfulness and accuracy of the various statements contained in or incorporated by reference into the SPO Offering Materials.

387.    Defendant Jefferies LLC ("Jefferies") served as a lead book-running manager and underwriter for the SPO, and sold millions of AdaptHealth shares in the SPO. As an underwriter of the SPO, Jefferies was responsible for ensuring the truthfulness and accuracy of the various statements contained in or incorporated by reference into the SPO Offering Materials.

388.    Defendant BofA Securities, Inc. ("BofA") served as a lead book-running manager and underwriter for the SPO, and sold hundreds of thousands of AdaptHealth shares in the SPO. As an underwriter of the SPO, BofA was responsible for ensuring the truthfulness and accuracy of the various statements contained in or incorporated by reference into the SPO Offering Materials.

389.    Defendant Truist Securities, Inc. ("Truist") served as a lead book-running manager and underwriter for the SPO and sold hundreds of thousands of AdaptHealth shares in the SPO. As an underwriter of the SPO, Truist was responsible for ensuring the truthfulness and accuracy of the various statements contained in or incorporated by reference into the SPO Offering Materials.

390.    Defendant Robert W. Baird & Co. Incorporated ("Baird") served as a joint book-running manager and underwriter for the SPO, and sold hundreds of thousands of AdaptHealth shares in the SPO. As an underwriter of the SPO, Baird was responsible for ensuring the truthfulness and accuracy of the various statements contained in or incorporated by reference into the SPO Offering Materials.

391.    Defendant RBC Capital Markets, LLC ("RBC") served as a joint book-running manager and underwriter for the SPO, and sold hundreds of thousands of AdaptHealth shares in the SPO. As an underwriter of the SPO, RBC was responsible for ensuring the truthfulness and accuracy of the various statements contained in or incorporated by reference into the SPO Offering Materials

392.    Defendant Stifel, Nicolaus & Company, Incorporated ("Stifel") served as a joint book-running manager and underwriter for the SPO, and sold hundreds of thousands of AdaptHealth shares in the SPO. As an underwriter of the SPO, Stifel was responsible for ensuring the truthfulness and accuracy of the various statements contained in or incorporated by reference into the SPO Offering Materials

393.    Defendant UBS Securities LLC ("UBS") served as a joint book-running manager and underwriter for the SPO, and sold hundreds of thousands of AdaptHealth shares in the SPO.

As an underwriter of the SPO, UBS was responsible for ensuring the truthfulness and accuracy of the various statements contained in or incorporated by reference into the SPO Offering Materials.

394.    Defendant Canaccord Genuity LLC ("Canaccord") served as a co-manager and underwriter for the SPO, and sold hundreds of thousands of AdaptHealth shares in the SPO. As an underwriter of the SPO, Canaccord was responsible for ensuring the truthfulness and accuracy of the various statements contained in or incorporated by reference into the SPO Offering Materials.

395.    Defendant Leerink Partners LLC ("Leerink") is the successor entity of SVB Leerink, LLC ("SVB Leerink"). SVB Leerink served as a co-manager and underwriter for the SPO, and sold hundreds of thousands of AdaptHealth shares in the SPO. As an underwriter of the SPO, SVB Leerink was responsible for ensuring the truthfulness and accuracy of the various statements contained in or incorporated by reference into the SPO Offering Materials. Following the March 2023 collapse of Silicon Valley Bank, SVB Leerink's parent company filed for bankruptcy. SVB Leerink was excluded from the bankruptcy. In July 2023, SVB Leerink was purchased and renamed Leerink Partners.

396.    Defendants Deutsche Bank, Jefferies, BofA, Truist, Baird, RBC, Stifel, UBS, Canaccord, and Leerink are collectively referred to herein as the "Underwriter Defendants." AdaptHealth, the Individual Securities Act Defendants, and the Underwriter Defendants are collectively referred to herein as the "Securities Act Defendants."

## XV.    BACKGROUND OF THE SECURITIES ACT CLAIMS

397.    The Securities Act claims arise out of AdaptHealth's $264.4 million secondary public offering of approximately 8 million shares of AdaptHealth common stock conducted on or about January 5, 2021 (defined above as "the SPO"). On January 4, 2021, AdaptHealth issued a press release announcing the SPO. In the press release, the Company announced that it would sell 7,250,000 shares of AdaptHealth common stock and a selling stockholder would sell an additional

750,000 shares of AdaptHealth common stock. The press release explained that AdaptHealth intended to use half the proceeds from the SPO to finance the AeroCare acquisition and the "remainder for general corporate purposes." The Company also announced that it would grant the underwriters a 30-day option to purchase up to 1,200,000 additional shares of AdaptHealth common stock. The next day, AdaptHealth announced the pricing of the SPO at $33 per share.

398.    On or around January 5, 2021, AdaptHealth conducted the SPO. The SPO was conducted pursuant to a Form S-3 filed by the Company with the SEC on December 18, 2020 (the "SPO Registration Statement"), a Prospectus on Form 424B5 filed by the Company with the SEC on January 4, 2021, which incorporated and formed part of the SPO Registration Statement, and a Prospectus on Form 424B5 filed by the Company with the SEC on January 7, 2021, which incorporated and formed part of the SPO Registration Statement (collectively, the "SPO Offering Materials").

399.    Pursuant to the SPO Offering Materials, the Company sold 8,450,000 shares of AdaptHealth common stock, including the full exercise of the underwriters' option to purchase an additional 1,200,000 shares, and a selling stockholder sold an additional 750,000 shares of AdaptHealth common stock.

