# Exhibit 12

**UNITED STATES**
**SECURITIES AND EXCHANGE COMMISSION**
**WASHINGTON, D.C. 20549**

# FORM 10-Q

**x**  **QUARTERLY REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934**

**For the quarterly period ended March 31, 2022**

**OR**

☐  **TRANSITION REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934**

**Commission file number: 001-38399**

# AdaptHealth Corp.

(Exact name of registrant as specified in its charter)

| | |
|---|---|
| **Delaware** | **82-3677704** |
| (State of Other Jurisdiction of incorporation or Organization) | (I.R.S. Employer Identification No.) |
| **220 West Germantown Pike Suite 250, Plymouth Meeting, PA** | **19462** |
| (Address of principal executive offices) | (Zip code) |

**Registrant's telephone number, including area code: (610) 424-4515**

**Securities registered pursuant to Section 12(b) of the Act:**

| **Title of Each Class** | **Trading Symbol(s)** | **Name Of Each Exchange On Which Registered** |
|---|---|---|
| **Common Stock, par value $0.0001 per share** | **AHCO** | **The Nasdaq Stock Market LLC** |

**Securities registered pursuant to Section 12(g) of the Act:  None**

Indicate by check mark whether the registrant:  (1) has filed all reports required to be filed by Section 13 or 15(d) of the Securities Exchange Act of 1934 during the preceding 12 months (or for such shorter period that the registrant was required to file such reports), and (2) has been subject to such filing requirements for the past 90 days. Yes **x**   No ☐

Indicate by check mark whether the Registrant has submitted electronically every Interactive Data File required to be submitted pursuant to Rule 405 of Regulation S-T (§232.0405 of this chapter) during the preceding 12 months (or for such shorter period that the registrant was required to submit such files).   Yes **x**   No ☐

Indicate by check mark whether the registrant is a large accelerated filer, an accelerated filer, a non-accelerated filer, a smaller reporting company, or an emerging growth company. See the definitions of "large accelerated filer," "accelerated filer," "smaller reporting company," and "emerging growth company" in Rule 12b-2 of the Exchange Act.

Large accelerated filer **x**         Accelerated filer ☐         Non-accelerated filer ☐         Smaller reporting company ☐
                                                                                                   Emerging growth company ☐

If an emerging growth company, indicate by check mark if the registrant has elected not to use the extended transition period for complying with any new or revised financial accounting standards provided pursuant to Section 13(a) of the Exchange Act. ☐

Indicate by check mark whether the registrant is a shell company (as defined in Rule 12b-2 of the Exchange Act). Yes ☐ No **x**

As of May 6, 2022, there were 134,289,067 shares of the Registrant's Common Stock issued and outstanding.

Table of Contents

**ADAPTHEALTH CORP.**

**FORM 10-Q**
**TABLE OF CONTENTS**

| | Page Number |
|---|---|
| **PART I FINANCIAL INFORMATION** | |
| Item 1. Interim Consolidated Financial Statements (Unaudited) | |
| Consolidated Balance Sheets as of March 31, 2022 and December 31, 2021 | 4 |
| Consolidated Statements of Operations for the three months ended March 31, 2022 and 2021 | 5 |
| Consolidated Statements of Comprehensive Income (Loss) for the three months ended March 31, 2022 and 2021 | 6 |
| Consolidated Statements of Changes in Stockholders' Equity for the three months ended March 31, 2022 and 2021 | 7 |
| Consolidated Statements of Cash Flows for the three months ended March 31, 2022 and 2021 | 8 |
| Notes to Interim Consolidated Financial Statements | 9 |
| Item 2. Management's Discussion and Analysis of Financial Condition and Results of Operations | 40 |
| Item 3. Quantitative and Qualitative Disclosures About Market Risk | 54 |
| Item 4. Controls and Procedures | 54 |
| | |
| **PART II OTHER INFORMATION** | 56 |
| Item 1. Legal Proceedings | 56 |
| Item 1A. Risk Factors | 56 |
| Item 2. Unregistered Sales of Equity Securities and Use of Proceeds | 56 |
| Item 3. Defaults upon Senior Securities | 56 |
| Item 4. Mine Safety Disclosure | 56 |
| Item 5. Other Information | 56 |
| Item 6. Exhibits | 56 |
| **Signatures** | 58 |

**CERTAIN DEFINED TERMS**

Throughout this Quarterly Report on Form 10-Q, unless otherwise specified or the context so requires:

"*AdaptHealth Holdings*" means AdaptHealth Holdings LLC, a Delaware limited liability company;

"*Business Combination"* means the transactions completed pursuant to the Agreement and Plan of Merger, dated as of July 8, 2019, by and among DFB Healthcare Acquisitions Corp. a Delaware corporation, DFB Merger Sub LLC, a Delaware limited liability company, our wholly owned subsidiary, AdaptHealth Holdings, AH Representative LLC, BM AH Holdings, LLC, Access Point Medical Inc. and, solely for the purposes described therein, Clifton Offshore Investments L.P., a British Virgin Islands limited partnership, BlueMountain Foinaven Master Fund L.P., a Cayman Islands exempted limited partnership, BMSB L.P. a Delaware limited partnership, BlueMountain Fursan Fund L.P. a Cayman Islands exempted limited partnership, which we completed on November 8, 2019;

*"Charter"* means our Third Amended and Restated Certificate of Incorporation, filed with the Secretary of State of the State of Delaware on July 28, 2021;

"*Class A Common Stock"* means the Class A Common Stock, par value $0.0001 per share, created on the Closing of the Business Combination, which, following the filing of the Charter, has been renamed to "Common Stock" (as defined below);

"*Class B Common Stock*" means the Class B Common Stock, par value $0.0001 per share, created on the Closing of the Business Combination, which following the filing of the Charter, no longer exists;

"*Closing of the Business Combination*" means the closing of the Business Combination, which occurred on November 8, 2019;

"*Common Stock*" means our Common Stock, par value $0.0001 per share;

"*Exchange Agreement*" means the Exchange Agreement, dated as of November 8, 2019, by and among AdaptHealth, AdaptHealth Holdings, and holders of AdaptHealth Units;

"*New AdaptHealth Units*" common units representing limited liability company interests in AdaptHealth Holdings from and after the Closing of the Business Combination;

"*Series B-1 Preferred Stock*" means the series of preferred stock of the Company designated as "Series B-1 Convertible Preferred Stock," par value $0.0001 per share;

"*Sponsor*" means Deerfield/RAB Ventures LLC;

"*Tax Receivable Agreement*" means the Tax Receivable Agreement, dated as of November 8, 2019, by and among AdaptHealth, AdaptHealth Holdings, and holders of AdaptHealth Units; and

*"Warrants"* means, collectively, the warrants that were issued in our initial public offering (our "IPO") pursuant to the registration statement declared effective on February 15, 2018 and which were redeemed on September 2, 2020 (the "*public warrants*") and the warrants initially issued to our Sponsor in a private placement that occurred simultaneously with our IPO (the "*private placement warrants*"), which private placement warrants have been distributed from the Sponsor to its members.

**CAUTIONARY STATEMENT**

In this Quarterly Report on Form 10-Q, including "*Management's Discussion and Analysis of Financial Condition and Results of Operations*" in Part I Item 2, and the documents incorporated by reference herein, we make forward-looking statements within the meaning of the Private Securities Litigation Reform Act of 1995. These forward-looking statements relate to expectations for future financial performance, business strategies or expectations for our business. These statements may be preceded by, followed by or include the words "may," "might," "will," "will likely result," "should," "estimate," "plan," "project," "forecast," "intend," "expect," "anticipate," "believe," "seek," "continue," "target" or similar expressions.

These forward-looking statements are based on information available to us as of the date they were made, and involve a number of risks and uncertainties which may cause them to turn out to be wrong. Accordingly, forward-looking statements should not be relied upon as representing our views as of any subsequent date, and we do not undertake any obligation to update forward-looking statements to reflect events or circumstances after the date they were made, whether as a result of new information, future events or otherwise, except as may be required under applicable securities laws. As a result of a number of known and unknown risks and uncertainties, our actual results or performance may be materially different from those expressed or implied by these forward-looking statements. Some factors that could cause actual results to differ include:

- competition and the ability of our business to grow and manage growth profitably;

- changes in applicable laws or regulations;

- fluctuations in the U.S. and/or global stock markets;

- the possibility that we may be adversely affected by other economic, business, and/or competitive factors;

- the impact of the coronavirus (COVID-19) pandemic and our response to it;

- failure to consummate or realize the expected benefits of acquisitions, and

- other risks and uncertainties set forth in this Form 10-Q, as well as the documents incorporated by reference herein.

**PART I – FINANCIAL INFORMATION**
*Item 1. Interim Consolidated Financial Statements*

**ADAPTHEALTH CORP. AND SUBSIDIARIES**
**CONSOLIDATED BALANCE SHEETS**
**(IN THOUSANDS, EXCEPT SHARE AND PER SHARE DATA)**
**(UNAUDITED)**

| | March 31, 2022 | December 31, 2021 |
|---|---|---|
| **Assets** | | |
| Current assets: | | |
| Cash and cash equivalents | $ 119,428 | $ 149,627 |
| Accounts receivable | 369,898 | 359,896 |
| Inventory | 99,636 | 123,095 |
| Prepaid and other current assets | 26,026 | 37,440 |
| Total current assets | 614,988 | 670,058 |
| Equipment and other fixed assets, net | 424,764 | 398,577 |
| Operating lease right-of-use assets | 142,092 | 147,760 |
| Goodwill | 3,515,066 | 3,512,567 |
| Identifiable intangible assets, net | 192,370 | 202,231 |
| Other assets | 15,170 | 15,098 |
| Deferred tax assets | 299,891 | 304,193 |
| Total Assets | $ 5,204,341 | $ 5,250,484 |
| **Liabilities and Stockholders' Equity** | | |
| Current liabilities: | | |
| Accounts payable and accrued expenses | $ 316,051 | $ 358,384 |
| Current portion of finance lease obligations | 8,692 | 15,446 |
| Current portion of operating lease obligations | 30,597 | 31,418 |
| Current portion of long-term debt | 20,000 | 20,000 |
| Contract liabilities | 30,613 | 31,370 |
| Other liabilities | 37,602 | 43,194 |
| Total current liabilities | 443,555 | 499,812 |
| Long-term debt, less current portion | 2,179,730 | 2,183,552 |
| Operating lease obligations, less current portion | 115,420 | 120,180 |
| Other long-term liabilities | 313,963 | 322,487 |
| Warrant liability | 31,047 | 57,764 |
| Total Liabilities | 3,083,715 | 3,183,795 |
| Commitments and contingencies (note 14) | | |
| Stockholders' Equity: | | |
| Common Stock, par value of $0.0001 per share, 300,000,000 shares authorized; 134,245,536 and 133,843,732 shares issued and outstanding as of March 31, 2022 and December 31, 2021, respectively | 13 | 13 |
| Preferred Stock, par value of $0.0001 per share, 5,000,000 shares authorized; 124,060 and 124,060 shares issued and outstanding as of March 31, 2022 and December 31, 2021, respectively | 1 | 1 |
| Additional paid-in capital | 2,112,976 | 2,107,267 |
| Accumulated deficit | (1,271) | (43,021) |
| Accumulated other comprehensive income (loss) | 3,644 | (2,354) |
| Total stockholders' equity attributable to AdaptHealth Corp. | 2,115,363 | 2,061,906 |
| Noncontrolling interests in subsidiaries | 5,263 | 4,783 |
| Total Stockholders' Equity | 2,120,626 | 2,066,689 |
| Total Liabilities and Stockholders' Equity | $ 5,204,341 | $ 5,250,484 |

See accompanying notes to unaudited interim consolidated financial statements.

**ADAPTHEALTH CORP. AND SUBSIDIARIES**
**CONSOLIDATED STATEMENTS OF OPERATIONS**
**(IN THOUSANDS, EXCEPT PER SHARE DATA)**
**(UNAUDITED)**

| | Three Months Ended March 31, | | | |
|---|---|---|---|---|
| | | 2022 | | 2021 |
| Net revenue | $ | 706,203 | $ | 482,119 |
| Costs and expenses: | | | | |
| Cost of net revenue | | 597,122 | | 396,698 |
| General and administrative expenses | | 41,444 | | 56,632 |
| Depreciation and amortization, excluding patient equipment depreciation | | 16,085 | | 13,380 |
| Total costs and expenses | | 654,651 | | 466,710 |
| Operating income | | 51,552 | | 15,409 |
| Interest expense, net | | 24,776 | | 22,185 |
| Change in fair value of warrant liability (note 10) | | (26,717) | | (3,168) |
| Change in fair value of contingent consideration common shares liability (note 10) | | — | | (1,965) |
| Loss on extinguishment of debt | | — | | 4,213 |
| Other (income) loss, net | | 5,660 | | (519) |
| Income (loss) before income taxes | | 47,833 | | (5,337) |
| Income tax expense (benefit) | | 5,603 | | (1,695) |
| Net income (loss) | | 42,230 | | (3,642) |
| Income attributable to noncontrolling interest | | 480 | | 324 |
| Net income (loss) attributable to AdaptHealth Corp. | $ | 41,750 | $ | (3,966) |
| | | | | |
| Weighted average common shares outstanding - basic | | 134,023 | | 111,109 |
| Weighted average common shares outstanding - diluted | | 138,483 | | 115,995 |
| | | | | |
| Basic net income (loss) per share [1] | $ | 0.29 | $ | (0.04) |
| Diluted net income (loss) per share [1] | $ | 0.08 | $ | (0.08) |

[1]   See Note 11, *Earnings (Loss) Per Share*, to the unaudited interim consolidated financial statements for the calculations of basic and diluted net income (loss) per share.

See accompanying notes to unaudited interim consolidated financial statements.

5

**ADAPTHEALTH CORP. AND SUBSIDIARIES**
**CONSOLIDATED STATEMENTS OF COMPREHENSIVE INCOME (LOSS)**
**(IN THOUSANDS)**
**(UNAUDITED)**

| | Three Months Ended March 31, | |
| --- | --- | --- |
| | 2022 | 2021 |
| Net income (loss) | $ 42,230 | $ (3,642) |
| Other comprehensive income: | | |
| Interest rate swap agreements, inclusive of reclassification adjustment | 5,998 | 1,876 |
| Comprehensive income (loss) | 48,228 | (1,766) |
| | | |
| Income attributable to noncontrolling interest | 480 | 324 |
| Comprehensive income (loss) attributable to AdaptHealth Corp. | $ 47,748 | $ (2,090) |

See accompanying notes to unaudited interim consolidated financial statements.

6

**ADAPTHEALTH CORP. AND SUBSIDIARIES**
**CONSOLIDATED STATEMENTS OF CHANGES IN STOCKHOLDERS' EQUITY**
**(IN THOUSANDS)**
**(UNAUDITED)**

| | Common Stock | | Preferred Stock | | Additional paid-in capital | Accumulated deficit | Accumulated other comprehensive income (loss) | Noncontrolling interests in subsidiaries | Total |
| --- | --- | --- | --- | --- | --- | --- | --- | --- | --- |
| | Shares | Amount | Shares | Amount | | | | | |
| Balance, December 31, 2021 | 133,844 | $ 13 | 124 | $ 1 | $ 2,107,267 | $ (43,021) | $ (2,354) | $ 4,783 | $ 2,066,689 |
| Equity-based compensation | 187 | — | — | — | 5,502 | — | — | — | 5,502 |
| Exercise of stock options | 184 | — | — | — | 723 | — | — | — | 723 |
| Payments for tax withholdings from restricted stock vesting and stock option exercises | — | — | — | — | (1,269) | — | — | — | (1,269) |
| Common Stock issued in connection with employee stock purchase plan | 31 | — | — | — | 753 | — | — | — | 753 |
| Net income | — | — | — | — | — | 41,750 | — | 480 | 42,230 |
| Change in fair value of interest rate swaps, inclusive of reclassification adjustment | — | — | — | — | — | — | 5,998 | — | 5,998 |
| Balance, March 31, 2022 | 134,246 | $ 13 | 124 | $ 1 | $ 2,112,976 | $ (1,271) | $ 3,644 | $ 5,263 | $ 2,120,626 |

| | Class A Common Stock | | Class B Common Stock | | Preferred Stock | | Additional paid-in capital | Accumulated deficit | Accumulated other comprehensive income (loss) | Noncontrolling interests in subsidiaries | Total |
| --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- |
| | Shares | Amount | Shares | Amount | Shares | Amount | | | | | |
| Balance, December 31, 2020 | 76,458 | $ 8 | 13,219 | $ 1 | 164 | $ 1 | $ 558,486 | $ (199,196) | $ (4,411) | $ (74,044) | $ 280,845 |
| Issuance of Class A Common Stock for acquisitions | 14,092 | 2 | — | — | — | — | 564,986 | — | — | — | 564,988 |
| Issuance of Series C Preferred Stock for an acquisition | — | — | — | — | 130 | — | 523,856 | — | — | — | 523,856 |
| Issuance of stock options for an acquisition | — | — | — | — | — | — | 134,683 | — | — | — | 134,683 |
| Exchange of Class B Common Stock for Class A Common Stock | 13,219 | 1 | (13,219) | (1) | — | — | (77,919) | — | — | 77,919 | — |
| Equity-based compensation | 172 | — | — | — | — | — | 8,582 | — | — | — | 8,582 |
| Cashless exercise of stock options | 9 | — | — | — | — | — | — | — | — | — | — |
| Issuance of Class A Common Stock, net of offering costs of $13,832 | 8,450 | 1 | — | — | — | — | 265,017 | — | — | — | 265,018 |
| Conversion of Series B-1 Preferred Stock to Class A Common Stock | 3,950 | — | — | — | (40) | — | — | — | — | — | — |
| Conversion of Series C-1 Preferred Stock to Class A Common Stock | 13,047 | 1 | — | — | (130) | — | (1) | — | — | — | — |
| Class A Common Stock issued in connection with employee stock purchase plan | 8 | — | — | — | — | — | 314 | — | — | — | 314 |
| Net income (loss) | — | — | — | — | — | — | — | (3,966) | — | 324 | (3,642) |
| Equity activity resulting from the Tax Receivable Agreement | — | — | — | — | — | — | 16,768 | — | — | — | 16,768 |
| Change in fair value of interest rate swaps, inclusive of reclassification adjustment | — | — | — | — | — | — | — | — | 1,876 | — | 1,876 |
| Other | (19) | — | — | — | — | — | (810) | — | — | — | (810) |
| Balance, March 31, 2021 | 129,386 | $ 13 | — | $ — | 124 | $ 1 | $ 1,993,962 | $ (203,162) | $ (2,535) | $ 4,199 | $ 1,792,478 |

See accompanying notes to unaudited interim consolidated financial statements.

7

Table of Contents

**ADAPTHEALTH CORP. AND SUBSIDIARIES**
**CONSOLIDATED STATEMENTS OF CASH FLOWS**
**(IN THOUSANDS)**
**(UNAUDITED)**

| | Three Months Ended March 31, | |
| --- | --- | --- |
| | 2022 | 2021 |
| Cash flows from operating activities: | | |
| Net income (loss) | $ 42,230 | $ (3,642) |
| Adjustments to reconcile net income (loss) to net cash provided by operating activities: | | |
| Depreciation and amortization, including patient equipment depreciation | 77,030 | 47,206 |
| Equity-based compensation | 5,502 | 8,582 |
| Change in fair value of contingent consideration common shares liability | — | (1,965) |
| Change in fair value of warrant liability | (26,717) | (3,168) |
| Reduction in the carrying amount of operating lease right-of-use assets | 7,484 | 6,957 |
| Deferred income tax expense (benefit) | 4,303 | (1,695) |
| Change in fair value of interest rate swaps, net of reclassification adjustment | (726) | (709) |
| Amortization of deferred financing costs | 1,309 | 894 |
| Write-off of deferred financing costs | — | 4,213 |
| Other | — | 266 |
| Changes in operating assets and liabilities, net of effects from acquisitions: | | |
| Accounts receivable | (9,481) | (7,344) |
| Inventory | 21,331 | 16,444 |
| Prepaid and other assets | 12,237 | 2,589 |
| Operating lease obligations | (7,420) | (6,806) |
| Operating liabilities | (60,631) | (43,442) |
| Net cash provided by operating activities | 66,451 | 18,380 |
| Cash flows from investing activities: | | |
| Payments for business acquisitions, net of cash acquired | (2,932) | (1,178,168) |
| Purchases of equipment and other fixed assets | (77,166) | (35,596) |
| Net cash used in investing activities | (80,098) | (1,213,764) |
| Cash flows from financing activities: | | |
| Proceeds from borrowings on long-term debt and lines of credit | — | 795,000 |
| Repayments on long-term debt and lines of credit | (5,000) | (303,771) |
| Repayments of finance lease obligations | (8,156) | (9,854) |
| Proceeds from the exercise of stock options | 723 | — |
| Proceeds received in connection with employee stock purchase plan | 753 | 314 |
| Proceeds from the issuance of senior unsecured notes | — | 500,000 |
| Proceeds from the issuance of Class A Common Stock | — | 278,850 |
| Payments for equity issuance costs | — | (13,832) |
| Payments of deferred financing costs | — | (16,148) |
| Payments for tax withholdings from restricted stock vesting and stock option exercises | (1,269) | (810) |
| Payments of contingent consideration and deferred purchase price from acquisitions | (3,603) | (2,190) |
| Net cash (used in) provided by financing activities | (16,552) | 1,227,559 |
| Net (decrease) increase in cash and cash equivalents | (30,199) | 32,175 |
| Cash and cash equivalents at beginning of period | 149,627 | 99,962 |
| Cash and cash equivalents at end of period | $ 119,428 | $ 132,137 |
| Supplemental disclosures: | | |
| Cash paid for interest | $ 43,931 | $ 16,188 |
| Cash paid for income taxes | 11 | 2,802 |
| Noncash investing and financing activities: | | |
| Equipment acquired under finance lease obligations | $ 1,335 | $ 7,445 |
| Unpaid equipment and other fixed asset purchases at end of period | 26,194 | 19,200 |
| Assets subject to operating lease obligations | 2,627 | 10,750 |
| Operating lease obligations | (2,627) | (10,750) |
| Equity consideration issued in connection with acquisitions | — | 1,223,527 |
| Deferred purchase price in connection with acquisitions | 308 | 423 |

See accompanying notes to unaudited interim consolidated financial statements.

Table of Contents

**ADAPTHEALTH CORP. AND SUBSIDIARIES**

**Notes to Interim Consolidated Financial Statements (Unaudited)**

**(1)    General Information**

AdaptHealth Corp. and subsidiaries (AdaptHealth or the Company), a Delaware Corporation, is a national leader in providing patient-centered, healthcare-at-home solutions including home medical equipment (HME), medical supplies, and related services. AdaptHealth focuses primarily on providing (i) sleep therapy equipment, supplies and related services (including CPAP and bi PAP services) to individuals suffering from obstructive sleep apnea (OSA), (ii) medical devices and supplies to patients for the treatment of diabetes (including continuous glucose monitors (CGM) and insulin pumps), (iii) home medical equipment to patients discharged from acute care and other facilities, (iv) oxygen and related chronic therapy services in the home, and (v) other HME devices and supplies on behalf of chronically ill patients with wound care, urological, incontinence, ostomy and nutritional supply needs. AdaptHealth services beneficiaries of Medicare, Medicaid and commercial insurance payors.

The interim consolidated financial statements are unaudited, but reflect all normal recurring adjustments that are, in the opinion of management, necessary to fairly present the information set forth herein. The interim consolidated financial statements should be read in conjunction with the audited consolidated financial statements and related notes included in the Company's Annual Report on Form 10-K for the year ended December 31, 2021. Interim results are not necessarily indicative of the results for a full year.

There have been no material changes in the Company's significant accounting policies as compared to the significant accounting policies described in the Company's Annual Report on Form 10-K for the year ended December 31, 2021.

**(a)    Basis of Presentation**

The interim consolidated financial statements of the Company have been prepared in accordance with accounting principles generally accepted in the United States of America (U.S. GAAP). In the opinion of management, the interim consolidated financial statements include all necessary adjustments for a fair presentation of the financial position and results of operations for the periods presented.

**(b)    Basis of Consolidation**

The accompanying interim consolidated financial statements include the accounts of the Company and its wholly-owned subsidiaries. All intercompany balances and transactions have been eliminated in consolidation.

**(c)    Concentration of Credit Risk**

Financial instruments which potentially subject the Company to concentrations of credit risk consist principally of cash and cash equivalents and trade accounts receivable. The Company maintains its cash in bank deposit accounts, which, at times, may exceed federally insured limits. The Company has not experienced any losses in such accounts and believes it is not exposed to any significant credit risk on cash and cash equivalents.

**(d)    Accounting Estimates**

The preparation of consolidated financial statements in conformity with U.S. GAAP requires management to make estimates and assumptions that affect the reported amounts of assets and liabilities, and the disclosure of contingent assets and liabilities at the date of the consolidated financial statements, and reported amounts of revenues and expenses during the reporting period. Management bases these estimates and assumptions upon historical experience, existing and known circumstances, authoritative accounting pronouncements and other factors that management believes to be reasonable. Significant areas requiring the use of management estimates relate to revenue recognition and the valuation of accounts receivable (implicit price concession), income taxes, contingent consideration,

9

**ADAPTHEALTH CORP. AND SUBSIDIARIES**

**Notes to Interim Consolidated Financial Statements (Unaudited) (Continued)**

equity-based compensation, interest rate swaps, warrant liability and long-lived assets, including goodwill and identifiable intangible assets. Actual results could differ from those estimates.

**(e)    Valuation of Goodwill**

The Company has a significant amount of goodwill on its balance sheet that resulted from the business acquisitions the Company has made in recent years. Goodwill is not amortized and is assessed for impairment annually and upon the occurrence of a triggering event or change in circumstances indicating a possible impairment. Such triggering events potentially warranting an interim goodwill impairment assessment include, among other factors, declines in historical or projected revenue, operating income or cash flows, and declines in the Company's stock price or market capitalization. Such changes in circumstance can include, among others, changes in the legal environment, reimbursement environment, operating performance, and/or future prospects. The Company performs its annual impairment assessment of goodwill during the fourth quarter of each year. The impairment assessment can be performed on either a quantitative or qualitative basis. The Company first assesses qualitative factors to determine whether it is necessary to perform a quantitative goodwill impairment analysis. If determined necessary, the Company applies the quantitative impairment test to identify and measure the amount of impairment, if any. During the three months ended March 31, 2022, the Company experienced an additional decline in its market capitalization as a result of a decline in the Company's stock price. The Company considered such decline to represent a triggering event requiring management to perform a goodwill impairment assessment as of March 31, 2022. Refer to note 5, *Goodwill and Identifiable Intangible Assets*, for additional details.

**(f)    Long-Lived Assets**

The Company's long-lived assets, such as equipment and other fixed assets, operating lease right-of-use assets and definite-lived identifiable intangible assets, are assessed for impairment whenever events or changes in circumstances indicate that the carrying amount of an asset may not be recoverable. Recoverability of assets to be held and used is measured by a comparison of the carrying amount of an asset to estimated undiscounted future cash flows expected to be generated by the asset. If the carrying amount of an asset exceeds its estimated undiscounted future cash flows, an impairment charge is recognized by the amount by which the carrying amount of the asset exceeds the fair value of the asset.

Definite-lived identifiable intangible assets consist of tradenames, payor contracts, contractual rental agreements and developed technology. These assets are amortized using the straight-line method over their estimated useful lives, which reflects the pattern in which the economic benefits of the assets are expected to be consumed. These assets are assessed for impairment consistent with the Company's long-lived assets. In addition to consideration of impairment upon the events or changes in circumstances described above, management regularly evaluates the remaining useful lives of its long-lived assets. The following table summarizes the useful lives of the Company's identifiable intangible assets acquired:

| | | |
|---|---|---|
| Tradenames | 5 to 10 | years |
| Payor contracts | 10 | years |
| Contractual rental agreements | 2 | years |
| Developed technology | 5 | years |

The Company did not incur any impairment charges on long-lived assets for the three months ended March 31, 2022 and 2021.

10

**ADAPTHEALTH CORP. AND SUBSIDIARIES**

**Notes to Interim Consolidated Financial Statements (Unaudited) (Continued)**

*(g)*      *Business Segment*

The Company's chief operating decision-makers are its Chief Executive Officer and President, who make resource allocation decisions and assess performance based on financial information presented on an aggregate basis. There are no segment managers who are held accountable by the chief operating decision-makers, or anyone else, for any planning, strategy and key decision-making regarding operations. The corporate office is responsible for contract negotiation with vendors and payors, corporate compliance with healthcare laws and regulations, and revenue cycle management, among other corporate supporting functions. Accordingly, the Company has a single reportable segment and operating segment structure.

*(h)*      *Accounting for Leases*

The Company adopted FASB Accounting Standards Update (ASU) No. 2016-02, *Leases* (Topic 842) (ASC 842) with an effective date of January 1, 2021, using the modified retrospective approach, for leases that existed on January 1, 2021. ASC 842 requires the Company to recognize a lease liability, which represents the discounted obligation to make future minimum lease payments, and a corresponding right-of-use (ROU) asset on its consolidated balance sheet for most leases, and disclose key information about leasing arrangements. The Company elected to apply certain practical expedients permitted under the transition guidance within ASC 842 to leases that commenced before January 1, 2021, including the package of practical expedients, which, among other things, permits lease agreements that are twelve months or less to be excluded from the balance sheet, and permits the Company not to reassess under the new standard its prior conclusions about lease identification, lease classification and initial direct costs. Due to the Company's election of these practical expedients, the Company carried forward certain historical conclusions for existing contracts, including conclusions related to the existence and classification of leases and to initial direct costs. ASC 842 applies to a number of arrangements to which the Company is a party.

Whenever the Company enters into a new arrangement, it must determine, at the inception date, whether the arrangement is or contains a lease. This determination generally depends on whether the arrangement conveys to the Company the right to control the use of an explicitly or implicitly identified asset for a period of time in exchange for consideration. Control of an underlying asset is conveyed to the Company if the Company obtains the rights to direct the use of and obtain substantially all the economic benefits from the use of the underlying asset.

If a lease exists, the Company must then determine the separate lease and non-lease components of the arrangement. Each right to use an underlying asset conveyed by a lease arrangement should generally be considered a separate lease component if it both: (i) can benefit the Company without depending on other resources not readily available to the Company and (ii) does not significantly affect and is not significantly affected by other rights of use conveyed by the lease. Aspects of a lease arrangement that transfer other goods or services to the Company but do not meet the definition of lease components are considered non-lease components. The consideration owed by the Company pursuant to a lease arrangement is generally allocated to each lease and non-lease component for accounting purposes. However, the Company has elected, for all of its leases, to not separate lease and non-lease components. Each lease component is accounted for separately from other lease components, but together with the associated non-lease components.

For each lease, the Company must then determine the lease term, the present value of lease payments and the classification of the lease as either an operating or finance lease.

The lease term is the period of the lease not cancellable by the Company, together with periods covered by: (i) renewal options the Company is reasonably certain to exercise, (ii) termination options the Company is reasonably certain not to exercise, and (iii) renewal or termination options that are controlled by the lessor.

11

Table of Contents

**ADAPTHEALTH CORP. AND SUBSIDIARIES**

**Notes to Interim Consolidated Financial Statements (Unaudited) (Continued)**

The present value of lease payments is calculated based on:

- Lease payments – lease payments include fixed and certain variable payments, less lease incentives, together with amounts probable of being owed by the Company under residual value guarantees and, if reasonably certain of being paid, the cost of certain renewal options and early termination penalties set forth in the lease arrangement. Lease payments exclude consideration that is not related to the transfer of goods and services of the Company.

- Discount rate – the discount rate must be determined based on information available to the Company upon the commencement of the lease. Lessees are required to use the rate implicit in the lease whenever such rate is readily available; however, as the implicit rate in the Company's leases is generally not readily determinable, the Company generally uses the hypothetical incremental borrowing rate it would have to pay to borrow an amount equal to the lease payments, on a collateralized basis, over a timeframe similar to the lease term.

