# Exhibit 33

Case 3:23-cv-04850-EBR Document 55 Filed 08/09/2002 Page 2 of 126 PageID 2646 (55)

COHN LIFLAND PEARLMAN
 HERRMANN & KNOPF LLP
PETER S. PEARLMAN
New Jersey Bar No. PP8416
Park 80 Plaza West-One
Saddle Brook, NJ 07663
Telephone: 201/845-9600

Liaison Counsel

MILBERG WEISS BERSHAD
 HYNES & LERACH LLP
WILLIAM S. LERACH
ARTHUR C. LEAHY
LAURA M. ANDRACCHIO
RAY A. MANDLEKAR
401 B Street, Suite 1700
San Diego, CA 92101
Telephone: 619/231-1058

Lead Counsel for Plaintiffs

**FILED**

AUG - 9 2002

AT 8:30 _____ M
WILLIAM T. WALSH
CLERK

UNITED STATES DISTRICT COURT

DISTRICT OF NEW JERSEY

| | |
|---|---|
| CALIFORNIA PUBLIC EMPLOYEES' RETIREMENT SYSTEM, et al., On Behalf of Themselves and All Others Similarly Situated,<br><br>    Plaintiffs,<br><br> vs.<br><br>THE CHUBB CORPORATION, et al.,<br><br>    Defendants. | No. 3:00-CV-04285<br><br>CLASS ACTION<br><br>Judge Garrett E. Brown, Jr.<br><br>SECOND AMENDED COMPLAINT FOR VIOLATION OF §§10(b) (AND RULE 10b-5), 14 AND 20(a) OF THE SECURITIES EXCHANGE ACT OF 1934 AND §§11 AND 15 OF THE SECURITIES ACT OF 1933<br><br>DEMAND FOR JURY TRIAL |

## I.   SUMMARY OF ACTION

1.     This is a class action on behalf of all purchasers of the common stock of The Chubb Corporation ("Chubb" or the "Company") between 4/27/99 and 10/15/99 (the "Class Period"), including the former shareholders of Executive Risk, Inc. ("Executive Risk") who exchanged their Executive Risk shares for shares of Chubb stock in the merger in 7/99.  Chubb sells personal, standard commercial and specialty commercial insurance and is one of the largest U.S. underwriters of directors' and officers' liability insurance.  This action arises out of a scheme to make it appear that serious problems and increasingly large losses in Chubb's standard commercial insurance business, which had badly hurt Chubb's results in 97-98, were being overcome by a combination of rate increases and non-renewal of unprofitable standard commercial insurance business (the "rate increase/policy non-renewal initiative"), which enabled Chubb to report better-than-expected 1stQ 99 earnings per share ("EPS"), indicating Chubb's business was turning around faster than expected and that Chubb would therefore achieve stronger EPS growth in 99 and 00 than earlier forecast, thus artificially inflating Chubb's stock, causing it to rise to $76-3/8 per share in mid-99, and otherwise *stabilize at higher levels than it would have* during the Class Period had defendants not concealed and misrepresented the true facts about Chubb's business.

2.     Defendants perpetrated this scheme to artificially inflate and stabilize the price of Chubb stock during the Class Period for the purposes of:

(a)     Enabling Chubb to successfully complete its critically important acquisition of Executive Risk – a highly profitable underwriter of directors' and officers' liability insurance – in a stock-for-stock transaction via a 6/17/99 Registration Statement ("Registration Statement") and a 6/17/99 Merger Proxy ("Merger Proxy") and other false and misleading public statements, which also allowed the top three insiders of Executive Risk to receive millions in special benefits and payments upon the sale of Executive Risk to Chubb.  Defendants' scheme to artificially inflate and

- 1 -

CaSas2:2023rcv0428504EWRPDocDonument55tFiled3 08/09/020728/243 ofP5agPagefD2648

## TABLE OF CONTENTS

| | | Page |
|---|---|---|
| I. | SUMMARY OF ACTION | 1 |
| II. | BACKGROUND AND OVERVIEW OF COMPLAINT | 8 |
| III. | JURISDICTION AND VENUE | 33 |
| IV. | THE PARTIES | 34 |
| V. | FALSE AND MISLEADING STATEMENTS DURING THE CLASS PERIOD AND THE REASONS SUCH STATEMENTS WERE FALSE AND MISLEADING | 36 |
| VI. | SCIENTER AND SCHEME ALLEGATIONS | 69 |
| VII. | CHUBB'S FALSE 1STQ 99 AND 2NDQ 99 FINANCIAL RESULTS | 100 |
| | A. The Company's Improper Reporting of Commercial Standard Insurance Losses and Expenses | 102 |
| | B. Chubb's Manipulation of Its Property and Marine Specialty Insurance | 110 |
| | C. Chubb's Improper and Premature Recognition of Revenue | 110 |
| | D. Chubb's Violation of Other GAAP Standards | 112 |
| VIII. | STATUTORY SAFE HARBOR | 114 |
| IX. | CLASS ACTION ALLEGATIONS | 114 |
| X. | FIRST CLAIM FOR RELIEF | 115 |
| XI. | SECOND CLAIM FOR RELIEF | 116 |
| XII. | THIRD CLAIM FOR RELIEF | 119 |
| XIII. | PRAYER | 120 |
| XIV. | JURY DEMAND | 120 |

# Chubb Corporation
## July 1, 1998 - October 19, 1999
### Daily Share Prices

**7/98 - 10/98  Chubb Stock Collapses**
- Poor results caused by SCL losses/problems

**Late 98 / Early 99  Chubb stock declines**
- Very poor 3rd & 4th Q 98 results
- SCL huge losses cause 98 EPS to decline from 97

**2/6/99  Chubb-Ex. Risk to merge**
- 1.235 Chubb shares for each Ex. Risk share
- Worth $71 per Ex. Risk share
- $839 million total value

**2/99 Analysts Furious**
- Chubb stock "a disappointment"
- Chubb stock "horrific"
- 98 a year Chubb investors want to forget

**2/99 Chubb Tells Analysts**
- Taking aggressive action to reprice SCL
- Know where problem areas are — getting unprofitable business off books

**5/12/99 Chubb Presentation to Analysts**
- Pricing initiative for SCL working
- New business intensely audited
- Chubb very comfortable with SCL pricing
- Stock worth $102-140 per share - $128 is realistic now
- '99 EPS $4.10+

**5/7/99 Bloomberg Interview**
- Stock rebound "overdue"
- Shares "undervalued"

**3/99 Meetings with Analysts**
- Chubb has turned corner on SCL
- Rates increasing; momentum builds
- SLC turnaround in place

**4/27/99  Chubb's 1st Q Results**
- Results "better than expected" - $1.14 EPS
- SCL pricing strategy "working" - "exceeding expectations"
- "Totally confident" of success of new SCL pricing policy
- "Sending strong signal ... this goddam ship has turned faster than I thought it would"
- '99 EPS $4.10+

**1st Q 10Q** - Expect SLC premium rates to continue to increase

**6/17/99 Chubb/ Ex. Risk Proxy**
- Deal worth $84-91 per Ex. Risk share; $1+ billion

**6/3/99  DLJ Dinner**
- SCL turnaround "strong," "exceeeding managements' expectations"
- Combined ratio will continue to improve - '99 EPS $4.10+

**7/19-20/99 Ex. Risk shareholders approve merger and merger completed**

**7/27/99 Chubb's 2nd Q Results**
- Well below expectations - $1.00 per share; "shocking disappointment"
- Will take "at least" two renewal cycles to reprice SCL
- "At least" mid 2000 before any bottom line benefits from SCL repricing
- Chubb admits "got euphoric" "overly optimistic"

**6/25/99 Chubb Briefing**
- SCL repricing continues to succeed

**Later Events**
- SCL "severe disappointment"
- 3rd Q EPS even worse -- only $.40-.45
- SCL adversely impacts 99 results
- Chubb 99 results decline from 98

Class Period
4/27/99 - 10/15/99

stabilize the price of Chubb stock was necessary to secure consummation of the merger as the merger was subject to approval by Executive Risk shareholders, and Executive Risk shareholders would not have approved the merger had the true facts about Chubb's business been disclosed to the public and the value of Chubb's stock declined accordingly. This was due to the fact that the merger agreement established a fixed exchange ratio for Chubb and Executive Risk stock and, as such, any significant decline in the value of Chubb stock would render the merger unfair and not in the best interest of Executive Risk shareholders;

(b) Enabling defendants to avoid a successful takeover attempt of Chubb. In the months before the beginning of the Class Period, during the Class Period, and even after the Class Period, Chubb faced the rising threat of a hostile takeover attempt, specifically by a larger U.S. or European insurer (as was recognized in the public media at that time), because of the decline in Chubb stock price since 7/98 caused by Chubb's problems in its standard commercial lines business; and

(c) Enabling the Chubb defendants to retain their positions and compensation at Chubb by eliminating the grounds for criticism then currently leveled at the Chubb defendants – especially defendant O'Hare – that the Chubb defendants should be removed from their positions due to Chubb's decline in stock price.

3. Defendants' scheme was ultimately successful. The price of Chubb stock rose to $76-3/8 per share in mid-99 – and otherwise stabilized at inflated levels during the Class Period – on defendants' false and misleading statements that the serious problems and increasingly large losses in Chubb's standard commercial insurance business were being overcome by the rate increase/policy non-renewal initiative, thus permitting consummation of the merger, the avoidance of a takeover attempt of Chubb and the Chubb defendants' retention of their positions and compensation at Chubb. *Just eight days after Chubb's acquisition of Executive Risk*, however, Chubb shocked the markets by revealing much worse-than-expected 2ndQ 99 EPS (although such EPS were also falsified to conceal the true extent of Chubb's dismal financial

- 2 -

performance) due to *increasing losses* in its standard commercial insurance business, later revealing that its "rate increase/policy non-renewal initiative," which prior to the merger defendants had consistently represented was beneficial and would continue to benefit Chubb's 99 EPS, *would have no positive impact on Chubb's results until mid-2000 at the earliest!* Chubb's stock immediately declined and continued to fall, to as low as $44 in mid-10/99, as Chubb continued to report *worsening results* for its standard commercial insurance business, which caused Chubb's 99 EPS to *decline sharply* from its 98 EPS. At least several days before the merger vote, Chubb management was made aware that Chubb's 2ndQ 99 results would be far worse-than expected, *but defendants purposely withheld disclosing Chubb's worse-than-expected 2ndQ 99 financial results until after Executive Risk's shareholders voted in favor of the merger* because they feared that announcing these results beforehand would cause the shareholders to vote against the acquisition.

4. Dean O'Hare became Chairman/CEO of Chubb in 96. During 95-97, Chubb reported erratic and poor operating results, due mainly to problems with and losses in Chubb's standard commercial insurance operations, and Chubb's stock significantly under-performed the stocks of other property and casualty carriers. During 98, O'Hare was seeking to have Chubb make a major acquisition of a highly profitable specialty insurer to help boost its financial results. By 8/98-9/98, O'Hare had identified Executive Risk as Chubb's acquisition target. However, just as Chubb was approaching Executive Risk about acquiring it, Chubb's stock suffered a huge decline (its worst in over 10 years), collapsing from $88-13/16 in mid-7/98 to just $57-1/2 in 10/98 – a 40% decline in just 90 days – wiping out $5 billion in Chubb shareholder value. This huge decline was due to continued terrible results – and increasing operating losses – in Chubb's standard commercial insurance business, *i.e.*, multiple peril, casualty and workers' compensation insurance.

5. As Chubb's secret merger negotiations with Executive Risk continued during 10/98-1/99, Chubb publicly revealed it would suffer very poor 4thQ 98 and 98

- 3 -

Case 2:23-cv-04048-MRP Document 55 Filed 08/09/2027 Page 4 of 526 Page ID 2652

results due to ***worsening results and increasing losses in its standard commercial insurance operations***. As a result, Chubb's stock continued to perform very poorly, trading as low as $57-7/8 on 2/2/99, when Chubb reported very poor 4thQ 98 and 98 results, ***which both showed declines from the comparable 97 periods***.

6. On 2/6/99, Chubb's and Executive Risk's top executives announced a merger agreement whereby Chubb would acquire Executive Risk in exchange for 1.235 shares of Chubb stock for each share of Executive Risk stock ***if Executive Risk's public shareholders approved the proposed acquisition*** in a vote to be held in mid-99. All of Executive Risk's officers and directors agreed to vote their shares in favor of the merger and to recommend to Executive Risk's public shareholders that voting in favor of the sale of their company to Chubb in exchange for Chubb stock was in their "***best interests***" and "***fair***." Based on Chubb's 2/5/99 closing stock price of $58-1/16, the proposed acquisition was worth $71.70 per share to Executive Risk shareholders -- $839 million in the aggregate. Not only was this value below Executive Risk's 98 high stock price of $75-5/8 per share, but, because the price of Chubb stock was in decline due to the worsening results in Chubb's standard commercial insurance operations (indeed, after the proposed merger was announced, Chubb's stock fell to $54), and was headed for a further decline for the same reason, Chubb's ability to consummate the merger was jeopardized. This was due to the fact that the exchange ratio of Chubb to Executive Risk stock in the merger agreement was fixed, and any drop in the value of Chubb stock would reduce the value of the merger to Executive Risk shareholders and thus, should the value of Chubb stock drop significantly, Executive Risk shareholders would certainly vote in opposition to the merger. As a result, because Chubb desperately needed the acquisition of Executive Risk to boost its profitability and because Executive Risk's top insiders wanted to bring about the merger to obtain millions of dollars in special benefits and payments not available to Executive Risk's other shareholders – including Executive Risk's CEO (Stephen Sills) becoming the Chairman and CEO of Chubb's expanded directors' and officers' liability

- 4 -

Case 2:23-cv-04259-BRM Document 55 Filed 08/04/2007 Page 9 of 126

unit (at a large salary and guaranteed bonus), the headquarters of which would be relocated from Chubb's New Jersey headquarters to Simsbury, Connecticut where Sills lived – defendants were motivated to engage in the fraudulent scheme to artificially inflate and stabilize the price of Chubb stock to effectuate the merger.

7. Defendants knew that in order to boost and stabilize Chubb's stock price and increase the likelihood that Executive Risk's public shareholders would vote to sell their company to Chubb in return for 1.235 shares of Chubb stock (the ratio established by the merger agreement), it was important that it appear that Chubb's standard commercial insurance business was turning around due to the "aggressive steps" Chubb's management said it was taking to raise rates upon policy renewals, while walking away from customers who were unwilling to accept rate increases – Chubb's rate increase/policy non-renewal initiative. Defendants hoped this would persuade investors that Chubb was going to achieve strong EPS growth in 99 and 00 and boost and/or prevent a decline in the market price of Chubb's stock before Executive Risk shareholders voted on the proposed sale of their company to Chubb in exchange for Chubb stock – thus increasing the value of the consideration being offered to them and making Chubb stock look more attractive to Executive Risk shareholders as an ongoing investment.

8. During 3/99-4/99, the defendants were preparing the SEC filings necessary to register the Chubb shares to be issued (sold) to complete the acquisition and seek the vote of Executive Risk's public shareholders approving the sale of Executive Risk to Chubb. They knew that Chubb's results for the 1stQ 99 ended 3/31/99 (to be reported in late 4/99) would be included in these filings. They also knew Chubb's 1stQ 99 results would be extremely important to both analysts and investors (including Executive Risk's shareholders) in determining whether or not Chubb management's *aggressive steps* to fix Chubb's standard commercial insurance business *were, in fact, succeeding* and whether or not Chubb's 98 EPS decline was being reversed, and would also have an important impact on how Chubb's stock price

would perform in advance of the critical Executive Risk shareholder vote on the merger in mid-99. On 4/26/99, Chubb stock sold for just $57. When Chubb reported its 1stQ 99 results on 4/27/99, *they were purportedly much better than forecasted*. Chubb attributed these better than forecasted results to a *more successful and faster turnaround of Chubb's standard commercial insurance operations than anticipated, which would lead to stronger than earlier forecast 99-00 EPS growth for Chubb*. However, defendants concealed that Chubb's better-than-forecasted 1stQ 99 financial results were only accomplished by falsifying the Company's financial statements. As a result of Chubb's very favorable (but false) 1stQ 99 results and increased EPS forecasts, Chubb's stock *soared* higher from $57 on 4/26/99 to $70-5/16 on 5/7/99 and on to its Class Period high of $76-3/8 on 5/24/99, just as defendants were preparing to have the Chubb and Executive Risk Registration Statement and Merger Proxy declared effective by the SEC and then mail those materials to Executive Risk's public shareholders seeking their approval of the sale of their company to Chubb in return for Chubb stock.

9. The Merger Proxy (which included Chubb's falsified 1stQ 99 results) was mailed to Executive Risk shareholders on 6/18/99, seeking an Executive Risk shareholder vote approving the merger at a meeting to be held on 7/19/99. During 6/18/99-7/19/99, while Executive Risk's public shareholders were considering how to vote on the proposed exchange of their Executive Risk shares for Chubb shares, Chubb stock traded between $67-13/16 and $74-1/8 per share, making the offer worth $84-$91 per share to Executive Risk shareholders – $982 million to $1.071 billion in the aggregate – *much higher amounts than when the acquisition was first announced in early 2/99 when Chubb stock traded at as low as $54* per share. On 7/19/99, Executive Risk shareholders voted to approve the sale of their company to Chubb. *Just eight days later – on 7/27/99 – Chubb reported worse-than-expected 2ndQ 99 results due to increasingly large losses in its standard commercial insurance operations – what one analyst termed a "shocking disappointment."* While these

- 6 -

financial results were worse than expected, they were falsified to conceal the true extent of the failure of the rate increase/policy non-renewal initiative. Chubb's Chairman/CEO admitted he had been too *"optimistic" or "euphoric"* in earlier representing that the turnaround of Chubb's standard commercial insurance operations was succeeding *better than expected*. O'Hare now also admitted that Chubb's standard commercial insurance operations would adversely impact Chubb's financial results until *at least the second half of 00*. Chubb's stock nosedived to $58-5/8 on 7/30/99, but continued to trade at artificially inflated prices because the true extent of Chubb's dismal financial condition had been concealed through defendants' falsification of Chubb's 2ndQ 99 results. Then on 10/15/99, when Chubb revealed very poor 3rdQ 99 results – due, in large part, to continued deterioration of its standard commercial insurance business – *Chubb's stock fell to $44 – its lowest price in years*! Had the true facts about Chubb's business not been concealed and/or misrepresented by defendants at the time of merger approval and, consequently, had Chubb's stock traded at uninflated post-Class Period price levels (levels that were not inflated by defendants' fraud) at the time of merger approval, Chubb's offer to acquire Executive Risk would have been valued at a mere $57.66 per share – *representing a massive loss of $26.84 per share to Executive Risk shareholders* – and thus would not have been approved by Executive Risk shareholders. As such, the merger was unfair to, and not in the best interests of, Executive Risk shareholders. The following chart depicts and summarizes the events leading up to and defendants' fraudulent scheme during the Class Period:

- 7 -

10. As a result of the continued horrible performance of Chubb's standard commercial insurance operations *throughout 99*, Chubb reported a *substantial earnings decline in 99 from 98*. While purchasers of Chubb stock during the Class Period, including Executive Risk's public shareholders who exchanged (sold) their Executive Risk shares for Chubb stock, have suffered hundreds of millions if not billions in damages due to defendants' fraudulent scheme, Chubb has successfully acquired Executive Risk's highly profitable directors' and officers' liability insurance business on very favorable terms[1] and Executive Risk's top three executives have received millions in special benefits and payments not available to Executive Risk's other shareholders. Purchasers of Chubb stock during the Class Period, including Executive Risk's former shareholders, have lost hundreds of millions of dollars.

## II. BACKGROUND AND OVERVIEW OF COMPLAINT

11. After O'Hare became Chairman/CEO of Chubb in 96, Chubb's financial performance was poor and Chubb's EPS actually declined in 96 from 95 and in 98 from 97. This poor performance was due in large part to losses in Chubb's standard commercial insurance operations resulting mainly from inadequate premiums. In explaining Chubb's poor results O'Hare stated, *"the real culprit was the abysmal market in standard commercial lines."* Chubb's standard commercial insurance lines were more of a challenge for Chubb, as the customers who purchased these types of policies had many choices and the pricing on these policies was much more competitive. Consequently, Chubb was obligated under many unprofitable contracts in its standard commercial insurance business, which adversely affected the Company's earnings. As a result of these disappointing results, while Chubb's stock increased in

---

[1] Chubb's 99 10-K reflected the impact of the acquisition of Executive Risk on Chubb and noted:

> *Executive protection results were highly profitable in each of the past three years* due to favorable loss experience on business worldwide, particularly in the directors and officers and fiduciary components.

- 8 -

Case 2:02-cv-04405-ER Document 55 Filed 08/09/07 Page 12 of 50 Page ID 657

price due to the strong overall bull market, its performance was ***much worse than that of similar diversified property/casualty companies***, as the chart below shows:



**Chubb Corporation**
vs. S&P Property/Casualty Insurance Index
January 1995 - June 1998

12. The poor financial performance of Chubb's business and the significant relative under-performance of Chubb's stock resulted in criticism of O'Hare's stewardship of Chubb from large Chubb shareholders and analysts who followed the Company, which put pressure on him to dramatically improve the performance of Chubb's standard commercial insurance operations, Chubb's overall profitability and EPS growth and the performance of Chubb's stock. The poor performance of Chubb's stock also made Chubb vulnerable to a takeover which would have resulted in O'Hare and his executive team being ousted from their positions of power, prestige and profit at Chubb. As an important part of solving these problems, O'Hare caused Chubb to seek out the acquisition of a very profitable specialty insurance company ***not*** in the standard commercial insurance business that would help boost Chubb's profitability and EPS growth, while at the same time attempting to turn around Chubb's standard commercial insurance operations by raising rates significantly and refusing to renew

- 9 -

Case 3:00-cv-04285-MBR Document 55 Filed 08/00/02 Page 14 of 50 PageID 258

businesses where policyholders would not accept the price increases, *i.e.*, the "*rate increase/policy non-renewal initiative.*"

13.     In mid-98, Chubb stock was selling at $75-$80, reaching a high of $88-13/16 in mid-7/98.  By mid-98, Chubb had identified Executive Risk – a carrier specializing in directors' and officers' insurance which had consistently reported growing EPS over the past several years – as its acquisition target.  The Executive Risk acquisition was to be made with Chubb stock.  However, during 8/98-10/98, Chubb's stock suffered a huge decline, falling to as low as $55-3/8 on 10/8/98 – *a decline of almost 40% in just three months, wiping out $5 billion of Chubb shareholder value* – just as Chubb was approaching Executive Risk about the acquisition:



**Chubb Corp.**
Common Stock Price
January 2, 1990 - October 29, 1998

14.     The reason for the sharp decline in Chubb's stock was the continued terrible performance of Chubb's standard commercial insurance business which was suffering an increasing combined ratio,[2] resulting in increasingly large underwriting losses and very poor EPS for Chubb.  The problems with Chubb's standard commercial insurance business resulted in Chubb reporting much *worse-than-expected* EPS in its

---

[2]     The "combined ratio" compares the incurred losses plus operating expenses of an insurance business to its total earned premiums.  In general, if the ratio exceeds 100 then the insurance operation is suffering an "underwriting loss" before consideration of any investment income or gains.

- 10 -

2ndQ, 3rdQ and 4thQ 98 and Chubb suffering a *decline* in 98 net income to $707 million from $769.5 million in 97. This very poor performance in Chubb's business and the substantial decline in Chubb's stock posed a major danger to Chubb successfully acquiring Executive Risk, as it made Chubb's stock much less valuable and desirable, meaning it would be more difficult to get Executive Risk's shareholders to approve the sale of their company in exchange for Chubb stock. The 8/98-10/98 decline in Chubb's stock also created a major embarrassment for Chubb's high-profile and domineering Chairman/CEO, Dean O'Hare, as it exacerbated the upset among Chubb's large and institutional shareholders over Chubb's recent poor financial performance and relative stock under-performance since 95. The sharp stock price decline in 8/98-10/98 also made Chubb even more vulnerable to a takeover, which would result in O'Hare and Chubb's other top executives losing their positions at Chubb – something O'Hare very much wanted to prevent. To prevent a hostile takeover, O'Hare took steps to have Chubb's Board adopt a strengthened "poison pill" provision without a shareholder vote. To try to improve Chubb's profitability and EPS growth, O'Hare was determined to have Chubb acquire Executive Risk.

15. On 10/19/98, O'Hare met with Sills to discuss the acquisition of Executive Risk in exchange for Chubb stock. Sills indicated that he, Executive Risk's Chairman Robert Kullas, and Executive Risk's Executive Vice President and Chief Financial Officer Robert Deutsch, were interested in arranging such a transaction if they personally got what they wanted – a personal accommodation O'Hare was very willing to provide. This meant that a Chubb acquisition of Executive Risk – which O'Hare very much wanted to bring about and which would result in Sills, Kullas and Deutsch getting millions in special payments and benefits *and* Sills becoming the Chairman/CEO of Chubb's newly expanded directors' and officers' liability operation called Chubb/ Executive Risk, the headquarters of which O'Hare agreed to relocate to Simsbury, Connecticut, where Sills lived – was a distinct possibility. However, despite the wishes of O'Hare, Sills, Kullas and Deutsch, the acquisition faced a very substantial

- 11 -

hurdle – *Chubb's huge operating losses in its standard commercial insurance lines and the poor performance of its stock.* Unfortunately, Chubb's stock continued to perform terribly – trading at as low as $58 on 10/29/98 – the day before Chubb was to report its 3rdQ 98 results.

16.     To make matters worse, on 10/29/98, when Chubb reported its 3rdQ 98 results – EPS of $.90 (a decline from $1.00 in the 3rdQ 97) – *they were very poor and worse than expected.* According to O'Hare, the poor results were due to *"our underwriting results in standard commercial lines where competitive pressures are driving prices to increasingly unprofitable levels. Rate increases are an absolute necessity if we are to attain underwriting profitability.... We must put profitability ahead of growth and not renew underpriced business."* Then on 1/18/99, Chubb revealed that its 4thQ 98 results would also be far below forecasted levels – *yet another serious earnings shortfall for Chubb* – again due to very poor results from Chubb's standard commercial insurance lines. However, *O'Hare again assured investors that Chubb was taking "aggressive steps" to improve the standard commercial insurance business, including raising premiums and declining to renew unprofitable policies.*

17.     On 2/2/99, Chubb formally reported its disappointing 4thQ 98 and 98 results, EPS of $.90 and $3.80, respectively – a decline from $1.01 and $4.00 for the respective 97 periods. Again, O'Hare assured investors: *"We are taking aggressive steps to achieve adequate prices for this business, and we expect to see the impact of these actions later in the year as we move through the renewal cycle.... [W]e know where the problems are and we are moving as swiftly as possible to get adequate price increases or to get unprofitable business off our books."* However, O'Hare's *promises of "aggressive steps"* did little to help Chubb's stock, which traded as low as $57-7/8 on 2/2/99, as analysts who followed Chubb expressed their upset over its terrible 98 performance:

- 12 -

- C.S. First Boston noted:

The Chubb stock has fallen 37% from its 52-week high .... *Clearly, the Chubb stock has recently been a disappointment.*

- Deutsche Bank Securities noted:

*The stock of Chubb ... has been horrific over the past 12 months.*

- ING Baring Furman Selz noted:

*1998 will likely be remembered as a year Chubb investors would rather forget.*

In fact, Chubb's miserable performance in 98 capped several years of very disappointing results and under-performance of its stock compared to comparable companies, as the following graph shows:

## Chubb Corporation
### vs. S&P Property/Casualty Insurance Index
### January 1995 - February 1999



In short, investors refused to support Chubb's stock until they *saw concrete evidence* of success in the efforts to overcome the problems in Chubb's standard commercial insurance business, *i.e.*, that a turnaround *was actually taking place.*

18.     On 2/6/99, O'Hare and Sills announced a definitive merger agreement whereby Chubb would acquire Executive Risk for 1.235 shares of Chubb stock for

- 13 -

Case 3:02-cv-04709-MRP Document 55 Filed 08/09/02 Page 17 of 50 PageID 662

each Executive Risk share *if Executive Risk's shareholders voted to approve the sale of their company* at an Executive Risk shareholder meeting to be held in mid-99. Based on Chubb's 2/5/99 closing stock price of $58-1/16, the acquisition was worth $839 million in the aggregate – just $71.70 per Executive Risk share – *below Executive Risk's 98 stock price high of $75-5/8*! Because Chubb was paying for the Executive Risk acquisition with its stock after the stock had fallen to prices far below its 98 highs and the acquisition was going to dilute Chubb's 99 EPS, some Chubb shareholders and analysts were critical of the acquisition. Chubb's stock fell from its high of $60-1/8 on 2/5/99, the day *before* the proposed acquisition was announced, to $54 on 2/8/99, the next trading day, reflecting investor concern over the proposed acquisition. This decline in Chubb's stock exacerbated the serious problems already facing the defendants in securing Executive Risk's public shareholders' approval of the sale of their company to Chubb for just 1.235 shares of Chubb's stock for each of their Executive Risk shares, as Executive Risk – unlike Chubb – had a clear track record of substantial net income and EPS growth over the past several years, as shown below:

|  | Executive Risk Summary of Income for the Years ended December 31, | | | | |
|---|---|---|---|---|---|
|  | 1994 | 1995 | 1996 | 1997 | 1998 |
| Revenues | $117.1 | $144.8 | $189.6 | $261.7 | $ 323.2 |
| Net income | $ 19.3 | $ 25.3 | $ 28.1 | $ 36.5 | $ 43.4* |
| Net income per diluted common shares | $ 1.70 | $ 2.12 | $ 2.67 | $ 3.41 | $ 3.71* |

* Net income reduced by a net charge of $3.8 million or $.32 per share for the after-tax effect of $5.8 million of charges related to the closing of certain operations.

