# Exhibit 34

George S. Trevor (Bar No. 127875)
LAW OFFICES OF GEORGE S. TREVOR
300 Tamal Plaza, Suite 180
Corte Madera, California 94925
Telephone: (415) 924-7147
Facsimile: (415) 924-7159

John F. Friedemann (Bar No. 115632)
Kyle M. Fisher (Bar No. 127334)
FRIEDEMANN GOLDBERG LLP
420 Aviation Boulevard, Suite 201
Santa Rosa, California 95403
Telephone: (707) 543-4900
Facsimile: (707) 543-4910

Attorneys for Plaintiffs
ELLEN RUBKE, as Trustee of the 1986 Rubke Living
Trust, and JACK FERGUSON, individually and on
behalf of all other similarly situated shareholders of
Napa Community Bank

UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| ELLEN RUBKE, as Trustee of the 1986 Rubke Living Trust, and JACK FERGUSON, individually and on behalf of all other similarly situated shareholders of Napa Community Bank,<br><br>Plaintiffs,<br><br>vs.<br><br>CAPITOL BANCORP, LIMITED, a Michigan corporation; and JOSEPH D. REID,<br><br>Defendants. | **CASE NO. C-05-4800-PJF**<br><br>**PLAINTIFFS' FIRST AMENDED COMPLAINT FOR DAMAGES AND OTHER RELIEF**<br><br>**CLASS ACTION**<br><br>**JURY TRIAL DEMANDED**<br><br>1) **Violation of Section 11 of the Securities Act;**<br>2) **Violation of Section 12 of the Securities Act**<br>3) **Violation of Section 15 of the Securities Act;**<br>4) **Violation of Section 10(b) of the Exchange Act and Rule 10b-5 promulgated under the Exchange Act;**<br>5) **Violation of Section 20(a) of the Exchange Act;**<br>6) **Violation of Section 14(e) of the Exchange Act and Rule 14e-2 promulgated under the Exchange Act.** |

Plaintiffs ELLEN RUBKE, as Trustee of the 1986 Rubke Living Trust, and JACK FERGUSON (collectively "Plaintiffs"), complaining on behalf of themselves individually and all other similarly situated shareholders of Napa Community Bank, allege the following based upon personal knowledge as

1

FIRST AMENDED COMPLAINT – CLASS ACTION

to themselves and their own acts, and information and belief as to all other matters, based upon <u>inter alia</u>, the investigation conducted by their attorneys which included, among other things, a review of public documents filed with the Securities and Exchange Commission ("SEC") and documents sent by Defendants to Plaintiffs.

## I.     **INTRODUCTION**

1.     Defendant Capitol Bancorp, Limited ("Capitol") and its Chief Executive Officer and Chairman of the Board, Defendant Joseph Reid ("Reid" and together with Capitol, the "Defendants"), deceived the plaintiff class, the former shareholders of Napa Community Bank ("NCB"), into selling their shares to Capitol at a steep discount to what Capitol and Reid knew those shares were worth. Capitol might have succeeded in its tender offer for the NCB shares even if Capitol had disclosed that it was paying less than what the shares were worth. However, Capitol chose to engage in a campaign of deception to hide the fact that it was buying the shares at a steep discount to the fair value. Part of this campaign of deception was the material misrepresentations and omissions of material fact that Capitol made in a Registration Statement filed with the Securities and Exchange Commission. In addition, at the request of Reid and on behalf of Capitol, NCB's President and other members of NCB's management made a series of telephone calls to the NCB shareholders while the tender offer was pending. During these telephone calls, misrepresentations were made to NCB shareholders to pressure the shareholders into selling their shares to Capitol. Capitol thereby illegally obtained a benefit for itself of up to $6,000,000 in value at the direct expense of the plaintiff class.

2.     Capitol was an insider with respect to NCB. Capitol owned over 48% of the NCB shares (and together with Reid owned over 50% of the NCB shares) and Capitol admitted that it held effective control over NCB at all relevant times. For example, Page 5 of the "Fact Sheet Prepared for Minority Shareholders" that was sent to each NCB shareholder as part of the Offer Documents stated as follows:

> The fact is that they [(Capitol)] already control the majority of NCB shares, and have for quite some time. The shares that are currently contemplated for exchange represent a minority ownership interest and always have.

3.     Page 5 of the prospectus stated that "NCB is now and has been, since it commenced

2

FIRST AMENDED COMPLAINT – CLASS ACTION

business an affiliate and a controlled subsidiary of Capitol or one of Capitol's controlled affiliates." Page 15 of the prospectus stated that "NCB is already a majority controlled subsidiary of Capitol."

4. An executive officer of Capitol attended almost every meeting of the board of directors of NCB and Capitol was given monthly updates on NCB's performance. Capitol performed important back office functions for NCB, had in depth knowledge of NCB's business and had access to, and knew material, non-public information about NCB.

5. Defendants had fiduciary duties with respect to NCB by virtue of their collective ownership of over 50% of NCB shares and their effective control of NCB. Capitol was therefore required to disclose all material facts to the plaintiff class, including the fact that that the price being offered by Capitol was substantially below fair value, particularly because the Registration Statement led NCB shareholders to believe that they were receiving fair value.

6. Under federal securities laws (see e.g., *Glazer v. Formica Corp.* 964 F.2d 149, 157 (2nd Cir. 1992)), Defendants were required to disclose a particular material fact (in this case, the offering price's substantial discount to fair value) if (1) insider trading has occurred, (2) a statute or regulation required disclosure of the specific fact(s) at issue, or (3) there was an inaccurate, incomplete or misleading prior disclosure making disclosure of the particular fact necessary to render the prior disclosure not misleading. Defendants knowingly offered a substantially discounted price and nonetheless made extensive statements in the Registration Statement that either expressly stated or created the inference that Capitol was offering fair value for the NCB shares.

7. Under the federal securities laws (*see e.g., In re Apple Computer Securities Litigation,* 886 F.2d 1109, 1116 (9th Cir. 1989)), the material information which Capitol did not disclose must have been transmitted to the NCB shareholders by someone else with a degree of intensity and credibility sufficient to effectively counterbalance any misleading impression created by Capitol's misrepresentations and omissions, including the misrepresentations and omissions set forth in the Registration Statement. The NCB shareholders justifiably placed heavy reliance on the statements and opinions by Capitol, as the issuer/registrant, in the Registration Statement and the statements and opinions which Capitol otherwise caused to be made to the plaintiff class. As alleged herein, any corrective information that was transmitted by the committee created by NCB shareholders opposed to

3

Capitol's offer (the Minority Shareholder Committee") to NCB shareholders outside the Registration Statement was not done with the requisite degree of intensity and credibility to excuse Capitol's misrepresentations and omissions.

8. Capitol was able to purchase the NCB common stock at a price substantially below the fair market value as a direct result of misrepresentations and omissions of material fact made by Defendants in the Registration Statement and in other communications made in connection with the offering of Capitol's securities. These material misrepresentations and omissions of material fact by and on behalf of Defendants in connection with Capitol's offer to exchange shares materially affected Plaintiffs' and the class members' decision to exchange their NCB stock for Capitol stock at a price substantially less than its fair market value. As a direct and proximate result of these material misrepresentations and omissions of material fact by Defendants in connection with Capitol's offer to exchange shares, Plaintiffs and the class members have suffered damages, which they are entitled to recover from Defendants.

## II. JURISDICTION AND VENUE

9. The claims asserted in this complaint arise under and pursuant to Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act") [15 U.S.C. §§78j(b) and 79t(a)], and Rules 10b-5 and 14e-2 promulgated thereunder [17 C.F.R. § 240.10b-5 and 17 C.F.R. § 240.14e-2]. This action also arises under Sections 11, 12 and 15 of the Securities Act of 1933 (the "Securities Act") [15 U.S.C. §§77k, 77l and 77(o).

10. This Court has jurisdiction over the subject matter of this action pursuant to §27 of the Exchange Act [15 U.S.C. § 78aa], Section 22 of the Securities Act [15 U.S.C. §77v], and 28 U.S.C. §§1331 and 1337.

11. Venue is proper in this District pursuant to 28 U.S.C. §1391(b), as many of the acts and practices complained of herein occurred in substantial part in this District.

12. In connection with the acts alleged in this complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails, interstate telephone communications and the facilities of the national securities markets.

## III. PARTIES

4

FIRST AMENDED COMPLAINT – CLASS ACTION

**Plaintiffs**

13.    Plaintiff Ellen Rubke is a resident of Napa County, California.  The 1986 Rubke Living Trust is being administered by Plaintiff Ellen Rubke in Napa County, California.  The 1986 Rubke Living Trust was a common stock holder of NCB prior to and at the time of the Share Exchange Offer.

14.    Plaintiff Jack Ferguson is a resident of Hawaii and was a common stock holder of NCB prior to and at the time of the transactions with Capitol.

