# Exhibit 35

**KEEFE BARTELS**
John E. Keefe, Jr.
Danielle Abouzeid
830 Broad Street
Shrewsbury, NJ 07702
Phone: (732) 224-9400
Facsimile: (732) 224-9494
Email: jkeefe@keefebartels.com
      dabouzeid@keefebartels.com

**ZWERLING, SCHACHTER &**
  **ZWERLING, LLP**
Jeffrey C. Zwerling
Robin F. Zwerling
41 Madison Avenue
New York, NY 10010
Phone: (212) 223-3900
Facsimile: (212) 371-5969
Email: jzwerling@zsz.com
      rzwerling@zsz.com

## UNITED STATES DISTRICT COURT

## DISTRICT OF NEW JERSEY

| | |
|---|---|
| IN RE VONAGE INITIAL PUBLIC OFFERING (IPO) SECURITIES LITIGATION | Docket No. 07-CV-177 (FLW/TJB) ALL CASES<br><br>District Judge Freda L. Wolfson<br><br>Magistrate Judge Tonianne J. Bongiovanni<br><br>JURY TRIAL DEMANDED |

## CONSOLIDATED AMENDED CLASS ACTION COMPLAINT

Lead Plaintiff The Zyssman Group and the DSP Plaintiffs (collectively, the "Plaintiffs") on behalf of themselves and all other persons similarly situated, by their undersigned attorneys, allege upon personal knowledge as to themselves and their own acts, and information and belief as to all other matters, based upon, *inter alia*, the investigation conducted by and through their attorneys, which included, among other things, a review of public documents, announcements made by the Defendants, United States Securities and Exchange Commission ("SEC") filings, press reports, and press releases regarding Vonage Holdings Corp. ("Vonage" or the "Company"), news articles, interviews with former employees and other readily obtainable information. Plaintiffs believe that additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## **NATURE OF THE ACTION**

1. Lead Plaintiff brings this action on behalf of itself and a Class (defined in ¶ 70, *infra*) consisting of all persons and entities who purchased the common stock of Vonage pursuant and/or traceable to the Company's May 24, 2006 initial public offering ("IPO" or the "Offering") of 31.25 million shares at $17.00 per share and suffered damages.

2. Vonage filed an amended registration statement (the "Registration Statement") with the SEC which contained a prospectus (the "Prospectus"). The Registration Statement became effective on May 23, 2006, making an initial public offering of Vonage shares.

3. Both the Registration Statement and Prospectus contained material misrepresentations and omissions regarding its business growth, services reliability and intellectual property.

4. The Registration Statement and Prospectus were materially false and misleading in that:

- Vonage's increase in subscriber lines and low average monthly churn rate

2

were materially false as they resulted from a corporate policy of not allowing customers to cancel their services;

- Vonage's services and products at the time of the IPO had technical problems and fundamental deficiencies, such as its inability to properly handle facsimile transmission; and

- Vonage's business rested upon the misappropriation of other companies' intellectual property, including AT&T and Verizon.

5. The IPO was conducted in a defective manner as the website established for the "Vonage Customer Directed Share Program" did not work properly and failed to provide investors with the required information.

6. Following the IPO, shares of Vonage dropped from the offering price of $17.00 per share to close on May 24, 2006 at $14.85 per share, a loss of $2.15 or 12.6 percent.

7. In the six trading days after the IPO, shares of Vonage dropped by nearly one third of its initial offering price to $11.63.

## JURISDICTION AND VENUE

8. The claims alleged herein arise under Sections 5, 11, 12(a)(1), 12(a)(2) and 15 of the Securities Act of 1933 ("Securities Act"), 15 U.S.C. §§77(e), 77(k), 77(l)(a)(1), 77(l)(a)(2) and 77 (o).

9. This Court has jurisdiction over the subject matter of this action pursuant to Section 22 of the Securities Act, 15 U.S.C. §77v.

10. Venue is proper in this District pursuant to Section 22 of the Securities Act and 28 U.S.C. §1391(b). Many of the acts and transactions alleged herein, including the preparation and dissemination to the investing public of false and misleading information, occurred in part in this District. In addition, Vonage maintains corporate headquarters in this District.

11. In connection with the acts, transactions and conduct alleged herein, Defendants,

3

directly and indirectly, used the means and instrumentalities of interstate commerce, including the United States mails, interstate telephone communications and the facilities of the national securities exchanges.

## THE PARTIES

### Plaintiffs

12. Lead Plaintiff, The Zyssman Group, includes Oded Zyssman, Aileen Zyssman, The Northside Company and Sabra Company. Each member of the Zyssman Group purchased Vonage common stock pursuant to the IPO, as evidenced by the attached certifications, and was damaged. Lead Plaintiff acquired Vonage's common stock in the Offering from Underwriter Defendants Citigroup Global, Deutsche Securities and UBS Securities.

13. Schlomo Fuhrer ("Fuhrer") purchased Vonage common stock through the Directed Share Program, as evidenced by the attached certification, and was damaged.

14. Chana Leser ("C. Leser") purchased Vonage common stock through the Directed Share Program, as evidenced by the attached certification, and was damaged.

15. Menashe Leser ("M. Leser") purchased Vonage common stock through the Directed Share Program, as evidenced by the attached certification, and was damaged.

16. Plaintiffs Fuhrer, C. Leser and M. Leser are collectively referred to hereinafter as the "DSP Plaintiffs."

### Defendant Vonage

17. Defendant Vonage is a Delaware corporation with principal corporate headquarters at 23 Main Street, Holmdel, New Jersey. Vonage, through its subsidiaries, offers broadband telephone services primarily in the United States, Canada and the United Kingdom.

### Officer Defendants

18. Defendant Jeffrey A. Citron ("Citron") is the founder of Vonage and has served in

4

various corporate positions, including Chairman of the Board of Directors ("Board") since January 2001, Chief Executive Officer ("CEO") from January 2001 through February 2006, Chief Strategist since February 2006, and Interim Chief Executive Officer since April 2007.

19. Defendant Citron signed the Registration Statement.

20. Defendant Citron is responsible for Vonage's overall corporate strategy, technology matters and public relations.

21. Defendant Citron had a 41% beneficial ownership interest in Vonage prior to the IPO and has a 34% beneficial ownership interest in Vonage after the IPO.

22. Defendant Michael Snyder ("Snyder") was the CEO and a Director of the Company from February 2006 through April 2007.

23. Defendant Snyder signed the Registration Statement.

24. Defendant Snyder was responsible for the day to day management and operation of Vonage's business, including supervision of its financial and legal functions and business activities of its principal operating units in the United States, United Kingdom and Canada.

