# Exhibit 36

COUGHLIN STOIA GELLER
  RUDMAN & ROBBINS LLP
WILLOW E. RADCLIFFE (200087)
DANIEL J. PFEFFERBAUM (248631)
S. ASHAR AHMED (256711)
100 Pine Street, Suite 2600
San Francisco, CA  94111
Telephone:  415/288-4545
415/288-4534 (fax)
willowr@csgrr.com
dpfefferbaum@csgrr.com
aahmed@csgrr.com

Lead Counsel for Plaintiffs

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| In re RIGEL PHARMACEUTICALS, INC. SECURITIES LITIGATION | No. 3:09-cv-00546-JSW |
| | CLASS ACTION |
| This Document Relates To: | CONSOLIDATED AMENDED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS |
| ALL ACTIONS. | DEMAND FOR JURY TRIAL |

479520_1

**TABLE OF CONTENTS**

Page

I.      INTRODUCTION ....................................................................................................1

II.     JURISDICTION AND VENUE ..............................................................................8

III.    PARTIES .................................................................................................................8

IV.     DEFENDANTS MAKE MATERIALLY FALSE AND MISLEADING
        STATEMENTS AND OMISSIONS ABOUT THE PHASE IIa RA CLINICAL
        TRIAL ...................................................................................................................11

        A.      Prior to the Class Period, Rigel Was Conducting a Phase IIa RA Clinical
                Trial to Evaluate the Efficacy and Safety of R788, the Company's Lead
                Product Candidate and a Potential Treatment for Rheumatoid Arthritis ..............11

        B.      Just Prior to Class Period, Rigel's Stock Falls When Defendants Reveal
                Blood Pressure Concerns and Detailed Safety Data in the Phase II Clinical
                Trial of R788 for Idiopathic Thrombocytopenic Purpura ...................................13

        C.      December 13, 2007: Defendants Present Misleading Phase IIa RA Clinical
                Trial Results, Falsely Claim that R788 Demonstrated Statistically
                Significant Efficacy Results and Failed to Disclose Material Adverse
                Information Concerning the Safety of R788 .........................................................14

        D.      Reasons Why Defendants Knew the Statements Made on December 13,
                2007 Were Materially False and Misleading ........................................................19

                1.      R788 Was Neither as Effective as Reported and Did Not Achieve
                        Statistically Significant Results at the Primary Efficacy Endpoint ...........19

                2.      R788 Exhibited Greater Toxicity than Defendants Led Investors to
                        Believe ......................................................................................................28

                3.      R788 Was Critical to Rigel's Success .........................................................38

        E.      February 2008: Rigel's Registration Statement Contains False and
                Misleading Statements About the Safety and Efficacy Results of the Phase
                IIa RA Clinical Trial ..........................................................................................48

        F.      February 11, 2008: Gower Makes Materially False and Misleading
                Statements about the Phase IIa RA Clinical Trial During the BIO CEO &
                Investor Conference ...........................................................................................51

        G.      July 8, 2008: Rodriguez Makes Materially False and Misleading
                Statements About the Phase IIa RA Clinical Trial During the Collins
                Stewart 4th Annual Growth Conference ...............................................................54

        H.      October 27, 2008: Rigel's Stock Price Declines Substantially After It
                Begins to Reveal Previously Concealed Adverse Information About the
                Phase IIa RA Clinical Trial and Its Impact on the Company's Condition;
                Defendants Continue to Mislead Investors About the Prospectus for a
                Partner ...............................................................................................................57

CONSOLIDATED AMENDED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES
LAWS - 3:09-cv-00546-JSW

- i -

|  |  | Page |
|---|---|---|
| I. | February 3, 2009: Rigel Stock Price Declines Significantly After It Reveals a Delay in Partnership Discussions Regarding R788 | 60 |
| V. | LOSS CAUSATION | 60 |
| VI. | FEBRUARY 2008 OFFERING: VIOLATIONS OF THE 1933 ACT | 63 |
| VII. | CLASS ACTION ALLEGATIONS AND FRAUD-ON-THE-MARKET PRESUMPTION OF RELIANCE | 68 |
| VIII. | NO SAFE HARBOR | 71 |
| IX. | PRAYER FOR RELIEF | 75 |
| X. | JURY DEMAND | 76 |

479520_1

CONSOLIDATED AMENDED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS - 3:09-cv-00546-JSW

- ii -

## I. INTRODUCTION

1. This is a securities class action on behalf of all persons who acquired the securities of Rigel Pharmaceuticals, Inc. ("Rigel" or the "Company") between December 13, 2007 and February 3, 2009 (the "Class Period"), including all persons who acquired the common stock of Rigel pursuant and/or traceable to a false and misleading registration statement and prospectus (collectively, the "Registration Statement") issued in connection with the Company's February 2008 offering (the "Offering"). This action asserts strict liability claims under the Securities Act of 1933 ("1933 Act") and fraud claims under the Securities Exchange Act of 1934 ("1934 Act") against Rigel, its senior insiders and the investment banks which underwrote the Offering (collectively, "defendants").

2. Rigel is a clinical-stage drug development company that discovers and develops novel, small-molecule drugs for the treatment of inflammatory/autoimmune diseases and cancer, as well as viral and metabolic diseases. The Company was founded in 1996 and is based in South San Francisco, California.

3. Before the Class Period, Rigel was developing a new drug, R788, for the treatment of rheumatoid arthritis ("RA"), an autoimmune disease characterized by chronic inflammation that affects multiple tissues but typically produces its most pronounced symptoms in the joints. R788 was the Company's lead product candidate, and Rigel designed, paid for and conducted a Phase IIa clinical trial to evaluate the safety and preliminary clinical efficacy of R788 in patients with active RA despite methotrexate therapy (the "Phase IIa RA clinical trial"). Rigel described the Phase IIa RA clinical trial as a multi-center, randomized, double-blind, placebo-controlled, ascending-dose study involving 189 patients in the U.S. and Mexico. The patients were divided into 3 approximately equal-size cohorts receiving 50, 100 or 150mg of R788 twice a day. The Phase IIa RA clinical trial was conducted over a 12-week treatment period in patients who had RA for at least 12 months.

4. On December 13, 2007, Rigel issued a press release and held a conference call (attended by defendants James M. Gower ("Gower"), Elliott B. Grossbard ("Grossbard"), Donald G. Payan ("Payan"), Raul R. Rodriguez ("Rodriguez"), and Ryan D. Maynard ("Maynard")) touting the

purportedly positive summary results of the recently completed Phase IIa RA clinical trial. The press release was an exhibit to a Form 8-K filed with the United States Securities and Exchange Commission ("SEC") the same day. In the press release, titled "Rigel's R788 Demonstrates Significant Improvement in Rheumatoid Arthritis in Phase 2 Clinical Study," the Company presented a single set of data for all patients which indicated an ascending dose response (*i.e.*, the higher the dose a patient received, the greater the improvement in their symptoms) and efficacy results purportedly demonstrating statistically significant improvement over placebo. Defendants also purportedly reported safety data regarding R788's effect on blood pressure, liver enzymes, neutropenia, diarrhea and gastrointestinal side effects.

5. The purportedly positive results of the Phase IIa RA clinical trial reported in the December 13, 2007 press release and conference call were repeated to the market in reports issued by analysts following the Company. The analysts highlighted the better-than-expected efficacy results, the ascending dose response and the lack of dose-dependent hypertension. The analysts increased their price target for the Company's stock and reported that they expected the price of the Company's stock to increase due to the positive reported results. They were right. In response to the announcement of the summary results of the Phase IIa RA clinical trial, Rigel's common stock price more than tripled in one day, from $8 per share to $25.95.

6. The results of the Phase IIa RA clinical trial, however, were neither "statistically significant," "impressive," a "major milestone" nor did they demonstrate that R788 was "highly effective" as defendants falsely led investors to believe. Properly applying basic principals of statistics, the results of Rigel's Phase IIa RA clinical trial were not statistically significant and demonstrated that the drug was not as effective as defendants claimed it to be.

7. Plaintiffs have retained the services of Stanford University Professor (Emeritus) of Biostatistics, Dr. Daniel A. Bloch, who has published 196 original articles in peer-reviewed journals, including co-authoring over 30 articles which appeared in *Arthritis and Rheumatism*. Dr. Bloch reviewed defendants' December 13, 2007 press release, the per-country data disclosed on October

CONSOLIDATED AMENDED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS - 3:09-cv-00546-JSW                                                    - 2 -

27, 2008 and the subsequent publication of the Phase IIa RA clinical trial in the November 2008 issue of *Arthritis and Rheumatism*.[1] He summarized his findings as follows:

> ***When the data is properly analyzed, all of the nominal p-values are higher [i.e., show less statistical significance] than those reported with the December 13, 2007 press release . . . . The comparisons of both 100mg and 150mg groups to Placebo for the primary outcome variable, the ACR20, with or without accounting for multiple comparisons, are not statistically significant.[2]***

Bloch Decl. at 12-13.

8. In addition to defendants' claims that R788 exhibited statistically significant results (when it did not), defendants presented only the combined data for U.S. and Mexico patients in Rigel's December 13, 2007 press release. The presentation of the combined data concealed from investors contained material information including: (i) the existence of a country interaction so substantial that the placebo in Mexico was more effective than any dose in the U.S. at ACR20;[3] (ii) that the distribution by dose in the Phase IIa RA clinical trial was not balanced among the U.S. and Mexico patients *i.e.*, the low dose was tested in the U.S. and high dose was tested in Mexico; and (iii) there was no ascending dose response.

---

[1] The Declaration of Dr. Daniel A. Bloch ("Bloch Decl."), dated January 23, 2010, including his curriculum vitae, is attached hereto as Exhibit A. Plaintiffs have incorporated Dr. Bloch's analysis and conclusions that defendants' statements regarding the statistical significance and efficacy of R788 violated basic statistical principals and were thus false and misleading herein.

[2] A "p-value" is a statistical measure of the probability that a difference between groups in a clinical trial happened by chance. In this case, the lower the p-value, the more likely it is that the difference between the dosed and placebo groups was caused by R788, rather than by chance alone. Statistical significance consisting of a p-value of 0.05 or below has traditionally been considered convincing evidence in clinical trials and by the U.S. Food and Drug Administration. A p-value of 0.05 means that there is a 5% likelihood that the observed result occurred by chance alone, and conversely a 95% likelihood that the improvement was attributable to the drug. Or in other words, if the drug performed no better than placebo, one would expect to see such results in only 5 out of 100 trials. For p-values less than 0.05, the conclusion is that the result is "statistically significant" and thus the patients' improvement is attributed to the function of R788. A p-value of 0.06 (*i.e.*, 6%), is considered too large to claim statistically significant improvement in the context of clinical trials; it is "statistically insignificant." Very large p-values, for example, p=.20, are statistically insignificant and indicate that the observed result would occur as a function of chance alone 20% of the time.

[3] ACR20, ACR50 and ACR70 refer to measures of improvement under the American College of Rheumatology ("ACR") criteria. To meet ACR criteria, a patient must show either 20, 50 or 70% improvement in tender or swollen joint counts and at least the same level of improvement in 3 of 5 other measures of symptoms. *See* ¶52.

9. Defendants' statements about the safety results of the Phase IIa RA clinical trial were also materially false and misleading. Defendants knew, but failed to disclose, that (i) there was a dose-dependent increase in average systolic blood pressure of 3-5mm Hg in 100mg patients, and 8-9mm Hg in the 150mg patients; (ii) 5 patients (not 2, as reported on December 13, 2007) experienced hypertension, with blood pressure increases as high as 20-30mm Hg; (iii) hypertension was one of the two most common clinically meaningful drug related adverse events; (iv) 9 patients (not 3, as reported on December 13, 2007) experienced increased liver enzymes compared to patients taking the placebo; (v) 20 patients (not 15, as reported on December 13, 2007) experienced neutropenia; (vi) 34 patients (not 15, as reported on December 13, 2007) experienced diarrhea; and (vii) 35 patients (not 15, as reported on December 13, 2007) experienced upper gastrointestinal side effects. Rigel, Gower, Grossbard, Payan, Rodriguez and Maynard knew that these undisclosed toxicities could undermine the Company's investment thesis, *i.e.*, partnership, and present hurdles to regulatory approval.

10. Rigel, Gower, Grossbard, Payan, Rodriguez and Maynard also knew it was important to report the positive results for the R788 Phase IIa RA clinical trial for several reasons: R788 was the Company's lead product candidate; the worldwide market for RA drugs exceeded $13 billion in 2007; and Rigel was racing to develop the first oral pill for RA before Pfizer Inc. ("Pfizer").

11. Rigel, Gower, Grossbard, Payan, Rodriguez and Maynard also knew that the Company needed to raise additional funds and that the false and misleading statements about the Phase IIa RA clinical trial – and the inflated stock price those false and misleading statements caused – would allow Rigel to raise substantially greater funds than if the adverse information were disclosed.

12. Moreover, Rigel, Gower, Grossbard, Payan, Rodriguez and Maynard knew that the Company would become insolvent if it did not raise additional capital. The Company reported net losses every year since its December 2000 initial public offering ("IPO"). After reporting a net loss of $74.3 million in 2007, Rigel reported just $44.5 million of cash and $82.2 million of capital at December 31, 2007. Additional losses were projected for 2008 and Rigel reported a $132.3 million

CONSOLIDATED AMENDED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS - 3:09-cv-00546-JSW - 4 -

net loss in 2008 which would have rendered the Company insolvent if it did not raise additional capital in February 2008.

13. Rigel, Gower, Grossbard, Payan, Rodriguez and Maynard further knew that the Company's stock price would likely decline if they disclosed the adverse information about the Phase IIa RA clinical trial because the Company's stock price declined 40% after it reported the results of Phase II clinical trial of R788 in patients with immune thrombocytopenic purpura ("ITP") (the "Phase II ITP clinical trial") on November 9, 2007. Analysts following the Company reported the price decline was due to concerns about R788's adverse event profile, including, *inter alia*, blood pressure and gastrointestinal side effects.

14. Gower, Grossbard, Payan, Rodriguez and Maynard also knew that they would receive higher salaries, bonuses and stock option awards, and that the value of their existing stock options would increase substantially, if Rigel reported positive results from the Phase IIa RA clinical trial. As detailed below, the compensation of Gower, Grossbard, Payan, Rodriguez and Maynard was directly dependent on the results of the Phase IIa RA clinical trial, and they each received salary increases, bonuses and stock awards at the end of 2007 due to the reported positive results of the Phase IIa RA clinical trial and the inflated price of the Company's stock caused by their false and misleading statements about the Phase IIa RA clinical trial.

15. Defendants took advantage of the inflated stock price caused by their false and misleading statements and omissions on December 13, 2007, by causing Rigel to issue 5 million shares of Rigel stock at $27 per share in an offering that raised $135 million. On January 24, 2008, Rigel filed with the SEC an S-3ASR Registration Statement and Form 424B3 Preliminary Prospectus for the Offering, which incorporated by reference the materially false and misleading December 13, 2007 Form 8-K. On February 1, 2008, Rigel filed with the SEC a Form 424B5 Prospectus that also incorporated by reference the December 13, 2007 press release and repeated the false and misleading summary results of the Phase IIa RA clinical trial. Absent the false and misleading statements about the results of the Phase IIa RA clinical trial, Rigel's stock price would not have increased and the Company would not have been able to complete the Offering at $27 per share.

16. The four Underwriter Defendants (as defined *infra* ¶¶43-47) were paid more than $7 million to underwrite the Offering and failed to require disclosure of the adverse information about the Phase IIa RA clinical trial. Public investors relied on the Underwriter Defendants to conduct a reasonable investigation and to obtain and verify the information contained in the Registration Statement and to make sure essential facts about the Company were disclosed. Indeed, the Underwriter Defendants had access to the adverse information at a critical time in Rigel's corporate life – when it was seeking to raise capital. The Underwriter Defendants either knew about the adverse information and failed to require its disclosure or did not know by failing to conduct a reasonable investigation and independently verifying the representations in the Registration Statement. Either way, the Underwriter Defendants failed to meet their "gatekeeper" function of protecting investors.

17. After the Offering, Rigel, Gower and Rodriguez continued to tout the purportedly positive results of the Phase IIa RA clinical trial but concealed the adverse information related to the trial. On February 11, 2008, Gower touted the results of the Phase IIa RA clinical trial during the BIO CEO & Investor Conference. On July 8, 2008, Rodriguez touted the results of the Phase IIa RA clinical trial of R788 during the Collins Stewart 4th Annual Growth Conference. As a result, the Company's stock price continued to trade at artificially inflated prices.

18. On October 27, 2008, Rigel presented additional results of the Phase IIa RA clinical trial at a meeting of the ACR and on an investor conference call. Those results included the results on a per-country basis and the adverse safety information omitted from the Company's December 13, 2007 press release, as well as from the Registration Statement and the presentations on February 11, 2008 and July 8, 2008. When this adverse information was finally disclosed, Rigel's stock price plunged 38% in a single day, from $14.41 to $8.84.

19. Analysts following the Company issued reports in which they downgraded the Company's stock and wrote that the adverse information about the Phase IIa RA clinical trial of R788 raised significant concerns about the efficacy and safety of the drug, whether Rigel would be able to close a partnership deal and the ultimate commercialization of R788. Gower stated that Rigel

remained in detailed licensing discussions with several potential partners and expected a lucrative partnership in early 2009.

20. On February 3, 2009, Rigel announced that it would delay partnership discussions regarding R788 until after results from its Phase IIb clinical studies were available and that the Company laid off 36 employees, or 20% of its workforce. The price of the Company's stock declined 9.3%, from $7.17 on February 2, 2009 to $6.50 on February 3, 2009.

21. On July 23, 2009, Rigel announced that one of the Phase IIb clinical studies failed to meet efficacy endpoints because patients did not report statistically significant higher ACR response rates than the placebo group. The Company also stated that hypertension and diarrhea were the most common clinically meaningful drug related adverse events. Rigel's stock price dropped from a high of $14.60 on July 22, 2009 to a low of $9.31 on July 24, 2009, a drop of 36.2%.

22. The following chart (which is also attached hereto) illustrates how defendants' false and misleading statements and omissions about the Phase IIa RA clinical trial caused the price of Rigel's stock to be artificially inflated and how class members were damaged when the results of the trial – and its impact on Rigel's current and future business prospects – were revealed to the market:



## II.    JURISDICTION AND VENUE

23.    The claims alleged herein arise under §§10(b) and 20(a) of the 1934 Act (15 U.S.C. §§78j(b) and 78t(a)) and Rule 10b-5 promulgated thereunder by the SEC (17 C.F.R. §240.10b-5), and §§11, 12(a)(2) and 15 of the 1933 Act (15 U.S.C. §§77k, 77l(a)(2) and 77o).

24.    This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §§1331, 22 of the 1933 Act and §27 of the 1934 Act.

25.    Venue is proper pursuant to §22 of the 1933 Act and §27 of the 1934 Act.  The Company is located in this District, and the false and misleading statements were made in this District.

## III.    PARTIES

26.    Lead plaintiff Inter-Local Pension Fund GCC/IBT acquired the common stock of Rigel pursuant or traceable to the Offering as described in the attached certification and was damaged thereby.

27.    Defendant Rigel is headquartered in South San Francisco, California.  The Company was incorporated in Delaware in 1996 and completed its IPO in December 2000, issuing 5 million shares at $7 per share.  In 2Q07, Rigel completed a public offering of 5.75 million shares of common stock at $9.75 per share that raised net proceeds of $52.3 million.  The Company completed another public Offering in February 2008, issuing 5 million shares at $27 per share.

28.    Its stock trades in an efficient market on the NASDAQ under the symbol "RIGL."

29.    Defendant Gower was, at all relevant times, Chairman of the Board and Chief Executive Officer ("CEO") of the Company.  Gower made false and misleading statements about the results of the Phase IIa RA clinical trial in the December 13, 2007 press release, during the Company's December 13, 2007 conference call and during the February 11, 2008 conference call.  He also signed or authorized the signing of the false and misleading Registration Statement for the Company's February 2008 Offering.

30.    Defendant Maynard was, at all relevant times, Chief Financial Officer ("CFO") of the Company.  Maynard attended the December 13, 2007 conference call, during which defendants Gower and Grossbard made false and misleading statements about the results of the Phase IIa RA

clinical trial, and signed or authorized the signing of the false and misleading Registration Statement for the Company's February 2008 Offering.

31. Defendant Payan was, at all relevant times, Executive Vice President of Discovery and Research of the Company. He is a medical doctor and was a co-founder of the Company. Payan attended the December 13, 2007 conference call, during which defendants Gower and Grossbard made false and misleading statements about the results of the Phase IIa RA clinical trial, and signed or authorized the signing of the false and misleading Registration Statement for the Company's February 2008 Offering.

32. Defendant Rodriguez was, at all relevant times, Executive Vice President and Chief Operating Officer ("COO") of the Company. Rodriguez attended the December 13, 2007 conference call, during which defendants Gower and Grossbard made false and misleading statements about the results of the Phase IIa RA clinical trial, and made false and misleading statements about the results of the Phase IIa RA clinical trial during the July 8, 2008 Collins Stewart 4th Annual Growth Conference.

33. Defendant Grossbard was, at all relevant times, Executive Vice President and Chief Medical Officer of the Company. Grossbard made false and misleading statements about the results of the Phase IIa RA clinical trial in the December 13, 2007 press release and during the Company's December 13, 2007 conference call. He was a contributing author for an article on the Phase IIa RA clinical trial that was published in *Arthritis & Rheumatism*, Vol. 58, No. 11 (Nov. 2008). According to the article, Grossbard participated in the design of the Phase IIa RA clinical trial, had full access to the data from the trial, analyzed and interpreted the data from the study, was a member of the publication committee, prepared the manuscript and vouched for the completeness of the data and analysis.

34. The defendants referenced above in ¶¶29-33 are herein referred to as the "Officer Defendants."

35. Defendant Jean Deleage ("Deleage") was, at all relevant times, a director of the Company. Deleage signed or authorized the signing of the false and misleading Registration Statement for the Company's February 2008 Offering.

36. Defendant Bradford S. Goodwin ("Goodwin") was, at all relevant times, a director of the Company. Goodwin signed or authorized the signing of the false and misleading Registration Statement for the Company's February 2008 Offering.

37. Defendant Gary A. Lyons ("Lyons") was, at all relevant times, a director of the Company. Lyons signed or authorized the signing of the false and misleading Registration Statement for the Company's February 2008 Offering.

38. Defendant Walter H. Moos ("Moos") was, at all relevant times, a director of the Company. Moos signed or authorized the signing of the false and misleading Registration Statement for the Company's February 2008 Offering.

39. Defendant Hollings C. Renton ("Renton") was, at all relevant times, a director of the Company. Renton signed or authorized the signing of the false and misleading Registration Statement for the Company's February 2008 Offering.

40. Defendant Peter S. Ringrose ("Ringrose") was, at all relevant times, a director of the Company. Ringrose signed or authorized the signing of the false and misleading Registration Statement for the Company's February 2008 Offering.

41. Defendant Stephen A. Sherwin ("Sherwin") was, at all relevant times, a director of the Company. Sherwin signed or authorized the signing of the false and misleading Registration Statement for the Company's February 2008 Offering.

42. The defendants referenced above in ¶¶29-33, 35-41 are referred to herein as the "Individual Defendants."

43. Defendant Credit Suisse Securities (USA) LLC ("Credit Suisse") operates as an investment bank in the U.S. Its businesses include securities underwriting, sales and trading, investment banking, private equity, alternative assets, financial advisory services, investment research, and asset management. Credit Suisse acted as an underwriter in connection with the Offering.

44. Defendant Oppenheimer & Co. Inc. ("Oppenheimer") is an investment bank and full-service investment firm. Oppenheimer acted as an underwriter in connection with the Offering.

CONSOLIDATED AMENDED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS - 3:09-cv-00546-JSW

- 10 -

45.     Defendant Thomas Weisel Partners LLC ("Thomas Weisel") is an investment bank founded in 1998 focused primarily on the growth sectors of the economy. Thomas Weisel acted as an underwriter in connection with the Offering.

46.     Defendant Jefferies & Company, Inc. ("Jefferies") is a full-service global investment bank and institutional securities firm focused on growing and middle-market companies and their investors. Jefferies provides clients with capital markets and financial advisory services, institutional brokerage, securities research and asset management. Jefferies acted as an underwriter in connection with the Offering.

47.     Pursuant to the 1933 Act, the defendants referenced in ¶¶43-46 above are referred to herein as the "Underwriter Defendants."

48.     The Underwriter Defendants are liable for the false and misleading statements in the Registration Statement. In connection with the Offering, the Underwriter Defendants drafted and disseminated the Registration Statement and were paid over *$7 million* in gross fees in connection therewith. The Underwriter Defendants' failure to conduct an adequate due diligence investigation was a substantial factor leading to the harm complained of herein.

## IV.     DEFENDANTS MAKE MATERIALLY FALSE AND MISLEADING STATEMENTS AND OMISSIONS ABOUT THE PHASE IIa RA CLINICAL TRIAL

### A.     Prior to the Class Period, Rigel Was Conducting a Phase IIa RA Clinical Trial to Evaluate the Efficacy and Safety of R788, the Company's Lead Product Candidate and a Potential Treatment for Rheumatoid Arthritis

49.     In the Company's 2007 Form 10-K, Rigel describes itself as a clinical-stage drug development company that discovers and develops novel, small molecule drugs for treatment of inflammatory/autoimmune diseases, cancer and viral diseases. In 2007, the Company was developing multiple small molecule drug candidates whose specialized mechanisms of action were intended to provide therapeutic benefits for a range of inflammatory/autoimmune diseases, as well as cancers.

50.     According to the Company's 2007 Form 10-K, R788 was the Company's lead product candidate and was being developed to treat RA, an autoimmune disease characterized by

chronic inflammation that affects multiple tissues but typically produces its most pronounced symptoms in the joints. The Company reported on its website that RA was a progressive disease often leading to chronic pain and severe, incapacitating disabilities by causing the body's immune system to become inflamed, which in turn destroys soft tissue and erodes bone and cartilage. Rigel also reported that RA is often progressive and debilitating and affects nearly 2.1 million people in the U.S.

51. Rigel reported in its 2007 Form 10-K that treatments other than R788 had significant potential side effects and other shortfalls, including gastrointestinal complications and kidney damage. Most RA patients receive multiple drugs depending on the extent and aggressiveness of the disease, and most patients also eventually require some form of disease modifying anti-rheumatic drug ("DMARD"), including methotrexate.

52. Rigel focused its RA program on the development of a safe oral DMARD. Prior to the Class Period, Rigel was conducting a Phase IIa RA clinical trial to evaluate the safety and preliminary clinical efficacy of R788 in patients with active RA despite methotrexate therapy. The Company described the design of the clinical study in its December 13, 2007 press release as follows:

> The clinical trial was a multi-center, randomized, double blind, placebo controlled, ascending dose study involving 189 patients in three approximately equal size cohorts receiving 50, 100, or 150 mg po bid. Within each cohort, patients were assigned on a 3:1 basis to R788 or placebo. The clinical trial was conducted over a 12-week treatment period in patients who had RA for at least 12 months. These patients had active disease despite receiving adequate stable doses of methotrexate over the preceding 6 months. All of the patients continued to receive their same stable dose of methotrexate throughout the clinical trial period and extension. Efficacy assessments for each participant were based on the American College of Rheumatology criteria, which denote at least a 20% (ACR 20) improvement, at least a 50% (ACR 50) improvement, or at least 70% (ACR 70) improvement, from the baseline assessment at the end of the 12-week treatment period. The ACR measurement factors include, reported physician and patient global assessment of disease activity, patient reported pain score, and any change in C-reactive protein (CRP) in the patients' blood. ***The primary efficacy endpoint for the study was the percent of patients who were ACR 20 responders at the end of week 12***. Secondary efficacy endpoints were ACR 50 and ACR 70 scores as well as Disease Activity Score (DAS) at the end of week 12.

53. In the Company's September 6, 2006 press release, Rigel reported that it had initiated enrollment and dosing for the Phase IIa RA clinical trial. In the Company's April 11, 2007 press

release, Rigel reported that it had completed the 50mg dose group in the Phase IIa RA clinical trial, was enrolling patients in the 100mg dose group and expected to receive results from the completed clinical trial in the second half of 2007. In the Company's November 6, 2007 press release, Rigel announced that it would report the results of the Phase IIa RA clinical trial by the end of the year.

**B.** **Just Prior to Class Period, Rigel's Stock Falls When Defendants Reveal Blood Pressure Concerns and Detailed Safety Data in the Phase II Clinical Trial of R788 for Idiopathic Thrombocytopenic Purpura**

54. Just weeks before defendants announced the Phase IIa RA clinical trial results, Rigel presented results from its Phase II ITP clinical trial of R788.[4] On November 9, 2007, defendants published a press release which included the following:

> Nine of the first 14 patients (64%) studied responded favorably to R788 treatment. . . . The *primary side effects* were GI-related symptoms. *R788 elevated blood pressure in some patients* but appeared not to have significant effect on neutrophil counts.

55. On November 9, 2007, Adam Walsh of Jefferies described the efficacy results as "positive" and stated "There is no question that R788 has impressive efficacy for treatment of ITP, in our view." He also noted that "key safety data" included that "R788 elevated blood pressure in 14% (2/14) of patients between 5-10mm Hg."

56. After release of the Phase II ITP clinical trial results, Rigel's stock price declined 40%.

57. On December 4, 2007, Rigel held a conference call to discuss the results, including the side effects which were present in the Phase II ITP clinical trial. Defendants published slides, including one titled "R788 Phase 2 Trial in ITP – Safety" which provided the following information:

---

[4] Defendants were testing, or sought to test, R788 as a treatment for a variety of indications including RA, ITP (a bleeding disorder) lymphoma, multiple sclerosis and lupus.

CONSOLIDATED AMENDED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS - 3:09-cv-00546-JSW
- 13 -

| Adverse Reaction | N=16 |
|---|---|
| Nausea | 4 |
| Diarrhea | 4 |
| *SBP [Systolic Blood Pressure] increased by > 10* | 4 |
| Drowsiness | 3 |
| Weight gain >5 kg | 3 |
| Constipation | 2 |
| *ALT >2x ULN* | 2 |
| Vomiting | 1 |
| Abdominal pain | 1 |
| Headache | 1 |

58. As the chart in ¶57 depicts, defendants' disclosures in connection with the Phase II ITP clinical trial of R788 set expectations by including the disclosure of increased blood pressure (not just hypertension) and elevations in liver enzymes ("ALT") which were twice the upper limit of normal ("2x ULN") (as opposed to ALT >3x ULN reported on December 13, 2007).

59. On a conference call the same day, Grossbard indicated that the Company would know the mean change in blood pressure in the Phase IIa RA clinical trial "within a week or two" and flagged that a mean increase in systolic blood pressure of 5mm Hg might present a problem if observed:

> Finally, blood pressure. We are going to get a good fix on the general effect on blood pressure in the rheumatoid arthritis trial, because we have three doses, a placebo group, *and a we will see what the mean change in blood pressure is, and we should know that within a week or two,* there are occasional patients in the whom an investigator reports, that the patient has had an increase in blood pressure on the drug, in the lymphoma study, and this now kind of a rumor or anecdote, it seems to occur in a few patients that pre-existing hypertension.

> In the reheumatoid arthritis study, while I don't know we are still blinded, the overall incidence of that is quite low, so I don't think it's a very, very prevalent problem, *although I can't say that at a higher dose, the mean population increase in systolic pressure won't be 5 millimeters or what, I just don't know that yet*.

