# Exhibit 41

Case 2:23-cv-04104-MRP    Document 66-41    Filed 07/23/24    Page 2 of 37



**U.S. Securities and Exchange Commission**

Home / Rules and Regulations / Issuer Restrictions or Prohibitions on Ownership by Securities Intermediaries

## FINAL RULE

# Issuer Restrictions or Prohibitions on Ownership by Securities Intermediaries

## Overview

SECURITIES AND EXCHANGE COMMISSION

17 CFR Part 240

[Release No. 34-50758A; File No. S7-24-04]

RIN 3235-AJ26

ISSUER RESTRICTIONS OR PROHIBITIONS ON OWNERSHIP BY SECURITIES INTERMEDIARIES

AGENCY: Securities and Exchange Commission.

ACTION: Final rule.

SUMMARY: The Securities and Exchange Commission ("Commission") is adopting a new rule under the Securities Exchange Act of 1934 ("Exchange Act") that prohibits registered transfer agents from effecting any transfer of any equity security registered under Section 12 or any equity security that subjects an issuer to reporting under Section 15(d) of the Exchange Act if such security is subject to any restriction or prohibition on transfer to or from a securities intermediary, such as clearing agencies, banks, or broker-dealers. The

Case 2:23-cv-04104-MRP    Document 66-41    Filed 07/23/24    Page 3 of 37

primary purpose of the rule is to promote the integrity and efficiency of the U.S. clearance and settlement system.

EFFECTIVE DATE: March 7, 2005.

FOR FURTHER INFORMATION CONTACT: Jerry Carpenter, Assistant Director, or Susan M. Petersen, Special Counsel, Office of Risk Management, 202/942-4187, Division of Market Regulation, Securities and Exchange Commission, 450 Fifth Street, NW, Washington, DC, 20549-1001.

SUPPLEMENTARY INFORMATION:

I. INTRODUCTION

Recently, a number of issuers of equity securities trading in the public markets have imposed restrictions on their securities to limit or to prohibit ownership of the securities by securities intermediaries such as depositories, broker-dealers, and banks. Such restrictions require these securities to be certificated and transactions in these securities to be manually cleared, settled, and transferred on a transaction-by-transaction basis.

To facilitate the clearance and settlement of securities transactions, securities held by a securities intermediary on behalf of its customers or another securities intermediary are commonly registered in the name of the securities intermediary or in its nominee name, which makes the securities intermediary the registered owner.[1] This is often referred to as holding a security in "street name."[2] Holding securities in street name at a securities depository facilitates the transfer of negotiable certificates and obviates manually processed paperwork and physical delivery of certificates. Registered clearing agencies acting as securities depositories help to centralize and automate the settlement of securities, in part by reducing the physical movement of securities traded in the U.S. markets using book-entry movements. On occasion, other types of securities intermediaries, such as broker-dealers or banks, may perform similar functions by holding a certificate registered in its name but held on behalf of its customers.

The use of securities depositories in order to minimize the physical movement in connection with the settlement for securities traded in the public market is essential to the prompt and accurate clearance and settlement of securities transactions.[3] The effort by some issuers to restrict ownership of publicly traded securities by securities intermediaries can result in many of the inefficiencies and risks Congress sought to avoid when promulgating Section 17A of the Exchange Act.[4] Restrictions on intermediary ownership deny investors the ability to use a securities intermediary to hold their

Case 2:23-cv-04104-MRP    Document 66-41    Filed 07/23/24    Page 4 of 37

securities and to efficiently and safely clear and settle their securities transactions by book-entry movements.

On June 4, 2004, the Commission proposed Rule 17Ad-20 that would prohibit registered transfer agents from effecting any transfer of any equity security registered under Section 12 or any equity security that subjects an issuer to reporting under 15(d) of the Exchange Act[5] if such security is subject to any restriction or prohibition on transfer to or from a securities intermediary.[6] Under the proposed rule, the term "securities intermediary" would be defined as a clearing agency registered under Section 17A of the Exchange Act or a person, including a bank, broker, or dealer, that in the ordinary course of its business maintains securities accounts for others. As proposed, the rule would exclude any equity security issued by a partnership, as defined in Item 901 of Regulation S-K. For tax or other reasons, partnerships may have an appropriate need to restrict ownership and issue a securities certificate.

The Commission solicited comments on the proposed rule and received fourteen comment letters from eleven commenters.[7] The responses varied widely, with three commenters supporting the rule as proposed, five commenters opposing the proposal or expressing reservations about the proposal until certain preconditions have been met, and three commenters not expressing support or opposition but instead raising interpretive, operational, or timing concerns with adoption of the rule. After carefully considering the comments received, we have decided to adopt Rule 17Ad-20 with a minor modification to address certain commenter concerns raised relating to private placements and certain types of private agreements.

II. BACKGROUND

A. The National System for Clearance and Settlement of Securities Transactions

In Section 17A(a) of the Exchange Act, Congress made findings that (1) the prompt and accurate clearance and settlement of securities transactions, including the transfer of registered ownership and safeguarding of securities and funds related to clearance and settlement activities, are necessary for the protection of investors and those acting on behalf of investors,[8] and (2) inefficient clearance and settlement procedures impose unnecessary costs on investors and those acting on their behalf.[9] To address these concerns, Congress gave the Commission the authority and responsibility to regulate, coordinate, and direct the processing of securities transactions in order to facilitate the establishment of a national system for the prompt and accurate clearance and settlement of transactions in securities.[10] The basic purpose of Section 17A is to promote the

development of a modern, nationwide system for the safe and efficient processing of securities transactions that serves the interests of the financial community and the investing public.11 Congress expressly provided the Commission with jurisdiction over clearing agencies12 and transfer agents,13 as well as other participants14 in the national system for clearance and settlement.15 Furthermore, specifically recognizing that the use of securities certificates to transfer registered ownership decreases efficiency and safety in the capital markets, Congress also directed the Commission to end the physical movement of securities certificates in connection with the settlement among brokers and dealers.16

B. The Role of Securities Intermediaries

The process for delivering and transferring certificated securities is almost entirely manual and as such, is labor-intensive, expensive, and time-consuming.17 The use of securities certificates can result in significant delays and expense in processing securities transactions.18 Moreover, as negotiable instruments, certificates also can be lost, stolen, or forged.19 All this adversely affects the national system for clearance and settlement. The concern associated with lost certificates was dramatically demonstrated after September 11, 2001, when thousands of certificates at broker-dealers or banks (either being held in custody in vaults or being processed for transfer) either were destroyed or were unavailable for transfer. Certificates have also been identified by the financial services industry as an obstacle to achieving streamlined processing (i.e., straight-through-processing) and shorter settlement cycles.20

Securities intermediaries hold securities on behalf of others in order to facilitate more efficient clearance and settlement of securities transactions by reducing the need to transfer certificates. Investors' securities generally are held in the name of a securities intermediary, such as a securities depository, broker-dealer, or bank, or its nominee, for the benefit of the security intermediary's customers. The securities intermediary or its nominee is generally the registered owner of the securities while the securities intermediary's customer typically is the beneficial owner.21 Securities registered in the name of the securities intermediary or its nominee allows the securities to be immobilized22 and held in fungible bulk23 thereby significantly reducing the number of certificates that need to be delivered and transferred. This in turn reduces the risk and cost associated with transferring the securities. Transfers in ownership of securities held in the name of a securities intermediary are accomplished by making book-entry adjustments to the accounts on the securities intermediary's records.

Consistent with Congress' directive to establish a national system for clearance and settlement and to decrease the inefficiencies and risks associated with processing securities certificates, the Commission has long encouraged the use of alternatives to holding securities in certificated form. The Commission's approval of the registration of securities depositories as clearing agencies in 1983 constituted an important step in achieving the mandates established by Congress by immobilizing securities in a registered clearing agency and settling transactions by book-entry movements.24 The Commission also has approved the rule filings of self-regulatory organizations that require their members to use the facilities of a securities depository for the book-entry settlement of all transactions in depository-eligible securities25 and that require securities to be made depository eligible if possible before they can be listed for trading.26

Registered clearing agencies acting as securities depositories immobilize securities and centralize and automate securities settlements.27 Holding securities positions in book-entry form at securities depositories reduces the physical movement of publicly traded securities in the U.S. markets and significantly improves efficiencies and safeguards in processing securities certificates, which in turn reduces the costs of those transactions to investors and market professionals alike.

The Depository Trust Company ("DTC"), the largest securities depository in the world, provides custody and book-entry transfer services for the vast majority of securities transactions in the U.S. market involving equities, corporate and municipal debt, money market instruments, American depositary receipts, and exchange-traded funds.28 In accordance with its rules, DTC accepts deposits of securities from its participants (i.e., broker-dealers and banks),29 credits those securities to the depositing participants' accounts, and effects book-entry movements of those securities.30 The securities deposited with DTC are registered in DTC's nominee name31 and are held in fungible bulk for the benefit of its participants and their customers.32 Each participant having an interest in securities of a given issue credited to its account has a pro rata interest in the securities of that issue held by DTC.33

Some securities trading in the public market are not deposited at a securities depository because either the securities are not eligible for deposit34 or the securities intermediary chooses not to deposit the securities.35 To clear and settle securities transactions without the use of a securities depository, broker-dealers must make independent arrangements to provide for delivery of securities (in certificated form) and payment on a trade-by-trade basis. In cases where an issuer has prohibited ownership of their securities by certain securities intermediaries, such as DTC, some broker-dealers register their customers'

positions in the name of the broker-dealer so that certificates do not need to be issued for each customer and transferred on each trade. However, securities transactions between broker-dealers would still have to be manually processed. Thus, clearing and settling securities transactions outside of a depository causes greater risks and inefficiencies, including credit risk issues and risk of defaults, than clearing and settling securities transactions within a depository.

