# Exhibit 43

## DEPARTMENT OF HEALTH AND HUMAN SERVICES

### Centers for Medicare & Medicaid Services

**42 CFR Parts 400, 405, 409, 410, 412, 414, 415, 417, 418, 421, 422, 423, 425, 440, 482, and 510**

**[CMS–1744–IFC]**

**RIN 0938–AU31**

### Medicare and Medicaid Programs; Policy and Regulatory Revisions in Response to the COVID–19 Public Health Emergency

**AGENCY:** Centers for Medicare & Medicaid Services (CMS), HHS.

**ACTION:** Interim final rule with comment period.

---

**SUMMARY:** This interim final rule with comment period (IFC) gives individuals and entities that provide services to Medicare beneficiaries needed flexibilities to respond effectively to the serious public health threats posed by the spread of the 2019 Novel Coronavirus (COVID–19). Recognizing the urgency of this situation, and understanding that some pre-existing Medicare payment rules may inhibit innovative uses of technology and capacity that might otherwise be effective in the efforts to mitigate the impact of the pandemic on Medicare beneficiaries and the American public, we are changing Medicare payment rules during the Public Health Emergency (PHE) for the COVID–19 pandemic so that physicians and other practitioners, home health and hospice providers, inpatient rehabilitation facilities, rural health clinics (RHCs), and federally qualified health centers (FQHCs) are allowed broad flexibilities to furnish services using remote communications technology to avoid exposure risks to health care providers, patients, and the community. We are also altering the applicable payment policies to provide specimen collection fees for independent laboratories collecting specimens from beneficiaries who are homebound or inpatients (not in a hospital) for COVID–19 testing. We are also expanding, on an interim basis, the list of destinations for which Medicare covers ambulance transports under Medicare Part B. In addition, we are making programmatic changes to the Medicare Diabetes Prevention Program (MDPP) and the Comprehensive Care for Joint Replacement (CJR) Model in light of the PHE, and program-specific requirements for the Quality Payment Program to avoid inadvertently creating

incentives to place cost considerations above patient safety. This IFC will modify the calculation of the 2021 and 2022 Part C and D Star Ratings to address the expected disruption to data collection and measure scores posed by the COVID–19 pandemic and also to avoid inadvertently creating incentives to place cost considerations above patient safety. This rule also amends the Medicaid home health regulations to allow other licensed practitioners to order home health services, for the period of this PHE for the COVID–19 pandemic in accordance with state scope of practice laws. We are also modifying our under arrangements policy during the PHE for the COVID–19 pandemic so that hospitals are allowed broader flexibilities to furnish inpatient services, including routine services outside the hospital.

**DATES:**

*Effective date:* These regulations are effective on March 31, 2020.

*Applicability date:* These regulations are applicable beginning on March 1, 2020.

*Comment date:* To be assured consideration, comments must be received at one of the addresses provided below, no later than 5 p.m. on June 1, 2020.

**ADDRESSES:** In commenting, please refer to file code CMS–1744–IFC. Comments, including mass comment submissions, must be submitted in one of the following three ways (please choose only one of the ways listed):

1. *Electronically.* You may submit electronic comments on this regulation to *http://www.regulations.gov.* Follow the ''Submit a comment'' instructions.

2. *By regular mail.* You may mail written comments to the following address ONLY: Centers for Medicare & Medicaid Services, Department of Health and Human Services, Attention: CMS–1744–IFC, P.O. Box 8016, Baltimore, MD 21244–8016.

Please allow sufficient time for mailed comments to be received before the close of the comment period.

3. *By express or overnight mail.* You may send written comments to the following address ONLY: Centers for Medicare & Medicaid Services, Department of Health and Human Services, Attention: CMS–1744–IFC, Mail Stop C4–26–05, 7500 Security Boulevard, Baltimore, MD 21244–1850.

For information on viewing public comments, see the beginning of the **SUPPLEMENTARY INFORMATION** section.

