# Exhibit 44

**DEPARTMENT OF HEALTH AND HUMAN SERVICES**

**Centers for Medicare & Medicaid Services**

**42 CFR Parts 409, 410, 412, 413, 414, 415, 424, 425, 440, 483, 484, and 600**

**Office of the Secretary**

**45 CFR Part 156**

[CMS–5531–IFC]

RIN 0938–AU32

**Medicare and Medicaid Programs, Basic Health Program, and Exchanges; Additional Policy and Regulatory Revisions in Response to the COVID–19 Public Health Emergency and Delay of Certain Reporting Requirements for the Skilled Nursing Facility Quality Reporting Program**

**AGENCY:** Centers for Medicare & Medicaid Services (CMS), HHS.

**ACTION:** Interim final rule with comment period.

**SUMMARY:** This interim final rule with comment period (IFC) gives individuals and entities that provide services to Medicare, Medicaid, Basic Health Program, and Exchange beneficiaries needed flexibilities to respond effectively to the serious public health threats posed by the spread of the coronavirus disease 2019 (COVID–19). Recognizing the critical importance of expanding COVID–19 testing, we are amending several Medicare policies on an interim basis to cover FDA-authorized COVID–19 serology tests, to allow any healthcare professional authorized to do so under State law to order COVID–19 diagnostic laboratory tests (including serological and antibody tests), and to provide for new specimen collection fees for COVID–19 testing under the Physician Fee Schedule and Outpatient Prospective Payment System, during the public health emergency (PHE) for the COVID–19 pandemic. Recognizing the urgency of this situation, and understanding that some pre-existing CMS rules may inhibit innovative uses of technology and capacity that might otherwise be effective in the efforts to mitigate the impact of the pandemic on beneficiaries and the American public, we are amending several CMS policies and regulations in response to the COVID–19 PHE and recent legislation, as outlined in this IFC. These changes apply to physicians and other practitioners, hospice providers, federally qualified health centers, rural health clinics, hospitals, critical access hospitals (CAHs), community mental health centers (CMHCs), clinical laboratories, teaching hospitals, providers of the laboratory testing benefit in Medicaid, Opioid treatment programs, and quality reporting programs (QRPs) for inpatient rehabilitation facilities (IRFs), long-term care hospitals (LTCHs), skilled nursing facilities (SNFs), home health agencies (HHAs) and durable medical equipment, prosthetics, orthotics, and supplies (DMEPOS) suppliers.

**DATES:**

*Effective date:* These regulations are effective on May 8, 2020.

*Applicability date:* The policies in this IFC are applicable beginning on March 1, 2020, or January 27, 2020, except as further described in the table in **SUPPLEMENTARY INFORMATION**.

*Comment date:* To be assured consideration, comments must be received at one of the addresses provided below, no later than 5 p.m. on July 7, 2020.

**ADDRESSES:** In commenting, please refer to file code CMS–5531–IFC.

Comments, including mass comment submissions, must be submitted in one of the following three ways (please choose only one of the ways listed):

1. *Electronically.* You may submit electronic comments on this regulation to *http://www.regulations.gov.* Follow the ''Submit a comment'' instructions.

2. *By regular mail.* You may mail written comments to the following address ONLY: Centers for Medicare & Medicaid Services, Department of Health and Human Services, Attention: CMS–5531–IFC, P.O. Box 8016, Baltimore, MD 21244–8016.

Please allow sufficient time for mailed comments to be received before the close of the comment period.

3. *By express or overnight mail.* You may send written comments to the following address ONLY: Centers for Medicare & Medicaid Services, Department of Health and Human Services, Attention: CMS–5531–IFC, Mail Stop C4–26–05, 7500 Security Boulevard, Baltimore, MD 21244–1850.

For information on viewing public comments, see the beginning of the **SUPPLEMENTARY INFORMATION** section.

