# Exhibit 58

## Insurance companies ramp up efforts to claw back money from providers

Modern Healthcare

March 20, 2023

Print Version

Copyright 2023 Crain Communications All Rights Reserved

**Modern Healthcare**

**Section:** Pg. 24; Vol. 53

**Length:** 1818 words

**Byline:** Caroline Hudson

## Body

Insurance companies are ramping up efforts to recover overpayments made to hospitals and health systems-adding to providers' operational and financial challenges in an already-tough economic environment.

In a practice known as clawbacks, insurers can recoup money after determining they've paid too much on past claims due to incorrect coding or fee-for-service reclassifications. Some enlist third-party companies to find overpayments, even if they occurred years ago. Insurance companies typically offset the amount owed by deducting it from the current plan account, meaning they pay less for other services.

Providers can challenge insurers on clawbacks, but healthcare organizations often choose to absorb the cost to avoid additional administrative burdens on staff. Otherwise, they invest time and more money tracking down claims and completing paperwork for appeals in an effort that could produce minimal results-a factor that has pushed many healthcare groups to call for improvements.

"It's really quite painful for health systems [and] overwhelmingly disruptive to [their] processes," said Bart Fiser, vice president of corporate revenue cycle and managed care at Fayetteville, North Carolina-based Cape Fear Valley Health. "[Insurers] get the complete control to do it."

As the pandemic subsides and the inflationary economic environment pressures profit margins, healthcare consultants say insurance companies are returning their attention to clawbacks.

FINDING OVERPAYMENTS

Private and government insurers use internal teams, sometimes with the assistance of artificial intelligence, and third-party auditing companies to track down overpayments. The practice is especially common among larger operations.

A research study released in November by professional services firm Crowe found that payers took back an average 1.4% of debit accounts receivable, or total outstanding claims, each month from January 2021 to June 2022. In August 2022, that percentage rose to 1.8%, the highest in at least three years, equating to more than $1.6 billion in combined clawbacks from the roughly 1,800 facilities included in the study.

In December 2022, takebacks rose to another high at 2.3%, totaling about $2.3 billion.

Insurance companies ramp up efforts to claw back money from providers

Large insurance companies, armed with more resources, typically implement the most clawbacks. Commercial payers topped the list by taking back 2.4% of debit accounts receivable in 2022, up from 2.2% in 2021, according to Crowe data. That's followed by Medicaid managed care at 1.7% in 2022, compared with 1.5% in the prior year. Medicare managed care plans took back 1.5%, a slight increase from 1.4% in 2021.

Aetna, Humana, Elevance Health and UnitedHealth Group declined to comment for this story. Blue Cross Blue Shield directed requests for comment to regional affiliates. Cigna and AHIP did not respond to requests for comment.

"It just starts to create this snowball effect of impact for the health systems because they're already struggling with a decreased cash metric over the course of the past year-plus, and now the struggle is there to continue to hold onto and then really to fight for the additional dollars," said Colleen Hall, managing principal for the healthcare consulting group at Crowe.

IT STARTS WITH THE CODING

After treating a patient, physicians will submit diagnosis-related group codes, which determine reimbursement rates based on severity and mortality risk, to an insurance company. In some cases, insurers will reclassify these codes to a different payment weight after being alerted by internal or third-party teams. Clawbacks typically occur when a claim is changed to a lower reimbursement weight, known as downcoding.

In some cases, downcoding occurs due to physician error. In others, insurers say it's because of intentional misclassification.

"The majority of physician visits should be at level 1 and 2 because that's what you do for regular checkups, and yet most physicians bill at 4 and 5 because you make more money at 4 and 5," said Michael Bagel, director of public policy at the Alliance of Community Health Plans.

Many of the disputes happen with inpatient care. More complex cases, including patients with complications or comorbidities, tend to warrant greater scrutiny from payers.

Cape Fear Valley's Fiser said sepsis diagnoses are one of the most common services targeted for overpayment review, sometimes triggering a partial clawback if there is a code change.

He said payers pull data from sepsis patients to determine the "clinical validity" of each case and potentially change the claim to a lower-cost sepsis code or reclassify it as pneumonia or endocarditis, which pull in less reimbursement.

Some providers say that much of the downcoding isn't warranted. Changes can occur after a claim is approved, whether via prior authorization or regular submission.

"In some ways, [insurers] have this imperative to place us at triple jeopardy and it's not only unfair, but it affects care, and it hurts patients," said Chip Kahn, president and CEO of the Federation of American Hospitals.

Clawbacks can result in patients owing more money, but some healthcare organizations try to avoid contacting them when there is a dispute on an account.