400.    All sales in the SPO were issued pursuant to the SPO Offering Materials. However, the SPO Offering Materials and documents incorporated by reference therein contained untrue statements of material fact and omitted to state material facts that were required by applicable law and necessary to make the statements therein not misleading. In particular, the SPO Offering Materials informed investors that AdaptHealth's "revenue cycle management and billing processes have both manual and computerized elements that are *designed to maintain the integrity of revenue and accounts receivable*."

401.    AdaptHealth's prospectus supplement filed January 7, 2021 provides that common stock would be offered at $33.00 per share in the SPO. AdaptHealth's prospectus for the SPO also makes clear the Offering was a firm commitment offering, pursuant to which AdaptHealth "and the selling stockholders have agreed to sell to the underwriters, and each of the underwriters has agreed, severally and not jointly, to purchase" the AdaptHealth shares at the offering price, less underwriting discounts and underwriting commissions, as shown below:

| Underwriter | # of Shares |
|---|---|
| Deutsche Bank Securities Inc. | 2,147,368 |
| Jefferies LLC | 1,684,211 |
| BofA Securities, Inc. | 757,895 |
| Truist Securities, Inc. | 757,895 |
| Robert W. Baird & Co. Inc | 454,737 |
| RBC Capital Markets, LLC | 454,737 |
| Stifel, Nicolaus & Company, Inc | 454,737 |
| UBS Securities LLC | 454,737 |
| Canaccord Genuity LLC | 189,474 |
| SVB Leerink LLC | 189,474 |
| Citizens Capital Markets, Inc. | 113,684 |
| Regions Securities LLC | 113,684 |
| Fifth Third Securities, Inc. | 75,789 |
| Janney Montgomery Scott LLC | 75,789 |
| KeyBanc Capital Markets Inc. | 75,789 |
| **Total** | **8,000,000** |

## XVI.    THE    SPO    OFFERING    MATERIALS    CONTAINED    MATERIAL MISSTATEMENTS AND OMISSIONS

### A.    Untrue Statements Regarding AdaptHealth's Revenue And EBITDA

402.    The SPO Offering Materials incorporated by reference a number of AdaptHealth's recent SEC filings, including its Form 10-Qs for the First, Second and Third Quarters of 2020 and a Form 8-K filed August 4, 2020 announcing AdaptHealth's financial results for the second quarter of 2020. These financial results, however, were materially inflated by rampant and undisclosed billing practices (described further in *infra* Section XVI.B.), including AdaptHealth's widespread practice of shipping orders without proper prescriptions, documentation, or patient authorization, falsifying prescriptions and patient notes, and utilizing incorrect, more expensive billing codes.

403.    The Form 10-Q for the First Quarter of 2020, filed on May 8, 2020, which was signed by Defendant McGee, reported net revenue of $191.4 million and EBITDA of $26.05 million.

404.    The August 4, 2020 Form 8-K, which was signed by Defendant Clemens, included a press release declaring that AdaptHealth "recorded record revenue and profitability during the second quarter of 2020 aided by its ability to supply critically needed equipment and medical supplies to referral partners during the COVID-19 pandemic," and further reported that revenue was 87% higher than the first quarter of 2019. In the Form 10-Q for the Second Quarter of 2020, filed on August 7, 2020, which was signed by Defendants McGee and Clemens, AdaptHealth confirmed that Second Quarter 2020 revenue was $232.1 million and EBITDA was $42.6 million.

405.    The Form 10-Q for the Third Quarter of 2020, which was also signed by Defendants McGee and Clemens, reported revenue of $284.4 million and EBITDA of $30.7 million.

406.    The Securities Act Defendants failed to exercise reasonable care with respect to the statements in ¶¶403-04 and did not conduct a reasonable investigation or possess reasonable

grounds to believe these statements were true. Had the Securities Act Defendants exercised reasonable care, however, they would have known that these reported financial results were materially false and misleading because AdaptHealth booked a material portion of its revenue and achieved operating earnings as a result of the Company's illicit billing practices including: 1) using outdated, more expensive billing codes to bill for newer and cheaper CGMs (*supra* Section V.D.1.); 2) shipping CGMs and monthly supplies that patients did not order, were not needed, and/or were not covered by insurance (*supra* Section V.D.2.); 3) misleading Medicare patients about their obligations to pay for supplies upfront (*supra* Section V.D.2.); 4) continuing to bill as much as possible to insurance even when a customer switched from AdaptHealth to a different supplier, draining the patients' insurance coverage (*supra* Section V.D.2.-3.); and 5) altering doctors' prescriptions and notes in order to provide CGM and other supplies that patients would otherwise not receive and should not receive (*supra* Section V.D.3.). Given these practices, it was misleading to attribute AdaptHealth's revenue growth to "its ability to supply critically needed equipment and medical supplies to referral partners during the COVID-19 pandemic." To be clear, Lead Plaintiffs expressly disavow and disclaim any prior allegations of knowing or reckless misconduct on the part of the Securities Act Defendants. Lead Plaintiffs' claims under the Securities Act excludes any allegations of fraud or scienter and any allegation that could be construed as alleging fraud or intentional misconduct, as such claims are based exclusively on strict liability and negligence.