In making the determination of whether a lease is an operating lease or a finance lease, the Company considers the lease term in relation to the economic life of the leased asset, the present value of lease payments in relation to the fair value of the leased asset and certain other factors, including the lessee's and lessor's rights, obligations, and economic incentives over the term of the lease.

Generally, upon the commencement of a lease, the Company will record a lease liability and a ROU asset. However, the Company has elected, for all underlying leases with initial terms of twelve months or less (known as short-term leases), to not recognize a lease liability or ROU asset. Lease liabilities are initially recorded at lease commencement as the present value of future lease payments. ROU assets are initially recorded at lease commencement as the initial amount of the lease liability, together with the following, if applicable: (i) initial direct costs incurred by the lessee and (ii) lease payments made by the lessor net of lease incentives received, prior to lease commencement.

Over the lease term, the Company generally increases its lease liabilities using the effective interest method and decreases its lease liabilities for lease payments made. For finance leases, amortization and interest expense are recognized separately in the consolidated statements of operations, with amortization expense generally recorded on a straight-line basis over the lease term and interest expense recorded using the effective interest method. For operating leases, a single lease cost is generally recognized in the consolidated statements of operations on a straight-line basis over the lease term unless an impairment has been recorded with respect to a leased asset. Lease costs for short-term leases not recognized in the consolidated balance sheets are recognized in the consolidated statements of operations on a straight-line basis over the lease term. Variable lease costs not initially included in the lease liability and ROU asset impairment charges are expensed as incurred. ROU assets are assessed for impairment, similar to other long-lived assets.

**(i)    *Recently Issued Accounting Pronouncements***

In March 2020, the FASB issued ASU No. 2020-04, *Reference Rate Reform (Topic 848)*, which provides optional guidance to ease the potential burden in accounting for (or recognizing the effects of) reference rate reform on financial reporting. Specifically, the guidance permits an entity, when certain criteria are met, to consider amendments to contracts made to comply with reference rate reform to meet the definition of a modification under U.S. GAAP. It further allows hedge accounting to be maintained and a one-time transfer or sale of qualifying held-to-maturity securities. The expedients and exceptions provided by the amendments are permitted to be adopted any time through December 31, 2022 and do not apply to contract modifications made and hedging relationships entered into or evaluated after December 31, 2022, except for certain optional expedients elected for certain hedging relationships existing as of December 31, 2022. In April 2022, the FASB issued a proposed amendment to Topic 848 which, if approved, would defer the required adoption date of Topic 848 to December 31, 2024, with early adoption permitted. The Company is

12

**ADAPTHEALTH CORP. AND SUBSIDIARIES**

**Notes to Interim Consolidated Financial Statements (Unaudited) (Continued)**

currently evaluating the effect that this standard will have on its consolidated financial statements and related disclosures.

*(j)    Recently Adopted Accounting Pronouncements*

In January 2017, the FASB issued ASU No. 2017-04, *Simplifying the Test for Goodwill Impairment* (Topic 350), which requires an entity to perform a one-step quantitative impairment test, whereby a goodwill impairment loss will be measured as the excess of a reporting unit's carrying amount over its fair value (not to exceed the total goodwill allocated to that reporting unit). This standard eliminated the prior two-step goodwill impairment test, under which a goodwill impairment loss was measured by comparing the implied fair value of a reporting unit's goodwill with the carrying amount of that goodwill. The Company adopted this standard during the year ended December 31, 2021, which did not have an impact on its consolidated financial position, results of operations or cash flows.

In August 2020, the FASB issued ASU No. 2020-06, *Debt - Debt with Conversion and Other Options (Subtopic 470-20) and Derivatives and Hedging - Contracts in Entity's Own Equity (Subtopic 815-40)* (ASU 2020-06). The guidance in ASU 2020-06 reduces the number of accounting models for convertible debt instruments and convertible preferred stock. In addition, ASU 2020-06 improves and amends the related earnings per share guidance. The Company adopted this standard on January 1, 2022 using the modified retrospective approach. The adoption of this standard did not have an impact on the Company's consolidated financial position, results of operations, cash flows or earnings per share amounts.

**(2)    Revenue Recognition and Accounts Receivable**

*Revenue Recognition*

The Company generates revenues for services and related products that the Company provides to patients for home medical equipment, related supplies, and other items. The Company's revenues are recognized in the period in which services and related products are provided to customers and are recorded either at a point in time for the sale of supplies and disposables, or over the fixed monthly service period for equipment.

Revenues are recognized when control of the promised good or service is transferred to customers, in an amount that reflects the consideration to which the Company expects to receive from patients or under reimbursement arrangements with Medicare, Medicaid and third-party payors, in exchange for those goods and services.

The Company determines the transaction price based on contractually agreed-upon amounts or rates, adjusted for estimates of variable consideration, such as implicit price concessions. The Company utilizes the expected value method to determine the amount of variable consideration that should be included to arrive at the transaction price, using contractual agreements and historical reimbursement experience within each payor type. The Company applies constraint to the transaction price, such that net revenue is recorded only to the extent that it is probable that a significant reversal in the amount of the cumulative revenue recognized will not occur in the future. If actual amounts of consideration ultimately received differ from the Company's estimates, the Company adjusts these estimates, which would affect net revenue in the period such adjustments become known.

Sales revenue is recognized upon transfer of control of products or services to customers in an amount that reflects the consideration the Company expects to receive in exchange for those products or services. Revenues for the sale of sleep therapy equipment supplies (including CPAP resupply products), home medical equipment and related supplies (including wheelchairs, hospital beds and infusion pumps), diabetic medical devices and supplies (including continuous glucose monitors (CGM) and insulin pumps), and other HME products and supplies are recognized when control of the promised good or service is transferred to customers, which is generally upon shipment for direct to consumer medical devices and supplies and upon delivery to the home for home medical equipment.

13

**ADAPTHEALTH CORP. AND SUBSIDIARIES**

**Notes to Interim Consolidated Financial Statements (Unaudited) (Continued)**

The Company provides certain equipment to patients which is reimbursed periodically in fixed monthly payments for as long as the patient is using the equipment and medical necessity continues (in certain cases, the fixed monthly payments are capped at a certain amount). The equipment provided to the patient is based upon medical necessity as documented by prescriptions and other documentation received from the patient's physician. The patient generally does not negotiate or select the manufacturer or model of the equipment prescribed by their physician and delivered by the Company. Once initial delivery of this equipment is made to the patient for initial setup, a monthly billing process is established based on the initial setup service date. The Company recognizes the fixed monthly revenue ratably over the service period as earned, less estimated adjustments, and defers revenue for the portion of the monthly bill that is unearned. No separate revenue is earned from the initial setup process. Included in fixed monthly revenue are unbilled amounts for which the revenue recognition criteria had been met as of period-end but were not yet billed to the payor. The estimate of net unbilled fixed monthly revenue recognized is based on historical trends and estimates of future collectability.

The Company's billing system contains payor-specific price tables that reflect the fee schedule amounts in effect or contractually agreed upon by various government and commercial insurance payors for each item of equipment or supply provided to a customer. Revenues are recorded based on the applicable fee schedule. The Company has established a contractual allowance to account for adjustments that result from differences between the payment amount received and the expected realizable amount. If the payment amount received differs from the net realizable amount, an adjustment is recorded to revenues in the period that these payment differences are determined. The Company reports revenues in its consolidated financial statements net of such adjustments.

The Company recognizes revenue in the consolidated statements of operations and contract assets on the consolidated balance sheets only when services have been provided. Since the Company has performed its obligation under the contract, it has unconditional rights to the consideration recorded as contract assets and therefore classifies those billed and unbilled contract assets as accounts receivable.

Fixed monthly payments that the Company receives from customers in advance of providing services represent contract liabilities. Such payments primarily relate to patients who are billed monthly in advance and are recognized over the period as earned.

The Company disaggregates net revenue from contracts with customers by payor type and by core service lines. The Company believes that disaggregation of net revenue into these categories depicts how the nature, amount, timing and uncertainty of revenue and cash flows are affected by economic factors. The payment terms and conditions within the Company's revenue-generating contracts vary by payor type and payor source.

The composition of net revenue by payor type for the three months ended March 31, 2022 and 2021 are as follows (in thousands):

| | Three Months Ended March 31, | |
| --- | --- | --- |
| | **2022** | **2021** |
| Insurance | $ 420,890 | $ 290,010 |
| Government | 181,650 | 133,730 |
| Patient pay | 103,663 | 58,379 |
| Net revenue | $ 706,203 | $ 482,119 |

14

**ADAPTHEALTH CORP. AND SUBSIDIARIES**

**Notes to Interim Consolidated Financial Statements (Unaudited) (Continued)**

The composition of net revenue by core service lines for the three months ended March 31, 2022 and 2021 are as follows (in thousands):

| | Three Months Ended March 31, | | | |
|---|---|---|---|---|
| | **2022** | | **2021** | |
| Net sales revenue: | | | | |
| Sleep | $ | 192,335 | $ | 128,682 |
| Diabetes | | 151,359 | | 95,017 |
| Supplies to the home | | 39,865 | | 41,363 |
| Respiratory | | 8,145 | | 5,621 |
| HME | | 30,851 | | 24,156 |
| Other | | 53,400 | | 22,426 |
| Total net sales revenue | $ | 475,955 | $ | 317,265 |
| | | | | |
| Net revenue from fixed monthly equipment reimbursements: | | | | |
| Sleep | $ | 57,938 | $ | 48,109 |
| Diabetes | | 3,946 | | 2,853 |
| Respiratory | | 132,580 | | 83,454 |
| HME | | 25,725 | | 20,380 |
| Other | | 10,059 | | 10,058 |
| Total net revenue from fixed monthly equipment reimbursements | $ | 230,248 | $ | 164,854 |
| | | | | |
| Total net revenue: | | | | |
| Sleep | $ | 250,273 | $ | 176,791 |
| Diabetes | | 155,305 | | 97,870 |
| Supplies to the home | | 39,865 | | 41,363 |
| Respiratory | | 140,725 | | 89,075 |
| HME | | 56,576 | | 44,536 |
| Other | | 63,459 | | 32,484 |
| Total net revenue | $ | 706,203 | $ | 482,119 |

In response to the COVID-19 pandemic and the National Emergency Declaration, dated March 13, 2020, the Company increased its cash liquidity by, among other things, seeking recoupable advance payments of $45.8 million made available by the Centers for Medicare & Medicaid Services (CMS) under the Coronavirus Aid, Relief, and Economic Security Act (the CARES Act) legislation, which was received in April 2020. In addition, in connection with an acquisition completed in July 2020, the Company assumed a liability of $3.7 million relating to CMS recoupable advance payments received by the acquired company prior to the date of acquisition. The recoupment of the advance payments by CMS began in April 2021 and is being applied to services provided and revenue recognized during the period in which the recoupment occurs, and will impact the Company's cash receipts for services provided until such time all amounts have been recouped. During the three months ended March 31, 2022, CMS recouped $5.2 million of the advance payments. As of March 31, 2022, the Company has deferred $7.5 million related to the CMS recoupable advance payments, which is included in other current liabilities in the consolidated balance sheets.

*Accounts Receivable*

Due to the continuing changes in the healthcare industry and third-party reimbursement environment, certain estimates are required to record accounts receivable at their net realizable values. Inherent in these estimates is the risk that they will have to be revised or updated as additional information becomes available. The complexity of third-party billing arrangements and laws and regulations governing Medicare and Medicaid may result in adjustments to amounts originally recorded.

15

**ADAPTHEALTH CORP. AND SUBSIDIARIES**

**Notes to Interim Consolidated Financial Statements (Unaudited) (Continued)**

The Company performs a periodic analysis to review the valuation of accounts receivable and collectability of outstanding balances. Management's evaluation takes into consideration such factors as historical cash collections experience, business and economic conditions, trends in healthcare coverage, other collection indicators and information about specific receivables. The Company's evaluation also considers the age and composition of the outstanding amounts in determining their estimated net realizable value.

Receivables are considered past due when not collected by established due dates. Specific patient balances are written off after collection efforts have been followed and the account has been determined to be uncollectible. Revisions in reserve estimates are recorded as an adjustment to net revenue in the period of revision.

Included in accounts receivable are earned but unbilled accounts receivables. Billing delays, ranging from several days to several weeks, can occur due to the Company's policy of compiling required payor specific documentation prior to billing for its services rendered. As of March 31, 2022 and December 31, 2021, the Company's unbilled accounts receivable was $19.8 million and $23.8 million, respectively.

**(3)    Acquisitions**

During the three months ended March 31, 2022 and 2021, the Company completed several acquisitions to strengthen its current market share in existing markets or to expand into new markets. Each of the Company's acquisitions was accounted for using the acquisition method pursuant to the requirements of FASB ASC Topic 805, *Business Combinations*, and are included in the Company's consolidated financial statements since the respective acquisition date. The goodwill generated from these acquisitions is attributable to expected growth and cost synergies and the expected contribution of each acquisition to the Company's overall strategy. The goodwill recorded during the three months ended March 31, 2022 is not expected to be deductible for tax purposes. The estimated fair values of the net assets of acquired businesses as described below are subject to change resulting from such items as receipt of final valuations and working capital adjustments post-acquisition. As a result, the acquisition accounting for certain acquired businesses could change in subsequent periods resulting in adjustments to goodwill once finalized. Also, see subsection, "Pro forma information" of this Note 3 for pro forma information on net revenue and operating income.

*Three Months Ended March 31, 2022*

During the three months ended March 31, 2022, the Company acquired 100% of the equity interests of a provider of home medical equipment and acquired certain assets of the home medical equipment business of a provider of HME.

The following table summarizes the consideration paid at closing for all acquisitions during the three months ended March 31, 2022 (in thousands):

| | | |
|---|---|---|
| Cash | $ | 2,467 |
| Deferred payments | | 308 |
| Total | $ | 2,775 |

The Company allocated the consideration paid to the net assets acquired based on their estimated acquisition date fair values. The Company is still evaluating the fair value of certain assets and liabilities for which provisional amounts were recorded and expects to finalize such valuations during the remainder of 2022. Based upon management's

16

**ADAPTHEALTH CORP. AND SUBSIDIARIES**

**Notes to Interim Consolidated Financial Statements (Unaudited) (Continued)**

evaluation, which is preliminary and subject to completion of working capital and other adjustments, the consideration paid for all acquisitions during 2022 was allocated as follows (in thousands):

| | |
|---|---:|
| Cash | $ 21 |
| Accounts receivable | 521 |
| Inventory | 284 |
| Equipment and other fixed assets | 85 |
| Goodwill | 2,013 |
| Identifiable intangible assets | 100 |
| Accounts payable and accrued expenses | (249) |
| Net assets acquired | $ 2,775 |

During the three months ended March 31, 2022, the Company paid net cash of $0.5 million relating to working capital and other adjustments associated with businesses that were acquired during 2021, which was recorded as an increase to goodwill during the period.

*Three Months Ended March 31, 2021*

On February 1, 2021, the Company acquired 100% of the equity interests of AeroCare Holdings, Inc. (AeroCare). AeroCare is a leading national technology-enabled respiratory and home medical equipment distribution platform in the United States and offers a comprehensive suite of direct-to-patient equipment and services including CPAP and BiPAP machines, oxygen concentrators, home ventilators, and other home medical equipment products. The total consideration paid at closing consisted of (i) a cash payment of $1.1 billion, (ii) the issuance of 13,992,615 shares of the Company's Class A Common Stock, (iii) the issuance of 130,474.73 shares of the Company's Series C Convertible Preferred Stock, and (iv) the issuance of 3,959,892 fully vested options to purchase shares of the Company's Class A Common Stock in the future, which had a weighted-average exercise price of $6.24 per share and a weighted-average remaining exercise period of approximately 7 years from the date of closing. Refer to Note 10, *Stockholders' Equity*, for additional discussion of the Series C Convertible Preferred Stock issued in connection with the acquisition of AeroCare.

In addition, during the three months ended March 31, 2021, the Company acquired 100% of the equity interests of three providers of home medical equipment and acquired certain assets of the home medical equipment businesses of two providers of HME.

The following table summarizes the consideration paid at closing for all acquisitions during the three months ended March 31, 2021 (in thousands):

| | AeroCare | Other | | Total |
|---|---:|---:|---|---:|
| Cash | $ 1,174,888 | 59,264 | $ | 1,207,958 |
| Equity | 1,194,149 | 3,184 | | 1,223,527 |
| Deferred payments | — | 423 | | 423 |
| Total | $ 2,369,037 | 62,871 | $ | 2,431,908 |

The Company allocated the consideration paid to the net assets acquired based on their estimated acquisition date fair values. Based upon management's evaluation, which was preliminary and subject to completion of working capital and other adjustments, the consideration paid for all acquisitions during the three months ended March 31, 2021 was allocated as follows during that period (in thousands):

17

**ADAPTHEALTH CORP. AND SUBSIDIARIES**

**Notes to Interim Consolidated Financial Statements (Unaudited) (Continued)**

|  | AeroCare | Other | Total |
|---|---|---|---|
| Cash | $ 27,686 | 1,546 | $ 29,232 |
| Accounts receivable | 75,916 | 6,436 | 82,352 |
| Inventory | 27,612 | 5,537 | 33,149 |
| Prepaid and other current assets | 3,522 | 858 | 4,380 |
| Equipment and other fixed assets | 163,465 | 13,623 | 177,088 |
| Goodwill | 2,103,464 | 39,858 | 2,143,322 |
| Identifiable intangible assets | 138,200 | 1,500 | 139,700 |
| Other assets | 1,178 | — | 1,178 |
| Deferred tax liabilities | (63,713) | 212 | (63,501) |
| Accounts payable and accrued expenses | (82,722) | (5,101) | (87,823) |
| Contract liabilities | (14,495) | (43) | (14,538) |
| Other current liabilities | (10,021) | (1,555) | (11,576) |
| Other long-term liabilities | (1,055) | — | (1,055) |
| Net assets acquired | $ 2,369,037 | 62,871 | $ 2,431,908 |

The Company finalized the valuations of the fair values of the net assets acquired for these acquisitions during the remainder of 2021.

During the three months ended March 31, 2021, the Company received net cash of $0.6 million relating to working capital and other adjustments associated with businesses that were acquired during 2020, which was recorded as a decrease to goodwill during the period.

*Pro-Forma Information*

The unaudited pro-forma financial information presented below has been prepared by adjusting the historical results of the Company to include the historical results of the acquisitions described above and to give effect to the GAAP accounting for the acquisitions had they been owned in the earliest period presented below. The unaudited pro-forma financial information is presented for illustrative purposes only and may not be indicative of the results of operations that would have actually occurred. In addition, future results may vary significantly from the results reflected in the pro-forma information. The unaudited pro-forma financial information does not reflect the impact of future events that may occur after the acquisitions, such as the impact of cost savings or other synergies that may result from these acquisitions, and does not include interest expense associated with debt incurred to fund the acquisitions.

| (in thousands) (unaudited) | Three Months Ended March 31, | |
|---|---|---|
|  | 2022 | 2021 |
| Net revenue | $ 706,643 | $ 682,456 |
| Operating income | $ 51,549 | $ 34,017 |

*Results of Businesses Acquired*

The following table presents the amount of net revenue and operating income in the period of acquisition since the respective acquisition dates for the acquisitions described above that is included in the Company's consolidated statements of operations for the three months ended March 31, 2022 and 2021:

| (in thousands) | Three Months Ended March 31, | |
|---|---|---|
|  | 2022 | 2021 |
| Net revenue | $ 134 | $ 142,648 |
| Operating income | $ 35 | $ 20,383 |

18

**ADAPTHEALTH CORP. AND SUBSIDIARIES**

**Notes to Interim Consolidated Financial Statements (Unaudited) (Continued)**

**(4)      Equipment and Other Fixed Assets**

Equipment and other fixed assets as of March 31, 2022 and December 31, 2021 are as follows (in thousands):

|  | March 31, 2022 | December 31, 2021 |
|---|---|---|
| Patient medical equipment | $ 615,924 | $ 533,760 |
| Delivery vehicles | 33,424 | 36,213 |
| Other | 64,110 | 50,208 |
|  | 713,458 | 620,181 |
| Less accumulated depreciation | (288,694) | (221,604) |
|  | $ 424,764 | $ 398,577 |

For the three months ended March 31, 2022 and 2021, the Company recorded depreciation expense of $67.1 million and $36.9 million, respectively.

**(5)      Goodwill and Identifiable Intangible Assets**

Goodwill is an asset representing the future economic benefits arising from other assets acquired in a business combination that are not individually identified and separately recognized. The change in the carrying amount of goodwill for the three months ended March 31, 2022 was as follows (in thousands):

|  | Gross carrying amount |
|---|---|
| Balance at December 31, 2021 | $ 3,512,567 |
| Goodwill from acquisitions | 2,013 |
| Net cash payments relating to prior acquisitions | 486 |
| Balance at March 31, 2022 | $ 3,515,066 |

Management is required to perform an assessment of the recoverability of goodwill on an annual basis and upon the identification of a triggering event. Triggering events potentially warranting an interim goodwill impairment assessment include, among other factors, declines in historical or projected revenue, operating results or cash flows, and declines in the Company's stock price or market capitalization. While management cannot predict if or when future goodwill impairments may occur, a non-cash goodwill impairment charge could have a material adverse effect on the Company's operating results, net assets and the Company's cost of, or access to, capital. During the three months ended March 31, 2022, the Company experienced a decline in its market capitalization as a result of a decline in the Company's stock price. The Company considered such decline to represent a triggering event requiring management to perform a goodwill impairment assessment as of March 31, 2022. Based on the results of the goodwill impairment assessment it was concluded that the estimated fair value of the Company's reporting unit was greater than its carrying value, as such, the Company did not record a goodwill impairment charge during the three months ended March 31, 2022. The Company did not record a goodwill impairment charge during the three months ended March 31, 2021. Subsequent to March 31, 2022, the Company experienced an additional decline in its market capitalization as a result of a further decline in the Company's stock price, and if this decline continues for a sustained period of time, the Company may be required to perform an additional goodwill impairment assessment at an interim period and could be required to recognize a non-cash goodwill impairment charge at that time, which could be material.

As discussed in Note 3, *Acquisitions*, during the three months ended March 31, 2022, the Company paid net cash of $0.5 million relating to working capital and other adjustments associated with businesses that were acquired during 2021, which were recorded as an increase to goodwill during the period.

19

**ADAPTHEALTH CORP. AND SUBSIDIARIES**

**Notes to Interim Consolidated Financial Statements (Unaudited) (Continued)**

Identifiable intangible assets that are separable and have determinable useful lives are valued separately and amortized over the period which reflects the pattern in which the economic benefits of the assets are expected to be consumed. Identifiable intangible assets consisted of the following at March 31, 2022 and December 31, 2021 (in thousands):

| | March 31, 2022 | Weighted-Average Remaining Life (Years) |
|---|---|---|
| Tradenames, net of accumulated amortization of $15,886 | $ 96,514 | 8.2 |
| Payor contracts, net of accumulated amortization of $13,866 | 68,134 | 8.3 |
| Contractual rental agreements, net of accumulated amortization of $30,573 | 23,627 | 1.5 |
| Developed technology, net of accumulated amortization of $2,205 | 4,095 | 3.3 |
| Identifiable intangible assets, net | $ 192,370 | |

| | December 31, 2021 | Weighted-Average Remaining Life (Years) |
|---|---|---|
| Tradenames, net of accumulated amortization of $12,705 | $ 99,595 | 8.4 |
| Payor contracts, net of accumulated amortization of $11,816 | 70,184 | 8.6 |
| Contractual rental agreements, net of accumulated amortization of $26,158 | 28,042 | 1.8 |
| Developed technology, net of accumulated amortization of $1,890 | 4,410 | 3.5 |
| Identifiable intangible assets, net | $ 202,231 | |

Amortization expense related to identifiable intangible assets, which is included in depreciation and amortization, excluding patient equipment depreciation, in the accompanying statements of operations, was $10.0 million and $10.3 million for the three months ended March 31, 2022 and 2021, respectively.

Future amortization expense related to identifiable intangible assets is estimated to be as follows (in thousands):

| Twelve months ending March 31, | |
|---|---|
| 2023 | $ 39,916 |
| 2024 | 28,103 |
| 2025 | 22,182 |
| 2026 | 20,679 |
| 2027 | 18,704 |
| Thereafter | 62,786 |
| Total | $ 192,370 |

The Company recorded no impairment charges related to identifiable intangible assets during the three months ended March 31, 2022 and 2021.

**(6)     Fair Value of Assets and Liabilities**

FASB ASC Topic 820, *Fair Value Measurements and Disclosures* (ASC 820), creates a single definition of fair value, establishes a framework for measuring fair value in U.S. GAAP and expands disclosures about fair value measurements. Assets and liabilities adjusted to fair value in the balance sheet are categorized based upon the level of judgment associated with the inputs used to measure their fair value. Level inputs, as defined by ASC 820, are as follows:

20

**ADAPTHEALTH CORP. AND SUBSIDIARIES**

**Notes to Interim Consolidated Financial Statements (Unaudited) (Continued)**

| Level input | Input Definition |
|---|---|
| Level 1 | Inputs are unadjusted, quoted prices for identical assets or liabilities in active markets at the measurement date. |
| Level 2 | Inputs, other than quoted prices included in Level 1 that are observable for the asset or liability through corroboration with market data at the measurement date. |
| Level 3 | Unobservable inputs that reflect management's best estimate of what market participants would use in pricing the asset or liability at the measurement date. |

The following table presents the valuation of the Company's financial assets and liabilities as of March 31, 2022 and December 31, 2021 measured at fair value on a recurring basis. The fair value estimates presented herein are based on information available to management as of March 31, 2022 and December 31, 2021. These estimates are not necessarily indicative of the amounts the Company could ultimately realize.

| (in thousands) | Level 1 | | Level 2 | | Level 3 | |
|---|---|---|---|---|---|---|
| **March 31, 2022** | | | | | | |
| **Assets** | | | | | | |
| Money market accounts | $ | 13 | $ | — | $ | — |
| Interest rate swap agreements-long term | | — | | 1,025 | | — |
| Total assets measured at fair value | $ | 13 | $ | 1,025 | $ | — |
| | | | | | | |
| **Liabilities** | | | | | | |
| Acquisition-related contingent consideration-short term | $ | — | $ | — | $ | 11,250 |
| Acquisition-related contingent consideration-long term | | — | | — | | 6,800 |
| Interest rate swap agreements-short term | | — | | 1,758 | | — |
| Warrant liability | | — | | — | | 31,047 |
| Total liabilities measured at fair value | $ | — | $ | 1,758 | $ | 49,097 |

| (in thousands) | Level 1 | | Level 2 | | Level 3 | |
|---|---|---|---|---|---|---|
| **December 31, 2021** | | | | | | |
| **Assets** | | | | | | |
| Money market accounts | $ | 14 | $ | — | $ | — |
| Total assets measured at fair value | $ | 14 | $ | — | $ | — |
| | | | | | | |
| **Liabilities** | | | | | | |
| Acquisition-related contingent consideration-short term | $ | — | $ | — | $ | 13,500 |
| Acquisition-related contingent consideration-long term | | — | | — | | 6,800 |
| Interest rate swap agreements-short term | | — | | 5,098 | | — |
| Interest rate swap agreements-long term | | — | | 2,359 | | — |
| Warrant liability | | — | | — | | 57,764 |
| Total liabilities measured at fair value | $ | — | $ | 7,457 | $ | 78,064 |

*Interest Rate Swaps*

The Company uses interest rate swap agreements to manage interest rate risk by converting a portion of its variable rate borrowings to a fixed rate and recognizes these derivative instruments as either assets or liabilities in the accompanying consolidated balance sheets at fair value. The valuation of these derivative instruments is determined using widely accepted valuation techniques, including discounted cash flow analysis on the expected cash flows of each derivative. This analysis reflects the contractual terms of the derivatives, including the period to maturity, and uses observable market-based inputs, including interest rate curves and implied volatilities. The fair value of the Company's

21

**ADAPTHEALTH CORP. AND SUBSIDIARIES**

**Notes to Interim Consolidated Financial Statements (Unaudited) (Continued)**

interest rate swaps are determined using the market standard methodology of netting the discounted future fixed cash payments and the discounted expected variable cash payments receipts. The variable cash receipts are based on an expectation of future interest rates (forward curves) derived from observable market interest rate curves. To comply with the provisions of FASB ASC Topic 820, *Fair Value Measurement*, the Company incorporates credit valuation adjustments to appropriately reflect both its own nonperformance risk and the respective counterparty's nonperformance risk in the fair value measurements. In adjusting the fair value of its derivative contracts for the effect of nonperformance risk, the Company has considered the impact of netting and any applicable credit enhancements, such as collateral postings, thresholds, mutual puts and guarantees.

Although the Company has determined that the majority of the inputs used to value its derivatives fall within Level 2 of the fair value hierarchy, the credit valuation adjustments associated with the Company's derivatives utilize Level 3 inputs, such as estimates of current credit spreads to evaluate the likelihood of default by the Company and the respective counterparties. The Company has determined that the significance of the impact of the credit valuation adjustments made to its derivative contracts, which determination was based on the fair value of each individual contract, was not significant to the overall valuation. As a result, all of the Company's derivatives held as of March 31, 2022 and December 31, 2021 were classified as Level 2 of the fair value hierarchy. Refer to Note 7, *Derivative Instruments and Hedging Activities*, for additional information regarding the Company's derivative instruments

*Acquisition-Related Contingent Consideration*

The Company estimates the fair value of acquisition-related contingent consideration liabilities by applying the income approach using a probability-weighted discounted cash flow model. This fair value measurement is based on significant inputs not observed in the market and thus represents a Level 3 measurement. Level 3 instruments are valued based on unobservable inputs that are supported by little or no market activity and reflect the Company's own assumptions in measuring fair value. Each period, the Company evaluates the fair value of acquisition-related contingent consideration obligations and records any changes in the fair value of such liabilities in other income in the Company's consolidated statements of operations. At March 31, 2022, contingent consideration liabilities of $11.3 million and $6.8 million were included in other current liabilities and other long-term liabilities, respectively, in the accompanying consolidated balance sheets. At December 31, 2021, contingent consideration liabilities of $13.5 million and $6.8 million were included in other current liabilities and other long-term liabilities, respectively, in the accompanying consolidated balance sheets.

A reconciliation of the Company's contingent consideration liabilities related to acquisitions for the three months ended March 31, 2022 and 2021 is as follows (in thousands):

| Three Months Ended March 31, 2022 | Beginning Balance | Payments | Change in Fair Value | Other activity | Ending Balance |
|---|---|---|---|---|---|
| Contingent consideration - Level 3 liabilities | $ 20,300 | $ (2,250) | $ — | $ — | $ 18,050 |

| Three Months Ended March 31, 2021 | Beginning Balance | Payments | Change in Fair Value | Other activity | Ending Balance |
|---|---|---|---|---|---|
| Contingent consideration - Level 3 liabilities | $ 33,540 | $ — | $ 183 | $ 83 | $ 33,806 |

*Warrant Liability*

The warrant liability represents the estimated fair value of the Company's outstanding private warrants. The fair value of the private warrants was estimated using the Black-Scholes option pricing model. As an input to the Black-Scholes option pricing model, the volatility implied by trades in the public warrants was considered. In order to estimate this implied volatility, a Monte-Carlo simulation was employed. Refer to the discussion above for a description of the

22

**ADAPTHEALTH CORP. AND SUBSIDIARIES**

**Notes to Interim Consolidated Financial Statements (Unaudited) (Continued)**

Monte-Carlo simulation analysis. Refer to Note 10, *Stockholders' Equity*, for additional discussion of the warrant liability.