19. The more serious Chubb's business problems seemed to be, the less desirable its stock was compared to Executive Risk's stock, since Executive Risk, unlike Chubb, *had reported consistent earnings growth in recent years* and was a highly profitable specialty insurance company *without* troubled standard commercial insurance lines of business. In addition, because the acquisition consideration was

- 14 -

Case 3:02-cv-04805-FLW Document 55 Filed 08/09/07 Page 18 of 50 PageID: 663

fixed, *i.e.*, 1.235 shares of Chubb stock for each share of Executive Risk stock, if Chubb's stock price declined further, the consideration Executive Risk's shareholders were to receive would also decline. *Thus, the defendants were under pressure to make it appear that Chubb was solving its standard commercial insurance business problems to halt the decline in Chubb's stock price and to make Chubb's stock price move higher – much higher – in the following months, so that when the Executive Risk public shareholders actually considered whether or not to vote to approve the sale of their company to Chubb – and exchange their Executive Risk shares for Chubb shares – Chubb's business (especially its standard commercial insurance business) would look stronger and Chubb's prospects for EPS growth would appear to have improved and the consideration offered to the Executive Risk public shareholders would be much more valuable.*

20. During Chubb's 1stQ 99, after the announcement of the merger agreement on 2/6/99, Chubb and Executive Risk were working together to prepare the Registration Statement and Merger Proxy to register with the SEC the Chubb shares to be issued (sold) to the Executive Risk shareholders in exchange for their Executive Risk shares to effectuate the acquisition and to secure the approval of Executive Risk's shareholders of the sale of their company to Chubb. Defendants knew that Chubb's 1stQ 99 results would be crucial to the performance of Chubb's stock and to show whether the *"aggressive steps"* described by O'Hare as being undertaken to fix Chubb's standard commercial insurance business were, in fact, working – *"stabilizing"* that business, enabling it to *"turn[] the corner"* and *"return to profitability"* – and that Chubb was, in fact, on target to achieve EPS growth in 99 to $4.00+ and in 00 to $4.50+, as O'Hare had been telling analysts. They also knew that reporting *real progress* with respect to this critical area of Chubb's business *was indispensable to boosting Chubb's stock price*, making the proposed acquisition of Executive Risk more attractive to Executive Risk's public shareholders and thus assuring Executive

- 15 -

Risk shareholder approval of the proposed sale of their company to Chubb in exchange for Chubb stock.

21.     On 4/27/99, Chubb reported *much better-than-forecasted* 1stQ 99 results – EPS of $1.14, compared to $1.12 in 98. Chubb told investors that its *"favorable first quarter results reflect positive trends in all three major segments"* of Chubb's business, and that Chubb had successfully *"stabilized"* its standard commercial insurance business, which now had positive *"momentum"* due to Chubb management's *"aggressive"* steps to increase standard commercial insurance premiums whereby *"renewal rate increases were sticking."* Chubb also represented it now expected standard commercial insurance premium growth to *"rather rapidly"* reach 5-1/2%-6%, compared to the flat premium growth earlier forecast, which would enable Chubb's standard commercial insurance business to achieve a 5% underwriting profit leading to 99 EPS of $4.10+ and 00 EPS of $4.55+ – *higher results than earlier forecast.* During Chubb's 4/27/99 conference call with analysts, when certain analysts expressed skepticism as to how Chubb's business could have improved so significantly so quickly, an irate O'Hare exclaimed: *"You guys are so bloody negative it's disgusting. We're trying to send a strong signal to you that things are getting better. I don't know how else to say it .... This god dam ship has turned faster than I thought it was going to ...."* O'Hare also said Chubb's pricing strategy in standard commercial insurance was achieving its intended results, O'Hare was *"totally confident"* the rate increase/policy non-renewal strategy was working and that while Chubb might lose $250-$300 million in standard commercial insurance business in 99 due to its refusal to renew unprofitable businesses, this would leave Chubb's standard commercial insurance business *"a lot more profitable,"* as the other companies which would pick up the business Chubb declined were *"assholes."* Chubb's stock, which traded at as low as $57 on 4/26/99, jumped to $60-7/8 on 4/27/99, $62-1/16 on 4/28/99, and $70-5/16 on 5/7/99 – a major upward move for a large cap insurance stock.

- 16 -

22. As work continued to finalize the documents to register the Chubb stock to be issued in the Executive Risk acquisition and to seek a vote of Executive Risk's public shareholders approving the sale of their company in return for Chubb stock, during 5/99-early 6/99 O'Hare and other Chubb spokespersons had frequent discussions with analysts. During those discussions they told analysts that Chubb's stock was "*undervalued*" and there may be "*more good news ahead*," that Chubb's standard commercial insurance business' "*favorable*" pricing momentum "*continues to build*" and the turnaround of this business was "*exceeding management's expectations.*" They also reported that the new standard commercial insurance policies being accepted by Chubb had been "*intensely audited,*" Chubb was now "*very comfortable with the pricing*" of these lines of business and, as a result, Chubb's standard commercial insurance combined ratio (excluding catastrophes) *would improve steadily in 99-00* due to Chubb's rate increase/policy non-renewal initiative. Thus, O'Hare stated he was "*more optimistic than usual,*" Chubb was forecasting 99 EPS of $4.10+ and 00 EPS of $4.55+, and Chubb's own financial models – reflecting these more favorable trends – now showed Chubb's stock was worth $102-$140 per share and a $128 price was "*realistic in today's market.*" Based on Chubb's extremely strong 1stQ 99 results and the positive information put out by Chubb, Chubb's stock continued to move higher, reaching its Class Period high of $76-3/8 on 5/24/99, just as the defendants were completing the final version of the Merger Proxy and preparing to mail it to the Executive Risk shareholders.

23. On 6/15/99, Chubb's stock closed at $70-9/16. On 6/17/99 the Merger Proxy became effective with the SEC. The Merger Proxy, which was mailed to Executive Risk's shareholders on 6/18/99, sought the approval of Executive Risk's shareholders of the proposed sale of their company to Chubb for 1.235 shares of Chubb stock for each share of Executive Risk stock. The solicitation of proxies was vital to get approval of the transaction as, as of 3/1/99, Executive Risk's top officers and directors owned only a total of 1.1 million shares of Executive Risk stock – just

- 17 -

10.6% of its outstanding shares. *Therefore, the affirmative vote of a majority of Executive Risk's public shareholders was needed for the transaction to be approved.* Between 6/16/99 and 7/19/99, Chubb's stock traded between $67-13/16 and $74-1/8, giving the acquisition of Executive Risk a per share value of $84-$91 and an aggregate value of $982 million to $1.071 billion. On 7/19/99, Executive Risk's shareholders voted to approve the sale of Executive Risk to Chubb. On 7/20/99, Chubb completed the merger.

24. The statements made between 4/27/99 and 7/20/99 were false or misleading. The true facts which were known to the defendants but concealed by them were:

(a) Chubb's aggressive actions to raise prices on its standard commercial insurance policies and accept substantial non-renewals to boost operating results of those lines was not working, let alone exceeding management's expectations, *because the rate increases were not sticking and Chubb's standard commercial insurance underwriting losses were increasing.* In fact, according to a former commercial lines marketing underwriter for the Chubb Insurance Group in Seattle, Washington; a former umbrella and excess insurance manager for the Chubb Group of Insurance Companies in Englewood, Colorado; an independent insurance broker for A.O.N. Risk Services in Southfield, Michigan who did business with Chubb; a former senior customer services team leader at Chubb in Los Angeles and Seattle who worked in operations supervising employees who entered premiums and claims and coded policies into Chubb's computer system; a former commercial lines customer service representative/rater for The Chubb Corporation in Seattle; a former multi-national account specialist for Chubb Insurance in its Warren, New Jersey, headquarters; and a former renewal underwriter in the account service center for Chubb in Florham Park, New Jersey, Chubb was losing numerous profitable customers that it was trying to keep, and did not want to lose, because Chubb was raising rates in a very competitive insurance market — a market where, according to a former commercial lines marketing

- 18 -

Case 2:23-cv-04486-EMR Document 55 Filed 08/09/07 Page 22 of 50 PageID 2667

underwriter for the Chubb Insurance Group in Seattle, and a former Chubb underwriter in Rochester, New York, all of Chubb's competitors were lowering rates or keeping them flat. According to an independent insurance broker for A.O.N. Risk Services in Southfield, Michigan, some independent brokers moved up to 80% of their clients from Chubb to lower-priced insurers. Moreover, according to a former renewal underwriter (who processed renewed policies on established accounts) in Florham Park, New Jersey, an independent insurance agency named NIA Insurance Group systematically refused to go along with Chubb's rate increases and moved many customers to other insurers. Chubb's rate increases simply drove the Company's highly profitable customers to other insurers, where they could find the same coverage at lower rates. According to a former commercial lines marketing underwriter for Chubb based in Seattle, in the states of Washington and Oregon, Chubb lost all of its profitable customers who paid annual premiums of $500,000 to $1 million because of rate increases. According to a former customer service supervisor for Chubb Insurance in Pleasanton, California, who was in charge of supervising the staff that processed policies and analyzed risks, Chubb's California operations were also extremely adversely affected by the rate increase/policy non-renewal initiative because customers were not accepting the new higher rates and leaving, and also because the haphazard, uneven manner in which rate increases were applied (or not applied) resulted in regulatory violations of California's insurance laws and record fines of Chubb by the California Department of Insurance. According to a former senior customer services team leader at Chubb in Los Angeles and Seattle who worked in operations supervising employees who entered premiums and claims and coded policies into Chubb's computer system; an independent insurance broker for A.O.N. Risk Services in Southfield, Michigan who did business with Chubb; a former energy resources underwriter in the Commercial Lines Department of Chubb & Son, Inc., in Cincinnati and Pittsburgh; a former commercial lines marketing underwriter for the Chubb Insurance Group in Seattle; a former umbrella and excess insurance manager for the

- 19 -

CaSase202G-cv404840G-EMRRDocDmentn55t 66led 08/99#0207Pagj2423 of 50ePagef12568

Chubb Group of Insurance Companies in Englewood, Colorado; a former commercial lines customer service representative/rater for The Chubb Corporation in Seattle; and a former multi-national account specialist for Chubb Insurance in Chubb's Warren, New Jersey, headquarters, in addition to the hundreds of millions of dollars in business Chubb announced that it expected to lose through the rate increase/policy non-renewal initiative, Chubb lost *additional undisclosed hundreds of millions of dollars in profitable business that Chubb wanted to retain*, as profitable customers obtained insurance elsewhere. According to a former commercial lines customer service representative/rater for The Chubb Corporation in Seattle, among the large profitable customers which were lost was Western Wireless, which had provided Chubb with a $400,000-$500,000 annual premium, but was lost to CNA Insurance. According to a former manager of Chubb's customer care unit in Troy, Michigan, the rate increase/policy non-renewal initiative caused Chubb to also lose Burger King restaurants in that area, which represented a large loss to Chubb. According to a former Chubb property claims manager in Troy, Michigan, Chubb also lost the account of Arby's restaurants in the Michigan area. According to a former underwriting technical assistant of Chubb Group Insurance of Englewood, Colorado, the rate increase/policy non-renewal initiative caused Chubb to also lose the profitable policy provided to Echo-Star (annual premium of $105 million), as well as four to five other customers with annual premiums equal to Echo-Star's. Chubb also lost the account of Mary Kay Cosmetics, various large, high-technology firms and a huge multi-national account from Chubb's Washington, D.C. area office because of the rate increase/policy non-renewal initiative, according to a former multi-national account specialist for Chubb Insurance in Chubb's Warren, New Jersey headquarters;

(b)     The rate increases that were, in fact, being obtained on new and renewal standard commercial insurance policies were very small and well below the levels necessary to have any materially favorable impact on Chubb's 99 results, or even to lessen the growing underwriting losses in Chubb's standard commercial insurance

- 20 -

CaSase2023rcv04085043EBRPDocDocament55t 65l33 08/09a0207P28j2424 d75gePageofD2669

business. Indeed, because other insurance companies were reducing prices or keeping them flat, increases by Chubb were being met with extreme resistance, since customers (or their independent insurance brokers) could easily buy the same insurance from other companies at lower rates. To keep the customers that had not already left Chubb for lower-priced insurers, Chubb began to give their remaining customers either no rate increase or much smaller ones than it had planned under the rate increase/policy non-renewal initiative, according to a former property and casualty and director's and officer's underwriter in the financial institutions section of the Chubb Corporation in Chicago (and according to the other former Chubb employees who provide specific examples of such, directly below). According to a former underwriting manager for Executive Risk/Chubb in Simsbury, Connecticut, despite the rate increase/policy non-renewal initiative, *Chubb was renewing the policies of 50% of its customers either at flat rates or even at reduced premiums*; for example, according to this same former Chubb employee, as late as March, 2000, Chubb's energy industry customers in Texas had not received rate increases. And according to a former customer service supervisor for Chubb Insurance in Pleasanton, California, who was in charge of supervising the staff that processed policies and analyzed risks, the Robert Mondavi winery (with an annual premium of over $1 million) was not given a rate increase. Another customer, Novell (which had an annual premium of $105 million), also was not given an increase, according to a former regional supervisor for Chubb in Denver, Colorado. According to a former commercial lines customer service representative/rater in Chubb's Seattle office (who had worked for Chubb for 26 years and thus was intimately familiar with the Company's operations and methods of doing business), Chubb also failed to give its customers Microsoft or Boeing rate increases, as Chubb renewed both of their policies in April of 1999 with no rate increase even though the policies on each company had created huge losses for Chubb in the past. Similarly, many other customers were not given rate increases regardless of their profitability so that Chubb would not lose them as customers. Many times this was

- 21 -

Case 2:23-cv-04250-EP Document 55 Filed 08/09/07 Page 25 of 50 PageID: 2670

done because, according to a former property claims adjuster for Chubb Group of Insurance Companies in Boston, underwriters had the incentive to resist rate increases because their own compensation was dependent on keeping customers. Also, according to the former customer service supervisor for Chubb Insurance in Pleasanton, California, Chubb branch managers would themselves override intended rate increases;

(c) Chubb was, in fact, not maintaining a disciplined approach to renewing standard commercial insurance and was renewing hundreds of millions of dollars of standard commercial insurance policies at premium levels Chubb knew were unprofitable and thus would adversely impact Chubb's results going forward. According to a former umbrella and excess insurance manager for the Chubb Group of Insurance Companies in Englewood, Colorado; a former customer service supervisor for Chubb Insurance in Pleasanton, California; a former underwriting technical assistant of Chubb Group Insurance of Englewood, Colorado; a former energy resources underwriter in the Commercial Lines Department of Chubb & Son, Inc., in Cincinnati and Pittsburgh; and a former property and casualty and director's and officer's underwriter in the financial institutions section of the Chubb Corporation in Chicago, Chubb retained many of its unprofitable customers that the rate increase/policy non-renewal initiative was designed to eliminate, which only exacerbated Chubb's losses. Because these unprofitable customers were such bad risks, they could not obtain insurance from any other insurer, and accordingly renewed with Chubb and paid the increased premiums. The premiums that these customers paid, while they were higher, were still far too low to make these customers profitable to Chubb because the customers were such bad insurance risks. In other instances, Chubb did not raise rates on unprofitable customers at all, but rather renewed at the same, unprofitable rates, or even reduced rates, just to keep the customers. For example, according to a former Chubb branch manager in Grand Rapids, Michigan, in early 99, Chubb attempted to raise the rates on its insurance policy with McDonald's

- 22 -

Case 2:20-cv-04085-EMR Document 55 Filed 08/09/07 Page 26 of 50 PageID 2671

Corporation. This policy was consistently unprofitable for Chubb for many years. The independent agents that had placed the policy with Chubb refused to go along with the increase and threatened to move the McDonald's account to another insurer. Chubb relented and did not increase McDonald's rates. In addition, according to a former customer service representative for Chubb Insurance in Washington, D.C., notwithstanding the fact that Chubb customer Langenscheidt Publishing Group was a bad risk and unprofitable, Chubb actually lowered its rates for this customer. It was well-known within Chubb that this was occurring throughout the Company because management was pressuring employees to meet certain revenue targets which were impossible to achieve under the rate increase/policy non-renewal initiative, and so the initiative was simply being ignored, not complied with, and/or applied in a haphazard fashion. According to a former underwriting technical assistant of Chubb Group Insurance of Englewood, Colorado, ***Chubb was keeping approximately 60% of its high-risk, unprofitable customers that the rate increase/policy non-renewal initiative was purportedly eliminating***;

(d) Chubb's aggressive action to raise prices on its standard commercial insurance policies and accept substantial non-renewals to boost operating results of those lines, even if successful, would not have any significant positive impact on Chubb's financial results during 99 and, in fact, Chubb's standard commercial insurance problems would continue to very adversely impact Chubb's results throughout most of 99. It was well known within Chubb that it would take two to three years before any significant positive impact would occur from the rate increase/policy non-renewal initiative and in any event, little positive effect would be felt in 99 because, according to a former vice president in personal lines insurance who worked in Chubb's Warren, New Jersey, headquarters, the vast majority of Chubb policies came up for renewal either on July 1 or January 1 of a given year. Chubb was therefore able to manage only a minimal number of rate increases by January 1, 1999 for a number of reasons:

- 23 -

- Underwriters worked on commissions and so had a strong incentive to relent on rate increases rather than lose accounts.

- Because other insurance providers were not raising rates, policyholders would have had a lot of options for cheaper policies.

- Underwriters would be unaccustomed to asking for increases because Chubb, like most providers, had been lowering rates for so long. Therefore, some training would have been necessary and there was no specific training program at that time.

- By law, underwriters had to notify policyholders significantly in advance of rate increases – just how much in advance depended on the state. If the necessary notification time was more than one month, there would have been little or no time to effect a rate increase by January 1, 1999.

According to a former commercial lines underwriter in Chubb's Newport Beach, California office, *almost none* of the policies renewing on January 1, 1999, were renewed in accordance with the rate increase/policy non-renewal initiative since there was not enough time to implement rate increases in light of state regulatory requirements concerning rate increases and prior notice periods. According to this former underwriter, underwriters could only begin to renew at higher rates in 2/99 and, because of regulatory notice periods, could only increase policies up for renewal in 4/99, *after the end of Chubb's 1stQ 99!*;

(e) Chubb's reserves for its standard commercial, and property and marine insurance lines had been manipulated by reserve reductions which were not justified and by deliberate failures to set reserves, as detailed in ¶¶134-51. Indeed, according to a former general claims adjuster for Chubb Insurance in Boston, and a former senior customer services team leader at Chubb in Los Angeles and Seattle, upper management pressured branch managers to improperly reduce reserves, and ordered adjusters to refrain from recording reserves until after the Executive Risk acquisition was complete, as detailed in ¶¶143-45, resulting in artificially inflated earnings (the former senior customer services team leader supervised the clerks who entered the reserve adjustments into Chubb's computer system); and according to a former Chubb property claims manager in Troy, Michigan, and a former Chubb

- 24 -

manager in Florham Park, New Jersey, Chubb manipulated its reserves so as to report artificially inflated earnings through the practice known as "stair-stepping," as detailed in ¶144. According to the former Chubb customer services team leader in Los Angeles and Seattle, the majority of Chubb's branch offices were manipulating reserves to artificially enhance Chubb's financial performance and Chubb operations personnel openly discussed the reserve manipulations at Company meetings. ¶143;

(f) Chubb's standard commercial insurance business had not stabilized as, due to weak premium growth and increasing losses, the combined ratio on these lines of business was still increasing and would continue to increase throughout 99 (excluding catastrophes), leading to larger than ever losses in these lines of business. Contrary to defendants' representations that the combined ratio had decreased to 117.9% in 1stQ 99, in actuality, the combined ratio was not decreasing because of the rate increase/policy non-renewal initiative but skyrocketing to 130% during 1stQ 99, according to a former Chubb branch manager in Grand Rapids, Michigan, and a former Chubb commercial lines marketing underwriter in Seattle;

(g) Chubb's standard commercial insurance business was not encountering strong positive momentum or positive trends. Due to weak premium growth and increasing losses, the combined ratio on these lines of business was still increasing (to 130% according to a former Chubb branch manager in Grand Rapids, Michigan) and would continue to increase throughout 99 (excluding catastrophes), leading to larger than ever losses in these lines of business. According to numerous former Chubb employees, it was well-known within Chubb during the Class Period that the rate increase/policy non-renewal initiative was failing and that the purported turnaround in the standard commercial insurance business had not occurred;

(h) Chubb's strategy of renewing only at good prices would not have any significant impact on Chubb's results until at least mid-2000, as it would take "at least two annual renewal cycles" for Chubb to reprice the standard commercial lines premiums and after the premiums were repriced it would take another year for the

higher premiums to be earned into income. According to a former Chubb customer service supervisor in Pleasanton, California, and a former branch manager for Chubb in Grand Rapids, Michigan, it was well-known within Chubb that the rate increase/policy non-renewal initiative would take two to three years before it could positively affect Chubb's performance. This was so because: (1) according to a former branch manager at Chubb's West Michigan office, policies came up for renewal throughout the year (the vast majority renewing on either January 1 or July 1) and until a policy came up for renewal, its rates could not be increased; (2) even though a policy was renewed at a higher rate, the new, higher premium would not be collected immediately but would be paid over the policy period; (3) according to a former senior underwriter for financial institutions in Chubb's Chicago office, Chubb had written a good number of three-year long policies that would not be up for renewal (and therefore a rate increase) for an extended period of time; and (4) the haphazard manner in which the rate increases were being applied – small increases for some customers, no increases for others, and decreases for yet others – prevented any immediate positive results. Chubb concealed this key fact from its public disclosures until after the merger closed;

(i)     According to a former senior customer services team leader in Los Angeles and Seattle, Chubb's better-than-expected 1stQ 99 results were not the result of favorable developments or trends in Chubb's standard commercial insurance business as represented; in fact, Chubb's 1stQ 99 results had been deliberately falsified as detailed in ¶¶130-57 in order to artificially and improperly boost Chubb's reported EPS to conceal the continued serious deterioration in its standard commercial insurance business. According to this former employee, Chubb's upper management pressured branch managers to manipulate reserves to enhance Chubb's financial performance and such manipulations were a regular practice in the majority of Chubb's branch offices. Moreover, according to a former energy resources underwriter in the commercial lines department for Chubb in Cincinnati and Pittsburgh, and a former

- 26 -

property claims adjuster for Chubb Group of Insurance Companies in Boston, rumors circulated within the Company that Chubb had artificially boosted its reported financial performance with accounting tricks;

(j)     As a result of the foregoing negative conditions which were adversely impacting Chubb's business, defendants knew, according to a former Chubb branch manager in Grand Rapids, Michigan, that Chubb's forecasts of 5-1/2%-6% premium growth for its standard commercial insurance business during 99 and a falling combined ratio for its standard commercial insurance business were false and could not be obtained; and

(k)     As a result of the foregoing negative factors which were adversely impacting Chubb's business, defendants knew Chubb's forecasts of 99 EPS of $4.00+ and 00 EPS of $4.55+ were false when made and could not and would not be achieved, *even if Chubb suffered no catastrophe losses and even if Chubb achieved its repricing objectives in standard commercial insurance.*

25.     Immediately after the approval of the Executive Risk acquisition, Chubb's stock began to fall – from $70-1/2 on 7/19/99 to as low as $64-1/2 on 7/26/99 – on concerns that Chubb's 2ndQ 99 results, to be announced in late 7/99, would be worse than forecast. On 7/27/99, *eight days after the Executive Risk merger was approved,* Chubb reported its 2ndQ 99 financial results – *well below expectations.* Defendants were aware *prior* to the approval of the Executive Risk merger by Executive Risk's shareholders that Chubb would report these disappointing results, but defendants purposely withheld disclosing them until *after* the merger was approved, so as not to jeopardize a favorable vote on the merger by Executive Risk's shareholders. Moreover, while Chubb's 2ndQ 99 financial results were not as good as expected, *they still had been falsified so that Chubb's true financial performance – which was much worse than reported – could be concealed, and defendants' fraudulent scheme to inflate Chubb's stock price could also continue to be concealed thus avoiding detection by the SEC.* Chubb's release stated:

- 27 -

Standard commercial lines premiums in the second quarter *declined 9% to $455.4 million and had a combined ratio of 120.8%....*

*"Given the moderate magnitude of rate increases in the early stages of the repricing program,"* said Mr. O'Hare, *"it will take at least two renewal cycles to adequately reprice the entire standard commercial book, and during that time we will continue to have losses from non-renewed policies. Thus ... it will be mid-2000 before the benefits of these actions significantly flow to the bottom line."*

Analysts were furious. One analyst stated:

\* *In what was perceived as a shocking disappointment,* Chubb reported flat premiums for the second quarter with earnings of $1.00, short of the Street consensus of $1.04....

\* *Management dampened its earlier enthusiasm for improving market conditions, which had ratcheted up expectations early in the second quarter.*

\* \* \*

The bad news: *Total standard commercial business shrank 9.0%, more than expected. The combined ratio remained unacceptably high at 120.8%. Commercial multiperil results were terrible.... Premiums in total were flat rather than up about 5% as expected.*

Another analyst wrote:

*A month ago Chairman and CEO Dean O'Hare was enthusiastically optimistic that the turnaround in the standard commercial book might occur ahead of schedule based on trends seen mid-quarter.*

*HOWEVER, on yesterday's conference call he stated that he had been overly optimistic and returned to expect CB's original targets.*

O'Hare admitted: *"I might have actually gotten a little bit euphoric that we could do this turnaround of standard commercial lines without any real disturbance of the premium pattern.... [W]e are losing more business than we did in the first quarter and we're writing less new business than we did in the first quarter."* These statements were misleading in that O'Hare was aware *at the beginning of the Class Period*, that the rate increase/policy non-renewal initiative was not working, as he previously represented, yet he tried to pass off his earlier misrepresentations as just being innocent over optimism. Moreover, O'Hare continued to misrepresent how well the rate increase/policy non-renewal initiative was actually going by continuing to

- 28 -

create the impression that the rate increase/policy non-renewal initiative was working, by stating that Chubb had "continued [to make] progress in improving pricing," that the initiative was "building momentum" and that Chubb was retaining profitable business while non-renewing unprofitable policies.