15.    Plaintiffs, in reliance on the Registration Statement as well as other direct and indirect communications from Defendants, sold their shares of NCB common stock to Capitol in exchange for Capitol common stock.  As a result of those transactions, Plaintiffs became shareholders of Capitol.  Plaintiffs bring this action individually and on behalf of all others similarly situated.

**Defendants**

16.    Capitol is a Michigan corporation with its principal place of business in Lansing, Michigan and is the issuer of the Capitol common stock at issue in this action.

17.    Reid is a resident of the State of Michigan.  Reid was the chairman of the board, president and chief executive officer of Capitol, and an approximate 15% shareholder in Capitol, and signed the Registration Statement which contained the terms of the offer to exchange shares.

## IV.    PLAINTIFF CLASS ACTION ALLEGATIONS

18.    Plaintiffs bring this action as a federal class action pursuant to Federal Rules of Civil Procedure 23(a) and 23(b)(3) on behalf of a class consisting of all persons who owned shares of NCB common stock and who, on or about June 30, 2005 sold their shares to Capitol.  Plaintiffs are informed and believe that approximately 340 individual shareholders of NCB are members of the plaintiff class as defined above and that these shareholders, many of whom are residents of Napa County, California, exchanged 404,384 shares of NCB common stock pursuant to Capitol's offer to exchange shares.

19.    There is a well-defined community of interest in the legal and factual questions affecting the parties to be represented by this class.  The questions of law and fact common to the class claims predominate over questions which may affect individual class members.  The predominant questions of law and fact common to the class include, but are not limited to, whether Defendants, through the offering materials and other representations made to class members, made false and misleading

5

FIRST AMENDED COMPLAINT – CLASS ACTION

representations of material facts, or omitted to disclose material facts necessary for the statements that were made to not be misleading. The members of the plaintiff class, absent Defendants' material omissions and false statements, would not have exchanged their shares of NCB common stock at the price paid by Capitol.

20. The claims of the representative Plaintiffs are typical of the claims of all members of the class since the representations and omissions of material facts were made to all class members through the use of misleading offering materials.

21. The named Plaintiffs are representative parties who will fully and adequately protect the interest of the class. The number of persons who are members of the plaintiff class and the relevant size of each member's claim against Defendants makes joinder of all class members' claims impracticable. Plaintiffs have retained counsel who are experienced in the prosecution of plaintiff class actions generally and the securities laws specifically.

22. Plaintiffs know of no difficulty which would be encountered with the management of this litigation that precludes its maintenance as a class action.

## GENERAL FACTUAL ALLEGATIONS

## THE SHARE EXCHANGE OFFER

23. On or about June 2, 2005, Capitol made a tender offer to issue shares of Capitol common stock in exchange for the outstanding shares of NCB common stock not already owned by Capitol and Capitol affiliates (such offer is referred to as the "Share Exchange Offer"). In the Share Exchange Offer, Capitol offered to exchange Capitol stock for all outstanding shares of NCB common stock for a price (payable in shares of Capitol stock) equal to approximately 150% of the book value of NCB's common stock.

24. The terms of, and disclosures concerning, the Share Exchange Offer were set forth in certain documents (collectively, the "Offer Documents"), including a Prospectus that was part of an S-4 Registration Statement that Capitol filed with the U.S. Securities and Exchange Commission (the "SEC") on or about April 28, 2005. Capitol filed an amendment to the Registration Statement with the SEC on or about May 27, 2005 and, based on information and belief, the Registration Statement became effective on June 7, 2005 (the Registration Statement and the Prospectus included therein are

FIRST AMENDED COMPLAINT – CLASS ACTION

collectively referred to as the "Registration Statement"). Capitol did not file any further amendments to the Registration Statement.

25. In the Registration Statement, Capitol offered to issue shares of Capitol common stock in exchange for all outstanding NCB common stock not already owned by Capitol. The exchange ratio was calculated to result in NCB shareholders receiving, in exchange for each share of NCB stock, shares (or fractional shares) of Capitol stock worth, as of a selected date or dates, approximately 150% of the represented book value of NCB shares as of May 31, 2005 (approximately $15.81 per share of NCB common stock). The exact number of shares Capitol was to issue to the NCB shareholders in exchange for their NCB shares was based on a formula set forth in the Share Exchange Offer.

26. The NCB book value used by Capitol was approximately $10.60 per share, which meant that Capitol issued approximately $15.90 worth of Capitol shares per NCB share tendered by NCB shareholders participating in the share exchange. Approximately 340 individual shareholders of NCB are members of the plaintiff class as defined above and these shareholders, many of whom are residents of Napa County, California, exchanged 404,384 shares of NCB common stock pursuant to Capitol's Share Exchange Offer and Capitol issued approximately 198,148 shares of Capitol's common stock to the exchanging NCB shareholders.

27. Reid signed the Registration Statement as the Chief Executive Officer of Capitol. Certain documents, including a copy of the Prospectus that was part of the Registration Statement, that described the terms of, and included disclosures concerning, the Share Exchange Offer, were sent by Capitol to every member of the plaintiff class (such documents together with the Registration Statement the "Offer Documents"). Capitol is the issuer of the stock covered by the Registration Statement that contained the terms of the Share Exchange Offer made to members of the plaintiff class.

28. When the Registration Statement became effective, it contained untrue statements of material facts and omitted to state material facts required to be stated therein or necessary to make the statements therein not misleading. After the Registration Statement became effective, other misleading statements and omissions were made by or on behalf of Capitol that made the disclosures in the Registration Statement materially misleading, but Defendants did not amend the Registration Statement.

29. NCB (and Defendants, as controlling persons of NCB) failed to comply with Rule 14e-2

7

FIRST AMENDED COMPLAINT – CLASS ACTION

under the Exchange Act which required NCB to publish, send or give to NCB shareholders a statement disclosing that NCB either (1) recommended acceptance or rejection of the Share Exchange Offer tender offer, (2) expressed no opinion and remained neutral toward Capitol's Share Exchange Offer tender offer or (3) was unable to take a position with respect to Capitol's Share Exchange Offer tender offer. Such statement was required to also include the reason(s) for the position (including the inability to take a position) disclosed therein. Based on information and belief, Defendants caused NCB to violate Rule 14e-2 and the Registration Statement was materially misleading as a result. The NCB shareholders were entitled to know what the NCB board thought about the Share Exchange Offer but were denied this very important information.

**MISLEADING DISCLOSURE REGARDING NCB'S ANNUAL INCOME PROJECTIONS**

30. On page 28 of the Prospectus included in the Registration Statement containing the terms of the Share Exchange Offer, Capitol stated that "Capitol believes that NCB's profitability will increase." This statement failed to adequately disclose the dramatic growth in NCB's net income, retained earnings and book value in 2005 that Capitol knew was occurring. Defendants collectively owned over 50% of the outstanding NCB shares at the time. Officers and directors of Capitol were closely involved with NCB and a Capitol officer attended almost every meeting of the NCB board of directors during 2005.

31. Dennis Pedisich, President of NCB, told the NCB board of directors in a general board meeting on May 26, 2006 at which Reid was in attendance that NCB's year-to-date figures were on track for projected income of $1,000,000. In fact, NCB's net income for 2005 ended up being $964,500. Capitol and Reid knew about NCB's income projections for 2005 and they knew that many NCB shareholders were not aware of this information. Nevertheless, Capitol did not accurately or adequately disclose NCB's income projections for 2005 in the Registration Statement.

32. Capitol included in the Registration Statement unaudited statements of operations for NCB for the three months ended March 31, 2005. However, this information would not have conveyed Capitol's knowledge that a projection of $1,000,000 was considered "on track" by NCB's management. Many NCB shareholders did not know that the unaudited first quarter's financial results for 2005 were considered a realistic projection of the full year's financial performance. Capitol's statement that

8

FIRST AMENDED COMPLAINT – CLASS ACTION

"Capitol believes NCB's profitability will increase" did not adequately convey the expectation that NCB's profitability growth would be significant. Based on that statement, NCB shareholders would not reasonably conclude that the growth of Capitol would be as great as that which was actually projected.

33. It would have been material for the NCB shareholders to know that NCB management was projecting dramatic annual net income growth, which turned out to be a 66% increase. NCB shareholders were not provided in the Registration Statement with the information in Capitol's possession and Capitol's misleading income projection induced them to believe that NCB's income growth would be modest. As a result of Capitol's misleading projection, NCB shareholders were placed at a significant disadvantage to Capitol (who was an NCB insider) in evaluating the worth of their shares.