25. Defendant John S. Rego ("Rego") is the Chief Financial Officer and Treasurer of the Company.

26. Defendant Rego signed the Registration Statement.

27. Defendant Rego is responsible for the financial aspects of the business as well as for business development and investor relations.

28. Defendants Citron, Snyder, and Rego are collectively referred to hereinafter as the "Officer Defendants."

29. By reason of their management positions with the Company, the Officer Defendants had access to internal Company documents, reports and other information, including

5

the material, adverse, non-public information concerning the Company's IPO and business.

30. The Officer Defendants attended management and/or Board meetings at which they discussed Vonage's business.

31. The Officer Defendants were responsible for the truthfulness and accuracy of the Company's Registration Statement and Prospectus, and other public filings described herein.

32. By reason of their management position and/or their stock ownership, the Officer Defendants were and are controlling persons, and had the power to influence Vonage's activities.

**Director Defendants**

33. Defendant Peter Barris ("Barris") is a director of the Company.

34. Defendant Barris signed the Registration Statement.

35. Defendant Morton David ("David") is a director of the Company.

36. Defendant David signed the Registration Statement.

37. Defendant J. Sanford (Sandy) Miller ("Miller") is a director of the Company.

38. Defendant Miller signed the Registration Statement.

39. Defendant Thomas J. Ridge ("Ridge") is a director of the Company.

40. Defendant Ridge signed the Registration Statement.

41. Defendant John J. Roberts ("Roberts") is a director of the Company.

42. Defendant Roberts signed the Registration Statement.

43. Defendant Betsy S. Atkins ("Atkins") served as director of the Company from July 2005 through March 2007.

44. Defendant Atkins signed the Registration Statement.

45. Defendant Orit Gadiesh ("Gadiesh") served as director of the Company from August 2005 through February 2007.

6

46. Defendant Gadiesh signed the Registration Statement.

47. Defendant Hugh Panero ("Panero") served as director of the Company from January 2006 through August 2006.

48. Defendant Panero signed the Registration Statement.

49. Defendant Harry Weller ("Weller") served as director of the Company from November 2003 through July 2007.

50. Defendant Weller signed the Registration Statement.

51. Defendants Barris, David, Miller, Ridge, Roberts, Atkins, Gadiesh, Panero and Weller are collectively referred to hereinafter as the "Director Defendants."

52. By reason of their Board membership, the Director Defendants had access to internal Company documents, reports and other information, including the material, adverse, non-public information concerning the Company's IPO and business.

53. The Director Defendants attended Board meetings where the IPO was discussed.

54. As signatories of the Registration Statement, the Director Defendants were responsible for its truthfulness and accuracy.

55. By reason of their membership on Vonage's Board, the Director Defendants were and are controlling persons, and had the power to influence Vonage's activities.

**Underwriter Defendants**

56. Defendant Citigroup Global Markets Inc. ("Citigroup Global") is the investment banking division of Citigroup, Inc.

57. Defendant Citigroup Global served as a lead underwriter for the IPO and distributed the Registration Statement and Prospectus.

58. Defendant Deutsche Bank Securities Inc. ("Deutsche Securities") is the

7

investment banking and securities arm of Deutsche Bank AG in the United States.

59.     Defendant Deutsche Securities served as a lead underwriter for the IPO and distributed the Registration Statement and Prospectus.

60.     Defendant UBS Securities LLC ("UBS Securities") is a wholly-owned subsidiary and the investment banking division of UBS AG.

61.     Defendant UBS Securities served as a lead underwriter for the IPO and distributed the Registration Statement and Prospectus.

62.     Defendant Bear, Stearns & Co. Inc. ("Bear Stearns") is a global investment banking, securities trading and brokerage firm.  Bear Stearns is a wholly owned subsidiary of Bear Stearns Companies Inc.

63.     Defendant Bear Stearns served as a lead underwriter for the IPO and distributed the Registration Statement and Prospectus.

64.     Defendant Piper Jaffray & Co. ("Piper Jaffray") is an international middle-market investment bank and institutional securities firm.

65.     Defendant Piper Jaffray served as a lead underwriter for the IPO and distributed the Registration Statement and Prospectus.

66.     Defendant Thomas Weisel Partners LLC ("Thomas Weisel") is a wholly owned subsidiary of Thomas Weisel Partners Group Inc.

67.     Defendant Thomas Weisel served as a lead underwriter for the IPO and distributed the Registration Statement and Prospectus.

68.     Defendants Citigroup Global, Deutsche Securities, UBS Securities, Bear Stearns, Piper Jaffray and Thomas Weisel are collectively referred to hereinafter as the "Underwriter Defendants."

69. Vonage, Officer Defendants, Director Defendants and Underwriter Defendants are collectively referred to hereinafter as the "Defendants."

## CLASS ACTION ALLEGATIONS

70. Lead Plaintiff brings this action as a class action pursuant to Federal Rules of Civil Procedure 23(a) and (b)(3) on behalf of a class consisting of all persons and entities who purchased the common stock of Vonage pursuant and/or traceable to the Company's May 24, 2006 IPO and who suffered damages (the "Class"). Excluded are the Defendants, members of their immediate families, any entity in which any of the Defendants has a controlling interest or of which they are a parent or subsidiary or that is controlled by any of the Defendants, and the officers, directors, employees, affiliates, legal representatives, heirs, predecessors, successors and assigns of the Defendants.

71. The members of the Class are so numerous that joinder of all members is impracticable. Vonage sold 31.25 million shares pursuant to the IPO. While the exact number of Class members is unknown to Lead Plaintiff at this time and can only be ascertained through appropriate discovery, Lead Plaintiff believes there are, at minimum, thousands of members of the Class who purchased Vonage's common stock on the IPO.

72. Questions of law and fact are common to all members of the Class and predominate over any questions affecting solely individual members of the Class. Among the questions of law and fact common to the Class are:

    a)    whether Defendants violated the federal securities laws as alleged herein;

    b)    whether the Registration Statement and/or Prospectus contained materially false and misleading statements of fact;

    c)    whether the Registration Statement and/or Prospectus omitted material facts that were necessary in order to make the statements made not misleading;

9

d)  whether various communications announcing the Directed Share Program were illegal offers in violation of Section 5 of the Securities Act; and

e)  whether Lead Plaintiff and the other members of the Class have suffered damages and, if so, in what amount.

73.  Plaintiffs' claims are typical of the claims of the members of the Class as Plaintiffs and the other members of the Class each sustained damages as complained of herein.

74.  Plaintiffs will fairly and adequately protect the interests of the members of the Class and have retained counsel competent and experienced in class actions and securities litigation. Plaintiffs have no interests antagonistic to or in conflict with those of the Class.