**C. December 13, 2007: Defendants Present Misleading Phase IIa RA Clinical Trial Results, Falsely Claim that R788 Demonstrated Statistically Significant Efficacy Results and Failed to Disclose Material Adverse Information Concerning the Safety of R788**

60. **False Statement:** On December 13, 2007, the Company issued a press release entitled "Rigel's R788 Demonstrates Significant Improvement in Rheumatoid Arthritis in Phase 2 Clinical Study; Achieves Statistically Significant ACR20, ACR50 & ACR70 Results." The press

release was also an exhibit to a Form 8-K that Rigel filed with the SEC on December 13, 2007. The release stated in part (false and misleading statements are in bold and italics):

> Rigel Pharmaceuticals, Inc. . . . today announced that its oral syk kinase inhibitor, **R788** (*tamatinib fosdium*), **has demonstrated statistically significant results in treating Rheumatoid Arthritis (RA) patients in a recently completed Phase 2 clinical trial**. **Groups treated with R788 at 100mg and 150mg po bid (orally, twice daily), showed higher ACR20, ACR50, ACR70 and DAS28 response rates than the placebo group. The efficacy results for the 100mg and the 150mg dose groups were fairly comparable**. Dramatically, the onset of the effect in these dose groups occurred as early as one week after initiation of therapy. We believe that **the significant ACR scores and good tolerability observed in this clinical trial**, and the further benefit of oral delivery may make R788 a favorable alternative to the currently marketed biological agents.
>
>         \*        \*        \*
>
> "**This clinical study has shown that R788 treatment can achieve impressive ACR response rates,**" said Elliott Grossbard, M.D., senior vice president of medical development at Rigel. "In this clinical trial both the 100mg and 150mg doses improved arthritis symptoms and did so quickly. We plan to initiate the next clinical trial with R788 in RA in 2008," he added.
>
> **Efficacy Results**
>
> | Treatment Assigned po bid | Number (N) | ACR 20 % (N) | ACR 50 % (N) | ACR 70 % (N) | DAS28-CRP 2.6, % (N) |
> |---|---|---|---|---|---|
> | *Placebo* | *47* | *38% (18)* | *19% (9)* | *4% (2)* | *17% (8)* |
> | *50 mg* | *46* | *32% (15)* | *17% (8)* | *2% (1)* | *20% (9)* |
> | *100 mg* | *49* | *65% (32) (p=.008)* | *49% (24) (p=.002)* | *33% (16) (p<.001)* | *35% (17) (p=.005)* |
> | *150 mg* | *47* | *72% (34) (p<.001)* | *57% (27) (p<.001)* | *40% (19) (p<.001)* | *47% (22) (p<.001)* |
>
>         \*        \*        \*
>
> James M. Gower, chairman and chief executive officer of Rigel said, "**These very important clinical trial results are a major milestone for Rigel as we establish the potential of R788 in RA and its value as an alternative to current therapies**. In addition, **given these results** and the recent results in ITP, **we believe that R788 may be a useful drug in the treatment of autoimmune diseases**."
>
> **Safety Results**
>
> **The most common clinically meaningful adverse events noted in the clinical trial were dose-related neutropenia, mild elevations of liver function tests, and gastrointestinal (GI) side effects**. Dose reduction (to one half the assigned dose, by taking the drug once per day) was pre-specified in the protocol, contingent on neutrophil counts and/or liver function tests. Notably, a vast majority of the patients

(19 out of 21) who had their dose reduced, successfully completed the clinical trial with minimal safety issues.

**The key safety results are shown in the table below**:

| | Placebo po BID N=47 | 50mg po BID N=46 | 100mg po BID N=49 | 150mg po BID N=47 |
|---|---|---|---|---|
| Completed Study at Reduced Dose (N) | 1 | 0 | 5 | 13 |
| Dropouts (N): | 11 | 6 | 6 | 8 |
| Withdrew Consent | 6 | 3 | 2 | 1 |
| Adverse Event | 2 | 1 | 3 | 6 |
| Other | 3 | 2 | 1 | 1 |
| *Neutropenia (N) Requiring dose reduction* | *0* | *0* | *5* | *10* |
| *ALT > 3XULN (N)* | *2* | *0* | *0* | *3* |
| *Diarrhea (N) (severity moderate or greater)* | *0* | *3* | *2* | *10* |
| *Upper GI side effects (N) (gastritis, nausea, dyspepsia) (severity moderate or greater)* | *2* | *1* | *2* | *12* |
| *Hypertension (N) (severity moderate or greater)* | *0* | *0* | *2* | *0* |

61.     On December 13, 2007, the Company also held a conference call attended by defendants Gower, Grossbard, Payan, Maynard, and Rodriguez. During the call, defendants Gower and Grossbard repeated the positive results of the Phase IIa RA clinical trial (false and misleading statements are in bold and italics):

[Gower:] We were very pleased to be able to announce **highly statistically significant results of a Phase 2 trial of 788 in patients with rheumatoid arthritis**. And I would like to introduce Dr. Elliot Grossbard to take us through the study results. Elliot?

\*          \*          \*

[Grossbard:] The efficacy results are shown in the graph on the handout that many of you may have downloaded. **As you can see, the highly significant effect for both the ACR 20, 50, 70 and DAS28 score. The p values are uniformly less than .008, usually less than .001**. Of note, although not included in this graph, is that the onset of the effect was within one week, and you could see significant differences between the patients at one week after the initiation of treatment.

*We have concluded that the 100 milligram and 150 milligram dose groups have impressive and statistically significant improvements over placebo*, and that the onset occurs very, very early. The efficacy results for the two effective doses were fairly comparable, and the 100 milligrams bid dose kind of caught up by the end so that they were really equivalent. The 50 milligram dose [does] not appear to be much better than placebo, and so overall there was a good dose response.

With regard to safety, which is going to be a close focus of the future program, because *I think this study fairly establishes with certainty that this drug is effective in rheumatoid arthritis*.

*          *          *

*The incidence of neutropenia,* as I mentioned, was modest. *In the 100 milligram dose I think there were five patients out of the 49,* but it was a much higher percentage of the dose 150 milligrams twice a day.

*In terms of ALP elevations greater than three times the upper limit of normal,* which is the marker that FDA recently recommended in their guidelines for development of new (technical difficulty) *there were two patients in the placebo group who had ALP elevations, and three in the high dose group, and none in the two intermediate groups. The most prevalent side effect beyond neutropenia in the high dose group was a combination of gastrointestinal side effects, diarrhea and nausea, dyspepsia and so on*.

*The incidence of reported moderate hypertension was quite low*, although the way case report forms are filled out an occasional patients [sic] had a notation for his systolic blood pressure increase, and an occasional one had diastolic blood pressure increase. And it is hard to know exactly what that means, so I'm reporting to you here those where the case report forms noted, hypertension of moderate severity. *So in conclusion we think the 100 milligram dose was well tolerated. The 150 milligram dose somewhat less so*. But with dose reductions almost all the patients were able to finish the study.

*The most common side effects were neutropenia and gastrointestinal side effects* and they are most prevalent in the 150 milligram bid dose.

I think – my personal opinion is that *this study establishes with very little uncertainty that this drug at 100 milligrams a day – 100 milligrams twice a day or more is highly effective in the treatment of rheumatoid arthritis in terms of clinical signs and symptoms*. We have not investigated the question of bone erosions and joint damage – we will in a future study.

62.     Grossbard then turned the presentation of the Phase IIa RA clinical trial results over to Rigel consultant Dr. Michael Weinblatt ("Weinblatt"), who made the following false and misleading statements (false and misleading statements are in bold and italics):

[Weinblatt:] So from my standpoint as an investigator of rheumatoid arthritis, *this study* accomplished exactly what we wanted to see. *It established that in this first Phase 2 trial there was evidence of significant – by that statistically significant efficacy. The parameters that were changed are – were pretty dramatic with at least over a 30% delta between active drug and placebo, which is a very nice response rate*.

* * *

[Weinblatt:] *All I can tell you is that this study showed that there is a clinical effect which is significant at all major ACR response rates*.

63. The positive results of the Phase IIa RA clinical trial reported in the December 13, 2007 press release and conference call were repeated to the market in reports issued by analysts following the Company, including reports issued on December 13, 2007 by CIBC World Markets ("CIBC") analyst Brian Abrahams, Jefferies analyst Adam A. Walsh and Credit Suisse analyst Michael Aberman, M.D.

64. Credit Suisse analyst Aberman increased the price target of Rigel stock from $12 to $25 and highlighted the efficacy results, including the ascending dose response, and the absence of dose dependent hypertension:

It is hard to imagine better results than Rigel achieved with R788 in RA and we think this compound has a good chance of becoming a blockbuster for autoimmune diseases. Key efficacy highlights include 1) a no effect dose, 2) a dose response between all doses, and 3) arguably the best efficacy seen in a PII RA trial . . . . Of particular note . . . [there was] *no evidence of dose dependent hypertension*.

65. Jefferies analyst Walsh increased the price target for Rigel stock from $16 per share to $19 per share and highlighted the statistically significant efficacy results:

*R788 Shows Home Run Efficacy* and Good Tolerability in RA

* * *

Efficacy exceeded best-case expectations, with *highly statistically significant results* on all primary and secondary outcome measures at the likely go forward dose (100mg).

* * *

The 100mg dose group hit the primary endpoint of ACR20 improvement at 12 weeks vs placebo as well as all secondary measures including ACR50, ACR70 and DAS28-CRP. . . . We view these efficacy results as significantly better than our and Street expectations.

66. Abrahams reported that CIBC expected upside in Rigel's stock price because the results of the Phase IIa RA clinical trial provided "strong proof-of-concept for systemic Syk kinase inhibition in rheumatoid arthritis, and unlocks the potential for the agent to be used in other chronic autoimmune conditions as well." Abrahams, highlighted the "dose-dependent activity" and stated that

On the primary endpoint, the ACR20 rate in the 100mg 2x/day group was 65% (p=0.008), and the ACR20 rate in the highest-dose 150mg 2x/day group was 72% (p<0.001). For the 100mg and 150mg doses, ACR50, ACR70, and DAS28-CRP *response rates were statistically significantly higher than placebo*. The 50mg dose did not appear to be efficacious. Importantly, there were clear dose-dependent effects on all efficacy measures of the three R788 doses, which should facilitate determination of an optimal therapeutic window.

67. Rigel's stock price more than tripled, from $8 per share on December 12, 2007 to $25.95 on December 13, 2007, the day defendants announced the results of the Phase IIa RA clinical trial. By comparison, the peer group declined 0.9% and the NASDAQ declined 0.1%.[5]

**D. Reasons Why Defendants Knew the Statements Made on December 13, 2007 Were Materially False and Misleading**

**1. R788 Was Neither as Effective as Reported and Did Not Achieve Statistically Significant Results at the Primary Efficacy Endpoint**

68. The Officer Defendants and Rigel knew the statements made about the efficacy of R788 made on December 13, 2007 were materially false and misleading as follows:

69. **Defendants failed to report ACR response data by country**. As set forth in ¶60, on December 13, 2007, Rigel reported the following results for the Phase IIa RA clinical trial:

| | Placebo | 50MG | 100MG | 150MG |
|---|---|---|---|---|
| # of U.S. & Mexico Patients | 47 | 46 | 49 | 47 |
| ACR20 | 18 (38%) | 15 (33%) | 32 (65%) (p=.008) | 34 (72%) (p<.001) |
| ACR50 | 9 (19%) | 8 (17%) | 24 (49%) (p=.002) | 27 (57%) (p<.001) |
| ACR70 | 2 (4%) | 1 (2%) | 16 (33%) (p<.001) | 19 (40%) (p<.001) |

70. On October 27, 2008, Rigel revealed for the first time the study results on a per-country basis for patients in the U.S. and Mexico as follows:

---

[5] The peer group is the NASDAQ Biotechnology Index. In the Company's 2007 Form 10-K, Rigel compared its stock price to the NASDAQ and the NASDAQ Biotechnology Index.

|  | Placebo | 50MG | 100MG | 150MG |
|---|---|---|---|---|
| # of U.S. Patients | 25 | 46 | 21 | 5 |
| ACR20 | 6 (24%) | 15 (33%) | 11 (52%) | 2 (40%) |
| ACR50 | 1 (4%) | 8 (17%) | 6 (29%) | 2 (40%) |
| ACR70 | 0 (0%) | 1 (2%) | 3 (14%) | 2 (40%) |

|  | Placebo | 50MG | 100MG | 150MG |
|---|---|---|---|---|
| # of Mexico Patients | 22 | 0 | 28 | 42 |
| ACR20 | 12 (55%) | 0 (0%) | 21 (75%) | 32 (76%) |
| ACR50 | 8 (36%) | 0 (0%) | 18 (64%) | 25 (60%) |
| ACR70 | 2 (9%) | 0 (0%) | 13 (46%) | 17 (40%) |

71.     On October 27, 2008, Grossbard also acknowledged he knew about the differing response rates on December 13, 2007:

The issue of Mexico/US interaction before the study – I think we actually mentioned this at our original discussion on the Web after the study was over. I was concerned that there might be such an interaction.

And so, I requested before the study was unblinded that we do a country interaction and it turned out there was one. And the issue of the interaction was that *the placebo rate was much higher in Mexico than in the US. And the response rate was much higher in Mexico than in the US*.

72.     **Analysts recognized that the per-country data disclosed on October 27, 2008 undermined the efficacy results announced on December 13, 2007**. The differing response rates and unbalanced dose distribution revealed on October 27, 2008 was important information because it indicated that the higher response rates by Mexican patients overstated the dose response. In fact, numerous analysts reported this was important information when the Company disclosed it for the first time on October 27, 2008. In an October 28, 2008 report, RBC Capital Markets ("RBC") analyst Jason Kantor wrote that the impact of the Mexican data may have overstated the dose response:

*The formal presentation of the R788 Phase IIa data and subsequent investor event at ACR were confounded by two disclosures: 1) a dose-dependent increase in mean systolic blood pressure of 3-5 mmHg at 100mg; and 2) higher placebo and on-treatment response rates among patients treated in Mexico vs the US.*

*            *            *

**Response rates differ by geography**. The drug clearly worked in both the US and Mexico, and the benefit over placebo was similar in both countries. However,

479520_1

CONSOLIDATED AMENDED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS - 3:09-cv-00546-JSW

- 20 -

patients in Mexico had higher response rates in both the placebo treated arms. *The higher response rates at the Mexican sites may have contributed disproportionately to the benefit observed at the higher doses*, as nearly all patients in the 150mg cohort and no patients in the 50mg cohort were from Mexico.

\* \* \*

In the Phase IIa dose-ranging trial, 189 moderate-to-severe RA patients were dosed twice daily (BID) for 3 months at three doses vs. placebo. The trial was conducted in the US and Mexico with approximately 50% in each countr[y]. *The company provided the ACR response data by country for the first time. Patients in Mexico had a higher response rate in both placebo and treatment arms than the US patients*. The placebo group and the 100mg group were relatively evenly split between US and Mexican patients. However, *there were no Mexican patients treated at the 50mg dose and approximately 70% of the 150 mg dose was enrolled in Mexico*.

We do not view the efficacy differences as being a significant clinical or regulatory risk. The drug clearly worked in both the US and Mexico, and the benefit over placebo was similar in both countries. Moreover, this phenomenon has been reported in other clinical trials for RA drugs.

*The main concern is that the impact of the Mexican data may have been to overstate the dose response.* Patients in Mexico had higher response rates in general, and they represented a larger portion of the population at increasing doses. *The investment thesis for R788 in RA is based largely on the very robust efficacy results and strong dose response*.

73. Credit Suisse analyst Aberman also wrote in a report issued on October 27, 2008 that Rigel had presented the differences in efficacy in Mexico versus the U.S. for the first time and that it was a particular concern because the ratio of Mexico patients to U.S. patients was higher in the higher-dosing groups, which could skew the data in favor of R788:

One of the first areas of concerns that was raised from today's data presentation was the fact that patients enrolled in Mexico had a higher placebo response rate than in the US. A high placebo response could also lead to higher treatment response. *This is a particular concern since the ratio of Mexican patients to US patients was higher in the higher dosing groups, which could skew the data in favor of R788*.

The analysts were correct, the distribution of doses – with 50mg tested only in the U.S. and 150mg tested almost only in Mexico – and the very high placebo response rate in Mexico – 55% – did skew the data in favor of R788, as described further in ¶¶74-90.

74. **The Phase IIa RA clinical trial results were not statistically significant as reported by defendants on December 13, 2007**. Employing "a basic set of analyses applying standard statistical methodologies," R788 failed to show statistically significant improvement over placebo for 100mg or 150mg at ACR20, the primary efficacy endpoint. Bloch Decl. at 6.

When the data is properly analyzed, all of the nominal p-values are higher than those reported with the December 13, 2007 press release, even without accounting for multiple comparisons. ***The comparisons of both 100mg and 150mg groups to Placebo for the primary outcome variable, the ACR20, with or without accounting for multiple comparisons, are not statistically significant.***

*Id.* at 12. Because the drug failed to achieve statistically significant results at any of the stated efficacy endpoints, the statements at ¶¶60-62 touting the purported efficacy of R788 were false and misleading. As explained below, the improper pooling of country data, the use of an inappropriate statistical test and the failure to correct for multiple pair-wise comparisons rendered the statistical results and efficacy claims touted on December 13, 2007 false.

75. **Defendants improperly pooled the data inflating the efficacy results of R788**. It is axiomatic that a statistical analysis of data collected in a multi-site clinical study (such as the Phase IIa RA clinical trial) is analyzed separately and the results are combined. As explained in *Pitfalls of Multisite Randomized Clinical Trials of Efficacy and Effectiveness*:

> ***The simple answer, of course, is that site effects and site x treatment interactions should always be considered in the analysis of the results of a multisite RCT [randomized clinical trial].*** Ignoring site differences can produce a statistical artifact called Simpson's Paradox (Blyth 1972; Bickel and Hammel 1975; Hand 1979; Wagner 1982); which may result in a conclusion that the treatment is effective when in fact it is not effective at any site, or in a conclusion that the treatment is ineffective when in fact it is effective at every site.

Kraemer, H.C., *Schizophrenia Bulletin*, Vol. 26, No. 3, 538-39 (2000).

76. Indeed, basic statistical principals requires that the data for the U.S. and Mexico be analyzed separately and that defendants calculate two p-values. Bloch Decl. at 5. These p-values are then combined using Fisher's method to produce an overall p-value for the U.S. and Mexico data.[6] *Id.* at 5-9. Analysis of the pooled data from the U.S. and Mexico, as defendants did, "resulted in misleading success rates and false p-values":

> Inspection of the ACR rates by Country ***easily reveals*** that the analysis of the combined data from the U.S. and Mexico reported with the December 13, 2007 press

---

[6] Fisher's method, also known as Fisher's combined probability test, is a technique for data fusion or "meta-analysis" (analysis of analyses). In its basic form, it is used to combine the results from several independent tests bearing upon the same overall hypothesis. Dr. Bloch used this method to "combine p-values from 2 independent studies, in order to obtain an accurate p-value for the combined results from the U.S. and Mexico." Bloch Decl. at 6.

release is *not appropriate and resulted in misleading success rates and false p-values*. Specifically, Defendant failed to account for the fact that patients in Mexico had higher success rates in all treatment groups than the U.S[.] patient groups. *Because the Defendant did not report an analysis which adjusts for these large differences in success rates between countries, the results presented in Rigel's December 13, 2007 Press Release bias results in favor of R788*.

*Id.* at 5.

77. Correcting for this manipulation, the p-values for the 100mg and 150mg doses at ACR20 and ACR50 are all higher (*i.e.*, indicating less statistical significance) than those falsely reported on December 13, 2007, and R788 did not achieve statistically significant results at the primary efficacy endpoint, ACR20, for the 150mg dose. *Id.* at 7-9 (the p-values are "much bigger" at ACR20, the primary efficacy endpoint). The following chart depicts the correction of defendants' improper pooling of the data (but does not account for the improper use of the chi-squared test or the failure to account for the multiple comparisons problem discussed in ¶¶78-81, below, both of which further increase the p-values):

|  | **December 13, 2007 Reported P-Values** | **Calculated by Country with Chi-Squared Method** | **Not Statistically Significant** |
|---|---|---|---|
| ACR20 100mg | 0.008 | 0.037 |  |
| ACR20 150mg | <0.001 | 0.152 | x |
| ACR50 100mg | 0.002 | 0.003 |  |
| ACR50 150mg | <0.001 | 0.026 |  |

78. **Defendants further inflated the efficacy of R788 by using an improper statistical analysis**. In addition to inappropriately pooling the per-country data prior to analyzing it, defendants used the chi-squared analysis to calculate p-values. *Id.* at 6. Because the sample sizes are small in the Phase IIa RA clinical trial, application of the chi-squared test is inappropriate and yielded p-values that were indicative of greater statistical significance than the data supported. *Id.* at 6-7. Because of the small sample sizes at issue, "Fisher Exact test rather than a chi-square test is the appropriate statistical procedure." *Id.* at 9.

79. Using Fisher's Exact test to calculate p-values for the U.S. and Mexico, (and then properly combining them, *see* footnote 6), the p-values were higher and demonstrated less statistical significance than defendants reported on December 13, 2007. Bloch Decl. at 9-11. Indeed, when the

improper use of the chi-square analysis, and the improper pooling of data, is corrected for, the p-values for the 100mg and 150mg doses at ACR20, ACR50 and ACR70 are all higher (*i.e.*, indicating less significance) than those falsely reported on December 13, 2007 and ***at the primary efficacy endpoint, ACR20 for the 100mg or 150mg doses R788 did not achieve statistically significant results***. *Id.* at 9-11. The corrected results accounting for the improper pooling of the data and the use of the chi-squared analysis (but not accounting for the multiple comparisons problem) are summarized in the following table:

| | December 13, 2007 Reported P-Values | P-Values Calculated by Country with Fisher's Exact Test | Not Statistically Significant |
| --- | --- | --- | --- |
| ACR20 100mg | 0.008 | 0.056 | x |
| ACR20 150mg | <0.001 | 0.216 | x |
| ACR50 100mg | 0.002 | 0.022 | |
| ACR50 150mg | <0.001 | 0.043 | |
| ACR70 100mg | <0.001 | 0.004 | |
| ACR70 150mg | <0.001 | 0.002 | |

80. **Defendants failed to correct the multiple comparisons problem which further inflated the efficacy results of R788**.[7] Defendants made multiple pair-wise comparisons between groups – *i.e.*, 100mg versus placebo at ACR20, 100mg versus placebo at ACR50, 100mg versus placebo at ACR70 – which increased the likelihood that one comparison would be statistically significant by chance alone. Bloch Decl. at 3-4, 6, 11-12. When a set of statistical inferences is considered simultaneously, a proper statistical analysis should account for the multiple comparisons being made. *Id.* Defendants failed to do so, which resulted in p-values which were lower (*i.e.*, more statistically significant) than that data supported and which overstated the efficacy of R788.

[7] "Multiple comparisons" arise when a statistical analysis encompasses a number of formal comparisons, with the presumption that attention will focus on the strongest differences among all comparisons that are made. For example, in considering the efficacy of a drug in terms of the reduction of any one of a number of disease symptoms. As more symptoms are considered, it becomes more likely that the drug will appear to be an improvement over existing drugs in terms of at least one symptom. However a difference between the groups is only meaningful if it generalizes to an independent sample of data (*e.g.*, to an independent set of people treated with the same drug). The confidence that a result will generalize to independent data should generally be weaker if it is observed as part of an analysis that involves multiple comparisons, rather than an analysis that involves only a single comparison.

Applying Tukey's Studentized Range test, "control[s] for differences between the U.S[.] and Mexico and for multiple pair-wise comparisons that were made between groups." *Id.* at 12. Application of Tukey's Studentized Range test to the R788 data on a per-country basis – *i.e.*, the proper statistical analysis for the data obtained in the Phase IIa RA clinical trial – ***the p-values at the primary efficacy endpoint, ACR20 for 100mg and 150mg were very large and not statistically significant***. *Id.* at 11-12.

81. The p-values obtained by an appropriate statistical analysis of 100mg and 150mg at the primary efficacy endpoint, ACR20, were p=0.198 and p=0.444, respectively. *Id.* at 12. These values were more than 20 times larger for 100mg dose, and 400 times larger for 150mg dose, than reported by defendants on December 13, 2007, and demonstrate the falsity of defendants' claims of efficacy, as explained by Dr. Bloch:

> With this analysis I have controlled for differences between U.S[.] and Mexico and for multiple pair-wise comparisons that were made between groups. ***The overall p-values comparing both 100mg and 150mg groups to Placebo for the primary outcome variable, the ACR20, are large and the correct conclusion is that success rates between either of the high dose groups and Placebo are not statistically significantly different. The nominal p-values reported with the December 13, 2007 press release are false and misleading***.

*Id.*

82. **Presentation of the combined data on December 13, 2007 was additionally misleading because it skewed the efficacy results of R788**. Not providing investors with data on a per-country basis concealed (i) the existence of a country interaction so substantial that the placebo in Mexico was more effective than any dose in the U.S. at ACR20 as set forth in ¶70; (ii) that the distribution by dose was not balanced across the U.S. and Mexico (*Id.*); and (iii) that there was no ascending dose response.

83. Indeed, defendant Grossbard falsely stated on December 13, 2007, that "overall there was a good dose response," when in fact there was not. *See* ¶60. By combining the data defendants mislead investors into believing there was a strong ascending dose response.

84. The appearance of an ascending dose response and the apparent lack of response at 50mg, were highlighted by analysts as positive indicators of efficacy. For instance, Credit Suisse

analyst Aberman stated "Key efficacy highlights include 1) a no effect dose, 2) a dose response between all doses, and 3) arguably the best efficacy seen in a PII RA trial."

85.     As reflected in the chart below the combined data misleadingly portrayed an ascending dose-response.  For example, at ACR20, when defendants reported the pooled results on December 13, 2007, it appeared that patients were 5% worse than placebo at 50mg, 27% better than placebo at 100mg and 34% better than placebo at 150mg.  Failing to provide a per-country breakdown disguised that 100mg was only 19% better than placebo in the U.S., not 32% better, as it appeared in the pooled data reported on December 13, 2007 and that *150mg in the U.S. was worse than 100mg, by 12%, not 7% better as it was presented in the pooled data*.  In Mexico, where only 100mg and 150mg were tested, 150mg was only 1% better than 100mg, not 7% as it appeared in the pooled data.

| Improvement Over Placebo at ACR20 | 50mg | 100mg | 150mg |
|---|---|---|---|
| U.S. Data | 9% | 28% ($\Delta$19) | 16% ($\Delta$-12) |
| Mexico Data | NA | 20% (NA) | 21% ($\Delta$1) |
| Combined Data | -5% | 27% ($\Delta$32) | 34% ($\Delta$7) |

86.     By not presenting the per-country data (*i.e.*, U.S. and Mexico) on December 13, 2007, R788 appeared more effective at the primary efficacy endpoint, ACR20, for the 150mg dose, than it actually was in either the U.S. or Mexico.  As the chart above reflects, the combined results show an improvement of 34% over placebo when the sites individually achieved improvement of only 16% and 21%, respectively.  "[T]he difference reported with the December 13, 2007 press release is 34%, a success rate over twice that achieved in the U.S[.] and 13% higher than that achieved in Mexico." *Id.* at 5.

87.     At 50mg, a dose which analysts characterized as the "no effect dose," combining the data had the opposite effect, making R788 appear less effective than placebo.  This contributed to the false impression that there was a strong escalating dose response at the 100mg and 150mg, *i.e.*, the larger dose of R788 a patient received, the greater the improvement in their symptoms, as the following chart depicts:

| | Placebo | 50MG | Improvement Over Placebo |
|---|---|---|---|
| # of U.S. & Mexico Patients | 47 | 46 | |
| ACR20 | 18 (38%) | 15 (33%) | -5% |
| ACR50 | 9 (19%) | 8 (17%) | -2% |
| ACR70 | 2 (4%) | 1 (2%) | -2% |

88.  However, when compared to the U.S. placebo group the 50mg dose performed better than placebo, although at a level that was not statistically significant, as the following chart depicts:

| | Placebo | 50MG | Improvement Over Placebo |
|---|---|---|---|
| # of U.S. Patients | 25 | 46 | |
| ACR20 | 6 (24%) | 15 (33%) | 9% |
| ACR50 | 1 (4%) | 8 (17%) | 13% |
| ACR70 | 0 (0%) | 1 (2%) | 1% |

89.  Dr. Bloch noted this distortion, which made the 50mg dose appear 15% less effective than it was, and the distortions in ¶¶82-88 above, as evidence of why combining the data was misleading:

> Referencing the patient populations who received the 50mg dose or Placebo and were assessed for response with the ACR20, the primary outcome variable, the differences in success rates of the 50mg group verses the Placebo group was 9% in the U.S. No such comparison can be made for patients treated in Mexico since no patients received the 50mg dose in Mexico. However, the difference reported with the December 13, 2007 press release is -5%, a difference in success rates which is 14% lower than that achieved in the only country that gave patients the 50mg dose, the U.S. These examples illustrate that *the data from the U.S. and Mexico should not [be] pooled, and that a proper, overall, analysis must combine the results of pair-wise comparisons obtained from each country*.

Bloch Decl. at 5-6.

90.  On October 27, 2008, Grossbard attempted to downplay the significance of the differences in response rate per-country by claiming that the only "important factor is the difference between the active and control group." However, both the total response rate and the difference between active and placebo groups is essential to accurately assessing the study. The total response rate was material to investors because the investment thesis in R788 required it to be highly effective as Rigel was in a competition with other pharmaceutical companies, including Pfizer (*See* ¶¶122-25),

and higher ACR response rates would  indicate that R788 could beat out possible competing drugs and warranted a  lucrative partnership deal.  The combined data concealed the difference between the relevant active and control groups – *i.e.*, the U.S. active group versus the U.S. control group, making the drug appear to have an ascending dose-response (which was not actually present) and more effective than it was.

**2. R788 Exhibited Greater Toxicity than Defendants Led Investors to Believe**

91. Defendants' statements about the safety results of the Phase IIa RA clinical trial were also materially false and misleading because defendants knew but failed to disclose that (i) there was a dose-dependent increase in average systolic blood pressure of 3-5mm Hg in 100mg patients and 8-9mm Hg in the 150mg patients which signaled the potential for increased cardiovascular risk, presented additional hurdles to regulatory approval and commercial partnership, particularly because the mechanism that caused the increase was not well understood; (ii) 5 patients (not 2, as reported on December 13, 2007) experienced hypertension, with blood pressure increases as high as 20-30mm Hg; (iii) hypertension was one of the two most common clinically meaningful drug related adverse events (iv) 9 patients (not 3, as reported on December 13, 2007) experienced increased liver enzymes compared to patients taking the placebo; (v) 20 patients (not 15, as reported on December 13, 2007) experienced neutropenia; (vi) 34 patients (not 15, as reported on December 13, 2007) experienced diarrhea; and (vii) 35 patients (not 15, as reported on December 13, 2007) experienced upper gastrointestinal side effects.  The undisclosed adverse events were material as they signaled the strength of the side effects, presented complications for regulatory approval, impacted the need for and design of future studies and jeopardized Rigel's ability to obtain a partnership  for the further development of R788 – *i.e.*, its investment thesis.