C. Need for the Rule

A small but growing number of issuers whose securities are registered under Section 12 or are reporting under Section 15(d) of the Exchange Act[36] recently have restricted, or indicated their intention to restrict, ownership of their securities by prohibiting their transfer agents from acknowledging ownership of shares registered in the name of DTC or by prohibiting transfer of their securities to DTC or in some cases to any securities intermediary.[37] Most, if not all, of the issuers restricting ownership of their securities have also required that the shares be represented in certificated form.[38] In several cases, the issuer has required the broker-dealer to disclose the name of the ultimate beneficial owner before reregistering any securities held by the broker-dealer either in the name of the broker-dealer or in the name of DTC.[39] Some brokers refused because they believed disclosure of the customer's name would violate federal securities laws[40] or contractual obligations to the customer. Other broker-dealers could not disclose the name of the ultimate beneficial owner because they knew only the identity of their customer and not necessarily for whom their customer was holding the securities.

Issuers imposing these restrictions, sometimes referred to as "custody-only trading," frequently state that they are imposing ownership or transfer restrictions on their securities to protect their shareholders and their share price from "naked" short selling.[41] These issuers believe that requiring all securities to be in certificated form and precluding ownership by certain securities intermediaries forces broker-dealers to deliver certificates on each transaction and eliminates the ability of naked short sellers to maintain a naked short sale position.[42]

A number of these issuers indicated that they had adopted or would adopt restrictions, assertedly pursuant to state corporation laws, to prohibit ownership of their securities by a depository, securities intermediaries, or both.[43] Issuers' actions to implement the restrictions caused numerous clearance and settlement problems. Some of these issuers refused to recognize positions that had been registered in the name of DTC's nominee or in the name of broker-dealers before the adoption of the restriction and refused to transfer (or allow their transfer agent to transfer) stock to the name of any entity or person that the

issuer believed was not the ultimate beneficial owner. Where issuers refused to recognize ownership positions registered in the name of securities intermediaries, the broker-dealers and banks were forced individually to negotiate a solution directly with the issuer.

If securities intermediaries are precluded from having securities registered in their names, the securities intermediaries' ability to hold and move securities is severely limited. As a result, trading and clearance and settlement efficiency suffers, and costs and risks increase. This consequence of issuer restrictions is not compatible with the Congressional objective that trades in the securities of publicly traded companies should be settled through the national system for clearance and settlement and benefit from its efficiencies and risk reductions and is a significant step backwards in our progress to develop the national system. Furthermore, forced certification of securities is inconsistent with the industry's goals of streamlining processing of securities transactions.[44]

These types of restrictions have also caused investors increased costs and delays. By forcing securities intermediaries to submit securities as part of an issuer's recapitalization, the transfer agent must transfer the securities by canceling the certificate registered in the name of the securities intermediary and re-register a new certificate in the name of the beneficial owner. Transfer agent registration fees, which may range from $10.00 to $75.00 per transfer, and costs for secure delivery of securities certificates, can be more than the market value of the securities being processed.[45] In some cases, the broker-dealers assume these costs but in many cases the cost is passed along to investors. Broker-dealers that did reregister securities received numerous complaints from investors about the fees, particularly where the investors had not issued instructions to reregister the securities. Where broker-dealers must deliver the securities certificates to an issuer's transfer agent and the transfer agent similarly must deliver the newly registered certificates, there are significant costs and delays in obtaining certificates, which could ultimately impede the customers' ability to sell or otherwise negotiate the security in the marketplace.

III. THE PROPOSED RULE

On June 4, 2004, the Commission proposed Rule 17Ad-20[46] that would prohibit registered transfer agents[47] from effecting any transfer of any equity security registered under Section 12 or any equity security that subjects an issuer to reporting under 15(d) of the Exchange Act[48] if such security is subject to any restriction or prohibition on transfer to or from a securities intermediary.[49] Under the proposed rule, the term "securities intermediary" would be defined as a clearing agency registered under Section 17A of the Exchange Act or a person, including a bank, broker, or dealer, that in the ordinary course of

SEC.gov | Issuer Restrictions or Prohibitions on Ownership by Securities Intermediaries

its business maintains securities accounts for others. As proposed, the rule would exclude any equity security issued by a partnership, as defined in Item 901 of Regulation S-K.[50]

IV. COMMENT LETTERS

As noted above, the Commission received fourteen comment letters from eleven commenters in response to the proposed rule.[51] Three commenters submitting four letters supported the proposal in its current form.[52] The SIA stated that precluding securities intermediaries from having securities registered in their own name will increase the use of securities certificates and thereby will increase the costs and risks associated with processing these certificates. Legg Mason stated in its comment letter that it concurred with the SIA's comment. They noted that the use of certificates adversely affects the clearance and settlement system and undermines the industry's long-term efforts to streamline securities processing and achieving straight-through processing in the U.S.

DTC noted in its support for Rule 17Ad-20 that some issuers have refused to process or return shares presented by DTC for transfer or have significantly delayed transfer.[53] In many cases, DTC asserts, issuers' actions have resulted in the suspension of clearance and settlement services, and thereby have delayed or prevented the settlement of trades and ultimately disrupted the national system for clearance and settlement. While some issuers have claimed they have the right to control the disposition of securities trading in the public market and have directed that shares owned by and registered in the name of DTC's nominee be surrendered, DTC contends that issuers do not have continuing ownership rights in securities they have sold into the marketplace and that attempts to exercise control is improper and may constitute conversion. As such, DTC believes Rule 17Ad-20 will prevent transfer agents from aiding and abetting wrongful conduct by certain issuers that interferes with the exercise by DTC and by its participants of their duties to securityholders with respect to securities deposited at DTC.

DTC submitted a second comment letter[54] to address one commenter who opposed the adoption of Rule 17Ad-20 and who criticized the National Securities Clearing Corporation's ("NSCC")[55] stock borrow program because he believed that the stock borrow program facilitated naked short selling by allowing broker-dealers to trade more shares than have been issued.[56] DTC stated that the program was implemented in order to satisfy its members' priority needs for stock that the members do not receive because of fails, and therefore the program facilitates the settlement of securities transactions.[57] DTC further stated that shares must be on deposit at DTC and that the lender cannot loan shares multiple times.

Five commenters submitting seven comment letters were either against adoption of the proposal or expressed reservations about adopting such a rule until certain preconditions were met.58 One of the five commenters opposed the adoption of the proposed rule for a variety of reasons, including that adoption of the rule would remove the "self help" measure issuers were using to protect themselves against the negative effects of naked short selling.59 Another commenter opposed to adoption of Rule 17Ad-20 expressed her belief that it was important to be able to register shares in her own name and to obtain certificates.60

One of these commenters opposed to adoption of Rule 17Ad-20 believed that adoption of the rule raises state law concerns.61 This commenter stated that restrictions on transfer, as well as the rights of a corporation and its securityholders, are a matter of state law and that by prohibiting transfer agents from effecting certain transfers, the rule circumvents the rights of issuers to "control its own destiny and protect its shareholders."62

Three of these commenters believe that certain preconditions should be met before Rule 17Ad-20 is adopted.63 Two of these commenters believe the Commission should develop an effective program to prevent naked short selling before limiting the efforts of small companies to prevent naked short selling and to reasonably guarantee the "integrity" of the U.S. clearance and settlement system, including the alleged problems relating to "DTC's stock borrow program," which they believe facilitates naked short selling.64 One commenter also recommended, without addressing legal and regulatory concerns, that issuers should be able to require that their securities be cleared and settled through the issuer or other alternative means and that the proposed rule be amended to provide an exception to allow the issuer to do so if it can demonstrate the capability to settle transactions in electronic book-entry form.65

Three commenters did not express their support for or opposition to the adoption of Rule 17Ad-20 but instead raised interpretive, operational, or timing issues with the proposal.66 Two of these commenters suggested the proposed the rule should not be adopted until after Regulation SHO has become effective to ensure that the rules have effectively dealt with the naked short selling problem and therefore have eliminated the issuers' need to impose restrictions on ownership by or transfer to securities intermediaries.67 Another commenter expressed concern that adoption of Rule 17Ad-20 may lead to unintended consequences.68 This commenter argued that by prohibiting transfer agents from following the directions of issuers, the rule could force issuers to terminate their current transfer agent and assume the processing responsibilities as "self agents," which may lead to a deterioration of recordkeeping and shareholder services.