**FOR FURTHER INFORMATION CONTACT:** Jamie Hermansen, (410) 786–2064, for general information, contact one of the following:

*HAPG_COVID-19@cms.hhs.gov,* for issues related to telehealth services, and communication technology-based services; frequency limits on subsequent care services in inpatient and non-facility settings, critical care consultations, required ''hands-on'' visits for ESRD monthly capitation payments; removal of restrictions on technology, and supervision of interactive telecommunications technology; clinical laboratory fee schedule; services furnished by opioid treatment programs; payment under Medicare Part B for teaching physician services and resident moonlighting; remote physiologic monitoring; physician supervision flexibility for outpatient hospital services; payment for office/outpatient evaluation and management visits; counting of resident time at alternate locations; Ambulance Fee Schedule; rural health clinic services; federally qualified health center services; and inpatient hospital services furnished under arrangements outside of the hospital. (Note this email address has an underscore ''_'' between ''HAPG'' and ''COVID–19''.)

*IRFCoverage@cms.hhs.gov,* for issues related to the Medicare inpatient rehabilitation facility benefits.

*NCDsPublicHealthEmergency@ cms.hhs.gov,* for issues related to national coverage determination and local coverage determination requirements.

*PartCandDStarRatings@cms.hhs.gov,* for issues related to Medicare Parts C and D quality rating system.

*MedicaidHomeHealthRule@ cms.hhs.gov,* for issues related to Medicaid home health provider flexibility.

Hillary Loeffler, (410) 786–0456, *HomeHealthPolicy@cms.hhs.gov,* or *HospicePolicy@cms.hhs.gov,* for issues related to the Medicare home health and hospice benefits.

Megan Hyde, (410) 786–3247, and Rebecca Cole, (410) 786–1589, for issues related to Innovation Center Models, and alternative payment model treatment under the Quality Payment Program.

Kim Spalding Bush, (410) 786–3232, and Fiona Larbi, (410) 786–7224, for issues related to the Medicare Shared Savings Program.

Molly MacHarris, (410) 786–4461, for issues related to the Merit-based Incentive Payment System (MIPS).

Heather Holsey, (410) 786–0028, for Comprehensive Care for Joint Replacement model.

Amanda Rhee, (410) 786–3888, and Elizabeth Matthews, (410) 786–5433, for Medicare Diabetes Prevention Program expanded model.

Brittany LaCouture, (410) 786–0481, for Alternative Payment Model provisions of the Quality Payment Program.

CAPT Scott Cooper, USPHS, (410) 786–9496, for issues related to special requirements for psychiatric hospitals.

**SUPPLEMENTARY INFORMATION:**

*Inspection of Public Comments:* All comments received before the close of the comment period are available for viewing by the public, including any personally identifiable or confidential business information that is included in a comment. We post all comments received before the close of the comment period on the following website as soon as possible after they have been received: *http://regulations.gov.* Follow the search instructions on that website to view public comments.