**FOR FURTHER INFORMATION CONTACT:**
Rebecca Cole, (410) 786–1589, for general information, or contact one of the following:

*HHVBPquestions@cms.hhs.gov,* for issues related to the HHVBP Model.

*HAPG_COVID-19@cms.hhs.gov,* for issues related to scope of practice issues; additional flexibilities for hospital outpatient departments and CMHCs to furnish outpatient services at temporary expansion sites, including the beneficiary's home and expanded CMHCs; expansion of the extraordinary circumstances relocation exception policy for on-campus and excepted off-campus provider-based departments (PBDs) that relocate in response to the COVID–19 PHE; teaching physician policies, including time spent by residents at another hospital and the medical education methodology of counting teaching hospital beds; counting beds for provider-based rural health clinic payment level; services furnished by opioid treatment programs; modified requirements for ordering COVID–19 diagnostic laboratory tests; payment to hospitals and physician's offices for specimen collection; counting time for telehealth evaluation and management visits; method for updating the telehealth list during the PHE; paying for remote monitoring services; and increased payment for telephone evaluation and management visits (Note this email address has an underscore''_'' between ''HAPG'' and ''COVID–19''.)

*IRFCoverage@cms.hhs.gov,* for issues related to the Medicare IRF benefits.

*DMEPOS@cms.hhs.gov,* for issues related to section 3712 of the CARES Act.

Hillary Loeffler, (410) 786–0456, *HomeHealthPolicy@cms.hhs.gov,* or *HospicePolicy@cms.hhs.gov,* for issues related to the Medicare home health and hospice benefits.

*PHPPaymentPolicy@cms.hhs.gov,* for issues related to the Partial Hospitalization Program (PHP) and CMHC issues.

*MedicaidHomeHealthRule@ cms.hhs.gov,* for issues pertaining to the Medicaid home health benefit related to section 3708 of the CARES Act.

Kari Vandegrift, (410) 786–4008, and Elizabeth November, (410) 786–4518 or *SharedSavingsProgram@cms.hhs.gov,* for issues related to the Medicare Shared Savings Program.

Leigha Basini, (301) 492–4380, for issues related to the separate billing requirement.

Sheri Gaskins, (410) 786–9274, for issues related to Medicaid laboratory flexibilities.

Cassandra Lagorio, (410) 786–4554, for issues related to the BHP.

Molly MacHarris, (410) 786–4461, or *QPP@cms.hhs.gov,* for issues related to the Merit-based Incentive Payment System (MIPS).

*NCDsPublicHealthEmergency@ cms.hhs.gov,* for issues related to national coverage determination and local coverage determination requirements.

Joan Proctor, (410) 786–0949, or *HHQRPQuestions@cms.hhs.gov,* for issues related to the following Post-Acute Care QRPs: HH QRP, IRF QRP, LTCH QRP, and SNF QRP.

Julia Venanzi, (410) 786–1471, for issues related to the Hospital VBP Program.

Adam Rubin, (410–786–1919), for issues related to Certification of Home Health Services.

**SUPPLEMENTARY INFORMATION:** The policies in this IFC are applicable beginning on March 1, 2020, or January 27, 2020, except as further described in the following table:

| Provision | Applicability date |
|---|---|
| Medicare Shared Savings Program—Expansion of Codes used in Beneficiary Assignment. | We are revising § 425.400 to expand the definition of primary care services used in the Shared Savings Program beneficiary assignment methodology for the performance year starting on January 1, 2020, and for any subsequent performance year that starts during the PHE for the COVID–19 pandemic, as defined in § 400.200, which includes any subsequent renewals. |
| Modification to Medicare Rules and Medicaid Concerning Certification and Provision of Home Health Services. | We are revising §§ 409.41 through 409.48; 424.22; 424.507(b)(1); § 440.70(a)(2) and (3), and (b)(1), (2) and (4); and several sections of 42 CFR part 484 to include physician assistants, nurse practitioners, and clinical nurse specialists as individuals who can certify the need for home health services and order services. These changes are permanent, and applicable to services provided on or after March 1, 2020. |
| Flexibility for Medicaid Laboratory Services ....... | We are revising § 440.30 to provide states with flexibility to provide Medicaid coverage for certain laboratory tests and X-ray services that may not meet certain requirements in § 440.30(a) or (b) (such as the requirement that tests be furnished in an office or similar facility). This flexibility is retroactive to March 1, 2020, during the period of the COVID–19 PHE and for any subsequent periods of active surveillance. The flexibility also applies to future PHEs resulting from outbreaks of communicable disease and subsequent periods of active surveillance. |
| Requirement for Facilities to Report Nursing Home Residents and Staff Infections, Potential Infections, and Deaths Related to COVID–19. | We are revising § 483.80 to establish explicit reporting requirements for long-term care (LTC) facilities to report information related to COVID–19 cases among facility residents and staff. These reporting requirements are applicable on the effective date of this IFC. |
| Separate Billing and Segregation of Funds for Abortion Services. | We are delaying by 60 days the date when individual market qualified health plan (QHP) issuers must be in compliance with the separate billing policy for non-Hyde abortion services. Under this 60-day delay, individual market QHP issuers must comply with the separate billing policy beginning on or before the QHP issuer's first billing cycle following August 26, 2020. |
| DME Interim Pricing in the CARES Act ............. | We are revising § 414.210 to provide increased fee schedule amounts in certain areas starting on March 6, 2020, and for the duration of the PHE for the COVID–19 pandemic. |
| Merit-based Incentive Payment System (MIPS) Qualified Clinical Data Registry (QCDR) Measure Approval Criteria:<br>—Completion of QCDR Measure Testing<br>—Collection of Data on QCDR Measures | For the reasons discussed in section II.R. of this IFC, we are delaying the implementation of the completion of QCDR measure testing policy by 1 year. Specifically, we are amending § 414.1400(b)(3)(v)(C) to state that beginning with the 2022 performance period, all QCDR measures must be fully developed and tested, with complete testing results at the clinician level, prior to submitting the QCDR measure at the time of self-nomination. This change is applicable on the effective date of this IFC.<br><br>For the reasons discussed in section II.R. of this IFC, we are delaying the implementation of the collection of data on QCDR measures policy by one year. Specifically, we are amending § 414.1400(b)(3)(v)(D) to state that beginning with the 2022 performance period, QCDRs are required to collect data on a QCDR measure, appropriate to the measure type, prior to submitting the QCDR measure for CMS consideration during the self-nomination period. This change is applicable on the effective date of this IFC. |
| Hospital VBP Program ....................................... | We are revising the extraordinary circumstances exception policy to allow CMS to grant an exception to hospitals located in an entire region or locale without a request and we are codifying the updated policy at § 412.165(c). This change is permanent, and is applicable beginning on the effective date of this IFC. |
| IRF QRP ............................................................. | We are revising the compliance date for the IRF QRP to October 1st of the year that is at least one full fiscal year after the end of the PHE. This change is applicable on the effective date of this IFC. |
| LTCH QRP ......................................................... | We are revising the compliance date for the LTCH QRP to October 1st of the year that is at least one full fiscal year after the end of the PHE. This change is applicable on the effective date of this IFC. |
| HH QRP .............................................................. | We are revising the compliance date for the HH QRP to January 1st of the year that is at least one full calendar year after the end of the PHE. This change is applicable on the effective date of this IFC. |
| SNF QRP ........................................................... | We are revising the compliance date for the SNF QRP to October 1st of the year that is at least two full fiscal years after the end of the PHE. This change is applicable on the effective date of this IFC. |

*Inspection of Public Comments:* All comments received before the close of the comment period are available for viewing by the public, including any personally identifiable or confidential business information that is included in a comment. We post all comments received before the close of the comment period on the following website as soon as possible after they have been received: *http://regulations.gov.* Follow the search instructions on that website to view public comments.