"If you're a big system, you can handle it in terms of all the paperwork and back and forth with the insurers, but with smaller hospitals or providers, this can be a tremendous problem because a lot of times you'll just surrender," Kahn said.

Blue Cross Blue Shield of Massachusetts reviews claims if they are within the allotted timeframe outlined in the contract, said Scott Magit, vice president of payment strategy and integrity. He said the company works with providers to reduce the time frame on processing claims to avoid further confusion or complications. BCBSMA has teams that use various technologies to address payment integrity, which include internal claims experts, certified coders, medical professionals, clinicians and third-party vendors.

Insurance companies ramp up efforts to claw back money from providers

Most of the insurance company's 55 million claims a year are processed using real-time automation, but employees will reexamine some clinical chart documentation, potential instances of fraud and cross-claim billing scenarios, or when a provider submits multiple claims for one patient interaction, Magit said.

"As a health insurer, it's our responsibility to ensure claims are paid accurately and we're being good stewards of the premium dollar. This is an expectation of not only our provider partners, but also accounts, customers, and state and federal regulators," he said.

ASSESSING THE IMPACT

Clawbacks are another possible impact on operating margins already squeezed by high labor costs and supply chain issues. However, the total effect can be tricky to calculate for individual providers.

Fiser said Cape Fear Valley tries to determine the overall financial cost, but the process of running reports on recoups is complicated, especially without supporting software and the resources to manage the software. He declined to provide an estimate.

The potential administrative burden resulting from clawbacks can also create problems.

Payers, especially commercial insurance companies, may have varying processes on recovering funds and don't always send detailed notifications when doing so, said Krysten Blanchette, vice president of revenue cycle for Providence, Rhode Island-based Care New England. Administrative employees working for the healthcare providers are then tasked with finding out why a clawback occurred, and if it happens multiple times with the same type of claim, determining the larger issue responsible for it.

Tracking down claims is a largely manual process for providers that can take months, and many smaller organizations lack the resources to dedicate a team to clawbacks and their appeals, which can be resolved via arbitration or litigation. In some cases, the claims in question were submitted years ago.

"What happens is you'll just randomly have an account that is two to three years old, and they just take [the money] back," Blanchette said. "Sometimes there are going to be situations where Care New England is just at a full loss. We are not going to recoup that money because someone can't get to it to look at it."

Blanchette said it is also difficult to structure a team around clawbacks when they may not happen consistently.

At Cape Fear Valley, a credit balance group of five people handles all insurance requests, including clawback notifications, and can transition the case to the billing team if the dispute continues, Fiser said. Any influx of cases can be overwhelming for the small group, he added.

NEED FOR CHANGE?

Providers say big payers sometimes claw back funds even if a dispute is ongoing, leaving them with no comparable recourse-they can't take money from payers if they decide underpayment occurred.

"It's sort of a unilateral decision that this money is owed, and oftentimes that's not necessarily the case. ... If they truly were owed this money, why were they paying out more of it on the front end? It seems more complex than just saying, 'Well, that's money we were owed,' " said Terry Cunningham, director of administrative simplification policy at the American Hospital Association. The association is calling for more oversight and transparency in the claims process, which could indirectly affect clawbacks.

A BCBSMA spokesperson said clawing back money in the middle of a dispute is not consistent with its standard practices.

Value-based contracts can be a solution to clawbacks, as their often-bundled upfront payments prior to care eliminate the need for additional claims review, ACHP's Bagel said.

Insurance companies ramp up efforts to claw back money from providers

"You go in, the doctor says, 'You need to get this. I'll work to schedule with you.' Well, while they're getting you scheduled, we're working with them making sure they're providing the right service," he said. "Because we've agreed to that upfront, there's nothing to take back."

Bagel noted the industry has a long way to go in truly embracing value-based care.

In the meantime, some health systems see ways to improve the process on their end.

Fiser said he contractually specifies the timeframe during which a payer reserves the right to claw back funds. He also said he thinks third-party companies should not be involved in recouping money to avoid adding complexity to the process.

Care New England's Blanchette said she has found it helpful to build relationships with payers, creating a situation where the health system can advocate for itself on claims disputes.

"Those relationships with the payers are the only way you're going to be successful. Otherwise, you're not going to be able to present your case. You're not going to be able to tell them it's unfair to take back a three-year claim, where maybe they can take [the message] back to their senior leadership," she said. "If you don't advocate for yourself to the payers, you're always going to be behind the eight ball on it."

**Load-Date:** March 23, 2023

---

**End of Document**