407.    Moreover, accounts from former employees located throughout the Company's operations stated that these illicit practices affected a substantial percentage of claims that the Company used to book revenue and earnings. For instance, FE 8, who served as an inside sales specialist for both resupply and new diabetic patients at Solara, which was by far AdaptHealth's

largest diabetes supply subsidiary, estimated that 70-80% of all shipments that he processed were billed under improper A-codes. Medicaid claims from around the country corroborates this conclusion. Medicaid claims data from Louisiana showing that out of approximately 111,000 CGM claims submitted from July 2020 to November 2022, more than 107,000, or 97%, of all CGM claims were submitted using A-codes rather than the proper K-codes. This trend was not isolated to a single subsidiary or geographic area of the country. Data from Massachusetts and Nebraska also show that the vast majority of claims were billed under A-codes. In Michigan, approximately one third of all CGM claims were improperly billed under A-codes. Each of these claims using improper codes generated revenue and earnings AdaptHealth did not properly earn and should not have booked.

408.    AdaptHealth's other improper practices of submitting claims without proper documentation and billing insurance and patients for products that were never ordered or shipped were just as widespread and resulted in material misstatements of revenue and earnings. FE 5 (at Pinnacle in Mississippi) estimated that as many as 50% of all AdaptHealth's patients did not qualify for insurance coverage for their devices, and AdaptHealth managers qualified them by altering prescription and patient notes. FE 3 (FE 5's superior at Pinnacle in Mississippi), similarly estimated that 40% of re-order claims were sent out without obtaining proper documentation. FE 12 (at Solara's office in Chula Vista, California) conservatively estimated that 25% of orders were shipped without proper documentation. All of the claims that were improperly submitted generated revenue and earnings AdaptHealth did not properly earn and should not have been booked.

409.    Even if the AdaptHealth's illicit practices were limited to the Company's diabetes business, and there is no indication that it was, AdaptHealth's diabetes revenue for the Third Quarter of 2020 represented approximately20% of AdaptHealth's revenues. Thus, even the most

conservative estimate concerning the pervasiveness of AdaptHealth's illicit practices (25% of shipments), would have represented a material impact on the Company's reported revenue and earnings.

**B.    The SPO Offering Materials Contained Untrue Statements Regarding AdaptHealth's Abilities To Bill Clients Accurately.**

410.    In pitching AdaptHealth's SPO to investors, Defendants listed its supposedly unique system's ability to both ensure an effective and efficient experience for patients and providers and prevent errors, fraud, and other issues that plagued older, supposedly outdated processes.

411.    In one such statement, the SPO Offering Materials claimed that AdaptHealth's "revenue cycle management and billing processes have both manual and computerized elements that are *designed to maintain the integrity of revenue and accounts receivable*."

412.    Moreover, the SPO Offering Materials described several so-called "Competitive Strengths" that AdaptHealth "believe[d] [would] continue to enable it to provide high-quality products and services to its customers and to create value for stockholders." Listed foremost among those strengths, which supposedly guaranteed AdaptHealth would have an advantage over other home medical equipment suppliers, was its "[d]ifferentiated technology-enabled platform." The SPO Offering Materials continued:

> ***Differentiated technology-enabled platform:*** Over the last five years, we have developed an integrated technology system (based upon leading third-party applications and proprietary software products), which we believe provides a competitive advantage within the HME industry. ***Our integrated platform distinguishes itself from other industry participants by automating processes that can be complex, prone to mistakes and inefficient. We believe that our platform's ease of use, improved compliance, and automated, integrated workflow for delivery of care appeals to physicians and payors.*** Additionally, we believe our adoption of e-prescribing solutions enhances transparency and reduces clinical errors and delays. We believe such systems provide better patient service by reducing the time between an order's receipt and the delivery of the products to the patient. We believe our model is scalable, supporting future organic growth while

also allowing *for timely on-boarding of acquisitions*. We believe that this differentiated technology platform will help generate business from new clients, as other competitors either lack the resources to modernize their infrastructure or utilize systems which do not easily allow for changes from traditional, less automated models.

413.    The Securities Act Defendants failed to exercise reasonable care with respect to the statements in ¶¶411-12, and did not conduct a reasonable investigation or possess reasonable grounds to believe these statements were true. Had the Securities Act Defendants exercised reasonable care, however, they would have known that the above assurances about the quality of AdaptHealth's platform, its capacity to "maintain the integrity of revenue and accounts receivable," "distinguish[] itself from other industry participants by automating processes that can be complex, prone to mistakes and inefficient," and its ability to offer "ease of use, improved compliance, and automated, integrated workflow for delivery of care," were untrue, and omitted facts necessary to make them not misleading. These assurances were materially untrue and misleading because AdaptHealth engaged in numerous illicit billing practices, which undermined the accuracy of it bills and led to billing errors, including:

- using outdated, more expensive billing codes to bill for newer and cheaper CGMs (*supra* Section V.D.1.);

- shipping CGMs and monthly supplies that patients did not order, were not needed, and/or were not covered by insurance (*supra* Section V.D.2.);

- misleading Medicare patients about their obligations to pay for supplies upfront (*supra* Section V.D.2.);

- continuing to bill as much as possible to insurance even when a customer switched from AdaptHealth to a different supplier, draining the patients' insurance coverage (*supra* Section V.D.2.-3.); and

- altering doctors' prescriptions and notes in order to provide CGM and other supplies that patients would otherwise not receive and should not receive (*supra* Section V.D.3.).