*Non-Financial Assets Measured at Fair Value on a Non-Recurring Basis*

The following table presents the Company's hierarchy for non-financial assets measured at fair value on a non-recurring basis (in thousands):

| | March 31, 2022 | | December 31, 2021 |
|---|---|---|---|
| Assets: | | | |
| Goodwill (Level 3) | $ 3,515,066 | $ | 3,512,567 |
| Identifiable intangible assets, net (Level 3) | $ 192,370 | $ | 202,231 |

The fair value allocation related to the Company's acquisitions are determined using a discounted cash flow approach, or a replacement cost approach, which are based on significant unobservable inputs (Level 3). The Company estimates the fair value using the income approach (which is a discounted cash flow technique) or the cost approach. These valuation methods required management to make various assumptions, including, but not limited to, future profitability, cash flows, replacement costs, and discount rates. The Company's estimates are based upon historical trends, management's knowledge and experience and overall economic factors, including projections of future earnings potential.

Developing discounted future cash flows in applying the income approach requires the Company to evaluate its intermediate to longer-term strategies, including, but not limited to, estimates of revenue growth, operating margins, capital requirements, inflation and working capital management. The development of appropriate rates to discount the estimated future cash flows requires the selection of risk premiums, which can materially impact the present value of future cash flows.

The Company estimated the fair value of acquired identifiable intangible assets using discounted cash flow techniques that included an estimate of future cash flows, consistent with overall cash flow projections used to determine the purchase price paid to acquire the business, discounted at a rate of return that reflects the relative risk of the cash flows. The Company estimated the fair value of certain acquired identifiable intangible assets based on the cost approach using estimated costs consistent with historical experience. The Company believes the estimates and assumptions used in the valuation methods are reasonable.

**(7)**    **Derivative Instruments and Hedging Activities**

The Company records all derivatives on its consolidated balance sheet at fair value. As of March 31, 2022 and December 31, 2021, the Company had outstanding interest rate derivatives with third parties in which the Company pays a fixed interest rate and receives a rate equal to the one-month LIBOR. The notional amount associated with the swap agreements was $250 million as of March 31, 2022 and December 31, 2021 and had maturity dates at certain dates through March 2024. The Company has designated its swaps as effective cash flow hedges of interest rate risk. Accordingly, changes in the fair value of the interest rate swaps are recorded as a component of accumulated other comprehensive income (loss) within stockholders' equity and subsequently reclassified into interest expense in the same period during which the hedged transaction affects earnings.

**ADAPTHEALTH CORP. AND SUBSIDIARIES**

**Notes to Interim Consolidated Financial Statements (Unaudited) (Continued)**

The table below presents the fair value of the Company's derivatives related to its interest rate swap agreements, which are designated as hedging instruments, as well as their classification in the consolidated balance sheets at March 31, 2022 and December 31, 2021 (in thousands):

| Balance Sheet Location | March 31, 2022 | | December 31, 2021 | |
|---|---|---|---|---|
| | Asset (Liability) | | | |
| Other long-term assets | $ | 1,025 | $ | — |
| Other current liabilities | | (1,758) | | (5,098) |
| Other long-term liabilities | | — | | (2,359) |
| Total | $ | (733) | $ | (7,457) |

During the three months ended March 31, 2022 and 2021, as a result of the effect of cash flow hedge accounting, the Company recognized a gain of $6.7 million and $2.6 million, respectively, in other comprehensive income (loss). In addition, during the three months ended March 31, 2022 and 2021, $0.7 million and $0.7 million, respectively, was reclassified from other comprehensive income (loss) and recognized as a reduction to interest expense, net, in the accompanying consolidated statements of operations.

**(8)    Accounts Payable and Accrued Expenses**

Accounts payable and accrued expenses as of March 31, 2022 and December 31, 2021 consisted of the following (in thousands):

| | March 31, 2022 | | December 31, 2021 | |
|---|---|---|---|---|
| Accounts payable | $ | 212,820 | $ | 248,027 |
| Employee-related accruals | | 38,852 | | 34,370 |
| Accrued interest | | 10,356 | | 30,103 |
| Other | | 54,023 | | 45,884 |
| Total | $ | 316,051 | $ | 358,384 |

**(9)    Debt**

The following is a summary of long term-debt as of March 31, 2022 and December 31, 2021 (in thousands):

| | March 31, 2022 | | December 31, 2021 | |
|---|---|---|---|---|
| Secured term loans | $ | 780,000 | $ | 785,000 |
| Senior unsecured notes | | 1,450,000 | | 1,450,000 |
| Unamortized deferred financing fees | | (30,270) | | (31,448) |
| | | 2,199,730 | | 2,203,552 |
| Current portion | | (20,000) | | (20,000) |
| Long-term portion | $ | 2,179,730 | $ | 2,183,552 |

On January 20, 2021, the Company refinanced its then existing debt borrowings and entered into a new credit agreement with its existing bank group, which was amended in April 2021 (the 2021 Credit Agreement). The 2021 Credit Agreement included borrowings of $800 million under a term loan (the 2021 Term Loan), and $450 million in commitments for revolving credit loans (the 2021 Revolver). The 2021 Revolver has a $55 million letter of credit sublimit. The 2021 Term Loan and the 2021 Revolver both have maturities in January 2026. Borrowings under the 2021 Term Loan were used in part to partially finance the cash portion of the purchase price for the acquisition of AeroCare,

24

**ADAPTHEALTH CORP. AND SUBSIDIARIES**

**Notes to Interim Consolidated Financial Statements (Unaudited) (Continued)**

to repay amounts outstanding under the Company's then existing credit agreement of $301.9 million plus accrued interest, to repay amounts outstanding under revolving credit loans under the 2021 Credit Agreement which were borrowed prior to the April 2021 amendment, and to pay related fees and expenses. Amounts borrowed under the 2021 Credit Agreement bear interest quarterly at variable rates based upon the sum of (a) the Adjusted LIBOR Rate (subject to a zero percent floor) equal to the LIBOR (as defined) for the applicable interest period multiplied by the statutory reserve rate, plus (b) an applicable margin (as defined) ranging from 1.50% to 3.25% per annum based on the Consolidated Senior Secured Leverage Ratio (as defined). The 2021 Revolver carries a commitment fee during the term of the 2021 Credit Agreement ranging from 0.25% to 0.50% per annum of the average daily undrawn portion of the 2021 Revolver based on the Consolidated Senior Secured Leverage Ratio. On August 16, 2021, the Company amended the 2021 Credit Agreement to expressly permit the issuance of the 5.125% Senior Notes (see discussion below) and the prepayment of the outstanding principal amount under a then existing promissory note with the proceeds of the 5.125% Senior Notes. In connection with the 2021 Credit Agreement, the Company paid financing costs of $7.6 million. Further, in connection with executing the 2021 Credit Agreement, the Company wrote off unamortized deferred financing costs of $4.2 million related to the Company's then existing credit agreement, which is included in loss on extinguishment of debt in the accompanying consolidated statements of operations for the three months ended March 31, 2021.

Under the 2021 Credit Agreement, the Company is subject to a number of restrictive covenants that, among other things, impose operating and financial restrictions on the Company. Financial covenants include a Consolidated Total Leverage Ratio and a Consolidated Interest Coverage Ratio, both as defined in the 2021 Credit Agreement. The 2021 Credit Agreement also contains certain customary events of default, including, among other things, failure to make payments when due thereunder, failure to observe or perform certain covenants, cross-defaults, bankruptcy and insolvency-related events, and non-compliance with healthcare laws. Any borrowing under the 2021 Credit Agreement may be repaid, in whole or in part, at any time and from time to time without premium or penalty, other than customary breakage costs, and any amounts repaid under the 2021 Revolver may be reborrowed. Mandatory prepayments are required under the 2021 Revolver when borrowings and letter of credit usage exceed the total commitments for revolving credit loans. Mandatory prepayments are also required in connection with the disposition of assets to the extent not reinvested, unpermitted debt transactions, and excess cash flow, as defined, if certain leverage tests are not met. The Company was in compliance with all debt covenants as of March 31, 2022.

*Secured Term Loans*

The borrowings under the 2021 Term Loan require quarterly principal repayments of $5.0 million beginning June 30, 2021 through March 31, 2023, increasing to $10.0 million beginning June 30, 2023 through December 31, 2025, and the unpaid principal balance is due at maturity in January 2026. At March 31, 2022 and December 31, 2021, there was $780 million and $785 million, respectively, outstanding under the 2021 Term Loan. The interest rate under the 2021 Term Loan was 1.75% at March 31, 2022.

*Revolving Credit Facility*

During the three months ended March 31, 2022, the Company had no borrowings under the 2021 Revolver, and there was $0 outstanding under the 2021 Revolver at March 31, 2022. During the three months ended March 31, 2021, the Company borrowed $95.0 million under the 2021 Revolver. Borrowings under the 2021 Revolver may be used for working capital and other general corporate purposes, including for capital expenditures and acquisitions permitted under the 2021 Credit Agreement. At March 31, 2022, after consideration of stand-by letters of credit outstanding of $15.7 million, the remaining maximum borrowings available pursuant to the 2021 Revolver was $434.3 million.

*Senior Unsecured Notes*

On August 19, 2021, the Company issued $600.0 million aggregate principal amount of 5.125% senior unsecured notes due 2030 (the 5.125% Senior Notes). The 5.125% Senior Notes will mature on March 1, 2030. Interest on the 5.125% Senior Notes is payable on March 1st and September 1st of each year, beginning on March 1, 2022. The

25

**ADAPTHEALTH CORP. AND SUBSIDIARIES**

**Notes to Interim Consolidated Financial Statements (Unaudited) (Continued)**

5.125% Senior Notes will be redeemable at the Company's option, in whole or in part, at any time on or after March 1, 2025, and the redemption price for the 5.125% Senior Notes if redeemed during the 12 months beginning (i) March 1, 2025 is 102.563%, (ii) March 1, 2026 is 101.281%, (iii) March 1, 2027 and thereafter is 100.000%, in each case together with accrued and unpaid interest. The Company may also redeem some or all of the 5.125% Senior Notes before March 1, 2025 at a redemption price of 100% of the principal amount of the 5.125% Senior Notes, plus a "make-whole" premium, together with accrued and unpaid interest. In addition, the Company may redeem up to 40% of the original aggregate principal amount of the 5.125% Senior Notes before March 1, 2025 with the proceeds from certain equity offerings at a redemption price equal to 105.125% of the principal amount of the 5.125% Senior Notes, together with accrued and unpaid interest. Furthermore, the Company may be required to make an offer to purchase the 5.125% Senior Notes upon the sale of certain assets or upon specific kinds of changes of control. Borrowings under the 5.125% Senior Notes were used to repay existing amounts outstanding under the 2021 Revolver, to prepay the outstanding principal amount under a then existing promissory note, and to pay related fees and expenses.

On January 4, 2021, the Company issued $500.0 million aggregate principal amount of 4.625% senior unsecured notes due 2029 (the 4.625% Senior Notes). The 4.625% Senior Notes will mature on August 1, 2029. Interest on the 4.625% Senior Notes is payable on February 1st and August 1st of each year, beginning on August 1, 2021. The 4.625% Senior Notes will be redeemable at the Company's option, in whole or in part, at any time on or after February 1, 2024, and the redemption price for the 4.625% Senior Notes if redeemed during the 12 months beginning (i) February 1, 2024 is 102.313%, (ii) February 1, 2025 is 101.156%, (iii) February 1, 2026 and thereafter is 100.000%, in each case together with accrued and unpaid interest. The Company may also redeem some or all of the 4.625% Senior Notes before February 1, 2024 at a redemption price of 100% of the principal amount of the 4.625% Senior Notes, plus a "make-whole" premium, together with accrued and unpaid interest. In addition, the Company may redeem up to 40% of the original aggregate principal amount of the 4.625% Senior Notes before February 1, 2024 with the proceeds from certain equity offerings at a redemption price equal to 104.625% of the principal amount of the 4.625% Senior Notes, together with accrued and unpaid interest. Furthermore, the Company may be required to make an offer to purchase the 4.625% Senior Notes upon the sale of certain assets or upon specific kinds of changes of control. Borrowings under the 4.625% Senior Notes were used to partially finance the cash portion of the purchase price for the acquisition of AeroCare, and to pay related fees and expenses. In connection with the issuance of the 4.625% Senior Notes, the Company paid financing costs of $10.4 million.

On July 29, 2020, the Company issued $350.0 million aggregate principal amount of 6.125% senior unsecured notes due 2028 (the 6.125% Senior Notes). The 6.125% Senior Notes will mature on August 1, 2028. Interest on the 6.125% Senior Notes is payable on February 1st and August 1st of each year, beginning on February 1, 2021. The 6.125% Senior Notes will be redeemable at the Company's option, in whole or in part, at any time on or after August 1, 2023, and the redemption price for the 6.125% Senior Notes if redeemed during the 12 months beginning (i) August 1, 2023 is 103.063%, (ii) August 1, 2024 is 102.042%, (iii) August 1, 2025 is 101.021% and (iv) August 1, 2026 and thereafter is 100.000%, in each case together with accrued and unpaid interest. The Company may also redeem some or all of the 6.125% Senior Notes before August 1, 2023 at a redemption price of 100% of the principal amount of the 6.125% Senior Notes, plus a "make-whole" premium, together with accrued and unpaid interest. In addition, the Company may redeem up to 40% of the original aggregate principal amount of the 6.125% Senior Notes before August 1, 2023 with the proceeds from certain equity offerings at a redemption price equal to 106.125% of the principal amount of the 6.125% Senior Notes, together with accrued and unpaid interest. Furthermore, the Company may be required to make an offer to purchase the 6.125% Senior Notes upon the sale of certain assets or upon specific kinds of changes of control.

**(10)    Stockholders' Equity**

AdaptHealth, f/k/a DFB Healthcare Acquisitions Corp. (DFB), was originally formed in November 2017 as a publicly traded special purpose acquisition company for the purpose of effecting a merger, capital stock exchange, asset acquisition, stock purchase, reorganization, or similar business combination involving one or more businesses. On July 8, 2019, AdaptHealth Holdings LLC (AdaptHealth Holdings) entered into an Agreement and Plan of Merger (the Merger

26

**ADAPTHEALTH CORP. AND SUBSIDIARIES**

**Notes to Interim Consolidated Financial Statements (Unaudited) (Continued)**

Agreement), as amended on October 15, 2019, with DFB, pursuant to which AdaptHealth Holdings combined with DFB (the Business Combination). The Business Combination closed on November 8, 2019. In connection with the Business Combination, the name of the combined company was changed to AdaptHealth Corp.

Following the Closing of the Business Combination, AdaptHealth Corp. owned 56% of the combined company with the remaining 44% owned by the former owners of AdaptHealth Holdings in the form of common units representing limited liability company interests in AdaptHealth Holdings from and after the Closing of the Business Combination (New AdaptHealth Units). The former owners of AdaptHealth Holdings held New AdaptHealth Units and a corresponding number of non-economic Class B Common stock, which enabled the holder to one vote per share, and were exchangeable on a one-to-one basis for shares of Class A Common Stock. Subsequent to the Business Combination, all of the common unit interests of AdaptHealth Holdings and a corresponding number of shares of Class B Common Stock were exchanged for shares of Class A Common Stock, of which the final 13,218,758 of the exchanges occurred on January 1, 2021. As a result, the prior holders of the common unit interests of AdaptHealth Holdings no longer own a direct noncontrolling economic interest in AdaptHealth Holdings. In connection with the January 2021 exchanges, the Company recorded a decrease to the noncontrolling interest of $77.9 million in the accompanying consolidated statements of stockholders' equity (deficit).

The Company filed its Third Amended and Restated Certificate of Incorporation (the Certificate of Incorporation) on July 28, 2021. Among other things, the Certificate of Incorporation (x) increased the authorized number of shares of Common Stock from 245,000,000 shares of Common Stock to 300,000,000 shares of Common Stock and (y) (i) deleted provisions no longer applicable following the exchange of all outstanding New AdaptHealth Units and shares of Class B Common Stock for shares of Class A Common Stock and (ii) renamed the Company's Class A Common Stock to Common Stock. Holders of Common Stock are entitled to one vote for each share. The shares of Preferred Stock (see below) shall be issued with such designations, voting and other rights and preferences as may be determined from time to time by the Company's board of directors.

*Common Stock*

In January 2021, the Company issued 8,450,000 shares of Class A Common Stock at a price of $33.00 per share pursuant to an underwritten public offering (the 2021 Stock Offering) for gross proceeds of $278.9 million. In connection with this transaction, the Company received proceeds of $265.0 million which is net of the underwriting discount. A portion of the proceeds from the 2021 Stock Offering were used to partially finance the cash portion of the purchase price for the acquisition of AeroCare, and to pay related fees and expenses. In connection with the 2021 Stock Offering, the Company paid offering costs, inclusive of the underwriting discount, of $13.8 million.

*Preferred Stock*

In June 2020, the Company entered into an exchange agreement (the Exchange Agreement) with an investor pursuant to which the investor exchanged 15,810,547 shares of the Company's Class A Common Stock for 158,105.47 shares of Series B-1 Preferred Stock, par value $0.0001 per share. The Series B-1 Preferred Stock liquidation preference is limited to its par value of $0.0001 per share. The Series B-1 Preferred Stock will participate equally and ratably on an as-converted basis with the holders of Common Stock in all cash dividends paid on the Common Stock. The Series B-1 Preferred Stock is non-voting. The holder may convert each share of Series B-1 Preferred Stock into 100 shares of Common Stock (subject to certain anti-dilution adjustments) at its election, except to the extent that following such conversion, the number of shares of Common Stock held by such holder and its affiliates exceed 4.9% of the outstanding Common Stock of the Company. During the three months ended March 31, 2021, 39,500 shares of Series B-1 Preferred Stock were converted into 3,950,000 shares of Common Stock. There were no such conversions during the three months ended March 31, 2022.

As discussed in Note 3, Acquisitions, the Company issued 130,474.73 shares of Series C Convertible Preferred Stock in connection with the acquisition of AeroCare. The Series C Convertible Preferred Stock liquidation preference

27

Table of Contents

**ADAPTHEALTH CORP. AND SUBSIDIARIES**

**Notes to Interim Consolidated Financial Statements (Unaudited) (Continued)**

was limited to its par value of $0.0001 per share. The Series C Convertible Preferred Stock participated equally and ratably on an as-converted basis with the holders of Common Stock in all potential cash dividends paid on the Common Stock. The Series C Convertible Preferred Stock was non-voting. On March 3, 2021, the Company's stockholders approved, for purposes of complying with Nasdaq Listing Rule 5635, the issuance of shares of the Company's Common Stock, representing equal to or greater than 20% of the outstanding common stock or voting power of the Company issuable upon conversion of the Series C Convertible Preferred Stock issued to the former equity holders of AeroCare, by removal of the conversion restriction that prohibits such conversion of Series C Convertible Preferred Stock. Following the receipt of the approval of the Company's stockholders, the holders were able to elect to convert, and the Company was able to elect to effect a mandatory conversion of, each share of Series C Convertible Preferred Stock into 100 shares of Common Stock (subject to certain anti-dilution adjustments). The Company elected to effect a mandatory conversion of the Series C Convertible Preferred Stock, and the conversion of 130,474.73 shares of Series C Convertible Preferred Stock to 13,047,473 shares of Common Stock occurred on March 18, 2021.

*Warrants*

At the Closing of the Business Combination, the Company had 12,666,666 warrants outstanding. Each warrant is exercisable into one share of Common Stock at a price of $11.50 per share. The exercise price and number of shares of Common Stock issuable upon exercise of the warrants may be adjusted in certain circumstances including in the event of a share dividend, or recapitalization, reorganization, merger or consolidation. However, the warrants will not be adjusted for the issuance of common stock at a price below its exercise price. There were no warrants exercised during the three months ended March 31, 2022 and 2021. As of March 31, 2022, the Company had 4,056,427 warrants outstanding, which have an expiration date of November 20, 2024.

The Company classifies its warrants as a liability in its consolidated balance sheets because of certain terms included in the corresponding warrant agreement. The estimated fair value of the warrants is recorded as a liability, with such fair value reclassified to stockholders' equity upon the exercise of such warrants. Prior to exercise, the change in the estimated fair value of such warrants each period is recognized as a non-cash charge or gain in the Company's consolidated statements of operations.

A reconciliation of the changes in the warrant liability during the three months ended March 31, 2022 and 2021 was as follows (in thousands):

| | | |
|---|---|---|
| Estimated fair value of warrant liability at December 31, 2021 | $ | 57,764 |
| Change in estimated fair value of the warrant liability | | (26,717) |
| Estimated fair value of warrant liability at March 31, 2022 | $ | 31,047 |
| | | |
| Estimated fair value of warrant liability at December 31, 2020 | $ | 113,905 |
| Change in estimated fair value of the warrant liability | | (3,168) |
| Estimated fair value of warrant liability at March 31, 2021 | $ | 110,737 |

*Contingent Consideration Common Shares*

Pursuant to the Merger Agreement, the former owners of AdaptHealth Holdings who received Class A Common Stock and Class B Common Stock in connection with the Business Combination are entitled to receive earn-out consideration to be paid in the form of Common Stock, if the average price of the Company's Common Stock for the month of December prior to each measurement date equals or exceeds certain hurdles set forth in the Merger Agreement (Contingent Consideration Common Shares). The former owners of AdaptHealth Holdings were entitled to receive 1,000,000 shares of Common Stock on each of December 31, 2021 and 2020 based on an average stock price hurdle of $18 and $15, respectively. The average stock price of the Company's Common Stock was greater than these hurdles for the applicable measurement periods as of the December 31, 2021 and 2020 measurement dates, which triggered the

28

**ADAPTHEALTH CORP. AND SUBSIDIARIES**

**Notes to Interim Consolidated Financial Statements (Unaudited) (Continued)**

issuance of 1,000,000 shares of Common Stock on such dates. In addition, the former owners of AdaptHealth Holdings are entitled to receive an additional 1,000,000 shares of Common Stock on December 31, 2022 if the average stock price of the Company's Common Stock equals or exceeds $22 during the month of December 2022.

The Contingent Consideration Common Shares would be issued immediately in the event of a change of control as defined in the Merger Agreement. The estimated fair value of the Contingent Consideration Common Shares was previously recorded as a liability in the Company's consolidated balance sheets, with such fair value reclassified to stockholders' equity upon the issuance of any shares that are earned. Prior to issuance, the change in the estimated fair value of such shares each period was recognized as a non-cash charge or gain in the Company's consolidated statements of operations.

The Company estimated the fair value of the contingent consideration common shares liability using a Monte-Carlo simulation analysis. A Monte-Carlo simulation is a tool used to project asset prices based on a widely accepted drift calculation, the volatility of the asset, incremental time-steps and a random component known as a Weiner process that introduces the dynamic behavior in the asset price. In this framework, asset prices follow a log-normal distribution as they fluctuate through time, which the simulation process captures. A specific model can be developed around the projected stock price to capture the effects of any market performance conditions on value. Price path specific conditions can be captured in this type of open form model. The Monte-Carlo process expresses potential future scenarios that when simulated thousands of times can be viewed statistically to ascertain fair value. The contingent consideration common shares contain market conditions to determine whether the shares are earned based on the Company's common stock price during specified measurement periods. Given the path-dependent nature of the requirement in which the shares are earned, a Monte-Carlo simulation was used to estimate the fair value of the liability. The Company's common stock price was simulated to each measurement period based on the methodology described above. In each iteration, the simulated stock price was compared to the conditions under which the shares are earned. In iterations where the stock price corresponded to shares being earned, the future value of the earned shares was discounted back to present value. The fair value of the liability was estimated based on the average of all iterations of the simulation.

As discussed above, on each of December 31, 2021 and 2020, 1,000,000 shares of Common Stock were issued in connection with the portion of the Contingent Consideration Common Shares which were earned as of such dates. As a result, the estimated fair value related to such shares was reclassified to stockholders' equity, with such shares reflected as issued and outstanding Common Stock. In accordance with U.S. GAAP, the estimated fair value related to the remaining 1,000,000 Contingent Consideration Common Shares was reclassified to stockholders' equity at December 31, 2021. Since the fair value of these potential shares was reclassified to stockholders' equity on December 31, 2021, these potential shares are no longer liability classified and therefore the changes in the estimated fair value of such potential shares are not recognized as a non-cash charge or gain in the Company's consolidated statements of operations subsequent to December 31, 2021.

A reconciliation of the changes in the contingent consideration common shares liability during the three months ended March 31, 2021 was as follows (in thousands):

| | | |
|---|---|---|
| Estimated fair value of contingent consideration common shares liability at December 31, 2020 | $ | 70,477 |
| Change in estimated fair value of the contingent consideration common shares liability | | (1,965) |
| Estimated fair value of contingent consideration common shares liability at March 31, 2021 | $ | 68,512 |

*Equity-based Compensation*

In connection with the Company's 2019 Stock Incentive Plan (the 2019 Plan), the Company provides equity-based compensation to attract and retain employees while also aligning employees' interest with the interests of its stockholders. The 2019 Plan permits the grant of various equity-based awards to selected employees and non-employee directors. At March 31, 2022, the 2019 Plan permits the grant of up to 10,000,000 shares of Common Stock, subject to

29

Table of Contents

**ADAPTHEALTH CORP. AND SUBSIDIARIES**

**Notes to Interim Consolidated Financial Statements (Unaudited) (Continued)**

certain adjustments and limitations. At March 31, 2022, 2,276,916 shares of the Company's Common Stock were available for issuance under the 2019 Plan.

The following awards were granted in connection with the 2019 Plan during the three months ended March 31, 2022.

*Stock Options*

There were no stock option grants during the three months ended March 31, 2022. The following table provides the activity regarding the Company's outstanding stock options during the three months ended March 31, 2022 that were granted in connection with the 2019 Plan (in thousands, except per share data):

| | Number of Options | | Weighted-Average Grant Date Fair Value per Share | | Weighted-Average Exercise Price per Share | Weighted-Average Remaining Contractual Term |
|---|---|---|---|---|---|---|
| Outstanding, December 31, 2021 | 2,219 | $ | 3.75 | $ | 19.36 | |
| Activity - none | — | | | | | |
| Outstanding, March 31, 2022 | 2,219 | $ | 3.75 | $ | 19.36 | 6.8 Years |

The following table provides the activity for all outstanding stock options during the three months ended March 31, 2022 (in thousands, except per share data):

| | Number of Options | | Weighted-Average Exercise Price per Share | Weighted-Average Remaining Contractual Term |
|---|---|---|---|---|
| Outstanding, December 31, 2021 | 5,766 | $ | 11.26 | |
| Exercised | (283) | $ | 6.28 | |
| Outstanding, March 31, 2022 | 5,483 | $ | 11.52 | 6.2 Years |

During the three months ended March 31, 2022, 115,732 stock options were exercised resulting in $0.7 million of cash proceeds received by the Company and the issuance of 115,732 shares of the Company's Common Stock. Also, during the three months ended March 31, 2022, 167,720 stock options were exercised on a cashless basis resulting in the issuance of 68,454 shares of the Company's Common Stock.

*Restricted Stock*

During the three months ended March 31, 2022, the Company granted 98,645 shares of restricted stock to various employees which vest ratably over the three or four-year periods following the vesting commencement date (which is generally the grant date), subject to the employees' continuous employment through the applicable vesting date, and if applicable, subject to certain performance conditions. The grant-date fair value of these awards was $1.9 million.

During the three months ended March 31, 2022, the Company granted 308,764 shares of restricted stock units to senior executive management of the Company. These awards vest ratably over the three-year period following the grant date, subject to the employees' continuous employment through the applicable vesting date. The grant-date fair value of these awards was $5.5 million. In addition, during the three months ended March 31, 2022, the Company granted 308,764 shares of performance-vested restricted stock units (Performance RSUs) to senior executive management of the Company. The Performance RSUs will vest on the third anniversary of the grant date subject to the

30

**ADAPTHEALTH CORP. AND SUBSIDIARIES**

**Notes to Interim Consolidated Financial Statements (Unaudited) (Continued)**

achievement of specified goals relative to the Company's three-year relative total shareholder return (Relative TSR) performance versus the Company's defined peer group (the Peer Group), and is also subject to the employees' continuous employment through the vesting date. The grant-date fair value of these awards, using a Monte-Carlo simulation analysis, was $8.4 million. The payout of shares on the vesting date are as follows based on the Company's Relative TSR versus the Peer Group (for performance between the stated goals noted below, straight-line interpolation will be applied):

- Less than 25th Percentile – No payout
- Greater than or equal to 25th Percentile – 50% of Performance RSUs
- Equal to 50th Percentile – 100% of Performance RSUs
- Greater than or equal to 75th Percentile – 200% of Performance RSUs

Activity related to the Company's non-vested restricted stock grants for the three months ended March 31, 2022 is presented below (in thousands, except per share data):

| | Number of Shares of Restricted Stock | | Weighted-Average Grant Date Fair Value per Share |
|---|---|---|---|
| Non-vested balance, December 31, 2021 | 2,195 | $ | 19.58 |
| Granted | 716 | $ | 22.25 |
| Vested | (230) | $ | 26.11 |
| Forfeited | (27) | $ | 21.06 |
| Non-vested balance, March 31, 2022 | 2,654 | $ | 22.31 |

*Incentive Units*

AdaptHealth Holdings granted Incentive Units in June 2019 (the 2019 Incentive Units) to certain members of management. The 2019 Incentive Units were intended to constitute profits interests and were granted for purposes of enabling such individuals to participate in the long-term growth and financial success of the Company and were issued in exchange for services to be performed. The grant date fair value of the 2019 Incentive Units, as calculated under an Option Pricing Method, was $4.5 million. With respect to the 2019 Incentive Units, 50% of the awards were scheduled to vest in equal annual installments on each of the first four anniversaries of the Vesting Commencement Date as defined in the agreements (May 20, 2019). The first 25% of this portion of the 2019 Incentive Units vested in May 2020, and in January 2021, the vesting of the remaining unvested units associated with this portion of the 2019 Incentive Units was accelerated. The Company recorded $1.5 million of equity-based compensation expense during the three months ended March 31, 2021 in connection with such acceleration. The remaining 50% had initial vesting terms based upon a performance condition. In connection with the Business Combination, the vesting condition for this portion of the 2019 Incentive Units was changed to vest quarterly during the one-year period subsequent to the Closing of the Business Combination, and as such all of the units associated with this portion of the 2019 Incentive Units were fully vested in November 2020.

*Equity-Based Compensation Expense*

The Company recorded equity-based compensation expense of $5.5 million during the three months ended March 31, 2022, of which $3.6 million and $1.9 million is included in general and administrative expenses and cost of net revenue, respectively, in the accompanying consolidated statements of operations. The Company recorded equity-based compensation expense of $8.6 million during the three months ended March 31, 2021, of which $5.4 million and $3.2 million is included in general and administrative expenses and cost of net revenue, respectively, in the accompanying consolidated statements of operations. At March 31, 2022, there was $49.4 million of unrecognized compensation expense related to equity-based compensation awards, which is expected to be recognized over a weighted-average period of 2.6 years.

31

**ADAPTHEALTH CORP. AND SUBSIDIARIES**

**Notes to Interim Consolidated Financial Statements (Unaudited) (Continued)**

**(11)    Earnings (Loss) Per Share**

Earnings (Loss) Per Share (EPS) is computed by dividing net income (loss) by the weighted average number of common shares outstanding during the period on a basic and diluted basis. The Company computes diluted net income (loss) per share using the more dilutive of the treasury stock method and the two-class method after giving effect to all potential dilutive common stock.

The Company's potentially dilutive securities include potential common shares related to outstanding warrants, contingent consideration common shares, unvested restricted stock, outstanding stock options and outstanding preferred stock. Refer to Note 10, *Stockholders' Equity*, for additional discussion of these potential dilutive securities.

Diluted net income (loss) per share considers the impact of potentially dilutive securities except when the potential common shares have an antidilutive effect. The Company's outstanding preferred stock are considered participating securities, thus requiring the two-class method of computing diluted net income (loss) per share. Computation of diluted net income (loss) per share under the two-class method excludes from the numerator any dividends paid or owed on participating securities and any undistributed earnings considered to be attributable to participating securities. The related participating securities are similarly excluded from the denominator.