26. Chubb's stock continued to fall as these much worse-than-forecast results were revealed – to as low as $58-5/8 on 7/30/99. However, Chubb stock continued to trade at artificially inflated levels throughout the balance of the Class Period due to Chubb's failure to make full and complete disclosure of Chubb's true 2ndQ 99 financial performance, the true extent of the adverse facts and conditions then impacting Chubb's business and its continued false and misleading statements. Indeed, instead of disclosing that Chubb's 2ndQ 99 financial results had been falsely inflated by the artifices described in ¶¶130-57, or that the rate increase/policy non-renewal initiative was a failure, O'Hare falsely assured investors that Chubb's management was "*not in any way discouraged*" by the performance of Chubb's standard commercial insurance business in the 2ndQ 99, as "*[r]ate increases continue to build momentum*," permitting Chubb's management to maintain Chubb's "original" (*i.e.*, pre-4/27/99) forecasts, *i.e.*, because the standard commercial insurance "*turnaround strategy remains on target with original expectations*," and thus Chubb would still achieve 99 EPS of $4.00+.

27. During 8/2/99-9/22/99, Chubb's stock traded between $56 and $62-5/16 and traded as high as $56-5/8 on 9/21/99. However, in late 9/99, Chubb's stock fell to $49-$50 on concerns that Chubb's 3rdQ 99 results, to be released in mid-10/99, *would be much worse than forecast*. On 10/14/99, Chubb stock traded as high as $49-3/8. On 10/15/99, Chubb revealed *much lower-than-forecast 3rdQ 99 results of only about $.40-$.45, compared to $1.04 in the 3rdQ 98, due, in part, to catastrophe losses from Hurricane Floyd*. However, Chubb admitted: "*In addition, underwriting losses from its standard commercial business continued to have an*

- 29 -

CaSase:0203-cv04245504-EMR PDocDmennt 55 t 65l23 08/09/0207 Page 433 of 50 PageID 22678

*adverse effect on earnings." Chubb's stock fell to $44 – its lowest level in years!* On 10/18/99, C.S. First Boston wrote:

> **The Chubb stock now sells for about half the price it sold at in July 1998. While in retrospect at that point the stock was over priced now it has come back to earth.**

*   *   *

> **Chubb's standard commercial lines insurance operations remain a severe disappointment.**

Later, Chubb formally reported its terrible 3rdQ 99 results – EPS of just $.44, compared to $1.04 in 3rdQ 98 – admitting that:

> **Standard commercial insurance performed poorly in the third quarter, recording a combined ratio of 130.4%, which included 10.1 percentage points of catastrophe losses....**
>
> ... "[I]t will take time for the benefits of the pricing initiative to reverse the losses from underpriced business written in the extremely competitive market of the past few years," [said O'Hare].

28. As a result of the continued horrible performance of Chubb's standard commercial insurance operations throughout 99, Chubb reported a *substantial earnings decline in 99, not the increase forecast during the Class Period*, and Chubb's stock continued to sell for prices *below* the levels it was artificially inflated to during the Class Period – especially the critical period when Executive Risk's shareholders were determining how to vote on the proposed sale of their company to Chubb in return for Chubb stock. In Chubb's 99 10-K, signed by O'Hare, Kelso and Schram, they admitted:

PROPERTY AND CASUALTY INSURANCE

> Property and casualty income before taxes was $626 million in 1999 compared with $685 million in 1998 and $828 million in 1997. *The decrease in earnings in 1999 was due to deterioration in underwriting results caused in large part by the continued weakness in the standard commercial classes*, which include multiple peril, casualty and workers' compensation, and to a lesser extent, higher catastrophe losses.

\* \* \*

## STANDARD COMMERCIAL INSURANCE

*Reported net premiums from standard commercial insurance decreased 8% in 1999 compared with a 1% decrease in 1998....*

Our standard commercial insurance business produced substantial under-writing losses in each of the past three years, *with results becoming increasingly unprofitable each year. The combined loss and expense ratio was 123.6% in 1999 compared with 118.0% in 1998 and 114.5% in 1997.*

It will take at least two annual renewal cycles to adequately reprice the entire standard commercial book, and during that time we will continue to have losses from underpriced business. Thus, it will be the *latter part of 2000* before our pricing initiative is expected to have a noticeable effect on our standard commercial results.

Multiple peril results were unprofitable in each of the past three years due, in large part, to inadequate prices. *Such results were progressively more unprofitable each year. In the liability component of this class, results deteriorated in 1998 and again in 1999 due to increases in the severity of losses.*

\* \* \*

*Results for our casualty business were unprofitable in each of the past three years. Results deteriorated in 1999, primarily in the automobile and primary liability components....* Results for the primary liability component were unprofitable in each of the past three years, *but more so in 1999* ... due to a higher frequency of large losses in those years. Results in the automobile component *were increasingly unprofitable in each of the past three years due to an increase in the frequency of losses.* Our commercial automobile book of business has been inadequately priced, a consequence of the prolonged soft market.

Workers' compensation results were unprofitable in each of the past three years, reflecting the cumulative effect of price reductions over the past several years. Results were also adversely affected in 1999 ....

29. The horrible performance of Chubb's standard commercial insurance business during 97-99, and its increasingly poor performance during 99, is shown below:

- 31 -

CaSasSe:2023v-c0424t504-EMR PDocDroent55t f6i83 08/P040207P28J245 o7a5ge3Pa6gef126I80

**Chubb Corporation**
**Standard Commercial Lines Quarterly Results**
**(in thousands)**

|  | 1997 | | | | |
|---|---|---|---|---|---|
|  | 03/31 | 06/30 | 09/30 | 12/31 | Year |
| Net Premiums Written | $552,800 | $489,400 | $482,300 | $501,600 | $2,026,100 |
| Combined Ratio | 108.6% | 111.7% | 113.9% | 115.5% | 112.4% |
|  | 1998 | | | | |
|  | 03/31 | 06/30 | 09/30 | 12/31 | Year |
| Net Premiums Written | $519,200 | $500,800 | $468,200 | $517,600 | $2,005,800 |
| Combined Ratio | 113.4% | 121.1% | 117.9% | 119.5% | 118.0% |
|  | 1999 | | | | |
|  | 03/31 | 06/30 | 09/30 | 12/31 | Year |
| Net Premiums Written | $499,100 | $455,400 | $435,300 | $452,400 | $1,842,200 |
| Combined Ratio | 117.9% | 120.8% | 130.4% | 125.8% | 123.6% |

30. Chubb's very poor 98-99 financial performance -- showing declines from 97 – is shown below:

**Chubb Corporation**
**Quarterly Results**
**(in thousands, except EPS)**

|  | 1997 | | | | |
|---|---|---|---|---|---|
|  | 03/31 | 06/30 | 09/30 | 12/31 | Year |
| Net Premiums Earned | $1,321,000 | $1,249,000 | $1,293,000 | $1,294,400 | $5,157,400 |
| Operating Income Before Investment Gains | $ 175,900 | $ 175,600 | $ 175,100 | $ 174,500 | $ 701,100 |

- 32 -

**Chubb Corporation**
**Quarterly Results**
**(in thousands, except EPS)**

| | | | | | |
|---|---|---|---|---|---|
| Net Income | $ 192,100 | $ 188,700 | $ 194,000 | $ 194,700 | $ 769,500 |
| EPS Before Investment Gains | $ .99 | $1.00 | $1.00 | $1.01 | $4.00* |
| EPS | $1.08 | $1.08 | $1.10 | $1.13 | $4.39 |

| | | | 1998 | | |
|---|---|---|---|---|---|
| | 03/31 | 06/30 | 09/30 | 12/31 | Year |
| Net Premiums Earned | $1,314,000 | $1,324,400 | $1,328,400 | $1,336,900 | $5,303,700 |
| Operating Income Before Investment Gains | $ 188,800 | $ 154,400 | $ 149,800 | $ 147,800 | $ 640,800 |
| Net Income | $ 191,800 | $ 184,200 | $ 173,400 | $ 157,600 | $ 707,000 |
| EPS Before Investment Gains | $1.10* | $.90 | $.90 | $.90 | $3.80* |
| EPS | $1.12 | $1.08 | $1.04 | $.95 | $4.19 |

| | | | 1999 | | |
|---|---|---|---|---|---|
| | 03/31 | 06/30 | 09/30 | 12/31 | Year |
| Net Premiums Earned | $1,379,800 | $1,377,500 | $1,452,100 | $1,442,600 | $5,652,000 |
| Operating Income Before Investment Gains | $ 166,400 | $ 163,500 | $ 74,800 | $ 160,600 | $ 565,300 |
| Net Income | $ 186,900 | $ 193,300 | $ 77,300 | $ 163,600 | $ 621,100 |
| EPS Before Investment Gains | $1.02 | $1.00 | $.43 | $.91 | $3.33* |
| EPS | $1.14 | $1.18 | $.44 | $.93 | $3.66 |

\*    Operating income and EPS is before restructuring charges and before investment gains.

## III.    JURISDICTION AND VENUE

31.    The claims asserted herein arise under §§10(b), 14 and 20(a) of the Securities Exchange Act of 1934 ("1934 Act") and Rule 10b-5, and §§11 and 15 of the Securities Act of 1933 ("1933 Act"). Jurisdiction is conferred by §27 of the 1934 Act and §22 of the 1933 Act. Venue is proper as Chubb is headquartered here, false

- 33 -

statements were made here, O'Hare, Kelso and Schram live here and acts giving rise to the violations complained of occurred here.

## IV. THE PARTIES

32. Lead Plaintiff California Public Employees' Retirement System ("CalPERS") purchased shares of Chubb common stock during the Class Period and was damaged thereby.

33. Lead Plaintiff New York State Common Retirement Fund purchased shares of Chubb common stock during the Class Period and was damaged thereby.

34. Lead Plaintiff John N. Teeple acquired shares of Chubb common stock during the Class Period in exchange for his shares of Executive Risk in connection with Chubb's acquisition of Executive Risk.

35. (a) Defendant The Chubb Corporation ("Chubb") is headquartered in Warren, New Jersey. Chubb's common stock trades in an efficient market on the NYSE.

(b) Defendant Executive Risk Inc. ("Executive Risk") was an independent public company until 7/19/99, when it was acquired by Chubb and became a wholly owned subsidiary of Chubb.

36. (a) Defendant Dean R. O'Hare ("O'Hare") is Chairman and Chief Executive Officer of Chubb, positions he assumed in 96. O'Hare, by reason of his positions with Chubb, was a controlling person of Chubb and is liable under §20(a) of the 1934 Act and §15 of the 1933 Act. O'Hare controlled Chubb.

(b) Defendant Henry B. Schram ("Schram") is Chubb's Senior Vice President and Chief Accounting Officer and was responsible for the creation of Chubb's publicly disseminated financial statements.

(c) Defendant David B. Kelso ("Kelso") is Chubb's Executive Vice President and Chief Financial Officer and was responsible for the creation of Chubb's publicly disseminated financial statements.

- 34 -

(d)     Defendant Stephen J. Sills ("Sills") was, until 7/99, President and CEO of Executive Risk. After 7/99, he was Chairman and CEO of Chubb's new and expanded directors' and officers' liability insurance operation, known as Chubb/Executive Risk. Sills, by reason of his positions with Executive Risk, was a controlling person of Executive Risk and is liable under §20(a) of the 1934 Act and §15 of the 1933 Act. As a result of Executive Risk's public shareholders' approval of the sale of Executive Risk to Chubb, Sills got millions of dollars of special payments and benefits via accelerated stock options and bonus performance units. Sills also became Chairman and CEO of Chubb's newly formed and expanded directors' and officers' business unit, *i.e.*, Chubb/Executive Risk (at a large salary increase and guaranteed annual bonus), the headquarters of which were relocated from New Jersey where Chubb was headquartered to Connecticut where Sills lived.

(e)     Defendant Robert H. Kullas ("Kullas") was, until 7/99, Chairman of Executive Risk. Kullas, by reason of his position with Executive Risk, was a controlling person of Executive Risk and is liable under §20(a) of the 1934 Act and §15 of the 1933 Act. As a result of Executive Risk's public shareholders' approval of the sale of Executive Risk to Chubb, Kullas got millions of dollars of special payments and benefits via accelerated stock options and bonus performance units, plus a very lucrative "retirement" package.

(f)     Defendant Robert V. Deutsch ("Deutsch") was, until 7/99, Executive Vice President and Chief Financial Officer of Executive Risk. As a result of Executive Risk's public shareholders' approval of the sale of Executive Risk to Chubb, Deutsch got millions of dollars of special payments and benefits via accelerated stock options and bonus performance units, plus a very lucrative "retirement" package.

(g)     Defendants O'Hare, Schram and Kelso each signed the Registration Statement and were identified in and associated with the Merger Proxy. Defendants

Sills, Kullas and Deutsch each prepared and were identified in and associated with the Merger Proxy.

## V. FALSE AND MISLEADING STATEMENTS DURING THE CLASS PERIOD AND THE REASONS SUCH STATEMENTS WERE FALSE AND MISLEADING

37. On 4/27/99, Chubb reported much better-than-forecast 1stQ 99 results via a release which stated:

> "*Our favorable first quarter results reflect positive trends in all three major segments of our business*," said Dean R. O'Hare, chairman and chief executive officer....
>
> "*Even more significantly for the future, our pricing strategy in standard commercial lines has begun to show the impact we are looking for in our renewal business. Month by month, renewal rate increases are building momentum, and we expect this trend to continue. Moreover, we have been successful in retaining business we want to keep at higher rates, while at the same time we are walking away from business where we can't obtain adequate pricing. By maintaining this profit-oriented discipline, standard commercial lines will likely show a decline in premiums throughout the year and produce improved combined ratios. This decline in premiums should be offset by continued premium growth in personal and specialty commercial lines and by the benefits of a series of growth initiatives begun late last year.*"

In addition, the press release stated that Chubb's standard commercial insurance combined ratio was 117.9%, which was down from 4thQ 98's 119.5%.

38. On 4/27/99, subsequent to the release of its 1stQ 99 results, Chubb held a conference call for analysts, money and portfolio managers, institutional investors and large Chubb shareholders to discuss Chubb's 1stQ 99 results, its business and its prospects. During the call ‑ and in follow-up conversations with analysts – O'Hare and Schram stated:

- Management's actions to turn around Chubb's standard commercial insurance operations by raising prices and not renewing unprofitable policies were not only working, in fact, they were exceeding management's expectations, and this accounted in large part for Chubb's better-than-expected 1stQ 99 results.

- Due to the successful turnaround of Chubb's standard commercial insurance operations, that part of Chubb's business would show 5-1/2%-6% premium growth throughout 99, as Chubb's rate increases for new or renewal standard commercial insurance policies were sticking.

- 36 -

- The momentum of rate increases in Chubb's standard commercial insurance operations was growing month by month.

- Chubb was successful at retaining the higher priced standard commercial insurance rate which it desired and was profitable.

- Chubb was not losing as much of its standard commercial insurance business due to rate increases as it had feared. However, Chubb was prepared to lose $250-$300 million in standard commercial insurance business, as this would make Chubb's standard commercial insurance business "*a lot more profitable.*" The insurance companies who would pick up this business Chubb walked away from were "*assholes.*"

- The combined ratio of Chubb's standard commercial insurance business would decline throughout 99, to about 110% by year-end from 119.5% at year-end 98.

- The improvements in Chubb's standard commercial insurance business would produce an underwriting profit by 2000.

- O'Hare was "*totally confident*" in the success of Chubb's new pricing of its standard commercial insurance lines.

- O'Hare was optimistic over the future performance of Chubb's business, in part due to the turnaround of its standard commercial insurance business.

- O'Hare stated: "*You guys are so bloody negative it's disgusting. We're trying to send a strong signal to you that things are getting better. I don't know how else to say it .... This god dam ship has turned faster than I thought it was going to ....*"

39. Subsequent to the 4/27/99 conference call, O'Hare, Kelso and/or Schram had private one-on-one conversations with analysts from PaineWebber, Bear Stearns, Prudential Securities and Warburg Dillon Read, repeating the information provided in the 4/27/99 conference call and also telling them that:

- As a result of the better-than-expected pace of the turnaround of Chubb's standard commercial insurance business, Chubb was increasing its forecasted 99 EPS to $4.10+ and its 00 EPS to $4.50+.

40. On 4/27/99, Chubb executives, including O'Hare, Kelso and Schram, appeared at the Chubb 99 Shareholders' Meeting in New Jersey. In formal presentations and private conversations with the assembled shareholders, analysts, money and portfolio managers, institutional investors, brokers and stock traders, they told attendees the same information as disseminated during the 4/27/99 analyst conference call and follow-up conversations with analysts.

- 37 -

41.    On 4/27/99, *Best's Insurance News* reported on Chubb's Annual

Shareholders' meeting:

> Speaking at the company's annual meeting of shareholders, held Tuesday in Warren, N.J., Chubb Chairman Dean R. O'Hare said the company has focused on improving its underwriting results and expense ratios.

*    *    *

> At the meeting, several shareholder-representatives complained that Chubb's stock price has lagged behind several market and industry indexes in recent years. ***Based on improving commercial rates and strong results in personal lines, O'Hare said he expects the company to prove a long-term stock winner. "I'm a happy camper," he said.***

42.    On 4/27/99, *Bloomberg* reported an interview by Hampton with O'Hare,

as follows:

> Hampton:    Reporting from Bloomberg News New York Time Ted Hampton. Today I'm speaking with Dean O'Hare the chairman and chief executive of Chubb Corporation in Warren, New Jersey, which today reported first quarter earnings. Mr. O'Hare, thanks very much for joining me and congratulations on your quarter [you] beat estimates [and your] stock is up 1-5/8 as we speak. Why do you think investors are celebrating a little bit today?

> O'Hare:    ***I guess they're celebrating because earnings are better than the Street expected them to be.***

> Hampton:    And to what did you attribute that?

> O'Hare:    ***Why, I would hope that it's attributable to the fact this ship of ours is turning quicker than other people ... had expected....***

> Hampton:    Is there at Chubb a sense that commercial lines pricing is bottoming or are you still contending with the soft market conditions?

> O'Hare:    ***There is definitely a sense at Chubb that pricing is firming.***

*    *    *

> I will tell you this, that from what I've seen on a monthly basis, we have gone from a, let's take the month of December, ***where we were seeing price declines to a point that we are now seeing standard commercial lines price increases that are, let's call them 3-1/2 percent. I fully expect that [they're] going to build rather rapidly to 5-1/2 percent ....***

- 38 -

On 4/27/99, *Bloomberg* reported:

> "*This ship of ours is turning quicker than other people may have expected*," Dean R. O'Hare, chairman and chief executive of the Warren, New Jersey, company said in an interview, referring to the profit surprise.

43. On 4/27/99, PaineWebber issued a report on Chubb, which was based on and repeated information provided in the 4/27/99 conference call and in follow-up conversations with O'Hare. The report *increased* the forecasted 99 and 00 EPS to $4.10 and $4.55 for Chubb. It also stated:

> CB beat consensus with Q1 earnings of $1.02 vs. expectations of $0.97....

> *Management's repricing strategy is clearly working to drive out underpriced business and garner average rate increases on what remains.*

> \* \* \*

> *After a number of quarters of ratcheting down expectations, Chubb's first quarter of 1999 was pleasant surprise.* In addition to stronger earnings than we were looking for from a better-than-expected combined ratio, management commented on rate movement in its books and *predicted 6% average rate increases by the end of the year with a combined ratio in the standard/commercial lines down from 118% to what the company hopes will be 109-110%.*

> ... [W]e believe this quarter was good enough to justify an increase in our estimates ....

44. On 4/27/99, Bear Stearns issued a report on Chubb, which was based on and repeated information provided in the 4/27/99 conference call and in follow-up conversations with O'Hare. The report forecast 99 and 00 EPS of $4.35 and $4.80 and 2ndQ 99 EPS of $1.05 for Chubb. It also stated:

> We are reiterating our aggressive Buy rating of Chubb shares, following the company's *favorable commentary on its first quarter results and expectations for the balance of the year.*

> ... *[I]mportantly, management indicated on the company's conference call that results were ahead of Chubb's own expectations.* In ... standard commercial lines, *the momentum is positive and is expected to continue to show better results for the balance of the year* ....

> \* \* \*

- 39 -

Mr. O'Hare's comment in response to one question was "*This ship is turning around faster than I expected ....*"

    \*    \*    \*

*Overall, Mr. O'Hare indicated he is encouraged by results in the first quarter, and is raising his own expectations for premium growth to as much as 5% for the year, compared to previous guidance to flat premiums.*

45.    On 4/28/99, Dowling & Partners Securities issued a report on Chubb, based on the 4/27/99 conference call, forecasting 99 and 00 EPS of $4.10 and $4.65, respectively. It also stated:

After becoming somewhat agitated at the tone of the questions concerning rate activity and renewal experience associated with standard commercial ... [O'Hare] exclaimed, "You guys are so bloody negative it's disgusting. *We're trying to send a strong signal to you that things are getting better. I don't know how else to say it .... This god damn ship has turned faster than I thought it was going to but it's a big ship.*"

    \*    \*    \*

STANDARD COMMERCIAL MARKET. In Q3:98, mgmt announced that it was accelerating actions to bring Chubb's Standard Commercial business back to profitability via price increases of 5-20%, non-renewals and culling of unprofitable business, "even if this aggressiveness results in lost business." *Chubb suggested that it is willing to lose as much as $250-300MM of this business "if we cannot maintain adequate prices ...."*

    \*    \*    \*

This quarter mgmt updated analysts on the progress of the rating plan: "*The pricing strategy we have been executing since late last year is having the intended impact. We all know that you can't turn around a business of this size in one quarter but the signs bode well for the future. All the indications are that we are keeping much of the business that we want to keep at higher rates and we are being very disciplined about walking away from under-priced accounts...... right now we are thinking that standard commercial lines in 1999 could be down by as much as $200MM but it would be a lot more profitable.*"

Who would pick up this business? "*As long as there are a--holes present, and boy there are still two for sure, this is going to happen.*"

46.    On 4/28/99, Prudential Securities issued a report on Chubb, which was based on and repeated information provided in the 4/27/99 conference call and in follow-up conversations with O'Hare. The report forecast 99 and 00 EPS of $4.28 and $4.70 for Chubb. It also stated:

- 40 -

THE FIRST GOOD NEWS FROM CHUBB IN A LONG TIME

Following a string of earnings disappointments and deteriorating patterns of underwriting performance in the standard commercial lines, *Chubb made progress on all fronts in the first quarter.* EPS of $1.02 ... beat ... the Street consensus of $0.97....

... [F]ollowing the very disappointing fourth quarter, Chubb aggressively implemented repricing strategies to return its standard commercial lines margins to satisfactory levels. *Dean O'Hare, Chubb's Chairman and Chief Executive Officer sent out a strong signal that pricing initiatives are working, renewal rate increases are sticking and "the signs bode well for the future."* We are raising our 1999 EPS estimate to $4.28 ....

47. On 4/28/99, Warburg Dillon Read issued a report on Chubb, which was based on and repeated information provided in the 4/27/99 conference call and in follow-up conversations with O'Hare. The report increased the forecasted 99 and 00 EPS for Chubb to $4.20 and $4.75. It also stated:

Chubb Corp. management ended its first quarter 1999 teleconference with the following statement. *"[We are] trying to send a strong signal that things are getting better, the ship is turning around faster [than we] originally thought."* ... *Specifically, ... the actions instituted to turn around the standard commercial line book of business will prove successful, thereby enabling this historically superior underwriter to enhance its future growth rate by attaining its targeted 5% underwriting profit margin* pre-catastrophe related losses .... After reviewing the better than expected initial quarter 1999 results, we raised our 1999 and 2000 per share earnings estimates ....