## MISLEADING REFERENCES TO A "PLAN" TO SELL SHARES

34. The Offer Documents included a cover letter dated June 2, 2005 that was signed by Reid and stated as follows:

> As you are aware, approximately three years ago Capitol Bancorp Limited (CBC) embarked upon a plan to start a bank in Napa, California. This plan called for CBC to partner with local investors. CBC would purchase one-half of the stock in the bank. The remaining stock would be made available to investors such as yourself. This plan also suggested that you would be given an opportunity to exchange your shares of bank stock for the publicly-traded stock of CBC after three years of bank operation at a premium of 150% of the bank's book value.
> . . .
> We are aware of a few individuals who have suggested that we sell the bank. This idea ignores all that we have previously represented to you. (emphasis added)

35. The Offer Documents included a "Fact Sheet Prepared for Minority Shareholders of Napa Community Bank" that stated on page 1 as follows:

> Why is Capitol Bancorp (NYSE symbol = CBC) offering to exchange their publicly traded stock for Napa Community Bank (NCB) Stock? Because both CBC and NCB have always indicated that they hoped to! It was part of the original business plan . . . (emphasis added)

36. In addition, Betty O'Shaughnessy, the chairperson of the NCB board of directors, was quoted in a June 2005 article in the The Napa Valley Register, as follows:

> [Betty O'Shaughnessy] emphasized that the shareholder option that can be exercised Thursday

FIRST AMENDED COMPLAINT – CLASS ACTION

was written into the original investment agreements three years ago, when Johnson was with the bank, and that it offers a far better return than most investments do. (emphasis added)

37. The statements in the June 2, 2005 cover letter referenced and acknowledged that Capitol had made prior representations to the NCB shareholders about the "plan" to sell their shares in three years for "a premium of" 150% of book value. As referenced by the "all we have previously represented to you" language in Reid's cover letter and the "always indicated" language in the fact sheet, Capitol had in fact made many references to such a "plan" in connection with NCB and in connection with First California Northern Bancorp, NCB's holding company, that was formed approximately concurrently with the formation of NCB.

38. For example, Capitol stated on page 28 of a combined proxy statement/prospectus that was in turn contained in a registration statement on Form S-4 filed with the SEC on or about June 17, 2004 that "[t]he concept of a potential share exchange transaction with Capitol has been discussed informally from time to time from the beginning of First California Northern's operations." Approximately one year later, Capitol also stated on page 28 of the Prospectus included in the Registration Statement that "[t]he concept of a potential share exchange transaction with Capitol has been discussed informally from time to time from the beginning of NCB's operations."

39. The words "[a]s you are aware" in Reid's June 2, 2005 letter established that Capitol knew this pattern of informal discussions and representations over a three-year period had firmly established the concept of a "plan" in NCB shareholders' minds and that NCB shareholders were induced to believe that they were obligated, legally or morally, to sell their shares to Capitol for 150% of the shares' book value regardless of the shares' fair market value. This material misunderstanding was reflected by the statements made by Betty O'Shaughnessy, the chairperson of the NCB board of directors, in The Napa Valley Register article that the Capitol buyout was written into the investors' contracts.

40. It was a material omission for Capitol not to clearly and prominently tell NCB shareholders in the Registration statement that they were under no obligation to participate in the "plan" and that in fact there existed no moral or legal obligation of any kind to sell their shares to Capitol. Members of the plaintiff class were induced to participate in the Share Exchange Offer based, in part, on

FIRST AMENDED COMPLAINT – CLASS ACTION

a misunderstanding, knowingly fostered by Capitol and NCB management that the NCB shareholders were obligated, legally or morally, to abide by an agreement that had been struck with Capitol, regardless of how much their NCB shares were worth. In fact, as described below, many NCB shareholders were contacted by Dennis Pedisich, the NCB President, or by other members of NCB management, and told that they had no choice but to tender their shares to Capitol.

41. If investors are told that they have no choice but to participate in a transaction, that statement significantly alters the mix of information available to the investors because they are induced to downplay or disregard any other information in the offering materials that might suggest they are not receiving a fair price and to place less importance on the cautionary statements or disclosures in the Registration Statement. Capital's failure to disclose in the Registration Statement that the NCB shareholders had no obligation, legal or moral, to participate, and that they were not bound by any "plan," was material because Plaintiffs were induced to believe that they were obligated to accept the consideration being offered by Capitol, regardless of what the shares were actually worth.

## FAILURE TO DISCLOSE CAPITOL'S HIGHER VALUATION OF NCB EQUIVALENT SHARES

42. In 2001, at approximately the same time NCB was being formed and capitalized, Capitol solicited investors primarily located in Napa County to capitalize a holding company for NCB, First California Northern ("NCB Holdings"). NCB Holdings was a bank holding company whose primary function was to hold and own approximately 51% of NCB's total shares. NCB Holdings had no material assets other than its shares of NCB and its financial statements were consolidated with those of NCB. Any assets that NCB Holdings owned other than NCB shares were negligible or nonexistent. Capitol sold approximately 49% of NCB Holding to other investors and kept 51% for itself through an intermediate subsidiary, Sun Community Bancorp Limited, which was later merged into Capitol.

43. Capitol eventually purchased the other 49% of NCB Holdings through a share exchange offer that closed in September 2004 (such transaction, the "Prior Exchange Offer"). The terms of the Prior Exchange Offer were contained in a combined proxy statement/prospectus that was in turn contained in a Registration Statement on Form S-4 filed with the SEC on or about June 17, 2004 (such combined proxy statement/prospectus/registration statement and accompanying documents filed with the

11

FIRST AMENDED COMPLAINT – CLASS ACTION

SEC, the "Prior Offer Documents"). The Prior Exchange Offer to NCB Holdings shareholders paid NCB Holdings shareholders approximately $15.00 per share of NCB Holdings stock based on NCB Holdings' book value of $9.04 per share as of March 31, 2004. Capitol thereby paid approximately 167% of the NCB Holding shares' book value in Capitol stock to acquire the NCB Holdings shares.

44. JMP Financial, Inc. prepared a letter in June 2004 addressed to the Board of Directors of First California Northern Bancorp which stated that " . . . JMP is, subject to the foregoing, of the opinion on the date hereof, that the consideration to be received by the Shareholders in the Exchange would be fair from a financial point of view . . ." (such letter, the "2004 JMP Fairness Opinion"). One or more directors and officers of NCB, including Betty O'Shaughnessy, Geni Bennetts, Jeffrey Epps, Paul Krsek and Lee Hendrickson held shares in NCB Holdings and participated in the NCB Holdings share exchange with Capitol. In addition, Cristin Reid English, an executive officer of Capitol, the daughter of Reid and a director of NCB Holdings, owned 200 shares of NCB Holdings and exchanged those shares pursuant to the Prior Exchange Offer.

45. Based on information and belief, Reid and Cristin Reid English were, on or about August 19, 2004, both re-elected to the board of directors of NCB Holdings for another one-year term. (Both were incumbent members of the board of directors of NCB Holdings prior to their re-election.) Reid and Cristin Reid English served as members of the NCB Holdings board of directors during the period between August 19, 2004 and August 19, 2005.

46. JMP Financial, Inc. prepared a fairness opinion letter dated May 27, 2005 addressed to the Board of Directors of NCB which stated that " . . . JMP is, subject to the foregoing, of the opinion on the date hereof, that the consideration to be received by the Shareholders in the Exchange would be fair from a financial point of view . . . ." (the "2005 JMP Fairness Opinion"). The 2005 JMP Fairness Opinion included in the Registration Statement and accompanying the Share Exchange Offer opined that a price equal to 150% of NCB's book value as of May 31, 2005 was fair to the NCB shareholders. The 2005 JMP Fairness Opinion was inconsistent with the statements made in the 2004 JMP Fairness Opinion because the 2004 JMP Fairness Opinion opined that an exchange price of 167% of book value as of March 31, 2004 (when NCB's book value was approximately 17% less than it was as of May 31, 2005) was fair to the NCB Holdings shareholders. Capitol, as the issuer and registrant in both the Prior

12

FIRST AMENDED COMPLAINT – CLASS ACTION

Exchange Offer and the Share Exchange Offer, and Reid, as the Chief Executive Officer and Director of Capitol at the time of the Prior Exchange Offer and the Share Exchange Offer and as director of NCB Holdings, was aware of this inconsistency and the fact that Capitol had paid more in the 2004 Prior Exchange Offer (when NCB's book value was approximately 17% less) for shares that were substantially equivalent to the NCB shares than what Capitol was offering to pay in the 2005 Share Exchange Offer.

47. The prior, higher valuation was not disclosed in the Registration Statement or in the Offer Documents, nor were NCB shareholders advised to review any or all of Capitol's SEC filings. The significance of the Prior Exchange Offer as it related to the price offered in the Share Exchange Offer was not disclosed in Capitol's SEC filings. NCB shareholders (apart from NCB's management, Capitol and the Capitol affiliates) either did not know about the Prior Exchange Offer or did not know that the Prior Exchange Offer had any significance or meaning in the context of the Share Exchange Offer. The members of the plaintiff class were not Capitol shareholders prior to the consummation of the Share Exchange Offer and had no reason to review, and were therefore not properly deemed to know, the contents of Capitol's SEC filings. Capitol has made approximately 650 separate filings with the SEC and these filings collectively include thousands of pages. The fact that the Prior Offer Documents are included in Capitol's voluminous filings with the SEC does not satisfy Capitol's duty to disclose in the Registration Statement the significance of the Prior Exchange Offer.