75.  A class action is superior to other available methods for the fair and efficient adjudication of the controversy since joinder of all members of the Class is impracticable. Furthermore, because the damages suffered by the individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for the Class members individually to redress the wrongs done to them. Plaintiffs anticipate no difficulties in the management of this action as a class action.

## SUBSTANTIVE ALLEGATIONS

### Vonage and Its Business

76.  Vonage offers products and services which allow its customers to make and receive telephone calls using the Internet.

77.  The Company transmits calls, using a Voice over Internet Protocol or VoIP, technology platform, which converts voice signals into digital data packages for transmission over the internet.

78.  According to the Prospectus, Vonage claims that its network is "based on internally developed software and industry standard servers, rather than the more expensive

10

circuit switches used by traditional telephone service providers." [Vonage, Prospectus (Form 424(B)(4)) (May 23, 2006) ("Prospectus") at p. 69]

79. Vonage asserted in its Prospectus that since its launch in October 2002, it has experienced rapid revenue and subscriber line growth, reaching 1.6 million subscriber lines as of April 2006.

80. Vonage offers VoIP service plans to residential and small business customers, each providing basic features as voicemail, call waiting, call forwarding and caller ID at a fixed monthly rate.

81. Vonage also offers premium services, such as toll free numbers, fax numbers and virtual phone numbers, for an additional fee.

82. Vonage sells to customers portable telephone-to-Internet enabling devices that allow customers to make and receive calls over the Internet.

### Vonage IPO

83. Vonage filed its initial Form S-1 registration statement with the SEC on February 8, 2006 to register the Company's common stock. Vonage initially sought to raise up to $250 million through its IPO.

84. Vonage set aside 13.5% of its shares to be pre-sold directly and exclusively to its customers through what it referred to as the "Vonage Customer Directed Share Program" (the "Directed Share Program").

85. The Directed Share Program allocated shares to Vonage's customers and permitted them to order shares without having to pay any money until after the IPO.

86. The Directed Share Program was oversubscribed.

87. The Company's Directed Share Program was described in the Registration

Statement and Prospectus as follows:

> We have requested that the underwriters reserve up to 13.5% of the common stock offered in this prospectus for sale to certain of our customers at the initial public offering price in the Vonage Customer Directed Share Program. The Vonage Customer Directed Share Program will be centrally administered through the program website at ipoinfo.vonage.com. A Vonage customer may be eligible to participate in the Vonage Customer Directed Share Program if he or she meets all of the following criteria:
>
> - The customer opened an account directly with Vonage America on or prior to December 15, 2005. The customer must have opened an account with Vonage America and not through a third-party wholesaler.
> - The customer maintained the Vonage account in good standing through February 1, 2006.
> - The customer is a U.S. citizen.
> - The customer resides in the United States as of the date of the consummation of this offering.
> - The customer is a natural person and has a valid U.S. social security number. No entities are eligible to participate.

[Prospectus at p. 139]

88. In order to participate in the Directed Share Program, the customer was required to open a limited purpose brokerage account at either Smith Barney (a division of Defendant Citigroup Global), Deutsche Bank Alex. Brown (a division of Defendant Deutsche Securities), or UBS Financial Services Inc. (an affiliate of Defendant UBS Securities). Customers could submit offers to purchase at least 100 and no more than 5,000 shares.

89. According to the Prospectus, to compensate Underwriter Defendants in the event of the non-payment of shares purchased through the Directed Share Programs, Vonage "agreed to indemnify the underwriters against certain liabilities, including those that may be caused by the failure of Directed Share Program participants to pay for and accept delivery of the common stock which had been allocated to them or were subject to a properly confirmed agreement to purchase." [Prospectus at p. 24]

12

90.    On May 23, 2006, the Defendants priced the Vonage IPO shares at $17.00 per share. Vonage's Prospectus asserted that:

> the initial public offering price for the shares was determined by negotiation between us and Citigroup Global Markets Inc., Deutsche Bank Securities Inc. and UBS Securities LLC. Among the factors considered in determining the initial public offering price were our record of operations, our current financial condition, our future prospects, the markets in which we operate, the economic conditions in and future prospects for the industry in which we compete, our management, and currently prevailing general conditions in the equity securities markets, including current market valuations of publicly traded companies considered comparable to our company.
> [Prospectus at p. 137]

91.    On May 23, 2006, Vonage's Registration Statement and Prospectus became effective.

92.    On May 24, 2006, Vonage stock closed at $14.85, down $2.15 of the IPO offering price.

93.    On May 24, 2006, 33.8 million shares were traded, more than the number of shares offered in the IPO.

## Misstatements and Omissions

### a.  Vonage's Subscriber Line Growth and Churn Rate

94.    In the Prospectus, Vonage made certain statements with respect to its subscriber line growth and average monthly churn rate.  Vonage stated that it has experienced a rapid subscriber line growth while maintaining a low average monthly churn rate (*i.e.*, the rate of customer termination).

95.    As to subscriber lines, Vonage represented that:

> [s]ince our launch, we have experienced rapid subscriber line growth. For example, we grew from 85,717 subscriber lines as of December 31, 2003 to 390,566 as of December 31, 2004 to 1,269,038 as of December 31, 2005, and to 1,597,317 as of March 31, 2006. We believe we will continue

13

to add a significant number of subscriber lines in future periods; however, we do not expect to sustain our historical subscriber line growth rate on a percentage basis due to a combination of increased competition, a significantly larger and growing customer base and increasing saturation among our initial target customer base, which included many early adopters.
[Prospectus at p. 32]

96. Vonage stated in the Prospectus that the "increase in our subscriber lines was directly related to an increase in our online advertising spending and our expansion to other media, such as television, that have a broader customer reach. The increase was also due to expanded distribution through a larger retail distribution network." [Prospectus at p. 37]

97. According to the Prospectus, the rate of customer terminations, or average monthly customer churn, was maintained around 2.0%.

98. According to the Prospectus, Vonage's average monthly customer churn is calculated "by dividing the number of customers that terminated during that period by the simple average number of customers during the period and dividing the result by the number of months in the period." [Prospectus at p. 7]

99. The Prospectus stated that the average monthly customer churn was 1.82% for 2004, 2.05% for 2005 and 2.11% for the three month ended March 31, 2006.

100. Vonage stated in the Prospectus that it monitored "churn on a daily basis." [Prospectus at p. 7]

101. Vonage stated in the Prospectus that "a higher rate of customer terminations would negatively impact" its business by reducing revenues. [Prospectus at p. 13]

102. Vonage stated that the average monthly churn rate may fluctuate over time and may increase in the future if customers are not satisfied with its service or because of increased competition from other providers.