92. **R788 caused a dose-dependent increase in mean blood pressure**.  On December 13, 2007, Rigel reported that 2 patients in the 100mg cohort experienced moderate hypertension[8] and

---

[8] Hypertension is a clinical term for people who have systolic or diastolic blood pressure equal to or above a certain level, measured in mmHg ("millimeters of mercury").  Typically,

Grossbard stated that "[t]he incidence of reported moderate hypertension was quite low." Defendants statements were false and misleading because they failed to disclose (i) additional incidences of hypertension and that some of the increases were an alarming 20-30mm Hg; (ii) that there was a clinically significant and dose dependent increase in average blood pressure in all patients; and (iii) that hypertension and increased blood pressure were dose dependent side effects.

93. Rigel would later concede that hypertension was one of the "most common clinically meaningful" side effects of R788 in the Phase IIa RA clinical trial. On July 23, 2009, Rigel announced that one of the Phase IIb clinical studies failed to meet efficacy endpoints because patients did not report statistically significant higher ACR response rates than the placebo group. Despite failing to note the significance of hypertension in the Phase IIa RA clinical trial on December 13, 2007, defendants admitted to its significance in announcing the Phase IIb results:

> *Similar to [the Phase IIa study,] the most common clinically meaningful drug related adverse events* noted in [the Phase IIb study] were diarrhea and *hypertension*.

94. On the December 13, 2007 conference call, Grossbard explained that elevated liver enzymes and neutropenia were dose-related adverse events that were ameliorated by reduced dosages of R788. *See* ¶61. However, defendants disclosed only two incidences of moderate hypertension and described the incidence of moderate hypertension as "quite low." This gave investors the misleading impression that blood pressure effects were not dose-dependent (when they were), would not pose a clinical or regulatory risk (which they did), and would not be a barrier for potential partners (which it was).

95. The misleading nature of defendants' statements is echoed in analyst reports. Indeed, in his December 13, 2007 report, entitled "RA Phase II Data Look Great – Increase PT," Credit Suisse analyst Aberman highlighted the absence of dose dependent hypertension: "*Of particular note, . . . no evidence of dose dependent hypertension*."

---

blood pressure of 140-159/90-99mm Hg is considered "Stage 1" hypertension and blood pressure of 160+/100+mm Hg is considered "Stage 2" hypertension.

96. On October 27, 2008, defendants disclosed that in fact 5 patients experienced hypertension and the reported increase in blood pressure were as high as 20-30mm Hg. On the same day, defendants also disclosed that their was a dose-dependent increase in average blood pressure across all patients, *i.e.*, the more R788 a patient received the higher their blood-pressure. The mean systolic blood pressure increase was 3-4mm Hg in 50mg dose, 3-5mm Hg in the 100mg dose and 8-9mm Hg in the 150mg dose in all patients, regardless of whether or not their blood pressure reached the threshold for hypertension.

97. Defendants were aware that the effect of R788 on blood pressure was of key importance to investors even prior to the Class Period. On November 9, 2007, Rigel released a press release announcing the results of ITP study and stating "***R788 elevated blood pressure in some patients***" which also coincided with a 40% drop in Rigel's share price. On December 4, 2007, defendants admitted that they were looking to the results of the Phase IIa RA clinical trial to "get a good fix on the general effect on blood pressure." Defendants even stated "***we will see what the mean change in the blood pressure is, and we should know that within a week or two***."

98. Despite indicating that they would know of the "mean change" in blood pressure, defendants concealed this very information from investors when they presented the Phase IIa RA clinical trial data nine days later. On December 13, 2007, Defendants deliberately announced only incidences of moderate to severe hypertension – and downplayed their significance to make the drug appear safer than it was. Defendants provided no definition of what constituted "moderate" or "severe" blood pressure increases and the subsequently reported results on October 27, 2008 belie their prior representations, as reflected in the market's reaction.

99. During the October 27, 2008 ACR investor update, Grossbard acknowledged that five patients (not two, as reported on December 13, 2007) experienced hypertension, that there was a dose-dependent increase in blood pressure, that the increase was "of crushing importance to everybody" at the ACR conference, that additional studies would be necessary to get more precise estimates and that "the final word on blood pressure's pretty far down the road":

> [T]here were a total of ***five patients*** in the two high dose groups that the investigators wrote hypertension.

* * *

Then there's a question of blood pressure. And we have noted, and it is in the paper coming out in the next two weeks, that *our drug at doses of 100mg twice a day, for example, over 12 weeks, has an average increase in blood pressure of about 4mm systolic relative to their baseline*.

* * *

*I believe it's real and I believe there's an effect on blood pressure*. The magnitude of the effect that we measured in this study in the 100 mg twice a day dose was about 4 mm [for the patients in the 100mg cohort].

The studies we're doing now are much larger. We'll get another estimate from those studies. And it's possible over time we would end up doing an ambulatory blood pressure study to get an even more precise estimate of the blood pressure effect. So that's where we stand on blood pressure.

* * *

It's every person compared to his baseline that detects it. And so doing that, we had seven different changes from the baseline, one for each visit, and then we averaged them to get this number that we've given to you. The diastolic number is a little smaller than 4 mm. It was 2 mm or 3 mm. Systolic number was 4 mm to 5 mm.

* * *

The systolic was about 8 mm and the diastolic was about 4 mm [for the patients in the 100 mg cohort]. That's my recollection.

* * *

*And when the drug was withdrawn at the end of the study, at the end of the 12-week period, it came pretty much down to baseline. So I believe it's a real effect.* I just can't be precise about the magnitude of the effect, whether it's going to turn out to be three or five or seven. That's just harder to know because we at it that hard as part of this study.

We're paying more attention to it now in a Phase 2b study and I – my guess is it'll probably be a little better as we get large numbers and we've now alerted investigators to the fact that blood pressure can be a side effect and that they should treat it when it occurs and so on and so forth. But that's a prediction, it's not a fact.

* * *

It depends on the dose. The dose of 100 mg twice a day, it was four, and the dose 150 twice a day, it was seven to eight. And it would depend if it was sitting, if it was standing. But qualitatively, those are the way the numbers go. *It's dose dependent. There's no question about it*.

* * *

*In the course of the study, five patients either had antihypersensitive treatment initiated, or had their blood pressure medicine changed as a result of the blood pressure that was observed during the study*, which coincided usually with the five

CONSOLIDATED AMENDED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS - 3:09-cv-00546-JSW

patients – I don't want to say it was person to person, but it coincided with the *five patients who were identified as having the adverse event of hypertension*.

\*     \*     \*

When we do the next study we're going to have 400 or 500 patients for fairly long periods of time. So *I know it's of crushing importance to everybody here* whether its three or five, but that's not going to be the final word on blood pressure. *The final word on blood pressure's pretty far down the road*.

100. Gower also acknowledged that the blood pressure increases presented a regulatory hurdle: "The regulatory risks are more tangible . . . in that you never know, especially in this climate, what you are going to run into that will cause concern on the part of the FDA or an advisory panel."

101. The dose-dependent increase in blood pressure was important because (i) it might signal an increase in cardiovascular risk; (ii) the mechanism by which R788 increased blood pressure was not well understood; and (iii) it could be a stumbling block for some pharmaceutical companies in considering licensing the drug. Defendants would later admit that hypertension was one of two most "common clinically meaningful drug related adverse events" in the Phase IIa RA clinical trial.

102. In fact, when this information was first disclosed on October 27, 2008, several analysts noted their concern. In his October 28, 2008 report, RBC analyst Jason Kantor downgraded the stock due to "heightened safety concerns for R788" and noted that: (i) the previously undisclosed increase in blood pressure was viewed as a "potentially significant concern" to independent physicians attending the October 27, 2008 ACR conference; and (ii) the new negative information caused one pharmaceutical company to walk away from a potential partnership with Rigel. Kantor also reported that the defendants stated during the webcast that the blood pressure data was available to potential partners throughout the process:

> The formal presentation of the R788 Phase IIa data and subsequent investor event at ACR were confounded by two disclosures: 1) *a dose-dependent increase in mean systolic blood pressure of 3-5 mmHg at 100mg*; and 2) higher placebo and on-treatment response rates among patients treated in Mexico vs the US. Based on our conversations with the company, one principle investigator, and other physicians, we believe *the perceived risk/benefit ratio has worsened slightly, and in the absence of new data, concerns are likely to persist*. We still anticipate a partnership in early 2009, but no longer expect a deal sooner in 2008. We are downgrading to Sector Perform, Speculative Risk, and would not be aggressively buying on the current weakness.

> - **Increase in blood pressure**. *Rigel previously disclosed a modest increase in hypertensive adverse events with R788, and now disclosed a dose-*

*dependent increase in average blood pressure. The blood pressure increase is somewhat concerning in that 1) it may signal an increase in cardiovascular risk; 2) the mechanism is not well understood; and 3) it could be a stumbling block for some pharma companies in considering licensing the drug. In speaking to some independent physicians at the conference, the blood pressure issue was viewed as a potentially significant concern.*

\* \* \*

- **R788 partnership in early 2009**. According to management, Rigel remains in detailed licensing discussions with several potential partners, and confirmed that *the blood pressure data has been available to potential partners throughout the process*. Management continues to expect a lucrative partnership in early 2009, pending successful completion of the thorough QT study. The company emphatically stated that no QT prolongation signal has been observed so far. A partnership would be a catalyst for outperformance.

103. Kantor also wrote that the dose-dependent increase in mean systolic and diastolic blood pressure was surprising and raised several concerns:

As reported in prior top-line results, there were dose-dependent increases in several important adverse events, specifically neutropenia, elevated liver enzymes, GI side effects, and hypertension. However, *what surprised us was that there was a dose-dependent increase in mean systolic and diastolic blood pressure*. The clinical significance of the increased blood pressure is unclear, but we have several concerns:

1.    *An increase in blood pressure raises the potential concern of increased cardiovascular events in larger trials or future commercial experience. This increases both clinical and regulatory risk*.

2.    The mechanism of the blood pressure increase is unknown, which could raise additional regulatory concerns. One of the principle investigators suggested that the effect could be due to cross reactivity with the VEGF receptor. If there is a physiologically measurable impact on VEGF, it could raise further safety concerns.

3.    The blood pressure increase appears to be inseparable from efficacy because a slight increase is also observed at the low, non-efficacious dose.

4.    *There is a steep dose-related increase in blood pressure*.

5.    The increase in blood pressure may necessitate a larger and longer Phase III program, and may limit ultimate commercial uptake of the drug.

6.    Potential cardiovascular risk could limit partnering opportunity. *Rigel management informed us that potential partners have had access to this data for some time, and in fact at least one potential partner was discouraged enough to walk away*.

CONSOLIDATED AMENDED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS - 3:09-cv-00546-JSW

104.    Credit Suisse analyst Aberman also reported on October 27, 2008 that the magnitude of the increase in blood pressure was disclosed for the first time and that there was "no question" the increase in blood pressure was "one of the risks of the program":

> The next most important topic of debate at ACR was the issue of R788's blood pressure elevation. Specifically, the mean increase in blood pressure elevation over baseline was 4mmHg in the 100 mg PO BID group, which is the highest dose moving forward in the Phase IIb trials enrolling. **With the FDA's increased scrutiny over cardiac toxicity and the well known association of elevated blood pressure with cardiac events, this toxicity is not a non-issue**.

> *        *        *

> Perhaps more important, we understand that **at least one investigator not involved in the R788 program suggested that this level of elevated BP would be a show stopper clinically**.

> *        *        *

> Lastly, **one area that has raised concern is the magnitude of the BP rise in those patients who had hypertension as an adverse event**. While the complete patient level data were not disclosed, the company disclosed that the **BP went up as much as 20-30 mmHg. This magnitude is concerning in that it could precipitate significant morbidity acutely, such as a cardiac event**. While the rate of hypertension as an adverse event was relatively rare, **this is probably the biggest risk to the program and one that bears watching in the Phase IIb program**.

105.    On November 3, 2008, Rigel reported its financial results for the quarter ending September 30, 2008. The Company also held its first-ever earnings conference call, but the focus of the call was the toxicity concerns with R788 following the ACR presentation. Analysts following the Company asked numerous questions about the increase in blood pressure and then issued reports. Credit Suisse analyst Aberman issued a report on November 3, 2008, in which he wrote that, "[b]ased on the questions on the call, investors clearly remain wary over the toxicity profile of R788 and we think this will not wane until (1) a commercial partnership is signed in 1H09; and/or (2) Phase IIb data are released in 3Q09." He also wrote that "There is no question that the elevated blood pressure seen in the Phase IIa is a risk for the long term prospects of R788."

106.    **Increase in Liver Enzymes:** On December 13, 2007, Rigel reported that there was a dose-dependent increase in alanine aminotransferase ("ALT") (liver enzymes) in 3 patients in the 150mg cohort and none in the 50mg or 100mg cohort. However, during the October 27, 2008 ACR presentation and in the November 2008 article, it was reported that 9 patients experienced a dose-

dependent increase in ALT – 2 patients in the 50mg cohort, 3 patients in the 100mg cohort and 4 patients in the 150mg cohort.

107. Analysts noted the difference in defendants' disclosures. On October 28, 2008, Oppenheimer analyst Abrahams issued a report in which he wrote the following:

> ACR data highlighted neutropenia and LFT [liver function test] elevations as potential risks worth watching. ***Neutropenia was slightly higher than previously reported and not completely confined to the first several weeks, and LFT elevations were associated with R788.*** While ***R788's side effect profile is not benign, as suggested by prior data***, we believe it is acceptable thus far.

108. While Abrahams noted that the December 2007 data "suggested a possible association with LFT elevations," he wrote that the data presented on October 27, 2008 "showed mild dose-dependent ALT elevations greater than 1.2x ULN [upper limit of normal] at all doses, ***which confirms R788's association with LFT increases***, in our opinion." He also wrote that "there are clearly some additive liver abnormalities as evidenced by the increase in patients who had LFT levels of more than 1.2X ULN."

109. On December 4, 2007, in connection with the Phase II ITP clinical trial, defendants released all incidences of elevated liver enzymes (ALT) which were twice the upper limit of normal. *See* ¶57. However, on December 13, 2007, in connection with Phase IIa RA clinical trial, defendants released only liver enzyme elevations that were three times the upper limit of normal. Having reported two times elevations only nine days earlier, defendants set expectation for the safety results that would by reported by the Company and the failure to disclose the extent of elevated liver enzymes on December 13, 2007 was part of a deliberate effort to conceal the frequency of drug related adverse events.

110. **Neutropenia:** On December 13, 2007, Rigel reported that 15 patients experienced a dose-dependent increase in neutropenia – 5 patients in the 100mg cohort and 10 patients in the 150mg cohort. However, during the October 27, 2008 ACR presentation and in the November 2008 article, it was reported that 20 patients experienced neutropenia – 1 in the 50mg cohort, 5 in the 100mg cohort and 14 in the 150mg cohort.

111. Like the other adverse safety data, analysts noted the difference. For example, Oppenheimer analyst Abrahams wrote the following in his October 28, 2008 report: "***Full phase IIa***

*data showed an increase in neutropenia from previously reported top-line data. . . . There were five additional cases of neutropenia in the full phase IIa data*."

112. **Gastrointestinal side effects:** On December 13, 2007, Rigel reported that 15 patients experienced upper gastrointestinal side effects – 1 in the 50mg cohort, 2 in the 100mg cohort and 12 in the 150mg cohort. However, during the October 27, 2008 ACR presentation and in the November 2008 article, it was reported that 35 patients experienced upper gastrointestinal side effects – 4 in the 50mg cohort, 14 in the 100mg cohort and 17 in the 150mg cohort.

113. **Diarrhea:** On December 13, 2007, Rigel reported that 15 patients experienced diarrhea – 3 in the 50mg cohort, 2 in the 100mg cohort and 10 in the 150mg cohort. However, during the October 27, 2008 ACR presentation and in the November 2008 article, it was reported that 34 patients experienced diarrhea – 5 in the 50mg cohort, 8 in the 100mg cohort and 21 in the 150mg cohort.

114. **Rigel, Gower, Grossbard, Payan, Rodriguez, and Maynard knew about the adverse safety data on December 13, 2007, because the Phase IIa RA clinical trial was completed.** All of the above adverse information was known by the defendants on December 13, 2007, because the study was complete and the data was in. In fact, during the December 13, 2007 conference call, Grossbard acknowledged that the December 13, 2007 press release was an abstract of the November 2008 article in *Arthritis & Rheumatism* that references (i) the differing response rates between patients in Mexico and the U.S.; and (ii) the significantly worse adverse safety information. Further, defendants told investors that they would know the blood pressure data in December 2007 (*see* ¶59) and defendants admitted to analysts that the blood pressure data had been available throughout the process (*see* ¶102).

115. Further, Rigel had 159 employees as of December 31, 2007, according to its Form 10-K. According to the Company's April 8, 2008 Proxy Statement, Gower, Grossbard, Payan, Rodriguez and Maynard were its most senior executives. They were the highest paid officers in the Company, and each attended the December 13, 2007 conference call. Given the importance of the Phase IIa RA clinical trial to the Company's success and the senior positions of Gower, Grossbard,

CONSOLIDATED AMENDED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS - 3:09-cv-00546-JSW

Payan, Rodriguez and Maynard, as well as their admissions, it would be absurd to suggest they did not know about the adverse information that was concealed from investors until October 27, 2008.

116. Yet, the per-county data and statistically insignificant efficacy results as well as substantially worse safety information were not disclosed on December 13, 2007.

117. **Rigel, Gower, Grossbard, Payan, Rodriguez, and Maynard knew the undisclosed adverse safety data was important**. Rigel, Gower, Grossbard, Payan, Rodriguez, and Maynard knew the undisclosed safety data was important to the Company's financial results. Rigel reported in its 2007 Form 10-K that it must demonstrate the safety of any drug before it could be approved for commercial sale:

> Our ongoing development activities are and will continue to be subject to extensive regulation by numerous governmental authorities in the United States and other countries, including the Food and Drug Administration, or FDA, under the Federal Food, Drug and Cosmetic Act.

> \* \* \*

> Our failure, or the failure of our strategic partners, to adequately demonstrate the safety and efficacy of our products under development will prevent receipt of FDA and similar foreign regulatory approval and, ultimately, commercialization of our products.

118. Following the Company's December 13, 2007 press release and conference call, analysts that followed Rigel also reported that a key risk to the Company's stock price was adverse safety data. For example, CIBC analyst Abrahams reported on December 13, 2007 that "key risks" to the Company's 12- to 18-month stock price target included the "emergence of an unacceptable safety signal with R788."

119. In the November 2008 article on the Phase IIa RA clinical trial published in *Arthritis & Rheumatism* (of which Grossbard was a contributing author), it was written that the Phase IIa RA clinical trial was designed to evaluate the safety and preliminary clinical efficacy of R788 in patients with RA despite methotrexate therapy and that all patients were monitored for adverse events and serious adverse events. Moreover, it was stated in the article that "whether the adverse events seen in this study, including gastrointestinal intolerance, neutropenia, effects on blood pressure, and liver enzyme elevations, will be a major issue in longer studies of RA patients will also need to be determined." Yet, none of this information was disclosed on December 13, 2007.

CONSOLIDATED AMENDED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS - 3:09-cv-00546-JSW
- 37 -

### 3. R788 Was Critical to Rigel's Success

120. Rigel, Gower, Grossbard, Payan, Rodriguez, and Maynard also knew that R788 was critical to the Company's success. As reported by the Company in its 2007 Form 10-K, R788 was its lead product candidate for treating RA. During Rigel's November 3, 2008 conference call, Gower stated that R788 was the Company's "flagship product candidate." The pipeline report on the Company's website confirms that the development of R788 for RA had progressed farther than any other drug under development.



121. Rigel, Gower, Grossbard, Payan, Rodriguez and Maynard also knew that R788 could be very profitable. The Company reported on its website that the worldwide market for RA drugs exceeded $13 billion in 2007. After Rigel reported the incomplete results of the Phase IIa RA clinical trial on December 13, 2007, analysts reported that the market potential of R788 in both RA and other autoimmune indications was substantial. CIBC analyst Abrahams estimated worldwide end-use sales of R788 could exceed $650 million by 2013.

122. Rigel, Gower, Grossbard, Payan, Rodriguez and Maynard further knew that the Company was competing with Pfizer to develop the first oral pill for RA and that Pfizer was ahead in its clinical testing. In his October 23, 2007 report, CIBC analyst Abrahams wrote that "the most important potential competitors to R788 are the other targeted oral agents in clinical development" and singled out Pfizer's drug candidate, CP-690,550:

> Pfizer's candidate is in late phase II testing and is somewhat further ahead of Rigel's program[.]

>                    *          *          *

> Among the mid-stage oral small molecules for RA, we believe Pfizer's CP-690,550 demonstrated extremely strong efficacy results in a 6-week monotherapy trial[.]

123. At the October 7, 2008 JMP Securities LLC Healthcare Focus Conference, defendant Maynard acknowledged Rigel's fierce competition with Pfizer to develop the first oral pill for RA in response to an analyst's question:

> We have a got a good look at Pfizer's compound they're presenting at ACR as well. They are presenting on their three-month data and it looks pretty good. We are not sure exactly what the safety profile will look like for six months. But at three months with what they have shown, it looks pretty good. **And we're definitely going to be in a horserace with Pfizer**.

> **We want to beat them to the market with our compound. They're slight ahead of us but we think we have an opportunity to catch up**. But they're definitely who we think of when we think of the lead in this space. We want to be the first oral . . . on the market because there will be a value attributed to that.

124. In a December 16, 2008 report, Collins Stewart analyst Salveen J. Kochnover also noted that Pfizer's drug candidate was in direct competition with Rigel's R788:

> On the competitor front, R788 is facing direct competition in RA from Pfizer's oral JAK3 inhibitor, CP-690,550. Pfizer recently presented data from a Phase 2 trial at the ACR meeting in October . . . and expects to initiate two Phase 3 trials in 1Q09, placing Pfizer's compound >6 months ahead of R788 in development.

125. On June 15, 2009, Adam Feurstein reported on TheStreet.com that Rigel and Pfizer were "locked in a race to develop the first oral pill for RA" and that Pfizer's oral RA drug was "already in phase III studies."

126. **RBC analyst Kantor reports this lawsuit is warranted**. After the initial complaint in this lawsuit was filed, RBC analyst Kantor issued a report on February 24, 2009, in which he maintained RBC's: "Underperform rating and cautious outlook on RIGL shares based on: 1) a delay

in the expected partnership for R788 until after the Phase IIb data in Q3:09; 2) a dwindling cash balance; and 3) limited visibility regarding safety signals in the upcoming TASKi2 and TASKi3 trials, whose results are expected in July and August, respectively." He also noted the filing of the first complaint in this lawsuit and wrote the following:

> We typically do not put much emphasis on these types of lawsuits because they are often frivolous. However, the concerns raised in the suit are similar to those we raised at the time the data was presented (please refer to our note titles "Safety Concerns Heightened Following Phase IIa Presentation to ACR" published on October 28, 2008 for more details).

127. **Rigel, Gower, Grossbard, Payan, Rodriguez and Maynard knew the Company needed to raise funds to avoid insolvency**. In addition to knowing about the undisclosed adverse safety information, the statistically insignificant results at the primary efficacy endpoint and the differing response rates by patients in Mexico and the U.S., the defendants knew the Company needed to raise funds given the Company's deteriorating financial condition. Indeed, in every Form 10-Q filed by Rigel in 2007, the first risk factor reported was that Rigel needed additional capital in the future to sufficiently fund its operations and research. For example, Rigel reported the following in its 3Q07 Form 10-Q filed with the SEC on November 6, 2007:

> ***We will need additional capital in the future to sufficiently fund our operations and research***.
>
> We have consumed substantial amounts of capital to date, and operating expenditures are expected to increase over the next several years as we expand our research and development activities. We believe that our existing capital resources and anticipated proceeds from current collaborations will be sufficient to support our current operating plan through at least the next 12 months. ***In the foreseeable future, our operations will require significant additional funding in large part due to our research and development expenses, future preclinical and clinical-testing costs, and the absence of any meaningful revenues***. The amount of future funds needed will depend largely on the timing and structure of potential future collaborations. ***We do not know whether additional financing will be available when needed, or that, if available, we will obtain financing on terms favorable to our stockholders or us***. As of September 30, 2007 and December 31, 2006, our cash, cash equivalents and available-for-sale securities were $112.5 million and $104.5 million, respectively.
>
> To the extent we raise additional capital by issuing equity securities, our stockholders could at that time experience substantial dilution. To the extent that we raise additional funds through collaboration and licensing arrangements, we may be required to relinquish some rights to our technologies or product candidates, or grant licenses on terms that are not favorable to us.

128.    In fact, Rigel, Gower, Grossbard, Payan, Rodriguez and Maynard knew the Company would become insolvent if it did not raise funds.  After reporting a net loss of $74.3 million in 2007, Rigel reported just $44.5 million of cash and $82.2 million of capital at December 31, 2007.  Rigel's February 2008 Offering raised $127.5 million for the Company, but Rigel reported a $132.3 million net loss in 2008.  Thus, absent the $127.5 million raised in the February 2008 Offering, Rigel would have become insolvent before the end of 3Q08.  Rigel reported a $99 million net loss for the nine months ending September 30, 2008, which would have more than depleted the $82.2 million of capital the Company reported as of December 31, 2007.

129.    Rigel, Gower, Grossbard, Payan, Rodriguez and Maynard also knew disclosure of the adverse safety information and ineffective results would make raising funds more difficult, if not impossible.  Indeed, the stock price declined more than 38% following the disclosure of the adverse safety information and the data on a per-country basis reflecting the differing response rates and skewed dosing on October 27, 2008.  Instead of disclosing the full results of the Phase IIa RA clinical trial, Rigel, Gower, Grossbard, Payan, Rodriguez and Maynard concealed the adverse information and accurate efficacy results concerning R788, and the Company's stock price increased from $8 per share on December 12, 2007 to $25.95 on December 13, 2007.  Then, in February 2008, Rigel sold 5 million shares for $27 per share for net proceeds of $127.5 million.  If Rigel, Gower, Grossbard, Payan, Rodriguez and Maynard disclosed the adverse safety information and accurate efficacy results, the Company's stock price would not have increased, and Rigel could not have sold the 5 million shares for $27 per share and may not have been able to raise any funds.

130.    Rigel, Gower, Grossbard, Payan, Rodriguez and Maynard also knew that the Company's stock price would decline if they reported the adverse safety information about the Phase IIa RA clinical trial because that is precisely what occurred on November 9, 2007 when Rigel announced the results of its Phase II ITP clinical trial of R788.  The Company reported that a majority of the patients involved in the clinical study responded favorably to R788 and that the clinical study showed that R788 could improve platelet counts in ITP but also revealed safety concerns, including increases in blood pressure.  Following the release of this information, the

Company's stock price declined 14.1% from $11.04 on November 8, 2007 to $9.48 on November 9, 2007. By December 4, 2007, the Company's stock price had declined to $6.67.

131. Analysts attributed the decline to concerns about adverse safety data. For example, after the Company's December 4, 2007 Phase II ITP conference call, Jefferies analyst Walsh wrote in a December 5, 2007 report that Rigel shares had plummeted 40% since the Phase II ITP results were announced on November 9, 2007 due to concerns about "key safety data" including gastro intestinal side effects and elevated blood pressure.

132. **Need for partnership to raise funds**. Rigel, Gower, Grossbard, Payan, Rodriguez and Maynard also knew that it was important for investors to believe that the Company would be able to establish a partnership with a pharmaceutical or biotechnology company because such a partnership would provide the funds necessary to continue the development of R788 for RA. Rigel reported in its 2007 Form 10-K that one of its strategies was to "establish strategic collaborations with pharmaceutical and biotechnology companies to develop and market our product candidates." In addition, the Company reported that its future funding requirements depended on many uncertain factors, including the "ability to establish new collaborations and to maintain . . . existing collaboration partnerships" and that most of its expected future revenues were contingent upon collaborative and license agreements.

133. Wall Street analysts following the Company also reported that a partnership was important. For example, in his December 13, 2007 report, Credit Suisse analyst Aberman wrote that "a commercial partnership in Europe and/or Asia should also be a corporate goal *for 2008* on the strength of [the Phase IIa RA clinical trial] data."

134. During the October 27, 2008 ACR investor update, Gower falsely stated that Rigel was still on track for putting partnership in place in the early part of 2009 and that the Company needed to get the partnership in place before the second half of 2009.

> *[S]till on track for what we've been saying all along, which is putting the partnership in place as early as the early part of next year*. I doubt it will be this year. It's certainly not in our control that it would be. But *we need to get the partnership put in place, ideally a few months before we go to the end-of-Phase 2b meeting and start the Phase 3s, which starts in the second half of next year*.

So the ideal world to me would be around about end of the first quarter next year or something like that we'd be able to announce a partnership. And we – the *discussions have been progressing pretty well. So no change*. Doesn't mean somebody will not freak out about the credit crisis. But the nice thing is that *most of the folk we've been talking about it with, with deals of this size, they've been very nice deals for us,* if comes out of their self-generated cash.

135. Analysts following the Company noted the importance of those assurances. In a report issued on October 28, 2008, RBC analyst Kantor wrote that management stated that the Company continued to expect a lucrative partnership in *early 2009*. Oppenheimer analyst Abrahams wrote in a October 28, 2008 report that "importantly, management reiterated its timelines for a partnership for R788 . . . . Management continues to believe that a partnership could be completed *by late-1Q09*." Abrahams wrote that the timeline was achievable and that the terms of the partnership could be substantial, including $100-$150 million up front.

136. SIG Susquehanna ("SIG") analyst Derek Jellinek wrote in an October 28, 2008 report that "[m]anagement has indicated a key strategic goal is to secure partnership for R788 and has noted significant interest in the franchise from multiple parties, with several rounds of term sheet reviews already undertaken." In addition, Jellinek wrote that he believed "expectations are high for deal consummation by 1H09 and for deal economics to exceed partnerships such as the Vertex/JNJ deal for Telaprevir for the treatment of hepatitis C ($165 mln up-front; $380 mln in milestones)" and that "[a]nything less may be construed as a disappointment and could pressure shares."

137. On November 3, 2008, Gower admitted that potential partners knew about the blood pressure data before October 27, 2008 and had concerns about it. But Gower also stated that a partnership was still expected in early 2009. Analysts again issued reports noting the importance of those assurances. Credit Suisse analyst Aberman issued a report on November 3, 2008 that stated the following:

> The earnings were not the focus on the call, rather it was an opportunity to revisit toxicity concerns with R788 following the ACR meeting.

> \* \* \*

> Based on the questions on the call, investors clearly remain wary over the toxicity profile of R788 and we think this may not wane until (1) a commercial partnership is signed in 1H09, and/or (2) Phase IIb data are released in 3Q09.

479520_1

CONSOLIDATED AMENDED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS - 3:09-cv-00546-JSW

- 43 -

138. RBC analyst Kantor issued a report on November 3, 2008, in which he wrote the following:

> With recent safety concerns arising from ACR, a lucrative partnership would alleviate many investor concerns. Rigel forecasts completing a partnership in early 2009, likely after completing the formal Qt study.

139. Oppenheimer analyst Abrahams issued a report on November 3, 2008, in which he wrote the following:

> Importantly, mgmt reiterated that partnership discussions remain on track.

> *        *        *

> Mgmt said R788's safety profile has had no impact on partnership discussions, timing, or deal structure. Mgmt noted term sheets are actively being exchanged, and have been since ACR. Importantly, while BP effects have been a point of discussion with partners, they have not been singled out as a particularly concerning side effect.