One of these three commenters expressed concerns that adoption of Rule 17Ad-20 as proposed may unintentionally result in prohibiting certain restrictions on transfers that were never intended to be covered by the rule.69 The commenter contended that, as currently worded, the rule would not only cover "custody-only" trading restrictions on equity securities but would also prohibit issuers from issuing equity securities of the same class that are "subject to" transfer restrictions that may be imposed for a variety of commercial reasons, such as escrow arrangements, collateral security arrangements, and the issuance of equity securities in private placements. This commenter suggested that any restriction or prohibition on transfer be exempt from the rule when the same class of securities is eligible for clearance through a securities intermediary.

## V. DISCUSSION

### A. Adoption of the Rule

After considering the comments received, the Commission is adopting proposed Rule 17Ad-20, with one minor modification. In response to the concern raised by one commenter that Rule 17Ad-20 might unintentionally result in prohibiting transfers that were not intended to be covered by the rule (e.g., restrictions imposed by private placements or restrictions resulting from private agreements between shareholders), the Commission is modifying Rule 17Ad-20(a) to prohibit transfer agents70 from transferring71 any equity security registered under Section 12 or any equity security that subjects an issuer to reporting under Section 15(d) of the Act72 if such security is subject to any restriction or prohibition on transfer to or from a securities intermediary "in its capacity as such." Restrictions imposed by private placements or in private agreements generally do not permit transfers to anyone but those permitted to purchase or own the securities, as specified under federal law or by private agreements. By modifying Rule 17Ad-20(a), the Commission is making clear that the rule applies only to restrictions or prohibitions imposed by issuers on transfers of their publicly traded securities to or from those securityholders that are securities intermediaries and are not the ultimate beneficial owners.73 As a result, the rule does not apply to situations such as restrictions imposed by issuers in order to prevent an unregistered distribution or other violation of federal securities laws, or to effectuate private agreements.

Restrictions on transfer or ownership imposed by issuers subsequent to the purchase of securities by investors in the public market raise a number of legal and regulatory concerns. A number of issuers have received but refused to allow transfer and return of securities registered in DTC's nominee name, which in some cases has constituted DTC's entire position.74 DTC and its participants have expended significant resources in

attempting to negotiate resolutions with these issuers and their transfer agents. In many cases, the issuers' refusal to return the shares has resulted in the suspension of clearance and settlement services for the issuers' securities, which in some cases has resulted in problems in clearing and settling trades. The difficulty in obtaining access to securities deposited at DTC but withheld by an issuer or its transfer agent and the difficulty in obtaining timely transfers through the transfer agent have caused some broker-dealers to discontinue buying or selling these issuers' securities on behalf of their customers.

We believe that restrictions on transfer of publicly traded securities to securities intermediaries are inconsistent with Section 17A of the Exchange Act. Transactions settled outside of a registered clearing agency have to be certificated and then processed manually on a transaction-by-transaction basis, which creates inefficiencies, risks, and added costs in clearing and settling securities transactions and in transferring securities ownership. Furthermore, restrictions that force investors to clear and settle their securities outside the national system for clearance and settlement require shareholders to assume these increased costs and risks. Investors and market participants should be permitted to hold securities in street name and avail themselves of the benefits of the national system for clearance and settlement if they so choose.

The use of the national system for clearance and settlement, and more specifically, the use of clearing agencies, does not hamper an investors' ability to register securities in their own name or obtain certificates, provided that the issuer allows for certificated positions.75 Generally, an investor who wants an individually registered position in certificate form can instruct her broker-dealer to register the securities in her name and issue a certificate.

While we understand that restrictions on transfer to intermediaries reflect issuer attempts to address what they believe to be illegal naked short selling, the Commission does not believe that naked short selling concerns should be addressed by restrictions on transferability of securities that trade in the public markets. Restrictions on transferability to securities intermediaries results in the stock being less liquid, and in the risks, inefficiencies, and costs described above, and are not compatible with the structure or goals of the national system for clearance and settlement.

We also note that the Commission recently adopted Regulation SHO to address many of the problems associated with naked short selling.76 As adopted, Rule 203 of Regulation SHO creates a uniform Commission rule requiring broker-dealers, prior to effecting short sales in all equity securities, to "locate" securities available for borrowing and imposes additional delivery requirements on broker-dealers for securities in which a substantial

amount of failures to deliver have occurred (i.e., threshold securities).77 The Commission believes that the requirements in Regulation SHO will reduce short selling abuses and will act as a restriction on naked short selling.

We also do not believe that it is either necessary or prudent to delay the adoption of this rule until after Regulation SHO has been in effect for some period of time or until after its effect on naked short selling is determined, as some commenters have suggested.78 Any delay would continue to expose investors to increased costs and risks that come from exclusion of their securities from the national system for clearance and settlement.79

One commenter raised concerns that adoption of the rule would impede issuers' or securityholders' rights under state law.80 As discussed more fully above, in adopting Section 17A of the Exchange Act, Congress directed the Commission to use its authority to facilitate the establishment of the national system for clearance and settlement, including the regulation of clearing agencies and transfers agents. In using its authority under the Exchange Act to adopt Rule 17Ad-20, the Commission is following this Congressional mandate by facilitating access to the national system for clearance and settlement that is not impeded by restrictions on transfers to or from securities intermediaries. Rule 17Ad-20 does not prevent issuers from restricting or prohibiting transfer to or ownership by securities intermediaries. Rather, the rule addresses transfer agents' ability to effect transfers of equity securities that are required to register or report under Exchange Act and have restrictions or prohibitions on transfer to securities intermediaries. Accordingly, Rule 17Ad-20 is designed to prohibit registered transfer agents from transferring equity securities that are encumbered by restrictions that are inconsistent with the operation of the national system for clearance and settlement and the congressional mandate to end the physical movement of securities certificates.

Finally, one commenter suggested that because of Rule 17Ad-20 some issuers should be permitted to or may decide to use alternative securities transfer, clearance, and settlement mechanisms, including performing these functions internally.81 Issuers contemplating following this course of action must consider, among other provisions, that Section 17A(b)(1) of the Exchange Act makes it unlawful for any entity, including an issuer, to act as a clearing agency82 without registering with the Commission as a clearing agency.83 Similarly, in response to the commenter who raised concerns that some issuers may terminate their transfer agent and instead perform these functions internally,84 Section 17A(c) of the Exchange Act requires any entity acting as a transfer agent, including an issuer,85 for a security registered under Section 12 of the Exchange Act to register as a

transfer agent.[86] An issuer acting as its own transfer agent would, therefore, have to register as a transfer agent and would become subject to Rule 17Ad-20.

## B. Scope and Effective Date

The Commission believes that adoption of Rule 17Ad-20 advances the goals of the national system for clearance and settlement by requiring publicly traded equity securities to be eligible for clearance and settlement through the national system and by allowing investors and securities intermediaries the choice as to how to hold their securities. Therefore, the Commission is applying the rule to all equity securities, except those specifically excluded from Rule 17Ad-20, that either are registered pursuant to Section 12 of the Exchange Act or subject an issuer to reporting under Section 15(d) of the Exchange Act. In order to provide sufficient notice and opportunity for issuers to remove restrictions from securities if they so choose and for transfer agents to make sure they are in compliance with the rule, the Commission is providing for a compliance date of [Insert date 90 days after the date of publication in the Federal Register].

## VI. PAPERWORK REDUCTION ACT

Rule 17Ad-20 does not contain new "collection of information" requirements within the meaning of the Paperwork Reduction Act of 1995 ("PRA").[87] Accordingly, the PRA is not applicable to the adoption of the rule because it does not impose any new collection of information requirements that would require approval of the Office of Management and Budget ("OMB").

## VII. COSTS AND BENEFITS OF RULE

We are sensitive to the costs and benefits of our rules and we have considered the costs and benefits of Rule 17Ad-20. To assist us in evaluating the costs and benefits, in the proposing release we encouraged commenters to discuss any cost or benefits that the rule might impose. In particular, we requested comment on three major areas. First, we requested comment on the potential costs for any for any modification to computer systems, operations, or procedures the proposed rule may require, as well as any potential benefits resulting from the proposal for investors, securities intermediaries (including, but not limited to, broker-dealers, depositories, and banks), transfer agents, other securities industry professionals, and others. Second, we sought comments, analysis, and empirical data on the extent to which the proposed rule would benefit investors by reducing costs associated with issuer-imposed restrictions on transferring securities to or from securities intermediaries and comment and data on the benefits to investors of the proposed rule to the extent it precludes decreased liquidity, increased risk, and increased transaction costs

that may be associated with such issuer-imposed restrictions on securities. And third, we solicited data on the potential benefits that may accrue due to a reduction in production, transfers, and processing of certificates, and the increased use of a depository. Commenters were requested to provide analysis and data to support their views on the costs and benefits associated with proposed Rule 17Ad-20. We received no comments providing cost or benefit estimates, but received comments on the potential economic impact generally of the proposed rule.