## Table of Contents

I. Background
II. Provisions of the Interim Final Rule
    A. Payment for Medicare Telehealth Services Under Section 1834(m) of the Act
    B. Frequency Limitations on Subsequent Care Services in Inpatient and Nursing Facility Settings, and Critical Care Consultations and Required ''Hands-on'' Visits for ESRD Monthly Capitation Payments
    C. Telehealth Modalities and Cost-sharing
    D. Communication Technology-Based Services (CTBS)
    E. Direct Supervision by Interactive Telecommunications Technology
    F. Clarification of Homebound Status Under the Medicare Home Health Benefit
    G. The Use of Telecommunications Technology Under the Medicare Home Health Benefit During the PHE for the COVID–19 Pandemic
    H. The Use of Technology Under the Medicare Hospice Benefit
    I. Telehealth and the Medicare Hospice Face-to-Face Encounter Requirement
    J. Modification of the Inpatient Rehabilitation Facility (IRF) Face-to-Face Requirement for the PHE During the COVID–19 Pandemic
    K. Removal of the IRF Post-Admission Physician Evaluation Requirement for the PHE for the COVID–19 Pandemic and Clarification Regarding the ''3-Hour'' Rule
    L. Rural Health Clinics (RHCs) and Federally Qualified Health Centers (FQHCs)
    M. Medicare Clinical Laboratory Fee Schedule: Payment for Specimen Collection for Purposes of COVID–19 Testing
    N. Requirements for Opioid Treatment Programs (OTP)
    O. Application of Teaching Physician and Moonlighting Regulations During the PHE for the COVID–19 pandemic During the PHE for COVID–19
    P. Special Requirements for Psychiatric Hospitals (§ 482.61(d))
    Q. Innovation Center Models
    R. Remote Physiologic Monitoring
    S. Telephone Evaluation and Management (E/M) Services
    T. Physician Supervision Flexibility for Outpatient Hospitals—Outpatient Hospital Therapeutic Services Assigned to the Non-Surgical Extended Duration Therapeutic Services (NSEDTS) Level of Supervision
    U. Application of Certain National Coverage Determination and Local Coverage Determination Requirements During the PHE for the COVID–19 Pandemic
    V. Change to Medicare Shared Savings Program Extreme and Uncontrollable Circumstances Policy
    W. Level Selection for Office/Outpatient E/M Visits When Furnished Via Medicare Telehealth
    X. Counting of Resident Time During the PHE for the COVID–19 Pandemic
    Y. Addressing the Impact of COVID–19 on Part C and Part D Quality Rating Systems
    Z. Changes to Expand Workforce Capacity for Ordering Medicaid Home Health Services, Medical Equipment, Supplies and Appliances and Physical Therapy, Occupational Therapy or Speech Pathology and Audiology Services
    AA. Origin and Destination Requirements Under the Ambulance Fee Schedule
    BB. Merit-Based Incentive Payment System Updates
    CC. Inpatient Hospital Services Furnished Under Arrangements Outside the Hospital During the Public Health Emergency (PHE) for the COVID–19 Pandemic
    DD. Advance Payments to Suppliers Furnishing Items and Services Under Part B
III. Waiver of Proposed Rulemaking
IV. Collection of Information Requirements
V. Response to Comments
VI. Regulatory Impact Analysis
Regulations Text

## Addenda Available Only Through the Internet on the CMS Website

The Addenda along with other supporting documents and tables referenced in this interim final rule with comment period (IFC) are available through the internet on the CMS website at *https://www.cms.gov/.* For this IFC, refer to item CMS–1744–IFC. Readers who experience any problems accessing any of the Addenda or other documents referenced in this IFC and posted on the CMS website identified above should contact *HAPG_COVID-19@cms.hhs.gov.*

## CPT (Current Procedural Terminology) Copyright Notice

Throughout this IFC, we use CPT codes and descriptions to refer to a variety of services. We note that CPT codes and descriptions are copyright 2019 American Medical Association. All Rights Reserved. CPT is a registered trademark of the American Medical Association (AMA). Applicable Federal Acquisition Regulations (FAR) and Defense Federal Acquisition Regulations (DFAR) apply.

## I. Background

The United States is responding to an outbreak of respiratory disease caused by a novel (new) coronavirus that was first detected in China and which has now been detected in more than 190 locations internationally, including in all 50 States and the District of Columbia. The virus has been named ''SARS–CoV–2'' and the disease it causes has been named ''coronavirus disease 2019'' (abbreviated ''COVID–19'').

On January 30, 2020, the International Health Regulations Emergency Committee of the World Health Organization (WHO) declared the outbreak a ''Public Health Emergency of international concern'' (PHEIC). On January 31, 2020, Health and Human Services Secretary, Alex M. Azar II, declared a PHE for the United States to aid the nation's healthcare community in responding to COVID–19 (hereafter referred to as the PHE for the COVID–19 pandemic). On March 11, 2020, the WHO publicly characterized COVID–19 as a pandemic. On March 13, 2020 the President of the United States declared the COVID–19 outbreak a national emergency.

Coronaviruses are a large family of viruses that are common in people and many different species of animals, including camels, cattle, cats, and bats. Rarely, animal coronaviruses can infect people and then spread between people such as with MERS-CoV, SARS-CoV, and now with this new virus (COVID–19).