**Table of Contents**

I. Background
II. Provisions of the Interim Final Rule With Comment Period (IFC)
    A. Reporting Under the Home Health Value-Based Purchasing Model for CY 2020 During the COVID–19 Public Health Emergency

**27552**    **Federal Register** / Vol. 85, No. 90 / Friday, May 8, 2020 / Rules and Regulations

B. Scope of Practice
C. Modified Requirements for Ordering COVID–19 Diagnostic Laboratory Tests
D. Opioid Treatment Programs (OTPs)—Furnishing Periodic Assessments via Communication Technology
E. Treatment of Certain Relocating Provider-Based Departments During the COVID–19 PHE
F. Furnishing Hospital Outpatient Services in Temporary Expansion Locations of a Hospital or a Community Mental Health Center (Including the Patient's Home)
G. Medical Education
H. Rural Health Clinics (RHCs)
I. Durable Medical Equipment (DME) Interim Pricing in the CARES Act
J. Care Planning for Medicare Home Health Services
K. CARES Act Waiver of the ''3-Hour Rule'' and Modification of IRF Coverage and Classification Requirements for Freestanding IRF Hospitals for the PHE During the COVID–19 Pandemic
L. Medicare Shared Savings Program
M. Additional Flexibility Under the Teaching Physician Regulations
N. Payment for Audio-Only Telephone Evaluation and Management Services
O. Flexibility for Medicaid Laboratory Services
P. Improving Care Planning for Medicaid Home Health Services
Q. Basic Health Program Blueprint Revisions
R. Merit-Based Incentive Payment System (MIPS) Qualified Clinical Data Registry (QCDR) Measure Approval Criteria
S. Application of Certain National Coverage Determination and Local Coverage Determination Requirements During the PHE for the COVID–19 Pandemic
T. Delay in the Compliance Date of Certain Reporting Requirements Adopted for IRFs, LTCHs, HHAs and SNFs
U. Update to the Hospital Value-Based Purchasing (VBP) Program Extraordinary Circumstance Exception (ECE) Policy
V. COVID–19 Serology Testing
W. Modification to Medicare Provider Enrollment Provision Concerning Certification of Home Health Services
X. Health Insurance Issuer Standards Under the Affordable Care Act, Including Standards Related to Exchanges: Separate Billing and Segregation of Funds for Abortion Services
Y. Requirement for Facilities To Report Nursing Home Residents and Staff Infections, Potential Infections, and Deaths Related to COVID–19
Z. Time Used for Level Selection for Office/Outpatient Evaluation and Management Services Furnished Via Medicare Telehealth
AA. Updating the Medicare Telehealth List
BB. Payment for COVID–19 Specimen Collection to Physicians, Nonphysician Practitioners and Hospitals
CC. Payment for Remote Physiologic Monitoring (RPM) Services Furnished During the COVID–19 Public Health Emergency
III. Waiver of Proposed Rulemaking
IV. Collection of Information Requirements
V. Response to Comments
VI. Regulatory Impact Analysis
Regulations Text

## CPT (Current Procedural Terminology) Copyright Notice

Throughout this IFC, we use CPT codes and descriptions to refer to a variety of services. We note that CPT codes and descriptions are copyright 2019 American Medical Association. All Rights Reserved. CPT is a registered trademark of the American Medical Association (AMA). Applicable Federal Acquisition Regulations (FAR) and Defense Federal Acquisition Regulations (DFAR) apply.

## I. Background

The United States is responding to an outbreak of respiratory disease caused by a novel (new) coronavirus that was first detected in China and which has now been detected in more than 190 countries internationally, and all 50 States and the District of Columbia. The virus has been named ''severe acute respiratory syndrome coronavirus 2'' (SARS-CoV–2'') and the disease it causes has been named ''coronavirus disease 2019'' (''COVID–19'').