414.     To be clear, Lead Plaintiffs expressly disavow and disclaim any prior allegations of knowing or reckless misconduct on the part of the Securities Act Defendants. Lead Plaintiffs' claims under the Securities Act excludes any allegations of fraud or scienter and any allegation that could be construed as alleging fraud or intentional misconduct, as such claims are based exclusively on strict liability and negligence.

### C.     The SPO Offering Materials Contained Untrue Statements Regarding The Strength Of AdaptHealth's Internal Controls.

415.     The SPO Offering Materials incorporated by reference AdaptHealth's Form 10-K for Fiscal Year 2019 and Form 10-Qs for the First, Second, and Third Quarters of 2020. Each of those filings contained Certifications pursuant to the Sarbanes-Oxley Act of 2002 ("SOX") signed by Defendants McGee and Clemens. Each SOX Certification signed by Defendants McGee and Clemens stated, "Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report." In their SOX Certifications, Defendants McGee and/or Clemens, further stated that they were responsible "for establishing and maintaining disclosure controls and procedures . . . and internal control over financial reporting . . . and have:

   a.   Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

   b.   Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of the financial statements for external purposes in accordance with generally accepted accounting principles; and

   c.   Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure

controls and procedures, as of the end of the period covered by this report based on such evaluation[.]

416.    The Securities Act Defendants failed to exercise reasonable care with respect to the statements in ¶414-15, and did not conduct a reasonable investigation or possess reasonable grounds to believe these statements were true. Had the Securities Act Defendants exercised reasonable care, however, they would have known that the above assurances regarding AdaptHealth's internal control over financial reporting were materially false and misleading when made because, in truth, as Defendants later admitted in AdaptHealth's annual report for fiscal year 2021, which was filed on March 1, 2022, the Company's internal controls were virtually nonexistent, and there was a "lack of implementation and ineffectiveness of process level controls *in substantially all processes that support our financial statements and reporting.*"

417.    Moreover, Defendants' certifications regarding internal controls were further false and misleading because Lead Counsel's investigation demonstrates that the material weaknesses existed at the time of the SPO. Defendants did not design and evaluate effective internal controls and instead allowed AdaptHealth to engage in illicit billing practices, which included:

- using older, more expensive billing codes to bill for newer and cheaper continuous glucose monitors (*supra* Section V.D.1.);

- shipping CGMs and monthly supplies that patients did not order and were not needed or covered by insurance (*supra* Section V.D.2.);

- misleading Medicare patients about their obligations to pay for supplies upfront (*supra* Section V.D.2.);

- continuing to bill as much as possible to insurance even when a customer switched from AdaptHealth to a different supplier, draining the patients' insurance coverage (*supra* Section V.D.2.-3.); and

- altering doctors' prescriptions and notes in order to provide CGM and other supplies that patients would otherwise not receive (*supra* Section V.D.3.).

418.    Moreover, multiple former employees confirmed that AdaptHealth never implemented an audit or compliance system and that warnings to management about improper billing practices either went unheeded or were met with orders to continue the practices (*supra* Section V.E.). To be clear, Lead Plaintiffs expressly disavow and disclaim any prior allegations of knowing or reckless misconduct on the part of the Securities Act Defendants. Lead Plaintiffs' claims under the Securities Act excludes any allegations of fraud or scienter and any allegation that could be construed as alleging fraud or intentional misconduct, as such claims are based exclusively on strict liability and negligence.

**D.    The SPO Offering Materials Contained Untrue Statements Regarding AdaptHealth's Integration Of Acquisitions.**

419.    In the SPO Offering Materials, AdaptHealth claimed its platform allowed for the "timely integration" of acquisitions and listed its "Proven M&A Success" as a competitive strength. The SPO Offering Materials continued:

> AdaptHealth's integrated technology platform includes scalable and centralized front-end and back office processes that facilitate the effective onboarding of potential acquisitions and help achieve cost synergies. AdaptHealth and AeroCare have demonstrated their ability to execute upon acquisitions, completing over 230 transactions on a pro forma basis from their respective dates of founding through November 30, 2020. As AdaptHealth continues to grow, it expects to deploy incrementally more capital and integrate substantially larger targets over time, which in turn AdaptHealth expects will be a source of continued growth for AdaptHealth.

420.    The Securities Act Defendants failed to exercise reasonable care with respect to the statements in ¶417-18, and did not conduct a reasonable investigation or possess reasonable grounds to believe these statements were true. Had the Securities Act Defendants exercised reasonable care, however, they would have known that AdaptHealth failed to "effectively" integrate the many companies it acquired. In reality, except for imposing onerous sales quotas, AdaptHealth left newly acquired companies to operate independently for months on end (*supra*

Section V.C.-E.). Further, AdaptHealth never fully implemented the Company's supposed technological solutions and comprehensive compliance systems to ensure that appropriate billing procedures were being followed, proper documentation was in place, and patients were receiving the equipment they ordered (*supra* Section V.E.). When efforts to integrate the acquired companies were made, the results were often disastrous, resulting in improper billing, a lack of oversight, and ultimately a litany of patient complaints (*supra* Section VII.C.-F.).