Computations of basic and diluted net income (loss) per share were as follows (in thousands, except per share data):

| | Three Months Ended March 31, | | | |
| --- | --- | --- | --- | --- |
| | 2022 | | 2021 | |
| **Numerator** | | | | |
| Net income (loss) attributable to AdaptHealth Corp. | $ | 41,750 | $ | (3,966) |
| Less: Earnings allocated to participating securities [1] | | 3,537 | | — |
| Net income (loss) for basic EPS | $ | 38,213 | $ | (3,966) |
| Change in fair value of warrant liability [2] | | (26,717) | | (3,168) |
| Change in fair value of contingent consideration common shares liability [2] | | — | | (1,965) |
| Net income (loss) for diluted EPS | $ | 11,496 | $ | (9,099) |
| | | | | |
| **Denominator** [1] [2] | | | | |
| Basic weighted-average common shares outstanding | | 134,023 | | 111,109 |
| Add: Warrants [2] | | 1,462 | | 2,886 |
| Add: Contingent Consideration Common Shares [2] | | — | | 2,000 |
| Add: Stock options | | 2,772 | | — |
| Add: Unvested restricted stock | | 226 | | — |
| Diluted weighted-average common shares outstanding | | 138,483 | | 115,995 |
| | | | | |
| Basic net income (loss) per share | $ | 0.29 | $ | (0.04) |
| Diluted net income (loss) per share | $ | 0.08 | $ | (0.08) |

[1]  The Company's preferred stock are considered participating securities. Computation of EPS under the two-class method excludes from the numerator any dividends paid or owed on participating securities and any undistributed earnings considered to be attributable to participating securities. The related participating securities are similarly excluded from the denominator. There were participating securities outstanding for the three months ended March 31, 2022 and 2021. There was no amount allocated to the participating securities during the three months ended March 31, 2021 due to the net loss reported in that period.

32

**ADAPTHEALTH CORP. AND SUBSIDIARIES**

**Notes to Interim Consolidated Financial Statements (Unaudited) (Continued)**

(2)     For the three months ended March 31, 2022 and 2021, the impact to earnings from the change in fair value of the Company's warrant liability is excluded from the numerator, and the corresponding security is included in the denominator, for purposes of computing diluted net income (loss) per share. For the three months ended March 31, 2021, the impact to earnings from the change in fair value of the Company's contingent consideration common shares liability is excluded from the numerator, and the corresponding security is included in the denominator, for purposes of computing diluted net loss per share. These adjustments are included as the effect of the numerator and denominator adjustments for these derivative instruments is dilutive as a result of the non-cash gains recorded for the change in fair value of these instruments during the periods.

Due to the Company reporting a net loss attributable to AdaptHealth Corp. for the three months ended March 31, 2021, all potentially dilutive securities related to unvested restricted stock and outstanding stock options were excluded from the computation of diluted net loss per share for that period as their inclusion would have been anti-dilutive.

The table below provides the weighted-average number of potential common shares associated with outstanding securities not included in the Company's computation of diluted net income (loss) per share for the three months ended March 31, 2022 and 2021 because to do so would be antidilutive (in thousands):

|  | Three Months Ended March 31, | |
|---|---|---|
|  | **2022** | **2021** |
| Preferred Stock | 12,406 | 14,037 |
| Stock Options | — | 2,303 |
| Unvested restricted stock | 290 | 1,122 |
| Total | 12,696 | 17,462 |

In addition, there are 1,000,000 shares relating to the Contingent Consideration Common Shares that were not included in the diluted net income per share computation for the three months ended March 31, 2022 as the corresponding average stock price hurdle for issuing these contingently issuable shares would not have been met as of the March 31, 2022 reporting date. As discussed in note 10, *Stockholders' Equity*, the measurement date is December 31, 2022 for these shares and they will be issued at such time if they are earned.

**(12)     Leases**

The Company leases its office facilities and office equipment under noncancelable lease agreements which expire at various dates through March 2033. Some of these lease agreements include an option to renew at the end of the term. The Company also leases certain patient medical equipment with such leases set to expire at various dates through May 2022. The Company also leases certain office facilities on a month-to-month basis. In some instances, the Company is also required to pay its pro rata share of real estate taxes and utility costs in connection with the premises. Some of the leases contain fixed annual increases of minimum rent.

The Company's leases frequently allow for lease payments that could vary based on factors such as inflation and the incurrence of contractual charges such as those for common area maintenance or utilities.

Renewal and/or early termination options are common in the lease arrangements, particularly with respect to real estate leases. The Company's right-of-use assets and lease liabilities generally include periods covered by renewal options and exclude periods covered by early termination options (based on the conclusion that it is reasonably certain that the Company will exercise such renewal options and not exercise such early termination options).

33

**ADAPTHEALTH CORP. AND SUBSIDIARIES**

**Notes to Interim Consolidated Financial Statements (Unaudited) (Continued)**

The Company is also party to certain sublease arrangements related to real estate leases, where the Company acts as the lessee and intermediate lessor.

The Company has acquired patient medical equipment and supplies, and office equipment through multiple finance leases. The finance lease obligations represent the present value of minimum lease payments under the respective agreement, payable monthly at various interest rates.

The following table presents information about the Company's right-of-use assets and lease liabilities as of March 31, 2022 and December 31, 2021 (in thousands):

| | Consolidated Balance Sheets Line Item | March 31, 2022 | | December 31, 2021 |
|---|---|---|---|---|
| Right-of-use (ROU) assets: | | | | |
| Operating lease ROU assets | Operating lease right-of-use assets | $ 142,092 | $ | 147,760 |
| Finance lease ROU assets | Equipment and other fixed assets, net | 12,778 | | 17,410 |
| Total ROU assets | | $ 154,870 | $ | 165,170 |
| Operating lease liabilities: | | | | |
| Current operating lease liabilities | Current portion of operating lease obligations | $ 30,597 | $ | 31,418 |
| Noncurrent operating lease liabilities | Operating lease obligations, less current portion | 115,420 | | 120,180 |
| Total operating lease liabilities | | $ 146,017 | $ | 151,598 |
| Finance lease liabilities: | | | | |
| Current finance lease liabilities | Current portion of finance lease obligations | $ 8,692 | $ | 15,446 |
| Noncurrent finance lease liabilities | Other long-term liabilities | 66 | | 132 |
| Total finance lease liabilities | | $ 8,758 | $ | 15,578 |

The following table presents information about lease costs and expenses and sublease income for the three months ended March 31, 2022 and 2021 (in thousands). The amounts below are included in cost of net revenue in the accompanying consolidated statements of operations for the periods presented.

| | Three Months Ended | | | |
|---|---|---|---|---|
| | March 31, 2022 | | March 31, 2021 | |
| Operating lease costs | $ | 9,638 | $ | 8,022 |
| Finance lease costs: | | | | |
| Amortization of ROU assets | $ | 4,461 | $ | 9,450 |
| Other lease costs and income: | | | | |
| Variable leases costs [1] | $ | 4,245 | $ | 2,899 |
| Sublease income | $ | 335 | $ | 199 |
| Short-term lease costs | $ | — | $ | 8,141 |

(1) Amounts represent variable costs incurred that were not included in the initial measurement of the lease liability such as common area maintenance and utilities costs associated with leased real estate.

34

**ADAPTHEALTH CORP. AND SUBSIDIARIES**

**Notes to Interim Consolidated Financial Statements (Unaudited) (Continued)**

The following table provides the weighted average remaining lease terms and weighted average discount rates for the Company's leases as of March 31, 2022 and December 31, 2021:

|  | March 31, 2022 | December 31, 2021 |
|---|---|---|
| Weighted average remaining lease term, weighted based on lease liability balances: |  |  |
| Operating leases | 6.6 years | 6.7 years |
| Finance leases | 0.8 year | 1.0 year |
| Weighted average discount rate, weighted based on remaining balance of lease payments: |  |  |
| Operating leases | 3.8% | 3.8% |

The following table provides the undiscounted amount of future cash flows related to the Company's operating and finance leases, as well as a reconciliation of such undiscounted cash flows to the amounts included in the Company's lease liabilities as of March 31, 2022 (in thousands):

|  | Operating Leases | Finance Leases |
|---|---|---|
| 2022 | $ 26,956 | $ 8,049 |
| 2023 | 31,378 | 763 |
| 2024 | 26,100 | — |
| 2025 | 21,759 | — |
| 2026 | 15,018 | — |
| Thereafter | 46,452 | — |
| Total future undiscounted lease payments | $ 167,663 | $ 8,812 |
| Less: amount representing interest | (21,646) | (54) |
| Present value of future lease payments (lease liability) | $ 146,017 | $ 8,758 |

The following table provides certain cash flows and supplemental non-cash information related to our lease liabilities for the three months ended March 31, 2022 and 2021, respectively (in thousands):

|  | Three Months Ended | |
|---|---|---|
| Cash paid for amounts included in the measurement of lease liabilities: | March 31, 2022 | March 31, 2021 |
| Operating cash payments for operating leases | $ 9,581 | $ 7,956 |
| Financing cash payments for finance leases | $ 8,156 | $ 9,854 |
| Lease liabilities arising from obtaining right-of-use assets: |  |  |
| Operating leases | $ 2,627 | $ 10,750 |
| Finance leases | $ 1,335 | $ 7,445 |

**(13)    Income Taxes**

The Company is subject to U.S. federal, state, and local income taxes. For the three months ended March 31, 2022 and 2021, the Company recorded income tax expense of $5.6 million and income tax benefit of $1.7 million, respectively.

As of March 31, 2022 and December 31, 2021, the Company had an unrecognized tax benefit of $4.0 million.

35

Table of Contents

**ADAPTHEALTH CORP. AND SUBSIDIARIES**

**Notes to Interim Consolidated Financial Statements (Unaudited) (Continued)**

*Tax Receivable Agreement*

AdaptHealth Corp. is party to a Tax Receivable Agreement (TRA) with certain current and former members of AdaptHealth Holdings. The TRA provides for the payment by AdaptHealth Corp. of 85% of the tax savings, if any, that AdaptHealth Corp. realizes (or is deemed to realize in certain circumstances) as a result of (i) certain increases in tax basis resulting from exchanges of New AdaptHealth Units and shares of Class B Common Stock; (ii) certain tax attributes of the corresponding sellers existing prior to an exchange; (iii) imputed interest deemed to be paid by AdaptHealth Corp. as a result of payments it makes under the TRA; and (iv) certain increases in tax basis resulting from payments AdaptHealth Corp. makes under the TRA.

During the three months ended March 31, 2022, the Company recognized an expense of $4.5 million related to changes in the estimated liability related to the TRA as a result of settling the current portion of the contingent consideration common shares liability during the period, which is included in Other (income) loss, net in the accompanying consolidated statement of operations. During the three months ended March 31, 2021, the Company increased the estimated liability related to the TRA through an aggregate $146.5 million reduction in additional paid-in capital resulting from additional exchanges of New AdaptHealth Units and shares of Class B Common Stock. Correspondingly, during the three months ended March 31, 2021, the Company increased its deferred tax asset by $163.3 million through an increase in additional paid-in-capital resulting from these exchanges and other increases of AdaptHealth Corp.'s ownership interest in AdaptHealth Holdings.

At March 31, 2022, the Company had a liability recorded relating to the TRA of $304.8 million, of which $5.9 million and $298.9 million is included in other current liabilities and other long-term liabilities, respectively, in the accompanying consolidated balance sheets. At December 31, 2021, the Company had a liability recorded relating to the TRA of $300.3 million, which is included in other long-term liabilities in the accompanying consolidated balance sheets.

**(14)    Commitments and Contingencies**

In the normal course of business, the Company is subject to loss contingencies, such as legal proceedings and claims arising out of its business that cover a wide range of matters. In accordance with FASB ASC Topic 450, *Accounting for Contingencies*, the Company records accruals for such loss contingencies when it is probable that a liability has been incurred and the amount of loss can be reasonably estimated. Significant judgment is required to determine both probability and the estimated amount. The Company reviews its accruals at least quarterly and adjusts accordingly to reflect the impact of negotiations, settlements, rulings, advice of legal counsel, and updated information. At this time, the Company has no material accruals related to lawsuits, claims, investigations and proceedings. While there can be no assurance, based on the Company's evaluation of information currently available, the Company's management believes any liability that may ultimately result from resolution of such loss contingencies will not have a material adverse effect on the Company's financial conditions or results of operations. However, the Company's assessment may be affected by limited information. Accordingly, the Company's assessment may change in the future based upon availability of new information and further developments in the proceedings of such matters. The results of legal proceedings are inherently uncertain, and material adverse outcomes are possible.

In connection with the Company's acquisition of PPS HME Holdings LLC (PPS), in May 2018, the Company assumed a Corporate Integrity Agreement (CIA) at one of PPS' subsidiaries, Braden Partners L.P. d/b/a Pacific Pulmonary Services (BP). The CIA was entered into with the Office of Inspector General of the U.S. Department of Health and Human Services (OIG). The CIA has a five-year term which expires as of April 2022. In connection with the acquisition and integration of PPS by AdaptHealth, the OIG confirmed that the requirements of the CIA imposed upon BP would only apply to the operations of BP and therefore no operations of any other AdaptHealth affiliate are subject to the requirements of the CIA following the acquisition. On December 16, 2021, the OIG-HHS notified PPS that its report for the period ended March 31, 2021 had been accepted and PPS had satisfied its obligations under the CIA as of such date.

36

**ADAPTHEALTH CORP. AND SUBSIDIARIES**

**Notes to Interim Consolidated Financial Statements (Unaudited) (Continued)**

On July 25, 2017, the Company was served with a subpoena by the U.S. Attorney's Office for the United States District Court for the Eastern District of Pennsylvania (EDPA) pursuant to 18 U.S.C. §3486 to produce certain audit records and internal communications regarding ventilator billing. The investigation focused on billing practices regarding one payor that contracted for bundled payments for certain ventilators. The Company has cooperated with investigators and, through agreement with the EDPA, has submitted all information requested in the Company's possession. An independent third party was retained by the Company that identified overpayments and underpayments for ventilator billings related to the payor, and a remittance was sent to reconcile that account. On October 3, 2019, the Company received a follow-up civil investigative demand from the EDPA regarding a document previously produced to the EDPA and patients included in the review by the independent third party. The Company has responded to the EDPA and supplemented its production as requested with any relevant documents in the Company's possession. During subsequent communications, the EDPA indicated to the Company that the investigation remained ongoing. The EDPA also requested additional information regarding certain patient services and claims refunds processed by the Company in 2017. The Company produced this information in coordination with the EDPA. The EDPA has also raised questions regarding other aspects of ventilator billing. While the Company cannot provide any assurance as to whether the EDPA will seek additional information or pursue this matter further, it does not believe that the investigation will have a material adverse effect on the Company.

In March 2019, prior to its acquisition by the Company, AeroCare was served with a civil investigative demand ("CID") issued by the United States Attorney for the Western District of Kentucky (WDKY). The CID seeks to investigate allegations that AeroCare improperly billed, or caused others to improperly bill, for oxygen tank contents that were not delivered to beneficiaries. The WDKY has requested documents related to such oxygen tank content billing as well as other categories of information. AeroCare has cooperated with the WDKY and has produced documents and provided explanations of its billing practices. In September 2020, the WDKY indicated the investigation includes alleged violations of the federal False Claims Act and as well as alleged violations of state Medicaid false claims acts in ten states. AeroCare has cooperated fully with the investigation and has indicated to the WDKY that concerns raised do not accurately identify Medicare coverage criteria and that state Medicaid coverage requirements generally do not provide for separate reimbursement for portable gaseous oxygen contents in the circumstances at issue. While the Company cannot provide any assurance as to whether the WDKY will seek additional information or pursue this matter further, it does not believe that the investigation will have a material adverse effect on the Company.

On June 28, 2019, Solara, which was acquired by the Company in July 2020, determined that an unauthorized third-party gained access to a limited number of employee email accounts beginning in April 2019, as a result of a phishing email campaign. Solara undertook a comprehensive review of the accounts to identify what personal information was stored within the accounts and to whom that information related. In connection with the incident, Solara notified potentially affected individuals and reported this incident to law enforcement and relevant state and federal regulators. Solara was a defendant in a class action regarding the incident in federal court. In October 2021, the parties tentatively agreed to a settlement for a payment of $5.1 million, which will be covered in full by insurance and an escrow established at the time of the Solara acquisition. On January 25, 2022, the plaintiffs filed a Motion for Preliminary Approval of the settlement, and on April 20, 2022, the Court approved the settlement. As of March 31, 2022 and December 31, 2021, the Company recorded a liability of $5.1 million and a corresponding indemnification asset, which are included in other current liabilities and other current assets, respectively, in the accompanying consolidated balance sheets.

The Company and certain of its current and former officers were named as defendants in a lawsuit, as described below. The Company cannot reasonably predict the outcome of this legal proceeding, nor can it estimate the amount of loss or range of loss, if any, that may result. An adverse outcome in this proceeding could have a material adverse effect on the Company's results of operations, cash flows or financial condition. The results of legal proceedings are inherently uncertain, and material adverse outcomes are possible.

37

Table of Contents

**ADAPTHEALTH CORP. AND SUBSIDIARIES**

**Notes to Interim Consolidated Financial Statements (Unaudited) (Continued)**

On July 29, 2021, Robert Charles Faille Jr., a purported shareholder of the Company, filed a purported class action complaint against the Company and certain of its current and former officers in the United States District Court for the Eastern District of Pennsylvania (the "Complaint"). The Complaint purports to be asserted on behalf of a class of persons who purchased the Company's stock between November 11, 2019 and July 16, 2021. The Complaint generally alleges that the Company and certain of its current and former officers violated federal securities laws by making allegedly false and misleading statements and/or failing to disclose material information regarding the Company's organic growth trajectory. The Complaint seeks unspecified damages. On October 14, 2021, the Delaware County Employees Retirement System and the Bucks County Employees Retirement System were named Lead Plaintiffs. Pursuant to the scheduling order, Lead Plaintiffs filed a consolidated complaint on November 22, 2021 (the "Consolidated Complaint"), which asserts substantially the same claim, but adds a number of current and former directors of the Company as additional defendants and a new theory of recovery based on the Company's alleged failure to disclose information concerning the Company's former Co-CEO's alleged tax fraud arising from certain past private activity (the "Consolidated Class Action"). On January 20, 2022, the defendants filed a motion to dismiss the Consolidated Complaint. Lead Plaintiffs' opposition to defendants' motion was filed on March 21, 2022, and defendants' reply was filed on April 15, 2022. The Company intends to vigorously defend against the allegations contained in the Consolidated Complaint, but there can be no assurance that the defense will be successful.

On December 6, 2021, a putative shareholder of the Company, Carol Hessler, filed a shareholder derivative complaint against certain current and former directors and officers of the Company in the United States District Court for the Eastern District of Pennsylvania (the "Derivative Complaint"). The Derivative Complaint generally alleges that the defendants breached their fiduciary duties owed to the company by allegedly causing or allowing misrepresentations and/or omissions regarding the Company's organic growth and Luke McGee's alleged criminal activity, failing to maintain an adequate system of oversight, disclosure controls and procedures, and internal controls over financial reporting and due diligence into the Company's management team, and engaging in insider trading. The Derivative Complaint also alleges claims for waste of corporate assets and unjust enrichment. Finally, the Derivative Complaint alleges that certain of the individual defendants violated Section 14(a) of the Securities Exchange Act by allegedly negligently issuing, causing to be issued, and participating in the issuance of materially misleading statements to stockholders in the Company's Proxy Statements on Schedule DEF 14A in connection with a Special Meeting of Stockholders, held on March 3, 2021, and the 2021 Annual Meeting of Stockholders, held on July 27, 2021. The Derivative Complaint seeks, among other things, an award of money damages.

On March 4, 2022, the parties stipulated to stay the Hessler action pending final resolution of the Consolidated Class Action. On March 7, 2022, the court so-ordered the parties' stipulation.

The Company intends to vigorously defend against the allegations contained in the Derivative Complaint, but there can be no assurance that the defense will be successful.

**(15)    Related Party Transaction**

The Company and one of its executive officers and shareholder own an equity interest in a vendor of the Company that provides automated order intake software. The individual's equity ownership is less than 1%. The expense related to this vendor was $1.4 million and $1.0 million for the three months ended March 31, 2022 and 2021, respectively. The Company accounts for this investment under the cost method of accounting based on its level of equity ownership. As of March 31, 2022 and 2021, the Company had an immaterial outstanding accounts payable balance to this vendor.

A director of the Company serves on the board of directors of a third-party payor that does business with the Company in the normal course of providing services to patients. Net revenue from this third-party payor was less than 0.5% of the Company's consolidated net revenue during the three months ended March 31, 2022 and 2021. As of March 31, 2022 and December 31, 2021, the Company had an immaterial outstanding accounts receivable balance from this third-party payor.

Table of Contents

**ADAPTHEALTH CORP. AND SUBSIDIARIES**

**Notes to Interim Consolidated Financial Statements (Unaudited) (Continued)**

A director of the Company is an employee of a beneficial owner of more than 5% of the Company's Common Stock. This beneficial owner is also a minority shareholder of a vendor that provides equipment and supplies to the Company in the normal course of business. Purchases from this vendor were approximately $14 million for the three months ended March 31, 2022. As of March 31, 2022, the Company had $10 million in outstanding accounts payable to this vendor. Purchases from this vendor for the three months ended March 31, 2021 and the outstanding accounts payable to this vendor as of December 31, 2021 were immaterial.

**(16)    Subsequent Events**

Subsequent to March 31, 2022, the Company acquired 100% of the equity interests of a provider of home medical equipment and acquired certain assets of the home medical equipment business of three providers of HME. The total consideration included cash payments of $13.9 million at closing and deferred payment liabilities of $0.1 million. Due to the timing of these acquisitions, as of the date the interim consolidated financial statements were available to be issued, the Company was in the process of determining the allocation of the fair value of the consideration paid to the fair value of the net assets acquired and a preliminary allocation has not yet been determined.

Subsequent to March 31, 2022, the Company entered into forward-dated interest rate swap agreements with third parties in which the Company will pay a fixed interest rate and receive a rate equal to the one month-LIBOR. The purpose of these forward-dated interest rate swap agreements is to ensure that the Company operates within its derivatives policy by maintaining a total notional amount of $250 million under the Company's outstanding interest rate swap agreements through the maturity date of the 2021 Credit Agreement.

On May 9, 2022, the Company's board of directors authorized a share repurchase program for up to $200 million of the Company's Common Stock through December 31, 2022. The timing and actual number of shares to be repurchased will depend upon market conditions and other factors. Shares of the Company's Common Stock may be purchased from time to time on the open market, through privately negotiated transactions or otherwise. Purchases of the Company's Common Stock may be started or stopped at any time without prior notice depending on market conditions and other factors. The Company intends to fund the share repurchase program through its available cash and liquidity.

**Item 2. Management's Discussion and Analysis of Financial Condition and Results of Operations**

The following discussion should be read in conjunction with AdaptHealth Corp.'s ("AdaptHealth" or the "Company") consolidated financial statements and the accompanying notes included in this report. All amounts presented are in accordance with U.S. generally accepted accounting principles ("U.S. GAAP"), except as noted. In addition to historical information, this discussion contains forward-looking statements that involve risks, uncertainties and assumptions that could cause actual results to differ materially from management's expectations. Factors that could cause such differences include, but are not limited to, those discussed in Item 1A, "*Risk Factors*", in our 2021 Annual Report on Form 10-K filed with the SEC on March 1, 2022.

**AdaptHealth Corp. Overview**

AdaptHealth is a national leader in providing patient-centered, healthcare-at-home solutions including home medical equipment ("HME"), medical supplies, and related services. The Company focuses primarily on providing (i) sleep therapy equipment, supplies and related services (including CPAP and bi PAP services) to individuals suffering from obstructive sleep apnea ("OSA"), (ii) medical devices and supplies to patients for the treatment of diabetes (including continuous glucose monitors and insulin pumps), (iii) home medical equipment to patients discharged from acute care and other facilities, (iv) oxygen and related chronic therapy services in the home, and (v) other HME devices and supplies on behalf of chronically ill patients with wound care, urological, incontinence, ostomy and nutritional supply needs. The Company services beneficiaries of Medicare, Medicaid and commercial insurance payors. As of March 31, 2022, AdaptHealth serviced approximately 3.9 million patients annually in all 50 states through its network of 753 locations in 47 states. The Company's principal executive offices are located at 220 West Germantown Pike, Suite 250, Plymouth Meeting, Pennsylvania 19462.

**Impact of the COVID-19 Pandemic**

The COVID-19 pandemic has impacted AdaptHealth's business, as well as its patients, communities, and employees. AdaptHealth's priorities during the COVID-19 pandemic remain protecting the health and safety of its employees (including patient-facing employees providing respiratory and other services), maximizing the availability of its services and products to support patient health needs, and maintaining the operational and financial stability of its business.

In response to the COVID-19 pandemic and the National Emergency Declaration, dated March 13, 2020, in the first quarter of 2020, AdaptHealth activated certain business interruption protocols, including acquisition and distribution of personal protective equipment (PPE) to its patient-facing employees, accelerated capital expenditures of certain products and relocation of significant portions of its workforce to "work-from-home" status. Federal, state, and local authorities have taken several actions designed to assist healthcare providers in providing care to COVID-19 and other patients and to mitigate the adverse economic impact of the COVID-19 pandemic. Legislative actions taken by the federal government include the Coronavirus Aid, Relief, and Economic Security Act (the "CARES Act"), which was signed into law on March 27, 2020. Through the CARES Act, the federal government has authorized payments to be distributed to healthcare providers through the Public Health and Social Services Emergency Fund ("Provider Relief Fund" or "PRF"). Additionally, the CARES Act revised the Medicare accelerated and advance payment program in an attempt to disburse payments to healthcare providers more quickly to mitigate the financial impact on healthcare providers.

AdaptHealth increased its cash liquidity by, among other things, seeking recoupable advance payments of $45.8 million made available by CMS under the CARES Act legislation, which was received in April 2020. In addition, in connection with an acquisition completed in July 2020, AdaptHealth assumed a liability of $3.7 million relating to CMS recoupable advance payments received by the acquired company prior to the date of acquisition. The recoupment of the advance payments by CMS began in April 2021 and is being applied to services provided and revenue recognized during the period in which the recoupment occurs, and will impact AdaptHealth's cash receipts for services provided until such time all amounts have been recouped. During the three months ended March 31, 2022, CMS has recouped $5.2 million of the advance payments. As of March 31, 2022, AdaptHealth has deferred $7.5 million related to the CMS recoupable advance payments, which is included in other current liabilities in the consolidated balance sheets. In addition, in April

40

2020, AdaptHealth received distributions of the CARES Act PRF of $17.2 million. Subsequent to April 2020, AdaptHealth completed several acquisitions in which the acquired companies received a total of $22.2 million of PRF payments prior to the applicable dates of acquisition. In connection with the accounting for these acquisitions, AdaptHealth recorded assumed liabilities of $7.7 million relating to the PRF payments received by the acquired companies. The PRF payments are targeted to offset lost revenue and expenditures incurred in connection with the COVID-19 pandemic. The PRF payments are subject to certain restrictions and are subject to recoupment if not used for designated purposes. As a condition to receiving distributions, providers were required to agree to certain terms and conditions, including, among other things, that the funds would be used for lost revenues and unreimbursed COVID-19 related expenses as defined by the U.S. Department of Health and Human Services ("HHS"). All recipients of PRF payments were required to comply with the reporting requirements described in the terms and conditions and as determined by HHS. AdaptHealth recognizes grant payments as income when there is reasonable assurance that it has complied with the conditions associated with the grant. As of December 31, 2021, the Company has recognized as grant income all of the PRF payments it has received or relating to liabilities assumed for PRF received from acquired companies, as it was determined that the Company has complied with the conditions associated with the grant. As such, there is no liability recorded in the Company's interim consolidated financial statements relating to PRF as of March 31, 2022.

HHS has indicated that the CARES Act PRF are subject to ongoing reporting and changes to the terms and conditions, and there have been several updates to such reporting requirements and terms and conditions since they were issued by HHS. Such updates have related to changes to the guidance regarding utilization of the funds granted from the PRF and updates to the reporting requirements of such funds, among other updates. To the extent that there is any future updated guidance from HHS or modifications to the terms and conditions, it may affect AdaptHealth's ability to comply and AdaptHealth could be required to reverse the recognition of the grant income recorded and return a portion of the funds received, which could be material to AdaptHealth. AdaptHealth is continuing to monitor the terms and conditions issued by HHS. Furthermore, HHS has indicated that it will be closely monitoring and, along with the Office of Inspector General (United States) (OIG), auditing providers to ensure that recipients comply with the terms and conditions of relief programs and to prevent fraud and abuse. All providers will be subject to civil and criminal penalties for any deliberate omissions, misrepresentations or falsifications of any information given to HHS.

Also, as permitted under the CARES Act, AdaptHealth elected to defer certain portions of employer-paid FICA taxes otherwise payable from March 27, 2020 to January 1, 2021. In total, AdaptHealth deferred $8.6 million under this provision. AdaptHealth paid $4.3 million on January 4, 2022 and the remaining balance of $4.3 million is expected to be paid shortly after December 31, 2022. As of March 31, 2022, $4.3 million is included in other current liabilities in the consolidated balance sheets.

While the impact of the COVID-19 pandemic, the National Emergency Declaration and the various state and local government imposed stay-at-home restrictions did not have a material impact on AdaptHealth's consolidated operating results initially, AdaptHealth has experienced declines in net revenue in certain services associated with elective medical procedures (such as commencement of new CPAP services and medical equipment and orthopedic supply related to facility discharges), and such declines may continue during the duration of the COVID-19 pandemic. Offsetting these declines in net revenue, AdaptHealth has experienced an increase in net revenue related to increased demand for certain respiratory products (such as oxygen), increased sales in its resupply businesses (primarily as a result of the increased ability to contact patients at home as a result of state and local government imposed stay-at-home orders) and the one-time sale of certain respiratory equipment (primarily ventilators, bi-level PAP devices and oxygen concentrators) to hospitals and local health agencies. Additionally, the suspension of Medicare sequestration (resulting in an approximate 2% increase in Medicare payments to all providers through March 31, 2022 and a 1% increase from April 1, 2022 through June 30, 2022 (when the suspension of Medicare sequestration ends), and regulatory guidance from CMS expanding telemedicine and reducing documentation requirements during the emergency period, have resulted in increased net revenues for certain products and services.

The full extent of the impact of the COVID-19 pandemic on AdaptHealth's business, results of operations, and financial condition is highly uncertain and will depend on future developments and numerous evolving factors that it may not be able to accurately predict, and could be material to AdaptHealth's consolidated financial statements in future reporting periods.

41

*Key Components of Operating Results*

**Net Revenue.** Net revenue is recorded for services that AdaptHealth provides to patients for home healthcare equipment, medical supplies to the home and related services. AdaptHealth's primary service lines are (i) sleep therapy equipment, supplies and related services (including CPAP and bi PAP services) to individuals suffering from OSA, (ii) medical devices and supplies to patients for the treatment of diabetes (including continuous glucose monitors and insulin pumps), (iii) home medical equipment to patients discharged from acute care and other facilities, (iv) oxygen and related chronic therapy services in the home, and (v) other HME devices and supplies on behalf of chronically ill patients with wound care, urological, incontinence, ostomy and nutritional supply needs. Revenues are recorded either (x) at a point in time for the sale of supplies and disposables, or (y) over the service period for equipment rental (including, but not limited to, CPAP machines, hospital beds, wheelchairs and other equipment), at amounts estimated to be received from patients or under reimbursement arrangements with Medicare, Medicaid and other third-party payors, including private insurers.

**Cost of Net Revenue.** Cost of net revenue primarily includes the cost of non-capitalized medical equipment and supplies, distribution expenses, labor costs, facilities rental costs, revenue cycle management costs and depreciation for capitalized patient equipment. Distribution expenses represent the cost incurred to coordinate and deliver products and services to the patients. Included in distribution expenses are leasing, maintenance, licensing and fuel costs for the vehicle fleet; salaries, benefits and other costs related to drivers and dispatch personnel; and amounts paid to couriers.