\* \* \*

*By year end, management expects to ... increase renewal rates by better than 6%, while keeping retentions above 65% and in turn significantly improving the books profitability.*

48. The statements made on 4/27/99 and 4/28/99, that Chubb's *"favorable first quarter results reflect positive trends in all three major segments"* of Chubb's business, that Chubb had successfully stabilized its standard commercial insurance business, which now had positive *"momentum"* due to Chubb management's *"aggressive[ ]"* actions to increase standard commercial insurance premiums because *"renewal rate increases [were] sticking,"* and that Chubb expected standard commercial insurance premium growth to move *"rather rapidly" to 5-1/2%-6%,* compared to the flat premium growth earlier forecast, which would enable Chubb's

- 41 -

standard commercial insurance business to achieve a 5% underwriting profit margin leading to 99 EPS of $4.10+ and 00 EPS of $4.55+ − higher results than earlier forecast because Chubb's *"ship [was] turning quicker" than Chubb originally thought* − were false when made. The true facts − known to defendants but which they concealed − were:

(a) Chubb's aggressive actions to raise prices on its standard commercial insurance policies and accept substantial non-renewals to boost operating results of those lines was not working, let alone exceeding management's expectations, *because the rate increases were not sticking and Chubb's standard commercial insurance underwriting losses were increasing*. In fact, according to a former commercial lines marketing underwriter for Chubb in Seattle; a former umbrella and excess insurance manager for the Chubb Group of Insurance Companies in Englewood, Colorado; an independent insurance broker for A.O.N. Risk Services in Southfield, Michigan who did business with Chubb; a former senior customer services team leader at Chubb in Los Angeles and Seattle who worked in operations supervising employees who entered premiums and claims and coded policies into Chubb's computer system; a former commercial lines customer service representative/rater for Chubb in Seattle; a former multi-national account specialist for Chubb in its Warren, New Jersey, headquarters; and a former renewal underwriter in the account service center for Chubb in Florham Park, New Jersey, Chubb was losing numerous profitable customers that it was trying to keep, and did not want to lose, because Chubb was raising rates in a very competitive insurance market − a market where, according to a former commercial lines marketing underwriter for the Chubb in Seattle, and a former Chubb underwriter in Rochester, New York, all of Chubb's competitors were lowering rates or keeping them flat. According to an independent insurance broker for A.O.N. Risk Services in Southfield, Michigan, some independent brokers moved up to 80% of their clients from Chubb to lower-priced insurers. Moreover, according to a former renewal underwriter (who processed renewed policies on established accounts) in Florham

- 42 -

CaSase2023c04024504ERPDocDocumet55t66l3308/09/02072842446d45geP4gefD2691

Park, New Jersey, an independent insurance agency named NIA Insurance Group systematically refused to go along with Chubb's rate increases and moved many customers to other insurers. Chubb's rate increases simply drove the Company's highly profitable customers to other insurers, where they could find the same coverage at lower rates. According to a former commercial lines marketing underwriter for Chubb based in Seattle, in the states of Washington and Oregon, Chubb lost all of its profitable customers who paid annual premiums of $500,000 to $1 million because of rate increases. According to a former customer service supervisor for Chubb in Pleasanton, California, who was in charge of supervising the staff that processed policies and analyzed risks, Chubb's California operations were also extremely adversely affected by the rate increase/policy non-renewal initiative because customers were not accepting the new higher rates and leaving, and also because the haphazard, uneven manner in which rate increases were applied (or not applied) resulted in regulatory violations of California's insurance laws and record fines of Chubb by the California Department of Insurance. According to a former senior customer services team leader at Chubb in Los Angeles and Seattle; an independent insurance broker for A.O.N. Risk Services in Southfield, Michigan who did business with Chubb; a former energy resources underwriter in the Commercial Lines Department of Chubb & Son, Inc., in Cincinnati and Pittsburgh; a former commercial lines marketing underwriter for the Chubb in Seattle; a former umbrella and excess insurance manager for Chubb in Englewood, Colorado; a former commercial lines customer service representative/rater for Chubb in Seattle; and a former multi-national account specialist for Chubb in its Warren, New Jersey, headquarters, in addition to the hundreds of millions of dollars in business Chubb announced that it expected to lose through the rate increase/policy non-renewal initiative, Chubb lost *additional undisclosed hundreds of millions of dollars in profitable business that Chubb wanted to retain*, as profitable customers obtained insurance elsewhere. According to a former commercial lines customer service representative/rater for Chubb in Seattle, among the

- 43 -

Case 2:23-cv-04253-EP Document 55-3 Filed 08/09/24 Page 47 of 50 PageID: 1692

large profitable customers which were lost was Western Wireless, which had provided Chubb with a $400,000-$500,000 annual premium, but was lost to CNA Insurance. According to a former manager of Chubb's customer care unit in Troy, Michigan, the rate increase/policy non-renewal initiative caused Chubb to also lose Burger King restaurants in that area, which represented a large loss to Chubb. According to a former Chubb property claims manager in Troy, Michigan, Chubb also lost the account of Arby's restaurants in the Michigan area. According to a former Chubb underwriting technical assistant in Englewood, Colorado, the rate increase/policy non-renewal initiative caused Chubb to also lose the profitable policy provided to Echo-Star (annual premium of $105 million), as well as four to five other customers with annual premiums equal to Echo-Star's. Chubb also lost the account of Mary Kay Cosmetics, various large, high-technology firms and a huge multi-national account from Chubb's Washington, D.C. area office because of the rate increase/policy non-renewal initiative, according to a former multi-national account specialist for Chubb in its Warren, New Jersey headquarters;

(b)     The rate increases that were, in fact, being obtained on new and renewal standard commercial insurance policies were very small and well below the levels necessary to have any materially favorable impact on Chubb's 99 results, or even to lessen the growing underwriting losses in Chubb's standard commercial insurance business. Indeed, because other insurance companies were reducing prices or keeping them flat, increases by Chubb were being met with extreme resistance, since customers (or their independent insurance brokers) could easily buy the same insurance from other companies at lower rates. To keep the customers that had not already left Chubb for lower-priced insurers, Chubb began to give their remaining customers either no rate increase or much smaller ones than it had planned under the rate increase/policy non-renewal initiative, according to a former property and casualty and director's and officer's underwriter in the financial institutions section of Chubb in Chicago (and according to the other former Chubb employees who provide specific examples of

- 44 -

Case 2:23-cv-04150-ER Document 55 Filed 08/09/2027 Page 48 of 50 Page 49 of 126

such, directly below). According to a former underwriting manager for Executive Risk/Chubb in Simsbury, Connecticut, despite the rate increase/policy non-renewal initiative, *Chubb was renewing the policies of 50% of its customers either at flat rates or even at reduced premiums*; for example, according to this same former Chubb employee, as late as March, 2000, Chubb's energy industry customers in Texas had not received rate increases. And according to a former customer service supervisor for Chubb in Pleasanton, California, the Robert Mondavi winery (with an annual premium of over $1 million) was not given a rate increase. Another customer, Novell (which had an annual premium of $105 million), also was not given an increase, according to a former regional supervisor for Chubb in Denver, Colorado. According to a former commercial lines customer service representative/rater in Chubb's Seattle office (who had worked for Chubb for 26 years and thus was intimately familiar with the Company's operations and methods of doing business), Chubb also failed to give its customers Microsoft or Boeing rate increases, as Chubb renewed both of their policies in April of 1999 with no rate increase even though the policies on each company had created huge losses for Chubb in the past. Similarly, many other customers were not given rate increases regardless of their profitability so that Chubb would not lose them as customers. Many times this was done because, according to a former property claims adjuster for Chubb in Boston, underwriters had the incentive to resist rate increases because their own compensation was dependent on keeping customers. Also, according to the former customer service supervisor for Chubb Insurance in Pleasanton, California, Chubb branch managers would themselves override intended rate increases;

(c) Chubb was, in fact, not maintaining a disciplined approach to renewing standard commercial insurance and was renewing hundreds of millions of dollars of standard commercial insurance policies at premium levels Chubb knew were unprofitable and thus would adversely impact Chubb's results going forward. According to a former umbrella and excess insurance manager for Chubb in

Englewood, Colorado; a former customer service supervisor for Chubb in Pleasanton, California; a former underwriting technical assistant of Chubb in Englewood, Colorado; a former energy resources underwriter in the Commercial Lines Department of Chubb & Son, Inc. in Cincinnati and Pittsburgh; and a former property and casualty and director's and officer's underwriter in the financial institutions section of Chubb in Chicago, Chubb retained many of its unprofitable customers that the rate increase/policy non-renewal initiative was designed to eliminate, which only exacerbated Chubb's losses. Because these unprofitable customers were such bad risks, they could not obtain insurance from any other insurer, and accordingly renewed with Chubb and paid the increased premiums. The premiums that these customers paid, while they were higher, were still far too low to make these customers profitable to Chubb because the customers were such bad insurance risks. In other instances, Chubb did not raise rates on unprofitable customers at all, but rather renewed at the same, unprofitable rates, or even reduced rates, just to keep the customers. For example, according to a former Chubb branch manager in Grand Rapids, Michigan, in early 99, Chubb attempted to raise the rates on its insurance policy with McDonald's Corporation. This policy was consistently unprofitable for Chubb for many years. The independent agents that had placed the policy with Chubb refused to go along with the increase and threatened to move the McDonald's account to another insurer. Chubb relented and did not increase McDonald's rates. In addition, according to a former customer service representative for Chubb in Washington, D.C., notwithstanding the fact that Chubb customer Langenscheidt Publishing Group was a bad risk and unprofitable, Chubb actually lowered its rates for this customer. It was well-known within Chubb that this was occurring throughout the Company because management was pressuring employees to meet certain revenue targets which were impossible to achieve under the rate increase/policy non-renewal initiative, and so the initiative was simply being ignored, not complied with, and/or applied in a haphazard fashion. According to a former underwriting technical assistant of Chubb in Englewood,

- 46 -

Case 3:02-cv-04405-EMR Document 55 Filed 08/09/07 Page 50 of 50 PageID 1295

Colorado, *Chubb was keeping approximately 60% of its high-risk, unprofitable customers that the rate increase/policy non-renewal initiative was purportedly eliminating*;

     (d)    Chubb's aggressive action to raise prices on its standard commercial insurance policies and accept substantial non-renewals to boost operating results of those lines, even if successful, would not have any significant positive impact on Chubb's financial results during 99 and, in fact, Chubb's standard commercial insurance problems would continue to very adversely impact Chubb's results throughout most of 99. It was well known within Chubb that the rate increase/policy non-renewal initiative did not have the immediate impact defendants represented it did and would have very little positive effect in 99 because, according to a former vice president in personal lines insurance who worked in Chubb's Warren, New Jersey, headquarters, the vast majority of Chubb policies came up for renewal either on July 1 or January 1 of a given year. Chubb was therefore able to manage only a minimal number of rate increases by January 1, 1999 for a number of reasons:

- Underwriters worked on commissions and so had a strong incentive to relent on rate increases rather than lose accounts.

- Because other insurance providers were not raising rates, policyholders would have had a lot of options for cheaper policies.

- Underwriters would be unaccustomed to asking for increases because Chubb, like most providers, had been lowering rates for so long. Therefore, some training would have been necessary and there was no specific training program at that time.

- By law, underwriters had to notify policyholders significantly in advance of rate increases – just how much in advance depended on the state. If the necessary notification time was more than one month, there would have been little or no time to effect a rate increase by January 1, 1999.

According to a former commercial lines underwriter in Chubb's Newport Beach, California office, *almost none* of the policies renewing on January 1, 1999, were renewed in accordance with the rate increase/policy non-renewal initiative since there was not enough time to implement rate increases in light of state regulatory

- 47 -

requirements concerning rate increases and prior notice periods. According to this former underwriter, underwriters could only begin to renew at higher rates in 2/99 and, because of regulatory notice periods, could only increase policies up for renewal in 4/99, *after the end of Chubb's 1stQ 99!* Thus, it was virtually impossible for the rate increase/policy non-renewal initiative to have any effect on Chubb's 1stQ 99;

(e) Chubb's reserves for its standard commercial, and property and marine insurance lines had been manipulated by reserve reductions which were not justified and by deliberate failures to set reserves, as detailed in ¶¶134-51. Indeed, according to a former general claims adjuster for Chubb in Boston, and a former senior customer services team leader at Chubb in Los Angeles and Seattle, upper management pressured branch managers to improperly reduce reserves, and ordered adjusters to refrain from recording reserves until after the Executive Risk acquisition was complete, as detailed in ¶¶143-45, resulting in artificially inflated earnings (the former senior customer services team leader supervised the clerks who entered the reserve adjustments into Chubb's computer system); and according to a former Chubb property claims manager in Troy, Michigan, and a former Chubb manager in Florham Park, New Jersey, Chubb manipulated its reserves so as to report artificially inflated earnings through the practice known as "stair-stepping," as detailed in ¶144. According to the former Chubb customer services team leader in Los Angeles and Seattle, the majority of Chubb's branch offices were manipulating reserves to artificially enhance Chubb's financial performance and Chubb operations personnel openly discussed the reserve manipulations at Company meetings. ¶143;

(f) Chubb's standard commercial insurance business had not stabilized as, due to weak premium growth and increasing losses, the combined ratio on these lines of business was still increasing and would continue to increase throughout 99 (excluding catastrophes), leading to larger than ever losses in these lines of business. Contrary to defendants' representations that the combined ratio had decreased to 117.9% in 1stQ 99, in actuality, the combined ratio was not decreasing because of the

- 48 -

Case 2:23-04245-EBR Document 166 Filed 08/09/24 Page 53 of 126

rate increase/policy non-renewal initiative but skyrocketing to 130% during 1stQ 99, according to a former Chubb branch manager in Grand Rapids, Michigan, and a former Chubb commercial lines marketing underwriter in Seattle;

(g)     Chubb's standard commercial insurance business was not encountering strong positive momentum or positive trends.  Due to weak premium growth and increasing losses, the combined ratio on these lines of business was still increasing (to 130% according to a former Chubb branch manager in Grand Rapids, Michigan) and would continue to increase throughout 99 (excluding catastrophes), leading to larger than ever losses in these lines of business.  According to numerous former Chubb employees, it was well-known within Chubb during the Class Period that the rate increase/policy non-renewal initiative was failing and that the purported turnaround in the standard commercial insurance business had not occurred;

(h)     Chubb's strategy of renewing only at good prices would not have any significant impact on Chubb's results until at least mid-2000, as it would take "at least two annual renewal cycles" for Chubb to reprice the standard commercial lines premiums and after the premiums were repriced it would take another year for the higher premiums to be earned into income.  According to a former Chubb customer service supervisor in Pleasanton, California, and a former branch manager for Chubb in Grand Rapids, Michigan, it was well-known within Chubb that the rate increase/policy non-renewal initiative would take two to three years before it could positively affect Chubb's performance.  This was so because: (1) according to a former branch manager at Chubb's West Michigan office, policies came up for renewal throughout the year (the vast majority renewing on either January 1 or July 1) and until a policy came up for renewal, its rates could not be increased; (2) even though a policy was renewed at a higher rate, the new, higher premium would not be collected immediately but would be paid over the policy period; (3) according to a former senior underwriter for financial institutions in Chubb's Chicago office, Chubb had written a good number of three-year long policies that would not be up for renewal (and

- 49 -

therefore a rate increase) for an extended period of time; and (4) the haphazard manner in which the rate increases were being applied – small increases for some customers, no increases for others, and decreases for yet others – prevented any immediate positive results. Chubb concealed this key fact from its public disclosures until after the merger closed;

(i) According to a former senior customer services team leader in Los Angeles and Seattle, Chubb's better-than-expected 1stQ 99 results were not the result of favorable developments or trends in Chubb's standard commercial insurance business as represented; in fact, Chubb's 1stQ 99 results had been deliberately falsified as detailed in ¶¶130-57 in order to artificially and improperly boost Chubb's reported EPS to conceal the continued serious deterioration in its standard commercial insurance business. According to this former employee, Chubb's upper management pressured branch managers to manipulate reserves to enhance Chubb's financial performance and such manipulations were a regular practice in the majority of Chubb's branch offices. Moreover, according to a former energy resources underwriter in the commercial lines department of Chubb in Cincinnati and Pittsburgh, and a former property claims adjuster for Chubb in Boston, rumors circulated within the Company that Chubb had artificially boosted its reported financial performance with accounting tricks;

(j) As a result of the foregoing negative conditions which were adversely impacting Chubb's business, defendants knew, according to a former Chubb branch manager in Grand Rapids, Michigan, that Chubb's forecasts of 5-1/2%-6% premium growth for its standard commercial insurance business during 99 and a falling combined ratio for its standard commercial insurance business were false and could not be obtained; and

(k) As a result of the foregoing negative factors which were adversely impacting Chubb's business, defendants knew Chubb's forecasts of 99 EPS of $4.10+ and 00 EPS of $4.50+ were false when made and could not and would not be achieved,

- 50 -

*even if Chubb suffered no catastrophe losses and even if Chubb achieved its repricing objectives in standard commercial insurance.*

49. Chubb's stock soared higher after Chubb reported its much better-than-forecast 1stQ 99 results and O'Hare, Kelso and Schram made their very bullish comments to analysts. Chubb stock, which traded at as low as $57 on 4/26/99, jumped to $60-7/8 on 4/27/99, $62-1/16 on 4/28/99, and $70-5/16 on 5/7/99 – a major upward move for a large cap insurance stock. On 5/7/99, *Bloomberg* issued a report on Chubb, stating:

> Chubb Corp shares gained 19 percent this week, as the 14th-largest U.S. property and casualty insurer was seen benefitting from lower losses on commercial policies and regulatory reform legislation.
>
> Shares of the Warren, New Jersey, company advanced 11 1/6, including a 5 ½-point jump today, to a four-month high of 70 5/16....
>
> ***The rebound was "overdue" said spokeswoman Gail Devlin, and was a "recognition that the shares were undervalued." She said "there may be more ahead."***

50. On 5/12/99, O'Hare held a private meeting with securities analysts, institutional investors and money managers in Boston. During these discussions, O'Hare forecast 99 EPS of $4.28 and 00 EPS of $4.70 for Chubb. On 5/12/99, Prudential Securities issued a report on the O'Hare briefing, stating:

> On Wednesday, May 12, Dean O'Hare, Chairman and Chief Executive Officer of Chubb Corporation met with members of the Boston investment community.... ***We received an update on pricing initiatives in the troubled standard commercial lines, with an indication that pricing momentum continues to build. An improvement in underwriting results in this area is expected as the year unfolds.***
>
>        \*     \*     \*
>
> Here is what Chairman O'Hare said.
>
> BUILDING ON PREMIUM RATE INCREASES IN THE STANDARD COMMERCIAL LINES
>
> Today, we received another piece of confirmation that Chubb's pricing strategies are working. Premium rates for the standard commercial lines rose 4% in the first week of May, following increases of 3.2% in April and 2.2% in March.

- 51 -

Retention rates remain in the low 70s. *New business that is going on the books has been intensely audited and the company is very comfortable with the pricing.*

\* \* \*

*Chubb's financial models indicate its stock is worth $102-140 per share. Mr. O'Hare stated that a value of $128 per share is realistic in today's market ....*

51. On 5/14/99, Chubb filed its Report on Form 10-Q for 1stQ 99 with the SEC, which contained Chubb's previously publicly disseminated 1stQ 99 financial results. The 1stQ 99 10-Q was signed by Schram. It also stated:

Premiums from standard commercial insurance, which represent 35% of our total writings, decreased by 3.9% in the first quarter of 1999 compared with the same period a year ago. The decrease was the result of the strategy we put in place in late 1998 to renew good business at adequate prices and not renew underperforming accounts where we cannot attain price adequacy. *On that business that was renewed, rates increased modestly in the first quarter of 1999 and we expect this trend to continue.*

Chubb's stock continued to move higher, reaching its Class Period high of $76-3/8 on 5/24/99.

52. On 6/2/99, O'Hare was the main dinner speaker at DLJ's First Annual Insurance Conference, which was attended by large Chubb shareholders, securities analysts, institutional investors and money managers. During his speech – and in private conversations with attendees – O'Hare stated:

- Management's actions to turn around Chubb's standard commercial insurance operations by raising prices and not renewing unprofitable policies were not only working, in fact, they were exceeding management's expectations.

- Chubb's standard commercial insurance operations would show 5-1/2%-6% premium growth throughout 99, as Chubb's rate increases for new or renewal standard commercial insurance policies were sticking.

- The momentum of rate increases in Chubb's standard commercial insurance operations was growing month by month.

- Chubb was being successful at retaining the higher priced standard commercial insurance business which it desired and was profitable.

- Chubb was not losing as much of its standard commercial insurance business due to rate increases as it had feared.

- 52 -

- The combined ratio of Chubb's standard commercial insurance business would decline throughout 99, to about 110% by year-end from 119.5% at year-end 98.

- The changes in Chubb's standard commercial insurance business would produce an underwriting profit by 2000 and a 6% total return on equity by 2001.

- Chubb's stock was undervalued and, based on its improving business situation, the stock was worth between $102-$140 per share.

- O'Hare was very optimistic about the future performance of Chubb's business, in part due to the turnaround of its standard commercial insurance business.

- As a result of the better-than-expected pace of the turnaround of Chubb's standard commercial insurance business, Chubb had increased its forecasted 99 EPS to $4.10+ and its 00 EPS to $4.70+.

53. On 6/3/99, DLJ issued a report on Chubb which was based on and repeated information provided at the 6/2/99 dinner, including private conversations with O'Hare. The report forecast 99 and 00 EPS of $4.35 and $5.05 and 2ndQ 99 EPS of $1.06 for Chubb and stated:

> Last night, Chairman and CEO of the Chubb Corp., Dean O'Hare, was the guest speaker at the concluding dinner of DLJ's first annual Insurance Conference.

> SIGNIFICANT COMMENTS MADE INCLUDE:

> ***CB's execution of its turnaround strategy in its standard commercial lines business (roughly 35% of premiums written) is exceeding management's expectations.***

> \* \* \*

> ***Management expects that the overall combined ratio, ex catastrophes, will improve steadily due to expense reductions, claims management, and the repricing or non-renewing of unprofitable standard commercial business.***

54. On 6/15/99, O'Hare held a private luncheon for several securities analysts that followed Chubb. During the luncheon, O'Hare stated: ***"I know I have been criticized at times for being too optimistic,"*** but ***"I am more optimistic than usual"*** and he was "quite confident [he was] sending the correct signal as far as overall trends are concerned," as "Chubb [was] significantly outperforming most of its peers with respect to implementing renewal price increases on standard commercial business."

- 53 -

He added as to the turn in standard commercial lines, "*We're going to make it happen*" which would lead to "*a 6% return on equity*" by late 00 in the standard commercial lines.

55.     The statements made between 5/7/99 and 6/15/99 that Chubb's stock was "*undervalued*" and there may be "*more good news ahead*," that Chubb's standard commercial insurance business' favorable pricing momentum "*continues to build*," that the turnaround of this business was "*exceeding management's expectations*," that the new standard commercial insurance being accepted by Chubb had been "*intensely audited*" and Chubb was now "*very comfortable with the pricing*," that these premiums had increased "*modestly*" in the 1stQ 99 and, as a result, Chubb's standard commercial insurance combined ratio (excluding catastrophe) would improve steadily in 99-00 due to Chubb's rate increase/policy non-renewal strategy, and that O'Hare was "*more optimistic than usual*" and Chubb was forecasting 99 EPS of $4.20+ and 00 EPS of $4.70+, and thus that Chubb's own financial models – reflecting these more favorable trends – showed Chubb's stock was worth $102-$140 per share and that a $128 price was "*realistic in today's market*," were false when made. The true facts, known to defendants and which contradicted their public statements, are detailed above in ¶48, and are incorporated herein by reference. As a result of the negative factors set forth in ¶48, above, which were adversely impacting Chubb's business, defendants knew Chubb's forecasts of 99 EPS of $4.20+ and 00 EPS of $4.70+ were false when made and could not and would not be achieved, *even if Chubb suffered no catastrophe losses and even if Chubb achieved its repricing objectives in standard commercial insurance.*

56.     By 6/15/99, Chubb's stock closed at $70-9/16. On 6/17/99, Chubb and Executive Risk filed the final version of their Registration Statement and Merger Proxy with the SEC relating to the proposed merger, which became effective that day. The Registration Statement was signed by O'Hare, Kelso and Schram who were also associated with and identified in the Merger Proxy. Sills, Kullas and Deutsch wrote

Case 2:23-cv-04245-EBR Document 65 Filed 08/09/07/2024 8 of 50 PageID 203

the Merger Proxy and were associated with and identified in the Merger Proxy. The record date on the merger was 6/17/99. The Merger Proxy was mailed to Executive Risk's shareholders on 6/18/99 to secure Executive Risk's shareholders' approval of the proposed sale of their company to Chubb for 1.235 shares of Chubb stock for each Executive Risk share.

57. The Merger Proxy was mailed to Executive Risk's shareholders on 6/18/99 via a transmittal letter signed by Sills and Kullas, which stated:

> *We cannot complete the merger without the approval of the holders of a majority of the outstanding shares of Executive Risk common stock.*
>
> After careful consideration, your board of directors *has unanimously approved the merger agreement and determined that the merger is in the best interest of Executive Risk and its shareholders.* The board of directors unanimously recommends that you vote FOR the merger agreement.
>
> In arriving at its determination and recommendation, the board of directors took into account the factors described in the attached proxy statement/prospectus, including the opinions of Donaldson, Lufkin & Jenrette Securities Corporation and Salomon Smith Barney Inc. to the effect that *the merger consideration is fair to Executive Risk stockholders from a financial point of view.*

The Merger Proxy also stated:

> What Executive Risk Shareholders Will Receive in the Merger
>
> You will receive 1.235 Chubb shares for each Executive Risk share you hold.... *Based on the number of shares of Executive Risk common stock outstanding on June 15, 1999 and the closing price of $70.56 per share of Chubb stock on that date, Chubb would issue approximately 14.28 million shares to the stockholders of Executive Risk with an aggregate value of approximately $1,007.5 million.*

58. The Merger Proxy incorporated Chubb's 1stQ 99 10-Q by reference and included Chubb's 1stQ 99 financial results:

> The data as of March 31, 1999 and 1998 and for the three months ended March 31, 1999 and 1998 have been derived from Chubb's unaudited consolidated financial statements which include, in the opinion of Chubb's management, all adjustments, consisting of normal recurring accruals, necessary to present fairly the results of operations and financial position of Chubb for the periods and dates presented....

- 55 -

|  | For the Three Months Ended March 31, | |
|---|---|---|
|  | 1999 | 1998 |
| Total Revenues | $1,629.6 | $1,587.3 |
| Operating income from continuing operations** | $ 166.4 | $ 162.8 |
| Realized investment gains from continuing operations | $ 20.5 | $ 29.0 |
| Income from continuing operations | $ 186.9 | $ 191.8* |
| Operating income from continuing operations per diluted common shares** | $1.02 | $ .95* |
| Income from continuing operations per diluted common shares | $1.14 | $1.12* |

\* Property and casualty insurance income and income from continuing operations have been reduced by a net charge of $26.0 million or $.15 per share for the after-tax effect of a $40.0 million restructuring charge.

\*\* Operating income from continuing operations is defined as income from continuing operations excluding realized gains, net of tax.

59. The Merger Proxy stressed how the recent strong increase in Chubb's stock price made the sale of Executive Risk to Chubb much more advantageous to Executive Risk public shareholders:

The table ... sets forth the value of the shares of Chubb common stock that a stockholder would have received for one share of Executive Risk common stock assuming the merger has taken place on those dates....

|  | Closing Price of Chubb Common Stock | Closing Price of Executive Risk Common Stock | Value of Chubb Common Stock Received |
|---|---|---|---|
| February 5, 1999 | $58.06 | $44.00 | $71.70 |
| June 15, 1999 | $70.56 | $87.50 | $87.14 |

Based on these stock prices, the total consideration to be paid to Executive Risk's shareholders had increased from $839 million on 2/5/99 to $1.019 billion on 6/15/99.

60. The 6/17/99 Registration Statement and Merger Proxy and the oral proxy statements identified in ¶¶38, 50, 52, 54 and 57-59, were false and misleading because:

- 56 -

(a)    The merger was not in the best interests of Executive Risk's public shareholders, and the merger consideration to be received by Executive Risk's public shareholders was not fair, because, due to the false statements and accounting manipulations detailed herein, the price of the Chubb stock they were to receive in exchange for their Executive Risk stock was artificially inflated. As alleged above, on 6/17/99, defendants filed the Registration Statement/Merger Proxy. Because the merger consideration was fixed – Chubb would issue 1.235 shares of Chubb stock for each share of Executive Risk stock – the Registration Statement/Merger Proxy explained that if Chubb's stock price declined, the consideration Executive Risk shareholders were to receive would also decline:

> ***If the price of the Chubb common stock decreases, then the value of Chubb common shares that Executive Risk stockholders will receive in the merger will decrease.***
>
> ... [B]ecause the market price of Chubb shares fluctuates, ***the value at the time of the merger of the consideration to be received by Executive Risk stockholders will depend on the market price of Chubb shares at that time.***

(6/17/99 Proxy Statement, page 10). Accordingly, the Merger Proxy urged Executive Risk shareholders "to obtain current market quotations prior to making any decision with respect to the merger." (6/17/99 Proxy Statement, page 21).

(i)    On 2/8/99, Chubb and Executive Risk issued a joint announcement that they entered into the merger agreement, which announcement stated in part:

> Based on the closing prices of both companies' shares on Friday, February 5, 1999, ***Executive Risk shareholders would receive the equivalent of $71.71 per share.*** This represents a premium of 63% over Friday's closing price, 44% over Executive Risk's average trading price for the last month, and 38% over Executive Risk's three-month average trading price. The total value of the transaction would be approximately $850 million.

By 6/17/99, the final Registration Statement/Merger Proxy became effective. The price of Chubb's stock had increased to $73.56 per share on that date, implying that Executive Risk shareholders now would receive an equivalent dollar value of $90.85

($73.56 x 1.235) for each Executive Risk share in the proposed merger. On 7/19/99, the Executive Risk shareholders voted in favor of the proposed merger with Chubb. On that day, Chubb's stock price closed at $69.63 per share, implying a dollar value of $85.99 per share ($69.63 x 1.235).