48. It was a material fact that Capitol paid directors and officers of NCB as well as Cristin Reid English, a Capitol executive officer, a higher price for equivalent shares than was offered to the NCB shareholders. A reasonable investor would have considered this fact important in deciding whether or not to accept less than what was paid to the NCB directors and to Capitol's executive officer for shares equivalent to the NCB shares. Capitol's failure to disclose these facts was a material omission from the Registration Statement.

FIRST AMENDED COMPLAINT – CLASS ACTION

## THE DEFENDANTS KNEW BUT DID NOT DISCLOSE THAT THE PRICE OFFERED WAS SUBSTANTIALLY LESS THAN FAIR VALUE

49.     Capitol and Reid knew that the price of 150% of book value offered in the Share Exchange Offer was substantially less than the fair value of the NCB shares. Additionally, Capitol and Reid knew that the Registration Statement did not adequately disclose to NCB shareholders that the offering price was substantially less than fair value. The Registration Statement would have led reasonable investors to believe that they were being paid a fair price for NCB shares. The fact that the offering price was materially low was evidenced by conclusions set forth in the fairness evaluations obtained by the Minority Shareholder Committee which demonstrate that under any reasonable, objective analysis, the NCB shares were worth at least $21 per share, or approximately 200% of book value.

50.     Information available to and known by Capitol established that the NCB shares were worth far in excess of 150% of book value. By the time of the Share Exchange Offer, NCB had proved to be one of the best performing Capitol-affiliated banks and this performance was known to, and acknowledged by, Capitol. Capitol's own analysis and conclusion is evidenced by the valuation opinion Cristin Reid English, a Capitol executive officer, expressed to an NCB shareholder. On or about May 20, 2004, during a car trip from Napa, California to the Sacramento airport, Albert Holdener, an NCB shareholder, asked Cristin Reid English what NCB shares were worth. Ms. English responded that NCB shares were worth approximately $32 per share. In contrast, the price offered by Capitol to NCB shareholders was approximately $15 per share even though NCB's performance had substantially improved in the year after Ms. Reid's comments.

51.     Capitol knew or should have known that the 2005 JMP Fairness Opinion was inaccurate and biased because it was inconsistent with the 2004 JMP Fairness Opinion. Capitol knew that JMP Financial, Inc. had opined one year before that shares equivalent to NCB shares were worth more than what Capitol was offering in the Share Exchange Offer. Capitol knew that the book value of NCB's shares had increased by at least 17% during the period from 2004, the time of the Prior Exchange Offer until, May and June 2005, the time of the Share Exchange Offer.

52.     JMP Financial, Inc. had rendered approximately thirty fairness opinions in connection with Capitol's (or a Capitol affiliate's) acquisitions of subsidiary/affiliate banks in which Capitol (or a

14

FIRST AMENDED COMPLAINT – CLASS ACTION

Capitol affiliate) already owned a substantial stake. These banks were located across the United States, had achieved varying degrees of success at the time they were bought out by Capitol (or a Capitol affiliate), and had been purchased over a period of almost seven years.

53. A fair acquisition price for these banks would necessarily vary considerably to reflect the many different variables involved in acquiring different banks in different markets at different times. However, in 26 of 30 transactions, JMP Financial, Inc.'s fairness opinions concluded that a valuation of 150% of book value (or very minor deviations from 150% of book value) was fair and in the other four, the highest valuation in this group deemed fair by JMP Financial, Inc. was approximately 175% of book value and the lowest valuation deemed fair by JMP Financial, Inc. was approximately 124% of book value. These opinions were demonstrably biased in favor of low valuations generally and biased in favor of 150% of book value valuations specifically.

54. By the time of the Share Exchange Offer, NCB had proved to be one of the best performing Capitol-affiliated banks. This performance was known to, and acknowledged by, Capitol, including but not limited to, during a meeting of the NCB board of directors that occurred on January 15, 2004 at the Napa Community Bank building at which it was stated by Scott Andrews, a Capitol employee, that NCB was performing above _average_ as compared to similar banks.

55. A meeting was held on or about April 11, 2005 at the office of NCB, in Napa, California, between four members of the NCB board of directors, Betty O'Shaughnessy, Joseph P. Cristiano, Jeffrey Epps, and John Pappas, and Owen O'Donnell, a member of the Minority Shareholder Committee, Gary Findley, an investment banker, attorney and adviser to the Minority Shareholder Committee, Thomas Mecredy (who attended by telephone), an investment banker from Hoefer & Arnett and retained by the Minority Shareholders Committee, and John Friedemann, an attorney advising the Minority Shareholders Committee. In that meeting the members of the NCB board of directors were given copies of a memorandum of fairness prepared by The Findley Group, a California-based firm (the "Fairness Memorandum") and a fairness opinion prepared by Hoefer & Arnett, Incorporated, a California-based firm (the "Fairness Opinion). The Fairness Memorandum and the Fairness Opinion stated that the fair market value of NCB shares was at least $21 per share. The Fairness Memorandum and the Fairness Opinion were extensively discussed during the meeting.

15

FIRST AMENDED COMPLAINT – CLASS ACTION

56. Based on information and belief, copies of the Fairness Opinion and the Fairness Memorandum, and/or a written or oral summary of their terms, were delivered to Capitol and Reid, and/or Capitol and Reid knew or should have known about the substance of the Fairness Opinion and the Fairness Memorandum. The Minority Shareholders Committee correspondence and communications with NCB were a matter of significant importance to the NCB board of directors, to Capitol and to Reid personally because the Minority Shareholders Committee had communicated its concern about the unfairness of Capitol's planned exchange offer to the NCB board of directors and was threatening litigation against Capitol, Reid, NCB and/or members of the NCB board of directors.

57. Capitol was an insider of NCB and was aware of communications between the Minority Shareholders Committee and their attorneys in the April through June 2005 time period, including communications dealing with the Minority Shareholders Committee's request for a list of NCB shareholders and for copies of NCB's financial statements. Based on information and belief, NCB directors, particularly Betty O'Shaughnessy, and Dennis Pedisich, discussed every NCB business matter of substance with Reid and/or sent Reid or Capitol copies of every important communication received by NCB. NCB considered the Fairness Opinion and the Fairness Memorandum to be significant and important matters and communications. Therefore, based on information and belief, Betty O'Shaughnessy discussed the substance of the April 11, 2005 meeting with Reid or another Capitol executive and/or sent to Capitol copies of the Fairness Opinion and the Fairness Memorandum.

58. The Registration Statement did not disclose the fact that the price offered in the Share Exchange Offer was substantially below fair value even though Capitol and Reid knew or should have known this was the case. The Registration Statement did not disclose that the 2005 JMP Fairness Opinion was a biased and inaccurate opinion even though Capitol and Reid knew or should have known this was the case.

59. It would have been important to reasonable NCB shareholders to know that the price offered in the Share Exchange Offer was a substantially below the shares' fair value and/or that the 2005 JMP Fairness Opinion was biased and inaccurate. Such omissions were material to an analysis of the fairness of the Share Exchange Offer and would have altered the total mix of information available to

16

FIRST AMENDED COMPLAINT – CLASS ACTION

reasonable investors in their decision to sell or not sell NCB shares to Capitol in exchange for shares of Capitol.

## THE REGISTRATION STATEMENT MISLED NCB SHAREHOLDERS INTO BELIEVING THEY WERE BEING PAID FAIR VALUE OR A PREMIUM TO FAIR VALUE

60.     The Registration Statement included lengthy language and documents that stated or implied that the offering price reflected a premium to fair value and/or that the price offered was fair and based on objective analysis.  The Registration Statement included the two-page JMP Financial, Inc. fairness opinion attached as Annex B and eight pages of analysis in the Howe Barnes Investments, Inc. opinion attached as Annex C, which together purported to justify a price of 150% of book value as being fair.  The Registration Statement also included several pages summarizing the two fairness opinions, beginning on page 38 and ending on page 43 of the Prospectus included in the Registration Statement, which summarized the opinions' statements that a price of 150% of book value was fair.  Neither the fairness opinions themselves nor the summary of those fairness opinions discloses the fact that the offering price was a substantial discount to fair value.  The Registration Statement would have misled reasonable investors to believe that they were receiving fair value for NCB shares in the Share Exchange Offer.

61.     The Share Exchange Offer also misled NCB shareholders into thinking that they were being paid a premium to the shares' fair value.  The Registration Statement repeatedly stated that the offering price included a "premium" which misled NCB shareholders into thinking that the offering price reflected a premium to the shares' fair value.