103.    The Prospectus stated:

> Our churn rate could increase in the future if customers are not satisfied with our service. Other factors, including increased competition from other providers, also influence our churn rate....Therefore, if we are unsuccessful in retaining customers or are required to spend significant amounts to acquire new customers beyond those budgeted, our revenue could decrease and our net losses could increase.
> [Prospectus at p. 13]

104.    Vonage's increase in subscriber line and low average monthly churn rate was not the result of increased line sales, higher customer satisfaction and/or lower terminations but rather a corporate practice of refusing customers' cancellation requests.

105.    At the time of the IPO, customers had communicated to Vonage that they were not satisfied with Vonage's services.

106.    Prior to the IPO, Vonage's management instructed the retention department to refuse cancellation requests in order to keep the average monthly churn rate down. This practice has been in effect since at least the Fall of 2005.

107.    When a customer called Vonage to cancel service, customer representatives and account managers were instructed to offer a customer a "zero rate plan" to keep the customer signed on. A "zero rate plan" meant that customer paid as low as $4.99 per month for services and, in some cases, paid nothing for services.

108.    Vonage kept the subscriber lines on its books and avoided an increase in the average monthly churn rate.

109.    The Vonage customer retention department was directed not to let customers cancel their service to keep the average monthly churn rate down.

110.    By keeping the average monthly churn rate down through its corporate practice of refusing customers' cancellation requests, Vonage showed a greater number of subscriber lines

15

than it would have if it let customers cancel their services when they wanted.

111. By keeping the average monthly churn rate down through its corporate practice of refusing customers' cancellation requests, Vonage misrepresented its growth.

112. The statements in the Prospectus regarding subscriber line growth and average monthly churn rate were materially false and misleading because they failed to disclose that the truth about why subscriber lines continue to grow and how Vonage kept the average monthly churn rate down: Vonage's corporate practice of refusing customers' termination requests.

b. **Vonage's Services and Products**

113. With respect to general risks related to Vonage's service, products and technology platform, the Prospectus noted that the Company's success depended on its ability to provide reliable services and stated:

> *Flaws in our technology and systems could cause delays or interruptions of service, damage our reputation, cause us to lose customers and limit our growth.*
>
> Although we have designed our service network to reduce the possibility of disruptions or other outages, our service may be disrupted by problems with our technology and systems, such as malfunctions in our software or other facilities and overloading of our network....If service interruptions adversely affect the perceived reliability of our service, we may have difficulty attracting and retaining customers and our brand reputation and growth may suffer.
> [Prospectus at p. 11-12]

114. The statements in the above paragraph were false and misleading because they failed to disclose the truth about technical problems and fundamental deficiencies that were plaguing Vonage's services and products at the time of the IPO.

115. For example, the Prospectus failed to disclose the inability of Vonage's VoIP technology to properly handle facsimile transmissions. In particular, Vonage uses a transport layer protocol called Real Time Protocol/User Datagram Protocol ("RTP/UPD"). Although the

RTP/UPD technology may be sufficient for transmitting voice communications, it is insufficient for transmitting facsimile communications. As a result, facsimile transmissions using Vonage's technology platform were either aborted in midstream, transmitted in a fashion which was illegible to the recipient or simply did not transmit as they were supposed to.

116. On May 19, 2006, two customers filed a class action lawsuit in the United States District Court for the District of New Jersey against Vonage and its U.S. subsidiary, Vonage America, Inc. The lawsuit, captioned *Bustos v. Vonage America, Inc.*, No. 06 Civ. 02308 (D.N.J.) ("*Bustos* Class Action") alleged that Vonage did not timely or properly disclose to its customers that its technology platform was ill-equipped to transmit facsimile communications and that facsimile communications failed frequently to be transmitted properly.

117. The Prospectus does not mention the *Bustos* Class Action or the allegations contained therein.

### c. Vonage's Intellectual Property

118. The Prospectus failed to disclose that Vonage's business depended upon the misappropriation of other companies' intellectual property.

119. Vonage stated in the Prospectus that it had internally developed the technology needed to provide its VoIP telephone services:

> Our network is based on internally developed software, rather than the expensive circuit switches and soft switches used by other telephone service providers. We have also developed a number of software systems, such as our web-based billing system, that provide our customers with valuable features while simultaneously enabling us to manage our business more efficiently.
> [Prospectus at p. 76]

120. According to a lawsuit filed by AT&T Corp. ("AT&T") against Vonage in the Western District of Wisconsin, *AT&T Corp. v. Vonage Holdings Corp.*, Civ. 3:07-CV-

17

00585(BBC) (D.Wis.) ("*AT&T* Action"), AT&T contacted Defendant Citron on April 12, 2005 to notify him that Vonage was infringing one of its patents, U.S. Patent No, 6,487,200 (the "200 Patent") and that Vonage needed to enter into a licensing agreement with AT&T to continue using the patent.

121. Vonage continued using the 200 Patent without entering into such agreement. The 200 Patent covered technology relating to routing telephone calls over data networks like the Internet.

122. Prior to the IPO, AT&T also communicated to Vonage's counsel, in numerous meetings, letters and emails, that Vonage's services and products were infringing AT&T's intellectual property rights.

123. Prior to the IPO, Verizon claimed that Vonage was infringing seven of Verizon's patents relating to VoIP technology.

124. The Verizon patents covered technology relating to (i) gateway interfaces between a packet-switched and circuit-switched network, which is necessary to implementing commercially viable VoIP technology; (ii) billing and fraud detection in commercial VoIP telephony; (iii) call services in commercial VoIP telephony, such as call forwarding, follow me and voicemail; and (iv) methods relating to the use of Wi-Fi handsets in VoIP network.

125. On June 19, 2006, Vonage issued a press release announcing that it has been sued by Verizon over the infringement of those seven patents.

126. Following the press release on June 19, 2006, Vonage's shares dropped on June 19th, from the closing price on June 18, 2006 of $9.60 to $8.48 per share – 50% lower than the IPO.

127. According to an IDG News Service article published after the IPO, Klausner

18

Technologies informed Vonage in January 2006 that Vonage was infringing one of its patents, U.S. patent 5,572,576 ("Patent 576") and offered it the opportunity to enter into a licensing agreement, which Vonage refused. The 576 Patent covered VoIP voicemail technology.

128. On July 10, 2006, Klausner Technologies filed a lawsuit against Vonage in the Eastern District of Texas alleging that Vonage infringed 576 Patent.

129. Vonage's success in offering VoIP services to consumers was largely dependent on its continued unauthorized use of other companies' patented technology.

130. A claim on infringement or the enforcement of any of the patents referenced in the above paragraphs would have a material impact on Vonage's business and share price. Vonage stated that:

> Parties making claims of infringement may be able to obtain injunctive or other equitable relief that could effectively block our ability to provide our services and could cause us to pay substantial damages.
> [Prospectus at p. 15]

131. The statements in the Prospectus relating to intellectual property and patent litigation were materially false and misleading by omitting to disclose that, prior to the IPO, its competitors had already advised Vonage of their claims of patent infringement and of potential/threatened litigation.