140. Similar reports were issued on November 4, 2008 by Jefferies analyst Walsh and SIG analyst Jellinek.

141. On February 3, 2009, however, Rigel reported that it would *delay* partnership discussions regarding R788 until after results from its Phase IIb clinical studies were available and that the Company laid off 36 employees, or 20% of its workforce. The price of the Company's stock declined 9.3% from $7.17 on February 2, 2009 to $6.50 on February 3, 2009, compared to a 1.8% *increase* in the peer group and a 1.5% *increase* in the NASDAQ. On July 9, 2009, Rigel reported that it would not conduct corporate partnership discussions until 2010.

142. **Defendants' compensation:** Gower, Grossbard, Payan, Rodriguez and Maynard also knew that they would receive higher salaries, bonuses and stock option awards, and that the value of their existing stock options would increase substantially, if Rigel reported positive results from the Phase IIa RA clinical trial. According to the Company's Proxy Statement filed with the SEC on April 8, 2008, Rigel's "performance driven compensation program" consisted of three components: base salary, short-term cash incentive compensation (*i.e.*, bonuses) and long-term equity incentive compensation. For 2007, the amount of each component was based upon the achievement of Company goals and objectives related to (i) the clinical development of Rigel's new product

candidates; (ii) expansion of the Company's pipeline; and (iii) Rigel's cash position at the end of 2007.

143.    The April 8, 2008 Proxy Statement confirms that defendants Gower, Grossbard, Payan, Rodriguez and Maynard each received salary increases, bonuses and stock awards at the end of 2007 because Rigel achieved significant milestones with regard to clinical development, and the first significant milestone listed was the reported results of the Phase IIa RA clinical trial.  As shown in the following chart, Gower, Grossbard, Payan, Rodriguez and Maynard each received substantial salary increases:

| Defendant | 2007 Salary | 2008 Salary | % Increase |
|-----------|-------------|-------------|------------|
| Gower | $500,000 | $600,000 | 20% |
| Payan | $420,000 | $483,000 | 15% |
| Grossbard | $390,000 | $450,200 | 15.4% |
| Rodriguez | $380,000 | $430,000 | 13.2% |
| Maynard | $260,000 | $300,000 | 15.4% |

144.    In addition, it was reported in the April 8, 2008 Proxy Statement that individuals were eligible to receive a bonus of 0% to 60% of their 2007 base salary but that Gower, Grossbard, Payan, Rodriguez and Maynard each received bonuses that were substantially greater than 60% of their 2007 base salaries due to the Company's exceptional success in 2007, including the reported results of the Phase IIa RA clinical trial.  Further, it was reported in the April 8, 2008 Proxy Statement that while the stock price was not expressly stated as a goal under the 2007 non-equity incentive plan in determining bonuses, the $25.39 closing price of Rigel's stock on December 31, 2007 was considered.  As alleged above, the Company's stock price more than tripled from $8 per share on December 12, 2007 to $25.95 on December 13, 2007 as a result of defendants' false and misleading statements about the Phase IIa RA clinical trial.  The following chart shows the bonuses received by Gower, Grossbard, Payan, Rodriguez and Maynard:

| Defendants | Bonus | % of 2007 Salary |
|------------|-------|------------------|
| Gower | $600,000 | 120% |
| Payan | $420,000 | 100% |
| Grossbard | $351,000 | 90% |
| Rodriguez | $380,000 | 100% |
| Maynard | $208,000 | 80% |

145.     Gower, Grossbard, Payan, Rodriguez and Maynard also received additional stock awards on January 31, 2008.  Further, it was reported in the April 8, 2008 Proxy Statement that options generally vested over a four-year period from the date of the grant but that the options granted in January 2008 vested monthly over a one-year period:

| Defendants | Options Awarded in 1/07 | Options Awarded in 1/08 | % Increase |
|---|---|---|---|
| Gower | 100,000 | 165,000 | 65% |
| Payan | 80,000 | 140,000 | 75% |
| Grossbard | 80,000 | 130,000 | 62.5% |
| Rodriguez | 80,000 | 125,000 | 56.25% |
| Maynard | 50,000[9] | 75,000 | 50% |

146.     The increase in the Company's stock price caused by the false and misleading statements about the Phase IIa RA clinical trial also increased the value of the stock options owned by Gower, Grossbard, Payan, Rodriguez and Maynard.  As of December 31, 2007, Gower, Payan, Grossbard, Rodriguez and Maynard owned options to purchase millions of the Company's shares.  Many of the options were "out-of-the-money" until the false and misleading statements about the Phase IIa RA clinical trial caused the price of Rigel's stock to increase from $8 per share on December 12, 2007 to $25.95 on December 13, 2007:

| Defendant | Options | Exercise Price |
|---|---|---|
| **Gower** | 50,000 | $1.80 |
| | 270,000 | $8.25 |
| | 80,000 | $17.66 |
| | 15,000 | $22.17 |
| | 200,000 | $24.56 |
| | 60,000 | $7.40 |

---

[9]     Does not include the supplemental promotion option grant of 56,911 shares awarded to Maynard upon his promotion from Vice President and Acting CFO to Vice President and CFO in January 2007.

| Defendant | Options | Exercise Price |
|---|---|---|
| | 100,000 | $11.73 |
| **Payan** | 3,334 | $1.80 |
| | 250,000 | $8.25 |
| | 40,000 | $17.66 |
| | 11,250 | $22.17 |
| | 93,000 | $24.56 |
| | 55,000 | $7.40 |
| | 80,000 | $11.73 |

| Defendant | Options | Exercise Price |
|---|---|---|
| **Grossbard** | 150,000 | $8.25 |
| | 35,000 | $17.66 |
| | 32,222 | $22.17 |
| | 65,000 | $24.56 |
| | 60,000 | $7.40 |
| | 27,778 | $9.56 |
| | 80,000 | $11.73 |

| Defendant | Options | Exercise Price |
|---|---|---|
| **Rodriguez** | 150,000 | $8.25 |
| | 75,000 | $17.66 |
| | 12,500 | $22.17 |
| | 55,000 | $24.56 |
| | 65,000 | $7.40 |
| | 43,889 | $9.56 |
| | 80,000 | $11.73 |

| Defendant | Options | Exercise Price |
|---|---|---|
| **Maynard** | 7,504 | $8.15 |
| | 11,895 | $23.00 |
| | 60,000 | $23.32 |
| | 4,600 | $7.88 |
| | 90,000 | $10.20 |
| | 1,000 | $9.56 |
| | 106,911 | $11.73 |

147. The exercise price of the options received on January 31, 2008 was $26.45. The value of those options declined when the Company's stock price fell after the full results of the R788 Phase IIa RA clinical trial were disclosed on October 27, 2008. But Gower, Grossbard, Payan, Rodriguez and Maynard received additional options in 2009 with a substantially lower exercise price to replace the "out-of-the-money" options granted on January 31, 2008:

| Defendant | Options Awarded on 3/30/09 | Exercise Price |
|---|---|---|
| Gower | 190,000 | $6.49 |
| Payan | 145,000 | $6.49 |
| Grossbard | 115,000 | $6.49 |
| Rodriguez | 115,000 | $6.49 |
| Maynard | 150,000 | $6.49 |

**E.     February 2008: Rigel's Registration Statement Contains False and Misleading Statements About the Safety and Efficacy Results of the Phase IIa RA Clinical Trial**

148.    On or about January 24, 2008, Rigel filed with the SEC a Form S-3ASR Registration Statement and Form 424B3 Prospectus with the SEC for the Offering.   The Form S-3ASR Registration Statement was signed by Gower, Maynard, Payan, DeLeage, Goodwin, Lyons, Moos, Renton, Ringrose and Sherwin.

149.    On February 1, 2008, Rigel filed with the SEC a Form 424B5 Prospectus for the Offering.

150.    The Registration Statement contained untrue statements of material fact or omitted to state other facts necessary to make the statements made therein not misleading and was not prepared in accordance with applicable SEC rules and regulations.  Specifically, the Registration Statement provided "the following documents filed with the SEC are incorporated by reference . . . .  Our current report on Form 8-K, filed with the SEC on December 13, 2007."  The Form 8-K Rigel filed with the SEC on December 13, 2007 included the December 13, 2007 press release quoted above at ¶60.

151.    In addition, the Form 424B5 Prospectus contained the following statements (false and misleading statements in bold and italics):

> We recently completed a Phase 2, multicenter, ascending dose, randomized, double-blind, placebo-controlled, dose-ranging study evaluating three doses of R788 over a 12-week period in RA patients.  All of these patients continued to receive their same previously scheduled dose of methotrexate.  ***In this clinical trial, R788 demonstrated statistically significant efficacy results in treating RA patients at two dose levels***.  Efficacy assessments for each participant were based on the American College of Rheumatology criteria which denote a 20% (ACR 20) improvement, at least a 50% (ACR 50) improvement, or at least a 70% (ACR 70) improvement from the baseline assessment at the end of the 12-week treatment period.  ***Groups treated with R788 at 100mg and 150mg po bid (orally, twice daily) showed higher ACR20, ACR50, ACR70 and DAS28 response rates than the placebo group.  The most common clinically meaningful adverse events noted in the clinical trial were dose-related neutropenia, mild elevations of liver function tests and gastrointestinal side effects***.  Dose reduction (to one-half the assigned dose by taking the drug once per day) was pre-specified in the protocol and contingent on neutrophil counts and/or liver function tests.  Notably, a vast majority of the patients who had their dose reduced successfully completed the clinical trial with minimal safety issues.  We expect to initiate a Phase 2b clinical trial evaluating dosing and x-rays of bones over a 24-week period.  We also expect to initiate a second Phase 2b clinical trial treating a sub-population of RA patients with R788 by the end of the first half of 2008.

152. On February 6, 2008, at least 5 million shares of Rigel stock were sold to the public at $27.00 per share, raising $135 million.

153. **Reasons why the Registration Statement contained untrue statements of material fact or omissions:** As described in ¶¶68-90, Rigel, Gower, Grossbard, Payan, Rodriguez and Maynard knew that their presentation of, and statements about, the efficacy results of the Phase IIa RA clinical trial were materially false and misleading and that R788 had not "demonstrated statistically significant improvement efficacy results in treating RA patients at two dose levels [100mg and 150mg]" in the Phase IIa RA clinical trial. The Registration Statement was false because the defendants manipulated the statistical analysis of the Phase IIa RA clinical trial data by (i) pooling the data from the U.S. and Mexico prior to statistical analysis in contravention of basic statistical principals; (ii) improperly calculating p-values using the chi-squared analysis, as opposed to Fisher's Exact test; and (iii) failing to account for the multiple comparisons problem. *See* ¶¶68-90; *see also*, Bloch Decl. at 5-12. Each of these manipulations caused the p-values reported to appear lower (*i.e.*, more significant) than was supported by the data. Properly analyzed, none of the efficacy results at the primary efficacy endpoint, ACR20, were statistically significant. *Id.* at 12-13. The p-values at ACR20 were "much bigger" than reported.

154. Not disclosing the data on a per-country basis in the Registration Statement, defendants also concealed (i) the existence of a country interaction so substantial that the placebo in Mexico was more effective than any dose in the U.S. at ACR20; (ii) that the distribution of doses was not balanced across the U.S. and Mexico, and (iii) that the appearance of an ascending dose response was attributable to the uneven does distribution and the country interaction. *See* ¶¶82-90.

155. Defendants' statements in the Registration Statement about the safety results of the Phase IIa RA clinical trial in the offering document were also materially false and misleading because defendants knew but failed to disclose that (i) there was a dose-dependent increase in average systolic blood pressure of 3-5mm Hg in 100mg patients and 8-9mm Hg in the 150mg patients which increased both the clinical and regulatory risk; (ii) 5 patients (not 2, as reported on December 13, 2007) experienced hypertension, with blood pressure increases as high as 20-30mm Hg; (iii) hypertension, which was omitted from defendants list of common clinically meaningful

adverse events in the prospectus, was specifically admitted later as was one of the two most common clinically meaningful drug related adverse events; (iv) 9 patients (not 3, as reported on December 13, 2007) experienced increased liver enzymes compared to patients taking the placebo; (v) 20 patients (not 15, as reported on December 13, 2007) experienced neutropenia; (vi) 34 patients (not 15, as reported on December 13, 2007) experienced diarrhea; and (vii) 35 patients (not 15, as reported on December 13, 2007) experienced upper gastrointestinal side effects. *See* ¶¶91-119. The undisclosed adverse events were material as they signaled the strength of the side effects, presented complications for regulatory approval, impacted the need for and design of future studies and jeopardized Rigel's ability to obtain a partnership for the further development of R788 – *i.e.*, its investment thesis.

156. Defendants' omission of the dose-dependent increase in mean blood pressure was particularly egregious in light of the fact that defendants specifically told the market in the February 1, 2008 prospectus that: "***The most common clinically meaningful adverse events noted in the clinical trial were dose-related neutropenia, mild elevations of liver function tests and gastrointestinal side effects***." A statement made less than two months after defendant Grossbard acknowledged concerns regarding blood pressure increases and at a time when defendants had the data regarding the clinically significant dose dependent increase in average blood pressure. ¶¶59, 102, 114.

157. As reported in the Form 8-K filed with the SEC on February 14, 2008, the Rigel board of directors approved the bonuses awarded to Gower, Grossbard, Payan, Rodriguez and Maynard on February 11, 2008, just days after the Company raised $127.5 million that it needed to prevent Rigel from becoming insolvent in 2008. Rigel and the Officer Defendants knew at the time of the Offering that the safety and efficacy of R788 was critical to Rigel's success as well as their own compensation. ¶¶120-47.

158. Rigel paid the four Underwriter Defendants more than $7 million to underwrite the Offering which failed to require disclosure of the adverse information about the Phase IIa RA clinical trial. According to Rigel's January 31, 2008 press release, Credit Suisse was the sole book-runner for the Offering with Thomas Weisel, Jefferies and Oppenheimer, acting as co-managers.

According to the January 31, 2008 Underwriting Agreement between Rigel and the Underwriter Defendants, Rigel provided the Underwriter Defendants with a "General Disclosure Package" that included, among other things, a listing of the Company's clinical trials and "descriptions of the results of the studies, tests and trials."

**F.     February 11, 2008: Gower Makes Materially False and Misleading Statements about the Phase IIa RA Clinical Trial During the BIO CEO & Investor Conference**

159.     On February 11, 2008, at the BIO CEO & Investor Conference, defendant Gower made the following statements (false and misleading statements in bold and italics):

The Phase II study that we announced in December was a study on 190 patients, double-blind, placebo-controlled in 30 centers in the US and Mexico. ***We saw rather unprecedented numbers in terms of the ACR scoring. As you can see on the chart, significantly different as is noted by the stars in both the 100 milligram orally BID dose and 150 milligram orally BID dose across the board and all of ACR20, ACR50, ACR70 and DAS scoring. Rather spectacular numbers for the higher two dose groups specifically in the ACR50's and '70s where we got between 50 and 60% ACR50 response and over one-third ACR70's at 90 days*** which is relatively unprecedented in these kind of studies if you want to look at previous studies done in these same populations with the same protocol.

This was a very strict intense treat protocol.  And done using the same protocols that have been used for pretty much everything from Enbrel on forward, certainly the same protocols and the same, some of the same groups used in the studies done in the last few years with Rituxan and Orencia for approvals IL-6 and the JAK3's in terms of study.  So you can never compare studies directly one-to-one that aren't done in exactly the same time but these are using the same protocols and the same approach so they should be roughly comparable.

***The safety results were also good.  We did have two dose dependent toxicities that were noted.  One was neutropenia,*** which we've known from the animal studies on forward that we carry a certain amount of neutropenia along with the mechanism of this growth comes most likely from its ability to regulate adhesion molecules and the monocytes. And there you are seeing a dose dependent matter that increased from about slightly under 10% to just under 20% of between the higher two dose groups.

We had prespecified a protocol based dose reduction, which cut the dose in half for any patients that got a grade 2 neutropenia.  This is a neutrophil count of 1500.  We didn't see any grade 3 or grade 4 neutropenias in the study, and as many of you know those are the ones that are associated with infections.  But because this was an early study we wanted to be extra cautious and we cut the dose in half.  But when those patients hit a neutrophil count of 1500, all of those patients however did fine on the reduced dose.  Actually we got, if you look at those as a group although we didn't – this is not prespecified as a statistical endpoint, their ACR20 at 90 days was 82% and those that continued on the study with the dose reductions. So they did quite well and maintained the efficacy and the neutropenia has not recurred nor has anyone dropped off the study because of neutropenia.  But it is something which is not uncommon for this patient population.  As many of you know, RA patients are

predisposed to neutropenia. Methotrexate adds to it. Wheat appears added to that. That is something the rheumatologists have to watch but doesn't seem at this point to be something that is not manageable.

*The other thing that we saw that seems dose-related was lower GI disturbance*, also something fairly common in this disease. Methotrexate alone as you would notice in the placebo group, those were all methotrexate plus a dummy 788, has a number of patients that have lower GI symptoms. We had a modest number in the intermediate dose group, slightly higher number in the upper dose group. As with the neutropenia no patients found this uncomfortable enough to want to drop off the study. None were hospitalized. None had to be rehydrated. But certainly it is a tolerance issue. *Everything else that showed up is no different between the placebo group and the control group on the safety elements of the study. So, so far, so good*.

160. **Reasons why Gower knew his statements at the BIO CEO & Investor Conference were materially false and misleading:** As described in ¶¶68-90, Gower, knew that his presentation of, and statements about, the efficacy results of the Phase IIa RA clinical trial were materially false and misleading and that R788 had not demonstrated "unprecedented" or "significant[]" results or "Rather spectacular numbers" in the Phase IIa RA clinical trial. In fact, R788 showed statistically insignificant improvement over placebo in the Phase IIa RA clinical trial. Bloch Decl. at 5-12.

161. As discussed in ¶¶68-90, defendants manipulated the statistical analysis of the Phase IIa RA clinical trial data including by:

(a) **Improperly pooling the data from the U.S. and Mexico:** Basic statistical principals require (i) that the data for the U.S. and Mexico be analyzed separately, with the calculation of two p-values; and (ii) then combining the two p-values using Fisher's method to produce an overall p-value for the combined U.S. and Mexico data. Bloch Decl. at 5-9. Correcting solely for the improperly pooled data, the p-values for the 100mg and 150mg doses at ACR20 and ACR50 are all higher (*i.e.*, indicating less significance) than those falsely reported on December 13, 2007 and February 11, 2008, and R788 did not achieve statistically significant results at the primary efficacy endpoint, ACR20, for the 150mg dose. *Id.* at 9; *see* ¶¶75-77.

(b) **Improperly applying the chi-squared analysis:** In addition to pooling the data prior to analyzing it, defendants used the chi-squared analysis to calculate p-values. Because of the small sample size, the proper analysis required using Fisher's Exact test to obtain p-values,

CONSOLIDATED AMENDED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS - 3:09-cv-00546-JSW

- 52 -

which are all larger (*i.e.*, indicating less significance) than the p-values obtained by the chi-squared analysis. Bloch Decl. at 9. Correcting for the improper pooling of the data and applying Fisher's Exact test, the p-values for the 100mg and 150mg doses at ACR20, ACR50 and ACR70 are all substantially higher (*i.e.*, indicating less significance) than those falsely reported on December 13, 2007 and February 11, 2008; further R788 did not achieve statistically significant results at ACR20 for the 100mg or 150mg doses as defendants had claimed. *See* ¶¶78-79.

(c)     **Failing to account for the multiple comparisons problem:** Defendants made multiple pair-wise comparisons between groups – *i.e.*, 100mg versus placebo at ACR20, ACR50, ACR70 and DAS28 – which increased the likelihood that one comparison would be statistically significant by chance alone. Bloch Decl. at 11-12. Analyzed appropriately with Tukey's Studentized Range test on a per-country basis – the p-values at the primary efficacy endpoint, ACR20 for 100mg and 150mg were very large and not statistically significant. *See* ¶¶80-81.

162.    Thus, contrary to Gower's claims that R788 had demonstrated "unprecedented" or "significant[]" results or "Rather spectacular numbers" in the Phase IIa RA clinical trial, R788 had in fact failed to show statistically significant improvement over placebo.

163.    Moreover, by failing to disclose the data on a per-country basis on December 13, 2007 or in subsequent statements, defendants also concealed (i) the existence of a country interaction so substantial that the placebo in Mexico was more effective than any dose in the U.S. at ACR20 (¶¶69-70); (ii) that the dose distribution was not balanced across the U.S. and Mexico (¶¶69-70); and (iii) that the appearance of an ascending dose response was attributable to the uneven does distribution and the country interaction (¶¶69-70; 82-90).

164.    Further, Gower's statements about the safety results of the Phase IIa RA clinical study were materially false and his affirmative statement misleading, in particular his omission of hypertension as a dose-dependent side effect and his affirmative statement that safety results appeared "good." Gower knew but failed to disclose that (i) there was a dose-dependent increase in average systolic blood pressure of 3-5mm Hg in 100mg patients and 8-9mm Hg in the 150mg patients which increased both the clinical and regulatory risk; (ii) 5 patients (not 2, as reported on December 13, 2007) experienced hypertension, with blood pressure increases as high as 20-30mm

CONSOLIDATED AMENDED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES
LAWS - 3:09-cv-00546-JSW                                                                 - 53 -

Hg; (iii) hypertension was one of the two most common clinically meaningful drug related adverse events; (iv) 9 patients (not 3, as reported on December 13, 2007) experienced increased liver enzymes compared to patients taking the placebo; (v) 20 patients (not 15, as reported on December 13, 2007) experienced neutropenia; (vi) 34 patients (not 15, as reported on December 13, 2007) experienced diarrhea; and (vii) 35 patients (not 15, as reported on December 13, 2007) experienced upper gastrointestinal side effects. The undisclosed adverse events were material as they signaled the strength of the side effects, presented complications for regulatory approval, impacted the need for and design of future studies and jeopardized Rigel's ability to obtain a partnership for the further development of R788 – *i.e.*, its investment thesis. Gower knew that R788 was critical to Rigel's success and his own compensation. ¶¶120-47.

**G.    July 8, 2008: Rodriguez Makes Materially False and Misleading Statements About the Phase IIa RA Clinical Trial During the Collins Stewart 4th Annual Growth Conference**

165.    On July 8, 2008, at the Collins Stewart 4th Annual Growth Conference, defendant Rodriguez made the following statements (false statements in bold and italic):

Speaking of that, we last year started – reported a Phase II RA clinical trial. This is the data we reported in December of last year. This is a three-month study looking at R788 in patients with active RA all on a methotrexate background. It's a three-month study looking at those signs and symptoms.

***What we saw, and you see in this graph, is that we had some dramatic improvement in the signs and symptoms looking at ACR20, ACR50, and ACR70 at the 100 milligram and the 150 milligram dose groups.*** This is all b.i.d. The 50 looked pretty much like placebo. ***The others looked quite dramatic[]***.

In fact compared to other TNF agents or other products that are in the market now or in development now, this is in the higher range of those efficacy measures. So very dramatic improvement. We also saw a couple of things that we saw the benefit occur within the first two weeks of therapy. That is, even within the first week, we are able to see a dramatic improvement in signs and symptoms into the trial. That was sustained throughout the three months of the trial. So very nice results. Per the protocol, if we ran into any trouble with say neutropenia or elevated liver enzymes, the protocol required us to cut the dose in half. That is what occurred in a few cases.

***You see some of the safety background on these various doses in this chart. We had some cases of neutropenia, five in the 100 milligram and 10 in the 150 milligram dose groups that required the dose to be reduced.*** A few liver enzymes elevated in 150 milligram. I should note that all the patients that had their dosage reduced, about 18 of them, completed the trial and their ACR20 scores, 82% of them met their ACR20 scores. So they had a very nice benefit even though their dose was reduced.

CONSOLIDATED AMENDED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS - 3:09-cv-00546-JSW                                                                        - 54 -

So effectively, if you had a benefit it occurred early in the trial and then if you needed your dose reduced it didn't seem to undermine the benefit that you did receive. So we were very satisfied with this. *We had some GI side effects and they were somewhat random and transient, more in the 150 than the 100. A bit of hypertension here and there, but, basically, a fairly good safety profile.*

*The 100 milligram dose group had a very nice and profound efficacy result and a pretty good safety profile.* So that is going to be the lead dose that we go forward. However, the drug does have a very good PKA; we have about a 17-hour half-life. So we are going to try to push that a little bit and see if once a day works.

166. **Reasons why Rodriguez knew his statements at the Collins Stewart 4th Annual Growth Conference were materially false and misleading:** As described in ¶¶68-90, Rodriguez, knew that his presentation of, and statements about, the efficacy results of the Phase IIa RA clinical trial were materially false and misleading and that patients taking R788 had not shown "dramatic improvement" or that there was "profound efficacy" results in the Phase IIa RA clinical trial. In fact, R788 showed statistically insignificant improvement over placebo in the Phase IIa RA clinical trial. Bloch Decl. at 12-13.

167. As discussed in ¶¶68-90, defendants manipulated the statistical analysis of the Phase IIa RA clinical trial data by:

(a) **Improperly pooling the data from the U.S. and Mexico:** Basic statistical principals require that (i) the data for the U.S. and Mexico be analyzed separately, with the calculation of two p-values; and (iii) then in combining the two p-values using Fisher's method to produce an overall p-value for the combined U.S. and Mexico data. *Id.* at 5-9. Correcting solely for the improperly pooled data, the p-values for the 100mg and 150mg doses at ACR20 and ACR50 are all higher (*i.e.*, indicating less significance) than those falsely reported on December 13, 2007 and July 8, 2008 and R788 did not achieve statistically significant results at the primary efficacy endpoint, ACR20, for the 150mg dose. *See* ¶¶75-77.

(b) **Improperly applying the chi-squared analysis:** In addition to pooling the data prior to analyzing it, defendants used the chi-squared analysis to calculate p-values. Because of the small sample size, the proper analysis required using Fisher's Exact test to obtain p-values, which are all larger (*i.e.*, indicating less significance) than the p-values obtained by the chi-squared analysis. Bloch Decl. at 9-11. Correcting for the improper pooling of the data and applying Fisher's

Exact test, the p-values for the 100mg and 150mg doses at ACR20, ACR50 and ACR70 are all substantially higher (*i.e.*, indicating less significance) than those falsely reported on December 13, 2007 and July 8, 2008, and R788 did not achieve statistically significant results at ACR20 for the 100mg or 150mg doses as defendants had claimed. *See* ¶¶78-79.

(c) **Failing to account for the multiple comparisons problem:** Defendants made multiple pair-wise comparisons between groups – *i.e.*, 100mg versus placebo at ACR20, ACR50, ACR70 and DAS28 – which increased the likelihood that one comparison would be statistically significant by chance alone. Bloch Decl. at 11-12. Analyzed appropriately with Tukey's Studentized Range test on a per-country basis – the p-values at the primary efficacy endpoint, ACR20 for 100mg and 150mg were very large and not statistically significant. *Id.* at 11-13. *See* ¶¶80-81. Thus, the 100 mg dose group did not have a "very nice and profound efficacy result" or demonstrate "dramatic improvement."

168. Further, by failing to disclose the data on a per-country basis on December 13, 2007, or in subsequent statements, defendants also concealed (i) the existence of a country interaction so substantial that the placebo in Mexico was more effective than any dose in the U.S. at ACR20 (¶¶69-70); (ii) that the dose distribution was not balanced across the U.S. and Mexico (¶¶69-70); and (iii) that the appearance of an ascending dose response was attributable to the uneven does distribution and the country interaction (¶¶69-70; 82-90).

169. Rodriguez's July 8, 2008 statements about the safety results of the Phase IIa RA clinical trial were also materially false and misleading. In particular he deliberately down played the adverse hypertension results: "A of bit hypertension here and there, but, basically a fairly good safety profile." Rodriguez knew but failed to disclose that (i) there was a dose-dependent increase in average systolic blood pressure of 3-5mm Hg in 100mg patients and 8-9mm Hg in the 150mg patients which increased both the clinical and regulatory risk; (ii) 5 patients (not 2, as reported on December 13, 2007) experienced hypertension, with blood pressure increases as high as 20-30mm Hg; (iii) hypertension was one of the two most common clinically meaningful drug related adverse events; (iv) 9 patients (not 3, as reported on December 13, 2007) experienced increased liver enzymes compared to patients taking the placebo; (v) 20 patients (not 15, as reported on December

13, 2007) experienced neutropenia; (vi) 34 patients (not 15, as reported on December 13, 2007) experienced diarrhea; and (vii) 35 patients (not 15, as reported on December 13, 2007) experienced upper gastrointestinal side effects. Thus, R788 did not have a "pretty good safety profile" as Rodriguez touted to investors. The undisclosed adverse events were material as they signaled the strength of the side effects, presented complications for regulatory approval, impacted the need for and design of future studies and jeopardized Rigel's ability to obtain a partnership for the further development of R788 – *i.e.*, its investment thesis. Rodriguez knew that R788 was critical to Rigel's success and his own compensation. ¶¶120-47.

**H.     October 27, 2008: Rigel's Stock Price Declines Substantially After It Begins to Reveal Previously Concealed Adverse Information About the Phase IIa RA Clinical Trial and Its Impact on the Company's Condition; Defendants Continue to Mislead Investors About the Prospectus for a Partner**

170.    On October 27, 2008, the Company presented additional results of the Phase IIa RA clinical trial at the ACR meeting and during a conference call that was attended by Gower, Grossbard, Payan, Rodriguez and Maynard. The Company disclosed the differing response rates between patients in the U.S. and Mexico and additional adverse safety data regarding R788's effect on blood pressure, liver enzymes, neutropenia, diarrhea and gastrointestinal side effects.

171.    In response to this previously undisclosed negative information, the price of the Company's stock declined 38% from $14.41 on October 24, 2008 to $8.84 on October 27, 2008. Analysts following the Company issued reports in which they wrote that the previously undisclosed negative information raised questions about the efficacy and safety of the drug and caused the stock price to plummet.

172.    In an October 28, 2008 report, RBC analyst Jason Kantor downgraded the stock due to "heightened safety concerns for R788," and noted that (i) the impact of the Mexican data may have overstated the dose response; (ii) the previously undisclosed increase in blood pressure was viewed as a "potentially significant concern" to independent physicians attending the October 27, 2008 ACR conference; and (iii) the new negative information caused one pharmaceutical company to walk away from a potential partnership with Rigel. ¶¶72, 102.

173. Similar reports were issued by SIG analyst Jellinek, Oppenheimer analyst Abrahams, Jefferies analyst Walsh, Merrill Lynch analyst Andrew Berens and Credit Suisse analyst Aberman. Credit Suisse analyst Aberman reported that Rigel had presented the differences in efficacy in Mexico versus the U.S. for the first time and that it was a particular concern because the ratio of Mexican patients to U.S. patients was higher in the higher dosing groups which could skew the data in favor of R788 (which in fact it did). ¶73. He also reported that the magnitude of the increase in blood pressure was disclosed for the first time and that there was no question the increase in blood pressure was one of the risks of the program. Aberman wrote that it was an issue because of the FDA's increased scrutiny over cardiac toxicity and the well known association of elevated blood pressure with cardiac events. He also wrote that one investigator suggested that the elevated blood pressure would be a show stopper clinically.

174. Merrill Lynch analyst Andrew Berens reported that the detailed presentation revealed dose-related blood pressure increase with R788, an imbalance in response rates noted at the Mexico trial sites, and more granularity on elevated liver enzymes noted with R788, which were likely to increase regulatory risk for the drug and which could delay a partnership with a large pharmaceutical/biotech company.