A. Benefits

By prohibiting registered transfer agents from effecting a transfer in any equity security registered under Section 12 or in any equity security that subjects an issuer to reporting under Section 15(d) that restricts or prohibits transfers to or from securities intermediaries, proposed Rule 17Ad-20 would allow investors to clear and settle their securities transactions through the national system for clearance and settlement and thereby take advantage of benefits of that system. We believe that the use of the national system, which can only be accessed through securities intermediaries, provides significant benefits to U.S. investors, brokers, dealers, other securities intermediaries, and issuers, by increasing efficiencies and reducing risks associated with processing, transferring, and settling securities certificates. While some of these benefits may not be readily quantifiable in terms of dollar value, particularly those related to risk reduction, we nonetheless believe that investors and broker-dealers who choose to use the national system for clearance and settlement will lower their transactions costs and realize a reduction in certain risks related to settlement of securities transactions and transfer of securities to registered ownership.

Issuers restricting transfers of their securities to or from securities intermediaries are causing investors to have to certificate their positions, which must be reregistered after every purchase or sale transaction. The Securities Industry Association ("SIA") estimated that the annual direct and indirect cost of processing and transferring certificates in the U.S. market, including those related to shipping, signature guarantees,[88] transfer fees, custody, and manual processing, exceeds $234,000,000.[89] Costs and risks associated with missing, lost, counterfeit, or stolen certificates are also significant. Between 1996 and 2000, the SIA estimated that an average of 1.7 million certificates were reported lost or stolen.[90] In 2001, that figure increased to 2.5 million certificates.[91] Reporting missing, lost, stolen, or counterfeit securities certificates to SIC, determining negotiability of these certificates, and paying for surety bonds for lost certificates costs the financial industry and investors millions of dollars each year.[92] In recent years, the fraudulent resale and

fraudulent collateralization of cancelled certificates (certificates with no resale value) alone have cost investors and financial institutions millions of dollars.93

Furthermore, the process of manually transferring securities transactions on an individual trade basis through the transfer agent causes significant delays in settling securities transactions and registering ownership. These delays may prevent investors from effecting timed transactions in the market. All of these costs and risks are ultimately borne by investors. The Commission believes the costs and risks are substantially reduced or even eliminated through the use of book-entry transfers and automated settlement at a securities depository.

DTC and a number of broker-dealers have informed the Commission that they have had to undertake special communications with investors and institute manual processing in order to exit securities positions from DTC (or any other intermediary position) and to accommodate issuers' requests to certificate positions in the name of the ultimate beneficial owner. The Commission believes that by adopting Rule 17 Ad-20, investors and industry participants may realize cost savings and other potential benefits resulting from not having to undertake these communication and manual processing expenses.

B. Costs

The Commission believes that Rule 17Ad-20 will impose minimal, if any, cost to registered transfer agents complying with the rule. To date, we have identified one cost relating to the handling, shipping, or insurance costs associated with the repackaging and returning non-transferable certificates. One transfer agent estimated this cost to be approximately $22.50 per certificate.94 We are unable to estimate the total cost because transfer agents have no way of knowing how many, if any, of the issuers for whom they currently act as transfer agents would retain the restriction, and thereby incur the costs associated with returning non-transferable securities. Furthermore, we believe that many registered transfer agents would not act as transfer agent for an issuer that imposed restrictions subject to Rule 17Ad-20.

Rule 17Ad-20 will require registered transfer agents to determine whether or not securities subject to the rule could be eligible for transfer prior to effecting a transfer and whether the person or class of persons restricted from ownership by the issuer are securities intermediaries. We understand that transfer agents routinely make the determinations as to restrictions on the securities prior to accepting an agency appointment. Accordingly, we do not believe that any additional operational or procedural changes would be needed to be made to comply with Rule 17Ad-20.

The Commission understands that some issuers might believe that the rule removes a mechanism by which they believe they can counter the negative effects of naked short selling in general, and manipulative naked short selling in particular.[95] As has been contended in comment letters to the Commission, by requiring these securities to participate in the national system for clearance and settlement, it has been alleged that both issuers and investors will suffer losses due to the diminution in the market value of these securities caused by naked short selling or by adverse effects on ownership (e.g., market value and voting rights) stemming from such short sale transactions.[96] The Commission is addressing these issues through oversight and regulation[97] rather than issuers attempting to control the ownership or transfer of securities that trade in the public market, which conflicts with Congress' goals in enacting Section 17A of the Exchange Act. As stated earlier in this release, we believe issuer-imposed restrictions on securities often make the stock less liquid, causing reduction in the trading volume of the securities. Costs of imposing such restrictions can exceed the market value of the securities being processed. Under all of these circumstances, to the extent that there is any diminution of issuers' abilities to counter the perceived negative effects of naked short selling by restricting or prohibiting ownership or transfer by securities intermediaries, we believe the cost is justified by the benefits of the national system for clearance and settlement.[98]

## VIII. CONSIDERATION OF BURDEN ON COMPETITION, AND PROMOTION OF EFFICIENCY, COMPETITION, AND CAPITAL FORMATION

Section 3(f) the of the Exchange Act,[99] as amended by the National Securities Markets Improvement Act of 1996,[100] provides that whenever the Commission is engaged in rulemaking and is required to consider or to determine whether an action is necessary or appropriate in the public interest, it must also consider whether the action will promote efficiency, competition, and capital formation. Section 23(a)(2) of the Exchange Act requires the Commission, in adopting rules under the Exchange Act, to consider the anti-competitive effects of any rule it adopts. Exchange Act Section 23(a)(2) prohibits the Commission from adopting any rule that would impose a burden on competition not necessary or appropriate in furtherance of the purposes of the Exchange Act.

The Commission's view is that Rule 17Ad-20 would promote the objectives of the national system for clearance and settlement as established in Section 17A of the Exchange Act by allowing securities intermediaries and their customers effecting securities transactions in the public market to benefit from the increased efficiencies and risk reduction afforded by the national system for clearance and settlement. By prohibiting restrictions on transfers

to and from securities depositories and other intermediaries, Rule 17Ad-20 should promote efficiency by reducing some of the costs and delays associated with the clearance and settlement of securities transactions and promote capital formation by making it easier for the securities to be traded in the marketplace.

Rule 17Ad-20 also should enhance competition. While most companies listed on a national exchange or Nasdaq are already subject to rules that in essence prohibit restrictions on transfers to or from securities intermediaries,101 those issues trading in the non-national market and not subject to any listing requirements have not been subject to this restriction, such as those securities trading in the Pink Sheets. Rule 17Ad-20 would help to level the playing field by extending these obligations to all companies issuing equity securities that are registered under Section 12 or that subject issuers to reporting under Section 15(d) of the Exchange Act and transferred by a registered transfer agent.102 In doing so, the rule should also promote liquidity in these securities by removing barriers to ownership of securities and decreasing transaction costs, thereby facilitating increased efficiency and capital formation.

IX. FINAL REGULATORY FLEXIBILITY ANALYSIS

This Final Regulatory Flexibility Analysis ("FRFA") has been prepared in accordance with 5 U.S.C. 604. This FRFA relates to the adoption of Rule 17Ad-20 under the Exchange Act of 1934 ("Act"),103 which prohibits registered transfer agents from transferring any equity security registered pursuant to Section 12 of the Act or any equity security that subjects an issuer to reporting under Section 15(d) of the Act104 if such security is subject to any restriction or prohibition on transfer to or from a securities intermediary in its capacity as such. Under the rule, the term "securities intermediary" is defined as a clearing agency registered under Section 17A of the Exchange Act or a person, including a bank, broker, or dealer, that in the ordinary course of its business maintains securities accounts for others. The Commission is excluding from Rule 17Ad-20 any equity security issued by a partnership, as defined in Item 901 of Regulation S-K.105 A Summary of the Initial Regulatory Flexibility Analysis was published in the proposing release.106 The IRFA, which was prepared in accordance with 5 U.S.C. §603, is available for inspection at the Commission's Public Reference office, 450 5th Street, N.W., Washington, DC 20549.

A. Reasons for the Action

As described more fully in Section I, recently issuers whose securities are registered under Section 12, and therefore trading in the public markets, have restricted or attempted to restrict securities issued by them so as to limit or prohibit transfer to or from securities

intermediaries, and in particular a securities depository.107 In doing so, these issuers have precluded investors from being able to hold securities in street name through a securities intermediary and in turn preclude investors from availing themselves of the decreased risk and costs associated with automated settlement and book-entry transfers available through a securities depository. This consequence of issuer restrictions is not compatible with the congressional objective that trades in the securities of publicly traded companies should be settled through the national system for clearance and settlement and benefit from its efficiencies and risk reductions and is a significant step backwards in our progress to develop the national system.

## B. Significant Issues Raised by Public Comment

When the Commission proposed Rule 17Ad-20, it requested comment with respect to the proposal and the accompanying IRFA. We received no comments on the IRFA, but received comments on the rule generally. Three commenters supported adoption of the rule proposed. Two of these commenters stated that precluding securities intermediaries from having securities registered in their own name will increase the use of securities certificates and thereby will increase the costs and risks associated with processing these certificates. They noted that the use of certificates adversely affects the clearance and settlement system and undermines the industry's long-term efforts to streamline securities processing and achieving straight-through processing in the U.S. The third commenter, DTC, noted that some issuers have refused to process or return shares presented by DTC for transfer or have significantly delayed transfers. DTC asserted that such actions by these issuers have resulted in the suspension of clearance and settlement services and thereby have delayed or prevented the settlement of trades and ultimately disrupted the national system for clearance and settlement.