The complete clinical picture with regard to COVID–19 is not fully known. Reported illnesses have ranged from very mild (including some with no reported symptoms) to severe, including illness resulting in death. While information so far suggests that most COVID–19 illness is mild, a report out of China suggests serious illness occurs in 16 percent of cases. Older people and people of all ages with severe chronic medical conditions—like heart disease, lung disease and diabetes, for example—seem to be at higher risk of developing serious COVID–19 illness.[1]

A pandemic is a global outbreak of disease. Pandemics happen when a new virus emerges to infect people and can spread between people sustainably. Because there is little to no pre-existing

---

[1] *https://www.cdc.gov/coronavirus/2019-ncov/cases-updates/summary.html.*

**19232**    **Federal Register** / Vol. 85, No. 66 / Monday, April 6, 2020 / Rules and Regulations

immunity against the new virus, it spreads worldwide. The virus that causes COVID–19 is infecting people and spreading easily from person-to-person. This is the first pandemic known to be caused by the emergence of a new coronavirus.[2]

People in places where ongoing community spread of the virus that causes COVID–19 has been reported are at elevated risk of exposure, with the level of risk dependent on the location. Healthcare workers caring for patients with COVID–19 are at elevated risk of exposure. Close contacts of persons with COVID–19 also are at elevated risk of exposure.

Early information out of China, where COVID–19 first started, shows that some people are at higher risk of getting very sick from this illness. This includes:

• Older adults, with risk increasing by age.

• People who have serious chronic medical conditions like:

++ Heart disease.

++ Diabetes.

++ Lung disease.

The Centers for Disease Control and Prevention (CDC) has developed guidance to help in the risk assessment and management of people with potential exposures to COVID–19, including recommending that health care professionals make every effort to interview a person under investigation for infection by telephone, text monitoring system, or video conference.[3]

As the healthcare community works to implement and establish recommended infection prevention and control practices, regulatory agencies under appropriate waiver authority granted by the PHE for the COVID–19 pandemic declaration are also working to revise and implement regulations that work in concert with healthcare community infection prevention and treatment practices. Based on the current and projected increase in rate of incidence of the COVID–19 disease in the US population, and observed fatalities in the elderly population, who are particularly vulnerable due to age and co-morbidities, and additionally, impact on health workers that are at increased risk due to treating the population, we believe that certain Medicare and Medicaid regulations that may offer providers flexibilities in furnishing services to combat the COVID–19 pandemic should be reviewed and revised as appropriate.

We are addressing some of these regulations in this interim final rule with comment period (IFC) to ensure that sufficient health care items and services are available to meet the needs of individuals enrolled in the programs under Title XVIII (Medicare) and Title XIX (Medicaid) of the Social Security Act (the Act).

In this extraordinary circumstance, we recognize that public exposure greatly increases the overall risk to public health. We believe that this increased risk produces an immediate change, not only in the circumstances under which services can safely occur, but also results in an immediate change to the business relationships between providers, suppliers, and practitioners. By increasing access to services delivered using telecommunications technology, increasing access to testing in a patient's home, and improving infection control, this IFC will provide the necessary flexibility for Medicare beneficiaries to be able to receive medically necessary services without jeopardizing their health or the health of those who are providing those services, while minimizing the overall risk to public health.

## II. Provisions of the Interim Final Rule

In this IFC, we are defining the term, ''Public Health Emergency,'' in the regulation at 42 CFR 400.200, which contains definitions that apply under the entirety of chapter 400 of title 42 of the CFR. The definition identifies the PHE determined to exist nationwide by the Secretary of Health and Human services under section 319 of the Public Health Service Act on January 31, 2020, as a result of confirmed cases of COVID–19, including any subsequent renewals.

*A. Payment for Medicare Telehealth Services Under Section 1834(m) of the Act*

Section 1834(m) of the Act specifies the payment amounts and circumstances under which Medicare makes payment for a discrete set of services, all of which must ordinarily be furnished in-person, when they are instead furnished using interactive, real-time telecommunication technology. When furnished under the telehealth rules, many of these specified Medicare telehealth services are still reported using codes that describe ''face-to-face'' services but are furnished using audio/video, real-time communication technology instead of in-person. The list of these eligible telehealth services is published on the CMS website at *https://www.cms.gov/Medicare/Medicare-General-Information/Telehealth/index.html.*

In contrast, Medicare pays separately for other professional services that are commonly furnished remotely using telecommunications technology, but that do not usually require the patient to be present in-person with the practitioner when they are furnished. These services, including remote physician interpretation of diagnostic tests, care management services and virtual check-ins among many others, are considered physicians' services in the same way as services that are furnished in-person without the use of telecommunications technology. They are covered and paid in the same way as services delivered without the use of telecommunications technology, but are not considered Medicare telehealth services and are not subject to the conditions of payment under section 1834(m) of the Act.