On January 30, 2020, the International Health Regulations Emergency Committee of the World Health Organization (WHO) declared the outbreak a ''Public Health Emergency of international concern''. On January 31, 2020, Health and Human Services Secretary, Alex M. Azar II, determined that a Public Health Emergency (PHE) exists for the United States to aid the nation's healthcare community in responding to COVID–19 (hereafter referred to as the PHE for the COVID–19 pandemic) and on April 21, 2020, Secretary Azar renewed, effective April 26, 2020, the determination that a PHE exists. On March 11, 2020, the WHO publicly declared COVID–19 a pandemic. On March 13, 2020, the President of the United States declared the COVID–19 pandemic a national emergency.

Coronaviruses are a large family of viruses that are common in people and many different species of animals, including camels, cattle, cats, and bats. Rarely, animal coronaviruses can infect people and then spread between people such as with MERS-CoV, SARS-CoV, and now with this new virus (SARS-CoV–2).

The complete clinical picture with regard to COVID–19 is not fully known. Reported illnesses have ranged from very mild (including some with no reported symptoms) to severe, including illness resulting in death. While information so far suggests that much COVID–19 illness is mild, the Centers for Disease Control and Prevention (CDC) reports find that in the United States, between March 1 and 28, 2020, the overall laboratory-confirmed COVID–19-associated hospitalization rate was 4.6 per 100,000 population.[1] A pandemic is a global outbreak of disease. Pandemics happen when a new virus emerges to infect people and can spread sustainably, from person-to-person. The virus, SARS-CoV–2, that causes COVID–19 is infecting people and spreading easily worldwide from person-to-person because there is little to no pre-existing immunity. This is the first pandemic known to be caused by the emergence of a new coronavirus.[2]

People in places where ongoing community spread of the virus that causes COVID–19 has been reported are at elevated risk of exposure, with the level of risk dependent on the location. Healthcare workers caring for patients with COVID–19 are at elevated risk of exposure. Close contacts of persons with COVID–19 also are at elevated risk of exposure.

The CDC has reported that some people are at higher risk of getting very sick from this illness.[3] This includes:

• Older adults, with risk increasing by age.
• People who have serious chronic medical conditions like:
++ Obesity
++ Cardiovascular disease
++ Diabetes mellitus
++ Hypertension
++ Chronic lung disease.

The CDC has developed guidance to help in the risk assessment and management of people with potential exposures to COVID–19, including recommending that health care professionals make every effort to interview a person under investigation for infection by telephone, text monitoring system, or video conference.[4]

As the healthcare community establishes and implements recommended infection prevention and control practices, regulatory agencies under appropriate waiver authority granted by the PHE for the COVID–19 pandemic declaration are also working to revise and implement regulations that work in concert with healthcare community infection prevention and