421. Moreover, AdaptHealth actually cut compliance efforts and standards—and never implemented the Company's supposed technological solutions and comprehensive compliance systems to ensure that appropriate billing procedures were being followed, proper documentation was in place, and patients were receiving the equipment they ordered (*supra* Section V.C.-F.). To be clear, Lead Plaintiffs expressly disavow and disclaim any prior allegations of knowing or reckless misconduct on the part of the Securities Act Defendants. Lead Plaintiffs' claims under the Securities Act excludes any allegations of fraud or scienter and any allegation that could be construed as alleging fraud or intentional misconduct, as such claims are based exclusively on strict liability and negligence.

### E. The SPO Offering Materials Contained Untrue Statements Regarding Risks That Had Already Manifested.

#### 1. The Risk Disclosures Treated Realized Risks As Contingent And Hypothetical

422. The SPO Offering Materials also purported to provide the risks inherent in purchasing AdaptHealth common shares; such potential risks included

- federal and state changes to reimbursement and other Medicaid and Medicare policies;

- our ability to manage the complex and lengthy reimbursement process; . . .

- audits of reimbursement claims by various governmental and private payor entities;

- our failure to maintain controls and processes over billing and collections or the deterioration of the financial condition of our payors or disputes with third parties;

- our ability to comply with applicable law, including healthcare fraud and abuse and false claims laws and regulations, and data protection, privacy and security, and consumer protection laws;

- our ability to execute our strategic growth plan, which involves the acquisition of other companies;

- the impact if we were required to write down all or part of our goodwill;

- the risk of substantial monetary penalties or suspension or termination from participation in the Medicare and Medicaid programs if our subsidiary fails to comply with the terms of its Corporate Integrity Agreement;

- failure to consummate or realize the expected benefits of the AeroCare Acquisition.

423.    The Securities Act Defendants failed to exercise reasonable care with respect to the statements in ¶422, and did not conduct a reasonable investigation or possess reasonable grounds to believe these statements were true. Had the Securities Act Defendants exercised reasonable care, however, they would have known that the above risk warnings were materially false and misleading when made because those warnings omitted that the risk presented by overbilling had already materialized due to the Company's billing practices, including:

- using older, more expensive billing codes to bill for newer and cheaper continuous glucose monitors (*supra* Section V.D.1.);

- shipping CGMs and monthly supplies that patients did not order and were not needed or covered by insurance (*supra* Section V.D.2.);

-  misleading Medicare patients about their obligations to pay for supplies upfront (*supra* Section V.D.2.);

- continuing to bill as much as possible to insurance even when a customer switched from AdaptHealth to a different supplier, draining the patients' insurance coverage (*supra* Section V.D.2.-3.); and

- altering doctors' prescriptions and notes in order to provide CGM and other supplies that patients would otherwise not receive (*supra* Section V.D.3.).

424.   To be clear, Lead Plaintiffs expressly disavow and disclaim any prior allegations of knowing or reckless misconduct on the part of the Securities Act Defendants. Lead Plaintiffs' claims under the Securities Act excludes any allegations of fraud or scienter and any allegation that could be construed as alleging fraud or intentional misconduct, as such claims are based exclusively on strict liability and negligence.

### 2.   Defendants Violated Regulation S-K By Failing To Disclose Material Adverse Trends And The Risks Facing AdaptHealth

425.   Under applicable Securities and Exchange Commission rules and regulations governing the SPO Offering Documents, including Securities and Exchange Commission Regulation C, the Offering Documents were required to (but failed to) disclose additional material information.

426.   Specifically, Item 303 of SEC Regulation S-K, 17 C.F.R. § 229.303(a)(3)(ii), required Defendants to "[d]escribe any known trends or uncertainties that have had or that the registrant reasonably expects will have a material favorable or unfavorable impact on the sales or revenues or income from continuing operations."

427.   Accordingly, as the SEC has repeatedly emphasized, the "specific provisions in Item 303 [set forth above] require disclosure of forward-looking information." Indeed, the SEC has stated that Item 303 is "intended to give the investor an opportunity to look at the company through the eyes of management by providing both a short and long-term analysis of the business of the company. . .with particular emphasis on the registrant's prospects for the future." *See* Management's Discussion and Analysis of Financial Condition and Results of Operation, Securities Act Release No. 6835, 1989 WL 1092885, at *3 (May 18, 1989). Thus, "material forward looking information regarding known material trends and uncertainties is required to be disclosed as part of the required discussion of those matters and the analysis of their effects." *See*

Commission Guidance Regarding Management's Discussion and Analysis of Financial Condition and Results of Operation, Securities Act Release No. 8350, 2003 WL 22996757, at *11 (December 29, 2003).

428. Disclosure of forward-looking information concerning the registrant's revenue is required by Item 303 "where a trend, demand, commitment, event or uncertainty is both [i] presently known to management and [ii] reasonably likely to have material effects on the registrant's financial condition or results of operations." *See* Management's Discussion and Analysis of Financial Condition and Results of Operation, Securities Act Release No. 6835, 1989 WL 1092885, at *4 (May 18, 1989).

429. As set forth in detail above, both of these conditions were satisfied here. First, as set forth above at Section VIII, the trends that were negatively impacting AdaptHealth's revenue relating to AdaptHealth's unsustainable and improper upcoding and other illicit billing practices were widely "known" to AdaptHealth's management prior to the SPO. Second, the facts set forth above establish that the trends or uncertainties were "reasonably likely to have material effects on the [AdaptHealth's] financial condition or results of operations," as AdaptHealth's results of operations would inevitably decline once the practices were exposed and halted.