**General and Administrative Expenses.** General and administrative expenses consist of corporate support costs including information technology, human resources, finance, contracting, legal, compliance leadership, equity-based compensation, transaction expenses and other administrative costs.

**Depreciation and Amortization, Excluding Patient Equipment Depreciation.** Depreciation expense includes depreciation charges for capital assets other than patient equipment (which is included as part of the cost of net revenue). Amortization expense includes amortization of identifiable intangible assets.

**Factors Affecting AdaptHealth's Operating Results**

AdaptHealth's operating results and financial performance are influenced by certain unique events during the periods discussed herein, including the following:

**Acquisitions**

AdaptHealth accounts for its acquisitions in accordance with Financial Accounting Standards Board (FASB) Accounting Standards Codification (ASC) Topic 805, *Business Combinations*, and the operations of the acquired entities are included in the historical results of AdaptHealth for the periods following the closing of the acquisition. Refer to Note 3, *Acquisitions*, included in our interim consolidated financial statements for the three months ended March 31, 2022 included in this Quarterly Report on Form 10-Q for additional information regarding AdaptHealth's acquisitions.

**Debt**

In August 2021, AdaptHealth issued $600.0 million aggregate principal amount of 5.125% senior unsecured notes due 2030 (the "5.125% Senior Notes"). The 5.125% Senior Notes will mature on March 1, 2030. Interest on the 5.125% Senior Notes is payable on March 1st and September 1st of each year, beginning on March 1, 2022. Refer to the section below, titled Liquidity and Capital Resources, for additional discussion related to AdaptHealth's senior unsecured notes.

In January 2021, AdaptHealth refinanced its debt borrowings and entered into a new credit agreement with its existing bank group, which was subsequently amended in April 2021 (the "2021 Credit Agreement"). Refer to the section below, titled *Liquidity and Capital Resources*, for additional discussion related to the 2021 Credit Agreement.

In March 2019, AdaptHealth signed a Note and Unit Purchase Agreement with an investor. Pursuant to the agreement, AdaptHealth issued a promissory note with a principal amount of $100 million (the Promissory Note). In connection with the transactions completed as part of the Business Combination, the Promissory Note was replaced with a new amended and restated promissory note with a principal amount of $100 million, and the investor converted certain of its members' interests to a $43.5 million promissory note. The new $100 million promissory note, together with the $43.5 million promissory note, are collectively referred to herein as the New Promissory Note. In June 2021, AdaptHealth repaid $71.8 million of the outstanding principal balance under the New Promissory Note. In August 2021, AdaptHealth repaid the remaining outstanding principal balance of $71.7 million under the New Promissory Note. The outstanding principal balance under the New Promissory Note bore interest at 12%.

**Seasonality**

AdaptHealth's business experiences some seasonality. Its patients are generally responsible for a greater percentage of the cost of their treatment or therapy during the early months of the year due to co-insurance, co-payments and deductibles, and therefore may defer treatment and services of certain therapies until meeting their annual deductibles. In addition, changes to employer insurance coverage often go into effect at the beginning of each calendar year which may impact eligibility requirements and delay or defer treatment. Also, net revenue generated by the Company's diabetes product line is typically higher in the fourth quarter compared to the earlier part of the year due to the timing of when patients meet their annual deductibles and their associated reordering patterns. These factors may lead to lower net revenue and cash flow in the early part of the year versus the latter half of the year. Additionally, the increased incidence of respiratory infections during the winter season may result in initiation of additional respiratory services such as oxygen therapy for certain patient populations. AdaptHealth's quarterly operating results may fluctuate significantly in the future depending on these and other factors.

**Key Business Metrics**

AdaptHealth focuses on net revenue, EBITDA and Adjusted EBITDA as it reviews its performance. Total net revenue is comprised of net sales revenue and net revenue from fixed monthly equipment reimbursements less implicit price concessions. Net sales revenue consists of revenue recognized at a point in time for the sale of supplies and disposables. Net revenue from fixed monthly equipment reimbursements consists of revenue recognized over the service period for equipment (including, but not limited to, CPAP machines, oxygen concentrators, ventilators, hospital beds, wheelchairs and other equipment).

| | Three Months Ended | | | |
| --- | --- | --- | --- | --- |
| | March 31, 2022 | | March 31, 2021 | |
| Net Revenue (dollars in thousands) | Dollars | Revenue Percentage | Dollars | Revenue Percentage |
| | (Unaudited) | | | |
| Net sales revenue: | | | | |
| Sleep | $ 192,335 | 27.2 % | $ 128,682 | 26.7 % |
| Diabetes | 151,359 | 21.4 % | 95,017 | 19.7 % |
| Supplies to the home | 39,865 | 5.6 % | 41,363 | 8.6 % |
| Respiratory | 8,145 | 1.2 % | 5,621 | 1.2 % |
| HME | 30,851 | 4.4 % | 24,156 | 5.0 % |
| Other | 53,400 | 7.6 % | 22,426 | 4.7 % |
| Total net sales revenue | $ 475,955 | 67.4 % | $ 317,265 | 65.9 % |
| | | | | |
| Net revenue from fixed monthly equipment reimbursements: | | | | |
| Sleep | $ 57,938 | 8.2 % | $ 48,109 | 10.0 % |
| Diabetes | 3,946 | 0.6 % | 2,853 | 0.6 % |
| Respiratory | 132,580 | 18.8 % | 83,454 | 17.3 % |
| HME | 25,725 | 3.6 % | 20,380 | 4.2 % |
| Other | 10,059 | 1.4 % | 10,058 | 2.0 % |
| Total net revenue from fixed monthly equipment reimbursements | $ 230,248 | 32.6 % | $ 164,854 | 34.1 % |

43

| Total net revenue: | | | | | |
|---|---|---|---|---|---|
| Sleep | $ | 250,273 | 35.4 % | $ | 176,791 | 36.7 % |
| Diabetes | | 155,305 | 22.0 % | | 97,870 | 20.3 % |
| Supplies to the home | | 39,865 | 5.6 % | | 41,363 | 8.6 % |
| Respiratory | | 140,725 | 20.0 % | | 89,075 | 18.5 % |
| HME | | 56,576 | 8.0 % | | 44,536 | 9.2 % |
| Other | | 63,459 | 9.0 % | | 32,484 | 6.7 % |
| Total net revenue | $ | 706,203 | 100.0 % | $ | 482,119 | 100.0 % |

## Results of Operations

### Comparison of Three Months Ended March 31, 2022 and Three Months Ended March 31, 2021.

The following table summarizes AdaptHealth's consolidated results of operations for the three months ended March 31, 2022 and 2021:

| | Three Months Ended March 31, | | | | | |
|---|---|---|---|---|---|---|
| | 2022 | | 2021 | | Increase/(Decrease) | |
| (in thousands, except percentages) | Dollars | Revenue Percentage | Dollars | Revenue Percentage | Dollars | Percentage |
| | | | (unaudited) | | | |
| Net revenue | $ 706,203 | 100.0 % | $ 482,119 | 100.0 % | $ 224,084 | 46.5 % |
| Costs and expenses: | | | | | | |
| Cost of net revenue | 597,122 | 84.6 % | 396,698 | 82.3 % | 200,424 | 50.5 % |
| General and administrative expenses | 41,444 | 5.9 % | 56,632 | 11.7 % | (15,188) | (26.8)% |
| Depreciation and amortization, excluding patient equipment depreciation | 16,085 | 2.3 % | 13,380 | 2.8 % | 2,705 | 20.2 % |
| Total costs and expenses | 654,651 | 92.8 % | 466,710 | 96.8 % | 187,941 | 40.3 % |
| Operating income | 51,552 | 7.2 % | 15,409 | 3.2 % | 36,143 | 234.6 % |
| Interest expense, net | 24,776 | 3.5 % | 22,185 | 4.6 % | 2,591 | 11.7 % |
| Change in fair value of warrant liability | (26,717) | (3.8)% | (3,168) | (0.7)% | (23,549) | NM % |
| Change in fair value of contingent consideration common shares liability | — | — % | (1,965) | (0.4)% | 1,965 | NM % |
| Loss on extinguishment of debt | — | — % | 4,213 | 0.9 % | (4,213) | NM % |
| Other (income) loss, net | 5,660 | 0.8 % | (519) | (0.1)% | 6,179 | NM % |
| Income (loss) before income taxes | 47,833 | 6.7 % | (5,337) | (1.1)% | 53,170 | (996.3)% |
| Income tax expense (benefit) | 5,603 | 0.8 % | (1,695) | (0.4)% | 7,298 | NM % |
| Net income (loss) | 42,230 | 5.9 % | (3,642) | (0.7)% | 45,872 | (1,259.5)% |
| Income attributable to noncontrolling interest | 480 | 0.1 % | 324 | 0.1 % | 156 | NM % |
| Net income (loss) attributable to AdaptHealth Corp. | $ 41,750 | 5.8 % | $ (3,966) | (0.8)% | $ 45,716 | (1,152.7)% |

*Net Revenue.* Net revenue for the three months ended March 31, 2022 and 2021 was $706.2 million and $482.1 million, respectively, an increase of $224.1 million or 46.5%. Net revenue for the 2022 and 2021 periods included $0.3 million and $1.3 million, respectively, from referral partners and healthcare facilities in support of their urgent needs as the coronavirus pandemic has led to an increased demand for respiratory equipment including ventilators and oxygen concentrators. Excluding this revenue, net revenue was $705.9 million and $480.8 million for the three months ended March 31, 2022 and 2021, respectively, an increase of $225.1 million. The increase in net revenue was driven primarily

44

by acquisitions completed after December 31, 2020, which increased net revenue by $212.6 million, including the acquisition of AeroCare which occurred on February 1, 2021. Additionally, net revenue during the three months ended March 31, 2022 was impacted by a recall of certain ventilator, BiPAP, and CPAP devices supplied to AdaptHealth by Philips Respironics (Philips). On June 14, 2021, AdaptHealth received notice from Philips that these devices would be included in a Philips voluntary recall due to potential health risks to patients. Currently, it is not possible to purchase these products from Philips, which has led to shortages in the supply chain, and other suppliers are unable to meet the strong patient demand for these products, which has materially affected AdaptHealth's ability to service patient demand for these devices during the three months ended March 31, 2022.

For the three months ended March 31, 2022, net sales revenue (recognized at a point in time) comprised 67% of total net revenue, compared to 66% of total net revenue for the three months ended March 31, 2021. For the three months ended March 31, 2022, net revenue from fixed monthly equipment reimbursements comprised 33% of total net revenue, compared to 34% of total net revenue for the three months ended March 31, 2021.

*Cost of Net Revenue.*

The following table summarizes cost of net revenue for the three months ended March 31, 2022 and 2021:

| | Three Months Ended March 31, | | | | | |
| | 2022 | | 2021 | | Increase/(Decrease) | |
| (in thousands, except percentages) | Dollars | Revenue Percentage | Dollars | Revenue Percentage | Dollars | Percentage |
| | | | (unaudited) | | | |
| Cost of products and supplies | $ 282,593 | 40.0 % | $ 185,018 | 38.4 % | $ 97,575 | 52.7 % |
| Salaries, labor and benefits | 178,895 | 25.4 % | 119,102 | 24.7 % | 59,793 | 50.2 % |
| Patient equipment depreciation | 60,945 | 8.6 % | 33,826 | 7.0 % | 27,119 | 80.2 % |
| Other operating expenses | 58,418 | 8.3 % | 45,005 | 9.3 % | 13,413 | 29.8 % |
| Rent and occupancy | 14,356 | 2.0 % | 10,511 | 2.2 % | 3,845 | 36.6 % |
| Equity-based compensation | 1,915 | 0.3 % | 3,236 | 0.7 % | (1,321) | (40.8)% |
| **Total cost of net revenue** | $ 597,122 | 84.6 % | $ 396,698 | 82.3 % | $ 200,424 | 50.5 % |

Cost of net revenue for the three months ended March 31, 2022 and 2021 was $597.1 million and $396.7 million, respectively, an increase of $200.4 million or 50.5%, which is primarily related to acquisition growth. Costs of products and supplies increased by $97.6 million primarily as a result of acquisition growth, increased product costs, and increased net sales revenue. Salaries, labor and benefits increased by $59.8 million, primarily related to acquisition growth, increased headcount, higher commissions and overtime and wage increases. The increase in rent and occupancy and other operating expenses is primarily related to acquisition growth and increased fuel costs.

Cost of net revenue was 84.6% of net revenue for the three months ended March 31, 2022 compared to 82.3% for the three months ended March 31, 2021. The cost of products and supplies was 40.0% of net revenue in the 2022 period compared to 38.4% in the 2021 period. Salaries, labor and benefits was 25.4% of net revenue in the 2022 period compared to 24.7% in the 2021 period. Patient equipment depreciation was 8.6% of net revenue in the 2022 period compared to 7.0% in the 2021 period, primarily as a result of a change in product mix.

***General and Administrative Expenses.*** General and administrative expenses for the three months ended March 31, 2022 and 2021 were $41.4 million and $56.6 million, respectively, a decrease of $15.2 million or 26.8%. This decrease is primarily due to (1) lower transaction costs as there was more acquisition activity in the first quarter of 2021, (2) lower equity-based compensation expense as there was more equity-based compensation grant activity in the first quarter of 2021, offset by (3) higher professional fees including legal, accounting, information-technology, and consulting, including costs for Sarbanes Oxley compliance, and (4) higher labor costs associated with increased headcount and higher wages. General and administrative expenses as a percentage of net revenue was 5.9% in the 2022 period, compared to 11.7% in the 2021 period. General and administrative expenses in the 2022 period included $2.8 million of transaction costs, $3.6 million of equity-based compensation expense, and other non-recurring expenses of

45

$0.4 million. General and administrative expenses in the 2021 period included $31.4 million of transaction costs, $5.4 million of equity-based compensation expense, and $0.5 million of other non-recurring expenses. Excluding the impact of these charges, general and administrative expenses as a percentage of net revenue was 4.9% and 4.0% in the 2022 period and the 2021 period, respectively.

*Depreciation and amortization, excluding patient equipment depreciation.* Depreciation and amortization, excluding patient equipment depreciation, for the three months ended March 31, 2022 and 2021 was $16.1 million and $13.4 million, respectively, an increase of $2.7 million. The increase was primarily related to higher depreciation expense associated with fixed assets excluding patient equipment.

*Interest Expense.* Interest expense for the three months ended March 31, 2022 and 2021 was $24.8 million and $22.2 million, respectively. Interest expense related to long-term debt was higher in 2022 compared to 2021 as a result of higher long-term debt borrowings outstanding during that period. Such borrowings were primarily used to fund acquisitions.

*Loss on Extinguishment of Debt.* Loss on extinguishment of debt for the three months ended March 31, 2021 was a result of the write-off of unamortized deferred financing costs related to AdaptHealth refinancing its credit facility in January 2021. There was no such transaction in the three months ended March 31, 2022.

*Change in Fair Value of Contingent Consideration Common Shares Liability.* In connection with the Business Combination, certain former owners of AdaptHealth Holdings are entitled to contingent consideration common shares, as discussed in Note 10, *Stockholders' Equity*, to the accompanying March 31, 2022 interim consolidated financial statements. These shares were liability-classified through December 31, 2021, and the change in fair value of the contingent consideration common shares liability represents a non-cash gain in the 2021 period for the change in the estimated fair value of such liability during the period.

*Change in Fair Value of Warrant Liability*. AdaptHealth has outstanding warrants to purchase shares of Common Stock, as discussed in Note 10, *Stockholders' Equity*, to the accompanying March 31, 2022 interim consolidated financial statements. These warrants are liability-classified, and the change in fair value of the warrant liability represents a non-cash gain in the 2022 and 2021 periods for the change in the estimated fair value of such liability during the respective periods.

*Other (Income) Loss, net.* Other loss, net for the three months ended March 31, 2022 was a loss of $5.7 million, and consisted of a $4.5 million expense related to changes in AdaptHealth's estimated TRA liability, $0.8 million loss related to the write-off of an investment, and $0.4 million of expenses associated with lease terminations. Other income, net for the three months ended March 31, 2021 consisted of a gain of $0.5 million for the receipt of earnout proceeds in connection with an investment that was sold in 2020, $0.2 million of equity income related to equity method investments, offset by a $0.2 million charge for the increase in the fair value of a contingent consideration liability related to an acquisition.

*Income Tax Expense (Benefit).* Income tax expense for the three months ended March 31, 2022 was $5.6 million compared to an income tax benefit of $1.7 million for the three months ended March 31, 2021. The increase in income tax expense was primarily related to increased pre-tax income and AdaptHealth Holding's change in U.S. federal income tax classification during the first quarter of 2021.

**EBITDA and Adjusted EBITDA**

AdaptHealth uses EBITDA and Adjusted EBITDA, which are financial measures that are not prepared in accordance with generally accepted accounting principles in the United States, or U.S. GAAP, to analyze its financial results and believes that they are useful to investors, as a supplement to U.S. GAAP measures. In addition, AdaptHealth's ability to incur additional indebtedness and make investments under its existing credit agreement is governed, in part, by its ability to satisfy tests based on a variation of Adjusted EBITDA.

AdaptHealth defines EBITDA as net income (loss) attributable to AdaptHealth Corp., plus net income (loss) attributable to noncontrolling interests, interest expense, net, income tax expense (benefit), and depreciation and amortization.

AdaptHealth defines Adjusted EBITDA as EBITDA (as defined above), plus loss on extinguishment of debt, equity-based compensation expense, transaction costs, change in fair value of the contingent consideration common shares liability, change in fair value of the warrant liability, and other non-recurring items of expense or income.

AdaptHealth believes Adjusted EBITDA is useful to investors in evaluating AdaptHealth's financial performance. AdaptHealth uses this metric as the profitability measure in its incentive compensation plans that have a profitability component and to evaluate acquisition opportunities, where it is most often used for purposes of contingent consideration arrangements.

EBITDA and Adjusted EBITDA should not be considered as measures of financial performance under U.S. GAAP, and the items excluded from EBITDA and Adjusted EBITDA are significant components in understanding and assessing financial performance. Accordingly, these key business metrics have limitations as an analytical tool. They should not be considered as an alternative to net income or any other performance measures derived in accordance with U.S. GAAP or as an alternative to cash flows from operating activities as a measure of AdaptHealth's liquidity.

The following unaudited table presents the reconciliation of net income (loss) attributable to AdaptHealth, to EBITDA and Adjusted EBITDA for the three months ended March 31, 2022 and 2021:

| (in thousands) | Three Months Ended March 31, | |
| --- | --- | --- |
| | 2022 | 2021 |
| Net income (loss) attributable to AdaptHealth Corp. | $ 41,750 | $ (3,966) |
| Income attributable to noncontrolling interest | 480 | 324 |
| Interest expense, net | 24,776 | 22,185 |
| Income tax expense (benefit) | 5,603 | (1,695) |
| Depreciation and amortization, including patient equipment depreciation | 77,030 | 47,206 |
| **EBITDA** | **149,639** | **64,054** |
| Loss on extinguishment of debt (a) | — | 4,213 |
| Equity-based compensation expense (b) | 5,502 | 8,582 |
| Transaction costs (c) | 3,108 | 31,854 |
| Change in fair value of contingent consideration common shares liability (d) | — | (1,965) |
| Change in fair value of warrant liability (e) | (26,717) | (3,168) |
| Other non-recurring expense, net (f) | 6,112 | 605 |
| **Adjusted EBITDA** | **$ 137,644** | **$ 104,175** |

(a) Represents write offs of unamortized deferred financing costs related to refinancing of debt.

(b) Represents equity-based compensation expense for awards granted to employees and non-employee directors.

(c) Represents transaction costs and expenses related to other integration efforts related to acquisitions.

(d) Represents a non-cash gain for the change in the estimated fair value of the contingent consideration common shares liability. Refer to Note 10, *Stockholders' Equity*, included in the accompanying notes to the interim consolidated financial statements for the three months ended March 31, 2022 for additional discussion of such non-cash gain.

(e) Represents a non-cash gain for the change in the estimated fair value of the warrant liability. Refer to Note 10, *Stockholders' Equity*, included in the accompanying notes to the interim consolidated financial statements for the three months ended March 31, 2022 for additional discussion of such non-cash gain.

(f)   The 2022 period consists of a $4.5 million expense related to changes in AdaptHealth's estimated TRA liability, $0.5 million of expenses associated with litigation claims, $0.4 million of expenses associated with lease terminations, a $0.8 million loss related to the write-off of an investment, offset by $0.1 million of net other non-recurring items of income. The 2021 period includes $0.9 million of severance expense and a $0.2 million charge for the increase in the fair value of a contingent consideration liability related to an acquisition, offset by a gain of $0.5 million for the receipt of earnout proceeds in connection with an investment that was sold in 2020.

**Liquidity and Capital Resources**

AdaptHealth's principal sources of liquidity are its operating cash flows, borrowings under its credit agreements and other debt arrangements, and proceeds from equity issuances. AdaptHealth has used these funds to meet its capital requirements, which primarily consist of salaries, labor, benefits and other employee-related costs, product and supply costs, third-party customer service, billing and collections and logistics costs, capital expenditures including patient equipment, acquisitions and debt service, and may in the future use these funds to fund share repurchases. AdaptHealth's future capital expenditure requirements will depend on many factors, including its patient volume and revenue growth rates.

AdaptHealth's capital expenditures are made in advance of patients beginning service. Certain operating costs are incurred at the beginning of the equipment service period and during initial patient set up.

AdaptHealth believes that its expected operating cash flows, together with its existing cash, cash equivalents, and amounts available under its existing credit agreement, will continue to be sufficient to fund its operations and growth strategies for at least the next twelve months.

AdaptHealth may seek additional equity or debt financing in connection with the growth of its business, primarily for acquisitions. In addition, the COVID-19 pandemic may cause disruption in the capital markets, which could make financing more difficult and/or expensive. In the event that additional financing is required from outside sources, AdaptHealth may not be able to raise it on acceptable terms or at all. If additional capital is unavailable when desired, AdaptHealth's business, results of operations, and financial condition would be materially and adversely affected.

As of March 31, 2022, AdaptHealth had approximately $119.4 million of cash and cash equivalents. To supplement its cash liquidity, in April 2020, AdaptHealth received recoupable advance payments of $45.8 million, which were made available by CMS under the CARES Act. In addition, in connection with an acquisition completed in July 2020, AdaptHealth assumed a liability of $3.7 million relating to CMS recoupable advance payments received by the acquired company prior to the date of acquisition. The recoupment of the advance payments by CMS began in April 2021 and is being applied to services provided and revenue recognized during the period in which the recoupment occurs, and will impact AdaptHealth's cash receipts for services provided until such time all amounts have been recouped. During the three months ended March 31, 2022, CMS has recouped $5.2 million relating to the advance payments. As of March 31, 2022, AdaptHealth has deferred $7.5 million related to the CMS recoupable advance payments, which is included in other current liabilities in the consolidated balance sheets. In addition, in April 2020, AdaptHealth received distributions of the CARES Act PRF of $17.2 million. Subsequent to April 2020, AdaptHealth completed several acquisitions in which the acquired companies received a total of $22.2 million of PRF payments prior to the applicable dates of acquisition. In connection with the accounting for these acquisitions, AdaptHealth recorded assumed liabilities of $7.7 million relating to the PRF payments received by the acquired companies. The PRF payments are targeted to offset lost revenue and expenditures incurred in connection with the COVID-19 pandemic. The PRF payments are subject to certain restrictions and are subject to recoupment if not used for designated purposes. As a condition to receiving distributions, providers were required to agree to certain terms and conditions, including, among other things, that the funds would be used for lost revenues and unreimbursed COVID-19 related expenses as defined by the U.S. Department of Health and Human Services ("HHS"). All recipients of PRF payments were required to comply with the reporting requirements described in the terms and conditions and as determined by HHS. AdaptHealth recognizes grant payments as income when there is reasonable assurance that it has complied with the conditions associated with the grant. As of December 31, 2021, the Company has recognized as grant income all of the PRF

48

payments it has received or relating to liabilities assumed for PRF received from acquired companies, as it was determined that the Company has complied with the conditions associated with the grant. As such, there is no liability recorded in the Company's interim consolidated financial statements relating to PRF as of March 31, 2022.

HHS has indicated that the CARES Act PRF are subject to ongoing reporting and changes to the terms and conditions, and there have been several updates to such reporting requirements and terms and conditions since they were issued by HHS. Such updates have related to changes to the guidance regarding utilization of the funds granted from the PRF and updates to the reporting requirements of such funds, among other updates. To the extent that there is any future updated guidance from HHS or modifications to the terms and conditions, it may affect AdaptHealth's ability to comply and AdaptHealth could be required to reverse the recognition of the grant income recorded and return a portion of the funds received, which could be material to AdaptHealth. AdaptHealth is continuing to monitor the terms and conditions issued by HHS. Furthermore, HHS has indicated that it will be closely monitoring and, along with the Office of Inspector General (United States) (OIG), auditing providers to ensure that recipients comply with the terms and conditions of relief programs and to prevent fraud and abuse. All providers will be subject to civil and criminal penalties for any deliberate omissions, misrepresentations or falsifications of any information given to HHS.

Also, as permitted under the CARES Act, AdaptHealth elected to defer certain portions of employer-paid FICA taxes otherwise payable from March 27, 2020 to January 1, 2021. In total, AdaptHealth deferred $8.6 million under this provision. AdaptHealth paid $4.3 million on January 4, 2022 and the remaining balance of $4.3 million is expected to be paid shortly after December 31, 2022. As of March 31, 2022, $4.3 million is included in other current liabilities in the consolidated balance sheets.

At March 31, 2022, AdaptHealth had $780.0 million outstanding under its existing credit facility. In January 2021, AdaptHealth refinanced its debt borrowings and entered into a new credit agreement, which was subsequently amended in April 2021 (the "2021 Credit Agreement"). The 2021 Credit Agreement consists of a $800 million term loan (the "2021 Term Loan") and $450 million in commitments for revolving credit loans with a $55 million letter of credit sublimit (the "2021 Revolver"), both with maturities in January 2026. The borrowing under the 2021 Term Loan requires quarterly principal repayments of $5.0 million beginning June 30, 2021 through March 31, 2023, increasing to $10.0 million beginning June 30, 2023 through December 31, 2025, and the unpaid principal balance is due at maturity in January 2026. Borrowings under the 2021 Revolver may be used for working capital and other general corporate purposes, including for capital expenditures and acquisitions permitted under the 2021 Credit Agreement. As of March 31, 2022, and the date of this filing, there were no outstanding borrowings under the 2021 Revolver. Amounts borrowed under the 2021 Credit Agreement bear interest quarterly at variable rates based upon the sum of (a) the Adjusted LIBOR Rate (subject to a zero percent floor) equal to the LIBOR (as defined) for the applicable interest period multiplied by the statutory reserve rate, plus (b) an applicable margin (as defined) ranging from 1.50% to 3.25% per annum based on the Consolidated Senior Secured Leverage Ratio (as defined). The 2021 Revolver carries a commitment fee during the term of the 2021 Credit Agreement ranging from 0.25% to 0.50% per annum of the actual daily undrawn portion of the 2021 Revolver based on the Consolidated Senior Secured Leverage Ratio.

Under the 2021 Credit Agreement, AdaptHealth is subject to a number of restrictive covenants that, among other things, impose operating and financial restrictions on AdaptHealth. Financial covenants include a Consolidated Total Leverage Ratio and a Consolidated Interest Coverage Ratio, both as defined in the 2021 Credit Agreement. The 2021 Credit Agreement also contains certain customary events of default, including, among other things, failure to make payments when due thereunder, failure to observe or perform certain covenants, cross-defaults, bankruptcy and insolvency-related events, and non-compliance with healthcare laws. Any borrowing under the 2021 Credit Agreement may be repaid, in whole or in part, at any time and from time to time without premium or penalty, other than customary breakage costs, and any amounts repaid under the 2021 Revolver may be reborrowed. Mandatory prepayments are required under the 2021 Revolver when borrowings and letter of credit usage exceed the total commitments for revolving credit loans. Mandatory prepayments are also required in connection with the disposition of assets to the extent not reinvested, unpermitted debt transactions, and excess cash flow, as defined, if certain leverage tests are not met. AdaptHealth was in compliance with all debt covenants as of March 31, 2022.

In August 2021, AdaptHealth LLC issued $600.0 million aggregate principal amount of 5.125% senior unsecured notes due 2030 (the "5.125% Senior Notes"). The 5.125% Senior Notes will mature on March 1, 2030.

49

Interest on the 5.125% Senior Notes is payable on March 1st and September 1st of each year, beginning on March 1, 2022. The 5.125% Senior Notes will be redeemable at AdaptHealth's option, in whole or in part, at any time on or after March 1, 2025, and the redemption price for the 5.125% Senior Notes if redeemed during the 12 months beginning (i) March 1, 2025 is 102.563%, (ii) March 1, 2026 is 101.281%, (iii) March 1, 2027 and thereafter is 100.000%, in each case together with accrued and unpaid interest. AdaptHealth may also redeem some or all of the 5.125% Senior Notes before March 1, 2025 at a redemption price of 100% of the principal amount of the 5.125% Senior Notes, plus a "make-whole" premium, together with accrued and unpaid interest. In addition, AdaptHealth may redeem up to 40% of the original aggregate principal amount of the 5.125% Senior Notes before March 1, 2025 with the proceeds from certain equity offerings at a redemption price equal to 105.125% of the principal amount of the 5.125% Senior Notes, together with accrued and unpaid interest. Furthermore, AdaptHealth may be required to make an offer to purchase the 5.125% Senior Notes upon the sale of certain assets or upon specific kinds of changes of control.

In January 2021, AdaptHealth LLC issued $500.0 million aggregate principal amount of 4.625% senior unsecured notes due 2029 (the "4.625% Senior Notes"). The 4.625% Senior Notes will mature on August 1, 2029. Interest on the 4.625% Senior Notes is payable on February 1st and August 1st of each year, beginning on August 1, 2021. The 4.625% Senior Notes will be redeemable at AdaptHealth's option, in whole or in part, at any time on or after February 1, 2024, and the redemption price for the 4.625% Senior Notes if redeemed during the 12 months beginning (i) February 1, 2024 is 102.313%, (ii) February 1, 2025 is 101.156%, and (iii) February 1, 2026 and thereafter is 100.000%, in each case together with accrued and unpaid interest. AdaptHealth may also redeem some or all of the 4.625% Senior Notes before February 1, 2024 at a redemption price of 100% of the principal amount of the 4.625% Senior Notes, plus a "make-whole" premium, together with accrued and unpaid interest. In addition, AdaptHealth may redeem up to 40% of the original aggregate principal amount of the 4.625% Senior Notes before February 1, 2024 with the proceeds from certain equity offerings at a redemption price equal to 104.625% of the principal amount of the 4.625% Senior Notes, together with accrued and unpaid interest. Furthermore, AdaptHealth may be required to make an offer to purchase the 4.625% Senior Notes upon the sale of certain assets or upon specific kinds of changes of control.

In July 2020, AdaptHealth LLC issued $350.0 million aggregate principal amount of 6.125% senior unsecured notes due 2028 (the "6.125% Senior Notes"). The 6.125% Senior Notes will mature on August 1, 2028. Interest on the 6.125% Senior Notes is payable on February 1st and August 1st of each year, beginning on February 1, 2021. The 6.125% Senior Notes will be redeemable at AdaptHealth's option, in whole or in part, at any time on or after August 1, 2023, and the redemption price for the 6.125% Senior Notes if redeemed during the 12 months beginning (i) August 1, 2023 is 103.063%, (ii) August 1, 2024 is 102.042%, (iii) August 1, 2025 is 101.021% and (iv) August 1, 2026 and thereafter is 100.000%, in each case together with accrued and unpaid interest. AdaptHealth may also redeem some or all of the 6.125% Senior Notes before August 1, 2023 at a redemption price of 100% of the principal amount of the 6.125% Senior Notes, plus a "make-whole" premium, together with accrued and unpaid interest. In addition, AdaptHealth may redeem up to 40% of the original aggregate principal amount of the 6.125% Senior Notes before August 1, 2023 with the proceeds from certain equity offerings at a redemption price equal to 106.125% of the principal amount of the 6.125% Senior Notes, together with accrued and unpaid interest. Furthermore, AdaptHealth may be required to make an offer to purchase the 6.125% Senior Notes upon the sale of certain assets or upon specific kinds of changes of control.