(ii)  As alleged more fully below, however, just eight days after the vote on the merger, on 7/27/99, Chubb announced its 2ndQ 99 results *which were far below expectations.* Following the announcement, Chubb's common stock price declined to a closing price of $62.94 per share, down $10.625 per share from its price on 6/17/99 when the Merger Proxy was filed, and down $6.69 per share from its price on 7/19/99 when the vote took place. And, as also alleged more fully below, on 10/15/99, when Chubb announced its 3rdQ 99 results, again disappointing the market, it was then made apparent that defendants' positive statements during the Class Period were false. Following that announcement, *Chubb's stock price closed at only $46.69 per share on 10/15/99, down $26.875 per share or more than 36% from its price on 6/17/99 when the Merger Proxy was filed and down $22.94 per share or 33% from its price on 7/19/99 when the vote was taken.* The 1.235 Chubb shares received for each Executive Risk share exchanged in the merger was now worth only $57.66 ($46.69 x 1.235). This was significantly less than the roughly $90 equivalent dollar value anticipated at or around the time the Merger Proxy was mailed to the Executive Risk shareholders, and the approximate $86 per share value at the time of the merger vote on 7/19/99. It was also substantially less than the $71.71 equivalent dollar value specifically referenced in the 2/8/99 press release issued by Chubb announcing the merger; and

(iii)  Following these disclosures, it became clear that *Chubb's stock price at the time of the merger did not reflect all material adverse information which should have been disclosed prior to the merger.* As such, because Chubb's stock price was artificially inflated at the time of the merger, the merger was not in the "best interests" of Executive Risk shareholders, and the merger consideration was not

- 58 -

"fair" to Executive Risk shareholders, because while *at the time of the merger Executive Risk shareholders were led to believe that they would receive an equivalent dollar value of $85.99-$90.85 for each of their shares, in reality, the Executive Risk shareholders received an equivalent dollar value of only $57.66 for each of their shares -- amounting to only 63% of what Executive Risk shareholders were led to believe they were receiving.* This was not in the best interests of, and unfair to, Executive Risk shareholders because: (1) Executive Risk shareholders were in reality receiving only $57.66 worth of Chubb stock in exchange for each Executive Risk share which, at the time of the merger vote, 7/19/99, *was valued at approximately $86.00*; and (2) regardless of the value of Executive Risk shares at the time of the merger vote, Executive Risk shareholders were falsely led to believe that they would receive $85.99-$90.85 for each of their shares when they were really receiving an equivalent dollar value of only $57.66; and

(b) Chubb's aggressive actions to raise prices on its standard commercial insurance policies and accept substantial non-renewals to boost operating results of those lines was not working, let alone exceeding management's expectations, *because the rate increases were not sticking and Chubb's standard commercial insurance underwriting losses were increasing.* The true facts about Chubb's business and financial results, known to defendants and which contradicted their public statements, are detailed above in ¶48, subparagraphs (a) through (j), and are incorporated herein by reference. As a result of these foregoing negative factors which were adversely impacting Chubb's business, Chubb's forecasts of 99 EPS of $4.20+ and 00 EPS of $4.70 were false when made and could not and would not be achieved, *even if Chubb suffered no catastrophe losses and even if Chubb achieved its repricing objectives in standard commercial insurance.*

61. On 6/25/99, Bear Stearns met privately with O'Hare and other top Chubb executives to receive a briefing about Chubb's business. On 6/28/99, Bear Stearns

- 59 -

issued a report on Chubb, which was based on and repeated the information Chubb's executives had given it on 6/25/99. The report stated:

> We are reiterating our aggressive Buy rating of Chubb shares, following a private meeting with management Friday. We expect that, as Chubb continues to meet and exceed "Street" earnings expectations, the shares will be revalued back toward historical relative valuations....

> Chubb's CEO Dean O'Hare noted that the company's repricing/reunderwriting project in the standard commercial lines (approximately 30% of Chubb's total business) *continues to make progress* ....

> One of the issues concerning investors earlier this year was the decline in retentions (the amount of business successfully renewed) that Chubb saw when it first began its repricing efforts. *However, according to the company, the decline in retentions appears to have bottomed, and management expects these figures to begin to move higher.*

62. The positive statements on 6/25/99 that Chubb's *"repricing/ reunderwriting project* in the standard commercial insurance lines ... *continues to make progress,"* and that the decline in renewals "ha[d] bottomed" and would now *"move higher"* were false when made. The true facts, known to defendants and which contradicted their public statements, are detailed above in ¶48, subparagraphs (a) through (j), which plaintiffs incorporate herein by reference. In addition, Chubb was actually losing more standard commercial insurance business than stated and was writing less new standard commercial insurance than stated. As a result of these foregoing negative factors which were adversely impacting Chubb's business, defendants knew Chubb's forecasts of 99 EPS of $4.20+ and 00 EPS of $4.70+ were false when made and could not and would not be achieved, *even if Chubb suffered no catastrophe losses and even if Chubb achieved its repricing objectives in standard commercial insurance.*

63. Between 6/16/99 and 7/19/99, Chubb's stock traded between $67-13/16 and $74-1/8, giving the acquisition of Executive Risk a per share value of $84-$91 and an aggregate value of $982.8 million to $1.071 billion. On 7/19/99, a majority of Executive Risk's public shareholders voted to approve the sale of Executive Risk to Chubb and, on 7/20/99, Chubb completed the Executive Risk merger. Immediately

after the approval of the Executive Risk acquisition, Chubb's stock began to fall – from $70-1/2 on 7/19/99 to as low as $64-1/2 on 7/26/99 – on concerns that Chubb's 2ndQ 99 results, to be announced in late 7/99, would be worse than forecast.

64. On 7/27/99, just eight days after Executive Risk's shareholders approved the sale of their company to Chubb in return for stock, Chubb reported 2ndQ 99 operating income of $1.00 per share *well below expected results*. Chubb's release stated:

> Standard commercial lines premiums in the second quarter declined 9% to $455.4 million and *had a combined ratio of 120.8%.* *"We made continued progress in improving pricing* in our standard commercial lines during the quarter," said Mr. O'Hare. *"Our pricing initiative is building momentum, with rates on renewal business continuing to accelerate. We have retained business we want to keep at more attractive rates, while walking away from unprofitable or under-priced renewals....*
>
> *"Given the moderate magnitude of rate increases in the early stages of the repricing program,"* said Mr. O'Hare, *"it will take at least two renewal cycles to adequately reprice the entire standard commercial book, and during that time we will continue to have losses from non-renewed policies. Thus ... it will be mid-2000 before the benefits of these actions significantly flow to the bottom line."*

65. On 7/27/99, subsequent to the release of its 2ndQ 99 results, Chubb held a conference call for analysts, money and portfolio managers, institutional investors and large Chubb shareholders to discuss Chubb's 2ndQ 99 results, its business and its prospects. During the call – and in follow-up conversations with analysts – O'Hare and Kelso stated:

- Management's actions to turn around Chubb's standard commercial insurance operations by raising prices and not renewing unprofitable policies were in fact working, but would take longer than expected to benefit Chubb's EPS.

- The rate increases in Chubb's standard commercial insurance operations were still growing.

- The combined ratio of Chubb's standard commercial insurance business would decline during the balance of 99.

- The changes in Chubb's standard commercial insurance business would produce an underwriting profit by 2000 and a 6% total return on equity by 2001.

CHUBB (LEAD)
Service List - 08/08/02
Page   1


COUNSEL FOR PLAINTIFF(S)

Peter S. Pearlman
COHN LIFLAND PEARLMAN HERRMANN
  & KNOPF LLP
Park 80 Plaza West-One
Saddle Brook, NJ   07663
  201/845-9600
  201/845-9423 (fax)

Darren J. Robbins
Arthur C. Leahy
Laura M. Andracchio
MILBERG WEISS BERSHAD HYNES &
  LERACH LLP
401 B Street, Suite 1700
San Diego, CA   92101-5050
  619/231-1058
  619/231-7423 (fax)


COUNSEL FOR DEFENDANTS

Mary Catherine Roper *
DRINKER BIDDLE & REATH LLP
500 Campus Drive
Florham Park, NJ   07932-1047
  973/360-1100
  973/360-9831 (fax)

* William J. O'Shaughnessy
MCCARTER & ENGLISH, LLP
Four Gateway Center
100 Mulberry Street
Newark, NJ   07101-0652
  973/622-4444
  973/624-7070 (fax)

Herbert M. Wachtell *
WACHTELL, LIPTON, ROSEN & KATZ
51 West 52nd Street
New York, NY   10019
  212/403-1000
  212/403-2000 (fax)


COURTESY COPIES

Marte Castanos *
CALPERS LEGAL OFFICE
400 P Street, Suite 3340
Sacramento, CA   95814
  916/326-3663
  916/326-3659 (fax)

* Randy Treece
Legal Services
OFFICE OF THE STATE COMPTROLLER
Gov. Alfred E. Smith
  State Office Building
Albany, NY   12236
  518/474-3444
  518/473-9104 (fax)

* **DENOTES SERVICE VIA UPS.**

66. Subsequent to the 7/27/99 conference call, O'Hare and Kelso had private one-on-one conversations with analysts from PaineWebber, DLJ, Prudential Securities and Bear Stearns, during which they repeated the information from the 7/27/99 conference call and also told them that the rate increase/policy non-renewal initiative was working and Chubb still expected 99 EPS of over $4.00 and 00 EPS of over $4.50.

67. On 7/27/99, PaineWebber issued a report on Chubb, which was based on and repeated information provided in the 7/27/99 conference call and in follow-up conversations with O'Hare, Kullas and Sills. The report cut the forecasted 99 and 00 EPS for Chubb to $4.10 and $4.55. It also stated:

> * ***In what was perceived as a shocking disappointment***, Chubb reported flat premiums for the second quarter with earnings ... short of the Street consensus ....

> * ***Management dampened its earlier enthusiasm for improving market conditions, which had ratcheted up expectations early in the second quarter.***

>     \*     \*     \*

> The bad news: ***Total standard commercial business shrank 9.0%, more than expected. The combined ratio remained unacceptably high at 120.8%. Commercial multiperil results were terrible.... Premiums in total were flat rather than up about 5% as expected.***

> CEO Dean O'Hare stated: ***"I might have actually gotten a little bit euphoric that we could do this turnaround of standard commercial lines without any real disturbance of the premium pattern." Q2 "has brought me back to where I started." "I'm not in any way discouraged but I admit to being somewhat overly optimistic at the end of the first quarter."***...

> He also noted: ***"we are losing more business than we did in the first quarter and we're writing less new business than we did in the first quarter."***

>     \*     \*     \*

> ***Management stated that it will take at least two renewal cycles to adequately reprice the entire standard commercial book. It will be mid 2000 before these actions have a significant impact on the bottom line.***

- 62 -

68.     On 7/27/99, Prudential Securities issued a report on Chubb, which was based on and repeated information provided in the 7/27/99 conference call and in follow-up conversations with O'Hare, Kullas and Sills.  The report cut the forecasted 99 EPS for Chubb to $4.07.  It also stated:

> First quarter trends were very encouraging.  As you recall, following the very disappointing fourth quarter, Chubb aggressively implemented pricing strategies to return its standard commercial lines margins to satisfactory levels.  Chubb made progress on all fronts in the first quarter and management believed that the company had a good shot at increasing its total premiums by as much as 5% for the year (excluding any contribution from Executive Risk) for 1999 compared with its earlier projection of flat premiums.
>
> *... Management is not in any way discouraged by the second quarter trends. Rate increases continue to build momentum....* Management is returning to its initial projection of flat premiums for the year with the anticipation that it will lose about $200 million in standard commercial premiums, or about 10% of the standard commercial book.

*   *   *

> *Standard commercial results were awful.... The total standard commercial book reported a combined ratio of 120.8% slightly better than a year ago but deteriorated from the 117.9% reported in the first quarter.*

69.     On 7/28/99, DLJ issued a report on Chubb which was based on and repeated information provided in the 7/27/99 conference call and in follow-up conversations with O'Hare, Kullas and Sills.  The report cut the forecasted 99 EPS for Chubb to $4.25.  It also stated:

> *A month ago Chairman and CEO Dean O'Hare was enthusiastically optimistic that the turnaround in the standard commercial book might occur ahead of schedule based on trends seen mid-quarter.*
>
> *HOWEVER, on yesterday's conference call he stated that he had been overly optimistic and returned to expect CB's original targets.*
>
> We are lowering our 1999 estimate to $4.25 per share from $4.35 to incorporate trends in the 2Q 99 results....
>
> THERE IS GOOD NEWS:
>
> —     *CB's turnaround strategy remains on target with original expectations.*

- 63 -

70. Chubb's stock continued to fall as these much worse-than-forecast results and the continued, troubled nature of Chubb's standard commercial lines were revealed -- to as low as $58-5/8 on 7/30/99. However, Chubb's stock continued to trade at artificially inflated levels throughout the balance of the Class Period due to Chubb's failure to make full and complete disclosure of the adverse facts and conditions then impacting Chubb's business and Chubb's continued false and misleading statements.

71. Chubb's reported 2ndQ 99 financial results and the reassurances of 7/27/99 and 7/28/99 that Chubb had only been *"a little bit euphoric"* or *"overly optimistic"* at the end of the 1stQ 99, that Chubb's management was *"not in any way discouraged"* by the performance of Chubb's standard commercial insurance business in the 2ndQ 99 as "[r]ate increases continue to build momentum," permitting Chubb management to return to Chubb's "original" (*i.e.*, pre-4/27/99) forecasts because the standard commercial insurance *"turnaround strategy remains on target with original expectations,"* and thus that Chubb would still achieve 99 EPS of $4.00+, were false when made. The true facts, known to defendants and which contradicted their public statements, are detailed above in ¶48, subparagraphs (a)-(e), (g)-(h), (j), which plaintiffs incorporate herein by reference. In addition:

(a) Chubb's combined ratio was still increasing in 2ndQ 99 and would continue to increase throughout 99 (excluding catastrophes), which would hurt Chubb's EPS in 99. Contrary to defendants' representations that the combined ratio was 120.8% in 2ndQ 99, in actuality, the combined ratio was a 130% during 2ndQ 99, according to a former Chubb branch manager in Grand Rapids, Michigan;

(b) Chubb's reported 2ndQ 99 financial results had been deliberately falsified, as detailed in ¶¶130-57, in order to artificially and improperly boost Chubb's reported EPS and to conceal the true magnitude of the failure of the rate increase/policy non-renewal initiative; and

(c) As a result of the foregoing negative factors which were adversely impacting Chubb's business, defendants knew Chubb's forecasts of 99 EPS of $4.00+

and 00 EPS of $4.50+ were false when made and could not and would not be achieved, even if Chubb suffered no catastrophe losses.

72.     During 8/2/99-9/22/99, Chubb's stock continued to trade at inflated prices because of defendants' prior misleading statements, their dissemination of Chubb's falsified 2ndQ 99 financial results, and their failure to disclose that the integration of Executive Risk was having an adverse effect on Chubb. The management structures of the two companies did not mesh (which caused severe disorganization), there were problems integrating the computer systems of the two companies and they had no plan to address the two companies' overlapping areas of competition, which were counterproductive. Chubb's stock traded between $56 and $62-5/16, trading at as high as $56-5/8 on 9/21/99.

73.     However, in late 9/99, Chubb's stock began to fall to $49-$50 on concerns that Chubb's 3rdQ 99 results, to be released in mid-10/99, would be much worse than forecast. On 10/14/99, Chubb stock traded at as high as $49-3/8, but was still inflated by defendants' misleading statements concerning the rate increase/policy non-renewal initiative, Chubb's falsified 2ndQ 99 financial statements, and defendants' omissions concerning the problems with integrating Executive Risk.

74.     In 8/99, Chubb filed its 2ndQ 99 Report on Form 10-Q with the SEC, signed by Schram, which included Chubb's falsified 2ndQ 99 financial statements. It stated:

> Premiums from standard commercial insurance, which represent 34% of our total writings, decreased by 6.4% in the first six months of 1999 and 9.1% in the second quarter compared with the similar periods in 1998. The decreases were the result of the strategy we put in place in late 1998 to renew good business at adequate prices and not renew underperforming accounts where we cannot attain price adequacy. On the business that was renewed, rates have increased modestly yet steadily in the first six months of 1999 and we expect this trend to continue. Retention levels were lower in the first six months of 1999 compared with the same period in 1998. Approximately half of the non-renewals were the result of business we chose not to renew and half were the result of customers not accepting the price increases we instituted. It will take at least two renewal cycles to adequately reprice the entire standard commercial book and during that time we will continue to have losses

- 65 -

from non-renewal policies. Thus, it will be mid-2000 before these actions have a significant positive effect on our results.

75. Thus, Chubb belatedly disclosed what it had concealed prior to the completion of the merger – that it would see no benefit from the pricing strategy of its standard commercial insurance business during 99. However, the Company failed to disclose just how bad its 99 results would be due to its poor standard commercial insurance business, or how bad Chubb's actual 2ndQ 99 results actually were.

76. On 10/15/99, Chubb revealed *much lower-than-forecast 3rdQ 99 results of only about $.40-$.45, compared to $1.04 in the 3rdQ 98, due, in part, to catastrophe losses from Hurricane Floyd.* However, Chubb admitted:

> *In addition, underwriting losses from its standard commercial business continued to have an adverse effect on earnings.*

77. On 10/15/99, Merrill Lynch reported:

> \* Chubb continues to address the poor profitability in its standard commercial lines business, *although an earnings turnaround could take 12-14 months.*
>
> \* We have reduced our 2000 per share estimate to $4.15 from $4.65. We have taken down our 1999 estimate to $3.35 from $4.10 ....
>
>       \*   \*   \*
>
> *Chubb's preannounced earnings shortfall represents another in a string of quarterly earnings disappointments.* While weather has hurt earnings over the past year, *the profitability problems in the company's standard commercial lines business is a greater concern among investors.*

78. On 10/15/99, Bear Stearns cut its 99 EPS forecast to $3.25 and its 00 EPS to $4.20, and stated:

> Chubb finally pre-announced third quarter earnings that will be significantly reduced by catastrophe losses .... In addition, *when adjusting for the catastrophe losses, we conclude that the comparisons will still have been difficult.*
>
> Chubb announced that third quarter earnings will be in the $0.40-$0.45 range, reduced by approximately $0.50 because of catastrophe losses....
>
> If we add back the $0.50 catastrophe losses, we get to $0.90, our recently-revised estimate for the quarter, which is about even with last year's figure. But last year, the company incurred $0.27 per share from

catastrophe losses, mostly Hurricane Georges, *so it becomes obvious that continued margin difficulty in the company's book of standard commercial lines of business is having a drag effect on earnings.*

79. On 10/15/99, Chubb stock fell to $44 from $49-3/8 on 10/14/99 – falling to its lowest price in years.

80. On 10/18/99, C.S. First Boston wrote:

*The Chubb stock now sells for about half the price it sold at in July 1998. While in retrospect at that point the stock was over priced now it has come back to earth.*

\* \* \*

*Chubb's standard commercial lines insurance operations remain a severe disappointment.*

81. On 11/4/99, Chubb formally reported its terrible 3rdQ 99 results – EPS of just $.44, compared to $1.04 in 3rdQ 98. Chubb's release stated:

*Standard commercial insurance performed poorly in the third quarter, recording a combined ratio of 130.4%, which included 10.1 percentage points of catastrophe losses....*

..."[I]t will take time for the benefits of the pricing initiative to reverse the losses from underpriced business written in the extremely competitive market of the past few years," [said O'Hare].

82. As a result of the continued horrible performance of Chubb's standard commercial insurance operations throughout 99, Chubb reported a *substantial earnings decline in 99, not the large increase forecast during the Class Period*, and Chubb's stock continued to sell for prices *well below* the levels it was artificially inflated to during the Class Period – especially the critical period when Executive Risk's shareholders were determining how to vote on the proposed sale of their company to Chubb in return for Chubb stock.

83. In Chubb's 99 10-K, signed by O'Hare and Schram, they admitted:

PROPERTY AND CASUALTY INSURANCE

Property and casualty income before taxes was $626 million in 1999 compared with $685 million in 1998 and $828 million in 1997. *The decrease in earnings in 1999 was due to deterioration in underwriting results caused in large part by the continued weakness in the standard commercial classes*, which include multiple peril, casualty

Case 3:02-cv-04405-GEB-RB Document 55-1 66-33 Filed 08/09/07/23/04 22 Page 73 of 126 Page ID: 217

and workers' compensation, and to a lesser extent, higher catastrophe losses.

\* \* \*

STANDARD COMMERCIAL INSURANCE

> *Reported net premiums from standard commercial insurance decreased 8% in 1999 compared with a 1% decrease in 1998....*

Our standard commercial insurance business produced substantial underwriting losses in each of the past three years, *with results becoming increasingly unprofitable each year. The combined loss and expense ratio was 123.6% in 1999 compared with 118.0% in 1998 and 114.5% in 1997.*

It will take at least two annual renewal cycles to adequately reprice the entire standard commercial book, and during that time we will continue to have losses from underpriced business. Thus, it will be the latter part of 2000 before our pricing initiative is expected to have a noticeable effect on our standard commercial results.

Multiple peril results were unprofitable in each of the past three years due, in large part, to inadequate prices. *Such results were progressively more unprofitable each year. In the liability component of this class, results deteriorated in 1998 and again in 1999 due to increases in the severity of losses.*

\* \* \*

> *Results for our casualty business were unprofitable in each of the past three years. Results deteriorated in 1999, primarily in the automobile and primary liability components....* Results for the primary liability component were unprofit-able in each of the past three years, *but more so in 1999* ... due to a higher frequency of large losses in those years. Results in the automobile component *were increasingly unprofitable in each of the past three years due to an increase in the frequency of losses.* Our commercial automobile book of business has been inadequately priced, a consequence of the prolonged soft market.

Workers' compensation results were unprofitable in each of the past three years, reflecting the cumulative effect of price reductions over the past several years. Results were also adversely affected in 1999 ....

84. The horrible performance of Chubb's standard commercial insurance business during 97-99, and its increasingly poor performance during 99, is shown below:

**Chubb Corporation**
**Standard Commercial Lines**
**Quarterly Results**
**(in thousands)**

| | | | **1997** | | |
|---|---|---|---|---|---|
| | 03/31 | 06/30 | 09/30 | 12/31 | Year |
| Net Premiums Written | $552,800 | $489,400 | $482,300 | $501,600 | $2,026,100 |
| Combined Ratio | 108.6% | 111.7% | 113.9% | 115.5% | 112.4% |
| | | | **1998** | | |
| | 03/31 | 06/30 | 09/30 | 12/31 | Year |
| Net Premiums Written | $519,200 | $500,800 | $468,200 | $517,600 | $2,005,800 |
| Combined Ratio | 113.4% | 121.1% | 117.9% | 119.5% | 118.0% |
| | | | **1999** | | |
| | 03/31 | 06/30 | 09/30 | 12/31 | Year |
| Net Premiums Written | $499,100 | $455,400 | $435,300 | $452,400 | $1,842,200 |
| Combined Ratio | 117.9% | 120.8% | 130.4% | 125.8% | 123.6% |

## VI.  SCIENTER AND SCHEME ALLEGATIONS

85.    Each defendant is liable for making false statements *or* for participating in a fraudulent scheme which permitted O'Hare, Kelso and Schram to have Chubb acquire Executive Risk on terms very favorable to Chubb, which could not have occurred had the truth about Chubb's standard commercial insurance business and its actual 99-00 prospects been disclosed, and allowed Executive Risk's top insiders (Sills, Kullas and Deutsch) to obtain millions in special benefits and payments not available to Executive Risk's public shareholders.

86.    After O'Hare became Chubb's Chairman/CEO in 96, Chubb's financial performance was erratic at best and its EPS actually declined in 96 from 95 and in 98 from 97.  This poor performance was due in large part to losses in Chubb's standard commercial insurance operations resulting mainly from inadequate premiums.  The erratic financial performance of Chubb's business and the significant under-

- 69 -

performance of its stock resulted in criticism of O'Hare's leadership of Chubb from large Chubb shareholders and analysts who followed the Company. This put pressure on O'Hare to dramatically improve the performance of Chubb's standard commercial insurance operations and Chubb's overall profitability and EPS growth and improve the performance of Chubb's stock. This situation also made Chubb vulnerable to a hostile takeover which defendants desperately wanted to prevent. To prevent such a hostile takeover, O'Hare had Chubb's Board adopt a strengthened "poison pill" provision *without* a shareholder vote. In order to try to boost Chubb's profits and EPS growth, O'Hare caused Chubb to seek to accomplish a major acquisition of a profitable specialty insurance carrier (not in the standard commercial insurance business) that would help boost Chubb's profitability and its EPS growth, while attempting an aggressive turnaround of Chubb's standard commercial insurance operations by raising premiums significantly and refusing to write or renew standard commercial insurance business where policyholders would not accept price increases. Thus, O'Hare was determined to have Chubb acquire Executive Risk.

87. In mid-98, Chubb stock was selling at $75-$80 per share, reaching $88-13/16 in mid-7/98. By mid-98, Chubb had identified Executive Risk – an insurance carrier specializing in directors' and officers' liability insurance which had reported growing EPS for several years – as its acquisition target. Because of the large size (cost) of the Executive Risk acquisition, the acquisition could only be made with Chubb stock. However, during 8/98-10/98, Chubb stock suffered a huge decline, falling to as low as $55-3/8 on 10/8/98 – *a decline of almost 40% in just three months, wiping out $5 billion of Chubb shareholder value* – just as Chubb was approaching Executive Risk about a possible acquisition. The reason for the decline in Chubb's stock was the continued terrible performance of Chubb's standard commercial insurance business which was suffering an increasingly large combined ratio, producing increasingly large underwriting losses, resulting in very poor EPS for Chubb. The continued deterioration in Chubb's standard commercial insurance

- 70 -

business resulted in Chubb reporting much ***worse-than-expected*** EPS in its 2ndQ, 3rdQ and 4thQ 98 and Chubb suffering ***a decline*** in 98 EPS to $4.19 from $4.39 in 97 and a decline in net income to $707 million from $769.5 million. As the chart below shows, this was the most substantial decline in Chubb's stock in over 10 years – a decline that wiped out $5 billion in Chubb shareholder value in ***three months***:

# Chubb Corp.
## Common Stock Price
## January 2, 1990 - October 29, 1998



88.  This very poor performance in Chubb's business and the substantial decline in Chubb's stock made Chubb highly vulnerable to a takeover by another company, which would result in O'Hare and Chubb's other top executives losing their jobs at Chubb - something O'Hare very much wanted to prevent. This threat of a takeover was known to O'Hare, Kelso and Schram, as it was recognized in the media and discussed within Chubb, and further, O'Hare on several occasions openly expressed his resistance to a takeover of Chubb. A 2/8/99 Barron's article, entitled *Ultimate Insurance: Chubb Looks Capable of Righting its Operations, but If it Doesn't* ... , recognized that Chubb faced a specific takeover threat from larger insurers at that time:

But with Congress expected to soon knock down the remaining barriers that separate insurance from banking, Chubb could have takeover appeal to a large U.S. financial-services firm intent on expanding into insurance. Chubb also could attract interest from big European insurers like Aegon or Allianz (which already owns Fireman's Fund), whose high-priced shares give them the currency to make sizable acquisitions here.

Then there's Warren Buffett's Berkshire Hathaway. In a recent research report on Berkshire, Paine Webber insurance analyst Alice Schroeder identified Chubb as the one insurer Buffett might be interested in buying.

On 2/14/99, a Milwaukee Journal Sentinel article on Chubb, commenting on the 2/8/99, Barron's article, recognized that O'Hare was failing to deliver the needed results to Chubb shareholders, and *O'Hare faced a personal threat of removal* should Chubb be the subject of a successful takeover attempt:

[A]n article in the Feb. 8 issue of Barron's financial weekly highlighted the fact that Chubb's chairman and chief executive officer, Dean R. O'Hare, hasn't been able to deliver earnings performance.

"The article said *the chairman better get moving or the company will be pulled out from under him*," [Barry S.] Arnold [a principal and portfolio manager at Arnold Investment Counsel in Milwaukee] said. It mentioned European companies such as Aegon and Allianz as potential acquirers, along with Warren Buffet's Berkshire Hathaway.

89.     It became undeniably clear that Chubb upper management both recognized the takeover threat facing Chubb, and intended to staunchly resist any such attempt when, on 3/12/99, Chubb issued a press release revealing that its Board of Directors had adopted what is commonly referred to as a "poison pill" provision, which would enable Chubb to resist a takeover attempt. On 3/16/99, Chubb sent its shareholders a letter in which it conceded that "the purpose of the [provision] is to ensure that you receive maximum value for your shares *in the event of a takeover offer for Chubb*." On 4/15/99, in an article entitled *Chubb Takes Steps to Ward off Takeovers*, the Journal of Commerce reported that:

Dean R. O'Hare, chairman and chief executive of Chubb Corp., told reporters the company has implemented a "poison pill" strategy to ward off potential buyers. Mr. O'Hare ... said the strategy will make it "very, very expensive" to buy the Warren, N.J.-based insurer....