62.     The Registration Statement stated on page 1 of the Prospectus that "[t]he actual exchange ratio will be based on the actual book value per share of NCB as of May 31, 2005, applying the same premium." (emphasis added).

63.     The Registration Statement stated on page 3 of the prospectus that "[t]he actual exchange ratio will be based on the actual book value per share of NCB as of May 31, 2005, applying the same premium." (emphasis added).

64.     The Registration Statement stated on page 28 that "[t]he objectives of the potential exchange would be to enable shareholders of NCB to achieve liquidity in their investment, a reasonable

17

FIRST AMENDED COMPLAINT – CLASS ACTION

return on their investment in the form of a 'premium' . . ." (emphasis added).

65. The Registration Statement stated on page 29 of the prospectus that "[t]he actual exchange ratio will be based on the actual book value per share of NCB as of May 31, 2005, applying the same premium." (emphasis added).

66. There is no disclosure in the Registration Statement or the Offer Documents that the offering price included no premium to the shares' fair value. The Registration Statement repeatedly used language that would lead reasonable investors to believe that they were receiving a premium to the shares' fair value, but the Registration Statement did not disclose that the shares were being purchased at a substantial discount to the shares' fair value.

67. It was material to NCB shareholders to know whether the price they were being offered was believed to reflect a premium over fair value or a premium over book value. Due to the importance of this distinction, and the repeated use of the word "premium" in the Registration Statement without adequate clarification of the distinction, the lack of adequate disclosure created a reasonable probability of misleading NCB shareholders as to the value of NCB shares and the reasonableness of the Share Exchange Offer. The Registration Statement did in fact so mislead the NCB shareholders.

## THE ORAL MISREPRESENTATIONS MADE IN CONNECTION WITH THE SHARE EXCHANGE OFFER

68. Based on information and belief, in response to letters and other communications from the Minority Shareholder Committee, the directors of NCB and the President of NCB, Dennis Pedisich, in a meeting of the board of directors on May 26, 2005 in the NCB boardroom in Napa, California, and on other occasions during the period of March through June, 2005, were exhorted by Reid to call or otherwise communicate with the NCB shareholders on behalf of Capitol. These oral communications were made in order to induce NCB shareholders to sell their shares to Capitol as part of the Share Exchange Offer and to ensure that Capitol obtained over 80% of the shares of NCB.

### A. The Shares Would Be Worthless if Not Sold to Capitol.

69. On June 22, 2005, Jan Smith, an NCB shareholder, received a telephone call from Dennis Pedisich, the President of NCB, at Jan's home telephone number. In that telephone call, Mr. Pedisich told Mr. Smith that if he did not tender his NCB shares to Capitol as part of the Share Exchange Offer,

18

FIRST AMENDED COMPLAINT – CLASS ACTION

that his NCB shares would be worthless. Based on information and belief, Dennis Pedisich and/or the other officers and directors of NCB made telephone calls to other NCB shareholders and made similar statements to those shareholders.

70. On June 20, 2005, Doris Baker, an NCB shareholder, received a telephone call from Dennis Pedisich, the President of NCB, at her home telephone number. In that telephone call, Mr. Pedisich told Ms. Baker that if she did not tender her NCB shares to Capitol as part of the Share Exchange Offer, that her shares were likely to wind up as worthless pieces of paper and that she would lose her investment. Based on information and belief, Dennis Pedisich and/or the other officers and directors of NCB made telephone calls to other NCB shareholders and made similar statements to those shareholders.

71. The statements that the shares would be worthless if not sold were false because Capitol knew that NCB's shares would be valuable after completion of the Share Exchange Offer. On page 28 of the Prospectus included in the Registration Statement, Capitol stated that "Capitol believes that NCB's profitability will increase" and that "Capitol desires to acquire the remainder of NCB's common stock so that Capitol can include 100% of NCB's income in Capitol's consolidated income statement."

72. The statements that the shares would be worthless if not sold were false because NCB's audited balance sheet as of December 31, 2005 shows that NCB's retained earnings increased from $260,554 as of December 31, 2004 to $1,225,054 as of December 31, 2005 and that NCB's book value increased by approximately 8% during that period. During 2005, the year in which the Share Exchange Offer occurred, NCB's retained earnings soared by approximately 470%. NCB's audited Statements of Income for the years ended December 31, 2004 and December 31, 2005 showed that NCB's net income increased from $579,269 for the year ended December 31, 2004 to $964,500 for the year ended December 31, 2005, an increase of approximately 66%.

73. The statements that the shares would be worthless if not sold were false because NCB shareholders who did not tender their shares to Capitol would still be entitled by law to receive per share dividends from NCB, when and if those dividends were declared. NCB was, at the time of the Share Exchange Offer, a healthy, growing bank and was one of the best performing banks controlled by Capitol, as shown by its retained earnings having soared by approximately 470% in 2005 and its net

FIRST AMENDED COMPLAINT – CLASS ACTION

income having jumped by approximately 66% in 2005. Capitol had caused its subsidiary or controlled banks to declare dividends in the past and it was unreasonable to foster the impression that Capitol would never allow NCB to pay a dividend because Capitol would be depriving itself of dividends. The reason Capitol acquired the NCB shares was Capitol's desire to receive dividend income from NCB. The right to receive dividends, and the reasonable certainty of dividends being declared, carried substantial value.

74. The statements that the shares would be worthless if not sold were false because NCB shareholders who did not tender their shares to Capitol would still be entitled by law to receive information from NCB as to NCB's performance and NCB shareholders would have the right to obtain other information from NCB by law. This right to receive information was a valuable right.

75. The statements that the shares would be worthless if not sold were false because shares of NCB stock were considered valuable by other NCB shareholders and by persons who did not own shares of NCB stock. For example, on or about June 24, 2005, Owen O'Donnell, C. Paul Johnson, Gary Steven Findley, Gerald Vanoli and Sutter Capital Management collectively made an offer to purchase up to 57,142 shares of NCB common stock at a cash price of $17.50 per share (the "Higher Price Tender Offer"). In addition, prior to and after the expiration of the Share Exchange Offer, at least ten NCB shareholders sold their NCB shares to other persons for prices in excess of $17 per share. Dennis Pedisich and the NCB Directors knew about the Higher Price Tender Offer. Capitol knew that these sales/purchases occurred because, among other facts and circumstances, the Higher Price Tender Offer was mailed to NCB shareholders and because Stephanie Swan, a Capitol employee, maintained the NCB share register and handled the transfer of shares and the issuance of new share certificates to buyers of NCB shares.

76. The statements that the NCB shares would be worthless if not sold were material misrepresentations because NCB shareholders were induced to believe if they did not sell their shares to Capitol, their shares would be worthless and they would lose their investment. It also led the NCB shareholders to place little or no importance on the price being offered or on any of the cautionary disclosures or statements made in the Registration Statement.

20

FIRST AMENDED COMPLAINT – CLASS ACTION

**B. The Shareholders Were Required to Sell the Shares.**

77. On June 20, 2005, Doris Baker, an NCB shareholder, received a telephone call from Dennis Pedisich, the President of NCB, at her home telephone number. In that telephone call, Mr. Pedisich told Ms. Baker that she had no choice but to tender her NCB shares to Capitol. Based on information and belief, Dennis Pedisich and/or the other officers and directors of NCB made telephone calls to other NCB shareholders and made similar statements to those shareholders.

78. The statements that the NCB shareholders were required to sell their shares were false. The NCB shareholders were not subject to any legal, moral or other obligation to tender their shares to Capitol even though Capitol encouraged and failed to correct this misunderstanding.

79. The statements that the NCB shareholders were required to sell their shares were material misrepresentations. NCB shareholders were led to believe that they had no choice but to tender their shares to Capitol and the NCB shareholder were induced to place little or no importance on the price being offered or on any of the cautionary disclosures or statements made in the Registration Statement.

**C. The Shares Would Be Illiquid If Not Sold.**

80. On June 21, 2005, Patricia Drucquer, an NCB shareholder in her capacity as trustee, received a telephone call from Dennis Pedisich, the President of NCB, at her home telephone number. In that telephone call, Mr. Pedisich told Ms. Drucquer that if she did not tender her NCB shares to Capitol as part of the Share Exchange Offer, then her NCB shares would not be liquid for 50-60 years. Based on information and belief, Dennis Pedisich and/or the other officers and directors of NCB made telephone calls to other NCB shareholders and made similar statements to those shareholders.

81. The statements that the shares would be illiquid for 50-60 years if not sold to Capitol were false. There existed an informal market for NCB shares, as evidenced by the Higher Price Tender Offer. Before and after the Share Exchange Offer, at least ten NCB shareholders sold their NCB shares to other persons for prices in excess of $17 per share. Dennis Pedisich and the NCB Directors knew about the Higher Price Tender Offer. Capitol knew that these sales/purchases occurred because, among other facts and circumstances, the Higher Price Tender Offer was mailed to many NCB shareholders and because Stephanie Swan, a Capitol employee, maintained the NCB share register and handled the transfer of shares and the issuance of new share certificates to buyers of NCB shares.