**IPO and Directed Share Program Problems**

132. The Directed Share Program was "centrally administered through the program website at ipoinfo.vonage.com." [Prospectus at p. 139]

133. Vonage directed its customers to this website in order to learn about and participate in the Directed Share Program.

134. The vonageipo.com website contained a "Frequently Asked Questions" section ("FAQ"), which set forth the terms and conditions of the Directed Share Program and responded

to common questions about the program.

135. In the FAQ section of the vonageipo.com website, Vonage stated that it allowed prospective participants in the Directed Share Program to "withdraw [a] conditional offer" to buy Vonage's shares "at any time until we post an acceptance notification on this website, which would not occur until after the registration statement has been declared effective....and the initial public offering price of Vonage's common stock has been determined." [FWP dated 5/8/2006, available at http://www.sec.gov/Archives/edgar/data/1272830/000110465906031887/a06-10549_2fwp.htm]

136. Vonage also stated in the FAQ section of the vonageipo.com website that "an acceptance notification will be posted in [the] website if [the] conditional offer has been accepted" and would show how many shares have been allocated to Directed Share Program participants. Vonage advised Directed Share Program participants that the acceptance notification would be posted in the website "as little as one hour after the initial offering price" was determined. [FWP dated 5/8/2006, available at http://www.sec.gov/Archives/edgar/data/1272830/000110465906031887/a06-10549_2fwp.htm]

137. Vonage also stated in the FAQ section of the vonageipo.com website, in response to the question "When can I sell the shares I purchase through the Vonage Customer Directed Share Program?", the Company answered "You may place an order to sell the shares you purchase in the Vonage Customer Directed Share Program as soon as the trading of Vonage common stock begins on the New York Stock Exchange." [FWP dated 5/8/2006, http://www.sec.gov/Archives/edgar/data/1272830/000110465906031887/a06-10549_2fwp.htm]

138. On May 23, 2006, when the Registration Statement became effective and the IPO price was determined, the website did not work properly and had operational problems.

20

139. Many participants of the Directed Share Program were unable to log onto the website to obtain timely information regarding their conditional offers for, or their actual transactions in, the IPO. They remained unaware that Vonage accepted their conditional offers and were thus improperly denied their right to withdraw their conditional offers.

140. Certain participants of the Directed Share Program were unable to trade their shares or were delayed improperly from doing so.

141. The June 3-4, 2006 weekend edition of *The Wall Street Journal* reported:

> Investors also claim the debut has been plagued by poor communication from Vonage and technical glitches in the electronic system used for notifying them about their orders and transferring shares to them. These glitches delayed attempts to trade, they say, or led them to believe they didn't own shares when in fact their orders had gone through and they did. As Vonage stock dropped, these customers say, their losses mounted without their knowledge…

> …Mr. Baden [a Vonage customer] says he signed up for 200 shares but wasn't notified of the $17 offering price or given a chance to confirm his purchase before his deal went through. "I think it has been very lousy as a customer experience," he says, adding that he hasn't decided whether he will contest the purchase.

142. *The Wall Street Journal* article also described the confusion created by Vonage regarding rescinding the shares acquired through the Directed Share Program:

> In the first days of trading, the company added to the confusion by suggesting on CNBC that it wasn't likely to play hardball with customers who balked. "While all avenues are available to us, we cannot imagine alienating our customers in that way," the company said in a statement on May 30. "If certain…customers don't pay, we expect to repurchase the shares from the underwriters if necessary."

> The statement set off a flood of speculation on www.vonage-forum.com and elsewhere that Vonage was allowing customers to back out and would buy shares back from customers. But a week after trading began, Vonage clarified that it wouldn't buy back shares and reserved the right to pursue payment. It sent customers emails reiterating their obligation to pay.

143. On August 1, 2006, Vonage announced its results for the quarter ending June 30,

2006. Among other things, the Company disclosed in a press release that because certain participants in the Directed Share Program did not pay for the shares, it had to, as part of its indemnification obligations, acquire "from the Underwriters or their affiliates 1,055,297 shares of Vonage common stock at an aggregate fair market value of $11.7 million."

144. On August 1, 2006, the price of Vonage stock fell 5.5% or $0.39, to $6.70 per share.

**COUNT I**
**VIOLATION OF SECTION 11 OF THE SECURITIES ACT**
**AGAINST VONAGE**

145. Lead Plaintiff repeats and realleges the allegations set forth in ¶¶ 1 through 4, ¶¶ 6 through 17 and ¶¶ 70 through 131 contained above as if fully stated herein.

146. This count is asserted against Vonage for violations of §11 of the Securities Act, 15 U.S.C. §77(k), on behalf of Lead Plaintiff and the Class.

147. Vonage is the issuer of the common stock issued pursuant to the Registration Statement.

148. Lead Plaintiff and other members of the Class acquired shares of Vonage pursuant to, or traceable to, the Registration Statement.

149. The Registration Statement was materially false and misleading, contained untrue statements of material facts and/or omitted to state material facts necessary to make the statements made in the Registration Statement, under the circumstances in which they were made, not misleading.

150. As detailed herein, the misstatements contained in or the material facts omitted from the Registration Statement, included, but were not limited to the: (1) misstatements regarding subscriber line growth and average monthly churn rate because they failed to disclose

22

that the truth about why subscriber lines continue to grow and how Vonage kept the average monthly churn rate down; (2) failure to disclose material information relating to the technical problems and fundamental deficiencies of Vonage's services, products and technology; and (3) failure to disclose material information regarding Vonage's misappropriation of other companies' intellectual property.

151. At the time they obtained Vonage shares pursuant to the Registration Statement, neither the Lead Plaintiff nor any member of the Class knew, or by exercise of reasonable care could have known, of the material misstatements and/or omissions alleged herein.

152. This action was brought within one year after discovery of the untrue statements in and omissions from the Registration Statement, and within three years of the effective date of the Registration Statement.

153. By reason of the foregoing, Vonage violated §11 of the Securities Act and is liable to Lead Plaintiff and members of the Class, and jointly liable with the Officer Defendants and with the Underwriter Defendants (as alleged in Count III). Lead Plaintiff and the other members of the Class are entitled to damages as measured by the provisions of §11(e) from Vonage.

## COUNT II
## VIOLATION OF SECTION 11 OF THE SECURITIES ACT AGAINST
## THE OFFICER DEFENDANTS AND THE DIRECTOR DEFENDANTS

154. Lead Plaintiff repeats and realleges the allegations set forth in ¶¶ 1 through 4, ¶¶ 6 through 16, ¶¶ 18 through 55 and ¶¶ 70 through 131 contained above as if fully stated herein.