175. On November 3, 2008, Rigel reported its financial results for the quarter ending September 30, 2008. The Company also held its first ever earnings conference call but the focus of the call was the toxicity concerns with R788 following the ACR presentation. Analysts following the Company asked numerous questions about the increase in blood pressure and then issued reports. Credit Suisse analyst Aberman issued a report on November 3, 2008 in which he wrote that "[b]ased on the questions on the call, investors clearly remain wary over the toxicity profile of R788 and we think this may not wane until (1) a commercial partnership is signed in 1H09, and/or (2) Phase IIb data are released in 3Q09." He also wrote that "There is no question that the elevated blood pressure seen in the Phase IIa is a risk for the long term prospects of R788."

176. While defendants disclosed the per-country data and additional adverse safety results on October 27, 2008, defendants continued to mislead investors by falsely assuring them that Rigel

was "still on track" for putting a partnership in place in the early part of 2009 (false and misleading statements are in bold and italic):

> [Gower:] *[S]till on track for what we've been saying all along, which is putting the partnership in place as early as the early part of next year.* I doubt it will be this year. It's certainly not in our control that it would be. But we need to get the partnership put in place, ideally a few months before we go to the end-of-Phase 2b meeting and start the Phase 3s, which starts in the second half of next year.

177. On November 3, 2008, defendants also falsely stated:

> [Gower:] We remain committed to doing everything possible to develop and commercialize R788 in RA. *We expect to establish a collaboration partnership to further these ends, and that in fact is going quite well*.

178. In fact, Rigel and the Officer Defendants knew that the Phase IIa RA clinical trial results had derailed the Company's partnership prospects. Defendants admitted on the October 27, 2008 conference call that Rigel's potential partners had the underlying data related to the trial. Defendants knew that the data would inform potential partners that R788, based on the Phase IIa RA clinical trial, did not demonstrate statistically significant results at the primary efficacy endpoint. ¶¶68-90. Any potential partner of Rigel's, before making a substantial financial commitment (*i.e.*, in excess of $100 million), would want demonstrated efficacy and would perform its own due diligence with respect to the data. Thus, Rigel was not on track for partnership because it had demonstrated statistically significant results at the primary efficacy endpoint to its potential partners.

179. The R788 per-country and additional safety data was made available to the investors on October 27, 2008, alerting the investment community to efficacy concerns and increased toxicity results. Subsequently an *Arthritis and Rheumatism* article entitled "Treatment of Rheumatoid Arthritis With a Syk Kinase Inhibitor: A Twelve-Week, Randomized, Placebo-Controlled Trial," Vol. 58, No. 11, was published in November 2008. The article contained the same improper conclusions that R788 was effective made by defendants throughout the Class Period, as well as inaccurately claiming that R788 showed statistically significant changes in certain biomarkers, IL-6 and MMP-3, which are thought to be associated with joint damage progression. Bloch Decl. at 13-18. The Phase IIa RA clinical trial was less robust than the article claimed, certain secondary efficacy endpoints (including DAS28 response rates and the IL-6 and MMP-3 biomarkers) were skewed in R788's favor and did not exhibit statistically significant results, as claimed. *Id.* All

conclusions that Rigel's potential partners likely had already drawn from the data in the course of their due diligence.

### I. February 3, 2009: Rigel Stock Price Declines Significantly After It Reveals a Delay in Partnership Discussions Regarding R788

180. On February 3, 2009, Rigel finally announced, what defendants already knew internally, that it would delay partnership discussions regarding R788 until after results from its Phase IIb clinical studies were available and that the Company laid off 36 employees, or 20% of its workforce. The price of the Company's stock declined 9.3%, from $7.17 on February 2, 2009 to $6.50 on February 3, 2009, compared to a 1.8% *increase* in the peer group and a 1.5% *increase* in the NASDAQ.

## V. LOSS CAUSATION

181. The false and misleading statements and omissions caused and maintained the artificial inflation in Rigel's stock price throughout the Class Period. During the Class Period, defendants made materially false and misleading statements about the Phase IIa RA clinical trial, failed to disclose adverse data related to the clinical trial and the effect of the clinical trial on its prospect for a partner.

182. The false and misleading statements and omissions caused Rigel's stock to trade at artificially inflated prices. After the Company reported the false and misleading results of the Phase IIa RA clinical trial on December 13, 2007, Rigel stock price more than tripled, from $8 per share on December 12, 2007 to $25.95 per share on December 13, 2007, compared to a 0.9% *decline* in the peer group and a 0.1% *decline* in the NASDAQ. The stock continued to trade at artificially inflated prices, which allowed the Company to issue 5 million shares for $27 per share in February 2008.

183. Rigel made two partial disclosures on October 27, 2008 and February 3, 2009 that disclosed some of the previously concealed problems and some of the impact those problems were having on Rigel's financial condition and would have on the Company's future results. The partial disclosures caused Rigel's stock price to decline significantly more than the changes in the peer group and the NASDAQ. As a result, the price declines following the partial disclosures provide a measurement of class members' economic losses. Indeed, investors were alerted to the fact that the

defendants may have previously overstated the efficacy results in Phase IIa RA clinical trial and that there were additional toxicity results, including a dose dependent increase in blood pressure.

184. On October 27, 2008, Rigel disclosed additional results of the Phase IIa RA clinical trial, including the data on a per-country basis, which revealed that the prior representations of the safety and efficacy results of the Phase IIa RA clinical trial were materially false and misleading including (i) the existence of a country interaction so substantial that the placebo was more effective than any dose in the U.S. at ACR20; (ii) that the distribution of doses was not balanced across the U.S. and Mexico; and (iii) that the efficacy results may have been overstated based on the country interaction. Defendants also revealed additional safety results of the Phase IIa RA clinical trial including that (i) there was a dose-dependent increase in average systolic blood pressure of 3-5mm Hg in 100mg patients and 8-9mm Hg in the 150mg patients which increased both the clinical and regulatory risk; (ii) 5 patients (not 2, as reported on December 13, 2007) experienced hypertension, with blood pressure increases as high as 20-30mm Hg; (iii) 9 patients (not 3, as reported on December 13, 2007) experienced increased liver enzymes compared to patients taking the placebo; (iv) 20 patients (not 15, as reported on December 13, 2007) experienced neutropenia; (v) 34 patients (not 15, as reported on December 13, 2007) experienced diarrhea; and (vi) 35 patients (not 15, as reported on December 13, 2007) experienced upper gastrointestinal side effects.

185. On this news, Rigel's stock dropped 38.7% from the previous day's closing price of $14.41, to $8.84. By comparison, the peer group declined 5.3% and the NASDAQ declined 3%. Thus, some of the inflation of Rigel's stock price was removed upon the negative disclosures, causing economic loss (damages) to investors.

186. However, the Company's stock price remained artificially inflated because Rigel did not reveal the full extent of the Phase IIa RA clinical trial results on the Company's ability to partner with a pharmaceutical company for the continued development of R788. In fact, during the October 27, 2008 and November 3, 2008 conference calls, Gower assured investors that Rigel was still on track for putting a partnership in place in the early part of 2009 and the establishment of a partnership was "going quite well."

187. On February 3, 2009, however, Rigel disclosed that it would delay partnership discussions regarding R788 until after results from its Phase IIb clinical studies were available and that the Company laid off 36 employees, or 20% of its workforce. The price of the Company's stock declined 9.3%, from $7.17 on February 2, 2009 to $6.50 on February 3, 2009, compared to a 1.8% increase in the peer group and a 1.5% increase in the NASDAQ.

188. The declines in Rigel's stock price as the negative news was incrementally disclosed, revealing that the Company's condition was not as previously reported, were directly related to defendants' prior misrepresentations and omissions. Each partial disclosure of adverse facts that removed inflation from Rigel's stock price (thereby causing damages) was directly related to the false statements and omissions about the Phase IIa RA clinical trial and their impact on the Company's financial condition and future prospects.

189. The declines in Rigel's stock price following the partial disclosures compared to the changes in the peer group and NASDAQ negate any inference that the losses suffered by class members were caused by changed market or industry conditions or Company-specific facts unrelated to the fraudulent conduct. The following chart (which is also attached hereto) illustrates the changes in Rigel's stock price during the Class Period compared to the peer group and the NASDAQ:

CONSOLIDATED AMENDED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS - 3:09-cv-00546-JSW

- 62 -



## VI. FEBRUARY 2008 OFFERING: VIOLATIONS OF THE 1933 ACT

190. On or about January 24, 2008, Rigel filed with the SEC a Form S-3ASR Registration Statement and Form 424B3 Prospectus with the SEC for the Offering. The Form S-3ASR Registration Statement was signed by Gower, Maynard, Payan, DeLeage, Goodwin, Lyons, Moos, Renton, Ringrose and Sherwin. On February 1, 2008, Rigel filed with the SEC a Form 424B5 Prospectus for the Offering. In connection with the Offering the Underwriter Defendants drafted and disseminated the Registration Statement.

191. The Registration Statement contained untrue statements of material fact or omitted to state other facts necessary to make the statements made therein not misleading and was not prepared in accordance with applicable SEC rules and regulations. Specifically, the Registration Statement provided "the following documents filed with the SEC are incorporated by reference . . . . Our current report on Form 8-K, filed with the SEC on December 13, 2007." The Form 8-K Rigel filed

with the SEC on December 13, 2007 included false statements in the December 13, 2007 press release quoted above at ¶60.

192. For purposes of the 1933 Act claims, plaintiff alleges that defendants made false and misleading representations in the December 13, 2007 press release, part of the Registration Statement. The false statements in the December 13, 2007 press release are quoted in ¶60 and are summarized as follows:

- The p-values provided in the December 13, 2007 press release – i.e. "(p=.008)," "(p=.002)" and "(p<.001)" [as depicted in the table "Efficacy Results."]

- "Rigel's R788 Demonstrates Significant Improvement in Rheumatoid Arthritis in Phase IIa Clinical Study; Achieves Statistically Significant ACR20, ACR50 & ACR70 Results."

- "Rigel Pharmaceuticals, Inc. . . . today announced that its oral syk kinase inhibitor, R788 (*tamatinib fosdium*), has demonstrated statistically significant results in treating Rheumatoid Arthritis (RA) patients in a recently completed Phase 2 clinical trial."

- "We believe that the significant ACR scores and good tolerability observed in this clinical trial, and the further benefit of oral delivery may make R788 a favorable alternative to the currently marketed biological agents."

- "This clinical study has shown that R788 treatment can achieve impressive ACR response rates, . . . In this clinical trial both the 100mg and 150mg doses improved arthritis symptoms and did so quickly."

- "These very important clinical trial results are a major milestone for Rigel as we establish the potential of R788 in RA and its value as an alternative to current therapies." "The most common clinically meaningful adverse events noted in the clinical trial were dose-related neutropenia, mild elevations of liver function tests, and gastrointestinal (GI) side effects."

- The number of patients who experienced hypertension, increased liver enzymes, neutropenia, diarrhea, and upper gastrointestinal side effects [as depicted in the table of "Safety Results."]

193. The Form 424B5 Prospectus contained the following additional false and misleading statements:

We recently completed a Phase 2, multicenter, ascending dose, randomized, double-blind, placebo-controlled, dose-ranging study evaluating three doses of R788 over a 12-week period in RA patients. All of these patients continued to receive their same previously scheduled dose of methotrexate. *In this clinical trial, R788 demonstrated statistically significant efficacy results in treating RA patients at two dose levels*. Efficacy assessments for each participant were based on the American College of Rheumatology criteria which denote a 20% (ACR 20) improvement, at least a 50% (ACR 50) improvement, or at least a 70% (ACR 70) improvement from the baseline assessment at the end of the 12-week treatment period. *Groups treated with R788 at 100mg and 150mg po bid (orally, twice daily) showed higher ACR20,*

*ACR50, ACR70 and DAS28 response rates than the placebo group.  The most common clinically meaningful adverse events noted in the clinical trial were dose-related neutropenia, mild elevations of liver function tests and gastrointestinal side effects.*  Dose reduction (to one-half the assigned dose by taking the drug once per day) was pre-specified in the protocol and contingent on neutrophil counts and/or liver function tests.  Notably, a vast majority of the patients who had their dose reduced successfully completed the clinical trial with minimal safety issues.  We expect to initiate a Phase 2b clinical trial evaluating dosing and x-rays of bones over a 24-week period.  We also expect to initiate a second Phase 2b clinical trial treating a sub-population of RA patients with R788 by the end of the first half of 2008.

194.    On February 6, 2008, at least 5 million shares of Rigel stock were sold to the public at $27.00 per share, raising $135 million.

195.    Inter-Local Pension Fund GCC/IBT acquired the common stock of Rigel pursuant or traceable to the Offering.

196.    **Reasons why the Registration Statement contained untrue statements of material fact or omissions:** The presentation of, and the statements about, the efficacy results of the Phase IIa RA clinical trial in the Registration Statement were materially false and misleading.  Contrary to the representations in the Registration Statement, R788 did not achieve statistically significant efficacy results at the primary efficacy endpoint, ACR20, for any dose.  Bloch Decl. 12-13.  Further, the p-values given in the Registration Statement were false (*i.e.*, show greater statistical significance than the results support) because they were not computed using basic principals of statistics.  *Id.* at 5-13.

197.    The Phase IIa RA clinical trial data presented in the Registration Statement was also false for the following reasons:

(a)    **The statements of efficacy in the Registration Statement were based upon improperly pooled data**.  Basic statistical principals requires that the data for the U.S. and Mexico be analyzed separately and that two p-values be calculated.  These p-values are to then be combined using Fisher's method to produce an overall p-value for the pooled U.S. and Mexico data.  *Id.* at 5-6.  Application of this basic statistical principal (but not correcting for the improper chi-squared test or multiple comparison problem, described below) renders the p-values for the 100mg and 150mg doses at ACR20 and ACR50 all higher (i.e., indicating less significance) than those falsely reported

CONSOLIDATED AMENDED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS - 3:09-cv-00546-JSW

in the Registration Statement and further establishes that *R788 did not achieve statistically significant results at the primary efficacy endpoint, ACR20, for the 150mg dose*. *Id.* at 7-9.

(b) **Application of the chi-squared analysis produced false results**. In addition to pooling the data prior to analyzing it, defendants used the chi-squared method to obtain p-values reported in the Registration Statement. Because of the small sample size, the proper analysis required using Fisher's Exact test, which when applied, yielded p-values that were all larger (*i.e.*, indicating less significance) than the p-values obtained by the chi-squared analysis. Bloch Decl. at 9-11. Application of Fisher's Exact test on a per-country basis (but not correcting for the multiple comparisons problem), yields p-values for the 100mg and 150mg doses at ACR20, ACR50 and ACR70 that are all substantially higher (i.e., indicating less significance) than those falsely reported in the Registration Statement and further establishes that *R788 did not achieve statistically significant results at ACR20 for the 100mg or 150mg doses*. *Id.*

(c) **The efficacy results in the Registration Statement did not account for the multiple comparisons problem rendering the results false and misleading**. The Phase IIa RA clinical trial made multiple pair-wise comparisons between groups – *i.e.*, 100mg versus placebo at ACR20, ACR50, ACR70 and DAS28 – which increased the likelihood that one comparison would be statistically significant by chance alone. Under this situation, multiple pair-wise comparisons must be accounted for (and were not in the Registration Statement). Bloch Decl. at 11-12. Tukey's Studentized Range test properly accounts for the multiple pair-wise comparisons performed in the Phase IIa RA clinical trial. Applying Tukey's Studentized Range test on a per-country basis results in *p-values at the primary efficacy endpoint, ACR20, for 100mg and 150mg that are very large and not statistically significant as falsely reported in the Registration Statement.* *Id.* at 11-12.

198. Thus, the efficacy results were falsely reported by defendants in the Registration Statement. Further, the Registration Statement omitted the per-country data (*i.e.*, Mexico and the U.S.) which concealed the following adverse material information (i) the existence of a country interaction so substantial that the placebo in Mexico was more effective than any dose in the U.S. at ACR20 (¶70); (ii) that the dose distribution was not balanced across the U.S. and Mexico (*Id.*); and

CONSOLIDATED AMENDED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS - 3:09-cv-00546-JSW
- 66 -

(iii) that the appearance of an ascending dose response was attributable to the uneven does distribution and the country interaction (¶¶85-89).

199. The statements about the safety results of the Phase IIa RA clinical study in the Registration Statement were also materially false and misleading because defendants failed to disclose that (i) there was a dose-dependent increase in average systolic blood pressure of 3-5mm Hg in 100mg patients and 8-9mm Hg in the 150mg patients which increased both the clinical and regulatory risk; (ii) 5 patients (not 2, as reported on December 13, 2007) experienced hypertension, with blood pressure increases as high as 20-30mm Hg; (iii) hypertension was one of the two most common clinically meaningful drug related adverse events; (iv) 9 patients (not 3, as reported on December 13, 2007) experienced increased liver enzymes compared to patients taking the placebo; (v) 20 patients (not 15, as reported on December 13, 2007) experienced neutropenia; (vi) 34 patients (not 15, as reported on December 13, 2007) experienced diarrhea; and (vii) 35 patients (not 15, as reported on December 13, 2007) experienced upper gastrointestinal side effects. The undisclosed adverse events were material as they signaled the strength of the side effects, presented complications for regulatory approval, impacted the need for and design of future studies and jeopardized Rigel's ability to obtain a partnership for the further development of R788 – *i.e.*, its investment thesis.

200. Rigel and the Individual Defendants were responsible for the contents and dissemination of the Registration Statement. Rigel, Gower, Maynard, Payan, Deleage, Lyons, Moos, Renton, Ringrose and Sherwin signed or authorized the signing of the Registration Statement. None of these defendants made a reasonable investigation or possessed reasonable grounds for the belief that the statements contained in the Registration Statement were true and without omissions of any material facts and were not misleading.

201. The four Underwriter Defendants that were paid more than $7 million to underwrite the Offering failed to require disclosure of the adverse information about the Phase IIa RA clinical trial. According to Rigel's January 31, 2008 press release, Credit Suisse was the sole book-runner for the Offering with Thomas Weisel, Jefferies and Oppenheimer, acting as co-managers. According to the January 31, 2008 Underwriting Agreement between Rigel and the Underwriter Defendants,

Rigel provided the Underwriter Defendants with a "General Disclosure Package" that included, among other things, a listing of the Company's clinical trials and "descriptions of the results of the studies, tests and trials."

202. Public investors relied on the Underwriter Defendants to conduct a reasonable investigation and to obtain and verify the information contained in the Registration Statement and to make sure essential facts about the Company were disclosed. Indeed, the Underwriter Defendants had access to the adverse information at a critical time in Rigel's corporate life – when it was seeking to raise capital. The Underwriter Defendants failed to conduct a reasonable investigation and independently verify the representations in the Registration Statement. The Underwriter Defendants failed to meet their "gatekeeper" function of protecting investors.

203. The Underwriter Defendants purchased the 5 million shares for $25.5825 and sold the shares to the public for $27 per share. As a result, the Underwriter Defendants received $7,087,500 from the Offering.

## VII. CLASS ACTION ALLEGATIONS AND FRAUD-ON-THE-MARKET PRESUMPTION OF RELIANCE

204. Plaintiff brings this action as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure on behalf of all persons who purchased Rigel securities during the Class Period, including persons who acquired the common stock of Rigel pursuant and/or traceable to the false and misleading Registration Statement, and were damaged thereby (the "Class"). Excluded from the Class are defendants, directors and officers of Rigel and their families and affiliates.

205. The members of the Class are so numerous that joinder of all members is impracticable. During the Class Period, there were approximately 31 million to 36.7 million outstanding shares owned by hundreds, if not thousands, of persons. Thus, the disposition of their claims in a class action will provide substantial benefits to the parties and the Court.

206. There is a well-defined community of interest in the questions of law and fact involved in this case. Questions of law and fact common to the members of the Class that predominate over questions which may affect individual Class members include:

      (a)     Whether the 1933 and 1934 Acts were violated by defendants;

(b)    Whether defendants engaged in a fraudulent scheme and omitted and/or misrepresented material facts;

(c)    Whether defendants' statements omitted material facts necessary to make the statements made, in light of the circumstances under which they were made, not misleading;

(d)    Whether defendants knew or recklessly disregarded that their statements were materially false and misleading;

(e)    Whether the prices of Rigel securities were artificially inflated;

(f)    Whether defendants' fraudulent scheme, misrepresentations and omissions caused Class members to suffer economic losses, *i.e.*, damages; and

(g)    The extent of damage sustained by Class members and the appropriate measure of damages.

207.   Plaintiff's claims are typical of those of the Class because plaintiff and the Class purchased Rigel common stock during the Class Period and sustained damages from defendants' wrongful conduct.  Plaintiff will adequately protect the interests of the Class and has retained counsel who are experienced in class action securities litigation.  Plaintiff has no interests that conflict with those of the Class.

208.   A class action is superior to other available methods for the fair and efficient adjudication of this controversy.  A class action will achieve economies of time, effort and expense and provide uniformity of decision to the similarly situated members of the Class without sacrificing procedural fairness or bringing about other undesirable results.  Class members have not indicated an interest in prosecuting separate actions as none have been filed.  The number of Class members and the relatively small amounts at stake for individual Class members make separate suits impracticable.  No difficulties are likely to be encountered in the management of this action as a class action.

209.   In addition, a class action is superior to other methods of fairly and efficiently adjudicating this controversy because the questions of law and fact common to the Class predominate over any questions affecting only individual Class members. Although individual Class members have suffered disparate damages, the fraudulent scheme and the misrepresentations and

omissions causing damages are common to all Class members. Further, there are no individual issues of reliance that could make this action unsuited for treatment as a class action because all Class members relied on the integrity of the market and are entitled to the fraud-on-the-market presumption of reliance.

210. The market for Rigel's common stock was open, well developed and efficient at all relevant times. Rigel's stock met the requirements for listing, and was listed and actively traded, on the NASDAQ, a highly efficient and automated market. As a regulated issuer, Rigel filed periodic public reports with the SEC. Rigel regularly communicated with public investors via established market communication mechanisms, including through regular disseminations of press releases on the national circuits of major newswire services and through other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services.

211. As alleged herein, the change in the price of Rigel's stock – compared to the changes in the peer group and NASDAQ – in response to the release of unexpected material positive and negative information about the Company shows there was a cause-and-effect relationship between the public release of the unexpected information about Rigel and the price movement in the Company's stock. The average weekly trading volume of Rigel's stock during the Class Period was approximately 4.25 million shares, or 11.6% of total outstanding shares. Numerous analysts followed Rigel, attended the Company's conference calls and issued reports throughout the Class Period. The Company was eligible to register and did register securities on Form S-3 during the Class Period.

212. As a result of the foregoing, the market for Rigel common stock promptly digested current information regarding Rigel from all publicly available sources and reflected such information in the Company's stock price. Under these circumstances, all purchasers of Rigel common stock during the Class Period suffered similar injury through their purchases of Rigel common stock at artificially inflated prices and the subsequent revelations concerning declines in price, and a presumption of reliance applies.

## VIII.  NO SAFE HARBOR

213.  Rigel's verbal "Safe Harbor" warnings accompanying its oral forward-looking statements issued during the Class Period were ineffective to shield those statements from liability.

214.  Defendants are also liable for any false or misleading forward-looking statements pled because, at the time each forward-looking statements was made, the speaker knew the forward-looking statements was false or misleading and the forward-looking statements was authorized and/or approved by an executive officer of Rigel who knew that the forward-looking statements was false.  None of the historic or present tense statements made by defendants was an assumption underlying or relating to any plan, projection or statement of future economic performance, as they were not stated to be such assumptions underlying or relating to any projection or statement of future economic performance when made, nor were any of the projections or forecasts made by defendants expressly related to or stated to be dependent on those historic or present tense statements when made.

**COUNT I**

**For Violations of Section 10(b) of the 1934 Act and Rule 10b-5**
**Against Defendants Rigel, Gower, Maynard, Payan, Grossbard and Rodriguez**

215.  Plaintiff incorporates ¶¶1-189; 204-14 by reference.

216.  During the Class Period, defendants named in this Count disseminated or approved the false statements specified above, which they knew or recklessly disregarded were misleading in that they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

217.  These defendants violated §10(b) of the 1934 Act and Rule 10b-5 in that they:

(a)  Employed devices, schemes, and artifices to defraud;

(b)  Made untrue statements of material facts or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or

(c)    Engaged in acts, practices, and a course of business that operated as a fraud or deceit upon plaintiff and others similarly situated in connection with their purchases of Rigel securities during the Class Period.

218.   Plaintiff and the Class have suffered damages in that, in reliance on the integrity of the market, they paid artificially inflated prices for Rigel securities. Plaintiff and the Class would not have purchased Rigel securities at the prices they paid, or at all, if they had been aware that the market prices had been artificially and falsely inflated by defendants' misleading statements.

219.   As a direct and proximate result of these defendants' wrongful conduct, plaintiff and the other members of the Class suffered damages in connection with their purchases of Rigel securities during the Class Period.

## COUNT II

**For Violations of Section 20(a) of the 1934 Act**
**Against Defendants Rigel, Gower, Maynard,**
**Payan, Grossbard and Rodriguez**

220.   Plaintiff incorporates ¶¶1-189; 204-19 by reference.

221.   Gower, Maynard, Payan, Grossbard and Rodriguez acted as controlling persons of Rigel within the meaning of §20 of the 1934 Act. By virtue of their positions and their power to control public statements about Rigel, Gower, Maynard, Payan, Grossbard and Rodriguez had the power and ability to control the actions of Rigel and its employees. Rigel controlled Gower, Maynard, Payan, Grossbard and Rodriguez and its other officers and employees. By reason of such conduct, defendants are liable pursuant to §20(a) of the 1934 Act.

## COUNT III

**For Violations of Section 11 of the 1933 Act**
**Against All Defendants, Except Grossbard and Rodriguez**

222.   Plaintiff incorporates ¶¶1-4; 7-8; 15; 23-48, 190-203 by reference.

223.   This Count is brought pursuant to §11 of the 1933 Act, 15 U.S.C. §77k, on behalf of the Class, against all defendants except Grossbard and Rodriguez. For purposes of this Count, plaintiff expressly excludes and disclaims any allegation that could be construed as alleging fraud or intentional or reckless misconduct, as this Court is based solely on claims of strict liability and/or

negligence under the 1933 Act. Plaintiff does not repeat or reallege any paragraph that alleges defendants' misconduct was done intentionally, knowingly or with a reckless disregard or otherwise sounds in fraud.

224. The Registration Statement was false and misleading, contained untrue statements of material facts, omitted to state other facts necessary to make the statements made not misleading, and omitted to state material facts required to be stated therein.

225. Rigel is the registrant for the Offering. As issuer of the shares, Rigel is strictly liable to plaintiff and the Class for the misstatements and omissions.

226. The Individual Defendants named herein were responsible for the contents and dissemination of the Registration Statement. Each of the Individual Defendants named in this Count signed or authorized the signing of the Registration Statement. None of the defendants named herein made a reasonable investigation or possessed reasonable grounds for the belief that the statements contained in the Registration Statement were true and without omissions of any material facts and were not misleading.

227. Defendants issued and disseminated, caused to be issued and disseminated, and participated in the issuance and dissemination of materially false and misleading written statements to the investing public that were contained in the February 2008 Offering, which misrepresented or failed to disclose the facts set forth above. By reason of the conduct alleged herein, each of the defendants violated §11 of the 1933 Act, employed a person who violated §11 of the 1933 Act and/or controlled a person who violated §11 of the 1933 Act.

228. Plaintiff acquired Rigel shares pursuant and/or traceable to the Registration Statement for the Offering.

229. Plaintiff and the Class have sustained damages. As a direct and proximate result of the acts and omissions of the defendants, in violation of the 1933 Act, the market price of Rigel common stock was artificially inflated, and plaintiffs and the Class suffered substantial damages in connection with their purchases of Rigel common stock pursuant to the February 2008 Offering.

230. At the times plaintiff purchased or otherwise acquired Rigel common stock, they and the other members of the class were without knowledge of the facts concerning the wrongful conduct

479520_1

CONSOLIDATED AMENDED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS - 3:09-cv-00546-JSW

alleged herein and could not have reasonably discovered those facts prior to October 27, 2008. Less than one year has elapsed from the time when plaintiff discovered or reasonably could have discovered the facts upon which this action is based to the time that they filed this action. Less than three years have elapsed from the time that the securities upon which this claim for relief is brought were bona fide offered to the public and this action was filed.

## COUNT IV

### For Violations of Section 12(a)(2) of the 1933 Act
### Against All Defendants, Except Grossbard and Rodriguez

231. Plaintiff repeats and realleges the allegations set forth above in Count III, only ¶¶1-4; 7-8; 15; 23-48; 190-203; 222-30. For purposes of this Count, plaintiff expressly excludes and disclaims any allegation that could be construed as alleging fraud or intentional or reckless misconduct, as this Count is based solely on claims of strict liability and/or negligence under the 1933 Act.

232. By means of the defective Prospectus, defendants named in this Count assisted in the sale of shares of the Company's securities to plaintiff and other members of the Class.

233. The Prospectus contained untrue statements of material fact, and concealed and failed to disclose material facts, as detailed above. Defendants owed plaintiff and the other members of the Class who purchased Rigel securities pursuant to the Prospectus the duty to make a reasonable and diligent investigation of the statements contained in the Prospectus to ensure that such statements were true and that there was no omission to state a material fact required to be stated in order to make the statements contained therein not misleading. These defendants, in the exercise of reasonable care, should have known of the misstatements and omissions contained in the Prospectus as set forth above.

234. Plaintiff did not know, nor in the exercise of reasonable diligence could have known, of the untruths and omissions contained in the Prospectus at the time it acquired the Company's securities.

235. By reason of the conduct alleged herein, defendants violated §12(a)(2) of the 1933 Act. As a direct and proximate result of such violations, plaintiff and the other members of the Class

who purchased Rigel common stock pursuant to the Prospectus sustained substantial damages in connection with their purchases of Rigel stock. Accordingly, plaintiff and the other members of the Class who hold such stock have the right to rescind and recover the consideration paid for their shares, and hereby tender their shares to the defendants sued herein. Class members who have sold their shares seek damages to the extent permitted by law.

**COUNT V**

**For Violations of Section 15 of the 1933 Act**
**Against the Individual Defendants, Except Grossbard and Rodriguez**

236. Plaintiff repeats and realleges each and every allegation contained in Count III and IV only ¶¶1-4; 7-8; 15; 23-48; 190-203; 222-35.

237. This Count is brought pursuant to §15 of the 1933 Act against the Individual Defendants, except Grossbard and Rodriguez.

238. Each of the Individual Defendants named in this Count was a control person of Rigel by virtue of his position as a director and/or senior officer of Rigel which allowed each of these defendants to exercise control over Rigel, its employees and its operations.

239. Each of the Individual Defendants was a participant in the violations of §11 of the 1933 Act alleged in the Count above, based on their having signed or authorized the signing of the Registration Statement and having otherwise participated in the process which allowed the Offering to be successfully completed.

## IX. PRAYER FOR RELIEF

WHEREFORE, plaintiff prays for relief and judgment, as follows:

A. Declaring this action to be a proper class action pursuant to Fed. R. Civ. P. 23;

B. Awarding plaintiff and the members of the Class damages and interest;

C. With respect to Count IV, ordering rescission or rescissory damages for purchasers of Rigel common stock in the Offering;

D. Awarding plaintiff's reasonable costs, including attorneys' fees; and

E. Awarding such equitable and/or injunctive or other relief as the Court may deem just and proper.

**X.     JURY DEMAND**

Plaintiff hereby demands a trial by jury.