Five commenters opposed adoption of Rule 17Ad-20 or expressed reservations about the proposed rule until certain preconditions were met. One of these commenters contended that that the rule would eliminate an important means by which issuers can protect themselves against the perceived negative effects of naked short selling. Several others believe the Commission should develop an effective program to prevent naked short selling before limiting the efforts of small companies to prevent naked short selling. One other stated that the rule raises state law concerns because the rights of a corporation and its securityholders are a matter of state law.

Three commenters did not express their support for or opposition to adopting Rule 17Ad-20 but instead raised interpretive, operational, or timing issues with the proposal. One of these commenters stated its concern that Rule 17Ad-20 as proposed may unintentionally

result in prohibiting certain restrictions on transfers that were never intended to be covered by the rule, such as escrow arrangements, collateral security arrangements, and the issuance of equity securities in private placements.

C. Small Entities Subject to the Rule

Rule 17Ad-20 will affect registered transfer agents and issuers that are small entities. Pursuant to Rule 0-10 under the Exchange Act,108 a registered transfer agent is a small entity if it: (1) received fewer than 500 items for transfer and fewer than 500 items for processing during the preceding six months (or in the time that it has been in business, if shorter); (2) transferred items only of issuers that would be deemed a "small business" or "small organizations" as defined in Rule 0-10 under the Exchange Act; (3) maintained master shareholder files that in the aggregate contained less than 1,000 shareholder accounts or was the named transfer agent for less than 1,000 shareholder accounts at all times during the preceding fiscal year (or in the time that it has been in business if shorter); or (4) is not affiliated with any person other than a natural person that is not a small business or small organization under Rule 0-10. We estimate that 470 transfer agents of approximately 900 registered transfer agents qualify as "small entities" for purposes of RFA and would be subject to the requirements of Rule 17Ad-20.

Rule 0-10 under the Exchange Act defines an issuer, other than an investment company, to be a small entity if it has total assets of $5 million or less on the last day of its most recent fiscal year.109 We estimate that approximately 2500 issuers qualify as "small entities" for purposes of RFA and could be affected by the requirements of Rule 17Ad-20. However, we believe that a significant number of these small issuers will not impose restrictions on their securities in a manner prohibited by Rule 17Ad-20 due to the impact of such restrictions on the liquidity of the securities and therefore will not be effected by the rule. To the extent that there is an impact on the minority of small issuers who choose to impose the type of restrictions effected by Rule 17Ad-20, we believe the benefits of this rule on the national system for clearance and settlement justify the costs imposed on them.

D. Reporting, Recordkeeping, And Other Compliance Requirements

While there are no reporting or recordkeeping obligations associated with Rule 17Ad-20, compliance by registered transfer agents will be subject to examination by the transfer agents' appropriate regulatory authority. Rule 17Ad-20 requires registered transfer agents to determine whether or not securities subject to the proposed rule could be eligible for transfer prior to effecting a transfer and whether the person or class of persons restricted from ownership by the issuer are securities intermediaries. Issuers and registered transfer

agents might obtain certain representations or indemnifications from each other to remove any current restrictions that would be prohibited by the proposed rule and to assist registered transfer agents in complying with the rule, which might require one-time expenses related to contract revisions or legal fees.

The Commission understands that some issuers might believe that the rule removes a mechanism by which they believe they can counter the negative effects of naked short selling in general, and manipulative naked short selling in particular.110 As has been previously contended in comment letters to the Commission, by requiring these securities to participate in the national system for clearance and settlement, it has been alleged that both issuers and investors will suffer losses due to the diminution in the market value of these securities caused by naked short selling or by adverse effects on ownership (e.g., market value and voting rights) stemming from such short sale transactions.111 The Commission believes that these issues are being addressed through oversight and regulation rather than issuers attempting to control the ownership or transfer of securities that trade in the public market. As stated in the release, we believe issuer-imposed restrictions on securities often make the stock less liquid, causing reduction in the trading volume of the securities. Under all of these circumstances, to the extent that there is any diminution of issuers' abilities to counter the perceived negative effects of naked short selling by restricting or prohibiting ownership or transfer by securities intermediaries, we believe the cost is justified by the benefits of the national system for clearance and settlement.112

E. Significant Alternatives

The RFA directs the Commission to consider significant alternatives that would accomplish the stated objective, while minimizing any significant adverse impact on small entities. In connection with Rule 17Ad-20, the Commission considered the following alternatives: (a) the establishment of differing compliance or reporting requirements or timetables that take into account the resources of small entities; (b) the clarification, consolidation or simplification of compliance and reporting requirements under the rule for small entities; (c) the use of performance rather than design standards; and (d) an exemption from coverage of the rule, or any part thereof, for small entities.

Rule 17Ad-20 is designed to promote the integrity and efficiency of the U.S. clearance and settlement system by requiring as many publicly traded securities as practicable be eligible to clear and settle through the national system for clearance and settlement and allow investors and securities intermediaries retain the choice as to how to hold their securities in order to avail themselves of the benefits of the national system for clearance

and settlement. The Commission believes that the establishment of different requirements for small entities is neither necessary nor practical because the proposal is designed to provide general standards that would protect the public and members of the financial community from increased inefficiencies, costs, and risks associated with trading, clearing, and settling securities without the protections afforded by the national system for clearance and settlement.

By prohibiting registered transfer agents from transferring any equity security registered pursuant to Section 12 of the Act or any equity security that subjects an issuer to reporting under Section 15(d) of the Act if such security is subject to any restriction or prohibition on transfer to or from a securities intermediary, Rule 17Ad-20 uses performance standards rather than design standards to achieve its purpose. In addition, the Commission is unaware of ways to further clarify, consolidate or simplify the proposed amendment for small entities.

X. STATUTORY AUTHORITY

The Commission is proposing to add §240.17Ad-20 of Chapter II pursuant to Sections 3(b), 17A, 23(a), and 36 of the Exchange Act113 in the manner set forth below.

List of Subjects

17 CFR Part 240

Securities, Securities Intermediaries, Transfer Agents.

TEXT OF FINAL RULE

In accordance with the foregoing, Title 17, Chapter II of the Code of Federal Regulations is amended as follows:

PART 240â"GENERAL RULES AND REGULATIONS, SECURITIES EXCHANGE ACT OF 1934

1. The general authority citation for Part 240 continues to read in part as follows:

Authority: 15 U.S.C. 77c, 77d, 77g, 77j, 77s, 77z-2, 77z-3, 77eee, 77ggg, 77nnn, 77sss, 77ttt, 78c, 78d, 78e, 78f, 78g, 78i, 78j, 78j-1, 78k, 78k-1, 78l, 78m, 78n, 78o, 78p, 78q, 78q-1, 78s, 78u-5, 78w, 78x, 78ll, 78mm, 79q, 79t, 80a-20, 80a-23, 80a-29, 80a-37, 80b-3, 80b-4, 80b-11, and 7201 et seq.; and 18 U.S.C. 1350, unless otherwise noted.

* * * * *

2. Section 240.17Ad-20 is added to read as follows:

§240.17Ad-20 Issuer Restrictions or Prohibitions on Ownership by Securities Intermediaries.

(a) Except as provided in paragraph (c) of this section, no registered transfer agent shall transfer any equity security registered pursuant to section 12 or any equity security that subjects an issuer to reporting under section 15(d) of the Act (15 U.S.C. 78l or 15 U.S.C. 78o(d)) if such security is subject to any restriction or prohibition on transfer to or from a securities intermediary in its capacity as such.

(b) The term securities intermediary means a clearing agency registered under section 17A of the Act (15 U.S.C. 78q-1) or a person, including a bank, broker, or dealer, that in the ordinary course of its business maintains securities accounts for others in its capacity as such.

(c) The provisions of this section shall not apply to any equity security issued by a partnership as defined in Rule 901(b) of Regulation S-K (§229.901(b) of this chapter).

By the Commission.

Jill M. Peterson
Assistant Secretary

Dated: December 7, 2004

1 The registered owner is the name of the individual shareholder recorded on the official records of the issuer (sometimes referred to as the record owner or legal owner of the securities).

2 In the case of securities held in street name, generally the securities are held by a securities depository (e.g., The Depository Trust Company) who as the registered owner holds the securities on behalf of another securities intermediary (e.g., a broker-dealer or bank) who in turn holds the securities for its customers, the beneficial owners. All the rights and obligations of the securities are passed through the registered owner to the beneficial owners. For more information on the relationship between securities intermediaries and beneficial owners, see infra note 21.

3 Section 17A(e) of the Exchange Act directs the Commission to use its authority to end the physical movement of securities certificates in connection with the settlement among brokers and dealers of transactions in securities. 15 U.S.C. 78q-1(e).

4 15 U.S.C. 78q-1.