On March 17, 2020, we announced the expansion of telehealth services on a temporary and emergency basis pursuant to waiver authority added under section 1135(b)(8) of the Act by the Coronavirus Preparedness and Response Supplemental Appropriations Act, 2020 (Pub. L. 116–123, March 6, 2020). Starting on March 6, 2020, Medicare can pay for telehealth services, including office, hospital, and other visits furnished by physicians and other practitioners to patients located anywhere in the country, including in a patient's place of residence. In the context of the PHE for the COVID–19 pandemic, we recognize that physicians and other health care professionals are faced with new challenges regarding potential exposure risks, for people with Medicare, for health care providers, and for members of the community at large. For example, the CDC has urged health care professionals to make every effort to interview persons under investigation for infection by telephone, text messaging system, or video conference instead of in-person. To facilitate the use of telecommunications technology as a safe substitute for in-person services, we are, on an interim basis, adding many services to the list of eligible Medicare telehealth services, eliminating frequency limitations and other requirements associated with particular services furnished via telehealth, and clarifying several payment rules that apply to other services that are furnished using telecommunications technologies that can reduce exposure risks.

As discussed in this IFC and in prior rulemaking, several conditions must be met for Medicare to make payment for telehealth services under the Physician Fee Schedule (PFS). For further details, see the full discussion of the scope of

---

[2] *https://www.cdc.gov/coronavirus/2019-ncov/cases-updates/summary.html.*

[3] *https://www.cdc.gov/coronavirus/2019-ncov/cases-updates/summary.html.*

Medicare telehealth services in the ''Medicare Program; Revisions to Payment Policies Under the Physician Fee Schedule and Other Revisions to Part B for CY 2018; Medicare Shared Savings Program Requirements; and Medicare Diabetes Prevention Program'' final rule (82 FR 53006, November 17, 2017) (hereinafter referred to as the CY 2018 PFS final rule) and in our regulations at 42 CFR 410.78 and 414.65.

1. Site of Service Differential for Medicare Telehealth Services

Under the PFS, there are two payment rates for many physicians' services: The facility rate; and the non-facility, or office, rate. The PFS non-facility rate is the single amount paid to a physician or other practitioner for services furnished in their office. The PFS facility rate is the amount generally paid to a professional when a service is furnished in a setting of care, like a hospital, where Medicare is making a separate payment to an entity in addition to the payment to the billing physician or practitioner. This separate payment, often referred to as a ''facility fee'' reflects the facility's costs associated with the service (clinical staff, supplies and equipment) and is paid in addition to what is paid to the professional through the PFS.

We note that, in accordance with section 1834(m)(2)(B) of the Act, a facility fee is, in most cases, paid to the ''originating site'' where the beneficiary is located at the time a telehealth service is furnished. The payment amount for the telehealth originating site facility fee is a nationally applicable flat fee, paid without geographic or site of service adjustments that generally apply to payments for different kinds of services furnished by Medicare providers and suppliers.

For Medicare telehealth services, we currently make payment to the billing physician or practitioner at the PFS facility rate since the facility costs (clinical staff, supplies, and equipment) associated with furnishing the service would generally be incurred by the originating site, where the patient is located, and not by the practitioner at the distant site; and because the statute requires Medicare to pay an originating site facility fee to the site that hosts the patient.

When a physician or practitioner submits a claim for their services, including claims for telehealth services, they include a place of service (POS) code that is used to determine whether a service is paid using the facility or non-facility rate. Currently, CMS requires that claims for Medicare telehealth services include the POS code 02, which is specific to telehealth services.