---

[1] *https://www.cdc.gov/mmwr/volumes/69/wr/mm6915e3.htm.*

[2] *https://www.cdc.gov/coronavirus/2019-ncov/cases-updates/summary.html.*

[3] *https://www.cdc.gov/mmwr/volumes/69/wr/mm6915e3.htm.*

[4] *https://www.cdc.gov/coronavirus/2019-ncov/cases-updates/summary.html.*

treatment practices. Based on the current and projected increase in the rate of incidence of the COVID–19 disease in the US population, and observed fatalities in the elderly population, who are particularly vulnerable due to age and co-morbidities, and additionally, the impact on health workers who are at increased risk due to treating the population, we believe that certain regulations should be reviewed and revised as appropriate to offer providers and suppliers additional flexibilities in furnishing services to combat the COVID–19 pandemic. We are addressing some of these regulations in a previous IFC which appeared in the April 6, 2020 **Federal Register** (85 FR 19230) with an effective date of March 31, 2020 (hereafter referred to as the ''March 31st COVID–19 IFC''). In this interim final rule with comment period (IFC), we are revising additional regulations to ensure that sufficient health care items and services are available to meet the needs of individuals enrolled in the programs under Title XVIII (Medicare) and Title XIX (Medicaid) of the Social Security Act (the Act), or in the identified programs authorized under the Affordable Care Act. In addition, we are implementing regulations in response to recent legislation including the Coronavirus Preparedness and Response Supplemental Appropriations Act, 2020 (Pub. L. 116–123, March 6, 2020), the Families First Coronavirus Response Act (Pub. L. 116–127, March 18, 2020), and the Coronavirus Aid, Relief, and Economic Security Act (CARES Act) (Pub. L. 116–136, March 27, 2020).

In this extraordinary circumstance, we recognize that the COVID–19 pandemic greatly increases the overall risk to public health. We believe that this increased risk results in an immediate change, not only in the circumstances under which services can safely occur, but also in to the business relationships among providers, suppliers, and practitioners. By increasing access to hospital and community mental health services furnished in temporary expansion locations of the hospital including the patient's home, increasing access to laboratory and diagnostic testing in a patient's home or other settings that could help to minimize transmission of communicable disease, and improving infection control, this IFC will provide the necessary flexibility for Medicare and Medicaid beneficiaries to be able to receive medically necessary services without jeopardizing their health or the health of those who are providing those services, while also minimizing the overall risk to public health. Notably, all final provisions included in this IFC are only for the duration of the PHE for the COVID–19 pandemic, unless otherwise indicated.

We also acknowledge that the COVID–19 PHE has created a lack of predictability for many ACOs regarding the impact of expenditure and utilization changes on historical benchmarks and financial performance, created uncertainty around future program participation, and disrupted population health activities as clinicians, care coordinators, and financial and other resources are diverted to address immediate acute care needs. We are amending the Shared Savings Program regulations in order to address the impact of the COVID–19 pandemic and encourage continued participation by ACOs. In addition, this IFC also provides flexibility to states operating a BHP to seek certification for temporary significant changes to its BHP Blueprint that are directly tied to the PHE for the COVID–19 pandemic, including the ability to apply the changes retroactively to the start of the PHE. Finally, in light of these extraordinary circumstances and the immediate need for QHP issuers to divert resources to responding to the COVID–19 PHE, we are delaying by 60 days the date when individual market issuers must be in compliance with the separate billing policy. Under this 60-day delay, QHP issuers must comply with the separate billing policy beginning on or before the QHP issuer's first billing cycle following August 26, 2020.

As QHP issuers and Exchanges work to respond to the COVID–19 PHE and implement and establish policies to ensure access to COVID–19-related care for enrollees, HHS is working to assess and extend regulatory flexibility to QHP issuers, Exchanges, and other health industry stakeholders where doing so may enable these stakeholders to divert existing resources to aiding the COVID–19 PHE response. We believe extending the deadline 60 days for QHP issuers and Exchanges to comply with the separate billing policy is appropriate so that they may adequately respond to and divert resources to address the COVID–19 PHE.

Also, consistent with section 3708 of the CARES Act, we are expanding 42 CFR parts 409, 424.22, 424.507(b), 440.70 and part 484 to permit nurse practitioners (NPs), clinical nurse specialists (CNSs), and physician assistants (PAs) to certify the need for home health services and to order services in the Medicare and Medicaid programs.

## II. Provisions of the Interim Final Rule With Comment Period (IFC)

In this IFC, we use the term, ''Public Health Emergency (PHE),'' as defined at 42 CFR 400.200. The definition identifies the PHE determined to exist nationwide by the Secretary of Health and Human Services (the Secretary) under section 319 of the Public Health Service Act on January 31, 2020, and renewed effective April 26, 2020, as a result of confirmed cases of COVID–19.