430. Similarly, Item 105 of SEC Regulation S-K, 17 C.F.R. § 229.105, requires, in the "Risk Factors" section of registration statements and prospectuses, "a discussion of the material factors that make an investment in the registrant or offering speculative or risky" and requires each risk factor to "adequately describe[] the risk" and not present "risks that could apply generically to any registrant or any offering."

431. Despite this requirement, the SPO Offering Materials failed to adequately disclose the financial, regulatory, and reputational risks posed by AdaptHealth's billing.

432.    The SPO Offering Materials also failed to disclose issues with AdaptHealth's integration of its acquisitions despite the fact, as multiple former employees have reported, AdaptHealth actually failed to effectively integrate its acquisitions' operations. Moreover, former employees confirmed that AdaptHealth practices, such as using the incorrect billing codes and shipping goods that were not needed by the patients immediately spread to AdaptHealth's acquisitions. (*supra* Section V.E.)

## XVII.  THE SECURITIES ACT DEFENDANTS FAILED TO EXERCISE REASONABLE CARE OR CONDUCT A REASONABLE INVESTIGATION IN CONNECTION WITH THE SPO.

433.    None of the Securities Act Defendants made a reasonable investigation or possessed reasonable grounds for the belief that the statements contained in the SPO Materials were accurate and complete and not misstated in all material respects. Had the Securities Act Defendants exercised reasonable care, they would have known of the material misstatements and omissions alleged herein.

434.    Due diligence is a critical component of the issuing and underwriting process. Directors, officers, accountants and underwriters are able to perform due diligence because of their expertise and access to the Company's non-public information. Underwriters must not rely on management statements; instead, they should play a devil's advocate role and conduct a verification process. At a minimum, due diligence for every public offering should involve: (1) interviews of upper and mid-level management; (2) a review of the auditor's management letters; (3) a review of items identified therein; (4) a review of the company's SEC filings (particularly those incorporated by reference); (5) a critical review of the company's financial statements, including an understanding of the company's accounting and conversations with the company's auditors without management present; (6) a review of the company's internal controls; (7) a review of negative facts and concerns within each underwriter's organization and within the underwriter

syndicate; and (8) a review of critical non-public documents forming the basis for the company's assets, liabilities and earnings. Red flags uncovered through this process must be investigated. Officers and auditors must participate in the underwriters' due diligence, and non-officer directors are responsible for the integrity of the due diligence process in their capacity as the ultimate governing body of the issuer.

435.    The Underwriter Defendants did not conduct a reasonable investigation of the statements contained in and incorporated by reference in the SPO Materials and did not possess reasonable grounds for believing that the statements therein were true and not materially misstated.

436.    Similarly, the Securities Act Individual Defendants who signed the Registration Statement and failed to conduct a reasonable investigation into the statements contained in the Registration Statement and documents incorporated therein by reference and did not possess reasonable grounds for believing that the statements therein were true and not materially misstated. Had these Securities Act Individual Defendants conducted a reasonable investigation, they would have known that the SPO Materials contained material misstatements and omissions about AdaptHealth's issues with billing practices, including:

- using older, more expensive billing codes to bill for newer and cheaper continuous glucose monitors;

- altering doctors' prescriptions and notes in order to provide CGM and other supplies that patients would otherwise not receive;

- shipping CGMs and monthly supplies that patients did not order and were not needed or covered by insurance;

- telling Medicare patients that they were required to pay for supplies upfront; and

-  continuing to bill as much as possible to insurance even when a customer switched from AdaptHealth to a different supplier, draining the patients' insurance coverage, as well as its failure to effectively integrate acquisitions.

## XVIII. SECURITIES ACT CAUSES OF ACTION

### COUNT III

**For Violations of Section 11 of the Securities Act
Against the Securities Act Defendants**

437.    This Count is brought pursuant to Section 11 of the Securities Act, 15 U.S.C. § 77k, on behalf of all members of the Class who purchased or otherwise acquired AdaptHealth common stock in and/or traceable to the SPO and who were damaged thereby.

438.    This Count expressly excludes and disclaims any allegation that could be construed as alleging fraud or intentional or reckless conduct, as this Count is solely based on claims of strict liability and/or negligence under the Securities Act. For purposes of asserting this Count, Lead Plaintiffs do not allege that the defendants named in this Count acted with scienter or fraudulent intent, which are not elements of a Section 11 claim.

439.    The Defendants named in this Count were responsible for the contents and dissemination of the SPO Offering Materials.

440.    AdaptHealth is the registrant for the SPO. As the issuer of the shares, AdaptHealth is strictly liable to Lead Plaintiffs and the Class for the misstatements and omissions contained in the SPO Offering Materials.

441.    Liability under this Count is predicated on the Individual Securities Act Defendants having signed the SPO Registration Statement, and the respective participation by all the defendants named in this Count in the SPO, which was conducted pursuant to the SPO Offering Materials.

442.    The SPO Offering Materials contained untrue statements of material facts, omitted to state other facts necessary to make the statements not misleading, and omitted to state material facts required to be stated therein.

443.    Lead Plaintiffs and the Class have suffered damages. The value of AdaptHealth common stock has declined substantially as a result of the Securities Act Defendants' violations.

444.    Less than one year has elapsed from the time that Lead Plaintiffs discovered or reasonably could have discovered the facts upon which this Complaint is based to the time that Leads Plaintiffs commenced this action. Less than three years has elapsed between the time that the securities upon which this Count is brought were offered to the public through the SPO and the time Lead Plaintiffs commenced this action.