As of March 31, 2022 and December 31, 2021, AdaptHealth had working capital of $171.4 million and $170.2 million, respectively. A significant portion of AdaptHealth's assets consists of accounts receivable from third-party payors that are responsible for payment for the products and services that AdaptHealth provides.

50

***Cash Flow.*** The following table presents selected data from AdaptHealth's consolidated statements of cash flows for three months ended March 31, 2022 and 2021:

| | Three Months Ended March 31, | |
|---|---|---|
| **(in thousands)** | **2022** | **2021** |
| | **(unaudited)** | |
| Net cash provided by operating activities | $ 66,451 | $ 18,380 |
| Net cash used in investing activities | (80,098) | (1,213,764) |
| Net cash (used in) provided by financing activities | (16,552) | 1,227,559 |
| Net (decrease) increase in cash and cash equivalents | (30,199) | 32,175 |
| Cash and cash equivalents at beginning of period | 149,627 | 99,962 |
| Cash and cash equivalents at end of period | $ 119,428 | $ 132,137 |

Net cash provided by operating activities for the three months ended March 31, 2022 and 2021 was $66.5 million and $18.4 million, respectively, an increase of $48.1 million. The increase was the result of (1) a $45.9 million improvement in net income, (2) a net increase of $1.6 million in non-cash charges, primarily from depreciation and amortization, the change in the estimated fair value of the warrant liability, equity-based compensation expense, and write-off of unamortized deferred financing costs, (3) a $6.0 million change in deferred income tax expense, and (4) a net $5.4 million decrease resulting from the change in operating assets and liabilities, primarily from the change in accounts receivable, inventory and accounts payable and accrued expenses.

Net cash used in investing activities for the three months ended March 31, 2022 and 2021 was $80.1 million and $1,213.8 million, respectively. The use of funds in 2022 consisted of $2.9 million for business acquisitions and $77.2 million for equipment and other fixed asset purchases, which has increased compared to the first quarter of 2021 due to acquisitions and partly to inflationary cost increases. The use of funds in 2021 consisted of $1,178.2 million for business acquisitions, primarily from the AeroCare acquisition, and $35.6 million for equipment and other fixed asset purchases.

Net cash used in financing activities for the three months ended March 31, 2022 was $16.6 million compared to net cash provided by financing activities of $1,227.6 million for the three months ended March 31, 2021. Net cash used in financing activities for the 2022 period consisted of repayments of $13.2 million on long-term debt and capital lease obligations, payments of $3.6 million for deferred purchase price in connection with acquisitions, and payments of $1.3 million for tax withholdings associated with equity-based compensation and stock option exercises, offset by proceeds of $0.8 million in connection with the employee stock purchase plan and proceeds of $0.7 million relating to stock option exercises. Net cash provided by financing activities for the 2021 period consisted of proceeds of $795.0 million from borrowings on long-term debt and lines of credit, proceeds of $500.0 million from the issuance of senior unsecured notes, proceeds of $278.9 million from the issuance of shares of Class A Common Stock in connection with a public underwritten offering, and proceeds of $0.3 million in connection with the employee stock purchase plan, offset by total repayments of $313.6 million on long-term debt and capital lease obligations, payments of $13.8 million for equity issuance costs, payments of $16.2 million for debt issuance costs, payments of $2.2 million for deferred purchase price in connection with acquisitions, and payments of $0.8 million for tax withholdings associated with equity-based compensation.

## Critical Accounting Policies and Significant Estimates

The discussion and analysis of the Company's financial condition and results of operations is based upon the Company's consolidated financial statements, which have been prepared in accordance with U.S. GAAP. The preparation of the Company's consolidated financial statements requires its management to make estimates and judgments that affect the reported amounts of assets, liabilities, revenue and expenses and related disclosures of contingent assets and liabilities. The Company's management bases its estimates, assumptions and judgments on historical experience and various other factors that are believed to be reasonable under the circumstances, the results of which form the basis for making judgments about the carrying values of assets and liabilities that are not readily apparent from other sources. Different assumptions and judgments would change the estimates used in the preparation of

the Company's consolidated financial statements which, in turn, could change the results from those reported. In addition, actual results may differ from these estimates and such differences could be material to the Company's financial position and results of operations.

Critical accounting policies and significant estimates are those that the Company's management considers the most important to the portrayal of the Company's financial condition and results of operations because they require management's most difficult, subjective or complex judgments, often as a result of the need to make estimates about the effect of matters that are inherently uncertain. The Company's critical accounting policies and significant estimates in relation to its consolidated financial statements include those related to revenue recognition, accounts receivable, business combinations, and valuation of goodwill and long-lived assets. There have been no material changes in the Company's critical accounting policies as compared to the critical accounting policies described in the Company's Annual Report on Form 10-K for the year ended December 31, 2021.

**Recent Accounting Pronouncements**

Recently issued accounting pronouncements that may be relevant to the Company's operations but have not yet been adopted are outlined in Note 1 (i), *Recently Issued Accounting Pronouncements*, to its interim consolidated financial statements included elsewhere in this report.

**Commitments and Contingencies**

In the normal course of business, the Company is subject to loss contingencies, such as legal proceedings and claims arising out of its business that cover a wide range of matters. In accordance with FASB ASC Topic 450, *Accounting for Contingencies*, the Company records accruals for such loss contingencies when it is probable that a liability has been incurred and the amount of loss can be reasonably estimated. Significant judgment is required to determine both probability and the estimated amount. The Company reviews its accruals at least quarterly and adjusts accordingly to reflect the impact of negotiations, settlements, rulings, advice of legal counsel, and updated information. At this time, the Company has no material accruals related to lawsuits, claims, investigations and proceedings. While there can be no assurance, based on the Company's evaluation of information currently available, the Company's management believes any liability that may ultimately result from resolution of such loss contingencies will not have a material adverse effect on the Company's financial conditions or results of operations. However, the Company's assessment may be affected by limited information. Accordingly, the Company's assessment may change in the future based upon availability of new information and further developments in the proceedings of such matters. The results of legal proceedings are inherently uncertain, and material adverse outcomes are possible.

In connection with the Company's acquisition of PPS HME Holdings LLC (PPS), in May 2018, the Company assumed a Corporate Integrity Agreement (CIA) at one of PPS' subsidiaries, Braden Partners L.P. d/b/a Pacific Pulmonary Services (BP). The CIA was entered into with the Office of Inspector General of the U.S. Department of Health and Human Services (OIG). The CIA has a five-year term which expires as of April 2022. In connection with the acquisition and integration of PPS by AdaptHealth, the OIG confirmed that the requirements of the CIA imposed upon BP would only apply to the operations of BP and therefore no operations of any other AdaptHealth affiliate are subject to the requirements of the CIA following the acquisition. On December 16, 2021, the OIG-HHS notified PPS that its report for the period ended March 31, 2021 had been accepted and PPS had satisfied its obligations under the CIA as of such date.

On July 25, 2017, AdaptHealth Holdings LLC, a Delaware limited liability company ("AdaptHealth Holdings"), was served with a subpoena by the U.S. Attorney's Office for the United States District Court for the Eastern District of Pennsylvania ("EDPA") pursuant to 18 U.S.C. §3486 to produce certain audit records and internal communications regarding ventilator billing. The investigation focused on billing practices regarding one payor that contracted for bundled payments for certain ventilators. AdaptHealth Holdings has cooperated with investigators and, through agreement with the EDPA, has submitted all information requested in the Company's possession. An independent third party was retained by AdaptHealth Holdings that identified overpayments and underpayments for ventilator billings related to the payor, and a remittance was sent to reconcile that account. On October 3, 2019, the Company received a follow-up civil investigative demand from the EDPA regarding a document previously produced to

52

the EDPA and patients included in the review by the independent third party. The Company has responded to the EDPA and supplemented its production as requested with any relevant documents in the Company's possession. During subsequent communications, the EDPA indicated to the Company that the investigation remained ongoing. The EDPA also requested additional information regarding certain patient services and claims refunds processed by the Company in 2017. The Company produced this information in coordination with the EDPA. The EDPA has also raised questions regarding other aspects of ventilator billing. While the Company cannot provide any assurance as to whether the EDPA will seek additional information or pursue this matter further, it does not believe that the investigation will have a material adverse effect on the Company.

In March 2019, prior to its acquisition by the Company, AeroCare was served with a civil investigative demand ("CID") issued by the United States Attorney for the Western District of Kentucky ("WDKY"). The CID seeks to investigate allegations that AeroCare improperly billed, or caused others to improperly bill, for oxygen tank contents that were not delivered to beneficiaries. The WDKY has requested documents related to such oxygen tank content billing as well as other categories of information. AeroCare has cooperated with the WDKY and has produced documents and provided explanations of its billing practices. In September 2020, the WDKY indicated the investigation includes alleged violations of the federal False Claims Act and as well as alleged violations of state Medicaid false claims acts in ten states. AeroCare has cooperated fully with the investigation and has indicated to the WDKY that concerns raised do not accurately identify Medicare coverage criteria and that state Medicaid coverage requirements generally do not provide for separate reimbursement for portable gaseous oxygen contents in the circumstances at issue. While the Company cannot provide any assurance as to whether the WDKY will seek additional information or pursue this matter further, it does not believe that the investigation will have a material adverse effect on the Company.

On June 28, 2019, Solara, which was acquired by the Company in July 2020, determined that an unauthorized third-party gained access to a limited number of employee email accounts beginning in April 2019, as a result of a phishing email campaign. Solara undertook a comprehensive review of the accounts to identify what personal information was stored within the accounts and to whom that information related. In connection with the incident, Solara notified potentially affected individuals and reported this incident to law enforcement and relevant state and federal regulators. Solara was a defendant in a class action regarding the incident in federal court. In October 2021, the parties tentatively agreed to a settlement for a payment of $5.1 million, which will be covered in full by insurance and an escrow established at the time of the Solara acquisition. On January 25, 2022, the plaintiffs filed a Motion for Preliminary Approval of the settlement, and on April 20, 2022, the Court approved the settlement. As of March 31, 2022, the Company recorded a liability of $5.1 million and a corresponding indemnification asset, which are included in other current liabilities and other current assets, respectively, in the accompanying consolidated balance sheets.

On July 29, 2021, Robert Charles Faille Jr., a purported shareholder of the Company, filed a purported class action complaint against the Company and certain of its current and former officers in the United States District Court for the Eastern District of Pennsylvania (the "Complaint"). The Complaint purports to be asserted on behalf of a class of persons who purchased the Company's stock between November 11, 2019 and July 16, 2021. The Complaint generally alleges that the Company and certain of its current and former officers violated federal securities laws by making allegedly false and misleading statements and/or failing to disclose material information regarding the Company's organic growth trajectory. The Complaint seeks unspecified damages. On October 14, 2021, the Delaware County Employees Retirement System and the Bucks County Employees Retirement System were named Lead Plaintiffs. Pursuant to the scheduling order, Lead Plaintiffs filed a consolidated complaint on November 22, 2021 (the "Consolidated Complaint"), which asserts substantially the same claim, but adds a number of current and former directors of the Company as additional defendants and a new theory of recovery based on the Company's alleged failure to disclose information concerning the Company's former Co-CEO's alleged tax fraud arising from certain past private activity (the "Consolidated Class Action"). On January 20, 2022, the defendants filed a motion to dismiss the Consolidated Complaint. Lead Plaintiffs' opposition to defendants' motion was filed on March 21, 2022, and defendants' reply was filed April 15, 2022. The Company intends to vigorously defend against the allegations contained in the Consolidated Complaint, but there can be no assurance that the defense will be successful.

On December 6, 2021, a putative shareholder of the Company, Carol Hessler, filed a shareholder derivative complaint against certain current and former directors and officers of the Company in the United States District Court for the Eastern District of Pennsylvania (the "Derivative Complaint"). The Derivative Complaint generally alleges that

53

Table of Contents

the defendants breached their fiduciary duties owed to the Company by allegedly causing or allowing misrepresentations and/or omissions regarding the Company's organic growth and the Company's former Co-CEO's alleged criminal activity, failing to maintain an adequate system of oversight, disclosure controls and procedures, and internal controls over financial reporting and due diligence into the Company's management team, and engaging in insider trading. The Derivative Complaint also alleges claims for waste of corporate assets and unjust enrichment. Finally, the Derivative Complaint alleges that certain of the individual defendants violated Section 14(a) of the Securities Exchange Act by allegedly negligently issuing, causing to be issued, and participating in the issuance of materially misleading statements to stockholders in the Company's Proxy Statements on Schedule DEF 14A in connection with a Special Meeting of Stockholders, held on March 3, 2021, and the 2021 Annual Meeting of Stockholders, held on July 27, 2021. The Derivative Complaint seeks, among other things, an award of money damages.

On March 4, 2022, the parties stipulated to stay the Hessler action pending final resolution of the Consolidated Class Action. On March 7, 2022, the court so-ordered the parties' stipulation.

The Company intends to vigorously defend against the allegations contained in the Derivative Complaint, but there can be no assurance that the defense will be successful.

**Item 3. Quantitative and Qualitative Disclosures About Market Risk**

Our exposure to market risk relates to fluctuations in interest rates from borrowings under the 2021 Credit Facility. Our interest accrued on our debt borrowings is based on a variable rate which is tied to the Adjusted LIBOR Rate plus an applicable margin and therefore is exposed to changes in interest rates. As of March 31, 2022, there was $780.0 million outstanding under the 2021 Term Loan, $15.7 million outstanding under letters of credit, and additional availability under the 2021 Revolver, net of letters of credit outstanding, was $434.3 million.

**Item 4. Controls and Procedures**

*Evaluation of Disclosure Controls and Procedures*

Under the supervision and with the participation of our management, including our principal executive officer and principal financial officer, we conducted an evaluation of the effectiveness of our disclosure controls and procedures (as defined in Rules 13a-15(e) and 15d-15(e) under the Securities Exchange Act of 1934 (the "Exchange Act")) as of March 31, 2022. Disclosure controls and procedures are designed to ensure that information required to be disclosed by us in our Exchange Act reports are recorded, processed, summarized, and reported within the time periods specified in the SEC's rules and forms, and that such information is accumulated and communicated to our management, including our principal executive officer and principal financial officer or persons performing similar functions, as appropriate, to allow timely decisions regarding required disclosure. Based on this evaluation, our Chief Executive Officer and Chief Financial Officer have concluded that, during the period covered by this Quarterly Report, our disclosure controls and procedures were not effective due to material weaknesses in internal control over financial reporting as further described below in Management's Report on Internal Control Over Financial Reporting.

As previously disclosed in Part II, Item 9A of our Annual Report on Form 10-K for the fiscal year ended December 31, 2021, management identified material weaknesses in internal control over financial reporting relating to an insufficient complement of resources resulting in an ineffective risk assessment (the "Insufficient Complement of Resources, Risk Assessment and General Information Technology Material Weaknesses"). Our ineffective risk assessment resulted in material weaknesses from both lack of implementation and ineffectiveness of process level controls in substantially all processes that support our financial statements and reporting. The ineffective risk assessment also resulted in ineffective general information technology controls due to an incomplete understanding of the risks associated with information technology systems relevant to our financial reporting processes.

As previously disclosed in Part II, Item 9A of our Annual Reports on Form 10-K for the fiscal years ended December 31, 2021, 2020 and 2019, management identified a material weakness in internal control over financial reporting relating to the timeliness of our review controls over non-routine transactions (the "Non-routine Transaction Material Weakness"). Additionally, in connection with the preparation of the Company's consolidated financial statements for the fiscal year ended December 31, 2020, as it relates to the Non-routine Transaction Material Weakness,

we further identified that, specifically we lacked a sufficient number of professionals with an appropriate level of accounting knowledge, training, and experience to appropriately analyze, record and disclose accounting matters timely and accurately.

As previously disclosed in Part II, Item 9A of our Annual Report on Form 10-K for the fiscal years ended December 31, 2021 and 2020, management identified a material weakness in internal control over financial reporting relating to the accounts payable process, specifically relating to the maintenance and approvals of vendors and the invoice approval process (the "Accounts Payable Material Weakness"). The Company has not identified any fraud or loss relating to such material weakness.

Notwithstanding the identified material weaknesses, management, including our principal executive officer and principal financial officer, believes the consolidated financial statements included in this Quarterly Report on Form 10-Q fairly represent in all material respects our financial condition, results of operations and cash flows at and for the periods presented in accordance with U.S. GAAP.

*Remediation of Previously Reported Material Weaknesses in Internal Control Over Financing Reporting*

With respect to the Insufficient Complement of Resources, Risk Assessment and General Information Technology Material Weaknesses, management is taking steps to remediate such material weaknesses, including (1) establishing an executive steering committee to monitor the remediation of the material weaknesses, (2) adding professionals to the executive team with expertise in process mapping and internal controls; (3) process mapping each business cycle to identify relevant process risk points, service and sub-service organizations, information technology systems and information, and designing and implementing responsive manual and automated controls, (4) engaging third-party consultants to assist management in this effort, and (5) implementing an enterprise resource planning system which went live in the first quarter of 2022, which has impacted a variety of processes and our review and approval of journal entries. While management has begun the remediation process, these material weaknesses cannot be considered remediated until the enhanced controls have been designed, implemented and operated effectively for a sufficient period of time.

With respect to the previously reported Non-routine Transaction Material Weakness, we have (1) implemented processes to improve our analysis, recording and disclosure of non-routine transactions and (2) while we still lack sufficient resources to effectively manage our overall system of internal control over financial reporting as described above, we have added experienced technical accounting resources to perform timely analysis and review of non-routine transactions.

With respect to the previously reported Accounts Payable Material Weakness, we have implemented additional processes and controls with respect to vendor masterfile changes in conjunction with the implementation of an enterprise accounts payable system.

*Changes in Internal Control over Financial Reporting*

Except with respect to the changes in connection with the implementation of the initiatives to remediate the material weaknesses noted above, there were no changes in the Company's internal control over financial reporting that occurred during the fiscal quarter ended March 31, 2022 that have materially affected, or are reasonably likely to materially affect, the Company's internal control over financial reporting. We have not experienced any material impact to our internal controls over financial reporting despite the fact that many of our employees are working remotely due to the COVID-19 pandemic. We are continually monitoring and assessing the COVID-19 situation on our internal controls to minimize the impact on their design and operating effectiveness.

**PART II. OTHER INFORMATION**

**Item 1. Legal Proceedings**

See Item 2. "Management's Discussion and Analysis of Financial Condition and Results of Operations —Commitments and Contingencies".

**Item 1A. Risk Factors**

Factors that could cause our actual results to differ materially from those in this report are any of the risks disclosed under the heading "Risk Factors" in our Annual Report on Form 10-K for the year ended December 31, 2021 filed with the SEC on March 1, 2022. Any of those factors could result in a significant or material adverse effect on our results of operations or financial condition. Additional risk factors not presently known to us or that we currently deem immaterial may also impair our business or results of operations. In addition, our results of operations and financial condition may be adversely affected by the COVID-19 pandemic, which is discussed in greater detail in our Management's Discussion and Analysis of Financial Condition and Results of Operations elsewhere herein.

**Item 2. Unregistered Sales of Equity Securities and Use of Proceeds**

We had no sales of unregistered equity securities during the period covered by this report that were not previously reported in a Quarterly Report on Form 10-Q or a Current Report on Form 8-K.

**Item 3. Defaults upon Senior Securities**

None.

**Item 4. Mine Safety Disclosures**

Not applicable.

**Item 5. Other Information**

None.

**Item 6. Exhibits**

See Exhibit Index for documents filed or furnished herewith and incorporated herein by reference.

**EXHIBIT INDEX**

| Exhibit Number | Description |
|---|---|
| 3.1 | Third Amended and Restated Certificate of Incorporation (incorporated by reference to Exhibit 3.1 of the Company's Current Report on Form 8-K, filed with the SEC on July 29, 2021). |
| 3.2 | Amended and Restated Bylaws (incorporated by reference to Exhibit 3.2 of the Company's Current Report on Form 8-K, filed with the SEC on November 14, 2019). |
| 3.3 | Certificate of Designation of Preferences, Rights and Limitations of Series B-1 Convertible Preferred Stock (incorporated by reference to Exhibit 3.1 to the Company's Current Report on Form 8-K filed with the SEC on June 26, 2020). |
| 10.1†*+ | Employment and Non-Competition Agreement, dated as of January 1, 2013, by and between Aerocare Holdings, Inc. and Daniel C. Bunting. |
| 10.2†*+ | Employment and Non-Competition Agreement, dated as of April 21, 2014, by and between Aerocare Holdings, Inc. and Albert Prast. |
| 31.1* | Certification of Chief Executive Officer Pursuant to Securities Exchange Act Rules 13a-14(a) and 15(d)-14(a), as adopted Pursuant to Section 302 of the Sarbanes-Oxley Act of 2002. |
| 31.2* | Certification of Chief Financial Officer Pursuant to Securities Exchange Act Rules 13a-14(a) and 15(d)-14(a), as adopted Pursuant to Section 302 of the Sarbanes-Oxley Act of 2002. |
| 32** | Certification of Chief Executive Officer and Chief Financial Officer Pursuant to 18 U.S.C. Section 1350, as adopted Pursuant to Section 906 of the Sarbanes-Oxley Act of 2002. |
| | |
| 101.INS*** | XBRL Instance Document - the instance document does not appear in the Interactive Data File because its XBRL tags are embedded within the Inline XBRL document. |
| 101.SCH*** | XBRL Taxonomy Extension Schema Document |
| 101.CAL*** | XBRL Taxonomy Extension Calculation Linkbase Document |
| 101.DEF*** | XBRL Taxonomy Extension Definition Linkbase Document |
| 101.LAB*** | XBRL Taxonomy Extension Label Linkbase Document |
| 101.PRE*** | XBRL Taxonomy Extension Presentation Linkbase Document |
| Exhibit 104 *** | Cover Page Interactive Data File - The cover page interactive data file does not appear in the Interactive Data File because its XBRL tags are embedded within the Inline XBRL document |

* Filed herewith.

** Furnished herewith.

*** XBRL (eXtensible Business Reporting Language) information is furnished and not filed or a part of a registration statement or prospectus for purposes of Sections 11 or 12 of the Securities Act of 1933, is deemed not filed for purposes of Section 18 of the Securities Exchange Act of 1934, as amended, and otherwise is not subject to liability under these sections.

† Management contract or compensatory plan or arrangement.

+ Portions of this exhibit (indicated by "[***]") have been omitted in accordance with Item 601(b)(10)(iv) of Regulation S-K.

57

**SIGNATURES**

Pursuant to the requirements of Section 13 or 15(d) of the Securities Exchange Act of 1934, the registrant has duly caused this report to be signed on its behalf by the undersigned, thereunto duly authorized.

AdaptHealth Corp.

| | | |
|---|---|---|
| May 10, 2022 | By: | /s/ Stephen P. Griggs |
| | | Stephen P. Griggs |
| | | Chief Executive Officer and Director |
| | | (*Principal Executive Officer*) |
| | | |
| May 10, 2022 | By: | /s/ Jason Clemens |
| | | Jason Clemens |
| | | Chief Financial Officer |
| | | (*Principal Financial Officer*) |
| | | |
| May 10, 2022 | By: | /s/ Frank Mullen |
| | | Frank Mullen |
| | | Chief Accounting Officer |
| | | (*Principal Accounting Officer*) |

58

Exhibit 10.1

## EMPLOYMENT AND NON-COMPETITION AGREEMENT

**THIS EMPLOYMENT AND NON-COMPETITION AGREEMENT** (this *"Agreement")* is made and entered into as of the 1st day of January, 2013, by and between **Aerocare Holdings, Inc.,** a Delaware Company (the *"Company"),* and **Daniel** C. **Bunting** (the *"Executive").*

### RECITALS

**WHEREAS,** the Executive desires to serve as the Vice President of Operations and Chief Operating Officer of the Company and the Company desires the Executive to serve in such capacities; and

**WHEREAS,** the Board of Directors of the Company (the *"Board of Directors")* desires to employ the Executive, and the Executive desires to be employed by the Company, all on the terms and subject to the conditions set forth herein; and

**WHEREAS,** the Executive is willing to enter into this Agreement in consideration of the benefits which the Executive will receive under the terms hereof.

### AGREEMENTS

**NOW, THEREFORE,** in consideration of the mutual covenants contained herein, and for other good and valuable consideration, the receipt and adequacy of which are hereby acknowledged, the parties agree as follows:

1.    **EMPLOYMENT OF EXECUTIVE.**

1.1.    **Duties and Status.** The Company hereby engages and employs the Executive as Vice President of Operations and Chief Operating Officer for the Employment Period, as defined in Section 3.1 hereof, and the Executive accepts such employment, on the terms and subject to the conditions set forth in this Agreement. During the Employment Period, the Executive shall faithfully exercise such authority and perform such duties on behalf of the Company as are normally associated with his title and position as Vice President of Operations and Chief Operating Officer, as well as such other duties or positions as the Board of Directors shall determine. The Executive shall also serve without additional compensation in such other offices of the Company or its subsidiaries to which the Executive may be elected or appointed by the Board of Directors.

1.2.    **Time and Effort.** During the Employment Period, the Executive shall devote substantially all of his working time, energy, skill and best efforts to the performance of his duties hereunder in a manner which will faithfully and diligently further the business and interests of the Company. Notwithstanding the foregoing, the Executive may participate fully in social, charitable and civic activities and such other personal affairs of the Executive as do not interfere with the performance of his duties hereunder.

1.3    **No Prior Agreements.** The Executive hereby represents and warrants to the Company that the execution of this Agreement by the Executive, his employment by the Company, and the performance of his duties hereunder will not violate or be a breach of any agreement with a former employer, client or any other Person. Further, the Executive agrees to indemnify and hold harmless the Company and its officers, directors and representatives for any claim, including, but not limited to, reasonable attorneys' fees and expenses of investigation, of any third party that such third party may now have or may hereafter come to have against the Company or such other persons, based upon or arising out of any noncompetition agreement, invention, secrecy or other agreement between the Executive and such third party that was in existence as of the effective date of this Agreement.

2.    **COMPENSATION AND BENEFITS.**

2.1.    **Annual Base Salary.** For all of the service rendered by the Executive to the Company, the Company shall pay the Executive an annual base salary of One Hundred Eighty Thousand Dollars ($180,000) (less all applicable deductions) (the **"Annual Base Salary").** The Executive's Annual Base Salary shall be payable in equal installments in accordance with the practice of the Company in effect from time to time for the payment of salaries to officers of the Company. The Executive's performance shall be reviewed at least annually.

2.2.    **Expenses.** The Company shall pay or reimburse the Executive for all reasonable expenses actually paid or incurred by the Executive during the Employment Period in the performance of the Executive's duties under this Agreement in accordance with the Company's employee business expense reimbursement policies in effect from time to time.

2.3.    **Bonuses, Etc.** The Executive shall be entitled to participate in such bonus, profit- sharing, stock option, incentive, and performance award plans and programs, if any, as may from time to time be determined by the Board of Directors in its discretion (the **"Bonus").** During the period commencing January 1, 2013 and ending December 31, 2014 (sometimes herein referred to as the **"Initial Term"),** the Company shall pay a Bonus to Executive in the amount of Fifteen Thousand Dollars ($15,000) per calendar quarter (prorated based on the number of days Executive was employed by the Company during the applicable calendar quarter). After the Initial Term, if this Agreement is renewed pursuant to Section 3.1 hereof, it is the intent of the Company and the Company's Board of Directors to create a reasonable bonus plan for the Executive whereby the Executive would have an opportunity under such plan to earn a cash bonus of up to Sixty Thousand Dollars ($60,000) per year.

2.4.    **Benefits.** The Executive shall be entitled to receive such employee benefits, including, without limitation, any and all pension, disability, group life, sickness, and accident and health insurance plans and programs, as the Company may provide from time to time to its salaried employees generally, and such other benefits as the Board of Directors may from time to time establish for the Company's executive officers, subject in all cases to any applicable eligibility requirements and any conditions or limitations of such plans or programs. The Company shall provide the Executive with long term disability insurance providing for payments equal to 60% of the Executive's Annual Base Salary and through an insurance company acceptable to both the Company and the Executive.

2

2.5.    **Vacation.** The Executive shall be entitled to paid vacation of four (4) weeks per calendar year, together with leave of absence and leave for illness or temporary disability in accordance with the policies of the Company in effect from time to time.

2.6    **Options to Purchase Shares of Aerocare Stock.** After the extension of the Aerocare Holdings, Inc. Stock Option Plan dated November 1, 2002 (the "Current Stock Option Plan"), or the replacement of the Current Stock Option Plan with a new stock option plan, the Company shall issue options to the Executive, pursuant to one or more of the existing forms of option agreements used by the Company as determined by the Company's Board of Directors, for the purchase of up to 500,000 shares of the Company at an option price of $1.75 per share, with the option to purchase 100,000 shares vesting after one full year of employment hereunder, the option to purchase an additional 100,000 shares vesting after two full years of employment hereunder, the option to purchase an additional 100,000 shares vesting after three full years of employment hereunder, the option to purchase an additional 100,000 shares vesting after four full years of employment hereunder and the option to purchase an additional 100,000 shares vesting after five full years of employment hereunder.

## 3.    TERM AND TERMINATION.

3.1.    **Employment Period.** Subject to Section 3.2 hereof, the Executive's employment (the ***"Employment Period")*** shall commence on the date of this Agreement and shall terminate on the earlier of: (a) the close of business on December 31, 2014 (the ***"Term");*** *provided however,* that such period and any Renewal shall automatically renew for a subsequent 12-month period (the ***"Renewal")*** unless either party provides written notice of termination to the other party at least 60 days in advance of the date of such termination; or (b) termination of this Agreement pursuant to Section 3.2 hereof. Termination by the Executive upon delivery of a notice of termination to the Company as contemplated in subparagraph (a) above shall be referred to herein as an ***"Executive Non-Renewal Election."*** Termination by the Company upon delivery of a notice of termination to the Executive as contemplated in subparagraph (a) above shall be referred to herein as a ***"Company Non-Renewal Election."***

3 .2.    **Termination of Employment.** Each party shall have the right to terminate the Executive's employment hereunder before the Term expires to the extent, and only to the extent, permitted by this Section 3.2.

(a)    **By the Company for Cause.** The Company shall have the right to terminate the Executive's employment at any time upon delivery of written notice of termination for Cause (as defined below) to the Executive (which notice shall specify in reasonable detail the basis upon which such termination is made), such employment to terminate immediately upon delivery of such notice unless otherwise specified by the Board of Directors, if the Board of Directors determines that the Executive: (i) has materially breached any provision of this Agreement or any other material agreement entered into between the Company and the Executive after a demand for substantial performance was delivered to the Executive by the Board of Directors (where such demand specifically identified the manner in which the Board of Directors believed that the Executive had breached such agreement), and such breach was not cured after a period of 30 days (or such longer period acceptable by the Board of Directors) after such demand, (ii) has engaged in willful misconduct or committed gross negligence which is

3

Case 2:23-cv-04104-MRB Document 66-12 Filed 07/23/24 Page 64 of 94

injurious to the Company, (iii) has engaged in conduct involving dishonesty for personal gain, fraud or unlawful activity which is injurious to the Company, (iv) has been convicted of or entered a plea of <u>nolo contendere</u> to a felony or any crime involving moral turpitude, or (v) has engaged in any willful, reckless or grossly negligent act which may, in the reasonable opinion of the Board of Directors, after due investigation, impugn the good name and reputation of the Company and which is injurious to the Company (collectively, *"Cause").* In the event that the Executive's employment is terminated for Cause, the Executive shall be entitled to receive only the payments referred to in <u>Section 3.3(e)</u> hereof.