- 72 -

He [O'Hare] said the company intends to remain independent while expanding through acquisitions of its own.

90. On 4/13/99, A.M. Best Company's BestWire reported:

When asked if Chubb is the object of an acquisition, O'Hare said "if we lose our independence, we will do it expensively. We're interested in buying – not selling"....

On 2/15/99, the National Underwriter, Property & Casualty/Risk & Benefits Management Edition, reported that, with respect to "Chubb's recent problems and the fuel they've added to rumors that **Chubb may be a takeover target for a large European or U.S. insurer**," "Mr. O'Hare told analysts 'Chubb is not for sale'." The article added the opinion of Michael Lewis, an insurance analyst for SBC Warburg Dillon Reed in New York, that Chubb looked like a takeover target:

Mr. Lewis said any "good company" might be attractive to potential acquirers in the current "difficult operating environment." The Executive Risk acquisition is "certainly a small acquisition in the scheme of things," he said, suggesting that the deal wouldn't preclude a larger deal with Chubb on the other end.

91. According to a former general claims adjuster for Chubb in Boston, as far back as 98, O'Hare was so concerned about a takeover attempt of Chubb, and so opposed to the idea, that O'Hare personally appeared at Chubb's Boston office to speak to the employees there in response to rumors circulating that Chubb was going to be subjected to a takeover attempt by AIG. According to this same former general claims adjuster, during the visit to the Boston office, O'Hare, in addressing the rumors of the possible takeover attempt, stated "over my dead body, I will do whatever I have to do to make sure that AIG does not get Chubb."

92. The large decline in Chubb's stock also created a major embarrassment for Chubb's high-profile Chairman/CEO, O'Hare, as this awful performance of the stock exacerbated the upset among Chubb's large and institutional shareholders over Chubb's recent poor financial performance and relative stock under-performance since 95. Further, this substantial decline in Chubb's stock posed a major danger to Chubb successfully acquiring Executive Risk, as it made Chubb's stock much less valuable

- 73 -

and desirable, meaning it would be more difficult to get Executive Risk's shareholders to approve the merger.

93. On 10/19/98, O'Hare met with Sills to discuss a possible acquisition of Executive Risk by Chubb for Chubb stock. Sills indicated he, Kullas and Deutsch were interested in such a transaction, meaning that a Chubb acquisition of Executive Risk was a distinct possibility. However, Chubb's stock continued to perform poorly – trading at as low as $58 on 10/29/98 – the day Chubb was to report its 3rdQ 98 results. As a result, O'Hare knew he had to do something to support Chubb's stock price – and halt its decline – to help Chubb avoid a takeover, which would cost O'Hare and Chubb's other top executives their jobs – and to help Chubb secure the approval of Executive Risk's shareholders of an acquisition by Chubb because, as described below, any decline in Chubb's share price threatened the possibility that Executive Risk's shareholders would accept an exchange of Chubb shares and thus approve the merger.

94. In mid-12/98, the Executive Risk and Chubb Boards received detailed reports on the proposed merger and authorized their top officers to go forward with negotiating the deal. On 1/4/99, O'Hare and Sills met to discuss integration issues between the two companies. During the first week of 1/99, there were telephone conferences between Chubb and Executive Risk. Chubb acknowledged that any agreement would involve a substantial premium to Executive Risk's market price because Executive Risk's stock did not adequately reflect its inherent value. Starting on 1/5/99, representatives of Chubb and Executive Risk met to conduct due diligence investigations of each other's businesses.

95. On 1/18/99, Chubb revealed that its 4thQ 98 results would also be far below forecasted levels – *yet another serious earnings shortfall for Chubb* – again due to very poor results from Chubb's standard commercial insurance lines. However, *O'Hare assured investors that Chubb was taking "aggressive steps" to improve the*

- 74 -

*standard commercial insurance business, including raising rates and declining to renew unprofitable policies.*

96. On 1/25/99, Executive Risk's Board reviewed the status of its due diligence investigation of Chubb. On 1/28/99, O'Hare and Sills agreed to the exchange ratio of 1.235 shares of Chubb stock for each share of Executive Risk stock and finalized the other key terms of the merger, including the special benefits and payments to be received by Sills, Kullas and Deutsch and Executive Risk's other Board members and top executives in return for endorsing the transaction and urging Executive Risk's public shareholders to vote for the sale of their company to Chubb.

97. After reporting Chubb's 4thQ 98 and 98 results, O'Hare, Schram and Kelso spoke with analysts again focusing on Chubb's standard commercial insurance business and the steps Chubb was taking to fix its problems in those lines of business. They indicated that it looked like the standard commercial insurance business was *beginning* to turn around and that Chubb was forecasting that its 99 EPS would increase over its 98 EPS.

98. On 2/5-6/99, the Chubb and Executive Risk Boards received updates regarding the transaction and approved the merger and related transactions. On 2/6/99, Chubb and Executive Risk executed the merger agreement. On 2/6/99, O'Hare and Sills announced the merger agreement whereby Chubb would acquire Executive Risk for 1.235 shares of Chubb stock for each Executive Risk share *if Executive Risk's shareholders voted to approve the sale of their company*. Based on Chubb's 2/5/99 closing price of $58-1/16, the acquisition was worth $839 million in the aggregate – or $71.70 per Executive Risk share – *below Executive Risk's 98 high of $75-5/8*. Because Chubb was paying for the Executive Risk acquisition with its stock *after* the stock had fallen far below its 98 high and the acquisition was going to dilute Chubb's 99 EPS, many Chubb shareholders and analysts were critical of the acquisition. Chubb's stock fell from its high of $60-1/8 on 2/5/99, the day *before* the proposed acquisition was announced, to $54 on 2/8/99 – the next trading day. This decline in

- 75 -

Chubb's stock exacerbated the serious problems defendants already faced in securing Executive Risk's public shareholders' approval of the sale of their company to Chubb in exchange for just 1.235 shares of Chubb stock for each of their Executive Risk shares, due, in part, to Executive Risk's consistent net income and EPS growth as shown below, unlike Chubb's erratic performance in recent years:

Executive Risk
Summary of Income for the Years
ended December 31,

|  | 1994 | 1995 | 1996 | 1997 | 1998 |
|---|---|---|---|---|---|
| Revenues | $117.1 | $144.8 | $189.6 | $261.7 | $ 323.2 |
| Net income | $ 19.3 | $ 25.3 | $ 28.1 | $ 36.5 | $43.4* |
| Net income per diluted common shares | $ 1.70 | $ 2.12 | $ 2.67 | $ 3.41 | $3.71* |

*  Net income reduced by a net charge of $3.8 million or $.32 per share for the after-tax effect of $5.8 million of charges related to the closing of certain operations.

99.    The more serious Chubb's business problems seemed to be, the less desirable its stock was compared to Executive Risk's stock, since Executive Risk, unlike Chubb, had reported consistent earnings growth in recent years and was a specialty insurance company without troubled standard commercial insurance lines of business.  In addition, because the acquisition consideration was fixed, *i.e.*, 1.235 shares of Chubb stock for each share of Executive Risk stock, if Chubb's stock price declined, the consideration Executive Risk's shareholders were to receive would also decline.  Thus, the defendants were under pressure to make Chubb appear to be solving its standard commercial insurance business problems to push Chubb's stock higher – *much higher* – in the following months, so that when the Executive Risk public shareholders actually considered whether or not to vote to approve the sale of their company to Chubb – and exchange their Executive Risk shares for Chubb shares – Chubb's business (especially its standard commercial insurance business) would look stronger and Chubb's prospects for EPS growth would appear to have improved, and thus its stock would look like an attractive investment and its stock price would be

- 76 -

much higher so that the consideration offered to Executive Risk's public shareholders would be much more valuable.

100. Because the merger/acquisition consideration was fixed, *i.e.*, 1.235 shares of Chubb stock for each share of Executive Risk stock, defendants faced a risk that if Chubb's stock price declined, the consideration Executive Risk shareholders were to receive would also decline. In fact, as the Merger Proxy stated:

> *If the price of the Chubb common stock decreases, then the value of Chubb common shares that Executive Risk stockholders will receive in the merger will decrease.*

> ... [B]ecause the market price of Chubb shares fluctuates, *the value at the time of the merger of the consideration to be received by Executive Risk stockholders will depend on the market price of Chubb shares at that time.*

Thus, as soon as the merger was publicly disclosed, the defendants began a campaign to persuade investors that actions were being taken to remedy the problems with Chubb's standard commercial insurance business, which would have a positive impact on Chubb's 99 and 00 results, leading to strong EPS growth for Chubb in 99 and 00.

101. In early 3/99, O'Hare made a speech at the annual Association of Insurance and Financial Analysts Conference in Arizona, during which speech and in one-on-one conversations with the analysts present he stated that Chubb had *"turned the corner (in the standard commercial lines pricing)"* and was *"starting to see rates increase."*

102. On or about 3/12/99, Chubb issued its 98 Annual Report to Shareholders, which included a letter signed by O'Hare stating:

> Chubb made progress on many fronts in the last year....

> Our progress, however, was partially obscured by disappointing financial results. We fell short of making an underwriting profit and earnings declined from 1997's levels.... *[T]he real culprit was the abysmal market in standard commercial lines. We are taking aggressive steps to correct pricing problems in this business, and we expect to see their impact on our financial results later this year.*

> \*   \*   \*

- 77 -

*Fixing the pricing problems we face in standard commercial lines is our number one priority in 1999.*

\* \* \*

Addressing Standard Commercial Pricing

The most significant challenge we face is in standard commercial lines, which represent about 35% of our total book, where the market has been virtually in a free fall. Pricing has sunk to levels where we have no choice but to walk away from business that is certain to lose money. Premiums in our standard commercial book, including commercial multiple peril, casualty and workers' compensation, were essentially flat for the year, and the combined ratio was well above 100%.

This performance is clearly not acceptable, *and we are taking aggressive steps to address it.* Simply put, we are seeking price increases .... In cases where we are not receiving significant premium for the risks we are taking on, we are prepared to walk away from the business rather than renew an unprofitable account. *Irrespective of the consequences, we are going to push very hard to make price increases stick.*

... Given that standard commercial lines represent a much smaller portion of our book than other insurers, *we are better positioned than most to absorb the business losses we will experience in the process of achieving profitable results.*

103. On 3/22/99, Deutsche Bank Securities issued a report on Chubb, which stated:

[A]t the annual Association of Insurance and Financial Analysts Conference in Arizona three weeks ago, we heard a speech by Chubb's chairman and CEO, Dean O'Hare, in which he reported that "*we have turned the corner (in standard commercial lines pricing) and are starting to see rates increase.*"

104. On 3/24/99, O'Hare had lunch with insurance company analysts. On 3/24/99, DLJ issued a report on Chubb, forecasting 99 EPS of $4.35 and 00 EPS of $5.05, and stating:

Restructuring, Turnaround, and Growth

We had lunch today with Chubb Chairman and CEO Dean O'Hare.

\* \* \*

*[T]he turnaround, is already in place. The turnaround part of the Chubb story is in the standard commercial lines which in 1998 totaled $2.0 billion and represented 36% of total.* Chubb's standard commercial lines have experienced terrible results in the last 12 months. The biggest challenge facing the Chubb organization at this time is fixing the underpriced business that has been dragging down the results of the

- 78 -

overall book. *Chubb has developed an aggressive strategy to reprice the business or non-renew accounts to get this business off the books.*

*Update on the turnaround: Management has taken a poor performing book of business that was getting worse and stabilized it. They now have momentum in terms of getting price increases. The goal now is to keep the momentum going.*

105. In late 98 and early 99, Chubb Senior Vice President, Paul Krump, held a series of meetings for branch managers and commercial line managers for Chubb's various United States zones. For instance, according to a former Chubb branch manager in Grand Rapids, Michigan, the Northern Zone meeting (Ohio, Illinois, Michigan, Pennsylvania and North and South Dakota) was held in Chicago with 30-40 branch and commercial line managers attending. Krump told attendees at these meetings that standard commercial line results were continuing to deteriorate, that this had "crushed" Chubb stock and, unless something was done, Chubb was in danger of being taken over. He told them that they had to improve the results of Chubb's standard commercial lines to push the stock back up. According to a former commercial lines marketing underwriter for Chubb in Seattle, branch and standard commercial line managers were given 10%-15% quotas for premium increases. They protested to Chubb's upper management that these premiums were ridiculous and unachievable given how bad the market was. Indeed, in light of the fact that many of Chubb's customers were cancelling Chubb and obtaining insurance from other insurers, it was impossible for the managers to achieve the 10%-15% increase quotas. According to a former property claims adjuster for Chubb in Boston, many top-quality, experienced personnel left Chubb for this reason, thus hampering Chubb's ability to successfully execute the rate increase/policy non-renewal initiative. The branch and standard commercial line managers were also told to improve underwriting results by not renewing unprofitable business, however, according to a former Chubb branch manager in Grand Rapids, Michigan, and a former vice president of personal lines for Chubb in its Warren, New Jersey, headquarters, *no underwriting training to improve underwriting was even put in place until well into the 1stQ and thus no positive*

- 79 -

*impact from the rate increase/non-renewal initiative could possibly occur during the 1stQ 99.* According to a former Chubb branch manager in Grand Rapids, Michigan, and a former commercial lines underwriter in Chubb's Newport Beach, California office, inside Chubb it was well-known that no turnaround in the standard commercial insurance business was occurring in the 1stQ 99 and people had no idea where the very favorable 1stQ 99 earnings report came from. Indeed, Chubb managers openly discussed the fact that the rate increase/policy non-renewal initiative would not work and that its goals were impossible to attain. According to a former commercial lines marketing underwriter for the Chubb in Seattle; a former umbrella and excess insurance manager for Chubb in Englewood, Colorado; an independent insurance broker for A.O.N. Risk Services in Southfield, Michigan, who did business with Chubb; a former senior customer services team leader at Chubb in Los Angeles and Seattle, a former commercial lines customer service representative/rater for Chubb in Seattle, Washington; a former multi-national account specialist for Chubb in its Warren, New Jersey headquarters; and a former renewal underwriter in the account service center for Chubb in Florham Park, New Jersey, Chubb was losing numerous profitable customers that it was trying to keep, and did not want to lose under the rate increase/policy non-renewal initiative, because Chubb was raising rates in a very competitive insurance market – a market where, according to a former commercial lines marketing underwriter for Chubb in Seattle and a former Chubb underwriter in Rochester, New York, all of Chubb's competitors were lowering rates or keeping them flat. Chubb's rate increases simply drove the Company's highly profitable customers to other insurers, where they could find the same coverage at lower rates. For example, according to a former commercial lines marketing underwriter for Chubb based in Seattle, Chubb lost all of its profitable customers in the states of Washington and Oregon who paid annual premiums of $500,000 to $1 million because of rate increases. According to a former customer service supervisor for Chubb in Pleasanton, California, Chubb's California operations were also extremely adversely affected by

- 80 -

the rate increase/policy non-renewal initiative because customers were not accepting the new higher rates and leaving, and also because the haphazard, uneven manner in which rate increases were applied (or not applied) resulted in regulatory violations of California's insurance laws and record fines of Chubb by the California Department of Insurance. According to a former senior customer services team leader at Chubb in Los Angeles and Seattle who worked in operations supervising employees who entered premiums and claims and coded policies into Chubb's computer system; an independent insurance broker for A.O.N. Risk Services in Southfield, Michigan, who did business with Chubb; a former energy resources underwriter in the commercial lines department of Chubb in Cincinnati and Pittsburgh; a former commercial lines marketing underwriter for Chubb in Seattle; a former umbrella and excess insurance manager for Chubb in Englewood, Colorado; a former commercial lines customer service representative/rater for Chubb in Seattle; and a former multi-national account specialist for Chubb in Warren, New Jersey, in addition to the hundreds of millions of dollars in business Chubb publicly announced that it expected to lose through the rate increase/policy non-renewal initiative, Chubb *lost additional **undisclosed**, hundreds of millions of dollars* in profitable business that Chubb wanted to retain, as profitable customers obtained insurance elsewhere. According to a former commercial lines customer service representative/rater for Chubb in Seattle, among the large profitable customers which were lost was Western Wireless, which had provided Chubb with a $400,000-$500,000 annual premium, but was lost to CNA Insurance. According to a former manager of Chubb's customer care unit in Troy, Michigan, the rate increase/policy non-renewal initiative caused Chubb to also lose Burger King restaurants in that area, which was a very large client. According to a former Chubb property claims manager in Troy, Michigan, Chubb also lost the large account of Arby's restaurants in the Michigan area. According to a former underwriting technical assistant of Chubb in Englewood, Colorado, the rate increase/policy non-renewal initiative caused Chubb to also lose the profitable policy provided to Echo-Star (annual

premium of \$105 million), as well as four to five other customers with annual premiums equal to Echo-Star's. Chubb also lost the account of Mary Kay Cosmetics, various large, high-technology firms and a huge multi-national account from Chubb's Washington, D.C. area office because of the rate increase/policy non-renewal initiative, according to a former multi-national account specialist for Chubb in Chubb's Warren, New Jersey, headquarters.

106. To keep the customers that had not already left Chubb for lower-priced insurers, Chubb began to give their remaining customers either no rate increase or much smaller ones than it had planned under the rate increase/policy non-renewal initiative, according to a former property and casualty and director's and officer's underwriter in the financial institutions section of Chubb in Chicago (and according to the other former Chubb employees who provide specific examples of such, directly below). According to a former underwriting manager for Executive Risk/Chubb in Simsbury, Connecticut, despite the rate increase/policy non-renewal initiative, Chubb was renewing the policies of 50% of its customers either at flat rates or even at reduced premiums; for example, according to this same former Chubb employee, as late as March, 2000, Chubb's energy industry customers in Texas had not received rate increases. And according to a former customer service supervisor for Chubb in Pleasanton, California, the Robert Mondavi winery (with an annual premium of over \$1 million) was not given a rate increase. Another customer, Novell (which had an annual premium of \$105 million), also was not given an increase, according to a former regional supervisor for Chubb in Denver. According to a former commercial lines customer service representative/rater in Chubb's Seattle office (who worked for Chubb for 26 years and was intimately familiar with Chubb's business practices), Chubb also failed to give its customers Microsoft or Boeing rate increases, as Chubb renewed both of their policies in April of 1999 with no rate increase, even though both policies had caused Chubb huge losses in the past. Similarly, many other customers

were not given rate increases regardless of their profitability so that Chubb would not lose them as customers.

107. Many times this was done because, according to a former property claims adjuster for Chubb in Boston, underwriters had the incentive to resist rate increases because their own compensation was dependent on keeping customers. Also, according to a former customer service supervisor for Chubb in Pleasanton, California, Chubb managers would themselves override intended rate increases.

108. According to a former umbrella and excess insurance manager for Chubb in Englewood, Colorado; a former customer service supervisor for Chubb in Pleasanton, California; a former underwriting technical assistant for Chubb in Englewood, Colorado; a former energy resources underwriter in the commercial lines department of Chubb in Cincinnati and Pittsburgh; and a former property and casualty and director's and officer's underwriter in the financial institutions section of Chubb in Chicago, Chubb also retained many of its unprofitable customers that the rate increase/policy non-renewal initiative was designed to eliminate, which only exacerbated Chubb's losses. Because these unprofitable customers were such bad risks, they could not obtain insurance from any other insurer, and accordingly renewed with Chubb and paid the increased premiums. The premiums that these customers paid, while they were higher, were still far too low to make these customers profitable to Chubb because the customers were such bad insurance risks.

109. In other instances, Chubb did not raise rates on unprofitable customers at all, but rather renewed at the same, unprofitable rates, or even reduced rates, just to keep the customers. For example, according to a former Chubb branch manager in Grand Rapids, Michigan, in early 99, Chubb attempted to raise the rates on its insurance policy with McDonald's Corporation. This policy was consistently unprofitable for Chubb for many years. The independent agents that had placed the policy with Chubb refused to go along with the increase and threatened to move the McDonald's account to another insurer. Chubb relented and did not increase

Case 2:03-cv-04346-GEB-MRP Document 55-1 66-3 Filed 08/09/07/23/04 38 Page 89 of 126 233

McDonald's rates. In addition, according to a former customer service representative for Chubb in Washington, D.C., notwithstanding the fact that Chubb customer Langenscheidt Publishing Group was a bad risk and unprofitable, Chubb actually lowered its rates for this customer. It was well-known within Chubb that this was occurring throughout the Company because management was pressuring employees to meet certain revenue targets which were impossible to achieve under the rate increase/policy non-renewal initiative, and so the initiative was simply being ignored, not complied with, and/or applied in a haphazard fashion. According to a former underwriting technical assistant for Chubb in Englewood, Colorado, *Chubb was keeping approximately 60% of its high-risk, unprofitable customers that the rate increase/policy non-renewal initiative was purportedly eliminating*. According to a former property and casualty underwriter for small business accounts in Chubb's Pittsburgh, Pennsylvania branch, and a former vice president of personal lines in Chubb's Warren, New Jersey headquarters, at the end of the 1stQ 99 a memo went to the Chubb branch and commercial managers admitting the rate increase/policy non-renewal initiative had not worked and the targeted 10%-15% premium increases had not been achieved.

110. By the end of Chubb's 1stQ 99, the "aggressive actions" to fix Chubb's standard commercial insurance business had been in place for six months. As a result of their actual experience with the rate increase/policy non-renewal initiative, by 3/99 O'Hare, Kelso and Schram actually knew the rate increase/policy non-renewal initiative was not working as hoped. Indeed, according to a former commercial lines underwriter in Chubb's Newport Beach, California, office, the initiative was implemented in such a manner as to prevent it from having *any* impact on 1stQ 99, since the first policies on which rate increases could be instituted were those coming up for renewal in 4/99, *after* 1stQ 99 was finished. The amounts of rate increases that were in fact "sticking" were very small and were far below the levels necessary for the rate increases to have any positive impact on Chubb's 99 *or* 00 results, especially since

the amount of non-renewals of profitable standard commercial insurance policies was much higher than expected. According to a former umbrella and excess insurance manager for Chubb in Englewood, Colorado, O'Hare's statements that the rate increase/policy non-renewal initiative was successful or exceeding expectations, and that rate increases were sticking, were untrue. Indeed, according to a former Chubb branch manager in Grand Rapids, Michigan, and an underwriting technical assistant for Chubb in Englewood, Colorado, O'Hare's public statements during the Class Period concerning the purported success of the rate increase/policy non-renewal initiative were "lies" and "ludicrous," in light of the true concealed facts. According to a former vice president of marketing for Chubb in the Warren, New Jersey, headquarters, O'Hare had a tendency to make "irresponsible" and "exaggerated" comments to the investment community, and such statements were a source of great concern to many managers at Chubb. According to a former Chubb customer service representative in Chubb's Washington, D.C. office, based on his observation of how the initiative was proceeding, O'Hare's public positive statements concerning the initiative were "bullshit." Moreover, contrary to O'Hare's representation that *"no matter what the consequences"* Chubb would enforce its rate increase policy, Chubb was relenting on its preferred premium increases and renewing business at rates that O'Hare, Kelso and Schram knew were at best break-even and more likely unprofitable levels. Also, Chubb's efforts to reduce its losses in its standard commercial insurance operations had failed and policy losses were running at higher levels. The unprofitable customers, who were very bad insurance risks, and who the rate increase/policy non-renewal initiative were designed to eliminate, paid the higher premiums and remained Chubb customers. And these customers remained unprofitable because the new, higher premiums were insufficient to turn these very bad insurance risks into profitable customers for Chubb.

111. As a result of these very negative factors, O'Hare, Kelso and Schram – Chubb's three highest ranking executive officers responsible for executing the rate

increase/policy non-renewal initiative – actually knew by 3/99 that the strategy was a failure, that the results of Chubb's standard commercial insurance business were *actually getting worse not better*, that Chubb would not obtain premium growth in its standard commercial insurance business during 99 and would suffer increasing underwriting losses, and thus this business unit would adversely impact Chubb's results during 99 and most, if not all, of 00. The failure of the rate increase/policy non-renewal initiative was made apparent to O'Hare, Kelso and Schram on an ongoing basis, according to a former vice president of personal lines based in Chubb's Warren, New Jersey headquarters, as these defendants constantly monitored the progress of the rate increase/policy non-renewal initiative by tracking premiums through a central Management Information System ("MIS"), tracking what business Chubb lost through monthly "churn reports," and by examining premium bookings several times a month. According to a former Chubb vice president of marketing in Chubb's headquarters in Warren, New Jersey (an employee who had worked for Chubb for nearly 20 years and therefore was very familiar with the Company, its MIS, and its operations), the "churn reports," which were also know as "lost account reports," were generated by the commercial lines division at Chubb's Warren headquarters on a monthly basis through an automated computer program and were reviewed by Chubb's most senior management, *i.e.*, defendants O'Hare, Kelso and Schram. These reports showed all of the profitable accounts Chubb was losing, thereby informing defendants fully of the failure of the rate increase/policy non-renewal initiative. Indeed, accordingly to the former head of Chubb's global operations, Chubb's executives had excellent MIS systems available to them which were "rich in data" and "could rate [Chubb's] book of business and dissect" it quickly to see the status of the Company's business. Moreover, because, according to a former underwriting manager for Executive Risk/Chubb in Simsbury, Connecticut, Chubb's upper management personally reviewed the premium amount on any policy over $10 million, O'Hare was personally made aware of whether the rate increase/policy non-renewal initiative was having an

effect on Chubb's largest, most profitable accounts. Further, O'Hare, Kelso and Schram, were informed of the progress of the rate increase/policy non-renewal initiative on an ongoing basis as, according to a former Chubb vice president of marketing in Chubb's Warren, New Jersey headquarters, Chubb maintained a reporting structure as follows: the underwriters at each branch reported to a commercial lines manager in the branch; the commercial lines manager reported to both the branch manager and a zone manager; the zone managers then reported to both Steve Pozzi, chief underwriting officer in commercial lines, and Paul Krump, senior vice president of commercial lines, at Chubb's home office in Warren, New Jersey, and to a zone official; the zone official reported to Doug Batting, the head of branch operations in the United States; Batting reported to Edward Dunlop, the head of worldwide branch operations; Dunlop reported directly to O'Hare; Krump reported directly to Charles Luchs, the chief underwriting officer for all lines at Chubb; Luchs also reported directly to O'Hare. In addition, according to this same former Chubb vice president of marketing in Warren, New Jersey, Chubb's senior management tracked the results of the rate increase/policy non-renewal initiative as it went along through "action summaries." These action summaries consisted of spreadsheets, compiled on a monthly and quarterly basis by Krump and Pozzi, reflecting the policies that had come up for renewal and what action had been taken with respect to them, including whether the rate was increased and by how much; whether the rate stayed the same; or whether the account was moved to another carrier. According to this former Chubb vice president, Chubb was intimately "measuring the success [or lack thereof] of the program as it went along." And according to a former general claims adjuster for Chubb in Boston, O'Hare was personally made aware of every loss in excess of $1 million, so he was well-aware of the failure of the rate increase/policy non-renewal initiative. Also, according to a former Chubb senior vice president and managing director of surety business, Chubb held quarterly meetings (in the boardroom of Chubb's Warren, New Jersey headquarters) where the heads of each Chubb business

- 87 -

unit — including commercial lines – gave a detailed report on the status of their business to defendants. These reports included "detailed numbers, figures and graphs" analyzing current results and comparing those results to previous years. O'Hare and Kelso were in attendance at these meetings, and in fact both attended one such meeting held in mid-99, where the progress of the rate increase/non-renewal initiative was specifically discussed.