21

FIRST AMENDED COMPLAINT – CLASS ACTION

82. The statements that the shares would be illiquid if not sold were material misrepresentations. NCB shareholders were led to believe that they would never (or at least not for the next 50-60 years) have any opportunity to sell their shares and these statements led them to place little or no importance on the price being offered or on any of the cautionary disclosures or statements made in the Registration Statement.

**D.      Ninety-eight Percent of NCB Shareholders were Tendering their Shares to Capitol.**

83. On or about June 15, 2005, Dianne Burke, an NCB shareholder, received a telephone call from Dennis Pedisich, the President of NCB. In that telephone call, Mr. Pedisich told Ms. Burke that she had better tender her NCB shares to Capitol because 98% of the people who had the stock were going to tender. Based on information and belief, Dennis Pedisich and/or the other officers and directors of NCB made telephone calls to other NCB shareholders and made similar statements to those shareholders.

84. The statements that 98% of NCB shareholders were tendering were false. There were approximately 511 registered NCB shareholders before the consummation of the Share Exchange Offer and approximately 163 registered NCB shareholders after the consummation of the Share Exchange Offer. Therefore, only approximately 348 (approximately 68%) of the NCB shareholders participated in the Share Exchange Offer.

85. The statements that 98% of NCB shareholders were tendering their shares were material misrepresentations, particularly in context of other statements made to the shareholders in the Offer Documents. Page 4 of the "Fact Sheet Prepared for Minority Shareholders" that was sent to each NCB shareholder stated that "if at least 80 percent of the outstanding NCB shares are exchanged for NCB stock, the event is generally not taxable to holders of NCB stock. If less than 80 percent of outstanding NCB shares are exchanged, the event will be taxable to those who do exchange their NCB stock for CBC stock."

86. Shareholders who were falsely told that 98% of the NCB shareholders were participating in the Share Exchange Offer were led to believe that there was no risk that their exchange would be taxable and were more inclined to participate in the Share Exchange Offer. In addition, the statement led NCB shareholders to justifiably believe that 98% of NCB shareholders found the Share Exchange Offer

22

FIRST AMENDED COMPLAINT – CLASS ACTION

acceptable and that if they did not sell, as part of the remaining 2% of minority NCB shareholders, they would have less representation and rights than if a larger number of shareholders refused to tender their shares. For example, if Capitol had succeeded in acquiring 90% or more of the NCB shares, Capitol would have been able to conduct a short form merger under Section 1110 of California's General Corporation Law. In short, the statements led NCB shareholders to believe that their NCB shares would have less value after consummation of the Share Exchange Offer than those shares actually had and the statements also led the NCB shareholders to place little or no importance on the amount of consideration being offered or on any of the cautionary disclosures or statements made in the Registration Statement.

**E.  All NCB Board Members Had Tendered Their Shares.**

87.  On or about June 24, 2005, Franz Wartenweiler, an NCB shareholder, received a telephone call from Dennis Pedisich, the President of NCB. In that telephone call, Mr. Pedisich told Mr. Wartenweiler that all of the members of the NCB board of directors were tendering their shares to Capitol. Based on information and belief, Dennis Pedisich and/or the other officers and directors of NCB made telephone calls to other NCB shareholders and made similar statements to those shareholders.

88.  The statements that all NCB board members had tendered their shares were false. Carlee Leftwich, a member of the NCB board of directors at the time, did not tender her NCB shares to Capitol because she was concerned about the decision-making process at NCB.

89.  The statements that all NCB board members had tendered their shares were material misrepresentations, particularly in context of other statements made to the shareholders in the Offer Documents. If NCB shareholders had been told that one NCB director had not tendered her shares, the NCB shareholders would have learned that there was not unanimity on the NCB board and that one of the directors was concerned about the decision-making process at NCB. The statements created the impression that the NCB board members had formally opined that the Share Exchange Offer was favorable, when in fact the NCB board never made a formal recommendation, notwithstanding a request by the Minority Shareholder Committee that they do so and notwithstanding their duty under Rule 14e-2 to do so.

90.  Defendants Capitol and Reid knew or should have known that the materially misleading

FIRST AMENDED COMPLAINT – CLASS ACTION

statements were being made to the NCB shareholders. Nevertheless, Defendants did not amend the Registration Statement to correct those materially misleading statements and the Registration Statement therefore contained material omissions of fact.

## COMMUNICATIONS FROM THE MINORITY SHAREHOLDER COMMITTEE

91.    The communications from the Minority Shareholders Committee (or from their attorneys or hired consultants) to NCB shareholders did not have the same credibility and importance as statements by Capitol and its agents. Capitol was an insider and a fiduciary with respect to the minority NCB shareholders. The Minority Shareholders Committee and their hired consultants and attorneys had a direct or indirect interest in the outcome of the Share Exchange Offer and did not have the assumed objectivity as a reputable, knowledgeable third party with no stake in the outcome.

92.    The communications from the Minority Shareholders Committee, and members of the Minority Shareholders Committee themselves, were actively disputed and attacked by or on behalf of Capitol. For example, Reid, Capitol and members of NCB management made statements that appeared in a June 26, 2005 article in The Napa Valley Register as follows:

> Officials from Napa Community Bank and its majority owner, Capitol Bancorp of Lansing, Mich., accused C. Paul Johnson, a former chairman of Napa Community Bank, of trying to undermine the June 30 offer and said <u>he is seeking revenge</u> over past dealings with the two banks. (emphasis added)

> Current bank chair Betty O'Shaughnessy said that "Paul Johnson is engaging in a <u>campaign of revenge</u>" and "<u>sour grapes</u>" against the bank and that his efforts stem from his departure from the board in 2002. (emphasis added)

> Capitol Bancorp's Reid accused Johnson and the minority shareholders of <u>seeking to gain control of the bank</u>. "He is forcing this. We are not," said Reid. "We will not participate in the liquidation of that bank." (emphasis added)

93.    Capitol and NCB management were publicly disputing the communications of the Minority Shareholders Committee and attacking the motives of the Minority Shareholders Committee. As a result, no information contained in any communications from the Minority Shareholders Committee could be considered to be made to the NCB shareholders with the degree of intensity and credibility required to effectively counterbalance the misleading impressions created by Capitol's one-sided misrepresentations and omissions.

24

FIRST AMENDED COMPLAINT – CLASS ACTION

## FIRST CLAIM FOR RELIEF

### False and Misleading Statements in Registration Statement
(Securities Act of 1933, Section 11)
(Against All Defendants)

94. Plaintiffs hereby incorporate by reference Paragraphs 1 through 93 above as though fully set forth herein. This claim is brought pursuant to Section 11 of the Securities Act, 15 U.S.C. §77k, on behalf of Plaintiffs and members of the class against all Defendants.

95. The Registration Statement contained specific material misrepresentations and omissions of material fact alleged in Paragraphs 30 through 67 and the Registration Statement failed to include any statement or disclosure that the oral misrepresentations alleged in Paragraphs 68 through 90 that were made in connection with the Share Exchange Offer were materially misleading. Capitol was an insider with respect to NCB, alleged in Paragraphs 2 through 5 above.

96. As alleged in Paragraphs 91 through 93, the communications from the Minority Shareholders Committee were not made or delivered with the degree of intensity and credibility required to effectively counterbalance the misleading impressions created by Capitol's one-sided misrepresentations and omissions

97. Plaintiffs and the class acquired their shares of Capitol stock through the acceptance of the Share Exchange Offer and the subsequent exchange of their NCB shares for Capitol stock in reliance upon untrue statements in the Registration Statement, and in reliance upon the Registration Statement not knowing of the omissions of material facts therefrom. The shares of Capitol stock received by Plaintiffs and members of the plaintiff class were issued pursuant to the Registration Statement and those shares received by Plaintiffs and class members are traceable to the false and misleading Registration Statement. Neither Reid nor Capitol had any reasonable grounds to believe that the statements made by Capitol in the Offer Documents, including the statements in the Registration Statement, or the various oral misrepresentations alleged above, were true and not misleading.

98. As a direct and proximate result of the making of false statements and omitting to state material facts in the Registration Statement by Defendants, Plaintiffs and the class are entitled to recover from Defendants, jointly and severally, such damages as represent the difference between the amount paid by class members for the Capitol stock they received in exchange for their NCB common stock and

25

FIRST AMENDED COMPLAINT – CLASS ACTION

the true value of their NCB common stock. The true value of NCB common stock on June 30, 2005 was greater than the consideration class members received as a result of the Share Exchange Offer.