155. This count is asserted against the Officer Defendants and Director Defendants for violations of §11 of the Securities Act, 15 U.S.C. §77(k), on behalf of Lead Plaintiff and the Class.

156. The Registration Statement was materially false and misleading, contained untrue statements of material facts and/or omitted to state material facts necessary to make the statements made in the Registration Statement, under the circumstances in which they were made, not misleading.

157. As detailed herein, the misstatements contained in or the material facts omitted from the Registration Statement, included, but were not limited to the: (1) misstatements regarding subscriber line growth and average monthly churn rate because they failed to disclose that the truth about why subscriber lines continue to grow and how Vonage kept the average monthly churn rate down; (2) failure to disclose material information relating to the technical problems and fundamental deficiencies of Vonage's services, products and technology; and (3) failure to disclose material information regarding Vonage's misappropriation of other companies' intellectual property.

158. The Officer Defendants and Director Defendants were responsible for the contents of the Registration Statement.

159. The Officer Defendants and Director Defendants each signed the Registration Statement and each of them is liable for the material misstatements and omissions contained in the Registration Statement as a "person who signed the Registration Statement," under §11(a)(1), 15 U.S.C. §77k(a)(1).

160. The Director Defendants, Defendant Citron and Defendant Snyder were directors of Vonage when the Registration Statement became effective. Each of them is liable for the material misstatements and omissions contained in the Registration Statement as a director under §11(a)(2), 15 U.S.C. §77k(a)(2).

161. Lead Plaintiff and other members of the Class acquired shares of Vonage pursuant

24

to, or traceable to, the Registration Statement.

162. At the time they obtained Vonage shares pursuant to the Registration Statement, neither the Lead Plaintiff nor any member of the Class knew, or by exercise of reasonable care could have known, of the material misstatements and/or omissions alleged herein.

163. This action was brought within one year after discovery of the untrue statements in and omissions from the Registration Statement, and within three years of the effective date of the Registration Statement.

164. By reason of the foregoing, the Officer Defendants and Director Defendants violated §11 of the Securities Act.

165. By reason of the forgoing, the Officer Defendants are jointly and severally liable with Vonage (as alleged in Count I) and the Underwriter Defendants (as alleged in Count III) to Lead Plaintiff and members of the Class.

166. Lead Plaintiff and the other members of the Class are entitled to damages as measured by the provisions of §11(e) from the Officer Defendants and Director Defendants.

## COUNT III
## VIOLATION OF SECTION 11 OF THE SECURITIES ACT
## AGAINST UNDERWRITER DEFENDANTS

167. Lead Plaintiff repeats and realleges the allegations set forth in ¶¶ 1 through 4, ¶¶ 6 through 16, ¶¶ 56 through 68 and ¶¶ 70 through 131 contained above as if fully stated herein.

168. This count is asserted against the Underwriter Defendants for violations of §11 of the Securities Act, 15 U.S.C. §77(k), on behalf of Lead Plaintiff and the Class.

169. The Registration Statement was materially false and misleading, contained untrue statements of material facts and/or omitted to state material facts necessary to make the statements made in the Registration Statement, under the circumstances in which they were

made, not misleading.

170. As detailed herein, the misstatements contained in or the material facts omitted from the Registration Statement, included, but were not limited to the: (1) misstatements regarding subscriber line growth and average monthly churn rate because they failed to disclose that the truth about why subscriber lines continue to grow and how Vonage kept the average monthly churn rate down; (2) failure to disclose material information relating to the technical problems and fundamental deficiencies of Vonage's services, products and technology; and (3) failure to disclose material information regarding Vonage's misappropriation of other companies' intellectual property.

171. The Underwriter Defendants were underwriters of the IPO within the meaning of §2(11) to the extent they directly or indirectly participated in the distribution of Vonage shares traceable to the Registration Statement that became effective.

172. Lead Plaintiff and other members of the Class acquired shares of Vonage pursuant to, or traceable to, the Registration Statement.

173. At the time they obtained Vonage's shares pursuant to the Registration Statement, neither the Lead Plaintiff nor any member of the Class knew, or by exercise of reasonable care could have known, of the material misstatements and/or omissions alleged herein.

174. This action was brought within one year after discovery of the untrue statements in and omissions from the Registration Statement, and within three years of the effective date of the Registration Statement.

175. By reason of the foregoing, the Underwriter Defendants violated §11 of the Securities Act and are jointly and severally liable with Vonage (as alleged in Count I) and the Officer Defendants (as alleged in Count II) to Lead Plaintiff and members of the Class. Lead

Plaintiff and the other members of the Class are entitled to damages as measured by the provisions of §11(e) from the Underwriter Defendants.

## COUNT IV
### VIOLATION OF SECTION 12(a)(2) OF THE SECURITIES ACT
### AGAINST VONAGE

176. Lead Plaintiff repeats and realleges the allegations set forth in ¶¶ 1 through 4, ¶¶ 6 through 17 and ¶¶ 70 through 131 contained above as if fully stated herein.

177. This count is asserted against the Vonage for violations of Section 12(a)(2) of the Securities Act, 15 U.S.C. §77(l)(a)(2), on behalf of the Class.

178. Vonage participated in the preparation and dissemination of the false and misleading Prospectus.

179. Vonage is a seller and offeror and/or solicitor of purchasers of Vonage's shares offered pursuant to the Prospectus.

180. Vonage is a seller because it was the issuer of the shares.

181. Vonage solicited the sale of its common stock in the IPO, by among other things, employing Underwriter Defendants to solicit Lead Plaintiff and other members of the Class, by conducting various road shows and other promotional meetings.

182. The Prospectus was materially false and misleading, contained untrue statements of material facts and/or omitted to state material facts necessary to make the statements made in the Prospectus, under the circumstances in which they were made, not misleading.

183. As detailed herein, the misstatements contained in or the material facts omitted from the Prospectus, included, but were not limited to the: (1) misstatements regarding subscriber line growth and average monthly churn rate because they failed to disclose that the truth about why subscriber lines continue to grow and how Vonage kept the average monthly

27

churn rate down; (2) failure to disclose material information relating to the technical problems and fundamental deficiencies of Vonage's services, products and technology; and (3) failure to disclose material information regarding Vonage's misappropriation of other companies' intellectual property.

184. Lead Plaintiff and other members of the Class acquired shares of Vonage pursuant to, or traceable to, the Prospectus.

185. At the time they obtained Vonage shares pursuant to the Prospectus, neither the Lead Plaintiff nor any member of the Class knew, or by exercise of reasonable care could have known, of the material misstatements and/or omissions alleged herein.