DATED: January 27, 2010           COUGHLIN STOIA GELLER
                                       RUDMAN & ROBBINS LLP
                                WILLOW E. RADCLIFFE
                                DANIEL J. PFEFFERBAUM
                                S. ASHAR AHMED

                                               /s/
                                     WILLOW E. RADCLIFFE

                                100 Pine Street, Suite 2600
                                San Francisco, CA  94111
                                Telephone:  415/288-4545
                                415/288-4534 (fax)

                                Lead Counsel for Plaintiffs

# Attachment 1



# Attachment 2

## CERTIFICATION OF NAMED PLAINTIFF
## PURSUANT TO FEDERAL SECURITIES LAWS

INTER-LOCAL PENSION FUND GCC/IBT ("Plaintiff") declares:

1. Plaintiff has reviewed a complaint and authorized its filing.

2. Plaintiff did not acquire the security that is the subject of this action at the direction of plaintiff's counsel or in order to participate in this private action or any other litigation under the federal securities laws.

3. Plaintiff is willing to serve as a representative party on behalf of the class, including providing testimony at deposition and trial, if necessary.

4. Plaintiff has made the following transaction(s) during the Class Period in the securities that are the subject of this action:

| Security | Transaction | Date | Price Per Share |
|----------|-------------|------|-----------------|

*See* attached Schedule A.

5. (a) Plaintiff has been appointed to serve as a representative party for a class in the following actions filed under the federal securities laws during the three years prior to the date of this Certification:

*Operative Plasterers and Cement Masons Int'l Assoc. Local 262 Annuity Fund v. Lehman Brothers Holdings Inc., et al.*, No. 08-CV-5523 (S.D.N.Y.)
*Coyne v. General Electric Company, et al.*, No. 3:08-cv-01135-SRU (D. Conn.)

(b) Plaintiff is seeking to serve as a representative party for a class in the following actions filed under the federal securities laws:

*City of Dearborn Heights Act 345 Police & Fire Retirement System v. Waters Corporation, et al.*, No. 1:08-cv-11889 (D. Mass)

(c) Plaintiff initially sought to serve as a representative party for a class in the following actions filed under the federal securities laws during the three years prior to the date of this Certification:

*Reimer v. Ambac Financial Group, Inc., et al.*, No. 1:08-cv-00411-NRB (S.D.N.Y.)
*In re First Marblehead Corporation Sec. Litig.*, No. 08-10612-JLT (D. Mass.)

RIGHT

6.     The Plaintiff will not accept any payment for serving as a representative party on behalf of the class beyond the Plaintiff's pro rata share of any recovery, except such reasonable costs and expenses (including lost wages) directly relating to the representation of the class as ordered or approved by the court.

I declare under penalty of perjury that the foregoing is true and correct. Executed this __5__ day of _February_, 2009.

INTER-LOCAL PENSION FUND
GCC/IBT

By: _Lawrence C. Drintill_

Its: _Executive Director_

- 2 -

## SCHEDULE A

## SECURITIES TRANSACTIONS

**Acquisitions**

| Date Acquired | Type/Amount of Securities Acquired | Price |
|---------------|-----------------------------------|-------|
| 01/31/2008 | 3,590 | $27.00 |
| 02/01/2008 | 900 | $27.37 |
| 02/01/2008 | 1,200 | $27.36 |

# Attachment 3

Case 2:23-cv-09941-MRP-JSW   Document 66-5   Filed 01/22/24   Page 86 of 130

# Rigel Pharmaceuticals, Inc.

## Indexed vs NASDAQ Composite, NASDAQ Biotechnology Indices
## October 1, 2007 to October 31, 2007



CERTIFICATE OF SERVICE

I hereby certify that on January 27, 2010, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the e-mail addresses denoted on the attached Electronic Mail Notice List, and I hereby certify that I have mailed the foregoing document or paper via the United States Postal Service to the non-CM/ECF participants indicated on the attached Manual Notice List.

I further certify that I caused this document to be forwarded to the following Designated Internet Site at: http://securities.standford.edu.

I certify under penalty of perjury under the laws of the United States of America that the foregoing is true and correct. Executed on January 27, 2010.

                                  /s/
                    WILLOW E. RADCLIFFE
                    COUGHLIN STOIA GELLER
                        RUDMAN & ROBBINS LLP
                    100 Pine Street, 26th Floor
                    San Francisco, CA  94111
                    Telephone:  415/288-4545
                    415/288-4534 (fax)
                    E-mail:willowr@csgrr.com

479520_1

# Mailing Information for a Case 3:09-cv-00546-JSW

## Electronic Mail Notice List

The following are those who are currently on the list to receive e-mail notices for this case.

- **Sayed Ashar Ahmed**
  AAhmed@csgrr.com

- **Margaret Irene Branick-Abilla**
  mbranickabilla@cooley.com,wilsonla@cooley.com,foxl@cooley.com

- **John C. Dwyer**
  dwyerjc@cooley.com,giovannonib@cooley.com

- **Shannon Marie Eagan , Esq**
  seagan@cooley.com

- **William S. Freeman**
  freemanws@cooley.com,galancr@cooley.com,dvance@rigel.com

- **Jerry L. Marks**
  jmarks@milbank.com,mawalsh@milbank.com

- **Matthew Paul Montgomery**
  mattm@csgrr.com,e_file_sf@csgrr.com,e_file_sd@csgrr.com

- **Erik David Peterson**
  epeterson@btkmc.com

- **Daniel Jacob Pfefferbaum**
  DPfefferbaum@csgrr.com,aserros@csgrr.com,nrogers@csgrr.com,khuang@csgrr.com,gfreemon@csgrr.com

- **Willow E. Radcliffe**
  willowr@csgrr.com,khuang@csgrr.com,e_file_sf@csgrr.com,e_file_sd@csgrr.com

- **Darren Jay Robbins**
  e_file_sd@csgrr.com

- **Paul Michael Torres**
  ptorres@milbank.com

## Manual Notice List

The following is the list of attorneys who are **not** on the list to receive e-mail notices for this case (who therefore require manual noticing). You may wish to use your mouse to select and copy this list into your word processing program in order to create notices or labels for these recipients.

- (No manual recipients)

# EXHIBIT A

DECLARATION of DANIEL A. BLOCH

I, Daniel A. Bloch, of the City of Tucson, in the state of Arizona, declare as follows:

I am an Emeritus Professor in the Department of Health Research and Policy, Division of

Biostatistics at Stanford University, Stanford, California. I was appointed Associate

Professor in 1993, Full Professor in 2001 and have been emeritus since 2007.

My primary interests include application of mathematical statistics to scientific studies and to

advance bio-statistical research methodology. I have published 196 original articles in peer-

reviewed journals and have an additional eight articles either in press or submitted for

publication. Approximately 170 of these articles have appeared in medical journals, mostly

co-authored with medical faculty at Stanford and at other universities in the United States,

Canada and Europe. Often these collaborations have afforded me the opportunity to explore

the application of recently developed statistical methods by illustrating their use on real data,

and to explore the development of new statistical methods. Among the several dozen articles

devoted to statistical methods, topics include efficiency and the bias of estimators, sample

size estimation, kappa statistics, non-parametric statistics, methods of assessing multi-

parameter endpoints, and other topics.

I am particularly experienced in applying statistics to the rheumatic diseases. I have co-

authored well over 30 articles in *Arthritis and Rheumatism* and 25 articles in the *Journal of*

*Rheumatology*, considered by many to be among the leading specialized peer-reviewed journals

for these fields of medicine. I have been statistical reviewer for dozens of medical journals,

including most journals in Europe, Canada and the U.S. that specialize in arthritis and

rheumatism. I have been a member of numerous data safety and monitoring boards for

1

studies of new agents to treat these diseases. Most recently, I participated in an ongoing US Food & Drug Administration (FDA) initiative seeking information on issues related to clinical development programs for human drugs, biological products, and medical devices for the treatment and prevention of osteoarthritis. Specifically, I served as Chair of the "Statistical Considerations" working group for the Osteoarthritis Society International (OARSI) proposal accepted by the FDA. I believe that recognition of my expertise as a statistical researcher and at-large applicator to diverse fields of medicine are behind a recent Nobel Prize committee's invitation to me to provide nominations for the Nobel Prize in Medicine.

I have extensive teaching experience, having taught courses offered by both the Mathematical Statistics and the Health Research and Policy departments at Stanford. Before becoming emeritus, at Stanford I supervised the statistical efforts of numerous post-doctoral fellows and medical students. I have also been invited to give dozens of bio-statistical presentations, in such diverse settings as Harvard, The Johns Hopkins University, the FDA Center for Biologics Evaluation and Research, the College of Problems for the Drug Dependence and the American College of Rheumatology annual meetings and at Institute of Mathematical Statistics meetings.

Since 1987 I have been a consultant on an ad hoc basis to pharmaceutical and biotechnical firms, including both start-up and established companies. Herein I participate in all aspects of applying statistics to implement investigational plans; e.g.: for protocol development, design of trials, data base design, and analysis. I continue to serve on numerous data safety monitoring boards and have been a member of the FDA Statistical Advisory Panel. I attach

2

as Exhibit 1 my *curriculum vitae* which sets out, in greater detail, my professional qualifications.

**The Present Case**

I have been retained by the law firm of Coughlin, Stoia, Geller, Rudman & Robbins, counsel for plaintiffs in a securities class action against Rigel Pharmaceuticals, Inc, to provide expert opinion and comments with regard to data interpretation, reporting and use of statistics in (a) the December 13, 2007 press release issued by Rigel, in (b) the ACR20, ACR50 and ACR70 summary data per Country and US/Mexico combined, dated October, 2008, and in (c) the Weinblatt et al article published in *Arthritis and Rheumatism* in November, 2008. In this regard I was given a copy of the Class Action Consolidated Complaint demanding a trial by jury, dated July 14, 2009.

**Comments on Rigel's December 13, 2007 Press Release "Efficacy Results."**

1. Rigel announced "R788 has demonstrated statistically significant results in treated Rheumatoid Arthritis…" and that " Groups treated …at 100mg and 150mg…showed higher ACR20, ACR50, ACR70 and DAS28 response rates than the placebo group." However, the reported achieved levels of statistical significance (p-values) were not adjusted for the multiple pair-wise comparisons performed by Rigel. At a minimum, 16 comparisons were performed: for each the of three doses, comparisons were performed of each of the four outcome variables to Placebo ( 12 comparison) and comparisons were performed between 100mg and 150mg dose groups of each of the four outcome variables (4 comparisons). Since we are not told if the 50mg group was to be compared to either of the other two higher dose groups, I do not know if an additional 8 comparisons were performed but I suspect the intent was to make these comparisons as well. A person skilled in the art of applied statistics

3

understands that when multiple comparisons are performed, an actual p-value is greater than the nominal, unadjusted value. The most common method to adjust p-values is the Bonferroni method---with this method each nominal p-value is multiplied by the number of comparisons. Applying this method to the nominal p-values included in the December 13, 2007 Efficacy Results table, among the eight comparisons with nominal p-values< 0.05 only six are significant after adjusting for 16 comparisons. The ACR20 100mg comparison to Placebo and the DAS28-CRP 100mg comparison to Placebo are not statistically significant at the 5% significance level.

2. I have verified that the 6 nominal p-values reported in the Efficacy Results table for the 6 ACR comparisons are correct with applications of the chi-square test for 2X2 contingency tables. However, when chi-square tests are applied to the DAS28-CRP data, one learns that both of the nominal reported p-values are not correct. The correct nominal p-values are p=0.049 (not 0.005 as reported) for comparing DAS28-CRP 100mg results to the Placebo group and p=0.002 (not <0.001) for comparing DAS28-CRP 150mg results to the Placebo group.

3. Methods other than the Bonferroni method could be employed to adjust for multiple comparisons. One method is the Tukey Method of Multiple Comparisons which makes reference to the Studentized Range distribution. Tukey's method adjusts the achieved significance level for all possible pair-wise comparisons that could be made among groups. Upon applying Tukey's Studentized Range test to the 189 patients among 4 dose groups with data recorded for ACR20, one learns that the ACR20 100mg comparison to Placebo is significant at the p=0.03 level and the 150mg comparison to Placebo is significant at the p=0.004 level. Here, each p-value has been adjusted for 6 different pair-wise comparisons. However, the results of applying Tukey's Studentized Range test separately to each Country's ACR20 Data clearly show these p-values are incorrect because of the distortion of the

4

results created by combining data from the U.S. and Mexico. In fact, neither the ACR20 100mg comparison to Placebo nor the ACR20 150mg comparison to placebo is statistically significant. These results are presented below.

**Comments on Rigel's October 27, 2008 Report of ACR Response Data by Country**

1. **Pooling the U.S. and Mexico data rather than combining each country's separate results is not appropriate**

Inspection of the ACR rates by Country easily reveals that the analysis of the combined data from the U.S. and Mexico reported with the December 13, 2007 press release is not appropriate and resulted in misleading success rates and false p-values. Specifically, Defendant failed to account for the fact that patients in Mexico had higher success rates in all treatment groups than the U.S patient groups. Because the Defendant did not report an analysis which adjusts for these large differences in success rates between countries, the results presented in Rigel's December 13, 2007 Press Release bias results in favor of R788.

Two examples are as follows: (1) Referencing the patient populations who received the 150mg dose or Placebo and were assessed for response with the ACR20, the primary outcome variable, the differences in response rates of the 150mg group verses the Placebo group were 16% and 21% in the U.S. and Mexico, respectively. However, the difference reported with the December 13, 2007 press release is 34%, a success rate over twice that achieved in the U.S and 13% higher than that achieved in Mexico. (2) Referencing the patient populations who received the 50mg dose or Placebo and were assessed for response with the ACR20, the primary outcome variable, the differences in success rates of the 50mg

5

group verses the Placebo group was 9% in the U.S. No such comparison can be made for patients treated in Mexico since no patients received the 50mg dose in Mexico. However, the difference reported with the December 13, 2007 press release is -5%, a difference in success rates which is 14% lower than that achieved in the only country that gave patients the 50mg dose, the U.S. These examples illustrate that the data from the U.S and Mexico should not pooled, and that a proper, overall, analysis must combine the results of pair-wise comparisons obtained from each country.

This led me to perform the following series of analyses: 1) Perform chi-square tests separately for each Country, 2) Combine the nominal p-values obtained from the separate chi-square tests across Countries to obtain an overall nominal p-value, adjusted for Country, 3) Perform Fisher Exact tests to the 2X2 Contingency table data, 4) Combine the nominal p-values obtained from the separate Fisher Exact tests across Countries to obtain an overall nominal p-value, adjusted for Country, 5) Apply Tukey's Studentized Range test separately to each Country's ACR20 data. Chi-square tests were performed because they were the statistical tests performed by the defendants, but I applied them separately to each country's data. Fisher's Exact tests were performed because often use of a chi-square test was not statistically justifiable. I used a second method developed by Fisher, Fisher's procedure to combine p-values from 2 independent studies, in order to obtain an accurate p-value for the combined results from the U.S. and Mexico. I applied Tukey's Studentized Range test to ACR20 success rates, the primary outcome variable, in order to address the multiple comparisons problem. This is a basic set of analyses applying standard statistical methodologies.

2. **The Fisher Exact test**

Fisher's Exact test is a non-parametric test that does not rely on asymptotic Normality assumptions, as does the chi-square test. It is most useful when at least one of the sample

sizes in the 2X2 contingency table is so small that the chi-square test should not be used. Two criteria that are often employed are to require using a test such as the Fisher Exact test (i) if the expected cell frequency of the smallest entry in the 2X2 table is less than 5 {Reference Fleiss, page 25}, and (ii) if the smallest entry in the 2X2 table is less than 20 {Reference Moses, page 231}. Because of it's computational simplicity, a modified version of the chi-square test, often called the Yates chi-square test {Reference Moses, pages 234-5}, is often employed instead of Fisher's Exact test. In what follows I do not report on results obtained using the Yates chi-square test because results were close to those obtained with Fisher's Exact test.

3.  **Results of performing chi-square tests separately for each Country**

    **(A) ACR20**: Comparison of 100mg dose to Placebo. The nominal p-values obtained by applying separate chi-square tests to the U.S data and to the Mexico data are 0.047 and 0.130, respectively. Using Fisher's procedure to combine p-values from 2 independent studies, the overall nominal p-value equals 0.037. The nominal p- value of 0.008 reported with the December 13, 2007 press release is false. Since the smallest frequency in both the U.S. and Mexico 2X2 data tables is less than 20, Fisher's Exact test results are presented below.

    **(B) ACR20**: Comparison of 150mg dose to Placebo. The nominal p-values obtained by applying separate chi-square tests to the U.S data and to the Mexico data are 0.460 and 0.076, respectively. Using Fisher's procedure to combine p-values from 2 independent studies, the overall nominal p-value equals 0.152. The nominal p-value of <0.001 reported with the December 13, 2007 press release is false and the correct conclusion is that success rates between the 150mg and Placebo groups are not statistically significantly different.

7

Additionally, since the smallest frequency in both the U.S. and Mexico 2X2 data tables is less than 20, Fisher's Exact test results are presented below.

**(C) ACR50**: Comparison of 100mg dose to Placebo. The nominal p-values obtained by applying separate chi-square tests to the U.S data and to the Mexico data are 0.021 and 0.050, respectively. Using Fisher's procedure to combine p-values from 2 independent studies, the overall nominal p-value equals 0.003. The nominal p-value of 0.002 reported with the December 13, 2007 press release is false. However, since the smallest expected cell frequency of the U.S. data is 3.8 and the smallest frequency in both the U.S. and Mexico 2X2 data tables is less than 20, Fisher's Exact test results are presented below.

**(D) ACR50**: Comparison of 150mg dose to Placebo. The nominal p-values obtained by applying separate chi-square tests to the U.S data and to the Mexico data are 0.014 and 0.078, respectively. Using Fisher's procedure to combine p-values from 2 independent studies, the overall nominal p-value equals 0.026. The nominal p- value of <0.001 reported with the December 13, 2007 press release is false. However, since the smallest expected cell frequency of the U.S. data is 2.5 and the smallest frequency in both the U.S. and Mexico 2X2 data tables is less than 20, Fisher's Exact test results are presented below.

(E) **ACR70**: Comparison of 100mg dose to Placebo. The nominal p-values obtained by applying separate chi-square tests to the U.S data and to the Mexico data are 0.051 and 0.004, respectively. Using Fisher's procedure to combine p-values from 2 independent studies, the overall nominal p-value equals 0.0006. However, because the smallest expected cell frequency of the U.S. data is 1.6 and the smallest frequency in both the U.S. and Mexico 2X2 data tables is less than 20, Fisher's Exact test results are presented below.

 **(F) ACR70**: Comparison of 150mg dose to Placebo. The nominal p-values obtained by applying separate chi-square tests to the U.S data and to the Mexico data are 0.001 and

8

0.009, respectively. Using Fisher's procedure to combine p-values from 2 independent studies, the overall nominal p-value equals 0.0001. However, because the smallest expected cell frequency of the U.S. data is 1.7 and the smallest frequency in both the U.S. and Mexico 2X2 data tables is less than 20, Fisher's Exact test results are presented below

**(G) Summary of Results of performing chi-square tests separately for each Country**

The overall nominal p-values are higher than those reported with the December 13, 2007 press release, even without accounting for multiple comparisons. The overall nominal p-values comparing both 100mg and 150mg groups to Placebo for the primary outcome variable, the ACR20, and the overall nominal p-value comparing the 150mg group to Placebo for the ACR50 are much bigger than those reported with the December 13, 2007 press release. Since in all instances p-values obtained using the ordinary chi-square are questionably valid, Fisher's Exact test is the preferred statistical method.

4.      **Results of performing Fisher Exact tests separately to each Country**

As pointed out in the previous section, Fisher Exact test rather than a chi-square test is the appropriate statistical procedure.

**(A) ACR20**: Comparison of 100mg dose to Placebo. The nominal p-values obtained by applying separate Fisher Exact tests to the U.S data and to the Mexico data are 0.068 and 0.1474, respectively. Using Fisher's procedure to combine p-values from 2 independent studies, the overall nominal p-value equals 0.056. The nominal p-value of 0.008 reported with the December 13, 2007 press release is false. The conclusion is that success rates between the 100mg and Placebo groups are not statistically significantly different.

**(B) ACR20**: Comparison of 150mg dose to Placebo. The nominal p-values obtained by applying separate Fisher Exact tests to the U.S data and to the Mexico data are 0.589 and 0.094, respectively. Using Fisher's procedure to combine p-values from 2 independent

9

studies, the overall nominal p-value equals 0.216. The nominal p-value of <0.001 reported with the December 13, 2007 press release is false. The conclusion is that success rates between the 150mg and Placebo groups are not statistically significantly different.

**(C) ACR50**: Comparison of 100mg dose to Placebo. The nominal p-values obtained by applying separate Fisher Exact tests to the U.S data and to the Mexico data are 0.037 and 0.086, respectively. Using Fisher's procedure to combine p-values from 2 independent studies, the overall nominal p-value equals 0.022. . The nominal p-value of 0.002 reported with the December 13, 2007 press release is false. If adjusted for multiple comparisons, the success rates between the 100mg and Placebo groups are not statistically significantly different.

**(D) ACR50**: Comparison of 150mg dose to Placebo. The nominal p-values obtained by applying separate Fisher Exact tests to the U.S data and to the Mexico data are 0.064 and 0.1144, respectively. Using Fisher's procedure to combine p-values from 2 independent studies, the overall nominal p-value equals 0.043. The nominal p-value of <0.001 reported with the December 13, 2007 press release is false. If adjusted for multiple comparisons, the success rates between the 150mg and Placebo groups are not statistically significantly different.

(E) **ACR70**: Comparison of 100mg dose to Placebo. The nominal p-values obtained by applying separate Fisher Exact tests to the U.S data and to the Mexico data are 0.088 and 0.005, respectively. Using Fisher's procedure to combine p-values from 2 independent studies, the overall nominal p-value equals 0.004. The nominal p-value of <0.001 reported with the December 13, 2007 press release is false.

**(F) ACR70**: Comparison of 150mg dose to Placebo. The nominal p-values obtained by applying separate Fisher Exact tests to the U.S data and to the Mexico data are 0.023 and

10

0.01, respectively. Using Fisher's procedure to combine p-values from 2 independent studies, the overall nominal p-value equals 0.002. The nominal p-value of <0.001 reported with the December 13, 2007 press release is false.

**(G) Summary of Results of performing Fisher Exact tests separately for each Country**

The combined p-values attained with using Fisher Exact tests are more accurate than those using chi-square tests. The overall nominal p-values are higher than those reported with the December 13, 2007 press release, even without accounting for multiple comparisons. Of note, not only are the overall nominal p-values comparing both 100mg and 150mg groups to Placebo for the primary outcome variable, the ACR20, much bigger than those reported with the December 13, 2007 press release, the conclusion is that success rates between either high dose group and Placebo are not statistically significantly different. This conclusion is supported with the application of Tukey's Studentized Range tests to the ACR20 outcome data. The results obtained with Tukey's Studentized Range tests are presented in the next section.

**5 Results of applying Tukey's Studentized Range test separately to each Country's ACR20 Data.**

The purpose of applying Tukey's Studentized Range test separately to each country's data and then combining the test results to obtain overall p-values is to obtain valid p-values, having adjusted for differences between U.S and Mexico and to account for the multiple pair-wise comparisons performed by Rigel. Upon applying Tukey's Studentized Range test to the 97 U.S. patients among 4 dose groups with data recorded for ACR20, one learns that the ACR20 100mg comparison to Placebo is not significant with p=0.191 and the 150mg

comparison to Placebo is not significant with p=0.902. Here p-values have been adjusted for 6 different pair-wise comparisons. Upon applying Tukey's Studentized Range test to the 92 Mexico patients among 3 dose groups with data recorded for ACR20 (Mexico did not treat patients with the 50mg dose), one learns that the ACR20 100mg comparison to Placebo is not significant with p=0.259 and the 150mg comparison to Placebo is not significant with p=0.172. Here p-values have been adjusted for 3 different pair-wise comparisons. Using Fisher's procedure to combine the p-values from the U.S. and Mexico, the overall p-values equal 0.198 and 0.444 when the 100mg and 150mg group success rates are compared to Placebo success rates, respectively.

**Summary of results of applying Tukey's Studentized Range test separately to each country's ACR20 data**

With this analysis I have controlled for differences between U.S and Mexico and for multiple pair-wise comparisons that were made between groups. The overall p-values comparing both 100mg and 150mg groups to Placebo for the primary outcome variable, the ACR20, are large and the correct conclusion is that success rates between either of the high dose groups and Placebo are not statistically significantly different. The nominal p-values reported with the December 13, 2007 press release are false and misleading.

**Summary Comments Based on Proper Statistical Analyses Allowed with Rigel's October 27, 2008 Report of ACR Response Data by Country**

When the data is properly analyzed, all of the nominal p-values are higher than those reported with the December 13, 2007 press release, even without accounting for multiple

12

comparisons. The comparisons of both 100mg and 150mg groups to Placebo for the primary outcome variable, the ACR20, with or without accounting for multiple comparisons, are not statistically significant.

**Weinblatt et al article published in *Arthritis and Rheumatism*, November, 2008**

In addition to the failures of statistical analyses revealed by my re-calculation of all of the p-values reported with Rigel's December 13, 2007 press release of "Efficacy Results" and revealed with my analysis allowed with Rigel's October 27, 2008 report of ACR response data by country, the statistical analysis in the *Arthritis and Rheumatism* publication also contains errors. As did Rigel's December 13, 2007 report of "Efficacy Results," the errors in this article skew results in favor of R788. In my opinion, the incorrect and misleading presentation of study design and faulty analyses cast the efficacy of R788 in an overly optimistic light. In what follows I will first provide a brief summary defining the statistical concepts of "level of significance" and "power" of a statistical test. With this background, I will support my contentions in subsequent comments.

**Significance level, one-sided and two-sided tests, and the power of a statistical test**

(A) **Significance level.** There are two kinds of error one must guard against in designing a study comparing drug groups. The first error, called the Type I error, occurs when one states the difference in success rates between groups is real when in fact the difference is zero. This error is controlled during the planning phase of the study by choosing the significance level of the test, denoted by $\alpha$, to be small, typically not greater than 5%. The results of the study are "statistically significant" if the observed difference between the success rates of the two groups is sufficiently large so that the p-value derived from

13

applying the statistical test is not greater than $\alpha$. In what follows I set $\alpha = 5\%$, the significance level reportedly used by Rigel in planning their study.

**(B)** **One-sided and two-sided tests.** Let $s_1$ and $s_2$ denote the observed success rates of the two drugs to be compared. The percentages $s_1$ and $s_2$ estimate the underlying (but unknown) success rates in the entire population who could receive either drug. Denote these hypothetical population success rates by $S_1$ and $S_2$. If the difference in rates is not zero and the Investigator hypothesizes that the difference in rates can only occur in one direction, say $S_2$ must be greater than $S_1$, then a one-sided test is performed. The test will be "statistically significant" at the 5% level of significance only if $s_2$ is sufficiently greater than $s_1$ so that the p-value from the test is not more than 5%. With a two-sided test, "statistical significance" is achieve if either $s_2$ is sufficiently greater than $s_1$ or if $s_1$ is sufficiently greater than $s_2$. The significance level of 5% is divided in two, so that the p-value must not exceed 2.5% if $s_2$ is sufficiently greater than $s_1$ or not exceed 2.5% if $s_1$ is sufficiently greater than $s_2$. For any given comparison between drug groups, only one of these possibilities can occur (either $s_2$ is greater than $s_1$ or $s_1$ is greater than $s_2$). All of the p-values reported with Rigel's December 13, 2007 report of "Efficacy Results" and reported by Weinblatt et al in the *Arthritis and Rheumatism* publication are two-sided.

A one-sided test is called for only if there is no interest in a difference in the reverse direction. However, for the Rigel study results an analyst is ethically required to perform two-sided tests, for if the data should reveal that the group receiving the active drug

14

compound did worse than the Placebo group, this result must be reported. This conclusion can only be reached with a two-sided test.

**(C) Power of a statistical test**

The second kind of error, called the Type II error, occurs when one fails to find that the difference in success rates between groups is real when in fact the difference is real. How large a difference is "real" is a clinical judgment of what is minimally important to detect. This error is controlled during planning phase of the study by choosing the probability of failing to find what is deemed "minimally important to detect" as being statistically significant, denoted by $\beta$, to be relatively small, typically not greater than 0.20. The value of $(1-\beta)\%$ is the power of the test. The power level reportedly used by Rigel in planning their study equals 70%.

**Comments on Weinblatt et al article published in *Arthritis and Rheumatism* , November, 2008**

1.  In the "**Statistical analysis**" section on page 3311, the authors state that " Thirty-five evaluable patients in each group would provide 70% power to detect a treatment difference of 25% between the R788 groups and the placebo group at the 5% significance level." Firstly, one learns upon performing the sample size calculation that the 5% significance value used in this power calculation was one-sided rather than two sided. All hypothesis tests are two-sided. Had the 2-sided 5% significance level been used, 46 evaluable patients in each group would provide 70% power to detect a treatment difference of 25% between the R788 groups and the placebo group. Secondly, with such small sample sizes, an expert skilled in the art of applied statistics would usually recommend sample size estimates be calculated

15

using formula that are second-order correct. Had this been applied in this case, 53 evaluable patients in each group would provide 70% power to detect a treatment difference of 25% between the R788 groups and the placebo group {Reference Fleiss, Table A.3). In fact, the study only had 50% power to detect a treatment difference of 25% between the R788 groups and a placebo group at the 2-sided 5% significance level.

**Summary of Rigel's presentation of study design**

This study was designed to test each of the multiple comparisons between drugs with nominal p-values, and each test was performed at the 5% significance level with only 50% power to detect a difference of 25% between a R788 group and a placebo group. The presentation of the study design was not accurate and misleadingly. The authors' presentation that the power was 70% misleads the public to believe the study design was more robust than it actually was.

2. The ACR response rates and number of patients achieving response In **Table 2** on page 3313 agree with those contained in Rigel's December 13, 2007 Press Release. However, the **DAS28<2.6 outcome** data do not agree with the data contained in Rigel's December 13, 2007 Press Release. For example, with the December 13, 2007 Press Release Rigel reports that 17 of the 49 (35%) patients treated with the 100mg dose were DAS28 responders. But in Table 2 of the *Arthritis and Rheumatism* publication, 11 were DAS28 responders with a reported response rate of 26%. If the number of patients included in this analysis equals 43, then 11 of 43 corresponds to the reported 26% rate. The difference appears to be attributable to the *Arthritis and Rheumatism* article including only those who completed the study in the DAS28 success analysis (see **Figure 1** : Disposition of the patients, page 3312 of the *Arthritis and Rheumatism* article). Thus with the DAS28 outcome, it is not true that "All patients randomized into the study were included in the efficacy and safety analysis," as the

16

authors state on page 3311. This is in direct contrast to the December 13, 2007 analysis which included all patients.

**Conclusion based on the *Arthritis and Rheumatism* article presentation of DAS28<2.6 outcome data**

The analysis of the DAS28<2.6 success rates presented in the *Arthritis and Rheumatism* article did not include all patients. It appears that "non-completers" were omitted, thereby skewing the data and results being biased favoring R788.