5 Pursuant to Section 12(g) of the Exchange Act and the rules thereunder, a company must generally register a class of equity securities if on the last day of its fiscal year it has total assets of more than $10 million and the class is held of record by more than 500 persons. 15 U.S.C. 78l(g). Under Section 12(b), all securities registered on a securities exchange must also be registered with the Commission. 15 U.S.C. 78l(b). Section 15(d) of the Exchange Act generally requires a company with an effective Securities Act registration statement to file the same periodic reports as a company that has a Section 12 registered class of securities. 15 U.S.C. 78o(d).

6 Securities Exchange Act Release No. 49809 (June 4, 2004), 69 FR 32784 (June 10, 2004), [File No. S7-24-04].

7 Letters from David Patch (May 29, 2004, June 7, 2004, and August 3, 2004); Glenda King (June 5, 2004); Frederick D. Lipman, Esq. (June 10, 2004); Larry E. Thompson, Managing Director and Senior Deputy General Counsel, The Depository Trust & Clearing Corporation (July 8, 2004, and August 19, 2004); Robert L. Stevens, Chairman, X-Clearing Corporation (July 9, 2004); Marc Castonguay, Vice President and CEO, Pacific Corporate Trust Company (July 12, 2004); H. Glenn Bagwell, Jr., Esq. (July 12, 2004); Thomas L. Montrone, President and Chief Executive Officer, Registrar and Transfer Company (July 16, 2004); Cleary, Gottlieb, Steen & Hamilton (July 19, 2004); Ernest A. Pittarelli, Chairman, Securities Industry Association ("SIA") (July 28, 2004), and D. Stuart Bowers, Senior Vice President, Legg Mason Wood Walker, Incorporated (July 30, 2004) ("Legg Mason").

8 15 U.S.C. 78q-1(a)(1)(A).

9 15 U.S.C. 78q-1(a)(1)(B).

10 15 U.S.C. 78q-1(a)(2)(A)(i). Congress envisioned the Commission's authority to extend to every facet of the securities handling process involving securities transactions within the United States, including activities by clearing agencies, depositories, corporate issuers, and transfer agents. See S. Rep. No. 75, 94th Cong., 1st Sess. at 55 (1975).

11 See S. Rep. No. 75, 94th Cong., 1st Sess. at 122 (1975).

12 The Exchange Act defines the term clearing agency as any person who acts as an intermediary in making payment or deliveries or both in connection with transactions in securities or who provides facilities for comparison of data respecting the terms of settlement of securities transactions, to reduce the number of settlements of securities transactions, or for the allocation of securities settlement responsibilities. Such term also

means a person, such as a securities depository, who (i) acts as a custodian of securities in connection with a system for the central handling of securities whereby all securities of a particular class or series of any issuer deposited within the system are treated as fungible and may be transferred, loaned, or pledged by bookkeeping entry without physical delivery of securities certificates, or (ii) otherwise permits or facilitates the settlement of securities transactions or they hypothecation or lending of securities without the physical delivery of securities certificates. 15 U.S.C. 78c(a)(23).

13 The Exchange Act defines the term transfer agent generally as any person who engages on behalf of an issuer of securities or on behalf of itself as an issuer of securities in (A) countersigning such securities upon issuance; (B) monitoring the issuance of such securities with a view to preventing unauthorized issuance, a function commonly performed by a person called a registrar; (C) registering the transfer of securities; (D) exchanging or converting such securities; or (E) transferring record ownership of securities by book-keeping entry without physical issuance of securities certificates. 15 U.S.C. 78c(a)(25).

14 Section 17A(f)(1) permits the Commission to adopt rules concerning the transfer of securities and the rights and obligations of purchasers, sellers, owners, lenders, borrowers, and financial intermediaries involved in or affected by such transfers, and the rights of third parties whose interests devolve from such transfers. 15 U.S.C. 78q-1(f)(1).

15 See, e.g., Section 17A(b)(1) of the Exchange Act makes it unlawful for any clearing agency, unless registered with the Commission, to perform the function of a clearing agency with respect to any security other than an exempted security. 15 U.S.C. 78q-1(b)(1). Section 17A(c)(1) of the Exchange Act, which makes it unlawful for any transfer agent, unless registered with the Commission, to directly or indirectly perform the function of a transfer agent with respect to any security registered under Section 12 of the Act or which would be required to be registered except for the exemption from registration proved by Section 12(g)(2)(B) (investment companies) or Section 12(g)(2)(G) (certain securities issued by insurance companies). 15 U.S.C. 78q-1(c)(1) and 15 U.S.C. 78l(a) respectively. Exchange Act Section 17A(d)(1) prohibits any registered clearing agency or registered transfer agent from engaging in any activity as a clearing agency or transfer agent in contravention of rules and regulations as the Commission may prescribe as necessary or appropriate in the public interest, for the protection of investors or otherwise in furtherance of the purposes of the Act. 15 U.S.C. 78q-1(d)(1).

16 15 U.S.C. 78q-1(e).

7/22/24, 11:45 PM
SEC.gov | Issuer Restrictions or Prohibitions on Ownership by Securities Intermediaries
Case 2:23-cv-04104-MRP    Document 66-41    Filed 07/23/24    Page 26 of 37

17 For more information on the costs and risks associated with processing certificates, see Exchange Act Release No. 49405 (March 11, 2004), 69 FR 12922 (March 18, 2004), [File No. S7-13-04] (securities transaction settlement concept release).

18 If a broker-dealer is unable to have the security reregistered into the name of the buyer or the buyer's securities intermediary after trade date, the rejection of the transfer after trade date exposes the customer to the costs and risks that she may have to buy in the security and exposes the broker-dealer to the costs and risks associated with buy-ins. Investors bear direct costs as well. Transfer agents require investors to obtain a surety bond before the transfer agent will issue a replacement certificate for lost and stolen certificates. We understand that generally most transfer agents charge investors between 2% - 4% of the current market value of the securities to obtain a surety bond.

19 In an effort to identify lost, missing, counterfeit, and stolen securities, Exchange Act Rule 17f-1 requires, among other entities, every exchange, the securities association, broker, dealer, transfer agent, registered clearing agency, and many banks to report to the Commission or delegee, which currently is the Securities Information Center ("SIC"), missing, lost, counterfeit, or stolen securities certificates. See 17 CFR 240.17f-1. SIC operates a centralized database that records lost and stolen securities. When a broker-dealer receives a security certificate to sell, the broker-dealer will submit information about the certificate to SIC so that SIC may search its database to see if the certificate has been reported as missing, lost, stolen, or counterfeited. (For more information about SIC, see www.secic.com (/cgi-bin/goodbye.cgi?www.secic.com/).)

20 See Exchange Act Release No. 49405 (March 11, 2004), 69 FR 12922 (March 18, 2004), [File No. S7-13-04] (securities transaction settlement concept release).

21 The relationship between various levels of securities intermediaries and beneficial owners is complex. There may be many layers of beneficial owners (some of which may also be securities intermediaries) with all ultimately holding securities on behalf of a single beneficial owner, who is sometimes referred to as the ultimate beneficial owner. For example, an introducing broker-dealer may hold its customer's securities in its account at a clearing broker-dealer, that in turn holds the introducing broker-dealer's securities in an account at DTC. In this context, DTC or its nominee is the registered owner and DTC's participants (i.e., broker-dealers and banks) are beneficial owners, as are the participants' customers. However, DTC, the clearing broker-dealer (the DTC participant), and the introducing broker-dealer are all securities intermediaries. These distinctions may be important under both federal and state law when determining the rights and obligations of the parties holding securities on behalf of others.

22 Immobilization of securities occurs where a securities depository holds the underlying certificate and transfers of ownership are recorded through book-entry movements between the depository's participants' accounts. An issue is partially immobilized (as is the case with most equity securities traded on an exchange or at the NASD) when the street name positions are immobilized (i.e., those held through broker-dealers that are participants of a depository), but certificates are still available to individual shareholders upon request. Dematerialization of securities occurs where there are no paper certificates available, and all transfers of ownership are made through book-entry movements. For more information about immobilization and dematerialization, see Exchange Act Release No. 49405 (March 11, 2004), 69 FR 12922 (March 18, 2004), [File No. S7-13-04].

23 Fungible bulk means that no participant or customer of a participant has any claim or ownership rights to any particular certificate held by DTC. Rather, participants have a securities entitlement to obtain a certificate representing securities held in their DTC accounts.

24 Exchange Act Release No. 20221 (September 23, 1983), 48 FR 45167 (October 3, 1983), [File Nos. SR-600-5 and 600-19] (order approving the clearing agency registration of four depositories and four clearing corporations).

25 Exchange Act Release No. 32455 (June 11, 1993), 58 FR 33679 (June 18, 1993), [File Nos. SR-Amex-93-07; SR-BSE-93-08; SR-MSE-93-03; SR-NASD-93-11; SR-NYSE-93-13; SR-PSE-93-04; and SR-Phix-93-09)] (order approving rules requiring members, member organizations, and affiliated members of the New York Stock Exchange, National Association of Securities Dealers, American Stock Exchange, Midwest Stock Exchange, Boston Stock Exchange, Pacific Stock Exchange, and Philadelphia Stock Exchange to use the facilities of a securities depository for the book-entry settlement of all transactions in depository-eligible securities with another financial intermediary). In rare circumstances, DTC will be unable to accept a deposit of a security because it is unable to process it. In those cases, the rules of the self-regulatory organizations do not require the security to be depository eligible.