Under the waiver authority exercised by the Secretary in response to the PHE for the COVID–19 pandemic, Medicare telehealth services can be furnished to patients wherever they are located, including in the patient's home. As provided by the amendments to section 1135(b)(8) of the Act, when telehealth services are furnished under the waiver to beneficiaries located in places that are not identified as permissible originating sites in section 1834(m)(4)(C)(ii)(I) through (IX) of the Act, no originating site facility fee is paid. We also recognize that as physician practices suddenly transition a potentially significant portion of their services from in-person to telehealth visits in the context of the PHE for the COVID–19 pandemic, the relative resource costs of furnishing these services via telehealth may not significantly differ from the resource costs involved when these services are furnished in person. For example, we expect that physician offices will continue to employ nursing staff to engage with patients during telehealth visits or to coordinate pre- or post-visit care, regardless of whether or not the visit takes place in person, as it would have outside of the PHE for the COVID–19 pandemic, or through telehealth in the context of the PHE for the COVID–19 pandemic. Consequently, the assumptions that have supported payment of telehealth services at the PFS facility rate would not apply in many circumstances for services furnished during the PHE for the COVID–19 pandemic. Instead, we believe that, as more telehealth services are furnished to patients wherever they are located rather than in statutory originating sites, it would be appropriate to assume that the relative resource costs of services furnished through telehealth should be reflected in the payment to the furnishing physician or practitioner as if they furnished the services in person, and to assign the payment rate that ordinarily would have been paid under the PFS were the services furnished in-person. For example, a physician practicing in an office setting who, under the PHE for the COVID–19 pandemic, sees patients via telehealth instead of in person would be paid at the non-facility, or office, rate for these services. Similarly, a physician who typically sees patients in an outpatient provider-based clinic of a hospital would be paid the facility rate for services newly furnished via telehealth.

To implement this change on an interim basis, we are instructing physicians and practitioners who bill for Medicare telehealth services to report the POS code that would have been reported had the service been furnished in person. This will allow our systems to make appropriate payment for services furnished via Medicare telehealth which, if not for the PHE for the COVID–19 pandemic, would have been furnished in person, at the same rate they would have been paid if the services were furnished in person. Given the potential importance of using telehealth services as means of minimizing exposure risks for patients, practitioners, and the community at large, we believe this interim change will maintain overall relativity under the PFS for similar services and eliminate potential financial deterrents to the clinically appropriate use of telehealth. Because we currently use the POS code on the claim to identify Medicare telehealth services, we are finalizing on an interim basis the use of the CPT telehealth modifier, modifier 95, which should be applied to claim lines that describe services furnished via telehealth. We note that we are maintaining the facility payment rate for services billed using the general telehealth POS code 02, should practitioners choose, for whatever reason, to maintain their current billing practices for Medicare telehealth during the PHE for the COVID–19 pandemic.

2. Adding Services to the List of Medicare Telehealth Services

In the ''Medicare Program; Revisions to Payment Policies Under the Physician Fee Schedule for Calendar Year 2003 and Inclusion of Registered Nurses in the Personnel Provision of the Critical Access Hospital Emergency Services Requirement for Frontier Areas and Remote Locations'' final rule with comment period (67 FR 79988, December 31, 2002) (hereinafter referred to the CY 2003 PFS final rule with comment period), we established a process for adding services to or deleting services from the list of Medicare telehealth services in accordance with section 1834(m)(4)(F)(ii) of the Act. This process provides the public with an ongoing opportunity to submit requests for adding services, which we then review. We have also routinely reviewed potential services for addition to the list of telehealth services and sought comment on any such proposed additions. Under this process, we assign any potential addition to the list of telehealth services to one of the following two categories:

• *Category 1:* Services that are similar to professional consultations, office visits, and office psychiatry services that are currently on the list of telehealth services. In reviewing these requests, we look for similarities between the requested and existing telehealth services for the roles of, and interactions among, the beneficiary, the physician (or other practitioner) at the distant site and, if necessary, the telepresenter, a practitioner who is present with the beneficiary in the originating site. We also look for similarities in the telecommunications system used to deliver the service; for example, the use of interactive audio and video equipment.

• *Category 2:* Services that are not similar to those on the current list of telehealth services. Our review of these requests includes an assessment of whether the service is accurately described by the corresponding code when furnished via telehealth and whether the use of a telecommunications system to furnish the service produces demonstrated clinical benefit to the patient. Submitted evidence should include both a description of relevant clinical studies that demonstrate the service furnished by telehealth to a Medicare beneficiary improves the diagnosis or treatment of an illness or injury or improves the functioning of a malformed body part, including dates and findings, and a list and copies of published peer reviewed articles relevant to the service when furnished via telehealth. Our evidentiary standard of clinical benefit does not include minor or incidental benefits.