### A. Reporting Under the Home Health Value-Based Purchasing Model for CY 2020 During the COVID–19 PHE

Through this IFC, we are implementing a policy to align the Home Health Value-Based Purchasing (HHVBP) Model data submission requirements with any exceptions or extensions granted for purposes of the Home Health Quality Reporting Program (HH QRP) during the PHE for COVID–19. We are also implementing a policy for granting exceptions to the New Measures data reporting requirements under the HHVBP Model during the PHE for COVID–19. Specifically, during the PHE for COVID–19, to the extent that the data that participating HHAs in the nine HHVBP Model states are required to report are the same data that those HHAs are also required to report for the HH QRP, HHAs are required to report those data for the HHVBP Model in the same time, form and manner that HHAs are required to report those data for the HH QRP. As such, if CMS grants an exception or extension that either excepts HHAs from reporting certain quality data altogether, or otherwise extends the deadlines by which HHAs must report those data, the same exceptions and/or extensions apply to the submission of those same data for the HHVBP Model. In addition, in this IFC, we are adopting a policy to allow exceptions or extensions to New Measure reporting for HHAs participating in the HHVBP Model during the PHE for COVID–19.

As authorized by section 1115A of the Act and finalized in the CY 2016 HH PPS final rule (80 FR 68624), the HHVBP Model has an overall purpose of improving the quality and delivery of home health care services to Medicare beneficiaries. The specific goals of the Model are to: (1) Provide incentives for better quality care with greater efficiency; (2) study new potential quality and efficiency measures for appropriateness in the home health setting; and (3) enhance the current public reporting process. All Medicare certified HHAs providing services in Arizona, Florida, Iowa, Nebraska, North

**27554** **Federal Register**/Vol. 85, No. 90/Friday, May 8, 2020/Rules and Regulations

Carolina, Tennessee, Maryland, Massachusetts, and Washington are required to compete in the Model. The HHVBP Model uses the waiver authority under section 1115A(d)(1) of the Act to adjust Medicare payment rates under section 1895(b) of the Act based on the competing HHAs' performance on applicable measures. The maximum payment adjustment percentage increases incrementally over the course of the HHVBP Model in the following manner, upward or downward: (1) 3 percent in CY 2018; (2) 5 percent in CY 2019; (3) 6 percent in CY 2020; (4) 7 percent in CY 2021; and (5) 8 percent in CY 2022. Payment adjustments are based on each HHA's Total Performance Score (TPS) in a given performance year (PY), which is comprised of performance on: (1) A set of measures already reported via the Outcome and Assessment Information Set (OASIS),[5] completed Home Health Consumer Assessment of Healthcare Providers and Systems (HHCAHPS) surveys, and select claims data elements; and (2) three New Measures for which points are achieved for reporting data.

The HHVBP Model utilizes some of the same quality measure data that are reported by HHAs for the HH QRP, including HHCAHPS survey data. The other HHVBP measures are calculated using OASIS data, which are still required to be reported during the PHE; however, we have given providers additional time to submit OASIS data (*https://www.cms.gov/files/document/covid-home-health-agencies.pdf*); claims-based data extracted from Medicare fee-for-service (FFS) claims; and New Measure data. To assist HHAs while they direct their resources toward caring for their patients and ensuring the health and safety of patients and staff, we are adopting a policy for the HHVBP Model to align the HHVBP data submission requirements with any exceptions or extensions granted for purposes of the HH QRP during the PHE for COVID–19. For the same reason, we are also establishing a policy for granting exceptions to New Measure reporting requirements for HHAs participating in the HHVBP Model during the PHE for COVID–19.

Under this policy, to the extent CMS has granted an exception to the HH QRP (for 2019 Q4 and 2020 Qs 1–2 as noted below in this section), or may grant any future exceptions or extensions under this same program for other CY 2020 reporting periods, HHAs in the nine HHVBP Model states do not need to separately report these measures for purposes of the HHVBP Model, and those same exceptions apply to the submission of those same data for the HHVBP Model. In accordance with this policy, if CMS grants an exception or extension under the HH QRP that either excepts HHAs from reporting certain quality data altogether, or otherwise extends the deadlines by which HHAs must report those data, the same exceptions and/or extensions apply to the submission of those same data for the HHVBP Model.