445.    By reason of the foregoing, the defendants named in this Count are each jointly and severally liable for violations of Section 11 of the Securities Act to Lead Plaintiffs and the other members of the Class.

### COUNT IV

**For Violations of Section 12(a)(2) of the Securities Act
Against the Underwriter Defendants**

446.    This Count is brought pursuant to Section 12(a)(2) of the Securities Act, 15 U.S.C. §771(a)(2), on behalf of all members of the Class who purchase or otherwise acquired AdaptHealth common stock in and/or traceable to the SPO and who were damaged thereby.

447.    This Count expressly excludes and disclaims any allegation that could be construed as alleging fraud or intentional or reckless conduct, and this Count is solely based on claims of strict liability and/or negligence under the Securities Act. For purposes of asserting this Count, Lead Plaintiffs do not allege that the Underwriter Defendants acted with scienter or fraudulent intent, which are not elements of a Section 12(a)(2) claim.

448.    The Underwriter Defendants were statutory sellers of AdaptHealth shares that were registered in the SPO pursuant to the SPO Registration Statement and sold by means of the SPO Offering Materials. By means of the SPO Offering Materials, the Underwriter Defendants sold

millions of shares of AdaptHealth common stock through the SPO to members of the Class. The Underwriter Defendants were at all relevant times motivated by their own financial interests. In sum, the Underwriter Defendants were sellers, offerors, and/or solicitors of sales of the stock that was sold in the SPO by means of the materially false and misleading SPO Offering Materials.

449.    The SPO Offering Materials contained untrue statements of material fact and omitted other facts necessary to make the statements not misleading, and failed to disclose material facts, as set forth above.

450.    Less than one year has elapsed since the time that the Lead Plaintiffs discovered, or could reasonably have discovered, the facts upon which this Complaint is based. Less than three years has elapsed since the time that the securities at issue in this Complaint were bona fide offered to the public.

451.    By reason of the foregoing, the Underwriter Defendants are liable for violations of Section 12(a)(2) of the Securities Act to Lead Plaintiffs and the other members of the Class who purchased AdaptHealth common stock in and/or traceable to the SPO, and who were damaged thereby.

## **COUNT V**

### **For Violations of Section 15 of the Securities Act**
### **Against the Individual Securities Act Defendants**

452.    This Count is brought pursuant to Section 15 of the Securities Act, 15 U.S.C. § 77o, on behalf of all members of the Class who purchased or otherwise acquired AdaptHealth common stock in and/or traceable to the SPO and who were damaged thereby.

453.    This Count expressly excludes and disclaims any allegation that could be construed as alleging fraud or intentional or reckless conduct, as this Count is solely based on claims of strict liability and/or negligence under the Securities Act. For purposes of asserting this Count, Lead

Plaintiffs do not allege that the defendants named in this Count acted with scienter or fraudulent intent, which are not elements of a Section 15 claim.

454.   As set forth in Count One above, AdaptHealth is strictly liable under Section 11 of the Securities Act for untrue statements and omissions of material fact in the SPO Offering Materials.

455.   The Individual Securities Act Defendants, by virtue of their positions as senior officers and/or directors at AdaptHealth, were controlling persons of AdaptHealth within the meaning of Section 15 of the Securities Act. The Defendants named in this Count had the power and influence, and exercised the same, to cause AdaptHealth to engage in the acts described herein, including by causing AdaptHealth to conduct the SPO pursuant to the SPO Offering Materials.

456.   By reason of the foregoing, to the extent that culpable participation is required element of a Section 15 claim, the Defendants named in this Count were culpable participants in the violations of Sections 11 and 12(a)(2) of the Securities Act as alleged in Counts One and Two above, based on their having signed the SPO Registration Statement and having otherwise participated in the process that allowed the SPO to be successfully completed. The Defendants named in this Count are liable for the aforesaid wrongful conduct and is liable, to the same extent AdaptHealth is liable under Section 11 of the Securities Act, to Lead Plaintiffs and members of the Class who purchased or otherwise acquired AdaptHealth common stock pursuant and/or traceable to the SPO, and who were damaged thereby.

## THE FOLLOWING SECTIONS APPLY TO BOTH THE EXCHANGE ACT AND SECURITIES ACT CLAIMS

## XIX.   CLASS ACTION ALLEGATIONS

457.   Lead Plaintiffs bring this action as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure on behalf of all persons or entities who purchased or otherwise acquired:

(i) AdaptHealth common stock during the Class Period; and/or (ii) AdaptHealth common stock pursuant and/or traceable to the Company's SPO (the "Class"). Excluded from the Class are Defendants and their families, directors, and officers of AdaptHealth and their families and affiliates.

458.    The members of the Class are so numerous that joinder of all members is impracticable. The disposition of their claims in a class action will provide substantial benefits to the parties and the Court. As of the conclusion of the Class Period, AdaptHealth had over 136 million shares of stock outstanding, owned by at least hundreds or thousands of investors.