(b) **By the Company Upon Total Disability.** The Company shall have the right to terminate the Executive's employment on five days' prior written notice to the Executive if the Board of Directors determines that the Executive is unable to perform his duties by reason of Total Disability, but any termination of employment pursuant to this subsection (b) shall obligate the Company to make the payments referred to in <u>Section 3 .3(b)</u> hereof. As used herein, *"Total Disability"* shall mean the inability of the Executive due to physical or mental illness or injury to perform his duties hereunder for any period of 180 consecutive days and the return of the Executive to his duties for periods of 20 business days or less shall not interrupt such 180-day period.

(c) **By the Company Other Than for Cause or Upon Death or Total Disability.** The Company shall have the right to terminate the Executive's employment, other than for Cause or upon the Executive's death or Total Disability, on 30 days' prior written notice to the Executive in the Board of Directors' sole discretion, but any termination of employment pursuant to this subsection (c) shall obligate the Company to make the payments referred to in <u>Section 3.3(c)</u> hereof.

(d) **By the Executive.** The Executive shall have the right to terminate his employment hereunder (i) for Good Reason (as defined below) or (ii) otherwise after 30 days' prior written notice to the Company. In the event that the Executive elects to terminate his employment pursuant to subsection (d)(ii), the Executive shall be entitled to receive only the payments referred to in <u>Section 3.3(d)</u> hereof. In the event the Executive elects to terminate his employment pursuant to subsection (d)(i), the Executive shall be entitled to receive the payments referred to in <u>Section 3.3(c)</u> hereof. *"Good Reason"* shall mean (A) any material breach by the Company of this Agreement or any option agreement or other material agreement entered into with, or provided to, the Executive, if such breach shall not have been cured by the Company within 30 days after the Executive's delivery of written notice to the Company of such breach, (B) a material reduction in the Executive's title, duties, responsibilities or status, or (C) the assignment to the Executive of different or additional material duties that are significantly inconsistent with the Executive's position.

(e) **Executive Non-Renewal Election.** Upon termination by an Executive Non-Renewal Election as contemplated under Section 3.1(a) hereof, the Executive's employment hereunder shall terminate upon the expiration of the Term or then-current Renewal thereof, as applicable, and the Executive shall be entitled to receive the payments referred to in <u>Section 3.3(g)</u> hereof.

4

(f) **Company - Non-Renewal Election.** Upon termination by a Company Non-Renewal Election as contemplated under Section 3.1(a) hereof, the Executive's employment hereunder shall terminate upon the expiration of the Term or then-current Renewal thereof, as applicable, and the Executive shall be entitled to receive the payments referred to in Section 3.3(f) hereof.

(g) **Death of the Executive.** The Executive's employment hereunder shall terminate upon the death of the Executive. In such an event, the Executive's estate shall be entitled to receive the payments referred to in Section 3.3(a) hereof.

3.3. **Compensation and Benefits Following Termination.** Except as specifically provided in this Section 3.3, any and all obligations of the Company to make payments to the Executive under this Agreement shall cease as of the date the Employment Period expires under Section 3.1 or as of the date the Executive's employment is terminated under Section 3.2, as the case may be. The Executive shall be entitled to receive only the following compensation and benefits following the termination of his employment hereunder:

(a) **Upon Death.** In the event that the Employment Period terminates pursuant to Section 3.2(g) on account of the death of the Executive, (i) the Company shall pay to the Executive's surviving spouse or, if none, his estate, a lump-sum amount equal to the sum of the Executive's earned and unpaid salary through the date of his death, any Bonus definitively granted to the Executive by the Company but not yet paid to the Executive, any unreimbursed business and entertainment expenses in accordance with the Company's policies, and any unreimbursed employee benefit expenses that are reimbursable in accordance with the Company's employee benefit plans through the date of termination (collectively, the *"Standard Termination Payments"),* (ii) the Company shall pay to the Executive's surviving spouse or, if none, his estate, a lump sum amount of Sixty Thousand Dollars ($60,000) (provided, however, that the Company shall not be obligated to pay such lump sum amount if the Executive was not continuously employed by the Company for a period of at least six (6) full months), and (iii) death benefits, if any, under the Company's employee benefit plans shall be paid to the Executive's beneficiaries as properly designated in writing by the Executive.

(b) **Upon Termination for Total Disability.** In the event that the Company elects to terminate the employment of the Executive pursuant to Section 3.2(b) because of his Total Disability, (i) the Company shall pay to the Executive a lump-sum amount equal to the Standard Termination Payments, (ii) the Company shall pay to the Executive a lump sum amount of Sixty Thousand Dollars ($60,000) (provided, however, that the Company shall not be obligated to pay such lump sum amount if the Executive was not continuously employed by the Company for a period of at least six (6) full months), and (iii) the Executive shall be entitled to such disability and other employee benefits as may be provided under the terms of the Company's employee benefit plans.

(c) **Upon Termination Other Than for Cause or Upon Death or Total Disability.** In the event that the Company elects to terminate the employment of the Executive pursuant to Section 3.2(c) or the Executive elects to terminate his employment under Section 3.2(d)(i), (i) the Company shall pay to the Executive within 30 days of such termination, by wire transfer of immediately available funds, a lump-sum amount equal to the Standard

5

Termination Payments and (ii) the Company shall pay to the Executive a lump sum amount of Sixty Thousand Dollars ($60,000) (provided, however, that the Company shall not be obligated to pay such lump sum if the Executive was not continuously employed by the Company for a period of at least six (6) full months). The Company shall also be obligated to provide continued coverage, at the Company's expense, under the Company's medical, dental, life insurance and total disability benefit plans or arrangements with respect to the Executive for a period of six (6) months following the Executive's termination date (provided, however, that the Company shall not be obligated to provide such additional six (6) months of coverage if the Executive was not continuously employed by the Company for a period of at least six (6) full months). From the date of such notice of termination other than for Cause or upon death or Total Disability through the last date of the Executive's employment hereunder, the Executive shall continue to perform the normal duties of his employment hereunder (unless waived by the Company), and shall be entitled to receive, when due, all compensation and benefits applicable to the Executive hereunder.

(d) **By the Executive.** In the event the Executive elects to terminate his employment pursuant to Section 3.2(d)(ii), (i) the Company shall pay to the Executive a lump-sum amount equal to the Standard Termination Payments and (ii) the Executive shall be entitled to such disability and other employee benefits as may be provided under the terms of the Company's employee benefit plans for the time period provided for in such plans.

(e) **For Cause.** In the event that the Company terminates the employment of the Executive pursuant to Section 3.2(a) for Cause, the Executive shall be entitled to receive an amount equal to the Standard Termination Payments.

(f) **By the Expiration of this Agreement upon Company Non-Renewal Election.** In the event that the Company elects to provide notice of termination of this Agreement pursuant to Section 3.1(a), (i) the Company shall pay to the Executive within 30 days of expiration of this Agreement, by wire transfer of immediately available funds, a lump-sum amount equal to the Standard Termination Payments and (ii) the Company shall pay to the Executive a lump sum amount of Sixty Thousand Dollars ($60,000) (provided, however, that the Company shall not be obligated to pay such lump sum if the Executive was not continuously employed by the Company for a period of at least six (6) full months). The Company shall also be obligated to provide continued coverage, at the Company's expense, under the Company's medical, dental, life insurance and total disability benefit plans or arrangements with respect to the Executive for the Restricted Period (provided, however, that the Company shall not be obligated to provide such additional six (6) months of coverage if the Executive was not continuously employed by the Company for a period of at least six (6) full months). From the date of such notice of termination pursuant to Section 3.1 (a) through the last date of the Executive's employment hereunder, the Executive shall continue to perform the normal duties of his employment hereunder (unless waived by the Company), and shall be entitled to receive, when due, all compensation and benefits applicable to the Executive hereunder.

(g) **By the Expiration of this Agreement upon Executive Non-Renewal Election.** In the event that the Executive elects to provide notice of termination of this Agreement pursuant to Section 3.1(a), (i) the Company shall pay to the Executive within 30 days of expiration of this Agreement, by wire transfer of immediately available funds, a lump-sum

6

amount equal to the Standard Termination Payments and (ii) the Executive shall be entitled to such disability and other employee benefits as may be provided under the terms of the Company's employee benefit plans for the time period provided for in such plans. From the date of such notice of termination pursuant to Section 3.1(a) through the last date of the Executive's employment hereunder, the Executive shall continue to perform the normal duties of his employment hereunder (unless waived by the Company), and shall be entitled to receive, when due, all compensation and benefits applicable to the Executive hereunder.

3 .4.    **All Payments.** All payments made to the Executive upon the termination of the Executive's employment are in lieu of all other termination or severance payments available at law or otherwise.

4.    **SOLICITATION, TRADE SECRETS, ETC.**

4.1.    **Definitions.** When used in this Section 4, the following terms shall have the meanings specified:

(a)    *"Company"* means Aerocare Holdings, Inc. and its subsidiaries.

(b)    *"Confidential Information"* means any data or information with respect to the business conducted by the Company, that is material to the Company's business operations and is not generally known by the public, including business and trade secrets. To the extent consistent with the foregoing definition, Confidential Information includes, without limitation: (a) reports, pricing, sales manuals and training manuals, selling, purchasing, and pricing procedures, and financing methods of the Company, together with any specific and proprietary techniques utilized by the Company in designing, developing, testing or marketing its products, product mix and supplier information or in performing services for clients, customers and accounts of the Company; (b) the business plans and financial statements, reports and projections of the Company; (c) research or development projects or results; (d) identities and addresses of consultants, customers, employees or clients or any other confidential information relating to or dealing with the business operations or activities of the Company; (e) information concerning trade secrets of the Company; and (f) information concerning existing or contemplated software, products, services, technology, designs, processes and research or product developments of the Company, made known to the Executive or acquired by the Executive in the course of his employment at the Company. Confidential Information further includes all of the foregoing information that the Executive has learned in the past or learns in the future during the course of the Executive's employment by the Company, whether or not such information is marked or otherwise designated as confidential. Confidential Information does not include any information that (a) is or becomes part of the public domain or is or becomes publicly available without breach of this Agreement by the Executive; (b) is lawfully acquired by the Executive from a source not under any obligation regarding the disclosure of such information; (c) is disclosed to any third party by or with the permission of the Company without confidentiality restrictions; or (d) is developed by an independent Person who has not received, directly or indirectly, any Confidential Information from the Executive, the Company or otherwise.

7

(c)      *"Company Business"* means the business engaged in by the Company during the Executive's employment, including marketing, promoting, renting and selling the Company Products or providing related services.

(d)      *"Company Products"* means nebulizer, respiratory medication, oxygen delivery and related respiratory products and such other products sold, leased, rented or otherwise provided by the Company to customers of the Company during the Executive's employment, or any such products for which, at the time of Executive's termination, the Company has definite plans to sell, lease, rent or otherwise provide to customers of the Company.

(e)      *"Company Territory"* means the 75 mile radius surrounding any of the Company's operations in Alabama, Arizona, Arkansas, Colorado, Florida, Georgia, Indiana, Kentucky, Missouri, Mississippi, North Carolina, New Mexico, Nevada, Oklahoma, Pennsylvania, South Carolina, Tennessee, Texas and Virginia and all other states in the United States in which the Company engages in the Company Business during Executive's employment

with the Company.

(f)      *"Person"* means an individual, firm, Company, partnership, limited liability company, joint venture, association, joint stock company, trust, or unincorporated organization, or a federal, state, city, municipal, or foreign government or an agency or political subdivision thereof, or any other type of entity or third party.

4.2.   **Recitals.**

(a)      The Company has and will grant the Executive access to and knowledge of the Company's Confidential Information during the course of his employment with the Company. The Executive recognizes and acknowledges that the Confidential Information that he has and will acquire in the course of his employment is and will be utilized by the Company in all geographic areas in which the Company does business. Further, the Confidential Information will also be utilized in all geographic areas into which the Company expands its business. Thus, the Executive acknowledges that he would be a formidable competitor in all areas where the Company conducts business.

(b)      The Executive acknowledges that the Company Business is quite competitive and that it is difficult to establish relationships with customers. The Company has spent many years and invested significant money and other resources to develop its customer relationships. The Executive will have personal contact with the Company's customers and develop personal knowledge of, and relationships with, the Company's customers. The Company has developed and continues to develop long term relationships with its customers.

(c)      The Executive acknowledges that the restrictive covenants in this Agreement serve to protect the Company's investment in its Confidential Information and in its relationship with its customers.

4.3.   **Agreement Not-to-Compete.** The Executive agrees that during the Restricted Period (as defined below), he shall not, directly or indirectly, (a) engage, directly or indirectly, whether as owner, officer, agent, principal, partner, employee, consultant, investor, lender or

8

otherwise, in the Company Business in the Company Territory, either individually or in affiliation with any Person; or (b) be the holder of any outstanding loans to, or be the record or beneficial owner, directly or indirectly, of any security interests in or outstanding capital stock or voting securities (or obligations or securities convertible into capital stock or voting securities) of any Person that is engaged, directly or indirectly, in the Company Business in the Company Territory or that is a direct or indirect owner or affiliate of any other Person that is engaged, directly or indirectly, in the Company Business in the Company Territory; provided, however, that this Section 4.3 shall not prohibit the Executive from making direct or indirect passive investments in the capital stock of any publicly-traded company so long as such aggregate ownership interest does not exceed two percent (2%) of the total outstanding shares of capital stock of any such company. For purposes hereof, *"Restricted Period"* shall mean a period of 36 months following the termination of the Executive's employment with the Company.

4.4.     **No Hiring.** Independent of the foregoing provisions, the Executive agrees that, during the Restricted Period, the Executive will not in any manner hire, engage, retain or employ any person engaged or employed by the Company on the date of termination, or engaged or employed by the Company within the twenty four-month period prior to the date of termination (whether part-time or full-time and whether as an officer, employee, consultant (other than legal or accounting advisors), agent, adviser or independent contractor) (a *"Company Employee")* (whether or not for compensation) as an officer, employee, consultant, agent, adviser or independent contractor for any Person other than the Company. Upon termination of this Agreement, the Company shall prepare a schedule of the Company Employees.

4.5.     **Non-Solicitation and Pirating of Customers.**

(a)     Independent of the foregoing provisions, the Executive agrees that, during the Restricted Period, the Executive shall not, directly or indirectly, solicit the purchase of products or services in competition with Company Products (or serve as a principal, partner, director, officer, agent, employee, contractor, or consultant for a Prohibited Business which markets or solicits the sale of products or services in competition with Company Products) from any Person who was a customer of the Company at the time of the termination of this Agreement or at any time during the last three years of the Executive's employment at the Company.

(b)     Independent of the foregoing provisions, the Executive agrees that, during the Restricted Period, the Executive shall not, directly or indirectly, market, sell or offer to sell products or services in competition with Company Products (or serve as a principal, partner, director, officer, agent, employee, contractor, or consultant for a Prohibited Business which markets, sells or offers to sell products or services in competition with Company Products) to any Person who was a customer of the Company at the time of the termination of this Agreement or at any time during the last three years of the Executive's employment at the Company.

4.6.     **No Interference with Suppliers.** Independent of the foregoing provisions, the Executive agrees that, during the Restricted Period, the Executive shall not, directly or indirectly, interfere with, or induce or cause the termination of, the business relationship between the Company and any business which supplied goods or services to the Company at the time of the termination of this Agreement or at any time during the Executive's employment with the Company.

9

4. Confidential Information. This covenant is independent of, and in addition to, those set forth above.

(a)     Executive covenants and agrees that he will not, directly or indirectly, use, divulge, disclose or make available or accessible any Confidential Information to or for any Person other than the Company, unless at the specific direction of, and with the knowledge and written consent of, another officer of the Company. Nothing in this Agreement, however, shall prohibit the Executive from disclosing Confidential Information when required to do so pursuant to a valid subpoena. The Executive agrees that in the event he, or any Person with whom the Executive is affiliated or employed as an officer, employee, owner, consultant or agent of any kind, receives a subpoena that would require him to divulge, in whole or in part, Confidential Information, he will immediately contact the Company in order to allow the Company the opportunity to intervene if necessary to protect against the disclosure of Confidential Information.

(b)     The Executive acknowledges that all Confidential Information is and shall remain the sole, exclusive and valuable property of the Company and that the Executive has and shall acquire no right, title or interest therein. Any and all printed, typed, written or other material that the Executive may have or obtain with respect to Confidential Information (including, without limitation, all copyrights therein) shall be and remain the exclusive property of the Company, and any and all material (including any copies) shall, upon termination of the Executive's employment for any reason or upon request of the Company, be promptly delivered by the Executive to the Company. Any provision of this Agreement to the contrary notwithstanding, the Executive agrees that, following the termination of his employment for any reason, the Company may withhold all post-termination compensation and benefits until Executive returns to the Company any and all Company property or documents (originals and all copies), including but not limited to Confidential Information.

4.8.     **Intellectual Property Rights.**

(a)     The Executive hereby assigns to the Company all right, title and interest in and to any ideas, inventions, original works or authorship, developments, improvements or trade secrets which the Executive, solely or jointly, has conceived or reduced to practice, or conceives or reduces to practice, or causes to be conceived or reduced to practice, during the period of, and in the course of, the Executive's employment with, the Company or which in any manner related to the business of the Company. All original works of authorship which are made by the Executive (solely or jointly with others) within the scope of, or during the Executive's employment with, the Company and which are protectable by copyright are "works made for hire," as that term is defined in the United States Copyright Act.

(b)     The Executive hereby waives all moral rights in all the said original works in favor of Company, its successors and assigns.

4.9.     **Severability.** The restrictive covenants in the various provisions of this Section 4 are separate and independent contractual provisions. The invalidity or unenforceability of any particular restrictive covenant or any other provision in this Agreement shall not affect the other

10

provisions hereof, and this Agreement shall be construed in all respects as if such invalid or unenforceable provision were omitted.

4.10. **Scope and Reasonableness.**

(a)    The parties agree that it is not their intention to violate any public policy, rule of public order or statutory or common law. The parties intend that the provisions of this Agreement be enforced to the fullest extent permissible under the laws and public policies applied in each jurisdiction in which enforcement is sought. If any provision of this Agreement is found by a court to be unenforceable, the parties authorize the court to amend or modify the provision to make it enforceable in the most restrictive fashion permitted by law.

(b)    The Executive acknowledges that the restrictions contained in the foregoing Sections 4.3, 4.4, 4.5, 4.6, 4.7 and 4.8, in view of the nature of the business in which the Company is engaged, are reasonable and necessary in order to protect the legitimate interests of the Company, and that any violation thereof would result in irreparable injuries to the Company, and the Executive therefore acknowledges that, in the event of his violation of any of these restrictions, the Company shall be entitled to obtain from a court of competent jurisdiction (as agreed to below) preliminary and permanent injunctive relief as well as damages and an equitable accounting of all earnings, profits and other rights or remedies to which the Company may be entitled. If the Executive violates any of the restrictions contained in the foregoing Sections 4.3, 4.4, 4.5, 4.6, 4.7 and 4.8, the restrictive period shall not run in favor of the Executive from the time of the commencement of any such violation until such violation shall be cured by the Executive to the satisfaction of Company.

4.11. **Survival of Non-Competition and Confidentiality Agreements.** Any provision of this Agreement to the contrary notwithstanding, if this Agreement is terminated for any reason, the provisions and covenants of this Section 4 shall nevertheless remain in full force and effect in accordance with their respective terms.

5.    **RIGHT OF REPURCHASE.**

*(a)*    In the event that the Executive's employment with the Company is terminated pursuant to Section 3.2(a), Section 3.2(b), Section 3.2(d)(ii), Section 3.2(e) or Section 3.(g), the Company, or such other party as the Company may designate, shall have the right (as described below) but not the obligation, to repurchase from the Executive any and all shares of Common Stock then held by the Executive (the *"Shares").*

(b)    In the event that the Executive's employment with the Company is terminated pursuant to Section 3.2(c), Section 3.2(d)(i) or Section 3.2(f), the Company, or such other party as the Company may designate, shall have the right (as described below), but not the obligation, to repurchase from the Executive the percentage of Shares then held by the Executive as follows:

11

| Date of Termination of Employment | Percentage of Shares Held by Executive at Time of Termination |
|---|---|
| on or before January 1, 2014 | 100% |
| on or before January 1, 2015 | 80% |
| on or before January 1, 2016 | 60% |
| on or before January 1, 2017 | 40% |
| on or before January 1, 2018 | 20% |
| anytime after January 1, 2018 | 0% |

(c)     Upon termination of the Executive's employment with the Company for any reason whatsoever, the Company, or such other party as the Company may designate, shall have the right (as described below), but not the obligation, to repurchase from the Executive any and all shares of Common Stock issuable upon exercise of any "Pool-A" (time-vesting) options or "Pool -B" (performance-vesting) options granted to the Executive pursuant to the Company's Stock Option Plan and any other options or rights to purchase Company Common Stock that may be owned by the Executive on the date of termination (collectively, the **"Option Shares")**.

(d)     This repurchase right shall be exercisable by the Company, or such other party as the Company may designate, by delivery of a repurchase notice to the Executive prior to the date which is, in the case of the Shares, no later than six months after the date of termination of the Executive's employment with the Company for any reason, and, in the case of the Option Shares, no later than the later of (i) two months following exercise of the Option Shares and (ii) six months following the date of termination of employment. The Company shall have the option at any time prior to closing to terminate the exercise of its repurchase right hereunder and rescind its offer to purchase the Shares from the Executive contemplated by this Section 5.

(e)     The price payable to the Executive by the Company in connection with the Company's purchase of any shares pursuant to this Section 5 shall be equal to the fair market value of such shares as mutually agreed in good faith by the Executive and the Company's Board of Directors; *provided, however,* that in the event the Executive and the Company's Board of Directors are unable to agree on a purchase price for the repurchase of such shares, they shall engage the services of a mutually agreed upon third party independent appraiser to value such shares, and the determination of such appraiser shall be final and binding on the parties. One-half of all fees and expenses of the third party appraiser shall be paid by the Executive and one-half of all fees and expenses of the third party appraiser shall be paid by the Company.

(f)     All sales to the Company and or its designee pursuant to this Section 5 shall be consummated contemporaneously at the offices of the Company on the later of (i) a mutually satisfactory business day within 60 days after the Company's (or its designee's) delivery of a repurchase notice to the Executive or (ii) the fifth business day following the receipt of all regulatory approvals, if any (including, without limitation, the expiration or termination of all waiting periods under the HSR), applicable to such sales, or at such other time and/or place as the parties to such sales may agree. The delivery of certificates or other instruments evidencing such shares duly endorsed for transfer and accompanied by stock powers shall be made on such date against payment of the purchase price for such shares as provided in Section 5(g) below.

12

(g) All shares to be purchased by the Company pursuant to Section 5(f) above may be paid for, at the Company's option, by the Company in any combination of the following payments: (i) in cash at the date of delivery of certificates or other instruments evidencing the shares to be sold; (ii) by offsetting any amounts due to the Company from the Executive, or (iii) with a note bearing a maturity of not longer than two years and bearing an interest rate equal to the rate on U.S. Government treasury notes of comparable maturity on the date of issuance plus 100 basis points.

6.    **MISCELLANEOUS.**

6.1.    **Applicable Law and Choice of Venue.** This Agreement shall be construed and interpreted according to the laws of the State of Delaware, without regard to the conflicts of law rules thereof. Further, the parties hereby consent to the exclusive jurisdiction of the Delaware Chancery Court for purposes of that court adjudicating any and all disputes involving the interpretation of this Agreement. In the event such an action is brought, the Company shall accept service of process through its Registered Agent, and the Executive shall accept service of process by a public or private process server, regardless of Executive's location. Executive hereby waives any objection to the initiation of such an action based on either the Delaware Chancery Court having a lack of jurisdiction (personal or subject matter) or the ineffective service of process, as long as actual service on the Executive has been affected.

6.2.    **Headings.** The headings and captions set forth herein are for convenience of reference only and shall not affect the construction or interpretation hereof.

6.3.    **Notices.** Any notice or other communication required, permitted, or desirable hereunder shall be hand delivered (including delivery by a commercial courier service) or sent by United States registered or certified mail, postage prepaid, addressed as follows:

If to Company:        Aerocare Holdings, Inc.
                      3325 Bartlett Boulevard
                      Orlando, FL 32811
                      Attention: Board of Directors
                      Telephone: (407) 206-0040
                      Fax: (407) 206-0010

                      with a copy to:

                      Ferrer Freeman & Company, LLC
                      10 Glenville Street
                      Greenwich, CT 06831
                      Attention: Theodore B. Lundberg
                      Telephone: (203) 532-8011
                      Fax: (203) 532-8016

If to the Executive:   Daniel C. Bunting

13

Case 2:23-cv-04104-MRP   Document 66-12   Filed 07/23/24   Page 74 of 94

or such other addresses as shall be furnished in writing by the parties. Any such notice or communication shall be deemed to have been given as of the date so delivered in person or three business days after so mailed.

6.4. **Successors and Assigns.** This Agreement shall be binding upon and inure to the benefit of successors and permitted assigns of the parties. This Agreement may not be assigned, nor may performance of any duty hereunder be delegated, by either party without the prior written consent of the other; *provided, however,* the Company may assign this Agreement to any successor to its business.

6.5. **Entire Agreement; Amendments.** This Agreement sets forth the entire agreement and understanding of the parties with respect to the subject matter hereof, and there are no other contemporaneous written or oral agreements, undertakings, promises, warranties, or covenants not specifically referred to or contained herein. This Agreement specifically supersedes any and all prior agreements and understandings of the parties with respect to the subject matter hereof, all of which prior agreements and understandings (if any) are hereby terminated and of no further force and effect. This Agreement may be amended, modified, or terminated only by a written instrument signed by the parties hereto.

6.6. **Execution of Counterparts.** This Agreement may be executed in two or more counterparts, each of which shall be deemed an original and all of which together shall constitute one and the same Agreement. This Agreement may be delivered by facsimile transmission of an originally executed copy to be followed by immediate delivery of the original of such executed copy.

6.7. **Severability.** If any provision, clause or part of this Agreement, or the applications thereof under certain circumstances, is held invalid or unenforceable for any reason, the remainder of this Agreement, or the application of such provision, clause or part under other circumstances, shall not be affected thereby.

6.8. **Recitals.** The Recitals to this Agreement are an integral part of, and by this reference are hereby incorporated into, this Agreement.

[Signature Page Follows]

14

**IN WITNESS WHEREOF**, the parties have executed this Employment and Non-Competition Agreement as of the day and year first above written.

**AEROCARE HOLDINGS, INC.**

By: /s/ Stephen P. Griggs
     Stephen P. Griggs, Chairman, President
     and CEO

**EXECUTIVE**

By: /s/ Daniel C. Bunting
     Daniel C. Bunting

15

**Exhibit 10.2**

### EMPLOYMENT AND NON-COMPETITION AGREEMENT

   **THIS EMPLOYMENT AND NON-COMPETITION AGREEMENT** (this *"Agreement")* is made and entered into as of the 21st day of April, 2014, by and between **Aerocare Holdings, Inc.,** a Delaware Company (the *"Company"),* and **Albert Prast** (the *"Executive").*

### RECITALS

   **WHEREAS,** the Executive desires to serve as the Chief Technology Officer of the Company and the Company desires the Executive to serve in such capacity; and

   **WHEREAS,** the Board of Directors of the Company (the *"Board of Directors")* desires to employ the Executive, and the Executive desires to be employed by the Company, all on the terms and subject to the conditions set forth herein; and

   **WHEREAS,** the Executive is willing to enter into this Agreement in consideration of the benefits which the Executive will receive under the terms hereof.

### AGREEMENTS

   **NOW, THEREFORE,** in consideration of the mutual covenants contained herein, and for other good and valuable consideration, the receipt and adequacy of which are hereby acknowledged, the parties agree as follows:

1.     **EMPLOYMENT OF EXECUTIVE.**

   1.1.     **Duties and Status.** The Company hereby engages and employs the Executive as Chief Technology Officer for the Employment Period, as defined in Section 3.1 hereof, and the Executive accepts such employment, on the terms and subject to the conditions set forth in this Agreement. During the Employment Period, the Executive shall faithfully exercise such authority and perform such duties on behalf of the Company as are normally associated with his title and position as Chief Technology Officer, as well as such other duties or positions as the Board of Directors shall determine. The Executive shall also serve without additional compensation in such other offices of the Company or its subsidiaries to which the Executive may be elected or appointed by the Board of Directors.

   1.2.     **Time and Effort.** During the Employment Period, the Executive shall devote substantially all of his working time, energy, skill and best efforts to the performance of his duties hereunder in a manner which will faithfully and diligently further the business and interests of the Company. Notwithstanding the foregoing, the Executive may participate fully in social, charitable and civic activities and such other personal affairs of the Executive as do not interfere with the performance of his duties hereunder.

   1.3     **No_Prior Agreements.** The Executive hereby represents and warrants to the Company that the execution of this Agreement by the Executive, his employment by the Company, and the performance of his duties hereunder will not violate or be a breach of any

agreement with a customer, employer, client, or any other Person, further the Executive agrees to indemnify and hold harmless the Company and its officers, directors and representatives for any claim, including, but not limited to, reasonable attorneys' fees and expenses of investigation, of any third party that such third party may now have or may hereafter come to have against the Company or such other persons, based upon or arising out of any noncompetition agreement, invention, secrecy or other agreement between the Executive and such third party that was in existence as of the effective date of this Agreement.

2. **COMPENSATION AND BENEFITS.**

2.1. **Annual Base Salary.** For all of the service rendered by the Executive to the Company, the Company shall pay the Executive an annual base salary of Three Hundred Fifty Thousand Dollars ($350,000.00) (less all applicable deductions) (the "***Annual Base Salary***"). The Executive's Annual Base Salary shall be payable in equal installments in accordance with the practice of the Company in effect from time to time for the payment of salaries to officers of the Company. The Executive's performance shall be reviewed at least annually.

2.2. **Expenses.** The Company shall pay or reimburse the Executive for all reasonable expenses actually paid or incurred by the Executive during the Employment Period in the performance of the Executive's duties under this Agreement in accordance with the Company's employee business expense reimbursement policies in effect from time to time.

2.3. **Bonuses, Etc.** The Executive shall be entitled to participate in such bonus, profit-sharing, stock option, incentive, and performance award plans and programs, if any, as may from time to time be determined by the Board of Directors in its discretion (the ***"Bonus"***).

2.4. **Benefits.** The Executive shall be entitled to receive such employee benefits, including, without limitation, any and all pension, disability, group life, sickness, and accident and health insurance plans and programs, as the Company may provide from time to time to its salaried employees generally, and such other benefits as the Board of Directors may from time to time establish for the Company's executive officers, subject in all cases to any applicable eligibility requirements and any conditions or limitations of such plans or programs. The Company shall provide the Executive with long term disability insurance providing for payments equal to 60% of up to $200,000.00 of the Executive's Annual Base Salary and through an insurance company acceptable to both the Company and the Executive.

2.5. **Vacation.** The Executive shall be entitled to paid vacation of four (4) weeks per calendar year, together with leave of absence and leave for illness or temporary disability in accordance with the policies of the Company in effect from time to time.

2.6 **Options to Purchase Shares of Aerocare Stock.** The Company shall issue options to the Executive, pursuant to one or more of the existing forms of option agreements used by the Company as determined by the Company's Board of Directors, for the purchase of up to 750,000 shares of the Company at an option price equal to $1.75 per share less the dividend per share paid by the Company to its shareholders during the 2014 calendar year, with the option to purchase 150,000 shares vesting after one full year of employment hereunder, the option to purchase an additional 150,000 shares vesting after two full years of employment hereunder, the

2

option to purchase an additional 150,000 shares vesting after three full years of employment hereunder, the option to purchase an additional 150,000 shares vesting after four full years of employment hereunder and the option to purchase an additional 150,000 shares vesting after five full years of employment hereunder.