112. O'Hare, Kelso and Schram knew that if Chubb revealed the true, concealed, adverse facts which contradicted their positive public statements concerning Chubb, it would have a very negative impact on Chubb's stock price and would make it much more difficult if not impossible to get Executive Risk's public shareholders to vote to approve the sale of their company to Chubb in exchange for Chubb stock. Therefore, to cover up the failure of the rate increase/policy non-renewal initiative, and to deceive investors and the markets into thinking that the initiative was working — and thus push Chubb's stock higher – O'Hare, Kelso and Schram *deliberately falsified* Chubb's 1stQ 99 financial results as detailed in ¶¶130-57, thus enabling Chubb to report much better than expected 1stQ 99 EPS on 4/27/99 and to lie to investors and the markets about the better than expected success of the rate increase/policy non-renewal initiative and Chubb's apparent faster than expected turnaround.

113. The falsified 1stQ 99 financial results reported that Chubb's combined ratio had fallen to 117.9% but, according to a former Chubb branch manager in Grand Rapids, Michigan, it was known within Chubb that Chubb's actual combined ratio was 130% during 1stQ 99, and according to a former commercial lines marketing underwriter for Chubb in Seattle, the rate increase/policy non-renewal initiative was not succeeding in lowering the combined ratio. According to a former energy resources underwriter in the commercial lines department of Chubb in Cincinnati and Pittsburgh, and a former property claims adjuster for Chubb in Boston, rumors circulated within the Company that Chubb had artificially boosted its reported

financial performance with accounting tricks. In fact, according to a former general claims adjuster for Chubb in Boston, and a former senior customer services team leader at Chubb in Los Angeles and Seattle, upper management had pressured branch managers to improperly reduce reserves, and ordered adjusters to refrain from recording reserves until after the Executive Risk acquisition was complete, as detailed in ¶¶143 and 145, resulting in artificially inflated EPS (the former senior customer services team leader supervised the clerks who entered the bogus reserve adjustments into Chubb's computer system); and, according to a former Chubb property claims manager in Troy, Michigan, and a former Chubb manager in Florham Park, New Jersey, Chubb manipulated its reserves so as to report artificially inflated EPS through the practice known as "stair-stepping," as detailed in ¶144. According to the former senior customer services team leader in Seattle and Los Angeles, the majority of Chubb's branch offices were manipulating reserves and Chubb operations personnel openly discussed the reserve manipulations at Company meetings. According to this same former senior customer services team leader at Chubb in Los Angeles and Seattle, and a former underwriter in Chicago, a former underwriter in Newport Beach, California, and a former ratings supervisor in Canada, Chubb had also improperly recognized revenue, as detailed in ¶¶152-55. Defendants O'Hare, Kelso and Schram themselves personally caused the accounting manipulations detailed in ¶¶130-57 because, according to a former Chubb branch manager in Grand Rapids, Michigan, and a former Chubb property and marine business underwriter in Chicago and Milwaukee, *decisions on the adjustment of Chubb's reserves originated with Chubb's upper management in Warren, New Jersey.* Indeed, Kelso was Chubb's CFO and Schram was Chubb's Chief Accounting Officer and both were primarily responsible for the creation of Chubb's publicly reported financial statements. Both of these defendants reported directly to O'Hare.

114. Sills, Kullas and Deutsch were the top three officers of Executive Risk and each of them were very experienced in and knowledgeable about the property and

casualty insurance industry. In connection with the proposed acquisition of Executive Risk by Chubb, Executive Risk's top management employees, accountants and financial advisors conducted due diligence investigations into Chubb's business under Sills', Kullas' and Deutsch's supervision. Defendant Deutsch, Executive Risk's CFO, was primarily responsible for conducting the due diligence concerning Chubb, and he involved Bill MacDonald, who was the manager of internal audits at Executive Risk. MacDonald reported directly to Deutesh, who in turn reported to Sills and Kullas concerning the due diligence. According to a former manager of benefits and compensation at Executive Risk, all of Executive Risk's employees other than Sills, Kullas and Deutsch were very concerned about Chubb's condition because Executive Risk was being bought with Chubb stock. Sills, Kullas and Deutsch, on the other hand, were not since they would reap a windfall in special benefits when the merger was completed, as described below in ¶¶116-22. Executive Risk's due diligence focused on how Chubb's rate increase/policy non-renewal initiative was working out six months after it was started, as the performance of this part of Chubb's business, a very large part of Chubb's overall business, was critical to Chubb's future results.

115. As a result, Sills, Kullas and Deutsch knew or recklessly disregarded that the rate increase/policy non-renewal initiative was not working as planned or forecast, as described ¶48, above. As a result of these very negative factors, Sills, Kullas and Deutsch – Executive Risk's three highest executive officers concerned with the impact of the rate increase/policy non-renewal initiative – knew or recklessly disregarded by 3/99 that the strategy was a failure, that the results for Chubb's standard commercial insurance business were *actually getting worse not better*, that Chubb would not obtain premium growth in its standard commercial insurance business during 99 and would suffer increasing underwriting losses, and thus this business unit would actually adversely impact Chubb's results during 99 and most, if not all, of 00. They knew that if Chubb revealed these adverse facts, it would have a very negative impact on Chubb's stock price and would make it much more difficult if not impossible to get Executive

Risk's public shareholders to vote to approve the sale of their company to Chubb in exchange for Chubb stock, and Sills, Kullas and Deutsch would not get the special benefits and payments they had been promised by Chubb in return for helping to bring about the sale of Executive Risk to Chubb, in part by recommending to Executive Risk's shareholders that they vote in favor of the sale.

116.  Sills, Kullas and Deutsch went ahead with the merger and recommended that Executive Risk's public shareholders vote in favor of the merger because it was *"in their best interests"* and the consideration being offered to them was *"fair,"* despite their knowledge or reckless disregard of the failure of Chubb's rate increase/policy non-renewal initiative and the adverse consequences that failure would have on Chubb's stock (and thus Executive Risk's public shareholders who exchanged their Executive Risk stock for Chubb stock) because they had interests that conflicted with the interests of Executive Risk's public shareholders and had positioned themselves to personally profit by millions of dollars due to special benefits and payments provided them in the merger which were not available to Executive Risk's public shareholders. The special benefits and payments assured that these top Executive Risk insiders would profit from the merger even if Chubb's standard commercial insurance operations continued to perform poorly and Chubb's stock price fell back to the levels it was trading at before the false claims of better than expected success with the turnaround of Chubb's standard commercial insurance lines were first made on 4/27-28/99, *i.e.,* $57-$58. The Merger Proxy admitted:

> [T]he directors and executive officers of Executive Risk may be deemed to have interests in the proposed merger that are different from or in addition to their interests as Executive Risk stockholders generally.

117.  Listed below are some of the special payments and benefits Sills, Kullas and Deutsch got from the merger – payments and benefits not available to Executive Risk's public shareholders:

- Chubb established a new operation, Chubb/Executive Risk, to manage the combined company's executive protection business following completion of the merger. Sills, President and Chief Executive Officer of Executive

Risk, became Chairman and Chief Executive Officer of this new operation at a large salary increase and guaranteed annual bonus and the headquarters of this huge operation was moved from Chubb's New Jersey headquarters to Simsbury, Connecticut, *where Sills lived*.

- Sills', Kullas' and Deutsch's Executive Risk stock options were all accelerated and made exercisable for Chubb common shares *at the closing of the merger*. These stock options were changed so that they *all* became vested and exercisable upon the closing of the merger. In addition, these stock options *would now remain exercisable until five years after the termination of employment or the original expiration date of the option*.

- Executive Risk's Performance Share Plan provided for the issuance of Performance Share Units and entitled Sills, Kullas and Deutsch to a distribution of shares of Executive Risk stock or cash based upon Executive Risk's achievement of corporate performance objectives specified in the plan. Under the plan, the level of achievement with respect to these performance objectives was required to be measured on the basis of Executive Risk's audited financial statements and the publicly announced financial results of peer group companies. This plan was changed to allow the Executive Risk Compensation Committee to measure performance with respect to this objective for the three-year performance period ended 12/31/98 on the basis of Executive Risk's *unaudited* 98 financial statements and *estimates* of peer group company results, rather than waiting until audited financial statements and reported peer group results were available. The Committee then made this measurement and distributions of cash and shares were made to Sills, Kullas and Deutsch and all outstanding Performance Share Units for the three-year performance period ending 12/31/99 became accelerated and fully vested upon the closing of the merger.

- On 5/7/99, Executive Risk entered into an agreement with Kullas that provided that Kullas would resign as an officer and director of Executive Risk on the merger, by which Kullas was entitled to continuation of his base salary through 12/31/99 – a minimum of $122,000 for this period. The agreement provided that Kullas' resignation *be treated as a retirement, meaning that Kullas had three years, rather than three months, to exercise his stock options and was entitled to receive incentive compensation with respect to Executive Risk's performance during 99 and prior years*.

- On 5/7/99, Executive Risk entered into an agreement with Deutsch that provided that if Deutsch's employment with Executive Risk was terminated following the merger, it would be treated as a retirement, meaning Deutsch would have three years, rather than three months, following termination of employment in which to exercise his stock options. In addition, Deutsch became entitled to receive incentive compensation with respect to Executive Risk's performance during 99 and prior years.

- Chubb also agreed to indemnify Sills, Kullas and Deutsch for all conduct prior to the merger, including the merger, and to provide directors' and officers' insurance, chosen by Executive Risk prior to the closing of the merger, to protect Sills, Kullas and Deutsch for six years after the merger.

Case 2:03-cv-04235-GEB-MRP Document 55-1 66-83 Filed 08/09/07/23/04 47 Page Page ID 26242

118. As of 3/1/99, Sills, Kullas and Deutsch owned relatively little Executive Risk common stock (including their vested and executable options to purchase Executive Risk stock):

| Name | Common Stock Beneficially Owned Excluding Options | Stock Options Exercisable Within 60 Days | Total Common Stock Beneficially Owned | Percent of Common Stock |
|---|---|---|---|---|
| DIRECTORS & OFFICERS | | | | |
| Robert V. Deutsch | 128,914 | 11,347 | 140,261 | 1.2% |
| Robert H. Kullas | 51,778 | 8,570 | 60,348 | ** |
| Stephen J. Sills | 171,828 | 17,320 | 189,148 | 1.7% |

Thus, Sills', Kullas' and Deutsch's interests as shareholders of Executive Risk were outweighed by the special benefits and promises made to them by Chubb in connection with the merger.

119. Under Executive Risk's executive stock option plans, Sills, Kullas and Deutsch, as Executive Risk's top executives, stood to personally profit by millions of dollars even if *after* the merger Chubb's stock declined and its business continued to perform poorly as it had done in 97-98. This was, in part, because the stock options of the Executive Risk executives to purchase Executive Risk stock would be *accelerated*, become fully vested and converted into options to purchase Chubb stock at a price computed by dividing the old exercise price by 1.235. As of 12/31/98 the Executive Risk executive stock option situation was as follows:

| | 1998 | |
|---|---|---|
| | NUMBER OF OPTIONS | WEIGHTED AVERAGE EXERCISE PRICE |
| Outstanding at beginning of year | 1,645,915 | $29.11 |
| Granted | 645,486 | 54.61 |
| Exercised | (386,390) | 12.49 |
| Forfeited | (205,725) | 70.50 |

| | 1998 | |
|---|---|---|
| | **NUMBER OF OPTIONS** | **WEIGHTED AVERAGE EXERCISE PRICE** |
| Outstanding at end of year | 1,699,286 | $37.57 |
| Options exercisable at end of year | 717,832 | $18.59 |

120. The following table summarizes information about Executive Risk's employee stock options outstanding at 12/31/98:

| | OPTIONS OUTSTANDING | | | OPTIONS EXERCISABLE | |
|---|---|---|---|---|---|
| RANGE OF EXERCISE PRICES | NUMBER OF OPTIONS | WEIGHTED AVERAGE PRICE | AVERAGE REMAINING CONTRACTUAL LIFE (YEARS) | NUMBER OF OPTIONS | WEIGHTED AVERAGE PRICE |
| $ 4.88-$12.91 | 111,875 | $11.36 | 4.3 | 111,875 | $11.36 |
| $13.77-$17.63 | 486,025 | $14.05 | 3.5 | 482,925 | $14.02 |
| $26.00-$37.50 | 307,600 | $33.62 | 7.6 | 61,623 | $27.97 |
| $40.25-$54.00 | 194,086 | $43.24 | 4.5 | 3,750 | $40.25 |
| $57.81-$72.81 | 599,700 | $61.72 | 7.9 | 57,659 | $59.47 |
| $ 4.88-$72.81 | 1,699,286 | $37.57 | 5.9 | 717,832 | $18.59 |

121. The following tables summarize information about Executive Risk's directors' stock options outstanding at 12/31/98:

| | 1998 | |
|---|---|---|
| | **NUMBER OF OPTIONS** | **WEIGHTED AVERAGE EXERCISE PRICE** |
| Outstanding at beginning of year | 79,172 | $15.24 |
| Granted | 24,986 | 56.05 |
| Exercised | (30,914) | 11.52 |
| Forfeited | – | ... |
| Outstanding at end of year | 73,244 | $30.73 |
| Options exercisable at end of year | 55,149 | $23.14 |

CaCase0223-c04245-04EBR PDocumenent651663iled 08/08/07/23/agee 49Page01Pagefl2644

| | | | OPTIONS OUTSTANDING | OPTIONS EXERCISABLE | |
| | | | | | |
| RANGE OF EXERCISE PRICES | NUMBER OF OPTIONS | WEIGHTED AVERAGE PRICE | AVERAGE REMAINING CONTRACTUAL LIFE (YEARS) | NUMBER OF OPTIONS | WEIGHTED AVERAGE PRICE |
|---|---|---|---|---|---|
| $ 3.32-$11.51 | 7,755 | $ 4.92 | 4.9 | 7,755 | $ 4.92 |
| $12.00 | 23,620 | $12.00 | 4.2 | 23,620 | $12.00 |
| $13.88-$36.31 | 18,473 | $27.21 | 5.7 | 12,749 | $23.23 |
| $45.09-$67.50 | 23,396 | $60.97 | 7.9 | 11,025 | $59.69 |
| $ 3.32-$67.50 | 73,244 | $30.73 | 5.8 | 55,149 | $23.14 |

Thus, *all* of these options, which had remaining lives of 5.8-5.9 years, became 100% accelerated, vested and exercisable Chubb stock options to purchase a number of Chubb common shares equal to the number of previously held Executive Risk stock options multiplied by 1.235, or 1,800,000 "new" Chubb stock options at weighted average exercise prices equal to the original Executive Risk stock options' exercise prices of $30.73- $37.57 divided by 1.235, or $24.55-$30.42. Sills, Kullas and Deutsch were the largest beneficiaries of these options. Because of these low option exercise prices, Sills, Kullas and Deutsch were assured to profit from the merger even if the truth about the continued problems with – and worsening revelations of Chubb's standard commercial insurance business became public after the merger was completed and Chubb's stock suffered a substantial decline. While it is impossible to tell if Kullas and Deutsch benefitted from this windfall, since they left Chubb after the merger and therefore are no longer required to file forms with the SEC showing their exercises of options and sales of Chubb stock, Sills remained with Chubb and his required SEC filings show that he benefitted in a large way from these cheaply-priced, accelerated options. Less than one month after the close of the merger, on 8/13/99, Sills exercised options on over 200,000 shares. Subsequently, he sold 190,000 shares for over *$14 million* in proceeds.

122. Thus, Sills, Kullas and Deutsch were uniquely positioned to personally profit from the sale of Executive Risk to Chubb and, in fact, each of them received

- 95 -

special benefits and payments in return for engineering the sale of Executive Risk to Chubb and for recommending to Executive Risk's public shareholders that they vote to approve the sale of their company to Chubb because that sale was purportedly in their best interest. Following below is a summary of the special benefits Sills, Kullas and Deutsch received:

| SILLS | KULLAS | DEUTSCH |
|---|---|---|
| Chairman/CEO of new and expanded D&O operation. | N/A | Continues as Chubb officer. |
| 100% of options become vested & exercisable upon merger. | 100% of options become vested and exercisable upon merger. | 100% of options become vested and exercisable upon merger. |
| Performance share units – accelerated for 12/31/99 to 12/31/98 and used unaudited figures -- plus all units accelerated and paid upon merger. | Performance share units – accelerated for 12/31/99 to 12/31/98 and used unaudited figures – plus all units accelerated and paid upon merger. | Performance share units – accelerated for 12/31/99 to 12/31/98 and used unaudited figures · plus all units accelerated and paid upon merger. |
| N/A | Resignation/Retirement Agreement. Paid through 12/31/99 ($122,000). Treated as retirement. Gets 3 years vs. 3 months to exercise options. Gets incentive compensation based on Executive Risk's 99 performance. | Resignation/Retirement Agreement. If terminated by Chubb, treated as retirement. Gets 3 years vs. 3 months to exercise options. Gets incentive compensation based on Executive Risk's 99 performance. |
| Indemnified vs. liability for acts prior to merger. Gets special D&O insurance policy protection. | Indemnified vs. liability for acts prior to merger. Gets special D&O insurance policy protection. | Indemnified vs. liability for acts prior to merger. Gets special D&O insurance policy protection. |

123. During Chubb's 1stQ 99, after the announcement of the merger agreement on 2/6/99, Chubb and Executive Risk were working together to prepare the Registration Statement and Merger Proxy to register with the SEC the Chubb shares to be sold to the Executive Risk shareholders in exchange for their Executive Risk shares to effectuate the acquisition and to secure the approval of Executive Risk's shareholders of the proposed sale of their company to Chubb for 1.235 shares of

Chubb stock for each of their Executive Risk shares. The drafts of these documents were first filed with the SEC in mid-4/99, just before Chubb reported its 1stQ 99 results.

124. The defendants knew that Chubb's 1stQ 99 results would be crucial to the performance of Chubb's stock and to show whether the *"aggressive steps"* described by O'Hare as being undertaken to fix Chubb's standard commercial insurance business were, in fact, working – *"stabilizing"* that business and enabling it to *"return to profitability"* – and that Chubb was, in fact, on target to achieve EPS growth in 99 to $4.25-$4.50 and in 00 to $5.00+, as O'Hare had been telling analysts during 2/99-4/99. They also knew that reporting *real progress* with respect to this critical area of Chubb's business *was indispensable to boosting Chubb's stock price*, making the proposed acquisition of Executive Risk more attractive to Executive Risk's public shareholders and thus assuring Executive Risk's shareholders' approval of the proposed sale of their company to Chubb in exchange for Chubb stock. On 4/16/99, the defendants filed the draft Registration Statement/Merger Proxy with the SEC anticipating that the Executive Risk shareholder vote on the merger would occur in mid-7/99. When defendants mailed the final version of the Registration Statement/Merger Proxy to Executive Risks's shareholders on 6/18/99 in order to obtain the shareholders' approval of the merger, defendants included Chubb's falsified 1stQ 99 financial results to induce a vote in favor of the merger. Defendants were successful, as executive Risk's Shareholders voted in favor of the merger on 7/19/99.

125. Like Chubb's 1stQ 99 financial statements, defendants also falsified Chubb's reported 2ndQ 99 financial results, as detailed in ¶¶130-57. Again, even though Chubb reported a combined ratio of 120.8%, it was known within the Company that the actual combined ratio was much higher – 130%, according to a former Chubb branch manager in Grand Rapids, Michigan. In addition, according to a former senior customer services team leader who worked in Chubb's Los Angeles and Seattle offices, Chubb's upper management was again pressuring branch managers to improperly

- 97 -

reduce reserves and improperly record revenue in order to artificially boost Chubb's EPS, and this was openly discussed by Chubb personnel at Company meetings, as detailed in ¶143.

126. Chubb's worse-than-expected 2ndQ 99 financial results (which had nonetheless been falsified to conceal the truly devastating impact of the failure of the rate increase/policy non-renewal initiative), were released *just 8 days after* Executive Risk's shareholders voted to approve the merger with Chubb. O'Hare and the other defendants had access to these financial results far in advance of when they were announced, and *before* the Executive Risk shareholders voted. According, to a former Chubb senior vice president and managing director of surety business, who was based in Chubb's Warren, New Jersey headquarters with the defendants, Chubb held quarterly meetings, with O'Hare and Kelso present – where the heads of each Chubb business unit gave detailed reports on the status of their business. According to this same former Chubb senior vice president and managing director of surety business, *these meetings were held two weeks after the close of each quarter*. As such, because the 2ndQ 99 ended on 6/30/99, the 2Q 99 meeting at Chubb was held on approximately 7/14/99 – *five full days before the merger vote on 7/19/99*. Given that at each of these meetings, according to this same former vice president, the reports presented to O'Hare and Kelso included "detailed numbers, figures and graphs" analyzing current results of each Chubb business unit, *defendants O'Hare, Kelso and Schram were fully aware that Chubb's 2Q 99 results would be far worse than expected, but defendants purposely withheld disclosing Chubb's worse-than-expected 2ndQ 99 financial results until after Executive Risk's shareholders voted in favor of Chubb's acquisition of Executive Risk* because they feared that announcing these results beforehand would cause the shareholders to vote against the acquisition.

127. According to a former Chubb branch manager in Grand Rapids, Michigan, and a former customer service supervisor for Chubb Insurance in

- 98 -

Pleasanton, California, prior to the 1stQ 99, Chubb branch managers could log onto the Company's computer system and track the Company's financial performance by comparing how the various offices around the country were currently performing. But, according to these same witnesses, as the rate increase/policy non-renewal initiative was implemented, and the deterioration in Chubb's finances started to accelerate, these managers were blocked from accessing the computer system – their passwords were inexplicably expired – and no explanation was given why they could not have access to current financial information. The managers were simply told they were not allowed access to such information any longer. Defendants were blocking access to Chubb's finances in order to conceal their fraud from other Chubb employees.

128. Subsequent to Chubb's acquisition of Executive Risk, defendants continued to conceal their fraud: (1) by continuing to misrepresent that the rate increase/policy non-renewal initiative was proceeding as planned (when in fact it was not); (2) by failing to disclose that they had improperly inflated Chubb's financial results during the Class Period, as alleged in ¶¶130-57; and (3) by concealing that the integration of Executive Risk was not proceeding smoothly, as alleged in ¶48. Defendants were motivated to continue lying in order to conceal their fraudulent scheme to avoid detection and prosecution by the SEC, and to avoid shareholder lawsuits like this one. Thus, defendants continued to make misrepresentations and conceal material information throughout the remainder of the Class Period so that their scheme would not be revealed.

129. Defendants were also motivated to continue to artificially inflate the price of Chubb's stock *after* its acquisition of Executive Risk because *Chubb was still a hostile takeover target*. Even after it was announced that Chubb was acquiring Executive Risk on 2/6/99, Chubb remained a much-discussed takeover target. The *Bloomberg* news service reported on 5/7/99 that the then-recent passage of legislation removing legal barriers separating insurers, banks and securities firms made "*Chubb and other insurers attractive as acquisition targets to foreign institutions.... Chubb*

*[was]* among the companies that 'people perceive[d] to be attractive candidates....'" When a Chubb spokesperson was asked if Chubb "was in talks to be acquired," she "declined to comment." *Id.* Furthermore, even *after* Chubb completed its acquisition of Executive Risk in 7/99, Chubb continued to face the threat of a hostile takeover. As an article in Barron's on 11/1/99 by A. Abelson noted, Mitchell Securities analyst C. Peabody specifically identified Chubb as a potential acquisition target nearly four months *after* Chubb had acquired Executive Risk. In addition, on 11/08/99, another article in Barron's by A. Bary specifically stated that *"Chubb also has been mentioned as a takeover target for Warren Buffet's Berkshire Hathaway."* During the period that the Barron's articles identifying Chubb as a takeover target were circulating in 11/99, Chubb's stock was trading in the $55-60 per share range. This is the same price range Chubb's stock was trading at *before* the Class Period in early 2/99 and mid-4/99 when there were news reports that Chubb was then a prime takeover target as alleged in ¶¶88-91. This is also the same price range Chubb stock was trading at immediately after the merger was consummated (for example, on 7/30/99, Chubb stock traded intra-day at $58-5/8). Thus, Chubb was an even more desirable takeover target *after* its acquisition of Executive Risk, as both Chubb and Executive Risk could be acquired for the same price as Chubb traded at before it acquired Executive Risk. In other words, it was a "two companies for the price of one" bargain post-acquisition, even more desirable for a suitor than before and defendants knew this. Thus, they continued to attempt to inflate Chubb's stock price post-merger in order to avoid a hostile takeover.

## VII. CHUBB'S FALSE 1STQ 99 AND 2NDQ 99 FINANCIAL RESULTS

130. In order to gain approval for the acquisition of Executive Risk, it was important for Chubb to show improved financial results for the quarter ended 3/31/99 (1stQ 99). For this reason, Chubb secretly overstated its earnings in the 1stQ 99 by violating generally accepted accounting principles ("GAAP") and SEC rules by failing

Case 2:02-cv-04435-GEB Document 55-36 Filed 08/09/02/28 Page 5 Page 106 of 126

to properly report the losses and expenses associated with its standard commercial insurance business and manipulating reserve levels in its standard commercial business and its property and marine specialty insurance line. Later, to prevent a complete collapse of its stock price, defendants continued to manipulate Chubb's reserve levels in the 2ndQ 99 to inflate its reported earnings. In addition, Chubb also artificially inflated its 1stQ and 2ndQ 99 financial results by prematurely recognizing revenue in violation of GAAP - revenue was improperly recorded for premiums on policies which were not up for renewal for three months, and revenue was recorded on policies that had not yet been written. Chubb attributed the unusually strong 1stQ 99 results to the better-than-expected success of its rate increase/policy non-renewal initiative for its standard commercial insurance business. However, immediately after the merger was approved, Chubb had to dramatically increase the losses and expenses associated with the commercial insurance business which adversely affected the Company's results – but *only after* the merger had been approved. Immediately after the merger was approved, Chubb also included a *new disclosure* in its SEC filings that directly contradicted its prior representations and admitted that the new pricing strategy Chubb had commenced in the 3rdQ 98 *would not have a significant positive impact until mid-2000 at the earliest*! This very important fact had of course been omitted from Chubb's explanation of the new pricing strategy *until after the merger was completed*, as had the other negative facts relating to Chubb's standard commercial insurance rate increase/policy non-renewal initiative detailed herein.

131. Chubb reported the following financial results for the 1stQ and 2ndQ 99:

|  | 1stQ | 2ndQ |
| --- | --- | --- |
| Premiums Written | $ 1.4 billion | $ 1.4 billion |
| Operating Income | $166.4 million | $163.5 million |
| Net Income | $186.9 million | $193.3 million |
| Commercial Insurance Combined Loss & Expense Ratio | 117.9% | 120.8% |

- 101 -

| Property and Marine Combined<br>Loss & Expense Ratio | 98.7% | 106.9% |
|---|---|---|
| Net Income Per Share | $1.14 | $1.18 |

Chubb included these results in press releases and filings made with the SEC including its 1stQ and 2ndQ 99 Form 10-Qs and included its 1stQ 99 results in the Registration Statement and Merger Proxy for the acquisition of Executive Risk.

132. These financial statements and the statements about them were false and misleading, as such financial information was not prepared in conformity with GAAP, nor was the financial information a fair presentation of the Company's 1stQ and 2ndQ 99 operations due to the Company's improper accounting for its revenues, expenses and losses, in violation of GAAP and SEC rules.

133. GAAP are those principles recognized by the accounting profession as the conventions, rules and procedures necessary to define accepted accounting practice at a particular time. Regulation S-X (17 C.F.R. §210.4-01(a)(1)) states that financial statements filed with the SEC which are not prepared in compliance with GAAP are presumed to be misleading and inaccurate. Regulation S-X requires that interim financial statements must also comply with GAAP, with the exception that interim financial statements need not include disclosures which would be duplicative of disclosures accompanying annual financial statements. 17 C.F.R. §210.10-01(a).

### A. The Company's Improper Reporting of Commercial Standard Insurance Losses and Expenses

134. GAAP, as set forth in FASB Statement of Financial Accounting Standard ("SFAS") No. 60, Accounting and Reporting by Insurance Enterprises, requires that companies recognize a liability for unpaid claims (including estimates of costs for claims relating to insured events that have occurred but have not been reported to the insurer) and a liability for loss adjustment expenses as insured events occur. SFAS No. 60, ¶9.