<strong><u>SECOND CLAIM FOR RELIEF</u></strong>

<strong><u>Sale of a Security by Means of a Prospectus or Oral Communication</u></strong><br><strong>(Securities Act of 1933, Section 12)</strong><br><strong>(Against All Defendants)</strong>

99. Plaintiffs hereby incorporate by reference Paragraphs 1 through 98 above as though fully set forth herein.

100. The Prospectus contained in the Registration Statement contained specific material misrepresentations and omissions of material fact alleged above in Paragraphs 30 through 67 and the Prospectus contained in the Registration Statement failed to include any statement or disclosure that the oral misrepresentations alleged in Paragraphs 68 through 90 that were made in connection with the Share Exchange Offer were materially misleading. Defendants offered or sold securities by means of a prospectus and by means of oral communications that contained materially false statements and omissions of material facts. Capitol was an insider with respect to NCB, as alleged in Paragraphs 2 through 5 above.

101. The oral communications alleged in Paragraphs 68 through 90 were made in connection with the Share Exchange Offer and were materially misleading.

102. As alleged above in Paragraphs 91 through 93, the communications from the Minority Shareholders Committee were not made or delivered with the degree of intensity and credibility required to effectively counterbalance the misleading impressions created by Capitol's one-sided misrepresentations and omissions.

103. Plaintiffs and the class acquired their shares of Capitol stock through the acceptance of the Share Exchange Offer and the subsequent exchange of their NCB shares for Capitol stock in reliance upon such untrue statements in the Registration Statement, in reliance upon the Registration Statement not knowing of the omissions of material facts therefrom and in reliance upon the materially misleading oral communications made in connection with the Share Exchange Offer. The shares of Capitol stock received by Plaintiffs and members of the plaintiff class were issued pursuant to the Registration Statement and those shares received by Plaintiffs and class members are traceable to the false and

26

misleading Registration Statement. Neither Reid nor Capitol had any reasonable grounds to believe that the statements made by Capitol in the Offer Documents, including the statements in the Registration Statement, or the various oral misrepresentations alleged above, were true and not misleading.

104. As a direct and proximate result of the making of false statements and omitting to state material facts in the Registration Statement by Defendants, Plaintiffs and the class are entitled to rescind the Share Exchange Offer and/or to recover from Defendants, jointly and severally, such damages as represent the difference between the amount paid by class members for the Capitol stock they received in exchange for their NCB common stock and the true value of their NCB common stock. The true value of NCB common stock on June 30, 2005 was greater than the consideration class members received as a result of the Share Exchange Offer.

**THIRD CLAIM FOR RELIEF**
**Violation of Section 15 of the Securities Act**
**(Against Reid Only)**

105. Plaintiffs hereby incorporate by reference Paragraphs 1 through 104 above as though fully set forth herein.

106. This claim is brought pursuant to Section 15 of the Securities Act against Reid as a control person of Capitol.

107. Capitol is liable under Sections 11 and 12 of the Securities Act as alleged herein.

108. Reid is a "control person" of Capitol within the meaning of Section 15 of the Securities Act because Reid was the Chairman of the Board of Directors of Capitol, the President and Chief Executive Officer of Capitol, and the Chairperson of the Executive Committee of the Board of Directors of Capitol during 2004 and 2005. Reid was a director of Capitol and/or its first bank affiliate since its inception in 1982. No employee, officer or director of Capitol had more authority at Capitol or exercised more control over Capitol than Reid during 2004 and 2005.

109. Reid is a "control person" of Capitol within the meaning of Section 15 of the Securities Act because Reid owned approximately 15% of the outstanding common stock of Capitol, including rights to acquire and restricted stock grants during 2004 and 2005. No director or executive officer of Capitol owned more shares of Capitol than did Reid during 2004 and 2005.

110. Reid is a "control person" of Capitol within the meaning of Section 15 of the Securities

27

FIRST AMENDED COMPLAINT – CLASS ACTION

Act because Reid's family members occupied significant management positions at Capitol during 2004 and 2005. Brian K. English was Capitol's General Counsel and is the son-in-law of Reid and the husband of Cristin Reid English. Capitol also employed Joseph D. Reid III, an attorney who is Capitol's Director of Bank Development. He is the son of Reid and the brother of Cristin Reid English. Cristin Reid English is the daughter of Reid and has served as a director of Capitol and in various executive officer capacities in 2004 and 2005. Based on information and belief, Reid's influence and control over Capitol was enhanced by having his son, daughter, and son-in-law serve in executive positions at Capitol in 2004 and 2005.

111. By virtue of his high-level position, and ownership and contractual rights, participation in and/or awareness of Capitol's operations and/or intimate knowledge of the Registration Statement, Reid had the power to influence and control and did influence and control, directly or indirectly, the decision-making of Capitol, including the content and dissemination of the various statements that Plaintiffs contend are false and misleading. Reid was provided with or had unlimited access to copies of Capitol's reports, public filings and other statements alleged by Plaintiffs to be misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

112. In particular, Reid had direct and supervisory involvement in the day-to-day operations of Capitol, and therefore, had the power to control or influence the particular transactions giving rise to the securities violations alleged herein, and exercised the same.

113. At the time Plaintiffs and the other members of the class exchanged shares of NCB for shares of Capitol, Reid had the power and authority, and exercised the same, to cause Capitol to engage in the wrongful conduct complained of herein and/or to personally engage in the wrongful conduct complained of herein. Capitol issued, caused to be issued, and participated in the issuance of materially false and misleading statements in the Registration Statement and elsewhere in the Offer Documents.

114. Defendants wanted to acquire shares of NCB for a price of 150% of the book value of those shares. Defendants were motivated to do so for financial as well as strategic reasons related to taking total control of NCB to maintain Capitol's business plan and to freeze out dissident shareholders such as the Minority Shareholder Committee.

28

FIRST AMENDED COMPLAINT – CLASS ACTION

115. Defendants knew that a price of 150% of book value was a substantial discount to the fair market value of those shares and Defendants were motivated to receive, and did receive, the financial benefit of up to a $6,000,000 collective discount.

116. If Defendants had not succeeded in owning 80% or more of NCB stock, the Share Exchange Offer would have been a taxable transaction, which would have greatly reduced the value received by NCB shareholders. This reduction in value would have made the offer much less attractive to NCB shareholders and NCB shareholders would have been less likely to sell their shares to Capitol. Defendants were motivated to cause Capitol to acquire at least 80% of NCB shares and did acquire over 80% of the NCB shares because Defendants were concerned that the Minority Shareholders Committee might convince enough of the NCB shareholders to reject the Share Exchange Offer so that Capitol would not acquire at least 80% of NCB shares.

117. If Defendants had succeeded in owning 90% or more of NCB stock, Capitol would have been able to effect a "squeeze out" merger in which it would have forced the remaining NCB minority shareholders to sell their shares to Capitol. Defendants were therefore motivated to cause Capitol to acquire at least 90% of the NCB shares.

118. Capitol's business model depended on the continued practice of buying out community banks for 150% of book value, which is frequently a discount to community bank shares' fair market value after three years of operations. Based on information and belief, had Capitol been delayed or thwarted in buying over 80% of the outstanding NCB shares, or forced to raise the price it was offering, it would have been less likely to succeed in future buyout offers for 150% of book value.

119. Based on information and belief, Reid, as a control person of Capitol, intentionally or with deliberate recklessness, exhorted members of the NCB board of directors and officers of NCB, including specifically Dennis Pedisich, to make telephone calls to NCB shareholders in connection with the Share Exchange Offer. In these telephone calls, various materially misleading statements were made. Based on information and belief, Defendants caused those statements to be made to the NCB shareholders either knowing that those statements were materially misleading or with deliberate recklessness as to whether those statements would be materially misleading. Based on information and belief, Defendants also knowingly or with deliberate recklessness caused the materially misleading

29

statements and omissions alleged herein at Paragraphs 30 through 67 to be included in the Registration Statement and the materially misleading statements alleged herein at Paragraphs 68 through 90 to be made.

120. Pursuant to Section 15 of the Securities Act, by reason of the foregoing, Reid is liable to Plaintiffs and the other members of the class for Capitol's primary violations of Sections 11 and 12 of the Securities Act.

121. By virtue of the foregoing, Plaintiffs and the other members of the class are entitled to damages against Reid.

<h3 style="text-align:center">FOURTH CLAIM FOR RELIEF</h3>

**Violation of Section 10(b) of the Exchange Act and Rule 10b-5 Promulgated Thereunder**
(Against All Defendants)

122. Plaintiffs hereby incorporate by reference Paragraphs 1 through 121 above as though fully set forth herein.

123. The Prospectus contained in the Registration Statement contained the specific material misrepresentations and omissions of material fact alleged above in Paragraphs 30 through 67 and the Prospectus contained in the Registration Statement failed to include any statements or disclosures that the oral misrepresentations alleged in Paragraphs 68 through 90 that were made in connection with the Share Exchange Offer were materially misleading. Capitol was an insider with respect to NCB, as alleged in Paragraphs 2 through 5 above.