186. This action was brought within one year after discovery of the untrue statements in and omissions from the Prospectus and within three years from the time that the Vonage shares were sold pursuant to the IPO to the investing public.

187. By reason of the foregoing, Vonage violated §12(a)(2) of the Securities Act and is liable to Lead Plaintiff and members of the Class.

188. Lead Plaintiff, individually and on behalf of all members of the Class, hereby tenders to Vonage those shares which Lead Plaintiff and the other members of the Class continue to own, in return for the consideration paid for those securities together with interest thereon. Class members who have sold their Vonage shares demand rescissory damages.

## COUNT V
## VIOLATION OF SECTION 12(a)(2) OF THE SECURITIES ACT
## AGAINST THE UNDERWRITER DEFENDANTS

189. Lead Plaintiff repeats and realleges the allegations set forth in ¶¶ 1 through 4, ¶¶ 6 through 16, ¶¶ 56 through 68 and ¶¶ 70 through 131 contained above as if fully stated herein.

190. This count is asserted against the Underwriter Defendants for violations of

28

Section 12(a)(2) of the Securities Act, 15 U.S.C. §77(l)(a)(2), on behalf of the Class.

191.  The Underwriter Defendants participated in the preparation and dissemination of the false and misleading Prospectus.

192.  The Underwriter Defendants were sellers and offerors and/or solicitors of purchasers of Vonage shares offered pursuant to the Prospectus.

193.  Pursuant to the Underwriter Agreements, the Underwriter Defendants agreed to purchase from the Company all the common shares being offered in the IPO at the IPO price of $17.00 minus a $1.02 discount. The Underwriter Defendants also agreed to offer to sell the common shares to the public in an IPO at the IPO price of $17.00.

194.  The Underwriter Defendants were sellers because they participated in, solicited and sold Vonage's shares in the Offering to Lead Plaintiff and other Class members.

195.  The Prospectus was materially false and misleading, contained untrue statements of material facts and/or omitted to state material facts necessary to make the statements made in the Prospectus, under the circumstances in which they were made, not misleading.

196.  As detailed herein, the misstatements contained in or the material facts omitted from the Prospectus, included, but were not limited to the: (1) misstatements regarding subscriber line growth and average monthly churn rate because they failed to disclose that the truth about why subscriber lines continue to grow and how Vonage kept the average monthly churn rate down; (2) failure to disclose material information relating to the technical problems and fundamental deficiencies of Vonage's services, products and technology; and (3) failure to disclose material information regarding Vonage's misappropriation of other companies' intellectual property.

197.  Lead Plaintiff and other Class members acquired shares of Vonage pursuant to, or

29

traceable to, the Prospectus.

198.    Lead Plaintiff and other Class members acquired Vonage's common stock in the Offering from the Underwriter Defendants.

199.    At the time they obtained Vonage's shares in the Offering, neither the Lead Plaintiff nor any member of the Class knew, or by exercise of reasonable care could have known, of the material misstatements and/or omissions alleged herein.

200.    This action was brought within one year after discovery of the untrue statements in and omissions from the Prospectus and within three years from the time that the Vonage shares were sold pursuant to the IPO to the investing public.

201.    By reason of the foregoing, the Underwriter Defendants violated §12(a)(2) of the Securities Act and are liable to Lead Plaintiff and members of the Class.

202.    Lead Plaintiff, individually and on behalf of all members of the Class, hereby tenders to the Underwriter Defendants those Vonage shares which Lead Plaintiff and the other members of the Class continue to own, in return for the consideration paid for those securities together with interest thereon.  Class members who have sold their Vonage shares demand rescissory damages..

**COUNT VI**
**VIOLATION OF SECTION 5 OF THE SECURITIES ACT**
**AGAINST VONAGE**

203.    DSP Plaintiffs repeat and reallege the allegations set forth in ¶ 1, ¶¶ 5 through 11, ¶¶ 13 through 17, ¶¶ 70 through 93 and ¶¶ 132 through 144 contained above as if fully stated herein.

204.    This count is asserted against Vonage for violations of Section 5 of the Securities Act, 15 U.S.C. §77(e), on behalf of the DSP Plaintiffs and other members of the Class who

purchased Vonage common stock pursuant to the Directed Share Program and suffered damage.

205. On May 8, 2006, Vonage sent a "blast" voicemail to its customers informing them of the Directed Share Program and the eligibility requirements to participate in the program.

206. The voicemail provided an Internet address at which prospective participants could obtain additional information about the Directed Share Program.

207. The voicemail did not contain a legend advising potential participants the name and address of a person from whom the prospectus could be obtained.

208. The voicemail included additional information beyond the scope of SEC Rule 144.

209. The voicemail is an offer in violation of Section 5 of the Securities Act.

210. The Company in its Registration Statement and Prospectus stated:

In addition, our initial voicemail communication to prospective Vonage Customer Directed Share Program participants, which communication may contain only limited information pursuant to Rule 134 under the Securities Act, included the Internet address at which prospective participants could obtain additional information about the Vonage Customer Directed Share Program, including a copy of the prospectus contained in our most recently filed registration statement relating to this offering. However, the voicemail did not include the name and address of a person from whom such a prospectus could be obtained. The inclusion of the Internet address in the voicemail might be viewed as incorporating into the voicemail information that is beyond the scope permissible under Rule 134. In addition, the omission of the name and address of a contact person means that the voice mail would not be entitled to the "safe-harbor" provided by Rule 134. As a result, it is possible that the voicemail could be determined to be an illegal offer in violation of Section 5 of the Securities Act, in which case recipients could seek to recover damages or seek to require us to repurchase their shares at the IPO price.
[Prospectus at p.140]

211. On May 8, 2006, Vonage sent an email to its customers informing them of the Directed Share Program. A copy of the email was filed with the SEC as a "free writing prospectus."

31

212. In addition to informing customers that certain shares were available for them to purchase under the Directed Share Program, the email indicated that more information about the Offering was available at www.vonageipo.com.

213. The hyperlink contained in the email, as well as in the first page of the website identified above, did not lead to the most recently filed Prospectus as required by Rule 433.

214. Under Rule 433, a "free writing prospectus" should be accompanied or preceded by the most recent prospectus satisfying the requirement of section 10 of the Securities Act and this requirement can be satisfied by including an active hyperlink to such prospectus.

215. The email is an offer in violation of Section 5 of the Securities Act.

216. The Company in its Registration Statement and Prospectus stated:

> Our initial email communication to prospective participants in the Vonage Customer Directed Share Program and the first page of the website identified above (from which a reader could access a detailed "frequently asked questions" section about the Vonage Customer Directed Share Program) did not include an active hyperlink to the prospectus contained in our most recently filed registration statement relating to this offering as required pursuant to Rule 433 under the Securities Act. As a result, it is possible that the e-mail communication and the first page of the website could be determined to be an illegal offer in violation of Section 5 of the Securities Act, in which case recipients could seek to recover damages or seek to require us to repurchase their shares at the IPO price.
> [Prospectus at p.140]

217. Defendant Vonage violated Section 5 by communicating with and delivering offering materials to prospective participants of the Directed Share Programs that did not contain the information required by SEC Rule 134 and Rule 433.