3. **The Arthritis and Rheumatism publication falsely claimed that R788 significantly decreased certain biomarkers.**

On page 3314 the authors wrote "There was a significant decrease from baseline in serum IL-6 and MMP-3 levels in the 2 higher dose groups (100mg and 150mg) versus placebo at week 12 ($P=0.05$ for IL-6 level in the 100 mg group, $P< 0.001$ for IL-6 in the 150mg group, and $P< 0.01$ for MMP-3 level in both high-dose groups)." Using the summary statistics for these two outcome variables presented in **Table 3** on page 3313, I have performed the four two-sample t-tests (method per statistical analysis plan) comparing average change in the high dose groups to change in the Placebo group. The results are as follows: (i) Comparing average change of IL-6 level in the 100 mg group to the average change in the Placebo group, $p=0.152$, (ii) Comparing average change of IL-6 level in the 150 mg group to the average change in the Placebo group, $p< 0.009$, (iii) Comparing average change of MMP-3 in the 100 mg group to the average change in the Placebo group, $p=0.125$, (iv) Comparing average change of MMP-3 in the 150 mg group to the average change in the Placebo group, $p=0.074$.

17

Summary of the analyses of biomarker data presented in *the Arthritis and Rheumatism* publication

The reported p-values are false and in 3 of the 4 pair-wise comparisons the decrease was not statistically significant compared to Placebo. The faulty analyses presented R788 as being statistically superior when no such claim is warranted.

4.      Regarding difference between Mexico and U.S data, on page 3313 the authors acknowledge that "the ACR20 did show a country effect...," but they do not provide a proper analysis to correct the distortion of the results due to the failure of accounting for country differences.

I declare under penalty of perjury that the foregoing is correct to the best of my knowledge and belief. This Declaration was executed the 23rd day of January, 2010, at Tucson, Arizona.

Daniel A. Bloch, PhD
Emeritus Professor of Biostatistics
Stanford University

REFERENCES

Fleiss, J.L. *Statistical Methods for Rates and Proportions,* second edition. John Wiley & Sons, New York, 1981

Moses, L.E. *Think and Explain with Statistics.* Addison-Wesley, Menlo Park, California, 1986.

# EXHIBIT 1

February 1, 2009

## CURRICULUM VITAE

### Daniel A. Bloch, Ph.D.

| | |
|---|---|
| **BIRTHPLACE & DATE:** | Palo Alto, CA; January 15, 1941 |
| **MARITAL STATUS:** | Married: Four children – born 1969, 72, 81, 85 |
| **UNIVERSITY AFFILIATION:** | Stanford University School of Medicine |
| | Department of Health Research and Policy |
| | Division of Biostatistics |
| | Room T206 |
| | Stanford, CA 94305-5405 |
| | Phone: (650) 723 7902 |

**PRIMARY OFFICE:**  8987 E. Tanque Verde #309-387
Tucson, AZ  85749
Phone: (520) 749 1844
Cell: (650) 996 4429
Fax:  (520) 749 3438

**EDUCATION:**
1963:  B.S. Stanford University, Major: Statistics
1967:  Ph.D. Johns Hopkins University, Statistics

**ACADEMIC APPOINTMENTS:**

1967 - 1968  Research Fellow, Biomathematics Department, Cornell University Medical School, New York, New York.

1967-1969  Research Associate, Sloan-Kettering Institute for Cancer Research, New York, New York.

1969-1970  Assistant Professor, Biomathematics Department, Cornell University Medical School, New York, NY
Associate, Sloan-Kettering Institute for Cancer Research, New York, New York.

1970 - 1972  Assistant Professor of Mathematics, California State University, Sonoma, Cotati, California.

1984 - 1985  Statistician II. Division of Immunology, Department of Medicine, Stanford University, Stanford, California. Head Biostatistician for

1

Arthritis, Rheumatism, and Aging Medical Information Systems (ARAMIS) and for Stanford Arthritis Center (SAC).

| | |
|---|---|
| 1985 - 1986 | Statistician III, Division of Immunology, Department of Medicine, Stanford University School of Medicine, Stanford, CA |
| 1986 - 1993 | Senior Research Scholar, Department of Medicine, Stanford University School of Medicine, Stanford, California. |
| 1993 - 1995 | Acting Associate Professor, Department of Medicine and Department of Health Research and Policy, Stanford University School of Medicine, Stanford, California. |
| 1995 – Sept. 2001 | Associate Professor of Health Research and Policy, Division of Biostatistics, Stanford University School of Medicine, Stanford, California. |
| Sept. 2001 – present | Professor of Health Research and Policy, Division of Biostatistics, Stanford University, Stanford, California. Active Emeritus since February, 2007. |

## PROFESSIONAL APPOINTMENTS AND ACTIVITIES

1. Research and Teaching Assistant, Statistics Department, Johns Hopkins University, Baltimore, Maryland, 1963 – 1967.

2. Statistical Consultant, Stanford Linear Accelerator Center, Stanford, California, 1967.

3. Owner, Daniel A. Bloch, dba Land House Construction, General Contractor "B", License No. 292149, 1972-1984.

4. Member, Human Rights Committee, VA Cooperative Studies Center, 1986-1990.

5. Head biostatistician for AIDS Time-Oriented Health Outcome Study (ATHOS), 1989-1995.

6. Head biostatistician for the Stanford Arthritis Center (SAC), 1985-1996.

7. Head biostatistician for Arthritis, Rheumatism, and Aging Medical Information Systems (ARAMIS) and for Stanford Arthritis Center (SAC), 1985-2000.

8. Consultant on an ad hoc basis to pharmaceutical and biotechnical firms, including Merck-Serono, Novartis, Sorin Biomedical, NeuroPace, Veryan Medical, Arthrocare, Novate Medical, Intuitive Surgical, NeoTract, Procter and Gamble, Accuray, and others, 1987-present.

9. Consultant to the VA Cooperative Studies Coordinating Center, 1990-2007.

10. Member, Steering Committee, California Society of Addiction Medicine, 1990-1993.

11. Special government employee: consultant to FDA (including FDA statistical advisors panel), 1995-2006.

12. Member, Database Advisory Steering Panel, National Multiple Sclerosis Society, 1997-2003.

13. Member, Editorial Board for "Osteoarthritis and Cartilage", 1998-2008.

14. Member, VA Combined Monitoring Board, 2002-2005.

15. Member, Editorial Board for "Journal of Endovascular Therapy," 2001-present.

16. Member, numerous DSMBs for private industry and NIH grants, 1993-present.

**SCHOLARLY PUBLICATIONS:**

### 1. Peer Reviewed Journal Articles

1. **Bloch DA.** "A note on the estimation of the location parameter of Cauchy distribution." *J Am Stat Assoc*, 1966; **61**: 852-855.

2. **Bloch DA**, Watson GS. "A Bayesian study of the multinomial distribution." *Ann Math Stat*, 1967; **38**: 1423-1435.

3. **Bloch DA**, Gastwirth JL. "On a simple estimate of the reciprocal of the density function." *Ann Math Stat*, 1968; **39**: 1083-1085.

4. Wynder EL, Dodo H, **Bloch DA**, Gantt R, Moore O. "An epidemiological investigation of multiple primary cancers of the upper alimentary and respiratory tracts, I: a retrospective study." *Cancer*, 1969; 730-739.

5. Lincoff H, O'Conner P, **Bloch DA**, Nadel A, Kressig I, Grinberg M. "The cryosurgical adhesion, II." *Am Acad Opthalmol*, 1970; 98-107.

6. **Bloch DA**, O'Conner P, Lincoff H. "The mechanism of the cryosurgical adhesion III: statistical analysis." *Am J Opthalmol*, 1971; **71(3)**: 666-673.

7. Fries J, **Bloch DA**, Spitz P. "Cancer in rheumatoid arthritis: a prospective long-term study of mortality." *Am J Med*, 1985; **78**: 56-59.

8. Fries J, **Bloch DA**, Sharp J, McShane D, Patricia S, Gilbert B, Forrester D, Genant H, Gofton P, Richman S, Weissman B, Wolfe F. "Assessment of radiological progression in rheumatoid arthritis: a randomized controlled trial." *Arthritis Rheum*, 1986; **29(1)**: 1-9

9. Sherrer Y, **Bloch DA**, Mitchell D, Young D, Fries J. "The development of disability in rheumatoid arthritis." *Arthritis Rheum*, 1986; **29(4)**: 494-500.

10. Mitchell D, Spitz P, Young D, **Bloch DA**, McShane DJ, Fries JF. "Survival, prognosis, and cause of death in rheumatoid arthritis." *Arthritis Rheum*, 1986; **29**: 706-714.

3

11. Lane N, **Bloch DA**, Jones H, Marshall W, Wood PD, Fries JF. "Long-distance running, bone density, and osteoarthritis." *J Am Med Assoc*, 1986; **255(9)**: 1147-1151.

12. Fries J, Spitz P, Mitchell D, Roth S, Wolfe F, **Bloch DA** "Impact of specific therapy upon rheumatoid arthritis." *Arthritis Rheum*, 1986; **29(5)**: 620-627.

13. **Bloch DA** "Sample size requirements and the cost of a randomized clinical trial with repeated measurements." *Stat Med*, 1986; **5(6)**: 663-667.

14. Altman R, Asch E, **Bloch DA**, Bole G, Borenstein D, Brandt K, Christy W, Cooke TD Greenwald R, Hochberg M, Howell D, Kaplan D, Koopman W, Longley S, Mankin D, McShane DJ, Medsger T, Meenan R, Mikkelsen W, Moskowitz R, Murphy W, Rothschild B, Segal M, Sokoloff L, Wolfe R. "Development of criteria for the classification and reporting of osteoarthritis; classification of osteoarthritis of the knee." *Arthritis Rheum*, 1986; **29(8)**: 1039-1049.

15. Sherrer Y, **Bloch DA**, Strober S, Fries J. "Comparative toxicity of total lymphoid irradiation and immunosuppressive drug treated patients with intractable rheumatoid arthritis." *J Rheumatol*, 1987; **14(1)**: 46-51.

16. Lane N, **Bloch DA**, Wood PD, Fries JF. "Aging, long-distance running, and the development of musculoskeletal disability." *Am J Med*, 1987; **82**: 772-780.

17. Sherrer YS, **Bloch DA**, Mitchell DM, Roth SH, Wolfe F, Fries JF. "Disability in rheumatoid arthritis: comparison of prognostic factors across three populations." *J Rheumatol*, 1987; **14(4)**: 705-709.

18. Altman R, **Bloch DA**, Bole G, Brandt K, Cooke D, Greenwald R, Hochberg M, Howell D, Kaplan D, Koopman W, McShane DJ, Mankin H, Medsger T, Meenan R, Mikkelsen W, Moskowitz R, Murphy W, Sokoloff L. "Development of clinical criteria for osteoarthritis." *J Rheumatol*, 1987; **14**: 3-6.

19. Altman R, Fries J, **Bloch DA**, Carstens J, Cooke T, Genant H, Gofton P, Groth H, McShane D, Murphy W, Sharp J, Spitz P, Williams C, Wolfe F. "Radiographic assessment of progression in osteoarthritis." *Arthritis Rheum*, 1987; **30(11)**: 1214-1224.

20. **Bloch DA**, Moses LE. "Non-optimally weighted least squares." *Am Statistician*, 1988; **42(1)**: 50-53.

21. Fries JF, **Bloch DA**, Segal MR, Spitz PW, Williams C, Lane N. "Post-marketing surveillance in rhuematology: analysis of purpura and upper abdominal pain." *J Rheumatol*, 1988; **15(2)**: 348-355.

22. Arnett F, Edworthy S, **Bloch DA**, McShane D, Fries J, Cooper N, Healey L, Kaplan S, Liang M, Luthra H, Medsger T, Mitchell D, Neustadt D, Pinals R, Schaller J, Sharp J, Wilder R, Hunder G. "The American Rheumatism Association 1987 revised criteria for the classification of rheumatoid arthritis." *Arthritis Rheum*, 1988; **31(3)**: 315-324.

23. Jariwalla, Sabin R, Lawson S, **Bloch DA**, Prender M, Andrews V, Herman Z. "Effects of dietary phytic acid (phytate) on the incidence of growth rate of tumors promoted in Fisher rats by a magnesium supplement." *Nutr Res*, 1988; **8**: 813-827.

4

24. Kraemer H, **Bloch DA** "Kappa coefficients in epidemiology: an appraisal of a reappraisal." *J Clin Epidemiol*, 1988; **41(10)**: 959-968.

25. Edworthy S, Zatarain E, McShane D, **Bloch DA.** "Analysis of the 1982 ARA lupus criteria data set by recursive partitioning methodology: new insights into the relative merit of individual criteria." *J Rheumatol*, 1988; **15(10)**: 1493 – 1498.

26. Fries J, Miller S, Spitz P, Williams C, Hubert H, **Bloch DA** "Toward an epidemiology of gastropathy associated with non-steroidal anti-inflammatory drug (NSAID) use." *Gastroenterology*, 1989; **96**: 647-655.

27. Edworthy S, **Bloch DA**, McShane D, Segal M, Fries J. "A state model of renal function in SLE: its value in the prediction of outcome in 292 subjects." *J Rheumatol*, 1989; **16(1)**: 29-35.

28. Fries JF, Singh G, **Bloch DA**, Colin A. "The natural history of ankylosing spondylitis: is the disease really changing?" *J Rheumatol*, 1989; **16**: 860-863

29. Schurman DJ, **Bloch DA**, Segal M, Tanner C. "Conventional cemented total hip arthroplasty: assessment of clinical factors associated with revision for mechanical failure." *Clin Orthop*, 1989; **240**: 173-180.

30. **Bloch DA**, Kraemer H. "2x2 kappa coefficients: measures of agreement or association." *Biometrics*, 1989; **45(1)**: 269-287.

31. Segal M, **Bloch DA** "A comparison of estimated proportional hazards models and regression trees." *Stat Med*, 1989; **8(5)**: 539-550.

32. Lane N, **Bloch DA**, Jones H, Simpson V, Fries J. "Osteoarthritis in the hand: a comparison of handedness and hand use." *J Rheumatol*, 1989; **16(5)**: 637-642.

33. Wysenbeek A, **Bloch DA**, Fries J. "Prevalence and expression of photosensitivity in systemic lupus erythematosus." *Ann Rheum Dis*, 1989; **48**: 461-463.

34. **Bloch DA**, Segal M. "Empirical comparison of approaches to forming strata: using classification trees to adjust for covariates." *J Am Stat Assoc*, 1989; **84(408)**: 897-905.

35. Lyon M, **Bloch DA**, Hollack B, Fries J. "Predisposing factors in polymyositis-dermatomyositis: results of a nation-wide survey." *J Rheumatol*, 1989; **16(9)**: 1218-1224.

36. Michel B, **Bloch DA**, Fries J. "Weight-bearing exercise, over exercise and lumbar bone density over age 50 years." *Arch Intern Med*, 1989; **149**: 2325-2329.

37. Kraemer H, **Bloch DA** "A note on case-control sampling to estimate kappa coefficients." *Biometrics*, 1990; **46(1)**: 49-59.

38. Fries JF, Spitz PW, Williams CA, **Bloch DA**, Singh G, Hurbert HB. "A toxicity index for comparison of side effects among different drugs." *Arthritis Rheum*, 1990; **33(1)**: 121-130.

39. Fries JF, Miller SR, Spitz PW, Williams CA, Hubert HB, **Bloch DA**. "Identification of patients at risk for gastropathy associated with NSAID use." *J Rheumatol*, 1990; **17(20)**: 12-19.

40. Lane N, **Bloch DA**, Hubert H, Jones H, Simpson U, Fries JF. "Running, osteoarthritis, and bone density: initial two-year longitudinal study."" *Am J Med*, 1990; **88**: 452-459.

41. Maloney W, Schurman D, Hangen D, Goodman S, Edworthy S, **Bloch DA** "The influence of continuous passive motion in total knee arthroplasty." *Clin Orthop*, 1990; **256**: 162-168.

42. Michel B, Lane N, Jones H, Fries J, **Bloch DA** "Plain radiographs can be useful in estimating lumbar bone density." *J Rheumatol*, 1990; **17**: 528-531.

43. **Bloch DA**, Moses LE, Michel BA. "Statistical approaches to classification: methods for developing classification and other criteria rules." *Arthritis Rheum*, 1990; **33(8)**: 1137-1144.

44. Arend WP, Michel BA, **Bloch DA**, Hunder G, Calabrese LH, Edworthy SM, Fauci AS, Leavitt RY, Lie JT, Lightfoot RW, Masi AT, McShane DJ, Mills JA, Stevens MB, Wallace SL, Zvaifler NJ. "The American College of Rheumatology 1990 criteria for the classification of Takayasu arteritis." *Arthritis Rheum*, 1990; **33(8)**: 1129-1134.

45. **Bloch DA**, Michel BA, Hunder GG, McShane D, Arend WP, Calabrese LH, Edworthy SM, Fauci AS, Fries JF, Leavitt RY, Lie JT, Lightfoot RW, Masi AT, Mills JA, Stevens MB, Wallace SL, Zvaifler NJ. "The American College of Rheumatology 1990 classification of vasculitis: patients and methods." *Arthritis Rheum*, 1990; **33(8)**: 1068-1073.

46. Calabrese LH, Michel BA, **Bloch DA**, Arend W, Edworthy SM, Fauci AS, Fries JF, Hunder GG, Leavitt RY, Lie JT, Lightfoot RW, Masi AT, McShane DJ, Mills JA, Stevens MB, Wallace SL, Zvaifler NJ. "The American College of Rheumatology 1990 criteria for the classification of hypersensitivity vasculitis." *Arthritis Rheum*, 1990; **33(8)**: 1108-1113.

47. Hunder GG, Arend WP, **Bloch DA**, Calebrese LH, Fauci AS, Fries JF, Leavitt RY, Lie JT, Lightfoot RW, Masi AT, McShane DJ, Michel BA, Mills JA, Stevens MB, Wallace SL, Zvaifler NJ. "The American College of Rheumatology 1990 criteria for the classification of vasculitis: introduction." *Arthritis Rheum*, 1990; **33(8)**: 1065-1067.

48. Hunder GG, **Bloch DA**, Michel BA, Stevens MB, Arend WP, Calabrese LH, Edworthy SM, Fauci AS, Leavitt RY, Lie JT, Lightfoot RW, Masi AT, McShane DJ, Mills JA, Wallace SL, Zvaifler NJ. "The American College of Rheumatology 1990 criteria for the classification of giant cell arteritis." *Arthritis Rheum*, 1990; **33(8)**: 1122—1128.

49. Leavitt RY, Fauci AS, **Bloch DA**, Michel BA, Hunder GG, Arend WP, Calabrese LH, Fries JF, Lie JT, Lightfoot RW, Masi AT, McShane DJ, Mills JA, Stevens MB, Wallace SL, Zvaifler NJ. "The American College of Rheumatology 1990 criteria for the classification of Wegener's Granulomatosis." *Arthritis Rheum*, 1990; **33(8)**: 1101-1107.

6

50. Lie JT, and Members and Consultants of the American College of Rheumatology Subcommittee on Classification of Vasculitis. "Illustrated histopathologic classification criteria for selected vasculitis syndromes." *Arthritis Rheum*, 1990; **33(8)**: 1074-1087.

51. Lightfoot RW, Michel BA, **Bloch DA**, Hunder G, Zvaifler NJ, McShane DJ, Arend WP, Calabrese LH, Leavitt RY, Lie JT, Masi AT, Mills JA, Stevens MB, Wallace SL. "The American College of Rheumatology 1990 criteria for the classification of polyarteritis nodosa." *Arthritis Rheum*, 1990; **33(8)**: 1088-1093.

52. Masi AT, Hunder GG, Lie JT, Michel BA, **Bloch DA**, Arend WP, Calabrese LH, Edworthy SM, Fauci AS, Leavitt RY, Lightfoot RW, McShane DJ, Mills JA, Stevens MB, Wallace SL, Zvaifler NJ. "The American College of Rheumatology 1990 criteria for the classification of Churg-Strauss syndrome (allergic granulomatosis and angiitis)." *Arthritis Rheum*, 1990; **33(8)**: 1094-1100.

53. Mills JA, Michel BA, **Bloch DA**, Calebrese HL, Hunder GG, Arend WP, Edworthy SM, Fauci AS, Leavitt RY, Lie JT, Lightfoot RW, Masi AT, McShane DJ, Stevens MB, Wallace SL, Zvaifler NJ. "The American College of Rheumatology 1990 criteria for the classification of Henoch-Schonlein purpura." *Arthritis Rheum*, 1990; **33(8)**: 1114-1121.

54. Fries JF, Hunder GG, **Bloch DA**, Michel B, Arend WP, Calabrese LH, Fauci AS, Leavitt RY, Lie JT, Lightfoot RW, Masi AT, McShane DJ, Mills JA, Stevens MB, Wallace SL, Zvaifler NJ. "The American College of Rheumatology 1990 criteria for the classification of vasculitis: summary." *Arthritis Rheum*, 1990; **33(8)**: 1135-1136.

55. Altman R, Alarcon G, Appelrouth D, **Bloch DA**, Borenstein D, Brandt K, Brown C, Cooke TD, Daniel W, Gray R, Greenwald R, Hochberg M, Howell D, Ike R, Kapila P, Kaplan D, Koopman W, Longley S, McShane DJ, Medsger T, Michel B, Murphy W, Osial T, Ramsey-Goldman R, Rothschild B, Stark K, Wolfe F. "The American College of Rheumatology criteria for classification and reporting of osteoarthritis of the hand." *Arthritis Rheum*, 1990; **33(11)**: 1601-1610.

56. Singh G, Fries JF, Williams CA, Zatarain E, Spitz P, **Bloch DA**.. "Toxicity profiles of disease modifying antirheumatic drugs in rheumatoid arthritis." *J Rheumatol*, 1991; **18(2)**: 188-194.

57. Wachter R, Russi M, **Bloch DA**, Hopewell P, Luce J. "Pneumocystis carinii pneumonia and respiratory failure in AIDS: improved outcomes and increased use of intensive care units."' *Am Rev Respir Dis*, 1991; **143**: 251-256.

58. Altman R, Medsger T, **Bloch DA**, Michel B. "Predictors of survival in systemic sclerosis (scleroderma)." *Arthritis Rheum*, 1991; **34(4)**: 403-413.

59. Altman R, Alarcon G, Appelrouth D, **Bloch DA**, Borenstein D, Brandt K, Brown C, Cooke TD, Daniel W, Feldman D, Greenwald R, Hochberg M, Howell D, Ike R, Kapila P, Kaplan D, Koopman W, Marino C, McDonald E, McShane DJ, Medsger T, Michel B, Murphy WA, Osial T, Ramsey-Goldman R, Rothschild B, Wolfe F. "The American College of Rheumatology criteria for classification and reporting of osteoarthritis of the hip." *Arthritis Rheum*, 1991; **34(5)**: 505-514.

60. Michel B, **Bloch DA**, Fries J. "Predictors of fractures in early rheumatoid arthritis." *J Rheumatol*, 1991; **18(6)**: 804-808.

61. Sharp J, Wolfe F, Mitchell D, **Bloch DA**. "The progression of erosion and joint space narrowing scores in RA during the first twenty-five years of disease." *Arthritis Rheum*, 1991; **34(6)**: 660-668.

62. Fries JF, Spitz PW, **Bloch DA**, Williams CA. "Factors in the duration and discontinuation of treatment with non steroidal anti-inflammatory medications." *Clin Ther*, 1991; **13(A)**: 51-62.

63. Fries JF, Williams CA, **Bloch DA**, Michel BA. "NSAID-associated gastropathy: incidence and risk factor models." *Am J Med*, 1991; **91(3)**: 213-222.

64. Fries JF, Williams CA, **Bloch DA**. "The relative toxicity of non-steroidal anti-inflammatory drugs." *Arthritis Rheum*, 1991; **34(11)**: 1353-1360.

65. Redelmeier D, **Bloch DA**, Hickam D. "Assessing predictive accuracy: how to compare Brier scores." *J Clin Epidemiol*, 1991; **44(11)**: 1141-1146.

66. Michel B, **Bloch DA**, Lane N, Fries J. "Effect of changes in weight-bearing exercise on lumbar bone mass after age fifty", *Ann Med*, 1991; **23**: 397-401.

67. Michel B, **Bloch DA**, Fries J. "Physical activity and fractures after age 50." *Int Orthop*, 1992; **16**: 87-91.

68. Michel BA, Hunder GG, **Bloch DA**, Calabrese LH. "Hypersensitivity vasculitis and Henoch-Schoenlein purpura: a comparison between the two disorders." *J Rheumatol*, 1992; **19(5)**: 721-728.

69. Callahan LF, **Bloch DA**, Pincus T. "Identification of work disability in rheumatoid arthritis: physical, radiographic and laboratory variables do not add explanatory power to demographic and functional variables." *J Clin Epidemiol*, 1992; **45(2)**: 127-138.

70. Michel BA, Lane NE, Bjorkengren A, **Bloch DA**, Fries JF. "Impact of running on lumbar bone density: A 5-year longitudinal study." *J Rheumatol*, 1992; **19(11)**: 1759-1763.

71. Michel B, Fries J, **Bloch DA**, Lane N, Jones H. "Osteophytosis of the knee: associations with changes in weight-bearing exercise." *Clin Rheumatol*, 1992; **11(2)**: 235-238.

72. Edworthy S, **Bloch DA**, Brant R, Fries J. "Detecting treatment effects in patients with rheumatoid arthritis: the advantages of longitudinal data." *J Rheumatol*, 1993; **20(1)**: 40-44.

73. Michel BA, Bjorkengren AG, Lambert E, Lane NE, Fries JF, **Bloch DA**. "Estimating lumbar bone mineral density from routine radiographs of the lumbar spine." *Clin Rheumatol*, 1993; **12(1)**: 49-52.

74. Hubert H, **Bloch DA**, Fries J. "Risk factors for physical disability in an aging cohort: the NHANES I epidemiologic followup study." *J Rheumatol*, 1993; **20(3)**: 480-488.

75. Lane N, Michel B, Bjorkengren A, Oehlert J, Shi H, **Bloch DA**, Fries J. "The risk of osteoarthritis with running and aging: a five year longitudinal study." *J Rheumatol*, 1993; **20(3)**: 461-468.

76. Fries J, Williams C, Ramey D, **Bloch DA**. "The relative toxicity of disease-modifying antirheumatic drugs." *Arthritis Rheum*, 1993; **36(3)**: 297-306.

77. Fries JF, **Bloch DA**, Harrington H, Richardson N, Beck R. "Two-year results of a randomized controlled trial of a health promotion program in a retiree population: The Bank of America study." *Am J Med*, 1993; **94(5)**: 455-462.

78. Belmonte MA, **Bloch DA**, Lane NE, Michel BE, Fries JF. "The relationship between spinal and peripheral osteoarthritis and bone density measurements." *J Rheumatol*, 1993; **20(9)**: 1005-1013.

79. Raynauld JP, **Bloch DA**, Fries JF. "Seasonal variation in the onset of Wegener's granulomatosis, polyarteritis nodosa and giant cell arteritis." *J Rheumatol*, 1993; **20(9)**: 1524-1526.

80. Bloch GJ, Butler PC, Kohlert J G, **Bloch DA**. "Microinjection of galanin into the medial preoptic nucleus facilitates copulatory behavior in the male rat." *Physiol Behav*, 1993; **54**: 615-624.

81. Astion ML, Wener MH, Thomas RG, Hunder GG, **Bloch DA**. "Over training in neural networks that interpret clinical data." *Clin Chem*, 1993; **39(9)**: 1998-2004.

82. Michel BA, **Bloch DA**, Wolfe F, Fries JF. "Fractures in rheumatoid arthritis: An evaluation of associated risk factors." *J Rheumatol*, 1993; **20(10)**: 1666-1669.

83. Clarke A, Esdaile J, **Bloch DA**, Lacaille D, Danoff D, Fries J.F. "A Canadian study of the total medical costs for patients with systemic lupus erythematosus and the predictors of costs." *Arthritis Rheum*, 1993; **36(11)**: 1548-1559.

84. Fries JF, Ramey DR, Singh G, Morfeld D, **Bloch DA**, Raynauld JP. "A re-evaluation of aspirin therapy in rheumatoid arthritis." *Arch Intern Med*, 1993; **153**: 2465-2471.

85. Fries JF, Williams CA, Ramey DR, **Bloch DA**. "The relative toxicity of alternative therapies for rheumatoid arthritis: implications for the therapeutic progression." *Semin Arthritis Rheum*, 1993; **23**: 68-73.

86. Kitchell BE, Brown DM, Luck EE, Woods L, Orenberg EK, **Bloch DA**. "Intralesional therapeutic implant for the treatment of primary oral malignant melanoma in the dog." *J Am Vet Med Assoc*, 1994; **204(2)**: 229-236.

87. Lacaille D, Clarke AE, **Bloch DA**, Danoff D, Esdaile JM. "The impact of disease activity, treatment and disease severity on short-term costs of systemic lupus erythematosus." *J Rheumatol*, 1994; **21(3)**: 448- 453.

88. Wolfe F, Mitchell D, Sibley J, Fries J, **Bloch DA**, Williams C, Spitz P, Haga M, Kleinheksel S, Cathey M. "The mortality of rheumatoid arthritis." *Arthritis Rheum*, 1994; **37(4)**: 481-494.

89. Astion ML, Wener MH, Thomas RG, Hunder GG, **Bloch DA**. "Application of neural networks to the classification of giant cell arteritis." *Arthritis Rheum*, 1994; **37(5)**: 760-770.

90. Winograd CH, Lemsky CM, Nevitt MC, Nordstrom TM, Stewart AL, Miller CJ, **Bloch DA**. "Development of a physical performance and mobility examination." *J Am Geriatr Soc*, 1994; **42(7)**: 743- 749.

91. Clarke AE, **Bloch DA**, Esdaile JM. "Decreasing costs and improving outcomes in SLE: Using regression trees to develop health policy." *J Rheumatol*, 1994; **21(12)**: 2246-2253.

92. Ward MM, Hubert HB, Shi H, **Bloch DA**, "Physical disability in older runners: prevalence, risk factors, and progression with age." *J Gerontol: Med Sci*, 1995; **50A(2)**: M70-M77.

93. Hornberger JC, Habraken H, **Bloch DA**. "Minimum data needed on patient preferences for accurate, efficient medical decision making." *Med Care*, 1995; **33(3)**: 297-310.

94. Tubert-Bitter P, **Bloch DA**, Raynauld JP. "Comparing the bivariate effects of toxicity and efficacy of treatments." *Stat Med*, 1995; **14**: 1129-1141.

95. Rubin GD, Alfrey EJ, Dake MD, Semba CP, Sommer FG, Kuo PC, Dafoe DC, Waskerwitz JA, **Bloch DA**, Jeffrey RB. "Assessment of living renal donors with spiral CT." *Radiology*, 1995; **195(2)**: 457-462.

96. Poole JL, Williams CA, **Bloch DA**, Hollak B, Spitz P. "Concurrent validity of the health assessment questionnaire disability index in seleroderma." *Arthritis Care Res*, 1995; **8(3)**: 189-193.

97. Singer AH, Tsao PS, Wang BY, **Bloch DA**, Cooke JP. "Discordant effects of dietary L-arginine on vascular structure and reactivity in hypercholesterolemic rabbits." *J Cardiovasc Pharmocol*, 1995; **25(5)**: 710-716.

98. Clarke AE, **Bloch DA**, Medsger TA, Oddis CV. "A longitudinal study of functional disability in a national cohort of patients with polymyositis - dermatomyositis." *Arthritis Rheum*, 1995; **38(9)**: 1218-1224

99. Matteson EL, Gold KN, **Bloch DA**, Hunder GG. "Long term survival of patients with giant cell arteritis from the American College of Rheumatology giant cell arteritis classification criteria cohort." *Am J Med*, 1996; **100**: 193-196.