26 Exchange Act Release No. 35798 (June 1, 1995), 60 FR 30909 (June 12, 1995), [File Nos. SR-Amex-95-17; SR-BSE-95-09; SR-CHX-95-12; SR-NASD-95-24; SR-NYSE-95-19; SR-PSE-95-14; SR-PHLX-95-34] (order approving rules setting forth depository eligibility requirements for issuers seeking to have their shares listed on the American Stock Exchange, Boston Stock Exchange, Chicago Stock Exchange, National Association of Securities Dealers, New York Stock Exchange, Pacific Stock Exchange, and the Philadelphia Stock Exchange).

Case 2:23-cv-04104-MRP    Document 66-41    Filed 07/23/24    Page 28 of 37

27 Securities depositories work in conjunction with securities clearing corporations. Both types of entities must be registered as clearing agencies under Section 17A of the Exchange Act. Clearing corporations, such as the National Securities Clearing Corporation, serve to compare trades submitted to it by its participants and net those trades to a single position at the end of the day. The trade position data is then submitted to the depository in order to effectuate settlement by debiting or crediting the participants' book-entry securities position at DTC and facilitating the payments to or from the participants.

28 Of the four depositories registered as clearing agencies in 1983, DTC is the only one still operating. DTC estimates that as of December 31, 2002, approximately 84% of the shares issued by domestic companies listed on the NYSE and 88% of the domestic companies listed on the Nasdaq are deposited at DTC. (These statistics do not include ADRs.) E-mail from Joseph Trezza, Senior Product Manager, DTCC, to the Commission staff (November 14, 2003).

29 In the case of "book-entry-only" securities (e.g., no securities certificates are available), the issuer will authorize DTC to credit the account or accounts of participants with all of the issuer's outstanding shares.

30 See, e.g., Rules 5 and 6 of DTC's Rules.

31 DTC registers securities in the name of its nominee, Cede & Co., which makes it the registered owner of the securities.

32 Securities deposited at DTC by its participants or the issuers in the case of book-entry-only securities are legally or beneficially owned by the participants or their customers at the time of the deposit and are subsequently transferred into DTC's nominee name.

33 While DTC is the registered owner, the participants and their customers are the beneficial owners. See supra note 21.

34 A securities depository determines whether a security is eligible for deposit. Certain securities may not be eligible for a variety of reasons such as the security cannot conform to the depository's processing systems or ownership of the security is restricted in such a manner that it cannot be freely transferred. See Rule 5 of DTC's Rules.

35 For example, DTC participants may choose not to deposit the securities in the depository if the security is not widely traded, and instead hold certificated securities registered in the name of either the participant's nominee or its customer.

36 Supra note 5.

Case 2:23-cv-04104-MRP    Document 66-41    Filed 07/23/24    Page 29 of 37

37 See, e.g., www.jagnotes.com (/cgi-bin/goodbye.cgi?www.jagnotes.com/); www.nutk.com (/cgi-bin/goodbye.cgi?www.nutk.com/). Also see "Intergold Corporation Announces Custody Only CommonShare Transfer System," PRNewswire-First Call (January 30, 2003).

38 Id. The certification requirement does not in and of itself preclude securities from being deposited at DTC. In fact, DTC's nominee owns many of the securities deposited at DTC in certificated form, generally by a global or balance certificate.

39 Id. Registration of a transfer is necessary to change registered ownership of a security.

40 For example, some broker-dealers have expressed concern that such disclosure may cause them to violate Exchange Act Rule 14b-1 that requires a broker to provide a requesting issuer only with the identities of beneficial owners who have not objected to disclosures of this information to issuers. 17 CFR 240.14b-1.

41 See Exchange Act Release No. 47978 (June 4, 2003), 68 FR 35037 (June 11, 2003), [File No. SR-DTC-2003-02] (order approving proposed rule change concerning requests for withdrawal of certificates by issuers). A short sale is a sale of a security that the seller does not own or is effectuated by the delivery of borrowed securities. Although "naked short sale" is not a defined term under federal securities laws, it generally refers to situations where a seller sells a security without owning or borrowing the security and does not deliver when delivery is due. Exchange Act Release No. 50103 (July 28, 2004), 69 FR 48008 (August 6, 2004), [File No. S7-23-03] (adoption of Regulation SHO).

42 Id.

43 See, e.g., www.jagnotes.com (/cgi-bin/goodbye.cgi?www.jagnotes.com/); www.nutk.com (/cgi-bin/goodbye.cgi?www.nutk.com/). Also see "Intergold Corporation Announces Custody Only CommonShare Transfer System," PRNewswire-First Call (January 30, 2003). Previously, some issuers sought to withdraw from DTC all securities issued by them and indicated that they would not allow their securities to be reregistered in the name of DTC. In June 2003, the Commission approved a DTC rule change clarifying that DTC's rules and procedures provide only for participants (i.e., broker-dealers and banks) to submit withdrawal instructions for securities deposited at DTC and do not require DTC to comply with withdrawal requests from issuers. Exchange Act Release Nos. 47365 (February 13, 2003), 68 FR 8535 (February 21, 2003), [File No. SR-DTC-2003-02] (notice of proposed rule change); 47978 (June 4, 2003), 68 FR 35037 (June 11, 2003), [File No. SR-DTC-2003-02] (order approving proposed rule change concerning requests for withdrawal of certificates by issuers).

44 See Exchange Act Release No. 49405 (March 11, 2004), 69 FR 12922 (March 18, 2004), [File No. S7-13-04]. See also "SIA T+1 Business Case Final Report," at 18-21 (August 2000) ("SIA Business Case Report"). The report is available online at http://www.sia.com/t_plus_one_issue/pdf/BusinessCaseFinal.pdf  (/cgi-bin/goodbye.cgi?www.sia.com/t_plus_one_issue/pdf/BusinessCaseFinal.pdf).

45 Only issuers whose securities are trading on the NYSE are prohibited from charging transfer or certification fees.

46 Securities Exchange Act Release No. 49809 (June 4, 2004), 69 FR 32784 (June 10, 2004), [File No. S7-24-04].

47 Supra note 13. Issuers acting as their own transfer agent would be subject to Rule 17Ad-20.

48 Supra note 5.

49 Supra note 15.

50 Item 901(b)(1) defines the term partnership to mean any: (i) finite-life limited partnership or (ii) other finite-life entity. 17 CFR 229.901(b)(1). The Commission has the authority under Section 36 of the Exchange Act to conditionally or unconditionally exempt any security or class of securities from the provisions of the Exchange Act to the extent that such exemption is necessary or appropriate in the public interest, and is consistent with the protection of investors. 15 U.S.C. 78mm(a)(1).

For tax or other reasons, partnerships may have an appropriate need to restrict ownership and issue a securities certificate. A "publicly traded partnership" as defined in Section 7704 of the Internal Revenue Code is subject to treatment as a corporation rather than a partnership for tax purposes. 26 CFR §1.7704-1.

51 Supra note 7.

52 Letters from the SIA, Legg Mason, and DTC.

53 Letter from DTC (July 8, 2004).

54 Letter from DTC (August 19, 2004).

55 NSCC is an affiliate of DTC and is a registered clearing agency that maintains a book-entry accounting system that centralizes the settlement of compared security transactions and maintains an orderly flow of security and money balances.

56 Letter from H. Glenn Bagwell.

57 NSCC's Stock Borrow Program was approved by the Commission. Securities Exchange Act Release No. 17422 (December 29, 1980), 46 FR 3104 (January 13, 1981).

58 Letters from David Patch, Glenda King, Frederick D. Lipman, X-Clearing Corporation, and H. Glenn Bagwell.

59 Letter from David Patch.

60 Letter from Glenda King.

61 Letter from X-Clearing Corporation.

62 Id.

63 Letters from David Patch, H. Glenn Bagwell, and Frederick D. Lipman.

64 Letters from H. Glenn Bagwell, and Frederick D. Lipman. One of these commenters maintained that state corporation laws generally permit corporations to establish the number of authorized shares in their certificates or articles or incorporation and authorize the board of directors to issue those shares. Naked short selling, this commenter contends, can increase the supply of shares beyond those authorized, thereby undermining the board's authority under state law to control the number of outstanding shares. Another commenter alluded to this issue when he noted that Regulation SHO indicated that in some cases settlement failure exceed the public float. Letter from David Patch (August 16, 2004). The Commission recently adopted Regulation SHO that addresses certain concerns relating to naked short selling. Exchange Act Release No. 50103 (July 28, 2004), 69 FR 48008 (August 6, 2004), [File No. S7-23-03]. See Section IV for further discussion on Regulation SHO.