Some examples of clinical benefit include the following:

• Ability to diagnose a medical condition in a patient population without access to clinically appropriate in-person diagnostic services.

• Treatment option for a patient population without access to clinically appropriate in-person treatment options.

• Reduced rate of complications.

• Decreased rate of subsequent diagnostic or therapeutic interventions (for example, due to reduced rate of recurrence of the disease process).

• Decreased number of future hospitalizations or physician visits.

• More rapid beneficial resolution of the disease process treatment.

• Decreased pain, bleeding, or other quantifiable symptom.

• Reduced recovery time.

The list of telehealth services, including the additions described later in this section, can be located on the CMS website at *https://www.cms.gov/ Medicare/Medicare-General-Information/Telehealth/index.html.*

On an interim basis, we are adding the following services to the Medicare telehealth list on a Category 2 basis for the duration of this PHE for the COVID–19 pandemic, for telehealth services with dates of service beginning March 1, 2020 through the end of the declared PHE including any subsequent renewals. When we previously considered adding these services to the list of telehealth services, either through a public request or through our own internal review, we considered whether or not these services met the category 1 or category 2 criteria. In many cases we reviewed requests to add these services on a category 1 basis but did not receive or identify information that allowed us to review the services on a category 2 basis. While we do not believe the context of this PHE for the COVID–19 pandemic changes the assessment of these services as category 1, we have reassessed all of these services on a category 2 basis in the context of the widespread presence of COVID–19 in the community. Given the exposure risks for beneficiaries, the health care work force, and the community at large, in-person interaction between professionals and patients poses an immediate potential risk that would not have been present when we previously reviewed these services. This new risk creates a unique circumstance where health care professionals need to weigh the risks associated with disease exposure so they can bill Medicare for the service. For example, certain persons, especially older adults who are particularly vulnerable to this specific virus, those considered at risk because of underlying health conditions, and those known to be recently exposed or diagnosed, and therefore, likely to spread the virus to others, are often being directed by local public health officials to self-isolate as much as possible. At the same time, we note that the risks to medical professionals treating patients is high and we consider it likely that medical professionals will try to treat patients as effectively as possible without exposing themselves or their patients unnecessarily. In some cases, use of telecommunication technology could mitigate the exposure risk, and in such cases, there is a clear clinical benefit of using such technology in furnishing the service. In other words, patients who should not be seen by a professional in-person due to the exposure risk are highly likely to be without access to clinically appropriate treatment or diagnostic options unless they have access to services furnished through interactive communication technology. Therefore, in the context of the PHE for the COVID–19 pandemic, we believe all of the following services meet the category 2 criteria to be added to the list of telehealth services on the basis that there is a patient population that would otherwise not have access to clinically appropriate treatment. We note that, as with other services on the Medicare telehealth list, it may not be clinically appropriate or possible to use telecommunications technology to furnish these particular services to every person or in every circumstance. However, in the context of the PHE for the COVID–19 pandemic with specific regard to the exposure risks noted above, we recognize the clinical benefit of access to medically reasonable and necessary services furnished using telecommunications technology as opposed to the potential lack of access that could occur to mitigate the risk of disease exposure. In light of the PHE for the COVID–19 pandemic, the demand for physicians in areas heavily impacted by COVID–19 or under served by clinicians may intensify, resulting in a need for critical care services for patients with suspected or diagnosed COVID–19 and those who are in acute care settings due to other conditions. These practitioners may be working with nurses, consulting with other healthcare professionals, writing orders, looking at images, communicating with family members for patients with a number of acute conditions. The CPT codes describing E/M services reflect an assumption that the nature of the work involved in evaluation and management visits varies, in part, based on the setting of care and the patient's status. Consequently, there are separate sets of E/M codes for different settings of care, such as office/outpatient codes, nursing facility codes, or emergency department codes. We expect physicians and other practitioners to use the E/M code that best describes the nature of the care they are providing, regardless of the physical location or status of the patient. Under ordinary circumstances, we would expect the kind of E/M code reported to generally align with the physical location or status of the patient. In the context of the PHE, we recognize that the relationship among the setting of care, patient status, and kind of E/M code reported may depend on the needs of local communities and the capacity of local health care institutions. Consequently, we are reiterating that practitioners should report the E/M code that best describes the nature of the care they are providing.