In response to the PHE for COVID–19, on March 27, 2020, we issued supplemental public guidance (*https://www.cms.gov/files/document/guidance-memo-exceptions-and-extensions-quality-reporting-and-value-based-purchasing-programs.pdf*) excepting HHAs from the requirement to report any HH QRP data for the following quarters:
• October 1, 2019–December 31, 2019 (Q4 2019).
• January 1, 2020–March 31, 2020 (Q1 2020).
• April 1, 2020–June 30, 2020 (Q2 2020).

Under our policy to align HHVBP data submission requirements with any exceptions or extensions granted for purposes of the HH QRP during the PHE for COVID–19, HHAs in the nine HHVBP Model states are not required to separately report measure data for these quarters for purposes of the HHVBP Model. We note that with regard to the exception from the requirement to report Q4 2019 HH QRP data, we do not anticipate any issues in calculating the TPSs based on CY 2019 data under the HHVBP Model because HHAs had the opportunity to submit these Q4 2019 data on a rolling basis.

In addition, to ensure that HHAs are able to focus on patient care in lieu of data submission during the PHE for COVID–19, in this IFC, we are establishing a policy to allow us to grant exceptions to New Measure reporting for HHAs participating in the HHVBP Model during the PHE for COVID–19. We are codifying these changes at § 484.315(b). In accordance with this policy, we are granting an exception to all HHAs participating in the HHVBP Model for the following New Measure reporting requirements*:*
• April 2020 New Measures submission period (data collection period October 1, 2019–March 31, 2020).
• July 2020 New Measures submission period (data collection period April 1, 2020–June 30, 2020).

We note that although the data collection period for the April 2020 New Measures submission period began in 2019, the data collected during this period are used for the calculation of the TPSs for CY 2020 performance, not CY 2019 data. We further note that HHAs may optionally submit part or all of these data by the applicable submission deadlines. If we make the determination to grant an exception to New Measure data reporting for periods beyond the April and July 2020 submission periods, for example if the PHE for COVID–19 extends beyond the New Measure submission periods we have listed in this IFC, we will communicate this decision through routine communication channels to the HHAs participating in the HHVBP Model, including but not limited to issuing memos, emails and posting on the HHVBP Connect website (*https://app.innovation.cms.gov/HHVBPConnect*).

We acknowledge that the exceptions to the HH QRP reporting requirements, as well as the modified submission deadlines for OASIS data and our exceptions for the New Measures reporting requirements, may impact the calculation of performance under the HHVBP Model for the performance year (PY) 2020. We also note that while we are able to extract the claims-based data from submitted Medicare FFS claims, we may need to assess the appropriateness of using the claims data submitted for the period of the PHE for COVID–19 for purposes of performance calculations under the HHVBP Model. We are evaluating possible changes to our payment methodologies for CY 2022 in light of this more limited data, such as whether we would be able to calculate payment adjustments for participating HHAs for CY 2022, including those that continue to report data during CY 2020, if the overall data is not sufficient, as well as whether we may consider a different weighting methodology given that we may have sufficient data for some measures and not others. We are also evaluating possible changes to our public reporting of CY 2020 performance year data. We intend to address any such changes to our payment methodologies for CY 2022 or public reporting of data in future rulemaking.

### B. Scope of Practice

In December 2019, CMS issued a request for feedback in response to part of the President's Executive Order (E.O.) 13890 on ''Protecting and Improving Medicare for Our Nation's Seniors,'' seeking the public's help in identifying additional Medicare regulations which contain more restrictive supervision requirements than existing state scope

---

[5] OASIS is the instrument/data collection tool used to collect and report performance data by HHAs.