459.    There is a well-defined community of interest in the questions of law and fact involved in this case. Questions of law and fact common to the members of the Class, which predominate over questions which may affect individual Class members, include:

    a.    Whether Defendants violated the Securities Act and/or the Exchange Act;

    b.    Whether the SPO Offering Materials were negligently prepared and contained inaccurate statements of material fact and omitted material information required to be stated therein;

    c.    Whether Exchange Act Defendants omitted and/or misrepresented material facts;

    d.    Whether Exchange Act Defendants' statements omitted material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading;

    e.    Whether Exchange Act Defendants knew or recklessly disregarded that their statements and/or omissions were false and misleading;

    f.    Whether the Individual Exchange Act Defendants and Individual Securities Act Defendants are personally liable for the alleged misrepresentations and/or omissions described herein;

    g.    Whether Defendants' conduct impacted the price of AdaptHealth common stock;

    h.    Whether Defendants' conduct caused the members of the Class to sustain damages; and

      i.     The extent of damages sustained by Class members and the appropriate measure of damages.

460.    Lead Plaintiffs' claims are typical of those of the Class because Lead Plaintiffs and the Class sustained damages from Defendants' wrongful conduct.

461.    Lead Plaintiffs will adequately protect the interests of the Class and have retained counsel experienced in class action securities litigation. Lead Plaintiffs have no interests which conflict with those of the Class.

462.    A class action is superior to other available methods for the fair and efficient adjudication of this controversy.

## XX.    PRAYER FOR RELIEF

WHEREFORE, Lead Plaintiffs pray for judgment as follows:

    a.    Determining that this action is a proper class action under Rule 23 of the Federal Rules of Civil Procedure;

    b.    Awarding compensatory damages in favor of Lead Plaintiffs and other Class members against all Defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including interest;

    c.    Awarding all other remedies available under Sections 10(b) and 20 of the Exchange Act and Section 11, 12(a), and 15 of the Securities Act;

    d.    Awarding Lead Plaintiffs and the Class their reasonable costs and expenses incurred in this action, including attorneys' fees and expert fees; and

    e.    Awarding any equitable, injunctive, or other further relief that the Court may deem just and proper.

## XXI.    JURY DEMAND

Lead Plaintiffs demand a trial by jury.

DATED: May 14, 2024

Respectfully submitted,

**BERNSTEIN LITOWITZ BERGER**
  **& GROSSMANN LLP**

*/s/John Rizio-Hamilton*
Hannah Ross
John Rizio-Hamilton (*pro hac vice*)
Katherine M. Sinderson (*pro hac vice*)
John J. Esmay (*pro hac vice*)
Timothy Fleming (*pro hac vice*)
Sarah K. Schmidt (*pro hac vice* forthcoming)
1251 Avenue of the Americas
New York, New York 10020
Telephone: (212) 554-1400
Facsimile: (212) 554-1444
hannah@blbglaw.com
johnr@blbglaw.com
katiem@blbglaw.com
john.esmay@blbglaw.com
timothy.fleming@blbglaw.com
sarah.schmidt@blbglaw.com

*Counsel for Lead Plaintiffs*

**KASKELA LAW LLC**

D. Seamus Kaskela (No. 204351)
Adrienne Bell (No. 202231)
18 Campus Boulevard, Suite 100
Newtown Square, PA 19073
Telephone: (484) 258-1401
skaskela@kaskelalaw.com
abell@kaskelalaw.com

*Liaison Counsel for Lead Plaintiffs*

| Former Employee Appendix[16] | | |
|---|---|---|
| **FE No.** | **Title** | **Tenure** |
| 1 | Human Resource Business Partner at Solara and then AdaptHealth (post-acquisition) | July 2018 to August 2023 |
| 2 | Location Manager at Solara's Michigan location and AdaptHealth (post-acquisition) | September 2019 to September 2021 |
| 3 | Intake and Inside Sales Specialist and team leader at Pinnacle and then AdaptHealth (post-acquisition) | March 2019 to April 2023 |
| 4 | Diabetes Care Specialist at Pinnacle and then AdaptHealth (post-acquisition) | July 2020 to July 2021 |
| 5 | Inside Sales Specialist at Pinnacle and AdaptHealth (post-acquisition) | July 2019 to July 2022 |
| 6 | Billing Clerk at AeroCare and AdaptHealth (post-acquisition) | May 2021 to February 2022. |
| 7 | Reimbursement Manager at Advanced Home Care and then AdaptHealth (post-acquisition) | June 2014 to April 2021 |
| 8 | Inside Sales Specialist who worked at Solara and then AdaptHealth (post-acquisition) | November 2020 to August 2021 |
| 9 | Senior Manager of Patient Acquisition at Solara and then AdaptHealth (post-acquisition) | June 2019 to October 2022 |
| 10 | Director of Training & Implementation, Operations at AdaptHealth (post-acquisition) | January 2018 to June 2021 |
| 11 | CGM Sales Manager at Pumps It and then AdaptHealth (post-acquisition) | February 2019 to June 2022 |
| 12 | Quality Assurance Specialist at Solara and then AdaptHealth (post-acquisition) | August 2018 to January 2022 |
| 13 | High-Level Executive at Pumps It and then AdaptHealth (post-acquisition)[17] | August 2012 to October 2022 |
| 14 | Senior PAP Specialist at AeroCare and then AdaptHealth (post-acquisition) | March 2020 to January 2024 |
| 15 | Account Executive at Diabetes Supply and the AdaptHealth (post-acquisition) | April 2022 to January 2024 |

[16] The information contained in this Appendix is based on the information provided by the Former Employees in connection with Lead Counsel's investigation in this matter.

[17] FE 13 asked Lead Counsel not to use their full title because their title would reveal their identity and they desire to remain anonymous. Lead Counsel can provide their full title to the Court upon request.