3.    **TERM AND TERMINATION.**

3.1.    **Employment Period.** Subject to Section 3.2 hereof, the Executive's employment (the **"Employment Period"**) shall commence on the date of this Agreement and shall terminate on the earlier of: (a) the close of business on April 20, 2016 (the **"Term");** *provided however*, that such period and any Renewal shall automatically renew for a subsequent 12-month period (the **"Renewal")** unless either party provides written notice of termination to the other party at least 60 days in advance of the date of such termination; or (b) termination of this Agreement pursuant to Section 3.2 hereof. Termination by the Executive upon delivery of a notice of termination to the Company as contemplated in subparagraph (a) above shall be referred to herein as an **"Executive Non-Renewal Election."** Termination by the Company upon delivery of a notice of termination to the Executive as contemplated in subparagraph (a) above shall be referred to herein as a **"Company Non-Renewal Election."**

3 .2.    **Termination of Employment.** Each party shall have the right to terminate the Executive's employment hereunder before the Term expires to the extent, and only to the extent, permitted by this Section 3.2.

**(a)    By the Company for Cause.** The Company shall have the right to terminate the Executive's employment at any time upon delivery of written notice of termination for Cause (as defined below) to the Executive (which notice shall specify in reasonable detail the basis upon which such termination is made), such employment to terminate immediately upon delivery of such notice unless otherwise specified by the Board of Directors, if the Board of Directors determines that the Executive: (i) has materially breached any provision of this Agreement or any other material agreement entered into between the Company and the Executive after a demand for substantial performance was delivered to the Executive by the Board of Directors (where such demand specifically identified the manner in which the Board of Directors believed that the Executive had breached such agreement), and such breach was not cured after a period of 30 days (or such longer period acceptable by the Board of Directors) after such demand, (ii) has engaged in willful misconduct or committed gross negligence which is injurious to the Company, (iii) has engaged in conduct involving dishonesty for personal gain, fraud or unlawful activity which is injurious to the Company, (iv) has been convicted of or entered a plea of nolo contendere to a felony or any crime involving moral turpitude, or (v) has engaged in any willful, reckless or grossly negligent act which may, in the reasonable opinion of the Board of Directors, after due investigation, impugn the good name and reputation of the Company and which is injurious to the Company (collectively, **"Cause").** In the event that the Executive's employment is terminated for Cause, the Executive shall be entitled to receive only the payments referred to in Section 3.3(e) hereof.

**(b)    By the Company Upon Total Disability.** The Company shall have the right to terminate the Executive's employment on five days' prior written notice to the Executive if the Board of Directors determines that the Executive is unable to perform his duties by reason

3

of Total Disability but any termination of employment pursuant to this subsection (b) shall obligate the Company to make the payments referred to in Section 3.3(b) hereof. As used herein, *"Total Disability"* shall mean the inability of the Executive due to physical or mental illness or injury to perform his duties hereunder for any period of 180 consecutive days and the return of the Executive to his duties for periods of 20 business days or less shall not interrupt such 180-day period.

(c)   **By the Company Other Than for Cause or Upon Death or Total Disability.** The Company shall have the right to terminate the Executive's employment, other than for Cause or upon the Executive's death or Total Disability, on 30 days' prior written notice to the Executive in the Board of Directors' sole discretion, but any termination of employment pursuant to this subsection (c) shall obligate the Company to make the payments referred to in Section 3.3(c) hereof.

(d)   **By the Executive.** The Executive shall have the right to terminate his employment hereunder (i) for Good Reason (as defined below) or (ii) otherwise after 30 days' prior written notice to the Company. In the event that the Executive elects to terminate his employment pursuant to subsection (d)(ii), the Executive shall be entitled to receive only the payments referred to in Section 3.3(d) hereof. In the event the Executive elects to terminate his employment pursuant to subsection (d)(i), the Executive shall be entitled to receive the payments referred to in Section 3.3(c) hereof. *"Good Reason"* shall mean (A) any material breach by the Company of this Agreement or any option agreement or other material agreement entered into with, or provided to, the Executive, if such breach shall not have been cured by the Company within 30 days after the Executive's delivery of written notice to the Company of such breach, (B) a material reduction in the Executive's title, duties, responsibilities or status, or (C) the assignment to the Executive of different or additional material duties that are significantly inconsistent with the Executive's position.

(e)   **Executive Non-Renewal Election.** Upon termination by an Executive Non-Renewal Election as contemplated under Section 3.1(a) hereof, the Executive's employment hereunder shall terminate upon the expiration of the Term or then-current Renewal thereof, as applicable, and the Executive shall be entitled to receive the payments referred to in Section 3.3(g) hereof.

(f)   **Company Non-Renewal Election.** Upon termination by a Company Non-Renewal Election as contemplated under Section 3.l(a) hereof, the Executive's employment hereunder shall terminate upon the expiration of the Term or then-current Renewal thereof, as applicable, and the Executive shall be entitled to receive the payments referred to in Section 3.3(f) hereof.

(g)   **Death of the Executive.** The Executive's employment hereunder shall terminate upon the death of the Executive. In such an event, the Executive's estate shall be entitled to receive the payments referred to in Section 3.3(a) hereof.

3.3.   **Compensation and Benefits Following Termination.** Except as specifically provided in this Section 3.3, any and all obligations of the Company to make payments to the Executive under this Agreement shall cease as of the date the Employment Period expires under

4

Section 3.1 or as of the date the Executive's employment is terminated under Section 1.2, as the case may be. The Executive shall be entitled to receive only the following compensation and benefits following the termination of his employment hereunder:

        **(a)**   **Upon Death.** In the event that the Employment Period terminates pursuant to Section 3.2(g) on account of the death of the Executive, (i) the Company shall pay to the Executive's surviving spouse or, if none, his estate, a lump-sum amount equal to the sum of the Executive's earned and unpaid salary through the date of his death, any Bonus definitively granted to the Executive by the Company but not yet paid to the Executive, any unreimbursed business and entertainment expenses in accordance with the Company's policies, and any unreimbursed employee benefit expenses that are reimbursable in accordance with the Company's employee benefit plans through the date of termination (collectively, the *"Standard Termination Payments"),* (ii) the Company shall pay to the Executive's surviving spouse or, if none, his estate, a lump sum equal to nine (9) months of the Annual Base Salary (provided, however, that the Company shall not be obligated to pay such lump sum amount if the Executive was not continuously employed by the Company for a period of at least nine (9) full months), and (iii) death benefits, if any, under the Company's employee benefit plans shall be paid to the Executive's beneficiaries as properly designated in writing by the Executive.

        **(b)**   **Upon Termination for Total Disability.** In the event that the Company elects to terminate the employment of the Executive pursuant to Section 3.2(b) because of his Total Disability, (i) the Company shall pay to the Executive a lump-sum amount equal to the Standard Termination Payments, (ii) the Company shall continue to pay the Annual Base Salary in accordance with Section 2.1 for a period of nine (9) months following the Executive's termination date (provided, however, that the Company shall not be obligated to pay an additional nine (9) months of Annual Base Salary if the Executive was not continuously employed by the Company for a period of at least nine (9) full months), and (iii) the Executive shall be entitled to such disability and other employee benefits as may be provided under the terms of the Company's employee benefit plans.

        **( c )**   **Upon Termination Other Than for Cause or Upon Death or Total Disability.** In the event that the Company elects to terminate the employment of the Executive pursuant to Section 3.2(c) or the Executive elects to terminate his employment under Section 3.2(d)(i), (i) the Company shall pay to the Executive within 30 days of such termination, by wire transfer of immediately available funds, a lump-sum amount equal to the Standard Termination Payments and (ii) the Company shall continue to pay the Annual Base Salary in accordance with Section 2.1 for a period of nine (9) months following the Executive's termination date (provided, however, that the Company shall not be obligated to pay an additional nine (9) months of Annual Base Salary if the Executive was not continuously employed by the Company for a period of at least nine (9) full months). The Company shall also be obligated to provide continued coverage, at the Company's expense, under the Company's medical, dental, life insurance and total disability benefit plans or arrangements with respect to the Executive for a period of nine (9) months following the Executive's termination date (provided, however, that the Company shall not be obligated to provide such additional nine (9) months of coverage if the Executive was not continuously employed by the Company for a period of at least nine (9) full months). From the date of such notice of termination other than for Cause or upon death or Total Disability through the last date of the Executive's employment

5

hereunder, the Executive shall continue to perform the normal duties of his employment hereunder (unless waived by the Company) and shall be entitled to receive, when due, all compensation and benefits applicable to the Executive hereunder.

**(d)** **By the Executive.** In the event the Executive elects to terminate his employment pursuant to Section 3.2(d)(ii), (i) the Company shall pay to the Executive a lump-sum amount equal to the Standard Termination Payments and (ii) the Executive shall be entitled to such disability and other employee benefits as may be provided under the terms of the Company's employee benefit plans for the time period provided for in such plans.

**(e)** **For Cause.** In the event that the Company terminates the employment of the Executive pursuant to Section 3.2(a) for Cause, the Executive shall be entitled to receive an amount equal to the Standard Termination Payments.

**(f)** **By the Expiration of this Agreement upon Company Non-Renewal Election.** In the event that the Company elects to provide notice of termination of this Agreement pursuant to Section 3.1(a), (i) the Company shall pay to the Executive within 30 days of expiration of this Agreement, by wire transfer of immediately available funds, a lump-sum amount equal to the Standard Termination Payments and (ii) the Company shall continue to pay the Annual Base Salary in accordance with Section 2.1 for a period of nine (9) months following the Executive's termination date (provided, however, that the Company shall not be obligated to pay an additional nine (9) months of Annual Base Salary if the Executive was not continuously employed by the Company for a period of at least nine (9) full months). The Company shall also be obligated to provide continued coverage, at the Company's expense, under the Company's medical, dental, life insurance and total disability benefit plans or arrangements with respect to the Executive for the Restricted Period (provided, however, that the Company shall not be obligated to provide such additional nine (9) months of coverage if the Executive was not continuously employed by the Company for a period of at least nine (9) full months). From the date of such notice of termination pursuant to Section 3.1(a) through the last date of the Executive's employment hereunder, the Executive shall continue to perform the normal duties of his employment hereunder (unless waived by the Company), and shall be entitled to receive, when due, all compensation and benefits applicable to the Executive hereunder.

**(g)** **By the Expiration of this Agreement upon Executive Non-Renewal Election.** In the event that the Executive elects to provide notice of termination of this Agreement pursuant to Section 3.1(a), (i) the Company shall pay to the Executive within 30 days of expiration of this Agreement, by wire transfer of immediately available funds, a lump-sum amount equal to the Standard Termination Payments and (ii) the Executive shall be entitled to such disability and other employee benefits as may be provided under the terms of the Company's employee benefit plans for the time period provided for in such plans. From the date of such notice of termination pursuant to Section 3.1(a) through the last date of the Executive's employment hereunder, the Executive shall continue to perform the normal duties of his employment hereunder (unless waived by the Company), and shall be entitled to receive, when due, all compensation and benefits applicable to the Executive hereunder.

6

3.4    *All Payments.* All payments made to the Executive upon the termination of the Executive's employment are in lieu of all other termination or severance payments available at law or otherwise.

4.    **SOLICITATION, TRADE SECRETS, ETC.**

4.1.    **Definitions.** When used in this <u>Section 4,</u> the following terms shall have the meanings specified:

(a)    *"Company"* means Aerocare Holdings, Inc. and its subsidiaries.

(b)    *"Confidential Information"* means any data or information with respect to the business conducted by the Company, that is material to the Company's business operations and is not generally known by the public, including business and trade secrets. To the extent consistent with the foregoing definition, Confidential Information includes, without limitation: (a) reports, pricing, sales manuals and training manuals, selling, purchasing, and pricing procedures, and financing methods of the Company, together with any specific and proprietary techniques utilized by the Company in designing, developing, testing or marketing its products, product mix and supplier information or in performing services for clients, customers and accounts of the Company; (b) the business plans and financial statements, reports and projections of the Company; (c) research or development projects or results; (d) identities and addresses of consultants, customers, employees or clients or any other confidential information relating to or dealing with the business operations or activities of the Company; (e) information concerning trade secrets of the Company; and (f) information concerning existing or contemplated software, products, services, technology, designs, processes and research or product developments of the Company, made known to the Executive or acquired by the Executive in the course of his employment at the Company. Confidential Information further includes all of the foregoing information that the Executive has learned in the past or learns in the future during the course of the Executive's employment by the Company, whether or not such information is marked or otherwise designated as confidential. Confidential Information does not include any information that (a) is or becomes part of the public domain or is or becomes publicly available without breach of this Agreement by the Executive; (b) is lawfully acquired by the Executive from a source not under any obligation regarding the disclosure of such information; (c) is disclosed to any third party by or with the permission of the Company without confidentiality restrictions; or (d) is developed by an independent Person who has not received, directly or indirectly, any Confidential Information from the Executive, the Company or otherwise.

(c)    *"Company Business"* means the business engaged in by the Company during the Executive's employment, including marketing, promoting, renting and selling the Company Products or providing related services.

(d)    *"Company Products"* means nebulizer, respiratory medication, oxygen delivery and related respiratory products and such other products sold, leased, rented or otherwise provided by the Company to customers of the Company during the Executive's employment, or any such products for which, at the time of Executive's termination, the Company has definite plans to sell, lease, rent or otherwise provide to customers of the Company.

"*Company Territory*" means the 75 mile radius surrounding any of the Company's Operations in Alabama, Arizona, Arkansas, Colorado, Florida, Georgia, Indiana, Kentucky, Missouri, Mississippi, North Carolina, New Mexico, Nevada, Oklahoma, Pennsylvania, South Carolina, Tennessee, Texas and Virginia and all other states in the United States in which the Company engages in the Company Business during Executive's employment with the Company.

(f)     "*Person*" means an individual, firm, Company, partnership, limited liability company, joint venture, association, joint stock company, trust, or unincorporated organization, or a federal, state, city, municipal, or foreign government or an agency or political subdivision thereof, or any other type of entity or third party.

### 4.2.  Recitals.

(a)   The Company has and will grant the Executive access to and knowledge of the Company's Confidential Information during the course of his employment with the Company. The Executive recognizes and acknowledges that the Confidential Information that he has and will acquire in the course of his employment is and will be utilized by the Company in all geographic areas in which the Company does business. Further, the Confidential Information will also be utilized in all geographic areas into which the Company expands its business. Thus, the Executive acknowledges that he would be a formidable competitor in all areas where the Company conducts business.

(b)   The Executive acknowledges that the Company Business is quite competitive and that it is difficult to establish relationships with customers. The Company has spent many years and invested significant money and other resources to develop its customer relationships. The Executive will have personal contact with the Company's customers and develop personal knowledge of, and relationships with, the Company's customers. The Company has developed and continues to develop long term relationships with its customers.

(c)   The Executive acknowledges that the restrictive covenants in this Agreement serve to protect the Company's investment in its Confidential Information and in its relationship with its customers.

4.3.   **Agreement Not-to-Compete.** The Executive agrees that during the Restricted Period (as defined below), he shall not, directly or indirectly, (a) engage, directly or indirectly, whether as owner, officer, agent, principal, partner, employee, consultant, investor, lender or otherwise, in the Company Business in the Company Territory, either individually or in affiliation with any Person; or (b) be the holder of any outstanding loans to, or be the record or beneficial owner, directly or indirectly, of any security interests in or outstanding capital stock or voting securities (or obligations or securities convertible into capital stock or voting securities) of any Person that is engaged, directly or indirectly, in the Company Business in the Company Territory or that is a direct or indirect owner or affiliate of any other Person that is engaged, directly or indirectly, in the Company Business in the Company Territory; provided, however, that this Section 4.3 shall not prohibit the Executive from making direct or indirect passive investments in the capital stock of any publicly-traded company so long as such aggregate ownership interest does not exceed two percent (2%) of the total outstanding shares of capital

8

stock of any such company for purposes hereof. *Restricted Period"* shall mean a period of eighteen (18) months following the termination of the Executive's employment with the Company.

4.4. **No Hiring.** Independent of the foregoing provisions, the Executive agrees that, during the Restricted Period, the Executive will not in any manner hire, engage, retain or employ any person engaged or employed by the Company on the date of termination, or engaged or employed by the Company within the twenty four-month period prior to the date of termination (whether part-time or full-time and whether as an officer, employee, consultant (other than legal or accounting advisors), agent, adviser or independent contractor) (a *"Company Employee")* (whether or not for compensation) as an officer, employee, consultant, agent, adviser or independent contractor for any Person other than the Company. Upon termination of this Agreement, the Company shall prepare a schedule of the Company Employees.

4.5. **Non-Solicitation and Pirating of Customers.**

(a) Independent of the foregoing provisions, the Executive agrees that, during the Restricted Period, the Executive shall not, directly or indirectly, solicit the purchase of products or services in competition with Company Products (or serve as a principal, partner, director, officer, agent, employee, contractor, or consultant for a Prohibited Business which markets or solicits the sale of products or services in competition with Company Products) from any Person who was a customer of the Company at the time of the termination of this Agreement or at any time during the last three years of the Executive's employment at the Company.

(b) Independent of the foregoing provisions, the Executive agrees that, during the Restricted Period, the Executive shall not, directly or indirectly, market, sell or offer to sell products or services in competition with Company Products (or serve as a principal, partner, director, officer, agent, employee, contractor, or consultant for a Prohibited Business which markets, sells or offers to sell products or services in competition with Company Products) to any Person who was a customer of the Company at the time of the termination of this Agreement or at any time during the last three years of the Executive's employment at the Company.

4.6. **No Interference with Suppliers.** Independent of the foregoing provisions, the Executive agrees that, during the Restricted Period, the Executive shall not, directly or indirectly, interfere with, or induce or cause the termination of, the business relationship between the Company and any business which supplied goods or services to the Company at the time of the termination of this Agreement or at any time during the Executive's employment with the Company.

4.7. **Confidential Information.** This covenant is independent of, and in addition to, those set forth above.

(a) Executive covenants and agrees that he will not, directly or indirectly, use, divulge, disclose or make available or accessible any Confidential Information to or for any Person other than the Company, unless at the specific direction of, and with the knowledge and written consent of, another officer of the Company. Nothing in this Agreement, however, shall prohibit the Executive from disclosing Confidential Information when required to do so pursuant

9

to a valid subpoena. The Executive agrees that in the event any Person with whom the Executive is affiliated or engaged as an officer, employee, owner, consultant or agent of any kind, receives a subpoena that would require him to divulge, in whole or in part, Confidential Information, he will immediately contact the Company in order to allow the Company the opportunity to intervene if necessary to protect against the disclosure of Confidential Information.

(b)     The Executive acknowledges that all Confidential Information is and shall remain the sole, exclusive and valuable property of the Company and that the Executive has and shall acquire no right, title or interest therein. Any and all printed, typed, written or other material that the Executive may have or obtain with respect to Confidential Information (including, without limitation, all copyrights therein) shall be and remain the exclusive property of the Company, and any and all material (including any copies) shall, upon termination of the Executive's employment for any reason or upon request of the Company, be promptly delivered by the Executive to the Company. Any provision of this Agreement to the contrary notwithstanding, the Executive agrees that, following the termination of his employment for any reason, the Company may withhold all post-termination compensation and benefits until Executive returns to the Company any and all Company property or documents (originals and all copies), including but not limited to Confidential Information.

4.8.    **Intellectual Property Rights.**

(a)     The Executive hereby assigns to the Company all right, title and interest in and to any ideas, inventions, original works or authorship, developments, improvements or trade secrets which the Executive, solely or jointly, has conceived or reduced to practice, or conceives or reduces to practice, or causes to be conceived or reduced to practice, during the period of, and in the course of, the Executive's employment with, the Company or which in any manner related to the business of the Company. All original works of authorship which are made by the Executive (solely or jointly with others) within the scope of, or during the Executive's employment with, the Company and which are protectable by copyright are "works made for hire," as that term is defined in the United States Copyright Act.

(b)     The Executive hereby waives all moral rights in all the said original works in favor of Company, its successors and assigns.

4.9.    **Severability.** The restrictive covenants in the various provisions of this <u>Section 4</u> are separate and independent contractual provisions. The invalidity or unenforceability of any particular restrictive covenant or any other provision in this Agreement shall not affect the other provisions hereof, and this Agreement shall be construed in all respects as if such invalid or unenforceable provision were omitted.

4.10.   **Scope and Reasonableness.**

(a)     The parties agree that it is not their intention to violate any public policy, rule of public order or statutory or common law. The parties intend that the provisions of this Agreement be enforced to the fullest extent permissible under the laws and public policies applied in each jurisdiction in which enforcement is sought. If any provision of this Agreement

10

is found by a court to be unenforceable, the parties authorize the Court to intend or modify the provision to make it enforceable to the most restrictive fashion permitted by law.

(b)    The Executive acknowledges that the restrictions contained in the foregoing Sections 4.3, 4.4, 4.5, 4.6, 4.7 and 4.8, in view of the nature of the business in which the Company is engaged, are reasonable and necessary in order to protect the legitimate interests of the Company, and that any violation thereof would result in irreparable injuries to the Company, and the Executive therefore acknowledges that, in the event of his violation of any of these restrictions, the Company shall be entitled to obtain from a court of competent jurisdiction (as agreed to below) preliminary and permanent injunctive relief as well as damages and an equitable accounting of all earnings, profits and other rights or remedies to which the Company may be entitled. If the Executive violates any of the restrictions contained in the foregoing Sections 4.3, 4.4, 4.5, 4.6, 4.7 and 4.8, the restrictive period shall not run in favor of the Executive from the time of the commencement of any such violation until such violation shall be cured by the Executive to the satisfaction of Company.

4.11.    **Survival of Non-Competition and Confidentiality Agreements.** Any provision of this Agreement to the contrary notwithstanding, if this Agreement is terminated for any reason, the provisions and covenants of this Section 4 shall nevertheless remain in full force and effect in accordance with their respective terms.

5.    **RIGHT OF REPURCHASE.**

(a)    In the event that the Executive's employment with the Company is terminated pursuant to Section 3.2(a), Section 3.2(b), Section 3.2(d)(ii), Section 3.2(e) or Section 3.2(g), the Company, or such other party as the Company may designate, shall have the right (as described below) but not the obligation, to repurchase from the Executive any and all shares of Common Stock then held by the Executive (the *"Shares").*

(b)    In the event that the Executive's employment with the Company is terminated pursuant to Section 3.2(c), Section 3.2(d)(i) or Section 3.2(f), the Company, or such other party as the Company may designate, shall have the right (as described below), but not the obligation, to repurchase from the Executive the percentage of Shares then held by the Executive as follows:

| Date of Termination of Employment | Percentage of Shares Held by Executive at Time of Termination |
| --- | --- |
| on or before April 21, 2015 | 100% |
| on or before April 21, 2016 | 80% |
| on or before April 21, 2017 | 60% |
| on or before April 21, 2018 | 40% |
| on or before April 21, 2019 | 20% |
| anytime after April 21, 2019 | 0% |

Case 2:23-cv-04104-MRP  Document 66-12  Filed 07/23/24  Page 86 of 94

upon termination of the Executive's employment with the Company for any reason whatsoever, the Company, or such other party as the Company may designate, shall have the right (as described below), but not the obligation, to repurchase from the Executive any and all shares of Common Stock issuable upon exercise of any options granted to the Executive pursuant to the Company's Stock Option Plan and any other options or rights to purchase Company Common Stock that may be owned by the Executive on the date of termination (collectively, the **"Option Shares").**

(d)     This repurchase right shall be exercisable by the Company, or such other party as the Company may designate, by delivery of a repurchase notice to the Executive prior to the date which is, in the case of the Shares, no later than six months after the date of termination of the Executive's employment with the Company for any reason, and, in the case of the Option Shares, no later than the later of (i) two months following exercise of the Option Shares and (ii) six months following the date of termination of employment. The Company shall have the option at any time prior to closing to terminate the exercise of its repurchase right hereunder and rescind its offer to purchase the Shares from the Executive contemplated by this <u>Section 5.</u>

(e)     The price payable to the Executive by the Company in connection with the Company's purchase of any shares pursuant to this <u>Section 5</u> shall be equal to the fair market value of such shares as mutually agreed in good faith by the Executive and the Company's Board of Directors; *provided, however,* that in the event the Executive and the Company's Board of Directors are unable to agree on a purchase price for the repurchase of such shares, they shall engage the services of a mutually agreed upon third party independent appraiser to value such shares, and the determination of such appraiser shall be final and binding on the parties. One-half of all fees and expenses of the third party appraiser shall be paid by the Executive and one-half of all fees and expenses of the third party appraiser shall be paid by the Company.

(f)     All sales to the Company and or its designee pursuant to this <u>Section 5</u> shall be consummated contemporaneously at the offices of the Company on the later of (i) a mutually satisfactory business day within 60 days after the Company's (or its designee's) delivery of a repurchase notice to the Executive or (ii) the fifth business day following the receipt of all regulatory approvals, if any (including, without limitation, the expiration or termination of all waiting periods under the HSR), applicable to such sales, or at such other time and/or place as the parties to such sales may agree. The delivery of certificates or other instruments evidencing such shares duly endorsed for transfer and accompanied by stock powers shall be made on such date against payment of the purchase price for such shares as provided in <u>Section 5(g)</u> below.

(g)     All shares to be purchased by the Company pursuant to <u>Section 5(f)</u> above may be paid for, at the Company's option, by the Company in any combination of the following payments: (i) in cash at the date of delivery of certificates or other instruments evidencing the shares to be sold; (ii) by offsetting any amounts due to the Company from the Executive, or (iii) with a note bearing a maturity of not longer than two years and bearing an interest rate equal to the rate on U.S. Government treasury notes of comparable maturity on the date of issuance <u>plus</u> 100 basis points.

12

**6. 1.    Applicable Law and Choice of Venue.** This Agreement shall be construed and interpreted according to the laws of the State of Delaware, without regard to the conflicts of law rules thereof. Further, the parties hereby consent to the exclusive jurisdiction of the Delaware Chancery Court for purposes of that court adjudicating any and all disputes involving the interpretation of this Agreement. In the event such an action is brought, the Company shall accept service of process through its Registered Agent, and the Executive shall accept service of process by a public or private process server, regardless of Executive's location. Executive hereby waives any objection to the initiation of such an action based on either the Delaware Chancery Court having a lack of jurisdiction (personal or subject matter) or the ineffective service of process, as long as actual service on the Executive has been affected.

**6 . 2 .    Headings.** The headings and captions set forth herein are for convenience of reference only and shall not affect the construction or interpretation hereof.

**6 . 3 .    Notices.** Any notice or other communication required, permitted, or desirable hereunder shall be hand delivered (including delivery by a commercial courier service) or sent by United States registered or certified mail, postage prepaid, addressed as follows:

If to Company:         Aerocare Holdings, Inc.
                       3325 Bartlett Boulevard
                       Orlando, FL 32811
                       Attention: Board of Directors
                       Telephone: (407) 206-0040
                       Fax: (407) 206-0010

                       with a copy to:

                       Ferrer Freeman & Company, LLC
                       10 Glenville Street
                       Greenwich, CT 06831
                       Attention: Theodore B. Lundberg
                       Telephone: (203) 532-8011
                       Fax: (203) 532-8016

If to the Executive:   Albert Prast

or such other addresses as shall be furnished in writing by the parties. Any such notice or communication shall be deemed to have been given as of the date so delivered in person or three business days after so mailed.

**6.4.    Successors and Assigns.** This Agreement shall be binding upon and inure to the benefit of successors and permitted assigns of the parties. This Agreement may not be assigned, nor may performance of any duty hereunder be delegated, by either party without the prior

13

written consent of the other provided however MRK Company may assign this Agreement to any successor to its business.

6.5.    **Entire Agreement; Amendments.** This Agreement sets forth the entire agreement and understanding of the parties with respect to the subject matter hereof, and there are no other contemporaneous written or oral agreements, undertakings, promises, warranties, or covenants not specifically referred to or contained herein. This Agreement specifically supersedes any and all prior agreements and understandings of the parties with respect to the subject matter hereof, all of which prior agreements and understandings (if any) are hereby terminated and of no further force and effect. This Agreement may be amended, modified, or terminated only by a written instrument signed by the parties hereto.

6.6.    **Execution of Counterparts.** This Agreement may be executed in two or more counterparts, each of which shall be deemed an original and all of which together shall constitute one and the same Agreement. This Agreement may be delivered by facsimile transmission of an originally executed copy to be followed by immediate delivery of the original of such executed copy.

6.7.    **Severability.** If any provision, clause or part of this Agreement, or the applications thereof under certain circumstances, is held invalid or unenforceable for any reason, the remainder of this Agreement, or the application of such provision, clause or part under other circumstances, shall not be affected thereby.

6.8.    **Recitals.** The Recitals to this Agreement are an integral part of, and by this reference are hereby incorporated into, this Agreement.

[Signature Page Follows]

14

Case 2:23-cv-04104-MRR   Document 66-12   Filed 07/23/24   Page 90 of 94

IN WITNESS WHEREOF, the parties have executed this Employment and Non-Competition Agreement, as of the day and year first above written.

AEROCARE HOLDINGS, INC.

By: **/s/** Stephen P. Griggs
    Stephen P. Griggs, Chairman, President
    and CEO

**EXECUTIVE**

By: /s/ Albert Prast
    Albert Prast

15

**Exhibit 31.1**

**CERTIFICATION**
**PURSUANT TO RULES 13A-14 AND 15D-14**
**UNDER THE SECURITIES EXCHANGE ACT OF 1934, AS AMENDED**

I, Stephen P. Griggs, certify that:

1.   I have reviewed this Quarterly Report on Form 10-Q of AdaptHealth Corp.;

2.   Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3.   Based on my knowledge, the financial statements and other financial information included in this report, fairly present, in all material respects, the financial condition, results of operations, and cash flows of the registrant as of, and for, the periods presented in this report;

4.   The registrant's other certifying officer and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the registrant and have:

   (a)   Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

   (b)   Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of the financial statements for external purposes in accordance with generally accepted accounting principles;

   (c)   Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

   (d)   Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

5.   The registrant's other certifying officer and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors:

   (a)   All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize, and report financial information; and

   (b)   Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

May 10, 2022                                    /s/ Stephen P. Griggs
                                               Stephen P. Griggs
                                               Chief Executive Officer and Director
                                               (Principal Executive Officer)

**CERTIFICATION**
**PURSUANT TO RULES 13A-14 AND 15D-14**
**UNDER THE SECURITIES EXCHANGE ACT OF 1934, AS AMENDED**

I, Jason Clemens, certify that:

1.    I have reviewed this Quarterly Report on Form 10-Q of AdaptHealth Corp.;

2.    Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3.    Based on my knowledge, the financial statements and other financial information included in this report, fairly present, in all material respects, the financial condition, results of operations, and cash flows of the registrant as of, and for, the periods presented in this report;

4.    The registrant's other certifying officer and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the registrant and have:

    (a)    Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

    (b)    Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of the financial statements for external purposes in accordance with generally accepted accounting principles;

    (c)    Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

    (d)    Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

5.    The registrant's other certifying officer and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors:

    (a)    All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize, and report financial information; and

    (b)    Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

May 10, 2022                                              /s/ Jason Clemens
                                                          Jason Clemens
                                                          Chief Financial Officer
                                                          (Principal Financial Officer)

**CERTIFICATION PURSUANT TO**
**18 U.S.C. SECTION 1350**
**AS REQUIRED BY**
**SECTION 906 OF THE SARBANES-OXLEY ACT OF 2002**

In connection with the Quarterly Report of AdaptHealth Corp. (the "Company") on Form 10-Q for the quarter ended March 31, 2022, as filed with the Securities and Exchange Commission on the date hereof (the "Report"), the undersigned hereby certify that to the best of our knowledge:

1.  The Report fully complies with the requirements of Section 13(a) or 15(d) of the Securities Exchange Act of 1934; and

2.  The information contained in the Report fairly presents, in all material respects, the financial condition and results of operations of the Company.

| May 10, 2022 | /s/ Stephen P. Griggs | Chief Executive Officer and Director |
|---|---|---|
| | Stephen P. Griggs | (Principal Executive Officer) |

| May 10, 2022 | /s/ Jason Clemens | Chief Financial Officer |
|---|---|---|
| | Jason Clemens | (Principal Financial Officer) |