Case: 2:03-cv-04252-GEB-RPD Document 55-36 Filed 08/09/02/23 Page 7 Page Page of 126 52

135. One measure of the profitability of a property and casualty insurance company is the combined loss and expense ratio ("combined ratio") which measures underwriting profitability. The combined ratio is the sum of the ratio of incurred losses and loss adjustment expenses to premiums earned plus the ratio of underwriting expenses to premiums plus the ratio of policyholders' dividends incurred to premiums earned.

136. Analysts, shareholders and other investors consider the combined ratio a key determinant of a company's success and prospects. The individual defendants knew this and also knew that this key ratio, as well as Chubb's reported earnings, could be affected by the estimates of losses and unpaid claims. A combined ratio of less than 100% is generally an indication that underwriting results are profitable. A combined ratio of more than 100% generally indicates that underwriting results are unprofitable.

137. From 96-98, Chubb's standard commercial insurance business deteriorated significantly due to unfavorable pricing compared to the losses Chubb was incurring. Note the following chart showing the combined ratio for Chubb's commercial insurance business:



- 103 -

138.    The multiple peril, casualty and workers' compensation commercial lines, which comprise the standard commercial insurance business, also showed marked deterioration between 95 and 98:



**Chubb Corporation**
Standard Commercial Combined Ratio

139.    In the 3rdQ 98, Chubb instituted a new strategy to renew only good business (*i.e.*, profitable business) in the standard commercial insurance business and not to renew unprofitable business, *i.e.*, the rate increase/policy non-renewal initiative.

140.    It was therefore important that Chubb's standard commercial insurance business show improvement in 99 to demonstrate that this new strategy was effective so that Chubb's investors and potential investors (particularly those voting on the Executive Risk merger) would view Chubb and its prospects favorably.  For this reason, O'Hare, Schram and Kelso caused Chubb to understate loss reserves and estimates of unpaid claims and otherwise manipulate Chubb's loss reserves so that the Company's earnings and ratios would appear to show improvement.  When Chubb ultimately reported its 1stQ 99 results, its earnings were favorable – in fact better than expected – and the standard commercial insurance combined ratio, while still greater than 100% at 117.9%, was an improvement over the ratio for the 4thQ 98 (119.5%) and was a reversal of a trend of continually increasing combined ratios over the prior years.  As PaineWebber noted in its 4/27/99 report:

- 104 -

Standard Commercial lines remained very weak -- 120.4% for multiperil, 116.8% for casualty, and 116.3% for workers compensation. This package line included 6.8 points of catastrophes *but management noted that rates are trending up* -- 2.5% in March and 3.5% in April - on the business that is renewed. In property package, three large losses totaled $23 million and there were 11 others over $1 million. Liability package results improved to a 103% combined ratio. Management also noted a modest improvement in umbrella liability.

141. Indeed, the press release announcing the 1stQ 99 results, dated 4/27/99, stated:

"Even more significantly for the future, our pricing strategy in standard commercial lines has begun to show the impact we are looking for on our renewal business. Month by month, renewal rate increases are building momentum, and we expect this trend to continue. *Moreover, we have been successful in retaining business we want to keep at higher rates, while at the same time we are walking away from business where we can't obtain adequate pricing*. By maintaining this profit-oriented discipline, standard commercial lines will likely show a decline in premiums throughout the year and produce improved combined ratios."

"We were particularly pleased by the improvement in the expense ratio to 32.9% from 33.3%. This resulted from our success in keeping controllable expenses flat compared with the 1998 first quarter..." said Mr. O'Hare.

142. In fact, the reason for the improvement in the trend was Chubb's failure to properly and adequately reserve for losses, particularly in the standard commercial lines and in property and marine as required by GAAP, as set forth in SFAS No. 60 and SFAS No. 5, Accounting for Contingencies, which requires that liabilities which have been incurred be accrued when the liability is probable and the amount of the liability can be reasonably estimated. Chubb has subsequently acknowledged that the improvements to be derived from the new pricing strategy will not bear fruit until mid-2000. *Thus, any improvement in the ratios in the 1stQ and 2ndQ 99 were not due to the new pricing strategy, but rather, were due to these financial manipulations!*

143. For example, defendants caused Chubb to manipulate downward its reserves for Incurred But Not Reported ("IBNR") claims. The IBNR reserves were set when loss claims were made by customers. The reserves were set in an amount which represented the amount which Chubb expected it would pay on the loss claim. According to a former senior customer services team leader in Chubb's Los Angeles

- 105 -

and Seattle offices, just before the end of the 1stQ and 2ndQ 99, in order to allow Chubb to boost its earnings for those quarters, Chubb management – which included the defendants – pressured branch managers to improperly reduce reserves. The directives to improperly reduce reserves came directly from Chubb's corporate headquarters in Warren, New Jersey. Chubb's top management pressured branch managers to reduce the reserves to amounts lower than that which Chubb expected and knew it would have to pay on the claims, which artificially increased Chubb's EPS in violation of GAAP. Reserves on claims by customers Microsoft and Boeing were improperly reduced this way. Moreover, according to this former employee, who worked for Chubb for nearly six years, and was thus very familiar with Chubb and how it operated, the majority of Chubb's branch offices improperly reduced reserves. Indeed, up to 25% of Chubb's IBNR reserves were manipulated downward in this manner and it was a common practice throughout Chubb, including in its Los Angeles and Seattle area offices, according to this former employee. According to this former employee, Chubb's operations employees openly discussed at Company meetings the fact that Chubb engaged in these reserve manipulations. According to a former marketing vice president in Chubb's Warren, New Jersey headquarters, Chubb was "managing" its reserves to artificially boost its earnings in 99, since reserves can be "conveniently manipulated" in the insurance industry. Moreover, according to a former branch manager for Chubb's West Michigan office "I guarantee you they [defendants] padded loss reserves."

144. According to a former Chubb manager in Florham Park, New Jersey, and a property claims manager in Troy, Michigan, Chubb also manipulated reserves by "stair-stepping" them. "Stair-stepping" was a term used internally at Chubb and involved recording half of a reserve in one quarter and the other half in the following quarter, even though the entire amount of the reserve should have been recorded in the first quarter. For example, if a reserve of $50 million should have been recorded in 1stQ 99, half of that reserve ($25 million) was recorded on the last day of 1st Q 99,

and the other half ($25 million) was recorded on the first day of the next quarter. This occurred in both the 1stQ and 2ndQ 99 and allowed the EPS in both quarters to be artificially and improperly inflated in violation of GAAP. This was done in order to allow branch offices to meet a particular number goal set by corporate headquarters, and allow defendants to report positive financial results for Chubb.

145. Chubb also manipulated its reserves by not recording reserves that should have been recorded during 1stQ and 2ndQ 99. Specifically, claims which were made during 1stQ and 2ndQ 99 were not reserved for, thereby artificially boosting Chubb's EPS in violation of GAAP. According to a former branch manager for Chubb's West Michigan branch, this non-recording of reserves was accomplished by either simply not recording a reserve for a claim or by delaying claims committee meetings -- meetings where such claims were discussed and the amounts of the reserves were determined – until after 1stQ and 2ndQ 99 ended. Moreover, according to a former general claims adjuster for Chubb in Boston, in 2ndQ 99, in approximately 5/99 or 6/99, before the 2ndQ 99 end, he and his fellow adjusters were instructed by their claims manager to "freeze," i.e., not enter, any reserves into Chubb's computer system until after Executive Risk was acquired by Chubb, in order to make Chubb appear financially better off than it was. This former adjuster and his colleagues were instructed not only to refrain from entering the reserve data into the computer but also were told not to ask any questions as to why they were doing it. In addition, this former employee observed that large existing reserves already in the computer were unilaterally reduced, i.e., "taken down," for the same reason. According to this former employee, the reserve freeze was occurring Company-wide, and they were only allowed to begin entering reserves again *after* the Executive Risk merger was consummated.

146. O'Hare, Kelso and Schram personally were involved in the reserve manipulations because, according to a former Chubb branch manager in Grand Rapids, Michigan, decisions to adjust reserves originated from Chubb's Warren, New Jersey

- 107 -

Case 2:23-cv-04045-EBR Document 65-36 Filed 08/09/23 Page 12 of 26 Page ID 257

headquarters, and defendants Schram (CFO) and Kelso (Chief Accounting Officer) were responsible for setting and adjusting Chubb's reserves, with input from O'Hare, Chubb's CEO.

147. Ultimately, Chubb was not able to maintain the appearance of improvement in its standard commercial insurance lines as the Company's subsequent results were adversely affected by increased unprofitability in these lines. Note the following chart which shows the slight improvement in the combined ratio of the standard commercial lines as of the 1stQ 99 and minor increase in 2ndQ 99, with the subsequent significant increase (deterioration) in this ratio:



148. Chubb's balance in unpaid claims (its loss reserve), which increased by a total of only $228.2 million in the 1stQ and 2ndQ 99, increased by $1.2 billion (or approximately $300 million excluding the balance derived from Executive Risk) in the 3rdQ 99 alone, reflecting in part Chubb's failure to make adequate accruals earlier in the year. The 3rdQ 99 results included large losses due to Hurricane Floyd, which resulted in larger catastrophe losses than Chubb experienced in prior quarters. However, even if the effects of catastrophe losses are excluded from every quarter,

- 108 -

Chubb still reported a significant increase in the standard commercial insurance combined ratio. The following chart shows the combined ratio for the 3rdQ 99, versus the amount in the prior quarters:



Moreover, Chubb used this opportunity to catch up on and try to hide normal, *i.e.*, non-catastrophe, standard commercial insurance losses that Chubb had improperly refused to record earlier.

149. Subsequent to 7/99, Chubb also disclosed important facts regarding its standard commercial insurance pricing strategy instituted in 98 which it had earlier concealed. *The 2ndQ and 3rdQ Form 10-Q's (filed in 8/99 and 11/99, respectively) included a new disclosure that the pricing strategy would have no significant positive effect until at least mid-2000, contrary to Chubb's prior representations that the strategy was having a positive impact on Chubb's 1stQ 99.* For example, the 2ndQ Form 10-Q stated:

> The decreases were the result of the strategy we put in place in late 1998 to renew good business at adequate prices and not renew underperforming accounts where we cannot attain price adequacy. On the business that was renewed, rates have increased modestly yet steadily in the first six months of 1999 and we expect this trend to continue. Retention levels were lower in the first six months of 1999 compared with the same period in 1998. Approximately half of the non-renewals

- 109 -

were the result of business we chose not to renew and half were the result of customers not accepting the price increases we instituted. *It will take at least two renewal cycles to adequately reprice the entire standard commercial book and during that time we will continue to have losses from non-renewal policies. Thus, it will be mid-2000 before these actions have a significant positive effect on our results.*

150. Chubb used the misstated 1stQ 99 financial results to support the defendants' false statements that its late-98 new pricing strategy for standard commercial insurance would have a positive impact on the Company's 99 results.

### B. Chubb's Manipulation of Its Property and Marine Specialty Insurance

151. For the 1stQ 99, Chubb reported a very favorable combined loss ratio for the property and marine line of its specialty commercial insurance business. The 1stQ 99 ratio for this line was only 98.7% compared to 131% in the 4thQ 98. In fact, the reason for this decline was a reversal of reserves accrued in the 4thQ 98 which defendants suddenly decided were unnecessary. In fact, this reversal allowed Chubb to report favorable overall results in the 1stQ 99. However, once the acquisition of Executive Risk was completed, Chubb reinstated the additional reserves and its combined ratio increased to 106.9% in the 2ndQ 99 and 130% in the 3rdQ 99. As previously alleged, according to a former general claims adjuster for Chubb in Boston, Chubb instructed its adjusters to improperly refrain from recording reserves until *after* the Executive Risk acquisition was completed. Chubb's improper manipulation of its property and marine reserve levels was a violation of GAAP, as set forth in SFAS No. 5, which requires that losses be accrued and maintained for liabilities which have probably been incurred and for which a reasonable estimate of the amount of the loss can be made.

### C. Chubb's Improper and Premature Recognition of Revenue

152. With respect to insurance companies recording revenue, GAAP, as set forth in FAS 60, ¶3, provides that, for short duration insurance contracts, premiums "are earned and recognized [as revenue] evenly as insurance protection is provided."

- 110 -

In other words, revenue from premiums must be recorded evenly over the policy period.

153. In violation of GAAP, defendants caused Chubb to improperly recognize and record premium revenue during 1stQ and 2ndQ 99 in order to make it appear that the rate increase/policy non-renewal initiative was more successful than it really was, and to mask the huge amounts of business Chubb was losing as a result of its rate increases.

154. Defendants' improper revenue manipulation was accomplished two different ways. The first method involved existing policies. According to a former Chubb senior customer services team leader in Seattle and Los Angeles, and a former Chubb personal lines underwriter in Chicago, ninety days *before* existing policies were up for renewal, defendants caused Chubb to record the premium for the renewal policy as revenue at that time – 90 days before the policy was even up for renewal. Defendants did this even though the policy was not subject to renewal for 90 days, the customer might not renew the policy, the customer was not obligated to pay any premiums until the new policy period began 90 days later, and the period for which insurance protection was provided would not begin for 90 days. These actions were in violation of GAAP, FAS 60, ¶3. According to the former Chubb team leader in Los Angeles and Seattle, these actions also violated Chubb's own internal revenue recognition policy which required that premiums not be recorded as revenue until the customer was legally obligated to pay the premium – in other words, revenue could not be recorded until the policy was renewed and the premium was paid 90 days later. According to these former employees, this conduct occurred throughout the Company, in all lines of its business, including in Chubb's Seattle and Chicago area offices. The former Chubb customer services team leader in Los Angeles and Seattle was personally aware of the practice because one of the clerks working under him in operations was occupied full time entering and then subsequently backing out such premiums after the quarter end.

155. The second method of improper revenue manipulation involved new policies. According to a former ratings supervisor who worked in Canada for Chubb Insurance, the former customer services team leader in Los Angeles and Seattle, and a former commercial underwriter in Newport Beach, California, revenue was recorded on new policies that had not even been written yet, and would not begin for long periods of time. This also violated GAAP, FAS 60, ¶¶3 and 13, and Chubb's internal revenue recognition policy. According to these former employees, this conduct occurred throughout Chubb, including in Chubb's Seattle and Newport Beach, California, area offices, as well as in Chubb's Canadian operations, specifically with Chubb's new "Custom Mark" insurance product.

**D.     Chubb's Violation of Other GAAP Standards**

156. Due to these accounting improprieties, the Company presented its financial results and statements in a manner which violated GAAP, including the following fundamental accounting principles:

(a)     The principle that interim financial reporting should be based upon the same accounting principles and practices used to prepare annual financial statements was violated (APB No. 28, ¶10);

(b)     The principle that financial reporting should provide information that is useful to present and potential investors and creditors and other users in making rational investment, credit and similar decisions was violated (FASB Statement of Concepts No. 1, ¶34);

(c)     The principle that financial reporting should provide information about the economic resources of an enterprise, the claims to those resources, and effects of transactions, events and circumstances that change resources and claims to those resources was violated (FASB Statement of Concepts No. 1, ¶40);

(d)     The principle that financial reporting should provide information about how management of an enterprise has discharged its stewardship responsibility to owners (stockholders) for the use of enterprise resources entrusted to it was violated.

- 112 -

To the extent that management offers securities of the enterprise to the public, it voluntarily accepts wider responsibilities for accountability to prospective investors and to the public in general (FASB Statement of Concepts No. 1, ¶50);

(e) The principle that financial reporting should provide information about an enterprise's financial performance during a period was violated. Investors and creditors often use information about the past to help in assessing the prospects of an enterprise. Thus, although investment and credit decisions reflect investors' expectations about future enterprise performance, those expectations are commonly based at least partly on evaluations of past enterprise performance (FASB Statement of Concepts No. 1, ¶42);

(f) The principle that financial reporting should be reliable in that it represents what it purports to represent was violated. That information should be reliable as well as relevant is a notion that is central to accounting (FASB Statement of Concepts No. 2, ¶¶58-59);

(g) The principle of completeness, which means that nothing is left out of the information that may be necessary to insure that it validly represents underlying events and conditions was violated (FASB Statement of Concepts No. 2, ¶79); and

(h) The principle that conservatism be used as a prudent reaction to uncertainty to try to ensure that uncertainties and risks inherent in business situations are adequately considered was violated. The best way to avoid injury to investors is to try to ensure that what is reported represents what it purports to represent (FASB Statement of Concepts No. 2, ¶¶95, 97).

157. Further, the undisclosed adverse information concealed by defendants during the Class Period is the type of information which, because of SEC regulations, regulations of the national stock exchanges and customary business practice, is expected by investors and securities analysts to be disclosed and is known by corporate officials and their legal and financial advisors to be the type of information which is expected to be and must be disclosed.

- 113 -

## VIII. STATUTORY SAFE HARBOR

158. The statutory safe harbor providing for forward-looking statements ("FLS") does not apply to the false FLS pleaded. The statutory safe harbor does not apply to Chubb's allegedly false financial statements. The FLS were not identified as "forward-looking statements" when made, it was not stated that actual results "could differ materially from those projected," nor did meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the FLS accompany those FLS. None of the *particular* oral FLS in Chubb's conference calls and O'Hare's presentations to analysts were so identified as required. Chubb's cautionary statements were ineffective and were not meaningful cautionary statements because Chubb and the individual defendants each actually knew that because of the worsening performance of Chubb's standard commercial insurance business, the failure of Chubb's rate increase/policy non-renewal initiative and the falsification of Chubb's 1stQ and 2ndQ 99 earnings, Chubb's positive statements and forecasts were false when made. The defendants are liable for the false FLS pleaded because, at the time each FLS was made, the speaker knew the FLS was false and the FLS was authorized and/or approved by an executive officer of Chubb who knew that the FLS was false. None of the historic or present-tense statements made by defendants were assumptions underlying or relating to any plan, projection or statement of future economic performance, as they were not stated to be such assumptions underlying or relating to any projection or statement of future economic performance when made nor were any of the projections or forecasts made by defendants expressly related to or stated to be dependent on those historic or present-tense statements when made.

## IX.   CLASS ACTION ALLEGATIONS

159. This is a class action on behalf of purchasers of Chubb stock between 4/27/99 and 10/15/99, excluding defendants (the "Class"), and including the shareholders of Executive Risk who exchanged their shares of Executive Risk stock

for 1.235 shares of Chubb stock (the "Proxy Sub-Class"). Class and Proxy Sub-Class members are so numerous that joinder of them is impracticable.

160. Common questions of law and fact predominate and include whether defendants: (i) violated the 1934 Act; (ii) omitted and/or misrepresented material facts; (iii) knew or recklessly disregarded that their statements were false; and (iv) artificially inflated Chubb's stock price and the extent of and appropriate measure of damages.

161. Plaintiffs' claims are typical of those of the Class. Prosecution of individual actions would create a risk of inconsistent adjudications. Plaintiffs will adequately protect the interests of the Class. A class action is superior to other available methods for the fair and efficient adjudication of this controversy.

## X.   FIRST CLAIM FOR RELIEF

### For Violations of §10(b) of the 1934 Act and Rule 10b-5 Against All Defendants

162. Plaintiffs incorporate ¶¶1-161. Defendants violated §10(b) and Rule 10b-5 by:

(a)   Employing devices, schemes and artifices to defraud;

(b)   Making untrue statements of material facts and omitting to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and

(c)   Engaging in acts, practices and a course of business that operated as a fraud or deceit upon the Class in connection with their purchases of Chubb stock.

163. Class and Proxy Sub-Class members were damaged. In reliance on the integrity of the market, they paid artificially inflated prices for Chubb stock.

164. The undisclosed adverse information concealed by defendants during the Class Period is the type of information which, because of SEC regulations, regulations of the national stock exchanges and customary business practice, is expected by investors and securities analysts to be disclosed and is known by corporate officials

and their legal and financial advisors to be the type of information which is expected to be and must be disclosed.

165.  Plaintiffs, the Class and the Proxy Sub-Class have suffered damages in that, in reliance on the integrity of the market, they paid artificially inflated prices for Chubb stock.  Plaintiffs, the Class and the Proxy Sub-Class would not have purchased Chubb stock at the prices they paid, or at all, if they had been aware that the market prices had been artificially and falsely inflated by defendants' misleading statements.

## XI.  SECOND CLAIM FOR RELIEF

### For Violations of §11 of the 1933 Act Against Defendants Chubb, O'Hare, Schram and Kelso

166.  Plaintiffs incorporate ¶¶1-161.  Plaintiffs expressly disclaim any allegations of fraud, knowledge, intent or scienter.

167.  Chubb issued and the individual defendants named in this Claim for Relief signed and issued the Registration Statement.

168.  On 7/19/99, the defendants named in this Claim for Relief completed the merger with Executive Risk issuing 14.8 million newly registered shares of Chubb stock to Executive Risk shareholders.

169.  In fact, the 6/17/99 Registration Statement was false and misleading because:

(a)  The merger was not in the best interests of Executive Risk's public shareholders as the price of the Chubb stock they were to receive in exchange for their Executive Risk stock was artificially inflated due to the false statements and accounting manipulations detailed herein;

(b)  The merger consideration to be received by Executive Risk's public shareholders was not fair as the price of the Chubb stock they were to receive in exchange for their Executive Risk stock was artificially inflated due to the false statements and accounting manipulations detailed herein;

(c)     Chubb was not exercising a disciplined approach to not renewing unprofitable standard commercial insurance policies and was, in fact, renewing hundreds of millions of dollars of standard commercial insurance policies at unprofitable premium levels, which would adversely impact Chubb's results going forward;

(d)     Chubb's aggressive actions to raise prices on its standard commercial insurance policies and accept substantial non-renewals to boost operating results of those lines was not working, let alone exceeding management's expectations, *because the rate increases were not sticking and Chubb's standard commercial insurance underwriting losses were increasing;*

(e)     Chubb's strategy of renewing only at good prices would not have any significant impact on Chubb's results until at least mid-2000, as it would take "at least two annual renewal cycles" for Chubb to reprice the standard commercial lines premiums and after the premiums were repriced it would take another year for higher premiums to be earned into income. Chubb concealed this key fact from its public disclosures until after the merger closed;

(f)     The rate increases that were, in fact, being obtained on new and renewal standard commercial insurance policies were very small and well below the levels necessary to have any materially favorable impact on Chubb's 99 results, or even to lessen the growing underwriting losses in Chubb's standard commercial insurance business;

(g)     Chubb's aggressive action to raise prices on its standard commercial insurance policies and accept substantial non-renewals to boost operating results of those lines, even if successful, would not have any significant positive impact on Chubb's financial results during 99 and, in fact, Chubb's standard commercial insurance problems would continue to very adversely impact Chubb's results throughout all of 99;

- 117 -

(h)   Chubb's standard commercial insurance business had not stabilized as, due to weak premium growth and increasing losses, the combined ratio on these lines of business was still increasing and would continue to increase throughout 99 (excluding catastrophes), leading to larger than ever losses in these lines of business;

(i)   Chubb's standard commercial insurance business was not encountering strong positive momentum or positive trends because due to weak premium growth and increasing losses, the combined ratio on these lines of business was still increasing and would continue to increase throughout 99 (excluding catastrophes), leading to larger than ever losses in these lines of business;

(j)   Chubb's better-than-expected 1stQ 99 results were not the result of favorable developments or trends in Chubb's standard commercial insurance business; in fact, Chubb's 1stQ 99 results were false as detailed in ¶¶130-57 and artificially boosted Chubb's reported EPS, thus concealing the continued serious deterioration in Chubb's standard commercial insurance business;

(k)   As a result of the foregoing negative conditions which were adversely impacting Chubb's business, defendants' forecasts of 5 ½%-6% premium growth for Chubb's standard commercial insurance business during 99 and a falling combined ratio for its standard commercial insurance business were false and could not be obtained; and

(l)   As a result of the foregoing negative factors which were adversely impacting Chubb's business, Chubb's forecasts of 99 EPS of $4.20+ and 00 EPS of $4.70 were false when made and could not and would not be achieved, *even if Chubb suffered no catastrophe losses and even if Chubb achieved its repricing objectives in standard commercial insurance*.

170.   As a result of the foregoing, members of the Proxy Sub-Class were damaged.

171. Members of the Proxy Sub-Class did not know of the false statements and omissions. This action was brought within one year of when they knew or reasonably could have known of such false statements or omissions.

## XII. THIRD CLAIM FOR RELIEF

### For Violation §14(a) of the 1934 Act Against All Defendants

172. Plaintiffs incorporate ¶¶1-161 and 169. Plaintiffs expressly disclaim any allegations of fraud, knowledge, intent or scienter.

173. Defendants violated §14(a) of the 1934 Act in that they solicited proxies or permitted the use of their names to solicit proxies from the Proxy Sub-Class by means of the Merger Proxy that contained statements which, at the time and in the light of the circumstances under which they were made, were false and misleading with respect to material facts, and omitted to state material facts necessary in order to make the statements therein not false or misleading.

174. The proxy solicitations were an essential link for the merger since the merger required a majority vote by the shareholders of Executive Risk since the officers and directors of Executive Risk did not own or control a majority of the shares.

175. The Merger Proxy and other oral proxy statements pleaded contained untrue statements of material fact and omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading, as specified in ¶169. Defendants were negligent in making those statements and/or permitting them to be made.

176. As a result, the Proxy Sub-Class was denied the opportunity to make an informed decision in voting on the merger, and received a smaller stake in the combined company than they otherwise would have had the information been disclosed, and have been damaged due to the harm inflicted on their equity ownership of Executive Risk.

- 119 -

177.   The Proxy Sub-Class suffered damages as a result of the merger which was approved through the use of a proxy in violation of §14(a) of the 1934 Act.

## XIII.   PRAYER

WHEREFORE, plaintiffs pray for judgment as follows: declaring this action to be a proper class action; awarding damages, including interest; rescinding the sale of Executive Risk to Chubb or ordering a new vote with a truthful proxy; and such other equitable and injunctive relief as the Court may deem proper.

## XIV.   JURY DEMAND

Plaintiffs demand a trial by jury.

DATED: August 9, 2002

COHN LIFLAND PEARLMAN
  HERRMANN & KNOPF LLP
PETER S. PEARLMAN

PETER S. PEARLMAN

Park 80 Plaza West-One
Saddle Brook, NJ  07663
Telephone: 201/845-9600

Liaison Counsel

MILBERG WEISS BERSHAD
  HYNES & LERACH LLP
WILLIAM S. LERACH
ARTHUR C. LEAHY
LAURA M. ANDRACCHIO
RAY A. MANDLEKAR
401 B Street, Suite 1700
San Diego, CA  92101
Telephone: 619/231-1058

Lead Counsel for Plaintiffs

N:\CASES\Chubb\MOM81138.cp2

- 120 -

## DECLARATION OF SERVICE BY MAIL

I, the undersigned, declare:

1. That declarant is and was, at all times herein mentioned, a citizen of the United States and a resident of the County of San Diego, over the age of 18 years, and not a party to or interest in the within action; that declarant's business address is 401 B Street, Suite 1700, San Diego, California 92101.

2. That on August 9, 2002, declarant served the SECOND AMENDED COMPLAINT FOR VIOLATION OF §§10(b) (AND RULE 10b-5), 14 AND 20(a) OF THE SECURITIES EXCHANGE ACT OF 1934 AND §§11 AND 15 OF THE SECURITIES ACT OF 1933 by depositing a true copy thereof in a United States mailbox at San Diego, California in a sealed envelope with postage thereon fully prepaid and addressed to the parties listed on the attached Service List.

3. That there is a regular communication by mail between the place of mailing and the places so addressed.

I declare under penalty of perjury that the foregoing is true and correct. Executed this 9th day of August, 2002, at San Diego, California.

LISA INSUNZA