124. The oral communications described in Paragraphs 68 through 90 that were made in connection with the Share Exchange Offer and were materially misleading.

125. As alleged above in Paragraphs 91 through 93, the communications from the Minority Shareholders Committee were not made or delivered with the degree of intensity and credibility required to effectively counterbalance the misleading impressions created by Capitol's one-sided misrepresentations and omissions.

126. During the class period, Defendants carried out a plan, scheme and course of conduct which was intended to, and throughout the class period did, deceive Plaintiffs and the other class members, as alleged herein and caused Plaintiffs and other members of the class to exchange shares of

30

FIRST AMENDED COMPLAINT – CLASS ACTION

NCB for shares of Capitol stock at less than fair value and otherwise suffered damages. In furtherance of this unlawful scheme, plan and course of conduct, Defendants, and each of them, took the actions set forth herein.

127. Defendants (a) employed devices, schemes, and artifices to defraud; (b) made untrue statements of material facts and/or omitted to state material facts necessary to make the statements not misleading; and (c) engaged in acts, practices, and a course of business which operated as a fraud and deceit upon Plaintiffs and other members of the class, in an effort to enrich themselves. Defendants are sued as primary participants in the wrongful and illegal conduct and scheme charged herein.

128. Defendants, individually and in concert, directly and indirectly, by the use, means or instrumentalities of interstate commerce and/or of the mails, engaged and participated in a continuous course of conduct to conceal adverse material information about the Share Exchange Offer.

129. Defendants employed devices, schemes and artifices to defraud and a course of conduct and scheme as alleged herein to unlawfully manipulate and profit from the Share Exchange Offer and thereby engaged in transactions, practices and a course of business which operated as a fraud and deceit upon Plaintiffs and members of the class.

130. Defendants had actual knowledge of the misrepresentations and omissions of material facts set forth herein, or acted with reckless disregard for the truth in that they failed to ascertain and to disclose such facts, even though such facts were available to them. Defendants' material misrepresentations and/or omissions were done knowingly or recklessly and for the purpose and effect of concealing the truth.

131. As a result of the dissemination of the materially false and misleading information and failure to disclose material facts, the price paid to each class member for their shares of NCB was materially understated and relied directly or indirectly on the false and misleading statements made by Defendants, and/or on the absence of material adverse information that was known to or recklessly disregarded by Defendants but not disclosed in public statements by Defendants. At all relevant times, Plaintiffs and the other members of the class sold their shares in NCB at distorted prices and were damaged thereby.

132. At the time of the misrepresentation and omissions, Plaintiffs and other members of the

31

FIRST AMENDED COMPLAINT – CLASS ACTION

class were ignorant of their falsity, and believed them to be true. Had Plaintiffs and the other members of the class known of the truth concerning the Share Exchange Offer which were not disclosed by Defendants, Plaintiffs and other members of the class would not have tendered their NCB shares or, if Capitol had acquired such shares pursuant to the Share Exchange Offer, NCB shareholders would not have done so at the exchange price offered in the Share Exchange Offer.

133. Defendants had motive and opportunity to do the acts complained of herein and /or Defendants acted intentionally or with reckless disregard for the truth, alleged in Paragraphs 114 through 119 herein.

134. By virtue of the foregoing, Defendants have violated Section 10(b) of the Exchange Act, and Rule 10b-5 promulgated thereunder.

135. As a direct and proximate result of Defendants' wrongful conduct, Plaintiffs and the other members of the class suffered damages in connection with their participation in the Share Exchange Offer.

## FIFTH CLAIM FOR RELIEF

### Violation of Section 20(a) of the Exchange Act
### (Against Reid Only)

136. Plaintiffs hereby incorporate by reference Paragraphs 1 through 135 above as though fully set forth herein. This claim is brought pursuant to Section 20(a) of the Exchange Act against Reid as a control person of Capitol.

137. Reid acted as a controlling person of Capital within the meaning of Section 20(a) of the Exchange Act as alleged herein. By virtue of his high-level position, and ownership and contractual rights, participation in and/or awareness of Capitol's operations and/or intimate knowledge of the Registration Statement, Reid had the power to influence and control and did influence and control, directly or indirectly, the decision-making of Capitol, including the content and dissemination of the various statements that Plaintiffs contend were false and misleading. Reid was provided with or had unlimited access to copies of Capitol's reports, public filings and other statements alleged by Plaintiffs to be misleading prior to and/or shortly after those statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

32

FIRST AMENDED COMPLAINT – CLASS ACTION

138. In particular, Reid had direct and supervisory involvement in the day-to-day operations of Capitol, and therefore, is presumed to have had the power to control or influence the particular transactions giving rise to the securities violations as alleged herein, and exercised the same.

139. Capitol and Reid each violated Section 10(b) and Rule 10b-5 by their acts and omissions as alleged herein. By virtue of his position as a controlling person, Reid is liable pursuant to Section 20(a) of the Exchange Act. As a direct and proximate result of Capitol's and Reid's wrongful conduct, Plaintiffs and other members of the class suffered damages in connection with their exchange of NCB common stock for shares of Capitol.

## SIXTH CLAIM FOR RELIEF

### False and Misleading Statements in Tender Offer
**(Exchange Act of 1934, Section 14(e) and Rule 14e-2 promulgated thereunder)**
**(Against All Defendants)**

140. Plaintiffs hereby incorporate by reference Paragraphs 1 through 139 above as though fully set forth herein. This claim is brought pursuant to Section 14(e) of the Exchange Act and Rule 14e-2 promulgated thereunder on behalf of Plaintiffs and members of the class against Defendants.

141. The Share Exchange Offer Capitol made on or about June 2, 2005 it offered to purchase all shares of NCB common stock not owned by Capitol in exchange for shares of Capitol stock was a tender offer.

142. The Share Exchange Offer tender offer was conveyed to members of the plaintiff class by use of a written offering that contained untrue statements of material facts and omitted to state material facts required to be stated therein or necessary to make the statements therein not misleading, as alleged in Paragraphs 30 through 67. Capitol was an insider with respect to NCB, as alleged in Paragraphs 2 through 5.

143. Plaintiffs and the class acquired their shares of Capitol stock through the acceptance of the Share Exchange Offer tender offer and the subsequent exchange of their NCB shares for Capitol stock in reliance upon such untrue statements made in the Share Exchange Offer tender offer, and in reliance upon the tender offer not knowing of the omissions of material facts therefrom.

144. Defendants caused NCB to violate Rule 14e-2, as set forth in Paragraph 29 herein.

33

FIRST AMENDED COMPLAINT – CLASS ACTION

145.     As a direct and proximate result of the making of false statements and omitting to state material facts in the written Share Exchange Offer tender offer made by Defendants, Plaintiffs and the class are entitled to rescind the Share Exchange Offer and/or to recover from Defendants, jointly and severally, such damages as represent the difference between the amount paid by class members for the Capitol stock they received in exchange for their NCB common stock and the true value of their NCB common stock.  Plaintiffs are informed and believe that the true value of NCB common stock on June 30, 2005 was significantly greater than the consideration class members received as a result of the Share Exchange Offer tender offer.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs demand that judgment be rendered in favor of Plaintiffs and the class against Defendants as follows:

1.     For compensatory and general damages according to proof;

2.     For rescission or recessionary damages.

3.     For special damages according to proof;

4.     For prejudgment interest at the maximum legal rate;

5.     For punitive and exemplary damages according to proof;

6.     For the costs of the proceedings herein;

7.     For Plaintiffs' reasonable attorneys' fees; and

8.     For all such other and further relief as the Court deems just.

## **DEMAND FOR JURY TRIAL**

Plaintiffs hereby demand a trial by jury in this action.

## **CIVIL LOCAL RULE 3-16 CERTIFICATION**

Pursuant to Northern District of California Civil Local Rule 3-16, Plaintiffs certify that as of this date, other than the named parties, there is no such interest to report.

34

FIRST AMENDED COMPLAINT – CLASS ACTION

July 31, 2006

FRIEDEMANN GOLDBERG LLP

_____
KYLE M. FISHER
Attorneys for Plaintiffs
ELLEN RUBKE, as Trustee of the 1986 RUBKE LIVING
TRUST and JACK FERGUSON, individually and on
behalf of all other similarly situated shareholders of Napa
Community Bank

GEORGE S. TREVOR
LAW OFFICES OF GEORGE S. TREVOR
Attorneys for Plaintiffs
ELLEN RUBKE, as Trustee of the 1986 RUBKE LIVING
TRUST and JACK FERGUSON, individually and on
behalf of all other similarly situated shareholders of Napa
Community Bank

35

FIRST AMENDED COMPLAINT – CLASS ACTION