218. By virtue of the conduct alleged herein, Vonage is liable for the foregoing wrongful conduct and is liable to the DSP Plaintiffs and members of the Class who purchased Vonage common stock pursuant to the Directed Share Program for damages suffered.

## COUNT VII
### VIOLATION OF SECTION 12(a)(1) OF THE SECURITIES ACT
### AGAINST VONAGE

219. Lead Plaintiff repeats and realleges the allegations set forth in ¶ 1, ¶¶ 5 through 11, ¶¶ 13 through 17, ¶¶ 70 through 93, ¶¶ 132 through 144 and ¶¶ 203 through 218 contained above as if fully stated herein.

220. This count is asserted against Vonage for violations of Section 12(a)(1) of the Securities Act, 15 U.S.C. §77(l)(a)(1), on behalf of the DSP Plaintiffs and other members of the Class who purchased Vonage common stock pursuant to the Directed Share Program and suffered damage.

221. Vonage offered to sell and sold shares in the Offering to participants of the Directed Share Program in violation of section 5 as set forth in Count VIII.

222. By virtue of the conduct alleged herein, Vonage is liable for the foregoing wrongful conduct and is liable to the DSP Plaintiffs and the other members of the Class who purchased Vonage common stock pursuant to the Directed Share Program for damages suffered.

## COUNT VIII
### VIOLATION OF SECTION 15 OF THE SECURITIES ACT
### AGAINST THE OFFICER DEFENDANTS

223. Plaintiffs repeat and reallege the allegations set forth in ¶¶ 1 through 16, ¶¶ 18 through 32, ¶¶ 70 through 153, ¶¶ 176 through 188 and ¶¶ 203 through 222 contained above as if fully stated herein.

224. This count is asserted against the Officer Defendants for violations of Section 15 of the Securities Act, 15 U.S.C. §77(o), on behalf of the Class.

225. Vonage is liable as an issuer under Section 11 of the Securities Act as set forth in

33

Count I herein, as a seller and/or solicitor of Vonage common stock under Section 12(a)(2) of the Securities Act as set forth in Count IV herein, and as a seller and/or offeror of Vonage common stock under Section 12(a)(1) of the Securities Act as set forth in Count VII.

226. The Officer Defendants, by virtue of their management position and/or stock ownership, have the power to influence and direct the activities of Vonage and are, thus, controlling persons of Vonage.

227. By virtue of the conduct alleged herein, the Officer Defendants are liable for the aforementioned wrongful conduct and are liable to the Plaintiffs and the Class for damages.

228. By reason of the foregoing, each of the Officer Defendants is jointly and severally liable with Vonage (as alleged in Count I, Count IV and Count VII) to Plaintiffs and members of the Class.

## COUNT IX
## VIOLATION OF SECTION 15 OF THE SECURITIES ACT
## AGAINST THE DIRECTOR DEFENDANTS

229. Plaintiffs repeat and reallege the allegations set forth in ¶¶ 1 through 16, ¶¶ 33 through 55, ¶¶ 70 through 153, ¶¶ 176 through 188 and ¶¶ 203 through 222 contained above as if fully stated herein.

230. This count is asserted against the Director Defendants for violations of Section 15 of the Securities Act, 15 U.S.C. §77(o), on behalf of the Class.

231. Vonage is liable as an issuer under Section 11 of the Securities Act as set forth in Count I herein, as a seller and/or solicitor of Vonage common stock under Section 12(a)(2) of the Securities Act as set forth in Count IV herein, and as a seller and/or offeror of Vonage common stock under Section 12(a)(1) of the Securities Act as set forth in Count VII.

232. The Director Defendants, by virtue of their directorships, have the power to

34

influence and direct the activities of Vonage and are, thus, controlling persons of Vonage.

233. By virtue of the conduct alleged herein, the Director Defendants are liable for the aforementioned wrongful conduct and are liable to the Plaintiffs and the Class for damages.

234. By reason of the foregoing, each of the Director Defendants is jointly and severally liable with Vonage (as alleged in Count I, Count IV and Count VII) to Plaintiffs and members of the Class.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs, on their own behalf and on behalf of the Class, prays for judgment as follows:

(a) Declaring this action to be a class action pursuant to Rule 23(a) and (b)(3) of the Federal Rules of Civil Procedure on behalf of the Class defined herein;

(b) Declaring that Vonage be enjoined from pursuing any collection efforts with respect to any unpaid amount by Directed Share Program participants for their shares;

(c) Awarding Lead Plaintiff, DSP Plaintiffs and the other members of the Class damages in an amount that may be proven at trial, together with interest thereon;

(d) Awarding Lead Plaintiff, DSP Plaintiffs and the other members of the Class rescission of Vonage common stock, which they hereby tender, or rescissory damages if they no longer own Vonage common stock;

(e) Awarding Lead Plaintiff, DSP Plaintiffs and the other members of the Class pre-judgment and post- judgment interest, as well as their reasonable attorneys' and experts' witness fees and other costs; and

(f) Such other relief as this Court deems appropriate.

35

## JURY DEMAND

Plaintiffs demand a trial by Jury.

Dated:  November 19, 2007

By:      s/ John E. Keefe, Jr.
      **KEEFE BARTELS**
      John E. Keefe, Jr.
      Danielle Abouzeid
      830 Broad Street
      Shrewsbury, NJ  07702
      Phone:  (732) 224-9400
      Facsimile:  (732) 224-9494
      Email: jkeefe@keefebartels.com
            dabouzeid@keefebartels.com

*Liaison Counsel for Lead Plaintiff the Zyssman Group and the Class*

**ZWERLING, SCHACHTER & ZWERLING, LLP**
Jeffrey C. Zwerling
Robin F. Zwerling
41 Madison Avenue
New York, NY 10010
Phone: (212) 223-3900
Facsimile: (212) 371-5969
Email:  jzwerling@zsz.com
      rzwerling@zsz.com

*Counsel for Lead Plaintiff the Zyssman Group and the Class*

      – and –

**POMERANTZ HAUDEK BLOCK GROSSMAN & GROSS LLP**
Marc I. Gross
100 Park Avenue, 26th Fl.
New York, NY 10017
Telephone:  (212) 661-1100
Facsimile: (212) 661-8865
Email:  migross@pomlaw.com

*Attorneys for DSP Plaintiffs*

36