100. Williams CA, **Bloch DA**, Sibley J, Haga M, Wolfe F, Reynauld JP, Singh G, Hickey AR, Fries JF. "Lymphoma and Leukemia in rheumatoid arthritis: are they associated with azathioprine, cyclophosphamide, or methotrexate?: A matched case - control study in the ARAMIS population." *J Clin Rheumatol*, 1996; **2(2)**: 64-72.

101.    Terr LC, **Bloch DA**, Michel BA, Shi H, Reinhardt JA, Metayer S. "Children's memories in the wake of Challenger." *Am J Psychiatry*, 1996; **153(5)**: 618-625.

102. Terr AI, **Bloch D A**, "Trends in asthma therapy in the United States: 1965-1992." *Ann Allergy Asthma Immunol*, 1996; **76**: 273-281.

103. Hornberger JC, Gibson CD, Wood W, Dequeldre C, Corso I, Palla B, **Bloch DA**. "Eliminating language barriers for non-English-speaking patients: a randomized control trial." *Med Care*, 1996; **34(8)**: 845-856.

104. James KE, **Bloch DA**, Lee KK, Kraemer HC, Fuller RF. "An index for assessing blindness in a multicenter clinical trial: disulfiram for alcohol cessation." *Stat Med*, 1996; **15(13)**: 1421-1434.

105. Gironimi G, Clarke AE, Hamilton VH, Danoff DS, **Bloch DA**, Fries JF, Esdaile JM. "Why health care costs more in the U.S.: comparing health care expenditures between SLE patients at Stanford and Montreal." *Arthritis Rheum*atol, 1996; **39(6)**: 979-987.

106. Matteson EL, Gold KN, **Bloch DA**, Hunder GG. "Long term survival of patients with Wegener's granulomatosis from the American College of Rheumatology Wegener's granulomatosis classification criteria cohort." *Am J Med*, 1996; **101**: 129-134.

107. Satish S, Winograd CH, Chavez C, **Bloch DA**. "Geriatric targeting criteria as predictors of survival and health care utilization." *J Am Geriatr Soc*, 1996; **44**: 914-921.

108. Bonello RS, Marcus R, **Bloch DA**, Strober S. "Effects of growth hormone and estrogen on T lymphocytes in older women." *J Am Geriatr Soc*, 1996; **44**: 1038-1042.

109. Sevin BU, Nadji M, Lu Y, **Bloch DA**, Koechli OR, Averette HA. "Surgically defined prognostic parameters in patients with early cervical carcinoma: a multivatiate survival tree analysis." *Cancer*, 1996; **78**: 1438-1446.

110. Rubin GD, Lane ML, **Bloch DA**, Leung AN, Stark P. "Optimization of thoracic spiral CT: effects of iodinated contrast medium concentration." *Radiology*, 1996; **201**: 785-791.

111. Altman RD, Brandt K, Hochberg MC, Moskowitz R, Bellamy N, **Bloch DA**, et al. "Design and conduct of clinical trials in patients with osteoarthritis: recommendations from a task force of the Osteoarthritis Research Society." *Osteoarthritis Cartilage*, 1996; **4**: 217-243.

112. **Bloch DA**, Silverman BW. "Monotone discriminant functions and their applications in rheumatology." *J Am Stat Assoc*, 1997; **92**: 144-153.

113. **Bloch DA**. "Comparing two diagnostic tests against the same "gold standard" in the same sample." *Biometrics*, 1997; **53**: 73-85.

114. Vosti KL, **Bloch DA**, Jacobs CD. "The relationship of clinical knowledge to months of clinical training among medical students." *Acad Med*, 1997; **72**: 305-307.

115. Carmeci C, DeConinck EC, Lawton T, **Bloch DA**, Weigel RJ. "Analysis of estrogen receptor messenger RNA in breast carcinomas from archival specimens is predictive of tumor biology." *Am J Pathol*, 1997; **150**: 1563-1570.

116. Winograd CH, Lindenberger EC, Chavez CM, Mauricio MP, Shi H, **Bloch DA**. "Identifying hospitalized older patients at varying risk for physical performance decline: a new approach." *J Am Geriatr Soc*, 1997; **45**: 604-609.

117. Terr LC, **Bloch DA**, Michel BA, Shi H, Reinhardt JA, Metayer S. "Children's thinking in the wake of Challenger." *Am J Psychiatry*, 1997; **154(6)**: 744-751.

118. Nelson LM, **Bloch DA**, Longstreth WT, Shi H. "Recursive partitioning for the identification of disease risk subgroups: a case - control study of subarachnoid hemorrhage." *J Clin Epidemiol*, 1998; **51(3)**: 199-209.

119. Hirsch R, Fernandes RJ, Pillemer SR, Hochberg MC, Lane NE, Altman RD, **Bloch DA**, Knowler WC, Bennet PH. "Hip osteoarthritis prevalence estimates by three radiographic scoring systems." *Arthritis Rheum*, 1998; **41(2)**: 361-368.

120. Lane NE, Oehlert JW, **Bloch DA**, Fries JF. "The relationship of running with osteoarthritis of the knee and hip and bone mineral density of the lumbar spine: a nine year longitudinal study." *J Rheum*, 1998; **25(2)**: 334-341.

121. Inserra MM, **Bloch DA**, Terris DJ. "Functional indices for sciatic, peroneal and posterior tibial nerve lesions in the mouse." *Microsurgery*, 1998; **18**: 119-124.

122. Hsieh FY, **Bloch DA**, Larsen MD. "A simple method of sample size calculation for linear and logistic regression." *Stat Med*, 1998; **17**: 1623-1634.

123. Hirsch R, Lin J-P, Scott WW, Ma LD, Pillemer SR, Kastner DL, Jacobsson LTH, **Bloch DA**, Knowler WC, Bennet PH, Bale SJ. "Rheumatoid arthritis in the Pima indians: the intersection of epidemiologic, demographic and genealogic data." *Arthritis Rheum*, 1998; **41(8)**: 1464-1469.

124. Wolff DR, Rose J, Jones VK, **Bloch DA**, Oehlert JW, Gamble JG. "Postural balance measurements for children and adolescents." *J Orthop Res*, 1998; **16**:271-275.

125. Schurman DJ, Matityahu A, Goodman SB, Maloney W, Woolson S, Shi H, **Bloch DA**. "Prediction of post-operative knee flexion in Insall-Burstein-11 total knee arthoplasty." *Clin Orthop*, 1998; **353**: 175-184.

126. Hayamizu K, Zeng D, Huie P, Garcia-Ojeda ME, **Bloch DA**, Fong L, Engeleman EG, Sibley RK, Strober S. "Donor blood monocytes but not T or B cells facilitate long-term allograft survival after total lymphoid irradication." *Transplantation*, 1998; **66(5)**: 585-593.

127. Gabalski EC, Adam M, Pinto H, Brown JM, **Bloch DA**, Terris DJ. "Pretreatment and mid-treatment measurements of oxygen tension levels in head and neck cancers." *Laryngoscope*, 1998; **108**: 1856- 1860.

128. Adam MF, Gabalski EC, **Bloch DA**, Oehlert JW, Brown JM, Elsaid AA, Pinto HA, Terris DJ. "Tissue oxygen distribution in head and neck cancer patients." *Head Neck*, 1999; **21**: 146-153.

129. Calkins H, Yong P, Miller JM, Olshansky B, Carlson M, Saul JP, Shoei K, Huang S, Liem LB, Klein LS, Moser SA, **Bloch DA**, Gillette P, Prystowsky E. "Catheter ablation of accessory pathways, atrioventricular nodal reentant tachycardia, and the atrioventricular junction: final results of a prospective multi-center clinical trial." *Circulation*, 1999; **99**: 262-270.

130. Thom DH, **Bloch DA**, Segal ES. "An intervention to increase patients' trust in their physicians, Stanford Trust Study Group." *J Acad Med*, 1999; **74(2)**: 195-198.

131. Rosen A, Gamble JG, Vallier H, **Bloch DA**, Smith L, Rinsky LA. "Analysis of radiographic measurement as prognostic indicators of treatment success in patients with developmental dysplasia of the hip." *J Pediatr Orthop B*, 1999; **8**: 118-121.

132. Hornberger J, **Bloch DA**, Hlatky M, Baumgartner W. "Patient preferences in coronary revascularization." *Am Heart J*, 1999; **137**: 1153-1162.

133. Lavori PW, **Bloch DA**, Bridge PT, Leiderman DB, LoCastro JS, Somoza E. "Plans, designs and analyses for clinical trials of anti-cocaine medications: where we are today." *J Clin Psychopharmacol*, 1999; **19(3)**: 246-256.

134. Fischer D, Stewart AL, **Bloch DA**, Lorig K, Laurent D, Holman H. "Capturing the patient's view of change as a clinical outcome measure." *JAMA*, 1999; **282(12)**: 1157-1162.

135. Terr LC, **Bloch DA**, Michel BA, Shi H, Reinhardt JA, Matayer S. " Children's symptoms in the wake of Challenger: a field study of distant-tramatic effects and an outline of related conditions." *Am J Psychiatry*, 1999; **156**: 1536-1544.

136. Schwartz AV, Villa ML, Prill M, Kelsey JA, Galinus JA, Delay RR, Nevitt MC, **Bloch DA**, Marcus R, Kelsey JL. "Falls in older Mexican-American women." *J Am Geriatr Soc*, 1999; **47**: 1371-1378.

137. Dorie MJ, Kovacs MS, Gabalski EC, Adam M, Le QT, **Bloch DA**, Pinto HA, Terris DJ, Brown MJ. "DNA damage by the comet assay in head and neck cancer patients treated with tirapazamine." *Neoplasia*, 1999; **1(5)**: 461-467.

138. Altman RD, **Bloch DA**, Hochberg MC, Murphy WA. "Prevalence of pelvic Paget's disease of bone in the United States." *J Bone Miner Res*, 2000; **15**: 461-465.

139. Chitkara U, Lee L, El-Sayed Y, Holbrook RH, **Bloch DA**, Oehlert JW, Druzin ML. "Ultrasonographic ear length measurement in normal second - and third - trimester fetuses." *Am J Obstet Gynecol*, 2000; **183**: 230-234.

140. Mills KM, Kheifets LI, Nelson LM, **Bloch DA**, Takemoto-Hambleton R, Kelsey JL. "Reliability of proxy-reported and self-reported household appliance use." *Epidemiology*, 2000; **11**: 581-588.

13

141. Dougados M, LeClaire P, Van Der Heijde D, **Bloch DA**, Bellamy N, Altman RD. "Response criteria for clinical trials on osteoarthritis of the knee and hip: A report of the Osteoarthritis Research Society International Standing Committee for clinical trials response criteria initiative." *Osteoarthritis Cartilage*, 2000; **8(6)**: 395-403.

142. Zarins CZ, White RA, Moll F, Crabtree T, **Bloch DA**, Hodgson KJ, Fillinger M, Fogarty TJ. "The Aneurx stent graft: four year results and worldwide experience 2000." *J Vasc Surg*, 2001; **33**: S135-S145.

143. Ritter PL, Stewart AL, Kaymaz H, Sobel DS, **Bloch DA**, Lorig KR. "Self-reports of health care utilization compared to provider records." *J Clin Epidemiol*, 2001; **54**: 136-141.

144. Barnett PG, Rodgers JH, **Bloch DA**. "A meta-analysis comparing buprenorphine to methadone for treatment of opiate dependence." *Addiction*, 2001; **96**: 683-690.

145. Robinson TE, Leung AN, Northway WH, Blankenberg FG, **Bloch DA**, Oehlert JW, Al-Dabbagh H, Hubli S, Moss RB. "Spirometer-triggered high-resolution CT and pulmonary function measurements during an acute exacerbation in patients with cystic fibrosis." *J Pediatr*, 2001; **138(4)**: 553-559.

146. Edson R, Lavori P, **Bloch DA**, Tracy K, Adler LA, Rotrosen J. "Interrater reliability of the abnormal involuntary movements scale (AIMS) in a multi-center trial: results from Department of Veterans Affairs cooperative study #394." *Int J Meth Psych Res*, 2001; **9(4)**: 157-164.

147. Nelson LM, Prill MM, Kelsey JL, Mills KM, **Bloch DA**, Kheifts LI, "Reliability of proxy-reported and self-reported occupational history: Implications for association studies of electric and magnetic field exposure and chronic disease." *J Clin Epidemiol*, 2001; **96**: 683-690.

148. **Bloch DA**, Lai TL, Tubert-Bitter P. "One-sided tests in clinical trials with multiple endpoints." *Biometrics*, 2001; **57**: 1039-1047.

149. Chitkara U, Lee L, Oehlert JW, **Bloch DA**, Holbrook RH, El-Sayed Y, Druzin ML. "Fetal ear length measurement: a useful predictor of aneuploidy?" *Ultrasound Obstat Gynecol*, 2002; **19**: 131-135.

150. Genovese MC, Uhrin Z, **Bloch DA**, Oehlert J, Sibley RK, Myers B, Strober S. "Long-term followup of patients treated with total lymphoid irradiation for lupus nephritis" *Arthritis Rheum*, 2002; **46(4)**: 1014-1018.

151. **Bloch DA**, Olshen RA, Walker MG. "Risk estimation for classification trees." *J Comput Graph Stat*, 2002; **11(2)**: 263-288.

152. Rose J, Wolff DR, Jones VK, **Bloch DA**, Oehlert JW, Gamble JG. "Postural balance in patients with cerebral palsy." *Dev Med Child Neurol*, 2002; **44**: 58-63.

153. Yorgin PD, Belson A, Sanchez J, Al Uzri AY, Sarwal M, **Bloch DA**, Oehlert J, Salvatierra O, Alexander SR. "Unexpectedly high prevalence of post-transplant anemia

14

in pediatric and young adult renal transplant recipients." *Am J Kidney Dis*, 2002; 40: 1306-1318.

154. Hubert HB, **Bloch DA,** Oehlert JW, Fries JF. "Life-style habits and compression of morbidity." *J. Gerontol: Med Sci,* 2002; **57A (6):** m347-m351.

155. Silverberg GD, Levinthal E, Sullivan EV, **Bloch DA,** Chang SD, Leverentz J, Flitman S, Winn R, Marciano F, Saul T, Huhn S, Mayo M, McGuire D. "Assessment of low-flow CSF drainage as a treatment for Alzheimer's disease: results of a randomized pilot study." *Neurology,* 2002; **59:** 1139-1145.

156. Tubert-Bitter P, **Bloch DA,** Lai TL. "Comparison of treatments with multiple outcomes. Statistical methods for Quality of Life studies: Design, Measurements and Analysis." Kluwer Academic Publishers, 2002: 113-128.

157. Van Den Eden SK, Tanner CM, Bernstein AL, Fross RD, Leimpeter A, **Bloch DA,** Nelson LM. "Incidence of Parkinson's disease: Variation by age, gender, and race/ethnicity." *Am J Epidemiol,* 2003; **157:** 1015-1022.

158. Reichert JA, **Bloch DA,** Cundiff E, Votteri BA. "Comparison of the Novasom QSG$^{TM}$, a new sleep apnea home-diagnostic system and polysomnography". *Sleep Med,* 2003; 4: 213-218.

159. Raynauld J-P, Kauffman C, Beaudoin G, Berthiaume M-J, Guise de J, **Bloch DA,** Comancho F, Godbout B, Altman R, Hochberg M, Meyer J, Pelletier J-P, Pelletier J-M. "Reliability of a new quantification imaging system using magnetic resonance images to measure cartilage thickness and volume in human normal and osteoarthritic knees." *Osteoarthritis Cartilage,* 2003; **11(5):** 351-360.

160. Robinson TE, Leung AN, Northway WH, Blankenberg FG, Chan FP, **Bloch DA,** Holmes TH, Moss RB. "Composite spirometric-CT outcome measure in early cystic fibrosis (CF) lung disease." *Am J Respir Crit Care Med,* 2003; **168:** 588-593.

161. Zarins CK, **Bloch DA,** Crabtree T, Matsumoto AH, White RA, Fogerty TJ. "Stent graft migration following endovascular aneurysm repair: importance of proximal fixation." *J Vasc Surg,* 2003; **38(6):** 1264-1272.

162. Goodman S, Trihdade M, Ma T, Lee M, Wang N, Ikenou T, Matsuura I, Miyanishi K, Fox N, Regula D, Genovese M, Klein J, **Bloch DA,** Smith RL. "Modulation of bone in-growth and tissue differentiation by local infusion of IL-10 in the presence of UHMWPE wear particles." *J Biomed Mater Res,* 2003; **65A (1):** 43-50.

163. Le Q-T, Kovacs MS, Kovacs MS, Dorie MJ, Koong A, Terris DJ, Pinto HA, Goffinet DR, Nowels K, **Bloch DA,** Brown JM. "Comparison of the comet assay and the oxygen microelectrode for measuring tumor oxygenation in head and neck cancer patients." *Int J Radiat Oncol Biol Phys,* 2003; **56:** 375-383.

164. Zarins CK, **Bloch DA,** Crabtree T, Matsumoto AH, White RA, Fogarty TJ. "Aneurysm enlargement following endovascular aneurysm repair: AneuRx Clinical Trial." *J Vasc Surg,* 2004; **39:** 109-117.

15

165. **Bloch DA**, Lai TL, Tubert-bitter P. A rejoinder to "A note on one-sided tests with multiple endpoints," by Perlman MD and Wu L. *Biometrics*, 2004; **60**: 279-280.

166. Altman RD, **Bloch DA**, Dougados M., Hochberg M., Lohmander S., Pavelka K., Spector T., Vignon E. " Measurement of progression of osteoarthritis of the hip: the Barcelona consensus group." *Osteoarthritis Cartilage*, 2004; **12**: 515-524.

167. Raynauld, J-P, Pelletier JM, Berthiaume MJ, Labonte F, Beaudoin G, Guise JA, **Bloch DA**, Choquette D, Haraoui B, Altman RD, Hochberg MC, Meyer JM, Cline GA, Pelletier J-P. "Quantitative magnetic imagining of knee osteoarthritis progression over two years and correlation with clinical symptoms and radiological changes." *Arthritis Rheum*, 2004; **50(2)**: 476-487.

168. Zarins CK, Arko FR, Crabtree T, **Bloch DA**, Ouriel K., Allen RC, White RA. "Explant analysis of AnauRx stent grafts-relationship between structural findings and clinical outcome." *J Vasc Surg*, 2004; **40(1)**: 1-11.

169. Tubert-Bitter P, **Bloch DA**, Letierce A, Kramer A. "Non-Parametric Comparison of the Effectiveness of Treatments: A multivariate Toxicity-Penalized Approach." *J Biopharm Stat*, 2005; **15(1)**: 129-142.

170. Bertiaume M-J, Raynauld J-P, Martel-Pelletier J., Labonte F., Beaudoin G., **Bloch DA**, Choquette D., Haraoui B., Altman RD, Hochberg M., Meyer JM, Cline GA, Pelletier J-P. "Meniscal tear and extrusion are strongly associated with the progression of symptomatic knee osteoarthritis as assessed by quantitative magnetic resonance imaging." *Ann Rheum Dis*, 2005; **64(4)**: 556-563.

171. Berger PS, Winhusen TM, Somoza EC, Harrer JM, Mezinskis JP, Leiderman DB, Montogmery AM, Goldsmith RJ, **Bloch DA**, Singal BM, and Elkashef A. " A Medication Screening Trial Evaluation of Reserpine, Gabapentin, and Lamotrigine Pharmacotherapy of Cocaine Dependence." *Addiction*, 2005; **100(S1)**: 58-67.

172. Ciraulo DA, Sarid-Segal O., Knapp CM, Ciraulo AM, Locastro J, and **Bloch DA**, Montgomery MA, Leiderman DB, and Elkashef A. "Efficacy Screening Trials of Paroxetine, Pentoxifylline, Riluzole, Pramipexole, and Venlafaxine in Cocaine Dependence." *Addiction*, 2005; **100(S1)**: 12-22.

173. Leiderman DB, Shoptaw S., Montgomery A., **Bloch DA**, Elkashef A., LoCastro J., and Vocci F. "Cocaine Rapid Efficacy Screening Trials (CREST): a Paradigm for the Controlled Evaluation of Candidate Medications for Cocaine Dependence." *Addiction*, 2005; **100(S1)**: 1-11.

174. Kampman KM, Leiderman D., Holmes T., LoCastro J., **Bloch DA**, Reid MS, Shoptaw S, Montgomery MA, Winhuser TM, Somoza EC, Ciraulo DA, Elkashef A., and Vocci F. "Cocaine Rapid Efficacy Screening Trials (CREST): Lessons Learned." *Addiction*, 2005; **100(S1)**: 102-110.

175. Elkashef A, Holmes TH, **Bloch DA**, Shoptaw S., Kampman K., Reid M., Samoza E., Ciraulo D., Rotrosen J., Leiderman D., Montgomery A., and Vocci F. " Retrospective

16

analysis of pooled data from CREST I and CREST II trials for treatment of cocaine dependence." *Addiction,* 2005; **100(S1)**: 91-101.

176. Winhusen TM, Somoza EC, Harrer JM, Mezinskis JP, Montgomery MA, Goldsmith RJ., Coleman FS, **Bloch DA,** Leiderman DB, Singal BM, Berger P, and Elkashef A. "A Placebo-Controlled Screening Trial of Tiagabine, Sertraline, and Donepezil as Cocaine Dependence Treatments." *Addiction,* 2005; **(S1)**: 68-77.

177. Zarins CK, Crabtree T, Arko FR, Heikkinen MA, **Bloch DA,** Ouriel K, White RA. "Endovascular repair or surveillance of patients with small AAA." *Eur J Vasc Endovasc Surg,* 2005; **29**: 496-503.

178. Popat RA, Eeden SK, Tanner CM, McGuire V, Bernstien AL, **Bloch DA,** Leimpeter MS, Nelson LM. "Effect of reproductive factors and postmenopausal hormone use on the risk of Parkinson's disease." *Neurology,* 2005; **65**: 383-390.

179. Lowsky R, Takahaste T, Liu YP, Dejbakhsh-Jones S, Grumet FC, Shizuru JA, Laport GG, Stockerl-Goldstein KE, Jonston LJ, Hoppe RT, **Bloch DA,** Blume KG, Negrin RS, Strober S. "Protective conditioning for acute graft-versus-host disease." *N Engl J Med,* 2005; **353**: 1321-1331.

180. Newton TF, De La Garza R, Fong T, Chiang N, Holmes TH, **Bloch DA,** Anderson A, Elkashef A. "A comprehensive assessment of the safety of intravenous methamphetamine administration during treatment with selegiline." *Pharmacol Biochem Behav,* 2005: **82**: 704-711.

181. Maheu E, Altman RD, **Bloch DA,** Doherty M, Hochberg M, Mannoni A, Punzi L Spector T, Verbruggen G. "Design and conduct of clinical trials in patients with osteoarthritis of the hand: recommendations from a task force of the Osteoarthritis Research Society International." *Osteoarthritis Cartilage,* 2006; **14(4)**: 303-322.

182. Le Q-T, Taira A, Budenz S, Dorie MJ, Goffinet DR, Fee WE, Goode R, **Bloch D,** Koong A, Brown MJ, Pinto HA. "Mature results of a randomized phase II trial of cisplatin/5-flurouracil and radiotherapy ± tirapazamine in patients with resectable stage IV head and neck squamous cell carcinomas." *Cancer,* 2006; **106(9)**: 1940-1949.

183. Popat RA, Van Den Eeden SK, Tanner CM, Bernstein AL, **Bloch DA,** Leimpeter A, McGuire V, Nelson LM. "Effect of reproductive factors and postmenopausal hormone use on the risk of amyotrophic lateral sclerosis." *Neuroepidemiology,* 2006; **27**: 117-121.

184. Camargo CA, **Bloch DA.** "Fluoxetine and suicide notes: suicide and the economy." *PLoS Med,* 2006; **3(11)**: 2161-2164.

185. Johnson BA, Roache JD, Ait-Daoud N, Lamb RJ, Javors MA, Harrison JM, Elkashef A, Mojsiak J, Li S-H, **Bloch DA.** "A preliminary randomized, double-blind, placebo controlled study of the safty and efficacy of ondansetron in the treatment of cocaine dependence." *Drug Alcohol Depend,* 2006; **84(3)**: 256-263.

186. Sandborg C, Holmes TH, Lee T, Biederman K, **Bloch DA,** Emery H, McCurdy D, Mellins ED. "Candidate early predictors for progression to joint damage in

systemic juvenile idiopathic arthritis." *J Rheumatol*, 2006; **33**: 2322-2329.

187. Kushida CA, Nichols DA, Quan SF, Goodwin JL, White DP, Gottlieb DJ, Walsh JK, Schweitzer PK, Guilleminault C, Srinon RD, Leary EB, Hyde PR, Holmes TH, **Bloch DA**, Green S, Gevins A, McEvoy LK, Dement WC. "The apnea positive pressure long-term efficacy study (APPLES): rationale, design, methods, and procedures." *J Clin Sleep Med*, 2006; **2**: 288-300.

188. Zarins CK, Crabtree T, **Bloch DA**, Arko FR, Ouriel K, White RA. "Endovascular aneurysm repair at 5 years: Does aneurysm diameter predict outcome?" *J Vasc Surg*, 2006; 44(5): 920-929.

189. Benharash P, Lee JT, Abilez OJ, Crabtree J, **Bloch DA**, Zarins CK. "Iliac fixation inhibits migration of both suprarenal and infrarenal aortic endografts." *J Vasc Surg*, 2007; 45(2): 250-257.

190. **Bloch DA**, Lai TL, Su Z, Tubert-Bitter P. "A combined superiority and non-inferiority approach to multiple endpoints in clinical trials." *Stat Med*, 2007; 26(6): 1193-1207.

191. Rocha-Singh KJ, Jaff MR, Crabtree TR, **Bloch DA**, Ansel G. "Performance goals and endpoint assessments for clinical trials of femoropopliteal bare nitinol stents in patients with symptomatic peripheral arterial disease." *Cathet and Cardiovasc Interv*, 2007; 69: 910-919.

192. Popat RA, Tanner CM, Eeden SK, Bernstein AL, **Bloch DA**, Leimpeter A, McGuire V, Nelson LM. "Effect of non-steroidal anti-inflammatory medications on the risk of amyotropic lateral sclerosis." *Amyotroph Lateral Scler*, 2007; **8**: 157-163.

193. Olsen JA, **Bloch DA**, Bloch GJ. "Controlling for occasion-specific effects when assessing the test-retest reliability of self-report health questionnaires." *Qual Life Res*, 2007; 16: 1399-1405.

194. Stafford IP, Garite T, Dildy GA, Lucah AC, Williams CA, Bobritchi B, Lapointe, J, **Bloch DA**. "A comparison of speculum and non-speculum collection of cervovaginal specimens for fetal fibronectin testing." *Am J Obstet Gynecol* 2008; 199(2): 131.e1-e4.

195. Johnson BA, Ait-Daoud N, Elkashef A, Smith EV, Kahn R, Vocci F, Li S-H, **Bloch DA**. "A preliminary randomized, double-blind, placebo controlled study of the safety and efficacy of ondansetron in the treatment of methamphetamine dependence." *Int J Neurpsycopharm* 2008;11: 1-14.

196. Altman RD, Rosen JE, **Bloch DA**, Hatoum HT, Korner P. "A double-blind, randomized, saline controlled study of the effects and safety of EUFLEXXA for treatment of painful osteoarthritis of the knee, with an open-label safety extension." ( *Semin Arthritis Rheum* 2009).

197. Gerszten PC, Smuck MW, Rathmell JP, Simopoulos TT, Bhagia SM, Mocek CK, Crabtree T, **Bloch DA**. "Plasma disc decomposition compared to fluoroscopy-guided transforminal epidural steroid injections for symptomatic contained lumbar disc

18

herniation: a prospective, randomized controlled trial." ( To appear, *J Neurosurg:Spine 2010)* .

198. Nelson LM, Van Den Eden SK, Tanner CM, Harrington D, **Bloch DA**, Bernstein AL. "Associations of tobacco, alcohol and caffeine consumption with the risk of developing Parkinson's disease: A population – based study." (submitted to *Neurology)*.

199. Bloch GJ, Kohlert JG, Mills RH, **Bloch DA**, "Acute and sensitized response to amphetamine in hyperactive vs. control rats." (submitted to *Pharm Biochem and Behav)*.

200. Glickman MH, Berman S, **Bloch DA**, Dickerman R, Frusha J, Henry ML, Hingorani A, Mistry B, Ross JR, Schild AF, Shenoy S. "Comparison of maturity, patency in arteriovenous fistula anastomoses: early results from a controlled, prospective, randomized, multi-center study comparing an interrupted nitinol clip technique to continuous suturing technique." (submitted to *J Vasc Surg.)*.

201. Yeast J, Peaceman A, Carlan S, Morrison J, Porter F, Perlow J, Colombo D, Goodwin T, Hickok D, Williams C, **Bloch D**, Garite T. "A positive fetal fibronectin test is associated with more favorable induction of labor outcomes." (submitted to *Am J Obstet Gynocol*).

202. Shino M, McGuire V, Van Den Eeden SK, Tanner CM, Popat R, Leimpeter A, **Bloch DA**, Bernstein AL, Nelson LM. "Familial aggregation of Parkinson's disease in a population-based case-control study." (submitted to *Neurology*).

203. Terr LC, **Bloch DA**, Oehlert J. "Compositions from Columbine: evidence of healing after a terror attack." (submitted to *Am J Psychiatry)*

204. Repossini A, **Bloch D**, Muneretto C, Piccoli P, Beholz S. "Transient thrombocytopenia after stentless pericardial aortic valve replacement: a real phenomenon? (submitted to *J Thorac Cardiovasc Surg*)

## 2. NON-PEER REVIEW PUBLICATIONS

1. **Bloch DA**, Lorig K, Brown BW, Moses LE. "Parametric versus non-parametric statistics." *Soc Sci Med*, 1989; **29(2)**:259-260.

2. Fries JF, Singh G, **Bloch DA**, Calin A. "The natural history of ankylosing spondylitis: is the disease really changing?" *J Rheumatol*, 1989; **16(7)**:860-863.

3. Astion ML, **Bloch DA**, Wener MH. "Neural network as expert systems in rheumatic disease diagnosis: artificial intelligence or intelligent artifice?" *J Rheumatol*, 1993; **20(9)**:1465-1471.

4. Kraemer HC, **Bloch DA**. "A goodness-of-fit approach to inference procedures for the kappa statistic: confidence interval construction, significance-testing and sample size estimation." *Stat Med*, 1994; **13(8)**:876-878.

5. Fries JF, **Bloch DA**, "Mortality in rheumatoid arthritis patients." *Ann Rheum Dis*, 1999; **59**:723-724.

6. Holman H, **Bloch DA**, Lorig K, Laurent D, Fisher D, Stewart AL. "Capturing the patient's view of change as a clinical outcome measure." *JAMA*, 2000; **283(14)**:1825.

7. Zarins CK and **Bloch DA**. "Misconceptions regarding the long term safety of the AneuRx stent graft." *J Vasc Surg*, 2004; **40(3)**:594-595.

8. Zarins CK, Crabtree T, Arko FR, Heikkinen MA, **Bloch DA**, Ouriel K, White RA. "Endovascular repair of surveillance of patients with small AAA." Letter to Editor. *Eur J Vasc Endovasc Surg*, 2006; **31**: 562-563.

20