65 Letter from X-Clearing Corporation.

66 Letters from Pacific Corporate Trust Company, Registrar and Transfer Company, and Cleary, Gottlieb, Steen & Hamilton.

67 Letters from Pacific Corporate Trust Company and Registrar and Transfer Company. The compliance date for the relevant provisions of Regulation SHO designed to address naked short selling problems is scheduled for January 3, 2005. Exchange Act Release No. 50103 (July 28, 2004), 69 FR 48008 (August 6, 2004), [File No. S7-23-03]

68 Letter from Registrar and Transfer Company.

69 Letter from Cleary, Gottlieb, Steen & Hamilton.

70 Supra notes 13 and 15. All transfer agents that are required to register as such pursuant to Section 17A(c) of the Exchange Act, whether they are in fact registered or not, must comply with Rule 17Ad-20 and all other applicable transfer agent rules.

71 The term "transfer" means (1) delivery of the security (i.e., the certificate, or in the case of book-entry, an instruction) (2) a volitional act by the transferor which manifests an intent to change ownership or convey a security interest and, (3) reregistration of ownership. Egon Guttman, Modern Securities Transfers § 6:2, at 6-4 (3d ed. 2002).

72 15 U.S.C. 78l and 15 U.C. C. 78o(d) respectively.

73 The rule will apply even if a restriction or prohibition does not expressly state that transfer to or ownership by securities intermediaries is restricted or prohibited. For example, the rule would apply to securities where the issuer permits transfer to or ownership by only the "ultimate beneficial owner."

74 When a broker-dealer participant or its customer requests a certificate for a position maintained at DTC, the broker-dealer participant submits a "Withdrawal by Transfer" instruction to DTC, which in turn sends the appropriate transfer agent a certificate representing all or a portion of DTC's position. The transfer agent registers the number of shares in the customer's name as instructed by DTC and then reregisters the remainder of the shares in DTC's nominee name. The transfer agent sends the broker-dealer or the customer his or her shares and sends DTC the balance of its shares.

75 State law determines if an issuer is required to issue certificates and the conditions to such issuance. Some states, such as New York, permit issuers to issue securities in book-entry form only (i.e., in dematerialized form).

76 Securities Exchange Act Release No. 50103 (July 28, 2004), 69 FR 48008 (August 6, 2004), [File No. S7-23-03].

77 Id. Regulation SHO requires broker-dealers to comply with the locate, borrow and delivery requirements by January 3, 2005.

78 Letters from Pacific Corporate Trust Company and Registrar and Transfer Company.

79 The compliance date for the relevant provisions of Regulation SHO designed to address naked short selling problems is scheduled for January 3, 2005. Exchange Act Release No. 50103 (July 28, 2004), 69 FR 48008 (August 6, 2004), [File No. S7-23-03].

80 Letter from X-Clearing Corporation.

81 Id.

82 15 U.S.C. 78c(a)(23).

83 15 U.S.C. 78q-1(b)(1).

84 Letter from Registrar and Transfer Company.

85 15 U.S.C. 78c(a)(25).

86 15 U.S.C. 78q-1(c)(1).

87 44 U.S.C. 3501 et seq.

88 Every endorsement of a securities certificate requires a signature guarantee by an acceptable guarantor. Securities Transfer Association Rule Book, Section 1.02 (1998). The Uniform Commercial Code that states that a signature guarantee is a warranty by the signature guarantor that, among other things, the endorser is an appropriate person to endorse and thus the transfer the security. UCC 8-312.

89 Letter to Robert L.D. Colby, Deputy Director, Division of Market Regulation, Commission, from Donald Kittell, Executive Vice President, SIA (August 20, 2003); letter to Annette Nazareth, Director, Division of Market Regulation, Commission, from Donald Kittell, Executive Vice President, SIA (March 24, 2003) ("Nazareth Letter"). These letters advocate the need to dematerialize the U.S. market.

90 Id. The SIA's statistics on securities reported lost and stolen were obtained by the SIA directly from SIC.

91 Id.

92 Nazareth Letter. Investors who have either lost their certificates or had the certificates stolen generally must obtain a surety bond before the transfer agent will register a transfer of ownership in order to protect the transfer agent from the risk of wrongful transfers in the event that the lost or stolen certificates reappear at a later date. We understand that generally most transfer agent charge investors 2% - 4% of the current market value of the securities for such a bond.

93 See Exchange Act Release No. 48931 (December 16, 2003), 68 FR 74390 (December 23, 2003), [File No. S7-18-00] (adopting rule relating to certificate destruction).

7/22/24, 11:45 PM
SEC.gov | Issuer Restrictions or Prohibitions on Ownership by Securities Intermediaries
Case 2:23-cv-04104-MRP Document 66-41 Filed 07/23/24 Page 34 of 37

94 Telephone conversation with Charlie Rossi, Division President, Equiserve, on October 1, 2004. The latest data showed an increase from an estimated cost of $5.00 indicated in the proposing release to $22.50 due to the results of a cost analysis performed by Equiserve. Most of the increase was associated with the manual process of scanning the certificate, ensuring appropriateness of the rejection, and communicating with the securityholders to explain the rejection.

95 Letter from David Patch. Also see Exchange Act Release No. 47978 (June 4, 2003), 68 FR 35037 (June 11, 2003), [File No. SR-DTC-2003-02].

96 Id.

97 Exchange Act Release No. 50103 (July 28, 2004), 69 FR 48008 (August 6, 2004), [File No. S7-23-03].

98 As noted above, most securities trading on an exchange or Nasdaq are already subject to SRO rules that require depository eligibility. See supra notes 25 and 26.

99 15 U.S.C. 78c.

100 Pub. L. No. 104-290, 110 Stat. 3416 (1996).

101 See supra notes 25 and 26.

102 As noted above, the proposed rule would not apply to equity securities of issuers subject to Section 15(d) that are transferred by transfer agents that are not required to be registered under Section 17A of the Exchange Act.

103 15 U.S.C. 78a et. seq.

104 Supra note 5.

105 Item 901(b)(1) defines the term partnership to mean any: (i) finite-life limited partnership or (ii) other finite-life entity. 17 CFR 229.901(b)(1). The Commission has the authority under Section 36 of the Exchange Act to conditionally or unconditionally exempts any security or class of securities from the provisions of the Exchange Act to the extent that such exemption is necessary or appropriate in the public interest, and is consistent with the protection of investors. 15 U.S.C. 78mm(a)(1).

106 Securities Exchange Act Release No. 49809 (June 4, 2004), 69 FR 32784 (June 10, 2004), [File No. S7-24-04].

Case 2:23-cv-04104-MRP Document 66-41 Filed 07/23/24 Page 35 of 37

107 Exchange Act Release Nos. 47365 (February 13, 2003), 68 FR 8535 (February 21, 2003), [File No. SR-DTC-2003-02] (notice of proposed rule change); 47978 (June 4, 2003), 68 FR 35037 (June 11, 2003), [File No. SR-DTC-2003-02] (order approving proposed rule change concerning requests for withdrawal of certificates by issuers).

108 17 CFR §240.0-10(a).

109 Id.

110 See Exchange Act Release No. 47978 (June 4, 2003), 68 FR 35037 (June 11, 2003), [File No. SR-DTC-2003-02].

111 Id.

112 Most securities trading on a registered exchange or Nasdaq are already subject to SRO rules that require depository eligibility. Supra note 25 and 26. Accordingly, the proposed Rule 17Ad-20 would affect only those issuers not trading on a registered exchange or Nasdaq.

113 15 U.S.C. 78q-1(a)(1), 78q-1(a)(2), 78q-1(d), and 78w(a).

# Prior Actions

**Notice Rule (34-49804)**

**Release Number**
34-49804

**SEC Issue Date**
June 4, 2004

**Federal Register Publish Date**
June 15, 2004

**Document Citation**
69 FR 33437

## Resources

Notice Rule: SEC Issued Version (htm 91.34 KB) (/files/rules/proposed/34-49804.htm)

Notice Rule: Federal Register Version (https://www.federalregister.gov/documents/2004/06/15/04-13356/self-regulatory-organizations-notice-of-filing-and-immediate-effectiveness-of-proposed-rule-change)

correction (/files/rules/proposed/34-49804a.htm)

for this proposal. Federal Register PDF (/files/rules/proposed/34-49804.pdf)

View Received Comments (https://www.sec.gov/rules/proposed/s72404.shtml)

Last Reviewed or Updated: April 7, 2023

## RESOURCES

2005 Federal Register PDF

Rel. No. 34-49804 (/files/rules/proposed/34-49804.htm)

correction (/files/rules/proposed/34-49804a.htm)

and comments (/files/rules/proposed/s72404.shtml)

## DETAILS

**File Number**

S7-24-04

**Rule Type**

Final

**Release Number**

34-50758A

**SEC Issue Date**

Dec. 7, 2004

**Effective Date**

March 7, 2005

**Notes**

Corrected to conform to Federal Register version File No.: S7-24-04 Effective Date: March 7, 2005 Federal Register PDF    (https://www.sec.gov/rules/final/34-50758.pdf) See also Proposed Rule, Rel. No. 34-49804 (https://www.sec.gov/rules/proposed/34-49804.htm) ; correction (https://www.sec.gov/rules/proposed/34-49804a.htm) ; and comments (https://www.sec.gov/rules/proposed/s72404.shtml)