**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF PENNSYLVANIA**

|  |  |
|---|---|
| *In re AdaptHealth Corp. Securities Litigation* | Case No. 2:23-cv-04104-MRP<br><br>ORAL ARGUMENT REQUESTED |

**PLAINTIFFS' OPPOSITION TO DEFENDANTS'**
**MOTION TO DISMISS THE AMENDED CLASS ACTION COMPLAINT**

# TABLE OF CONTENTS

Page

I.  INTRODUCTION ................................................................................................ 1

II.  STATEMENT OF FACTS ................................................................................. 8

    A.  AdaptHealth Expands By Rapidly Acquiring Home Healthcare Companies ......... 8

    B.  Defendants Issued Materially False And Misleading Statements About AdaptHealth's Compliance Program, Reported Revenue, And Integration ........... 9

        1.  Defendants' False Assurances Of Compliance Programs ........................ 9

        2.  Defendants' False Statements Concerning Revenue ............................... 12

        3.  Defendants' False Integration And Technology Statements ................... 13

    C.  Defendants Knew or Recklessly Disregarded That Their Statements Were False ............................................................................................................. 14

    D.  Defendants Cashed In On Acquisitions, Regardless Of AdaptHealth's Failures ............................................................................................................ 16

    E.  When The Truth Was Revealed, AdaptHealth's Stock Price Plummeted ........... 16

III.  LEGAL STANDARD ....................................................................................... 18

IV.  DEFENDANTS' STATEMENTS WERE MATERIALLY FALSE AND MISLEADING ............................................................................................. 19

    A.  Plaintiffs Have Consistently Attributed The Statements To Defendants .............. 19

    B.  Defendants Falsely Claimed That AdaptHealth's Superior Compliance Systems Differentiated It From Its Medical Device Peers .................................... 20

        1.  Defendants Made Actionable Statements Regarding Compliance .......... 20

        2.  Defendants' Arguments Regarding Compliance Fail .............................. 21

    C.  Defendants' Revenue Statements Were False And Misleading .......................... 26

    D.  AdaptHealth Falsely Claimed Its Technology Systems Would Prevent Errors .............................................................................................................. 30

    E.  Defendants Misrepresented AdaptHealth's Ability To Integrate Acquisitions ...................................................................................................... 31

F.  Defendants' Statements Regarding "Potential" Risks Are Actionable................ 33

G.  Defendants Signed SOX Certifications Falsely Stating That AdaptHealth Had Implemented Adequate Internal Controls ...................................................... 34

H.  The Statements Are Not Inactionable Opinion.................................................... 35

V.  THE COMPLAINT PROPERLY PLEADS SCIENTER ................................................. 36

A.  The Individual Exchange Act Defendants Acted with Knowledge or Reckless Disregard of the Falsity of Their Statements ......................................... 37

B.  The Complaint Properly Pleads Scienter Against AdaptHealth .......................... 45

VI.  PLAINTIFFS HAVE SUFFICIENTLY PLED LOSS CAUSATION ........................... 46

A.  Corrective Disclosure Events Corrected Defendants' Misrepresentations.......... 46

B.  Defendants' Loss Causation Arguments Are Unavailing..................................... 48

VII.  PLAINTIFFS HAVE ADEQUATELY ALLEGED A SCHEME LIABILITY CLAIM AND DEFENDANTS FAILED TO MOVE TO DISMISS THE CLAIM......... 51

VIII.  PLAINTIFFS HAVE SUFFICIENTLY ALLEGED SECTION 20(a) CLAIMS ............ 51

IX.  PLAINTIFFS HAVE SUFFICIENTLY ALLEGED SECURITIES ACT CLAMS ........ 53

A.  Plaintiffs' Claims Are Governed By The Rule 8 Notice Pleading Standard ........ 53

B.  Plaintiffs Have Sufficiently Traced Their Shares To The SPO ........................... 55

C.  The Securities Act Claims Alleged Untrue And Misleading Statements ............. 56

1.  The SPO Offering Materials Contained Misstatements........................... 56

2.  Plaintiffs Have Alleged Violations Of Item S-K ..................................... 59

D.  Plaintiffs Sufficiently Plead A Section 15 Claim ................................................ 59

X.  CONCLUSION.................................................................................................................. 60

# <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*In re Adolor Corp. Sec. Litig.*,
    616 F. Supp. 2d 551 (E.D. Pa. 2009) .......................................................................................39

*In re Advance Auto Parts, Inc., Sec. Litig.*,
    2020 WL 599543 (D. Del. Feb. 7, 2020) ................................................................................22

*Akil v. City of Philadelphia*,
    2024 WL 1252882 (E.D. Pa. Mar. 22, 2024) .........................................................................51

*In re Alstom SA*,
    406 F. Supp. 2d 433 (S.D.N.Y. 2005) ...................................................................................52

*In re Am. Bus. Fin. Servs., Inc. Sec. Litig.*,
    2007 WL 81937 (E.D. Pa. Jan. 9, 2007) ...............................................................................60

*Anderson v. Stonemor Partners, L.P.*
    296 F. Supp. 3d 693 (E.D. Pa. 2017) ....................................................................................47

*Anspach ex rel. Anspach v. City of Philadelphia, Dept. of Public Health*,
    503 F.3d 256 (3d Cir. 2007).....................................................................................................7

*In re Ascena Retail Grp., Inc. Sec. Litig.*,
    2022 WL 2314890 (D.N.J. June 28, 2022) ...........................................................39, 41, 42, 43

*In re AT&T/DirectTV Now Sec. Litig.*,
    470 F. Supp. 3d 507 (S.D.N.Y. Aug. 18, 2020)....................................................................58

*In re Aurora Cannabis Inc. Sec. Litig.*,
    2023 WL 5508831 (D.N.J. Aug. 24, 2023) ...........................................................................49

*In re Bare Escentuals, Inc. Sec. Litig.*,
    745 F. Supp. 2d 1052 (N.D. Cal. 2010) ................................................................................54

*In re BofI Holding, Inc. Sec. Litig.*,
    977 F.3d 781 (9th Cir. 2020) .................................................................................................47

*In re Cabletron Sys., Inc.*,
    311 F.3d 11 (1st Cir. 2002).....................................................................................................27

*Cal. Pub. Emps. Ret. Sys. v. Chubb Corp.*,
    394 F.3d 126 (3d Cir. 2004)...................................................................................................54

*In re Century Aluminum Co. Sec. Litig.*,
    729 F.3d 1104 (9th Cir. 2013) ........................................................................55

*In re CenturyLink Sales Pracs. & Sec. Litig.*,
    403 F. Supp. 3d 712 (D. Minn. 2019) ....................................................39, 40, 45

*City of Roseville Emps.' Ret. Sys. v. Horizon Lines, Inc.*,
    686 F. Supp. 2d 404 (D. Del. 2009) ................................................................42

*City of Roseville Emps.' Ret. Sys. v. Horizon Lines, Inc.*,
    442 F. App'x 672, 676 (3d Cir. 2011) .............................................................46

*City of Warwick Ret. Sys. v. Catalent, Inc.*,
    2024 WL 3219616 (D.N.J. June 28, 2024) ................................................37, 40

*In re Cognizant Tech. Sols. Corp. Sec. Litig.*,
    2018 WL 3772675 (D.N.J. Aug. 8, 2018) .......................................................21

*In re Cognizant Tech. Sols. Corp. Sec. Litig.*,
    2020 WL 3026564 (D.N.J. June 5, 2020) ...................................................46, 51

*In re Countrywide Fin. Corp. Deriv. Litig.*,
    554 F. Supp. 2d 1044 (C.D. Cal. 2008) ........................................................4, 43

*In re Countrywide Fin. Corp. Sec. Litig.*,
    588 F. Supp. 2d 1132 (C.D. Cal. 2008) .......................................................21, 43

*Cullen v. RYVYL Inc.*,
    2024 WL 898206 (S.D. Cal. Mar. 1, 2024) ......................................................35

*De Vito v. Liquid Holdings Grp., Inc.*,
    2018 WL 6891832 (D.N.J. Dec. 31, 2018) .......................................................55

*In re Dr. Reddy's Lab'y Ltd. Secs. Litig.*,
    2019 WL 1299673 (D.N.J. Mar. 21, 2019) .......................................................42

*In re Eletrobras Sec. Litig.*,
    245 F. Supp. 3d 450 (S.D.N.Y. 2017) .............................................................31

*In re Envision Healthcare Corp. Sec. Litig.*,
    2019 WL 6168254 (M.D. Tenn. Nov. 19, 2019) ..........................................58, 59

*In re EQT Corp. Sec. Litig.*,
    504 F. Supp. 3d 474 (W.D. Pa. 2020) ..................................................5, 23, 32, 50

*In re Equifax Inc. Sec. Litig.*,
    357 F. Supp. 3d 1189 (N.D. Ga. 2019) ............................................................31

*In re Eros Int'l PLC Sec. Litig.*,
  2021 WL 1560728 (D.N.J. Apr. 20, 2021) ..........................................................43, 48, 50, 51

*Fan v. StoneMor Partners LP*,
  927 F.3d 710 (3d Cir. 2019)............................................................................................24

*In re FBR Inc. Sec. Litig.*,
  544 F. Supp. 2d 346 (S.D.N.Y. 2008)..............................................................................25

*Flora v. Cnty. of Luzerne*,
  776 F.3d 169 (3d Cir. 2015)...............................................................................................4

*In re Franklin Bank Corp. Sec. Litig.*,
  782 F. Supp. 2d 364 (S.D. Tex. 2011) .............................................................................52

*Galestan v. OneMain Holdings, Inc.*,
  348 F. Supp. 3d 282 (S.D.N.Y. 2018)..............................................................................32

*Gorlamari v. Verrica Pharms., Inc.*,
  2024 WL 150341 (E.D. Pa. Jan. 11, 2024) ......................................................................52

*In re Grupo Televisa Sec. Litig.*,
  368 F. Supp. 3d 711 (S.D.N.Y. 2019)..............................................................................35

*Hall v. Johnson & Johnson*,
  2019 WL 7207491 (D.N.J. Dec. 27, 2019) ...........................................................21, 25, 30

*Halman Aldubi Provident & Pension Funds Ltd. v. Teva Pharms. Indus. Ltd.*,
  2022 WL 889158 (E.D. Pa. Mar. 25, 2022)...............................................................5, 25, 27

*Harriman v. E. I. DuPont De Nemours & Co.*,
  372 F. Supp. 101 (D. Del. 1974).......................................................................................52

*Haw. Structural Ironworkers Pension Tr. Fund v. AMC Ent. Holdings, Inc.*,
  422 F. Supp. 3d 821 (S.D.N.Y. 2019)..............................................................................33

*In re Hertz Global Holdings, Inc.*,
  905 F.3d 106 (3d Cir. 2018).............................................................................................45

*Howard v. Arconic Inc.*,
  2021 WL 2561895 (W.D. Pa. June 23, 2021)...................................................................24

*Indiana Pub. Ret. Sys. v. SAIC, Inc.*,
  818 F.3d 85 (2d Cir. 2016)...............................................................................................59

*Industriens Pensionsforsikring A/S v. Becton, Dickinson & Co.*,
  620 F. Supp. 3d 167 (D.N.J. 2022) .............................................................................33, 34

*Inst. Inv'rs Group v. Avaya, Inc.*,
  564 F.3d 242 (3d Cir. 2009) ............................................................... *passim*

*In re Intelligroup Sec. Litig.*,
  527 F. Supp. 2d 262 (D.N.J. 2007) ...............................................42, 49

*In re Intelligroup Sec. Litig.*,
  468 F. Supp. 2d 670 (D.N.J. 2006) ..........................................................50

*In re ITT Educ. Servs., Inc. Sec. & S'holder Derivatives Litig.*,
  859 F. Supp. 2d 572 (S.D.N.Y. 2012) ......................................................25

*Jedrzejczyk v. Skillz Inc.*,
  2022 WL 2441563 (N.D. Cal. July 5, 2022) ............................................55

*Johnson v. CBD Energy Ltd.*,
  2016 WL 3654657 (S.D. Tex. July 6, 2016) ............................................55

*Karimi v. Deutsche Bank Aktiengesellschaft*,
  607 F. Supp. 3d 381 (S.D.N.Y. 2022) ......................................................24

*Laasko v. Endo Int'l, PLC*,
  2022 WL 3444038 (D.N.J. Aug. 17, 2022) ..............................................45

*Lau v. Opera Ltd.*,
  527 F. Supp. 3d 537 (S.D.N.Y. 2021) ......................................................50

*In re Leslie Fay Companies, Inc. Sec. Litig.*,
  918 F. Supp. 749 (S.D.N.Y. 1996) ..........................................................53

*In re Loewen Grp. Inc.*,
  2003 WL 22436233 (E.D. Pa. July 16, 2003) ....................................38, 45

*Lord Abbett Affiliated Fund, Inc. v. Navient Corp.*,
  2019 WL 351260 (D. Del. Jan. 29, 2019) ................................................40

*Lord Abbett Affiliated Fund, Inc. v. Navient Corp.*,
  363 F. Supp. 3d 476 (D. Del. 2019) .........................................................22

*In re Lottery.com, Inc. Sec. Litig.*,
  2024 WL 454298 (S.D.N.Y. Feb. 6, 2024) ..............................................36

*Lowry v. RTI Surgical Holdings, Inc.*,
  532 F. Supp. 3d 652 (N.D. Ill. 2021) ..........................................39, 41, 44

*In re Lucent Tech., Inc. Sec. Litig.*,
  217 F. Supp. 2d 529 (D.N.J. 2002) ..........................................................31

*Luna v. Marvell Tech. Grp.*,
  2017 WL 2171273 (N.D. Cal. May 17, 2017) .......................................................41

*Makor Issues & Rights, Ltd. v. Tellabs, Inc.*,
  437 F.3d 588 (7th Cir. 2006) ..............................................................................24

*Mallen v. Alphatec Holdings, Inc.*,
  861 F. Supp. 2d 1111 (S.D. Cal. 2012)...............................................................32

*In re Marsh & Mclennan Companies, Inc. Sec. Litig.*,
  501 F. Supp. 2d 452 (S.D.N.Y. 2006)............................................................39, 43

*Matrixx Initiatives, Inc. v. Siracusano*,
  563 U.S. 27 (2011)...............................................................................................19

*In re Measurement Specialties, Inc.*,
  2003 WL 27398420 (D.N.J. Sept. 29, 2003) ...................................................8, 60

*In re Merck & Co., Inc. Sec., Derivative, & ERISA Litig.*,
  2011 WL 3444199 (D.N.J. Aug. 8, 2011) ............................................................58

*In re Merrill Lynch & Co. Rsch. Reps. Sec. Litig.*,
  568 F. Supp. 2d 349 (S.D.N.Y. 2008).................................................................50

*Meyer v. Jinkosolar Holdings Co., Ltd.*,
  761 F.3d 245 (2d Cir. 2014).....................................................................4, 21, 25

*Mill Bridge V, Inc. v. Benton*,
  2009 WL 4639641 (E.D. Pa. Dec. 3, 2009) ..........................................................6

*In re Mills Corp. Sec. Litig.*,
  257 F.R.D. 101 (E.D. Va. 2009) .........................................................................60

*Mineworkers' Pension Scheme v. First Solar Inc.*,
  881 F.3d 750 (9th Cir. 2018) ..............................................................................47

*In re MINISO Grp. Holding Ltd. Sec. Litig.*,
  2024 WL 759246 (S.D.N.Y. Feb. 23, 2024)........................................................50

*In re MobileMedia Sec. Litig.*,
  28 F. Supp. 2d 901 (D.N.J. 1998) .......................................................................33

*Mulligan v. Impax Labs., Inc.*,
  36 F. Supp. 3d 942 (N.D. Cal. 2014) ..................................................................23

*Nat'l Junior Baseball League v. Pharmanet Dev. Grp. Inc.*,
  720 F. Supp. 2d 517 (D.N.J. 2010) .....................................................................49

*In re Niaspan Antitrust Litigation*,
    42 F. Supp. 3d 735 (E.D. Pa. 2014) ........................................................................44

*In re NIO, Inc. Sec. Litig.*,
    2021 WL 3566300 (E.D.N.Y. Aug. 12, 2021) ........................................................60

*In re Ocugen, Inc. Sec. Litig.*,
    659 F. Supp. 3d 572 (E.D. Pa. 2023) ......................................................................24

*Oklahoma Firefighters Pension & Ret. Sys. v. Six Flags Ent. Corp.*,
    58 F.4th 195 (5th Cir. 2023) ............................................................................38, 44

*Payne v. DeLuca*,
    433 F. Supp. 2d 547 (W.D. Pa. 2006) .....................................................................49

*Pelletier v. Endo Int'l PLC*,
    439 F. Supp. 3d 450 (E.D. Pa. 2020) ......................................................................44

*Phoenix Ins. Co., Ltd. v. ATI Physical Therapy, Inc.*,
    690 F. Supp. 3d 862 (N.D. Ill. 2023) ......................................................................37

*Plichta v. SunPower Corp.*,
    790 F. Supp. 2d 1012 (N.D. Cal. 2011) ..................................................................55

*Plumber & Steamfitters Loc. 773 Pension Fund v. Danske Bank A/S*,
    11 F.4th 90 (2d Cir. 2021) ......................................................................................58

*In re Providian Fin. Corp. Sec. Litig.*,
    152 F. Supp. 2d 814 (E.D. Pa. 2001) ......................................................................27

*In re Prudential Sec. Inc. Ltd. P'ships Litig.*,
    930 F. Supp. 68 (S.D.N.Y. 1996) ...........................................................................34

*Puddu v. 6D Glob. Techs., Inc.*,
    2021 WL 1198566 (S.D.N.Y. Mar. 30, 2021) ........................................................50

*Rahman v. Kid Brands, Inc.*,
    2012 WL 12294490 (D.N.J. Oct. 17, 2012) ...........................................................38

*Rahman v. Kid Brands, Inc.*,
    736 F.3d 237 (3d Cir. 2013) ...................................................................................46

*Ret. Plan v. FleetCor Techs., Inc.*,
    2018 WL 4293143 (N.D. Ga. May 15, 2018) ...................................................27, 28

*Ret. Sys. v. Energy Transfer LP*,
    532 F. Supp. 3d 189 (E.D. Pa. 2021) ............................................................ *passim*

*Rigel Pharms., Inc. Sec. Litig. v. Deleage*,
    697 F.3d 869 (9th Cir. 2012) ..................................................................55

*Rombach v. Chang*,
    355 F.3d 164 (2d Cir. 2004)...................................................................55

*Roofer's Pension Fund v. Papa*,
    2018 WL 3601229 (D.N.J. July 27, 2018).............................................49

*Rubke v. Capitol Bancorp Ltd.*,
    551 F.3d 1156 (9th Cir. 2009) ...............................................................55

*In re SAIC, Inc. Sec. Litig.*,
    2013 WL 5462289 (E.D.N.Y. Sept. 30, 2013) .......................................36

*San Antonio Fire & Police Pension Fund v. Dentsply Sirona Inc.*,
    2024 WL 1898512 (S.D.N.Y. May 1, 2024) ..........................................39

*In re Sanofi Sec. Litig.*,
    155 F. Supp. 3d 386 (S.D.N.Y 2016)......................................................58

*Se. Pennsylvania Transportation Auth. v. Orrstown Fin. Servs., Inc.*,
    2022 WL 3572474 (M.D. Pa. Aug. 18, 2022) ........................................60

*SEB Inv. Mgmt. AB v. Endo Int'l, PLC*,
    351 F. Supp. 3d 874 (E.D. Pa. 2018) ............................................. *passim*

*Silverstrand Invs. v. AMAG Pharms., Inc.*,
    707 F.3d 95 (1st Cir. 2013) ....................................................................59

*In re SLM Corp. Sec. Litig.*,
    740 F. Supp. 2d 542 (S.D.N.Y. 2010).....................................................22

*In re Sotheby's Holdings, Inc.*,
    2000 WL 1234601 (S.D.N.Y. Aug. 31, 2000) ........................................58

*Springer v. Kilhefner*,
    2019 WL 3816839 (E.D. Pa. 2019) ........................................................44

*In re St. Paul Travelers Sec. Litig. II*,
    2006 WL 2735221 (D. Minn. Sept. 25, 2006) ........................................38

*Steamfitters Loc. 449 Pension Fund v. Alter*,
    2011 WL 4528385 (E.D. Pa. Sept. 30, 2011) ....................................20, 21

*Steiner v. MedQuist Inc.*,
    2006 WL 2827740 (D.N.J. Sept. 29, 2006) ............................................27

*Strougo v. Lannett Co., Inc.*,
    2019 WL 1172992 (E.D. Pa. Mar. 13, 2019) ........................................................19

*In re Suprema Specialties, Inc. Sec. Litig.*,
    438 F.3d 256 (3d Cir. 2006) ................................................................ *passim*

*Tellabs, Inc. v. Makor Issues & Rts., Ltd.*,
    551 U.S. 308 (2007) ......................................................19, 36, 41, 44

*In re Tellium, Inc. Sec. Litig.*,
    2005 WL 2090254 (D.N.J. Aug. 26, 2005) .........................................................49

*In re Teva Sec. Litig.*,
    671 F. Supp. 3d 147 (D. Conn. 2023) ...............................................................43

*Thomas v. Magnachip Semiconductor Corp.*,
    167 F. Supp. 3d 1029 (N.D. Cal. 2016) ...........................................................55

*In re Toronto-Dominion Bank Sec. Litig.*,
    2018 WL 6381882 (D.N.J. Dec. 6, 2018) ......................................................22, 43

*In re Universal Health Servs., Inc., Derivative Litig.*,
    2019 WL 3886838 (E.D. Pa. Aug. 19, 2019) .......................................................24

*In re Urban Outfitters, Inc. Sec. Litig.*,
    103 F. Supp. 3d 635 (E.D. Pa. 2015) ............................................................ *passim*

*Utesch v. Lannett Co., Inc.*,
    316 F. Supp. 3d 895 (E.D. Pa. 2018) .............................................................60

*Vanderhoef v. China Auto Logistics Inc.*,
    2020 WL 5105243 (D.N.J. Aug. 31, 2020) ........................................................47

*In re Vonage IPO Sec. Litig.*,
    2009 WL 936872 (D.N.J. Apr. 6, 2009) ...........................................................55

*Vrakas v. United States Steel Corp.*,
    2018 WL 4680314 (W.D. Pa. Sept. 29, 2018) ..................................................55-56

*In re Washington Mut., Inc.*,
    462 B.R. 137 (Bankr. D. Del. 2011) ...............................................................60

*Washington State Inv. Bd. v. Odebrecht S.A.*,
    461 F. Supp. 3d 46 (S.D.N.Y. 2020) ...............................................................23

*In re Wells Fargo & Co. S'holder Deriv. Litig.*,
    282 F. Supp. 3d 1074 (N.D. Cal. 2017) ...........................................................40

*Westley v. Oclaro, Inc.*,
    897 F. Supp. 2d 902 (N.D. Cal. 2012) .................................................................49

*Williams v. Globus Med., Inc.*,
    869 F.3d 235 (3d Cir. 2017).................................................................................26

*In re Westinghouse Secs. Litig.*,
    90 F.3d 696 (3d Cir. 1996)...................................................................................34

*In re Wilmington Tr. Sec. Litig.*,
    29 F. Supp. 3d 432 (D. Del. 2014).................................................................23, 47

*Wu v. GSX Techedu Inc.*,
    2024 WL 3163219 (D.N.J. June 25, 2024).........................................5, 27, 30, 40

*Wyche v. Advanced Drainage Sys., Inc.*,
    2017 WL 971805 (S.D.N.Y. Mar. 10, 2017) ......................................................39

**Statutes and Rules**

15 U.S.C. § 77k .................................................................................... *passim*

15 U.S.C. § 77o.............................................................................8, 59, 60

15 U.S.C. § 78j ..................................................................................... *passim*

15 U.S.C. § 78u-4 ........................................................................................30

17 C.F.R. § 229.105 .....................................................................................59

17 C.F.R. § 229.303(a)(3)(ii) ......................................................................59

Fed. R. Civ. P. 8 ................................................................................. *passim*

Fed. R. Civ. P. 9 ....................................................................................53, 54

Fed. R. Civ. P. 12(b)(6)...............................................................................30

S.E.C. Rule 10b–5................................................................7, 34, 50, 51

## GLOSSARY OF TERMS

| Term/Abbreviation | Definition |
|---|---|
| CGM | Continuous glucose monitor |
| CMS | Centers for Medicare & Medicaid Services |
| EBITDA | Earnings Before Interest, Taxes, Depreciation, and Amortization |
| Exchange Act Defendants | Defendants AdaptHealth Corp. Former Chief Executive Officer Luke McGee Former Co-Chief Executive Officer and Chief Executive Officer Stephen P. Griggs Former President and Director Joshua Parnes Chief Financial Officer Jason A. Clemens Chief Operating Officer Shaw Rietkerk Chief Compliance Officer Wendy Russalesi President and Chief Operating Officer, Diabetes Rodney Carson Former Director Alan Quasha |
| FEs | Former employees of AdaptHealth, including the companies that it acquired, such as AeroCare, Diabetes Supply, Pinnacle, Solara, and Pumps It |
| Hector Mendoza | Vice President of Inside Sales at AdaptHealth |
| Jim Vainio | Regional Vice President of Operations at AdaptHealth |
| Kevin Wood | Senior Vice President of Sales and Business Development at AdaptHealth |
| OIG | Office of Inspector General, AdaptHealth's primary government auditor |
| Plaintiffs | Plaintiff Allegheny County Employees' Retirement System, Plaintiff International Union of Operating Engineers Local No. 793, Members Pension Benefit Trust of Ontario, and Plaintiff City of Tallahassee Pension Plan |
| Securities Act Defendants | Luke McGee, Joshua Parnes, Jason A. Clemens, Frank J. Mullen, Richard Barasch, Alan Quasha, Terence Connors, Dr. Susan Weaver, Dale Wolf, Bradley Coppens, David S. Williams III, Rodney Carson, Deutsche Bank Securities Inc., Jefferies LLC, BofA Securities, Inc., Truist Securities, Inc., Robert W. Baird & Co. Incorporated, RBC Capital Markets, LLC, Stifel, Nicolaus & Company, Incorporated, UBS Securities LLC, Canaccord Genuity LLC, and Leerink Partners LLC |
| SOX | Sarbanes-Oxley Act of 2002 |
| SPO | Secondary public offering |
| SPO Offering Materials | Form S-3 filed by AdaptHealth with the SEC on December 18, 2020 (the "SPO Registration Statement"), a Prospectus on Form 424B5 filed by AdaptHealth with the SEC on January 4, 2021, which incorporated and formed part of the |

| | SPO Registration Statement, a Prospectus on Form 424B5 filed by AdaptHealth with the SEC on January 7, 2021, which incorporated and formed part of the SPO Registration Statement, as well other SEC filings incorporated by reference, including, AdaptHealth's Form 10-Qs for the First, Second and Third Quarters of 2020 and a Form 8-K filed August 4, 2020 announcing AdaptHealth's financial results for the second quarter of 2020. |
|---|---|

Plaintiffs Allegheny County Employees' Retirement System ("ACERS"), International Union of Operating Engineers, Local No. 793, Members Pension Benefit Trust of Ontario ("Local 793), and City of Tallahassee Pension Plan ("Tallahassee") ("Plaintiffs") file this brief in opposition to Defendants' Motion To Dismiss The Amended Class Action Complaint (ECF No. 65).[1]

## I.    INTRODUCTION

AdaptHealth sells sleep apnea, diabetes monitoring, and other home healthcare equipment. This case arises from AdaptHealth's and its executives' false and misleading statements regarding key business practices and its quarterly reported revenue. Throughout the Class Period, Defendants claimed that AdaptHealth was different from its competitors in the "dirty" home healthcare equipment industry through its supposedly superior compliance practices and technology. In reality, AdaptHealth was fully complicit in the industry's worst vices. At the same time, Defendants reported revenue figures that they knew, or were reckless in not knowing, were inflated by illegitimate billing practices that conned Medicare, Medicaid, and other insurance payors. When the truth about its practices came to light, investors lost hundreds of millions of dollars.

Defendants misled investors in three primary ways. ***First***, Defendants falsely claimed they had implemented a robust compliance system that "***prevented misconduct***," in which, for instance, they conducted an "***an exhaustive review of charts and chart notes to make sure there are no regulatory compliance issues***." ¶¶222-23. In truth, former employees ("FEs"), who spoke with Lead Counsel and personally processed AdaptHealth's orders, confirmed that to meet AdaptHealth's impossible sales quotas, 25-50% of insurance claims were submitted on behalf of

---

[1] All capitalized terms have the same meaning as used in the Amended Class Action Complaint (ECF No. 59) ("Complaint") or in the above Glossary. References to "¶__" refer to the paragraphs in the Complaint. Unless otherwise indicated, all emphasis is added, and all citations and quotations are omitted.

patients with falsified doctors' notes, improper documentation, or no documentation at all. ¶¶120-128, 209, 315. Far from preventing misconduct, FEs confirmed that AdaptHealth **gutted** existing compliance systems (¶¶131-135), and management directed employees to upcode Medicare and Medicaid claims—*i.e.*, use improper, more expensive codes (¶¶90-103) to obtain higher (but undeserved) payments from the government. These practices were rampant. Data from four state Medicaid payors shows that AdaptHealth systematically submitted claims with incorrect codes, and in one state used improper codes in as many as **97% of claims**. ¶¶104-107, 208, 314.

AdaptHealth also padded the Company's reported revenue by "balance billing" patients for medical supplies they did not order. ¶¶110-119. This was in stark contrast to Defendants' statements: Defendant McGee, AdaptHealth's former CEO who was convicted of tax fraud during the Class Period, specifically promised that AdaptHealth was not "***just shipping boxes and then hoping to get paid or getting paid upfront***" and not "***just sending the stuff and sending a bill and getting paid on a credit card.***" ¶¶217-218. But that is exactly what AdaptHealth was doing.

***Second***, quarter after quarter, Defendants reported materially false revenue and attributed it to legitimate business practices. These revenue statements were false in two ways. First, AdaptHealth's revenue numbers were fueled by the Company's illicit billing practices, and therefore included material amounts of revenue from improper claims that should never have been billed. AdaptHealth's reported revenue figures surged 342% from the start to the end of the Class Period (¶206), but investors had no idea that much of that impressive growth was propped up by improper upcoding, shipping of unwanted product, and billing patients who did not qualify for insurance coverage. Second, Defendants repeatedly attributed AdaptHealth's success to its compliance and revenue management (*i.e.*, billing), systems. For instance, Defendant Clemens told investors that "***[t]he technology and workflow investments we made over the past year are driving***

***these results.*** ¶252. These statements were false and misleading because AdaptHealth had not implemented adequate compliance and billing technology, and Defendants failed to disclose that a significant portion of revenue was actually derived from illicit billing practices.

***Third***, Defendants falsely stated that AdaptHealth quickly integrated more than 80 company acquisitions during the Class Period, supposedly deploying its compliance and revenue management systems throughout the network. Defendants stated, for instance, that by the end of 2021, AdaptHealth had achieved "***the full integration of technology across the company***," and that AdaptHealth had "***full[y] integrated***" its revenue cycle platform. ¶263. But FEs across the Company all reported the exact opposite—AdaptHealth entirely failed to implement a compliance system or adopt a common revenue cycle platform. ¶¶131-140. These failures led to rampant errors and billing abuses such as double and triple billing patients for unwanted products. ¶¶141-148. As a result, patient complaints exploded, leading to at least two investigations by state attorneys general offices into improper billing practices. ¶¶152-165.

The truth about these misstatements was slowly revealed to the market through five corrective disclosures, starting on March 1, 2022, when the Company revealed it lacked effective "process level controls" in "substantially all processes that support our financial statements and reporting." ¶¶167-68. A year later, on February 27, 2023, AdaptHealth announced a surprise earnings miss due to lower than anticipated reimbursement rates from insurance payors like Medicaid. ¶¶181-183. Then, just days later, on March 3, 2023, AdaptHealth further disclosed that the surprise earnings miss was due to the Company's lack of effective controls. ¶189. Then, on May 9, 2023, AdaptHealth revealed lower than expected revenue because patients were abandoning the Company in droves, and Defendant Griggs (then CEO) announced his sudden departure. ¶¶192-194. Finally, on November 7, 2023, AdaptHealth took a massive write down of

goodwill, which it tied to the Company's inability to successfully integrate acquisitions. ¶¶199-200. Following each of these announcements, AdaptHealth's stock price dropped significantly, causing hundreds of millions of dollars in investor losses. ¶¶177, 187, 197, 202-03.

Despite the fact that Plaintiffs' allegations are backed by firsthand accounts of fifteen FEs, thousands of Medicaid claims, scores of consumer complaints, and Defendants' own statements, Defendants nevertheless ask the Court to dismiss this case before any discovery takes place. Defendants' motion amounts to a request that this Court conduct a summary judgment review of the pleadings, attaching **66 exhibits**, including two under seal, and offering factual disputes at every turn.[2] Of course, pre-discovery, Plaintiffs do not bear the burden of **proving** the facts alleged in the Complaint—and the Court may not weigh factual disputes on this motion. *Flora v. Cnty. of Luzerne*, 776 F.3d 169, 175-76 (3d Cir. 2015) (error where "[r]ather than accepting the facts alleged in the complaint as true, the District Court in effect made factual determinations").

Defendants' challenges to Plaintiffs' Exchange Act claims should be rejected.

***Falsity***. Defendants wrongly claim the Complaint fails to allege a single actionable misstatement. But Defendants' compliance statements were squarely contradicted by, or at minimum rendered misleading by, the reports of numerous well-placed FEs who stated that AdaptHealth gutted compliance programs and encouraged widespread illicit billing practices to meet the Company's overly aggressive sales quotas.[3] Courts routinely find such statements actionable. *See, e.g.*, *Meyer v. Jinkosolar Holdings Co., Ltd.*, 761 F.3d 245, 251 (2d Cir. 2014). Contrary to Defendants' arguments, Plaintiffs have alleged each of the FEs' positions, dates of

---

[2] Plaintiffs' objections to Defendants' Exhibits can be found in their Opposition to Defendants' Request for Judicial Notice, filed contemporaneously herewith.

[3] Plaintiffs have included the title and tenure for each of the former employees used in the Complaint in the Former Employee Appendix on p. 178 of the Complaint.

employment, and the basis for their knowledge with more than sufficient particularity.

Defendants' revenue statements, too, were false and misleading because the revenue figures incorporated material percentages of improper claims—which FEs and claims data show were no less than 25%, and in some instances *up to 97%*, of all claims. *See Wu v. GSX Techedu Inc.*, 2024 WL 3163219, at *23 (D.N.J. June 25, 2024) (revenue statements that included fraudulent sales were false). Defendants' fact-based argument that the Company's revenue recognition procedure actually detected and corrected for AdaptHealth's illicit billing practices can only be resolved through expert analysis after fact discovery and cannot be resolved on a motion to dismiss. Moreover, Defendants fail to squarely address allegations that they falsely attributed the revenue growth to the successful deployment of their compliance and billing systems, when the growth was actually fueled by the illicit practices alleged in the Complaint. They argue instead that the revenue statements never attributed AdaptHealth's financial success to the "diabetes service line"—a limitation Defendants repeatedly seek to impose but one found nowhere in the Complaint. Courts routinely uphold such claims. *See Halman Aldubi Provident & Pension Funds Ltd. v. Teva Pharms. Indus. Ltd.*, 2022 WL 889158, at *9 (E.D. Pa. Mar. 25, 2022).

Finally, Defendants' statements about technology and the supposedly successful integration of AdaptHealth's 80 acquisitions were false and misleading. Numerous FEs located throughout the organization recounted how Defendants' integration efforts did not even start until mid-2022 and universally failed, a far cry from Defendants' concrete claim that they had achieved "the full integration of technology across the company" by 2021. ¶¶72, 136-40, 174, 262-63. Courts routinely find less definitive statements regarding successful integration—a key business risk—actionable. *See, e.g.*, *In re EQT Corp. Sec. Litig.*, 504 F. Supp. 3d 474, 493 (W.D. Pa. 2020).

In response, Defendants isolate certain compliance and integration statements and argue

they were vague, immaterial puffery, or opinion, and should be dismissed as a matter of law. MTD at 20-25. These fact-based materiality challenges all fail. Defendants ignore the critical context of these statements, which were made to assuage specific risks and vulnerabilities about which concerned investors repeatedly questioned Defendants. These challenges are rarely appropriate at the motion to dismiss stage, and Defendants give no reason for the Court to do so here.

*Scienter*. Defendants' scienter challenges fare no better. MTD 26-33. The Complaint alleges numerous facts that collectively support an overwhelming inference that Defendants were at least severely reckless concerning the truth of their statements. *See* ¶¶270-330. Among other things:

- Defendants were briefed weekly about daily complaints to AdaptHealth's Human Resource Department ("HR") regarding the unrealistic sales quotas, integration failures, and illicit practices, which employees specifically flagged as "insurance fraud," but nothing was done. ¶¶76-81, 150-151, 272, 285-289.

- Ten FEs complained to their managers, many of whom reported to the Individual Defendants, about the illicit activity and integration failures, but the FEs were ignored, instructed to improperly bill anyway, or punished if they refused to do so. ¶¶270-72.

- Defendants admitted that the Company failed to implement any adequate financial controls and oversaw extensive remediation of control issues. ¶¶274-284.

- Defendants gave assurances they had reviewed "real time" compliance data, and conducted "exhaustive reviews" of claims documentation. ¶¶ 295-303.

- Defendants' own Exhibits show that AdaptHealth had a prior record of malfeasance, with CMS at least twice finding "credible allegations of fraud" against the Company. In another case, AdaptHealth paid $5.3 million to resolve allegations Defendants had engaged in upcoding, and that McGee had instructed Russalesi to cover it up. ¶¶88, 311-12, 317-20, Exs. 59 and 60.

- Defendants made specific and repeated statements on these topics in response to direct analyst questions, evidencing their purported knowledge. ¶¶295-303.

*Loss Causation*. Pleading loss causation requires "only a short and plain statement" under Rule 8. *Mill Bridge V, Inc. v. Benton*, 2009 WL 4639641, at *33 (E.D. Pa. Dec. 3, 2009). Defendants have failed to show how the Complaint does not meet this standard. The Complaint

alleges five disclosures that revealed over time AdaptHealth's lack of controls and negative financial impacts due to improper billing practices and the failure to integrate acquisitions. ¶¶166-203. Further, immediate analyst reactions link the disclosures to the subject matters of Defendants' false statements. *Id.* Finally, AdaptHealth's stock price declined by a statistically significant amount following each corrective event. ¶¶331-33. Nothing more is required.

Notably, Defendants have failed to challenge Plaintiffs' scheme liability claim. *See* ¶¶348-57 (Count II, violations of Rule 10b-5(a) and (c) of the Securities Exchange Act). Defendants have thus waived any challenges to Count II. *See, e.g.*, *Anspach ex rel. Anspach v. City of Philadelphia, Dept. of Public Health*, 503 F.3d 256, 259 n.1 (3d Cir. 2007) ("Absent compelling circumstances not present here, failure to raise an argument in one's opening brief waives it."). Thus, in all events, that claim will move forward into discovery.

Separate from their Exchange Act claims, Plaintiffs allege violations of the Securities Act for material misstatements in connection with AdaptHealth's January 5, 2021 secondary offering. ¶¶363-66. Contrary to Defendants' arguments, Rule 8 applies here because Plaintiffs disclaimed any allegation of fraud and separately alleged their Securities Act claims under a negligence theory. *See In re Suprema Specialties, Inc. Sec. Litig.*, 438 F.3d 256, 273 (3d Cir. 2006).

Defendants' few arguments specific to the Securities Act claims fail. MTD 40-50. Defendants incorrectly argue that Plaintiffs cannot "trace" their shares to the Offering (MTD at 41-43), but Plaintiffs have alleged that they purchased shares in the offering from one of the Underwriter Defendants, on the date of the offering, at the offering price (¶¶371-72), which is more than is required. *Suprema*, 438 F.3d at 274 n.7. Defendants also argue that the Offering Materials cannot be untrue because they accurately described the prior filings that were incorporated, but that misses the point: those incorporated materials are actionable because they

contained untrue or misleading statements. Finally, Defendants' challenges to Section 15 control claims rest on the minority view requiring Plaintiffs to plead "culpable participation." MTD at 40. This Court should follow the lead of most courts that do not. *See, e.g.*, *In re Measurement Specialties, Inc.*, 2003 WL 27398420, at *13 (D.N.J. Sept. 29, 2003).

Plaintiffs respectfully submit that Defendants' motion should be denied in its entirety.

## II.    STATEMENT OF FACTS

### A.    AdaptHealth Expands By Rapidly Acquiring Home Healthcare Companies

In 2017, AdaptHealth began as a special purpose acquisition company ("SPAC") with the sole purpose of acquiring businesses that provide home medical equipment and services— including sleep apnea machines and diabetes monitors—to beneficiaries of Medicare, Medicaid, and commercial insurers. ¶¶43-44. From its inception, AdaptHealth made clear to investors that acquisitions were a key component of its growth strategy. ¶304. In its first three years alone, AdaptHealth acquired *over 80* companies, including AeroCare (a sleep apnea supplier), along with Pinnacle and Solara (diabetes equipment suppliers). ¶45. As Deutsche Bank noted, the home health industry was "a graveyard littered with companies that grew rapidly from acquisitions and then imploded" due to integration failures. ¶48. Investors were thus keenly focused on AdaptHealth's ability to successfully integrate its many acquisitions. ¶¶48-49.

In addition, because the Company derived a significant portion of its revenue from Medicare and Medicaid, AdaptHealth's ability to navigate and comply with federal and state regulations was critical to investors. ¶¶53, 305. AdaptHealth reported its revenue based on the revenue it purportedly reasonably anticipated it would receive from reimbursed claims—not the cash it received at the time of reporting. ¶91.

AdaptHealth's regulatory compliance became even more important when, due to the COVID-19 pandemic, the Centers for Medicare & Medicaid Services ("CMS") temporarily

suspended audits. ¶55. Investors understood that, without government oversight, AdaptHealth had to *independently* ensure it had a robust compliance program and adequate risk controls. ¶¶55-56. Defendants reassured investors they "[knew] how to bill the federal government," which was a "nuts and bolts competency" of the Company, and they admitted that the "consequences" for "not billing Medicare correctly are extremely high." ¶57.

**B.    Defendants Issued Materially False And Misleading Statements About AdaptHealth's Compliance Program, Reported Revenue, And Integration**

Throughout the Class Period, Defendants touted their compliance systems and processes. They boasted about rising revenue figures and attributed this growth to the Company's superior claims processing and billing technology. Defendants also assured investors that they had quickly integrated the dozens of companies AdaptHealth acquired into the Company's billing and revenue management systems. As a result of these representations, AdaptHealth's stock price soared to an all-time high. ¶51. None of these statements were true.

**1.    Defendants' False Assurances Of Compliance Programs**

Defendants assured investors that AdaptHealth had robust compliance systems and that the Company was not engaged in improper billing. ¶¶211-36. For instance, Defendants represented that AdaptHealth's compliance programs "prevented misconduct," "incorporate[d] all of the required elements from the Office of the Inspector General Guidance," and implemented a specific audit function called "Audit Share" and a "rigorous monitoring system" that gave executives "real time" access to billing trends. ¶¶216-17, 222, 226-27, 229-30. Defendant Carson assured investors that AdaptHealth continuously conducted "an exhaustive review of charts and chart notes to make sure there are no regulatory compliance issues." ¶223. When questioned about regulatory billing requirements for diabetes supplies, Defendant McGee claimed that there was "nothing we're concerned about whatsoever." ¶219. McGee further asserted that "AdaptHealth isn't a business

where we're just shipping boxes and then hoping to get paid or getting paid upfront" and "we're not just sending the stuff and sending a bill and getting paid on a credit card." ¶¶217-218. The market credited these statements, with industry analysts noting that "by all accounts [AdaptHealth's] compliance program remains robust by industry standards." ¶60.

These statements were false. FEs 5, 8, 9, 12, and 14, reported that AdaptHealth failed to implement adequate compliance systems. ¶¶101, 131-40. For example, contrary to OIG Guidance, FE 12 reported that after AdaptHealth acquired Solara there was no system for employees to report improper billing practices, no automated system to check claims, no compliance training, and management ignored repeated warnings of widespread billing abuses. ¶¶116, 132. Similarly, FE 14, a senior billing specialist at AeroCare, stated she was the "first and last check," there was no automated and integrated monitoring systems, and management ignored complaints of improper billing practices. ¶133. Further, FE 5, who was responsible for billing at Pinnacle, had never heard of the "Audit Share" program or any monitoring system that supposedly gave executives "real time access" to billing trends. ¶134.

In fact, rather than implement the Company's "rigorous" compliance systems (¶222), FEs 2, 5, 8, 9 and 12 stated that AdaptHealth gutted compliance systems after acquisitions. ¶¶100, 131, 136-140. As FE 2 recalled, when AdaptHealth acquired Solara, they "gutted everything," removing all oversight of billing codes and instructing employees to "put in whatever they wanted" to hit their sales numbers. ¶101. FE 9 corroborated that account, explaining that compliance systems were "stripped away." ¶131. Likewise, FE 5 reported that AdaptHealth shut down Pinnacle's existing compliance system, leaving employees without any channels to report the widespread improper billing practices. ¶¶134-35.

Indeed, rather than prevent misconduct, AdaptHealth's compliance failures allowed

employees to engage in three kinds of rampant illicit billing practices throughout the Company.
***First***, FEs 2, 3, 5, 7, 8, and 9 stated that management instructed employees to upcode and select improper and more expensive billing codes when submitting claims to Medicare and Medicaid. ¶¶90-109. While CMS made clear that CGMs, AdaptHealth's primary diabetes product, must be billed using "K-codes," ¶90, FE 3 was instructed by managers to use improper A-codes because "it pays more." ¶95. FE 8, who served as an inside sales specialist at Solara, AdaptHealth's largest diabetes supply subsidiary, estimated that ***70-80% of all shipments*** that he processed were billed under improper A-codes. ¶208. Medicaid claims data from Louisiana, Massachusetts, Michigan, and Nebraska, confirmed AdaptHealth used improper billing codes to over-bill government insurance agencies in as many as ***97% of claims*** to the tune of millions of dollars. ¶¶104-07.

***Second***, directly contrary to McGee's assurances that AdaptHealth was not just shipping products to get paid "upfront" or "bill credit cards" (¶¶217-218), FEs 2, 6, 9, 10, 11, 12, and 13 stated that AdaptHealth shipped unwanted and unnecessary supplies to patients, forcing insurance companies and patients to foot the bill. ¶¶86, 110-119. As FE 10, who worked at AdaptHealth's headquarters, explained, AdaptHealth instructed employees to "auto bill" patients' credit cards without consent when orders were denied insurance coverage. ¶112. FE 11 recalled a similar practice with unwanted resupply orders. ¶113. FE 9 recalled that her supervisor, AdaptHealth's Vice President of Sales, Hector Mendoza, instructed employees to ship products without patient confirmation and then pressure patients who complained about receiving the unwanted shipments. ¶117. FE 6, a sleep specialist at AeroCare, similarly recalled that she was instructed to mislead patients about the need to replace supplies. ¶86.

***Third***, contrary to Defendants' supposed "exhaustive" document review to assure regulatory compliance, FEs 3, 5, 12, and 13 described how AdaptHealth managers regularly

instructed employees to submit claims with improper documentation for patients that did not qualify for insurance. ¶¶120-128. FE 5, a former Inside Sales Specialist at Pinnacle, stated that her manager regularly altered patient documentation and doctor prescriptions to qualify up to 50% of AdaptHealth's patients, who otherwise did not meet the insurance-coverage criteria for a CGM device. ¶¶120-24. FE 3 stated that AdaptHealth billed approximately 40% of all claims without the proper paperwork. ¶125. FE 12, a Solara billing specialist, stated that her managers, including Mendoza, required her to process approximately 25% of orders without documentation, even though doctor notes specifically stated, "patient does not qualify." ¶¶127-128.

### 2. Defendants' False Statements Concerning Revenue

Throughout the Class Period, Defendants included revenue and earnings from improperly billed claims in their quarterly and annual financial reports filed with the SEC. ¶¶205-06. Moreover, in continually reporting positive revenue results, without any indication that such results were achieved improperly or would require adjustments, Defendants attributed AdaptHealth's apparent success to the superior compliance and billing systems and legitimate business factors they identified as competitive advantages. ¶¶61, 67, 205-06. For instance, Defendant Clemens told investors that "*[t]he technology and workflow investments we made over the past year are driving these results.*" ¶252.

In reality, as reported by FEs 2, 3, 5, 7, 9, 10, 11, 12, and 13, AdaptHealth's positive revenue results were the result of unrealistic sales quotas that could only be achieved through illicit billing practices, which were encouraged by management. ¶¶88-128. As FE 3 reported, management pressured employees to process undocumented claims and manually override billing systems to upcode "just to meet goals," particularly at the end of each month and quarter. ¶¶94-96, 125. According to FE 3, AdaptHealth could bill for $5 million worth of product—and thus book that $5 million as revenue up front—knowing that the Company would likely only receive

$1 million in reimbursements. ¶96. FE 2 confirmed that Solara employees "had to cheat" to achieve management's unrealistic sales goals, and executives pressured Jim Vainio, Vice President of Operations, to come down hard on employees who failed to meet quotas. ¶¶100, 102. FE 9 recalled that Mendoza, Vice President of Inside Sales, provided explicit instructions to FE 9's team of 25 representatives to ship products without patients' consent and charge patients' credit cards on file to meet revenue targets. ¶¶113-17. According to FE 13, a high-level executive from Pumps It, AdaptHealth managers intentionally processed claims without documentation, even though they knew the claims were likely to be denied, to maintain the Company's revenue. ¶126. FE 13 further recalled that Wood, AdaptHealth's Senior Vice President of Sales and Business Development, who reported directly to Defendant Carson, devised a scheme to improperly load patients up with four months of supplies at the end of 2022 to boost annual revenue numbers, even though Wood knew insurance would ultimately reject the claims. ¶119.

### 3.    Defendants' False Integration And Technology Statements

Defendants touted AdaptHealth's "differentiated technology-enabled platform" as a competitive strength that would "facilitate the effective onboarding of potential acquisitions and help achieve cost synergies." ¶¶237-64. Defendants claimed that AdaptHealth's "custom-built technology" that would "monitor payor rules," "deliver[] a clean claim" and, as a result, "driv[e] patient outcomes, grow[] resupply revenue, and fuel[] growth for the future." ¶251. Defendants specifically highlighted the role of AdaptHealth's "e-prescribe" platform, telling investors that it would "eliminate the hassle and paperwork of outdated and error-prone [] methods." ¶250. And when the market asked about AdaptHealth's acquisitions, Defendants told investors that, by the end of 2021, AdaptHealth had achieved "***the full integration of technology across the company***," and that AdaptHealth had "***full[y] integrated***" its revenue cycle platform. ¶263.

These statements were false, because AdaptHealth's technology was either never

integrated or its attempts to integrate technology were a complete disaster. As discussed above, AdaptHealth never implemented compliance systems at acquisitions, and actually cut systems that had been in place. ¶¶129-135. In addition, FEs 1, 3, 5, 9, 11 14, and 15 stated that AdaptHealth never integrated AeroCare, Solara, Pinnacle and other acquisitions to its revenue management system known as Brightree. ¶¶136-151. As FE 9 recalled, contrary to Defendants' statements that they had a "common [revenue management] platform" that was "fully integrated" by 2021, Solara's Brightree system was operated entirely separately and was never integrated before FE 9 left in October 2022, over two years after the acquisition. ¶136. FE 14 stated that AeroCare's and AdaptHealth's Brightree systems were never merged, and each system required separate logins and contained different policies, patients, and payor information. ¶137. Similarly, FE 5 stated that, at Pinnacle, AdaptHealth did not even attempt to implement its "e-Prescribe" system until well into mid-2022, 18 months after the acquisition, and, even then, it never worked. ¶138.

FEs 1, 3, 5, 9, and 11 each explained that the failure to properly integrate e-Prescribe and revenue management systems led to increased instances of duplicate patient profiles, double-billing, and dropped shipments. ¶¶141-43. As a result, customer (and employee) complaints skyrocketed, with AdaptHealth receiving 600 complaints to the Better Business Bureau in its first three years alone, as well as an overall F-rating—the lowest possible rating. ¶152.

### C.  Defendants Knew or Recklessly Disregarded That Their Statements Were False

Defendants knew of and failed to disclose the rampant, illicit billing practices at AdaptHealth, as well as the Company's botched and abandoned efforts to integrate its technology platform and compliance systems with its acquired companies. Indeed, Defendants received direct warnings of AdaptHealth's ongoing compliance issues. For example, FE 1 received regular complaints from AdaptHealth employees, including concerns regarding "insurance fraud," which she then elevated to executives who regularly met with Defendants Griggs, Parnes, and Russalesi.

¶¶151, 272. Likewise, FE 3 attended meetings with senior management, during which a senior manager "very aggressively" described the problems concerning the conversion of Pinnacle's systems to AdaptHealth's. ¶145. In addition, **ten** FEs described their efforts to warn managers—some of whom had direct lines of communication to executives, including Defendants—about AdaptHealth's use of improper billing codes and poor compliance with reimbursement requirements. ¶¶265-69. Moreover, AdaptHealth's improper billing practices started at the top. FEs 2, 3, 5, and 8 each recalled how AdaptHealth management shut down employees who expressed concerns or had questions regarding proper billing procedures, with one FE stating that they were instructed to use improper codes "no matter what" and to "balance bill the patient" if insurance rejected those improper claims. ¶¶285-89.

Defendants themselves told investors that they closely monitored AdaptHealth's compliance program and were themselves responsible for ensuring effective compliance and internal controls. ¶¶290-303. Defendants assured investors that AdaptHealth's "compliance-first culture starts at the top" with AdaptHealth's "executive leadership team" checking "real time" data and conducting "an exhaustive review" to ensure "there are no regulatory compliance issues." ¶¶290-94. Likewise, after AdaptHealth admitted to material weaknesses in internal controls in 2020, 2021, and 2022, Defendants McGee, Griggs, and Clemons acknowledged they were personally involved in overseeing and implementing remediation measures. ¶¶275-84.

AdaptHealth has been subject to multiple enforcement actions for improper billing practices and failures of the Company's technology. AdaptHealth received two suspension notices from CMS based on "***credible allegations of fraud***." ¶¶311-12; Exs. 59-60. As Defendants' own exhibits show, in the first suspension on June 24, 2020, CMS specifically found that AdaptHealth had "billed for services that were not rendered and/or medically necessary." Ex. 59 at 1. The

second, which occurred during the Class Period on February 17, 2021, found that AdaptHealth had "misrepresented services billed to the Medicare program." Ex. 60 at 1. In 2023, AdaptHealth settled a class action for over $5 million for blasting customers with hundreds of thousands of text messages and phone calls, without their consent, due to failures in the Company's patient contact system. ¶108. The Department of Justice ("DOJ") also investigated AdaptHealth after a 2017 *qui tam* action alleged that AdaptHealth's predecessor company engaged in upcoding—and that McGee personally directed Russalesi "not to disclose" the wrongdoing; AdaptHealth paid another $5.3 million to settle with the DOJ. ¶¶317-20.

### D.      Defendants Cashed In On Acquisitions, Regardless Of AdaptHealth's Failures

McGee, Clemens, Parnes, and Griggs each received special bonuses simply for closing acquisitions—without regard to whether the integration of those acquisitions was successful. ¶¶324-30. Those special bonuses included McGee's *$2 million* bonus for closing the AeroCare acquisition, as well as "synergy bonuses" for Clemens and Parnes, totaling hundreds of thousands of dollars. *Id.* According to FE 1, executives like Mendoza received "huge six figure bonuses" and were "super incentivized" to meet revenue targets at all costs. ¶78. Thus, short-term revenue goals incentivized Defendants to maximize savings and profits, including by closing transactions without regard for proper integration and cutting regulatory compliance. ¶¶324-30.

### E.      When The Truth Was Revealed, AdaptHealth's Stock Price Plummeted

Investors slowly learned the truth about AdaptHealth through a series of partial corrective disclosures. ¶¶166-203. A "corrective disclosure," as used in the caselaw and the Complaint, is news that "corrects" the issuer's stock price by removing "artificial inflation" in the stock price that had been created by defendants' misstatements or omissions.[4] *First*, on March 1, 2022,

---

[4] Defendants coined the euphemism "Innocuous Events" to refer to the corrective disclosures.

Defendants revealed that the Company suffered from ineffective "process level controls" in "substantially all processes that support our financial statements and reporting," which necessarily would include its supposedly sophisticated compliance, audit, and billing software. ¶¶167-68. The finding came after AdaptHealth's financial statements were subject to outside auditing for the first time, and KPMG issued an adverse finding that flagged "implicit price concessions" from Medicare, Medicaid, and third-party payors as a "critical auditor matter." ¶170. Analysts picked up on the news, reporting that "[i]nternal process and controls" was a "key risk." ¶178. In response, AdaptHealth's stock price dropped 12.7% between March 1, 2022, and March 2, 2022. ¶177. Defendants did not disclose the full truth, however, and soothed investors by claiming that the Company had instituted remedial measures. ¶¶171-77.

*Second*, on February 27, 2023, the Company admitted that it was experiencing substantially lower reimbursement from Medicare and other payors than the market expected. ¶180. The Company reported "a surprise loss of $0.02 per share for the fourth quarter of 2022" (when the market expected a substantial gain) and lowered the guidance for 2023 it had provided just seven weeks earlier. *Id.* AdaptHealth also disclosed that the Company's accounts receivable ("AR") reserve increased *69%* from the prior quarter. ¶181. Deutsche Bank referred to the large AR increase as the "canary in the coal mine" and connected it to "over reimbursement on CGM from Medicaid." ¶182. On the earnings call, Griggs admitted that "the reimbursement rates that [AdaptHealth] actually collected were much lower than it had anticipated." ¶183. The decline in expected reimbursements was a direct and foreseeable consequence of AdaptHealth's failure to integrate acquisitions, implement adequate compliance processes, and stem illicit billing practices that it encouraged. On this news, the price of AdaptHealth stock plummeted by $5.99 per share, or 32.4%, between February 28 and March 1, 2023. ¶187. But Defendants insisted that no further

surprises were forthcoming, and the Company had remedied financial control issues. ¶188.

However, a ***third*** event occurred a few days after the call, when RBC reported that AdaptHealth's management had disclosed to the analyst firm that the earnings miss was attributable to a "lack of visibility to material weaknesses in the company's control environment" and the Company "completely overhaul[ed] its accounting and finance infrastructure." ¶189. As a result, AdaptHealth's stock slid another 6.6% on March 6, 2023. ¶190.

***Fourth***, AdaptHealth disclosed lower-than-expected revenue in May 2023, which Defendant Griggs attributed to a decline in the diabetes business. ¶¶192-93. On the associated earnings call, Clemens blamed the shortfall on patients shifting away from AdaptHealth into the pharmacy channel. ¶194. In other words, payors and patients were opting to get their CGMs and supplies elsewhere, reflecting payor and patient exasperation with AdaptHealth's billing practices. ¶194. In addition, Griggs abruptly and without explanation announced that he was stepping down. ¶196. Analysts reacted to the news by discussing how patients were deserting AdaptHealth in droves and the market, which had previously bought into AdaptHealth's story of superior technology and integrating operations, were disappointed in the Company's growth. ¶195. The market reacted negatively, as AdaptHealth stock fell 6.4% to close at $11.30. ¶197.

***Finally***, on November 7, 2023, AdaptHealth wrote down hundreds of millions in "goodwill," which AdaptHealth explained was largely based on its ability to successfully integrate the acquired companies into its operations. ¶¶199-200. Through this write-down, therefore, investors learned further truth behind Defendants' repeated claims about AdaptHealth's ability to integrate its acquisitions. In all, AdaptHealth's stock price fell ***83.3%*** from its Class Period high of $40.15 to a low of $6.50, resulting in hundreds of millions of dollars in investor losses. ¶203.

## III.    LEGAL STANDARD

To state a claim for securities fraud under Section 10(b) of the Exchange Act, a plaintiff

must allege that defendants made a misstatement or omission of material fact with scienter in connection with the purchase or the sale of a security upon which the plaintiff reasonably relied, and that plaintiff's reliance was the proximate cause of his or her injury. *Matrixx Initiatives, Inc. v. Siracusano*, 563 U.S. 27, 37 (2011); *Inst. Inv'rs Group v. Avaya, Inc.*, 564 F.3d 242, 251 (3d Cir. 2009). A court considering a motion to dismiss should assess the complaint "in its entirety" and "holistically," accept all factual allegations as true, and construe the allegations in the light most favorable to plaintiffs. *Tellabs, Inc. v. Makor Issues & Rts., Ltd.*, 551 U.S. 308, 326 (2007).

## IV.     DEFENDANTS' STATEMENTS WERE MATERIALLY FALSE AND MISLEADING

A plaintiff adequately pleads falsity where they "specify each allegedly misleading statement and the reasons why the statement is misleading." *Avaya*, 564 F.3d at 252 (citing *Tellabs*, 551 U.S. at 321). A statement is false or misleading if it is "factually inaccurate, or additional information is required to clarify it." *Strougo v. Lannett Co., Inc.*, 2019 WL 1172992, at *8 (E.D. Pa. Mar. 13, 2019). "An omission is misleading if a plaintiff alleges some fact, known to defendants at the time of the statements, the disclosure of which would have made the statement clearer or more correct." *Id.* And "[o]nce a company has chosen to speak on an issue—even an issue it had no independent obligation to address—it cannot omit material facts related to that issue so as to make its disclosure misleading." *Allegheny Cty. Emps.' Ret. Sys. v. Energy Transfer LP*, 532 F. Supp. 3d 189, 222 (E.D. Pa. 2021).

As an initial matter, Defendants do not specifically challenge that the technology-related statements in ¶¶246-47, 249, and 251-52 or the integration-related statements at ¶¶260-61 are materially false or misleading. Therefore, those statements should be sustained. Every statement, moreover, should be sustained for the reasons discussed below.

### A.     Plaintiffs Have Consistently Attributed The Statements To Defendants

For their primary argument, Defendants contend that the Complaint improperly alleges that

every Exchange Act Defendant is liable for every false statement. MTD at 15-16. But the Complaint makes clear exactly which Defendant should be liable for each statement, either by uttering the statement at an earnings call or conference or by signing the relevant SEC filing. ¶¶205-269; *e.g.*, ¶206 (identifying McGee, Griggs and Clemens as signing the AdaptHealth's quarterly financial reports); *see also Steamfitters Loc. 449 Pension Fund v. Alter*, 2011 WL 4528385, at *9 (E.D. Pa. Sept. 30, 2011) (corporate officers liable for SEC filings they sign).

### B.    Defendants Falsely Claimed That AdaptHealth's Superior Compliance Systems Differentiated It From Its Medical Device Peers

#### 1.    Defendants Made Actionable Statements Regarding Compliance

As Plaintiffs allege in ¶¶209-233 and as set forth above at §II.B.1, throughout the Class Period, Defendants publicly highlighted the strength of AdaptHealth's compliance technology and practices as competitive strengths for the Company. For instance, Defendant McGee emphasized that the switch from A codes to K codes for diabetes supplies was "***nothing that we're concerned about whatsoever***" (¶219) and promised that they were not "***just sending the stuff and sending a bill and getting paid on a credit card.***" ¶¶217-218. Defendants represented that AdaptHealth's compliance program "***incorporates all of the required elements from the Office of the Inspector General Guidance***," which included specific requirements as to written policies, communications, monitoring, and redress of offenses. ¶¶226-27. Defendant Carson assured investors that Russalesi "and her organization does ***an exhaustive review of charts and chart notes to make sure there are no regulatory compliance issues***." ¶223. Russalesi claimed the Company had implemented a system called "Audit Share" that allowed Defendants to "***see our audit outcomes***." ¶229.

These statements were false and misleading because, as ***a dozen*** FEs across multiple product lines and acquired companies reported, AdaptHealth flouted regulations, including by improperly upcoding to obtain higher reimbursement rates (¶¶98, 103-07, 224), altering doctors'

prescriptions to qualify patients for coverage (¶¶120-28, 224), charging patients' credit cards without consent and shipping patients goods they did not order and could not pay for (¶¶110-13, 224), and continuing to bill patients who had switched from AdaptHealth to a different provider (¶¶114-15, 224). FEs who worked at Solara, AeroCare, and Pinnacle explained that, following acquisition by AdaptHealth, the Company did ***not*** implement a compliance program and in fact dismantled what was in place. ¶¶131-35. FE 5, who worked in billing, confirmed AdaptHealth had never implemented an Audit Share program. *Id*. The Complaint describes each FE with sufficient particularity, describing their position, dates of employment, and how they came by their information. *See In re Cognizant Tech. Sols. Corp. Sec. Litig.*, 2018 WL 3772675, at *20 (D.N.J. Aug. 8, 2018). Defendants do not challenge the adequacy of these descriptions.

These allegations are more than adequate to allege falsity. Courts hold that specific compliance assurances, like the ones Defendants made here, are actionable because they "gave comfort to investors that reasonably effective steps were being taken to comply with applicable [government] regulations." *Meyer*, 761 F.3d at 251; *see also Energy Transfer*, 532 F. Supp. 3d at 220-21 (failure to follow specific compliance steps actionable). Moreover, "statements emphasizing the strength of a particular business operation may be actionable as securities fraud[] where those operations are in reality deficient." *Hall v. Johnson & Johnson*, 2019 WL 7207491, at *16 (D.N.J. Dec. 27, 2019); *see also Cognizant*, 2018 WL 3772675, at *20 ("[i]mplicit in Cognizant touting of its training program was an assurance that the training program could actually be effective at the ground level"); *In re Countrywide Fin. Corp. Sec. Litig.*, 588 F. Supp. 2d 1132, 1144 (C.D. Cal. 2008) (finding statements touting "high quality" underwriting actionable where complaint alleged that underwriting practices were deficient).

### 2.    Defendants' Arguments Regarding Compliance Fail

Defendants' arguments that these statements are not actionable are unavailing. ***First***,

Defendants challenge the Complaint's reliance on the accounts of FEs, because the witnesses may not have "had any insight into *every* order, shipment, or customer interaction for the diabetes company at which they allegedly worked." MTD at 18-19. But Plaintiffs are not required to, without the benefit of discovery, identify every order that was tainted by misconduct in order to allege that the misconduct occurred. Rather, Plaintiffs satisfy the particularity requirement where the witnesses identify, as they do here, "a specific branch location or department, the time period when it occurred, how and why it occurred, and what products may have been involved." *In re Toronto-Dominion Bank Sec. Litig.*, 2018 WL 6381882, at *5 (D.N.J. Dec. 6, 2018).

**Second,** Defendants repeatedly denigrate the FEs as "low level." MTD at 9. But many of the witnesses are not "low level" at all. *See* Compl. p. 178 (appendix of FEs listing, *e.g.*, High Level Executive at Pumps It, Director of Training and Implementation, HR Business Partner); *see also* ¶¶77-81 (detailing FE 1's meetings with senior management); ¶82 (describing FE 2's weekly meetings with executives); ¶141 (describing FE 9's meetings with senior managers who reported to Defendant Carson). Moreover, it is well established that "[c]ourts will not disregard a confidential witness' allegations simply because he or she was a low-level employee." *In re Advance Auto Parts, Inc., Sec. Litig.*, 2020 WL 599543, at *3 (D. Del. Feb. 7, 2020); *see also In re SLM Corp. Sec. Litig.*, 740 F. Supp. 2d 542, 555 n.5 (S.D.N.Y. 2010) (crediting former employees "at low levels" to have knowledge of how company implemented its policies); *Lord Abbett Affiliated Fund, Inc. v. Navient Corp.*, 363 F. Supp. 3d 476, 493 (D. Del. 2019) (crediting witnesses who were "a few levels removed from one of the individual defendants"). The witnesses worked in geographically dispersed AdaptHealth offices, yet provided corroborating accounts of AdaptHealth's sales quotas, compliance failures, and technological breakdowns, including the involvement of their supervisors and other executives.

***Third***, Defendants claim that certain alleged statements (¶¶211, 213, 215-18, 220-23, 226, 229, 230, 232) were immaterial "puffery." MTD at 20-21. This is wrong for multiple reasons. First, this argument goes to the materiality of the statements, raising factual issues inappropriate for a motion to dismiss. *In re Urban Outfitters, Inc. Sec. Litig.*, 103 F. Supp. 3d 635, 650-51 (E.D. Pa. 2015) ("Generally, materiality is an issue of fact to be decided by the trier of fact.").

Further, Defendants' statements were verifiably false and material because they were made to assuage investor concern about particular risks and matters critical to the company. *Washington State Inv. Bd. v. Odebrecht S.A.*, 461 F. Supp. 3d 46, 74 (S.D.N.Y. 2020) (statements that "were made to reassure investors as to specific risks" were not puffery). Here, Defendants acknowledged compliance was essential to AdaptHealth. ¶¶53-57 (McGee: "the consequences for . . . not billing Medicare correctly are extremely high"). Thus, because AdaptHealth operated in "an industry where regulatory compliance . . . is essential," Defendants' repeated assurances about compliance were material. *See Mulligan v. Impax Labs., Inc.*, 36 F. Supp. 3d 942, 968 (N.D. Cal. 2014); *In re Wilmington Tr. Sec. Litig.*, 29 F. Supp. 3d 432, 447 (D. Del. 2014) (statements regarding "rigorous" and "consistent" risk management practices not puffery).

Defendants made verifiably false and material factual claims about AdaptHealth's compliance program, including, *inter alia*, that the Company conducted an "exhaustive review" of documents, implemented the OIG Guidance requirements, conducted training, maintained "open lines of communication," and did not improperly bill credit cards upfront. ¶¶217-218, 223, 226, 232. *See Energy Transfer*, 532 F. Supp. 3d at 218 (statements not puffery where lack of factual basis made them misleading); *EQT*, 504 F. Supp. 3d at 493 (statement that "we've hit the ground running" not puffery because it "set forth matters of present fact"). Here, Defendants' statements concerned specific compliance program elements that did not exist; such statements are material.

*See Howard v. Arconic Inc.*, 2021 WL 2561895, at *13 (W.D. Pa. June 23, 2021) (because defendants put product safety "in play," statements that systems increased safety were actionable); *Karimi v. Deutsche Bank Aktiengesellschaft*, 607 F. Supp. 3d 381, 396 (S.D.N.Y. 2022) (statements regarding "specific processes" to ensure regulatory compliance were actionable).

Finally, Defendants made many of the challenged statements in response to analyst questions. ¶¶214-216; 218, 221, 232. Such statements are not puffery because they are directly responsive to what investors consider material. *See Makor Issues & Rights, Ltd. v. Tellabs, Inc.*, 437 F.3d 588, 597-98 (7th Cir. 2006) (statement "went well beyond puffery: it was a direct response to an analyst's inquiry").

Defendants' cases are readily distinguishable. In *Howard v. Arconic*, the court declined to find certain "values-based" statements like "'[w]e always start with safety, safety first'" actionable where plaintiffs alleged a single negligent sale of the company's product ultimately contributed to a deadly fire. 395 F. Supp. 3d 516, 529 (W.D. Pa. 2019). Here, Defendants made repeated statements, sometimes in response to direct analyst questions, about the adequacy of one of AdaptHealth's *existing* "core competencies" and about a compliance program Plaintiffs allege was not actually implemented. Notably, the plaintiffs in *Arconic* amended their complaint and, with allegations more like those in this case, the court found that statements regarding "specific aspects" of the safety program were actionable because Arconic had placed its "product safety 'in play.'"[5]

***Fourth***, Defendants argue the compliance statements are not misleading because "there is

---

[5] Defendants' other cases are inapposite. *See Fan v. StoneMor Partners LP*, 927 F.3d 710, 717 (3d Cir. 2019) (the court did not consider puffery arguments); *In re Ocugen, Inc. Sec. Litig.*, 659 F. Supp. 3d 572, 593 (E.D. Pa. 2023) (projections about drug approvals made in context of "unprecedented global pandemic"); *In re Universal Health Servs., Inc., Derivative Litig.*, 2019 WL 3886838, at *42 (E.D. Pa. Aug. 19, 2019) (finding that there were actually "significant compliance controls" implemented).

no language in those [s]tatements that suggests that the alleged [misconduct] was not occurring, could not occur, or had never occurred." MTD at 20. That is not the standard. Rather, "[o]nce a company has chosen to speak on an issue—even an issue it had no independent obligation to address—it cannot omit material facts related to that issue so as to make its disclosure misleading." *Teva*, 2022 WL 889158, at *9. In this case, by repeatedly "emphasizing the strength" of AdaptHealth's compliance systems, which were "in reality deficient," Defendants misled investors. *Hall*, 2019 WL 7207491, at *16; *see also Meyer*, 761 F.3d at 251 (statements actionable even though they did not guarantee 100% compliance).[6]

**Fifth**, Defendants allege that statements concerning "the design of [AdaptHealth's compliance program" (¶¶220-22, 226, 229, 232) are inactionable because they "did not convey any information regarding the effectiveness or thoroughness of the compliance program." MTD at 21. But the Complaint alleges that several elements of the program, such as audit share, open lines of communication, and a written policy, did not actually exist. Defendants argue that "[t]he fact that practices were different—and maybe even that certain responsibilities were changed to a new function—does not mean they were wrong or eliminated." MTD at 21 n.32. But Defendants offer no basis for their claim and are, at best, impermissibly disputing facts. *Avaya*, 564 F.3d at 260.

**Fifth**, Defendants wrongly argue that McGee's statement that AdaptHealth was "not concerned" with the impact of the billing changes (¶219) is not misleading because it "concerns gross margins in connection with acquisitions, not billing." MTD at 20-21 (citing Ex. 28). Even if

---

[6] Defendants' cited cases are off-point, as the omitted material information was not "sufficiently related" to the statements made. *See In re ITT Educ. Servs., Inc. Sec. & S'holder Derivatives Litig.*, 859 F. Supp. 2d 572, 579 (S.D.N.Y. 2012) (claims that "enrollment growth was due in part to more experienced and better-trained recruiters" did not suggest company did not use quotas or aggressive sales tactics); *In re FBR Inc. Sec. Litig.*, 544 F. Supp. 2d 346, 357-58 (S.D.N.Y. 2008) (no connection between alleged insider trading scheme and defendants' statements).

McGee's statement concerned acquisition margins, it was still misleading to discuss the purportedly minimal impact of code changes on those margins without acknowledging that AdaptHealth failed to follow proper billing codes, which undoubtedly would (and did) affect financial performance. *Williams v. Globus Med., Inc.*, 869 F.3d 235, 241 (3d Cir. 2017) (even if a company has no independent obligation to speak on an issue, when it does so, "it cannot omit material facts related to that issue so as to make its disclosure misleading.").

### C.    Defendants' Revenue Statements Were False And Misleading

As detailed in ¶¶205-10, Defendants reported revenue that more than tripled from the second quarter of 2020 to the second quarter of 2023, from $232.1 million to $793.3 million. ¶206. Defendants also reported increased EBITDA, ultimately growing 400% from $42 million to $171 million over the same period. *Id.* Defendants readily connected AdaptHealth's apparent growth to its ability to comply with CMS regulations. From the start of the Class Period on August 4, 2020, Defendant McGee told investors they could expect the Company's new diabetes business to be lucrative because appropriate billing was one of AdaptHealth's "core competencies." ¶213. On an August 5, 2021 earnings call, McGee claimed that AdaptHealth's e-prescribing feature has "*allowed us really to grow with the market*." ¶245. On a November 8, 2022 earnings call, discussing the Company's revenue, Defendant Clemens told investors that "*[t]he technology and workflow investments we made over the past year are driving these results.*" ¶252.

These numbers—and purported reasons for revenue growth—were a mirage. The revenue figures AdaptHealth reported were inflated by employees submitting fraudulent bills to the federal government using more expensive and incorrect codes, shipping unwanted goods, and submitting claims with missing or altered paperwork. ¶¶77, 207. FEs reported that no fewer than 25% and as many as 80% of all claims were improper. ¶¶127, 208. Data from state Medicaid providers showed that *as many as 97%* of claims were billed using the wrong, more expensive A-codes. ¶¶208-10.

26

Courts have found that where revenue figures were "systematically and materially inflated" by fraudulent practices, those figures are actionable as misstatements. *Wu*, 2024 WL 3163219, at *23 (revenues based on student enrollment were false because a substantial number of enrolled students were bots, and thus the "Revenue Statements" included revenue that was not "bona fide revenue"); *see also In re Cabletron Sys., Inc.*, 311 F.3d 11, 35 (1st Cir. 2002) (SEC filings actionable where the company's "revenue was fraudulently inflated by tens of millions of dollars per quarter" by fraudulent practices such as "fictitious sales").

Further, where Defendants' statements "put the source of [the Company's] revenue at issue," the "failure to disclose a major source of that revenue" is "misleading." *Steiner v. MedQuist Inc.*, 2006 WL 2827740, at *16 (D.N.J. Sept. 29, 2006) (defendants failed to disclose an "improper billing scheme").[7] Here, Defendants put the source of AdaptHealth's success at issue, and their failure to disclose the illicit practices that led to this success is misleading.

In response, Defendants both mischaracterize the Complaint's allegations and raise factual arguments that are impermissible at the motion to dismiss stage.

***First***, Defendants insist that Plaintiffs "are referring to the wrong financial results," and that "AdaptHealth did not have an operational diabetes service line" in the first quarter of the Class Period. MTD at 17. As Defendants do throughout their brief, they attempt to limit the Complaint's allegations to the Company's diabetes business. This limitation directly contradicts the Complaint,

---

[7] *See also Teva*, 2022 WL 889158, at *11 ("Because Teva put the source of Copaxone's success at issue, the company's failure to disclose the real source of Copaxone's success—the underlying scheme involving Copaxone donations to PAPs—rendered its statements about Copaxone's success and market share misleading"); *In re Providian Fin. Corp. Sec. Litig.*, 152 F. Supp. 2d 814, 825 (E.D. Pa. 2001) (allegations of illegal or fraudulent business practices sufficiently questioned company's success and the viability of its reported profits); *City of Sunrise Gen. Emps.' Ret. Plan v. FleetCor Techs., Inc.*, 2018 WL 4293143, at *8 (N.D. Ga. May 15, 2018) ("Once FleetCor chose to speak regarding the source of its revenue growth, it had a duty to disclose the full truth.").

which alleges that the illicit practices (and integration failures) occurred throughout the company. For example, multiple FEs discussed misconduct and integration issues at AeroCare, which sells sleep apnea products. *See, e.g.*, ¶¶86, 133, 137, 210, 317-18. To the extent Defendants argue that Plaintiffs should have only alleged the diabetes segment statements (rather than Company-wide revenue) were false or misleading, their argument is nonsensical, since if revenue in the diabetes service line—AdaptHealth's second-largest segment (*see, e.g.*, Ex. 3 at 51)—was materially inflated, then overall revenue would be materially inflated. Plaintiffs properly pled that the financial results for ***every*** quarter of the Class Period were false.

***Second***, Defendants assert that diabetes revenue did not increase for two of the quarters. MTD at 17. That is a non-sequitur, as Plaintiffs never claimed that diabetes revenue increased every quarter but instead alleged that Company revenue—despite Defendants' claims that AdaptHealth's success was attributable to legitimate factors—was consistently inflated.

***Third***, Defendants argue that any statements after the first corrective disclosure are not actionable. MTD at 17. But Plaintiffs did not contend that the entire fraud was revealed in the first corrective disclosure, but instead through a series of disclosures. This is both permissible and routine under well-established law. *See infra* pp. 46-51. Indeed, many of the later disclosures specifically concern further revelations about financial results.

***Fourth***, Defendants argue that AdaptHealth's "methodology for calculating revenue . . . forecloses any possibility that the [Complaint's allegations] could have affected diabetes revenue or overall revenue in the manner that Lead Plaintiffs have alleged." MTD at 17. In passing, Defendants claim that the FEs were "several steps removed from the revenue figures reported," but these FEs reported widespread billing misconduct and Company policies encouraging such misconduct, across the breadth of the Company. *See Fleetcor*, 2018 WL 4293143, at *8 (finding

misstatements of revenue based on "thirteen, low-ranking confidential witnesses" and rejecting characterization of their accounts as "one-off anecdotes").

More specifically, Defendants appear to argue that, no matter how widespread the misconduct, the Company's reporting revenue recognition policy would keep it from misreporting its revenue. This argument fails for many reasons. To start, it raises fact issues. Contrary to all permissible inferences on the pleadings, Defendants ask the Court to review extraneous exhibits, assume these exhibits truthfully set forth the Company's policy as applied, further assume that this policy actually filtered out *all* illicit billing as a matter of law, and dismiss these claims.

Moreover, it is speculative and unproven. Defendants argue that if overbilling occurred, "the lower amount that is eventually paid [by insurers] will decrease revenue recognized in a later period." MTD at 7-8, 18 n.28. But Defendants' support for that assertion only suggests that revenue adjustments *could* occur; it does *not* demonstrate that adjustments *ever* occurred. Ex. 6 at 61 ("*[i]f* actual amounts of consideration ultimately received differ from the Company's estimates, the Company adjusts these estimates"); *id.* at 78 (saying that billing complexities "*may result* in adjustments to amounts originally recorded").

Finally, it ignores key facts. Defendants ignore the allegation that, in all events, the revenue initially recorded was inflated, irrespective of any later revenue "adjustments" that may (or may not) occur in subsequent quarters. And they ignore the allegations that even if insurers subsequently denied claims or paid less, AdaptHealth simply balance billed patients or ignored denials to keep the illicit revenue on the books. ¶¶99, 119, 126.

Ultimately, whether Defendants' revenue recognition practices corrected overbilling will require detailed fact discovery and expert testimony to resolve and are not permissible at a motion to dismiss, where the court is "required to accept as true all factual allegations in the complaint

and draw all inferences from the facts alleged in the light most favorable to [the plaintiff]." *Wu*, 2024 WL 3163219, at \*2; *Hall*, 2019 WL 7207491, at \*13; *Avaya*, 564 F.3d at 260 n.31 ("in reviewing a district court's dismissal under Rule 12(b)(6), we do not resolve factual disputes— even in cases governed by the PSLRA").

***Finally***, Defendants also claim that the statements "never attributed AdaptHealth's financial success to the diabetes service line." MTD at 18. But, as explained above, Defendants ***did*** attribute AdaptHealth's financial success to various legitimate factors like AdaptHealth's "core competenc[y]" in billing and its "technology and workflow investments" (¶¶213, 252) without disclosing the illicit practices alleged in the Complaint that boosted revenue across the Company.

### D.    AdaptHealth Falsely Claimed Its Technology Systems Would Prevent Errors

As alleged at ¶¶237-55, Defendants repeatedly touted AdaptHealth's unique technology platform as a key competitive advantage. They told investors that AdaptHealth's technology (including "e-prescribe") "allow[ed] for timely on-boarding of acquisitions" (¶242); allowed the Company to "process claims faster, quicker, better, and more accurate" (¶243); "alleviates a lot of the roadblocks [to CMS coverage]" (¶246); "dramatically shorten[s] the cycle time to get diabetic patients on CGM therapy" (¶247); "monitors [insurers'] rules"; and assures that "we are delivering a clean claim to the clearinghouse" (¶251).

Unbeknownst to investors, AdaptHealth never implemented its vaunted technology or botched its attempts to do so, resulting in ***increased*** compliance and billing errors and leading to skyrocketing patient complaints. ¶¶253-55. FEs confirmed that AdaptHealth did not implement compliance systems and actually ***gutted*** legacy compliance processes, allowing employees to engage in illicit billing practices. ¶¶253-254. Moreover, AdaptHealth failed to implement its revenue and billing software, including its "e-prescribe" systems, resulting in patients being double billed and other errors. ¶255. Accordingly, Defendants' statements regarding AdaptHealth's

technology platform are actionable. *In re Lucent Tech., Inc. Sec. Litig.*, 217 F. Supp. 2d 529, 556 (D.N.J. 2002) (statements attributing company's success to customer loyalties and optical network product misleading when customer satisfaction had waned and its optical networking products did not work); *In re Equifax Inc. Sec. Litig.*, 357 F. Supp. 3d 1189, 1231 (N.D. Ga. 2019) (statements that company maintained "a highly sophisticated data information network that includes advanced security, protections and redundancies" misleading when systems were substandard).

Defendants' responses fail. ***First***, Defendants argue that certain of these statements (¶¶220, 239, 240-43, 244-45, 248, 250) are immaterial puffery. MTD at 24. For the same reasons discussed above (*supra* pp. 23-24), Defendants' heavy reliance on AdaptHealth's purportedly unique and superior technology was material to investors. *See In re Eletrobras Sec. Litig.*, 245 F. Supp. 3d 450, 463 (S.D.N.Y. 2017) (statements that were "clearly designed to distinguish" company from its chief competitor were not puffery).

***Second***, Defendants wrongly argue that these statements are not false or misleading because they refer "loosely" to the term technology, not any specific program. MTD at 24. But Defendants touted specific elements of AdaptHealth "differentiated" technology platform, including e-prescribe, revenue cycle management, and compliance programs. ¶¶237-55.

***Third***, Defendants' claim that these statements are inactionable because they do not refer to "the diabetes service line specifically" (MTD at 24) is again irrelevant in the face of the Complaint's well-pled allegations of fraud across AdaptHealth's businesses.

### E.    Defendants Misrepresented AdaptHealth's Ability To Integrate Acquisitions

As alleged in ¶¶256-64 of the Complaint, Defendants falsely stated that AdaptHealth's ability to quickly and effectively integrate dozens of acquisitions was a key competitive advantage. For example, Defendants told investors that AdaptHealth had successfully "installed common reporting and visibility across the enterprise," and "[had] already been leveraging" AdaptHealth's

differentiated technology platform "across our combined business." ¶260. Defendants led investors to believe that, by the end of 2021, AdaptHealth had achieved "the full integration of technology across the company" and had "fully integrated" its revenue cycle platform. ¶263.

As discussed above (*supra* p. 14), these statements were materially false and misleading, because AdaptHealth never implemented the Company's revenue cycle platform and compliance processes. ¶¶136-140. When AdaptHealth tried to integrate businesses (often months, if not years after acquisitions), the results were disastrous, resulting in improper billing, a lack of oversight, and ultimately a litany of patient complaints. ¶264.

Courts routinely hold that statements regarding the success of acquisitions and integration efforts are actionable. *See, e.g.*, *EQT*, 504 F. Supp. 3d at 493 (statement that "we've hit the ground running and have started capturing the various synergies related to the [Acquisition]" was actionable); *Galestan v. OneMain Holdings, Inc.*, 348 F. Supp. 3d 282, 303-04 (S.D.N.Y. 2018) (positive statements about integration of companies actionable when integration efforts were "wreaking havoc" on the company); *Mallen v. Alphatec Holdings, Inc.*, 861 F. Supp. 2d 1111, 1126 (S.D. Cal. 2012) (upholding statement that company "ha[d] already begun to realize synergies from the [ ] acquisition").

Defendants' arguments in response fail. ***First***, Defendants claim that "nearly all" of the integration statements relate to AeroCare (the large sleep apnea company); thus, Defendants contend that the allegations related to the diabetes business does not support the falsity of these statements. MTD at 24. They are wrong. Defendants frequently spoke regarding the integration of ***all*** the Company's acquisitions. *See, e.g.*, ¶262 (Clemens claiming that AdaptHealth was "seeing . . . the full integration of technology ***across the company***"); ¶263 ("We've got a common revenue cycle platform now. We fully integrated it.").

32

To the extent the integration statements addressed only AeroCare (at most, ¶¶259, 261, partly 263), the Complaint adequately pleads the falsity of those statements. For example, former AeroCare employee FE 14 reported that AdaptHealth did not attempt to integrate AdaptHealth's and AeroCare's legacy revenue cycle management systems at all. ¶137. These allegations render Defendants' statements that AdaptHealth had "installed common reporting and visibility across the enterprise," and that AdaptHealth's common revenue cycle platform was "fully integrated" false and misleading. ¶¶258-59, 263-64. Contrary to Defendants' contention (MTD at 24), FE 14's accounts are not "too vague to consider," because Plaintiffs adequately describe the duration of their employment and how they acquired the information alleged in the Complaint. ¶¶133, 137.

***Second***, Defendants wrongly argue that certain statements (¶¶257, 258, 259, 263) are immaterial puffery. MTD at 25. As discussed above (*supra* pp. 23-24), because these allegations contradict Defendants' statements of ***present facts*** regarding AdaptHealth's integrations and addressed specific Company risks, they are material. *See In re MobileMedia Sec. Litig.*, 28 F. Supp. 2d 901, 939 (D.N.J. 1998) (statements that company "continue[d] to make good progress" on integration actionable when, in reality, integration was a "functional disaster"); *Haw. Structural Ironworkers Pension Tr. Fund v. AMC Ent. Holdings, Inc.*, 422 F. Supp. 3d 821, 845 (S.D.N.Y. 2019) (finding statements that integration was making "great progress" actionable).

### F.    Defendants' Statements Regarding "Potential" Risks Are Actionable

As alleged in ¶¶265-69 of the Complaint, Defendants assured investors that any risks related to improper billing and compliance issues were nothing more than hypothetical, noting that AdaptHealth "***could be*** adversely affected" if auditing payors discovered that "substantial overpayments were made to AdaptHealth due to coding errors." ¶¶265-69. Defendants even explicitly told investors that these risks "[had] just not materialized." *Id.* But as discussed above (*supra* pp. 13-14), the very risks that Defendants portrayed as hypothetical had already

33

materialized due to AdaptHealth's fraudulent billing scheme. *Id.* Because "to caution that it is only possible for the unfavorable events to happen when they have already occurred is deceit, in violation of Rule 10b-5," Defendants' risk statements are actionable. *Industriens Pensionsforsikring A/S v. Becton, Dickinson & Co.*, 620 F. Supp. 3d 167, 186-87 (D.N.J. 2022).

Defendants first argue that the risk statements are inactionable because the risks described were unrelated to AdaptHealth's improper billing practices. MTD at 25. This is plainly incorrect. The risk statements specifically address the risks of improperly billing—including that the Company would be required to adjust its revenue if it improperly billed insurers. *E.g.*, ¶266 (risk of "*coding errors*"); ¶267 ("[A]ny risk around pricing, reimbursement…have just not materialized"). Defendants next argue that the risk statements are protected by the safe harbor. MTD at 25. Not so. First, the statement that "risks have not materialized" (¶267) concerns present facts and is not forward-looking. Second, and as discussed above, the safe harbor does not apply when, as here, the risk statements are phrased as relating to *future* risks, but those same risks *have already transpired*. *In re Westinghouse Secs. Litig.*, 90 F.3d 696, 710 (3d Cir. 1996).[8] As discussed below (*infra* §V), Defendants knew that the risks they cautioned against had *already* materialized, an omission of *present* fact.

### G. Defendants Signed SOX Certifications Falsely Stating That AdaptHealth Had Implemented Adequate Internal Controls

As alleged in ¶¶233-35, McGee, Clemens, and Griggs each signed SOX Certifications stating that they were able to "provide reasonable assurance regarding the reliability of financial reporting and the preparation of the financial statements for external purposes in accordance with

---

[8] *See also In re Prudential Sec. Inc. Ltd. Partnerships Litig.*, 930 F. Supp. 68, 72 (S.D.N.Y. 1996) (safe harbor "provides no protection to someone who warns his hiking companion to walk slowly because there might be a ditch ahead when he knows with near certainty that the Grand Canyon lies one foot away").

generally accepted accounting principles." ¶233. Defendants later ***admitted*** that these disclosure statements were false. First, on March 1, 2022, AdaptHealth admitted that it had ineffective "process level controls" in "substantially all processes that support our financial statements and reporting." ¶¶167-68, 282. A year later, Defendants admitted to RBC that the Company's earnings miss for 2022 was due to a ***continued*** "material weakness" in internal controls. ¶189. They further admitted that KPMG's latest audit forced AdaptHealth to "completely overhaul its accounting and finance infrastructure." *Id.* Such disclosures render prior statements that no weaknesses existed false or misleading. *Cullen v. RYVYL Inc.*, 2024 WL 898206, at *13 (S.D. Cal. Mar. 1, 2024); *In re Grupo Televisa Sec. Litig.*, 368 F. Supp. 3d 711, 720 (S.D.N.Y. 2019).

Given these Class Period admissions, Defendants' arguments can be swiftly rejected. ***First***, the notion that SOX Certification statements are not actionable because they purportedly are not "absolute at identifying and preventing all financial reporting risks" (MTD at 22-23) ignores AdaptHealth's admission of ineffective controls in "***all processes***." ***Second***, Defendants' claim that the Company's admission as of December 31, 2021 says nothing about the rest of the Class Period (MTD at 23 n.33), is not credible. It is not plausible that the Company ***had*** implemented effective controls in November 2021 (when McGee and Griggs last signed SOX certifications, ¶233), but those controls somehow vanished in one month. Further, Defendants ignore the Company's admission that the widespread failures continued through to at least March 2023. ¶189.

## H.    The Statements Are Not Inactionable Opinion

Defendants assert that certain statements are inactionable opinions. MTD at 20 n.31, 22, 24-25.[9] Many, if not all, of the alleged false and misleading statements are not statements of

---

[9] Specifically, Defendants challenge certain compliance-related statements (¶¶211, 213, 221, 223), SOX Certification statements (¶233), technology-related statements (¶¶220, 239, 240-43, 244-45, 248, and 250), and integration statements (¶¶258, 259, 263) as opinions.

opinion, but verifiable fact. *See, e.g.*, ¶221 (stating that the compliance team led by Defendant Russalesi conducts an "exhaustive review" to ensure "no regulatory compliance issues"). Even if certain challenged statements are opinions, they are false if they do not "fairly align[] with the information in the issuer's possession at the time." *Energy Transfer,* 532 F. Supp. 3d at 212. Here, as further detailed in §V, Plaintiffs sufficiently allege that the information in Defendants' possession did not "fairly align[]" with the statements. *Id.* By contrast, in *Tanaskovic v. Realogy Holdings Corp.*, the case Defendants rely on, plaintiffs were unable to "point to specific facts that demonstrate that Defendants lacked a reasonable basis for their opinions." 2021 WL 211049, at *20 (D.N.J. Jan. 21, 2021).[10] Here, as discussed further in §V, Plaintiffs do allege that Defendants knew, or were reckless in not knowing, of illicit billing practices that contradicted any opinions about the strength of the compliance program and internal controls.

## V.     THE COMPLAINT PROPERLY PLEADS SCIENTER

At the pleading stage, a plaintiff is required to allege facts supporting a strong inference of scienter, but the inference need not be "irrefutable, i.e., of the 'smoking-gun' genre, or even the 'most plausible of competing inferences[.]'" *Tellabs*, 551 U.S. at 324. Plaintiffs can use circumstantial evidence "including the importance of a particular matter to the business, meetings and conversations the individual was alleged to be part of, and the day-to-day responsibilities of that individual." *Energy Transfer*, 532 F. Supp. 3d at 228. The Court's scienter analysis "will ultimately rest not on the presence or absence of certain types of allegations but on a practical judgment about whether, accepting the whole factual picture painted by the Complaint, it is at least

---

[10]  *See also* MTD at 22 (citing *In re Lottery.com, Inc. Sec. Litig.*, 2024 WL 454298, at *27 (S.D.N.Y. Feb. 6, 2024) (no allegation of omission that would "conflict with what a reasonable investor would take from the statement itself"); *In re SAIC, Inc. Sec. Litig.*, 2013 WL 5462289, at *11 n.6 (E.D.N.Y. Sept. 30, 2013) (same); *Cognizant*, 2018 WL 3772675, at *25-26 (same)).

likely as not that defendants acted with scienter." *Avaya,* 564 F.3d at 269.

Defendants disregard this standard by dismembering and analyzing Plaintiffs' scienter allegations independently. This strategy has been rejected by the Third Circuit. *Avaya,* 564 F.3d at 272 ("[I]t is the composite picture, not the isolated components, that judges must evaluate in the last instance."). Plaintiffs' numerous scienter allegations, which are summarized at ¶¶270-353 of the Complaint, together give rise to a strong inference of scienter.

### A.    The Individual Exchange Act Defendants Acted with Knowledge or Reckless Disregard of the Falsity of Their Statements

The Complaint contains ample allegations that each of the Individual Defendants "either knew at the time that [their] statements were false or was reckless in disregarding the obvious risk of misleading the public." *Avaya,* 564 F.3d at 272.

**Executive-Level Weekly Meetings**. Defendants Griggs, Parnes, and Russalesi, as well as other executives, met at least weekly with HR executives and discussed rampant employee complaints that, beginning in August 2020, inundated the HR Department. These discussions covered AdaptHealth's unrealistic sales quotas, improper sales tactics that amounted to "insurance fraud," and integration failures. ¶¶76-81, 149-51. *See Phoenix Ins. Co., Ltd. v. ATI Physical Therapy, Inc.*, 690 F. Supp. 3d 862, 891 (N.D. Ill. 2023) (crediting FE account that senior HR executives would have likely informed the CEO and CFO defendants of undisclosed attrition problems). This information directly contradicted Defendants' statements and is sufficient to establish their scienter. *See City of Warwick Ret. Sys. v. Catalent, Inc.*, 2024 WL 3219616, at *13 (D.N.J. June 28, 2024) (scienter where Defendants informed employees were engaging in fraudulent accounting practices to meet revenue targets).

**Intimate Involvement By Executive Direct Reports.** Ten FEs recounted how they complained about unrealistic revenue targets, improper billing practices, and integration failures

to AdaptHealth management, including Hector Mendoza (Vice President of Inside Sales), Jim Vainio (Regional Vice President of Operations), and Kevin Wood (Vice President of Operations)—each of whom reported to Defendants Carson and Griggs. ¶¶270-271. These allegations are highly probative of scienter, because it would be "exceedingly strange" for high-level executives to know of wide-spread failures while the Individual Defendants were in the dark. *ATI*, 690 F. Supp. 3d at 891.

Defendants argue that Plaintiffs fail to allege what precisely was said to the Individual Defendants and their deputies and when. MTD at 27-28. But there is no need at the pleading stage to have "a fly on every relevant wall" and provide such minutiae where, as here, Plaintiffs have connected the adverse information to Defendants in a "persuasive way." *See Oklahoma Firefighters Pension & Ret. Sys. v. Six Flags Ent. Corp.*, 58 F.4th 195, 216 n.18 (5th Cir. 2023) (crediting employee's allegations that he supplied adverse reports to his supervisors who reported to the defendants); *see also ATI*, 690 F. Supp. 3d at 892 (accepting scienter allegations even though plaintiffs did not allege the "exact timing of each event or fact described"). Here, multiple FEs informed high-level employees who reported to the Defendants. That is sufficient to plead scienter. *In re St. Paul Travelers Sec. Litig. II*, 2006 WL 2735221, at *4 (D. Minn. Sept. 25, 2006) (pervasiveness of misconduct and senior executives' access to reports of misconduct showed scienter).

Defendants' cases are distinguishable as they do not involve repeated reports of widespread failures to high-level executives who reported to the defendants. *See, e.g.*, *In re Loewen Grp. Inc.*, 2003 WL 22436233, at *18 (E.D. Pa. July 16, 2003) (no scienter where, unlike here, a single regional manager encouraged fraudulent sales practices); *Rahman v. Kid Brands, Inc.*, 2012 WL 12294490, at *13 (D.N.J. Oct. 17, 2012) (confidential witnesses were not knowledgeable of the

alleged misconduct); *In re Ascena Retail Grp., Inc. Sec. Litig.*, 2022 WL 2314890, at *10 (D.N.J. June 28, 2022) (defendants were not informed of improper goodwill valuation); *Wyche v. Advanced Drainage Sys., Inc.*, 2017 WL 971805, at *15 (S.D.N.Y. Mar. 10, 2017) (managers did not ask employees to engage in fraud); *In re Adolor Corp. Sec. Litig.*, 616 F. Supp. 2d 551, 573 (E.D. Pa. 2009) (employees did not report results of failed study up the chain). Unlike these cases, AdaptHealth's HR was flooded with employee complaints, which is corroborated by ten former AdaptHealth employees who reported fraud and integration failures to senior management.

**Unrealistic Sales Quotas Imposed By Senior Management**. The Complaint alleges AdaptHealth management pressured employees to meet unrealistic sales goals as additional strong evidence of scienter. FEs 2, 3, 5, 6, and 12 were pressured by Carson's and Griggs' direct reports to meet sales goals by resorting to improper practices. ¶¶82, 83, 86, 102, 103, 125, 127. Further, FEs 2, 3, and 5-13 all recounted how management specifically instructed and trained them to meet month-end revenue targets by altering telephone scripts (¶86), instructing employees to use improper codes (¶¶95, 97, 100, 101), or training employees to circumvent documentation requirements or ship unwanted products (¶¶86, 111, 113, 116, 117, 119, 123, 128). *See In re Marsh & Mclennan Cos., Inc. Sec. Litig.*, 501 F. Supp. 2d 452, 482 (S.D.N.Y. 2006) (non-speaking senior managers' involvement in fraud strongly supported scienter).

Courts throughout the country routinely find scienter where, as here, multiple FEs allege that upper management set unrealistic revenue targets that could only be met through improper sales tactics. *See San Antonio Fire & Police Pension Fund v. Dentsply Sirona Inc.*, 2024 WL 1898512, at *10 (S.D.N.Y. May 1, 2024) (scienter where employees were pressured to meet unrealistic goals by upper management); *In re CenturyLink Sales Practices & Sec. Litig.*, 403 F. Supp. 3d 712, 730-31 (D. Minn. 2019) (same); *Lowry v. RTI Surgical Holdings, Inc.*, 532 F. Supp.

3d 652, 661-62 (N.D. Ill. 2021) (same); *see also In re Wells Fargo & Co. S'holder Deriv. Litig.*, 282 F. Supp. 3d 1074, 1082, 1099-1100 (N.D. Cal. 2017) (imposition of strict sales quotas and close tracking by company established scienter when fraud was pervasive). Here, Defendants' unrealistic sales targets, coupled with their access to reports of widespread illicit sales practices, creates an overwhelming inference of scienter. Defendants do not respond to these allegations.

**Defendants' Admissions Of Their Direct Involvement.** The Individual Defendants admitted that they accessed and reviewed information underlying their statements. *See Urban Outfitters*, 103 F. Supp. 3d at 653 (defendants' "leadership role" in affected operations supported scienter); *City of Warwick*, 2024 WL 3219616, at *14 (same). AdaptHealth's financial reports and SOX certifications stated that Defendants McGee, Griggs, Parnes, Clemens, and the "corporate office" were responsible for the compliance, revenue cycle, and internal control functions. ¶¶233, 290. *Lord Abbett Affiliated Fund, Inc. v. Navient Corp.*, 2019 WL 351260, at *13-14 (D. Del. Jan. 29, 2019) (SOX certifications added to a strong inference of scienter). Defendant Russalesi stated that the "executive leadership team" (*i.e.*, McGee, Griggs, Parnes, Clemens, Rietkerk and Carsons) oversaw compliance and accessed "real time" audit results and billing trends. ¶¶290-292. *CenturyLink*, 403 F. Supp. 3d at 730-31 (scienter where defendants claimed to have access to "real time" data). Moreover, Carsons added that Russalesi and her team did an "exhaustive review" of every claim "to make sure there are no regulatory compliance issues." ¶293. *See Wu*, 2024 WL 3163219, at *27 (finding scienter where defendants claimed they had reviewed reports that contradicted their statements to investors). When such allegations are considered with the rampant employee complaints reported by FEs, Defendants either reviewed the compliance data and purposefully misled investors, or they recklessly ignored it.

Defendants McGee, Griggs, and Clemens also oversaw the remediation of material

weaknesses with respect to internal reporting and knew that AdaptHealth had not implemented effectively—or at all—the systems-wide billing and audit systems that they touted to investors. ¶¶274-84. *See Lowry*, 532 F. Supp. 3d at 661-62 (scienter where defendants were the "the key personnel responsible for designing and maintaining [company's] internal controls," which they later admitted were deficient); *see also Luna v. Marvell Tech. Grp.*, 2017 WL 2171273, at *5 (N.D. Cal. May 17, 2017) (implementation of "trainings for executives" about financial controls indicated executives were aware of wrongdoing). Similarly, Defendants undertook sweeping reforms, establishing an "executive steering committee," adding professionals to the executive team, and engaging a third party to assist management. ¶283.

Defendants argue that remediating material weaknesses cannot support scienter as a matter of law. MTD at 29. Yet they do not cite a single case to support that proposition, which contravenes the requirement to consider "all of the facts alleged" in a holistic analysis. *Tellabs*, 551 U.S. at 322-23. Defendants' cases merely state that knowledge of irrelevant problems does not support scienter. *See Ascena*, 2022 WL 2314890, at *9-10 (problems at company unrelated to defendants' public statements); *see also Suprema*, 438 F.3d at 282 (outside directors did not have access to information showing improper revenue recognition).

**Repeated And Direct Analyst Questions**. Defendants McGee, Parnes, and Griggs repeatedly made false statements in response to direct analyst inquiries. ¶¶295-303. In *Avaya*, the Third Circuit determined that a "strong inference" of scienter had been established in part because "specific" and "focused" questions from market analysts about a major issue were put "directly and repeatedly" to a company executive. 564 F.3d at 269-70; *see also, e.g.*, *Urban Outfitters*, 103 F. Supp. 3d at 653 ("In the context of specific inquiries . . . defendants' omission of actual circumstances that were contrary to their answers presents an obvious risk of misleading

investors."). Here, investors repeatedly asked McGee, Parnes, and Griggs about the integration of AdaptHealth's acquisitions, the deployment of claims processing technology, and the sustainability of its diabetes business revenue growth. *E.g.*, ¶¶297-301. Defendants either knew about and intentionally omitted AdaptHealth's improper billing practices and integration failures, or they were severely reckless and failed to inform themselves about topics they knew were of investor concern, while still responding to analyst questions.

Defendants misread the Complaint, claiming that it alleges that Defendants knew their statements were false simply because Defendants made them. MTD at 32. This is not what Plaintiffs allege, and Defendants' argument ignores controlling Third Circuit law that the context and content of the statements is "powerful evidence" of scienter. *Avaya*, 564 F.3d at 269. Defendants' cases do not say otherwise. *See In re Intelligroup Sec. Litig.*, 527 F. Supp. 2d 262, 285 (D.N.J. 2007) (no direct statements to analysts); *City of Roseville Emps.' Ret. Sys. v. Horizon Lines, Inc.*, 686 F. Supp. 2d 404, 423 (D. Del. 2009) (defendants did not have access to adverse information); *Ascena*, 2022 WL 2314890, at *10 (same).

**Core Operations**. Defendants' statements concerning AdaptHealth's compliance with applicable billing regulations and the integration of acquisitions were "core operations" critical to the success of the Company and, along with other allegations of knowledge, further supports scienter. ¶¶304-306; *see In re Dr. Reddy's Lab'y Ltd. Secs. Litig.*, 2019 WL 1299673, at *17 (D.N.J. Mar. 21, 2019) ("ensuring compliance with safety and manufacturing quality standards" was a core operation); *Urban Outfitters*, 103 F. Supp. 3d at 653-54 ("[M]isstatements and omissions made on core matters of central importance to the company and its high-level executives gives rise to an inference of scienter[.]").

Defendants barely challenge these allegations, incorrectly characterizing the core

42

operations doctrine as an impermissible "generalized imputation of knowledge." MTD at 32. They quote *Suprema*, 438 F.3d at 282, which does not address the core operations doctrine at all. Defendants' only other case, *In re Eros Int'l PLC Sec. Litig.*, 2021 WL 1560728 (D.N.J. Apr. 20, 2021), runs counter to Third Circuit precedent to the extent it requires allegations that Defendants received specific information. *See, e.g.*, *Toronto-Dominion*, 2018 WL 6381882, at *17 (in *Avaya*, "the Third Circuit . . . allowed the core operations doctrine to support scienter even though no CW statement or particular document showed a defendant's knowledge").

**Magnitude And Pervasiveness Of The Fraud.** The sheer magnitude and pervasiveness of the AdaptHealth's illicit billing practices supports scienter. ¶¶313-316; *See e.g.*, *In re Teva Sec. Litig.*, 671 F. Supp. 3d 147, 215 (D. Conn. 2023) (scienter where allegations of fraud showed "widespread company strategy"); *Marsh & Mclellan*, 501 F. Supp. 2d at 482 (the pervasiveness of fraudulent activity supports scienter); *In re Countrywide Fin. Corp. Deriv. Litig.*, 554 F. Supp. 2d 1044, 1058-59 (C.D. Cal. 2008) (scienter established when witness accounts tell "the same story . . . from markedly different angles" of a companywide culture of encouraging misconduct); *Ascena*, 2022 WL 2314890, at *10 (magnitude of the fraud is "a valid factor" in the scienter analysis). Here, multiple sources including FEs and reimbursement data from state Medicaid programs show that at ***every major acquisition***, in locations throughout the country, 25-80% of all orders were improperly billed. ¶¶313-316. In one location, Medicaid data shows that as many as 97% of diabetes monitors were billed using improper codes that inflated revenue. ¶314. AdaptHealth also received two separate suspensions from CMS, including one during the Class Period, in which the agency found there were "credible allegations of fraud" against AdaptHealth. Exs. 59 and 60. At best, Defendants recklessly turned a blind eye to these improper practices.

In response, Defendants improperly attack the factual underpinnings of Plaintiffs' claims.

However, while Defendants claim falsely that the Complaint only provides Plaintiffs' "opinions," they do not contend Plaintiffs misrepresented the data, which includes FE accounts and data from four Medicaid payors. arguing that the Complaint presents "only" four Medicaid payors' data. MTD at 29. Notably, Defendants do not contend Plaintiffs misrepresented the data. Moreover, plaintiffs are not required to "plead detailed evidentiary matter." *See, e.g.*, *In re Niaspan Antitrust Litig.*, 42 F. Supp. 3d 735, 753, 756 (E.D. Pa. 2014). Particularly pre-discovery, when Plaintiffs are reliant on FOIA requests and other public information, Plaintiffs' allegations—in combination with fifteen firsthand FE accounts from across the nation, *see supra* pp. 9-14—adequately support the breadth of the illicit billing practices and are not opinions. *See, e.g.*, *Lowry*, 532 F. Supp. 3d at 661 (finding illicit sales practices were "commonplace" based on reports from three witnesses).

**Regulatory Actions**. Defendants were on notice of improper billing practices and automated technology failures through a DOJ enforcement action, a private class action, and multiple CMS investigations. ¶¶307-321; Exs. 59-60. Defendants again complain that none of these actions involved the diabetes business segment (MTD at 31-32), which again ignores the fact that Complaint is not limited to the diabetes segment. *See supra* pp. 32-33.

**Incentive Payments.** Defendants McGee, Clemens, Griggs, Parnes, and others were financially motivated to pursue acquisitions at minimal cost to AdaptHealth, sacrificing effective compliance and successful integration. ¶¶324-330. In addition, executives like Mendoza were paid "huge six figure bonuses" to hit revenue targets by any means necessary. ¶78. While not required to establish scienter (*Tellabs*, 551 U.S. at 325), such "personal and concrete" benefits add to the scienter inference. *See Springer v. Kilhefner*, 2019 WL 3816839, at *5 (E.D. Pa. 2019) (defendants' $175,000 interest in loan that was subject of misstatement added to inference of scienter); *Six Flags*, 58 F.4th at 215 (earnings incentive supported scienter); *see also Pelletier v.*

44

*Endo Int'l PLC*, 439 F. Supp. 3d 450, 468 n.7 (E.D. Pa. 2020) (defendant's motivation to close acquisitions was "relevant to the Court's holistic review of the scienter allegations").

Defendants wrongly argue that the bonuses were unrelated to sales goals or AdaptHealth's diabetes business. MTD at 30 (citing*, e.g.*, *In re Loewen Grp. Inc.*, 2003 WL 22436233, at *18 (E.D. Pa. July 16, 2003) (generic allegations regarding compensation do not support motive)). The Complaint specifically tethers Defendants' compensation to the goals of acquiring companies, while spending as little as possible on compliance and integration. ¶¶324-330. Moreover, managers were "super incentivized" to engage in illicit sales practices to meet sales quotas. ¶78.

**Sudden Executive Departures.** Defendant Griggs' sudden departure supports his culpability. Defendants contend that Plaintiffs do not connect Griggs departure to any of the Individual Defendants' knowledge of the illicit billing practices or any of the misstatements. MTD at 30-31. But that is not the standard. Generally, "[t]he departure of corporate executive defendants is a factor that can strengthen the inference of scienter" where allegations suggest the executive's involvement in the fraud. *In re Hertz Global Holdings, Inc.*, 905 F.3d 106, 118 (3d Cir. 2018). Here, the Complaint alleges that Griggs had knowledge of the fraud (¶¶77-80, 272), and his departure came after disappointing results from the diabetes business due to illicit billing practices that drove customers to competing channels. ¶¶322-23. *See CenturyLink*, 403 F. Supp. 3d at 730 ("in the context of other evidence and coupled with evidence of timing," executive resignation helped establish scienter). Thus, Griggs' departure adds to the overall inference of scienter.[11]

### B.    The Complaint Properly Pleads Scienter Against AdaptHealth

Defendants argue that Plaintiffs have failed to allege scienter as to AdaptHealth. MTD at

---

[11] In *Laasko v. Endo Int'l, PLC*, unlike here, the resignation was long after negative news and there was no allegation tying executive to the fraud. 2022 WL 3444038, at *8 (D.N.J. Aug. 17, 2022).

32. But Defendants' argument immediately falls apart "because a corporation is liable for statements by employees who have apparent authority to make them." *Avaya*, 564 F.3d at 252 (quoting *Tellabs II*, 513 F.3d at 708). Here, the Individual Defendants made actionable statements in their employment and therefore their scienter can be imputed to AdaptHealth. *Id.* In addition, employees who engaged in the fraudulent scheme to boost AdaptHealth's revenue also establishes the Company's scienter. *See, e.g.*, *In re Cognizant Tech. Solutions Corp. Sec. Litig.*, 2020 WL 3026564, at *27 (D.N.J. June 5, 2020) (corporate scienter where non-speaking employee falsified orders that altered the company's financial statements). Here, *inter alia*, senior managers Mendoza, Vainio, and Woods allowed and encouraged employees to engage in illicit billing practices to boost the Company's reported revenues.

Defendants do not disagree but instead incorrectly argue that there can be no corporate scienter because the alleged billing practices were not sufficiently pervasive. MTD at 33. But this is wrong because Plaintiffs have alleged that the illicit practices were pervasive and known to management. *See supra* §V. Defendants' cases are inapposite. *See City of Roseville Emps.' Ret. Sys. v. Horizon Lines, Inc.*, 442 F. App'x 672, 676 (3d Cir. 2011) (insufficient allegations that individuals engaged in a scheme); *Rahman v. Kid Brands, Inc.*, 736 F.3d 237, 246 (3d Cir. 2013) (management was not aware of customs violations).

## VI.   PLAINTIFFS HAVE SUFFICIENTLY PLED LOSS CAUSATION

### A.   Corrective Disclosure Events Corrected Defendants' Misrepresentations.

To plead loss causation, Plaintiffs must simply provide the defendants with notice of the relevant economic loss and "what the causal connection might be between that loss and the misrepresentation." *Energy Transfer*, 532 F. Supp. 3d at 239. There is no heightened pleading standard, and Rule 8 "requires only a short and plain statement of the claim showing that the pleader is entitled to relief." *Id*. at 239. Thus, "the issue of causation is usually reserved for the

trier of fact." *Urb. Outfitters*, 103 F. Supp. 3d at 655.

Defendants misstate the law in several respects. For one, there is no need to quantify losses at the pleading stage, as Defendants argue. MTD at 15 n.24. *See, e.g.*, *In re BofI Holding, Inc. Sec. Litig.*, 977 F.3d 781, 788 (9th Cir. 2020) (economic loss adequately alleged where shareholders alleged stock lost half of its value). Further, corrective disclosures need not "mirror" earlier misrepresentations. *Energy Transfer*, 532 F. Supp. 3d at 239. A decline in performance that is tied to the subject of the alleged misstatements can constitute a corrective disclosure. *See Wilmington Tr.*, 29 F. Supp. 3d at 450 (loss causation alleged where defendant issued "press release revealing a large quarterly loss"); *Mineworkers' Pension Scheme v. First Solar Inc.*, 881 F.3d 750, 754 (9th Cir. 2018) (loss causation based on earnings miss). Finally, contrary to Defendants' claims (MTD at 35), a fraud can be revealed through a "a series of partial corrective disclosures." *See Vanderhoef v. China Auto Logistics Inc.*, 2020 WL 5105243, at *4 (D.N.J. Aug. 31, 2020).[12]

Here, Plaintiffs allege five corrective disclosures that gradually revealed the truth and more than meet the Rule 8 standard. ¶¶331-38; *see supra* II.E.

**March 1, 2022**: AdaptHealth's 2021 annual Form 10-K revealed that "substantially all processes" supporting its financial reporting, including compliance, audit, and billing software, suffered from significant control weaknesses. ¶¶167-179. AdaptHealth's common stock dropped 12% in response. ¶¶177, 332.

**February 27, 2023**: AdaptHealth's full-year 2022 results were significantly below guidance and revealed a ballooning accounts receivable ("AR") reserve, reflecting the fact the fact that insurers like Medicare and Medicaid would not reimburse improperly billed claims. ¶¶180-

---

[12] *Anderson v. Stonemor Partners, L.P.* does not support the proposition that all post-disclosure events are inactionable (MTD at 17) as there, unlike here, plaintiffs "concede[d] that no information was concealed" after the first disclosure. 296 F. Supp. 3d 693, 703 (E.D. Pa. 2017).

82. Analysts recognized the significance of the AR increase, with Deutsche Bank connecting the disclosure to "issues *like over reimbursement on CGM from Medicaid*." ¶182. AdaptHealth's common stock dropped 31% in response. ¶¶187, 332.

**March 3, 2023**. RBC analysts revealed that management had shared with RBC that the Company's revenue and earnings miss announced days earlier was attributable to continued "material weaknesses" in the Company's internal controls, partially correcting statements about compliance, technology, internal controls, and the risks facing the Company. ¶¶189-90. AdaptHealth's common stock dropped another 6% in response. ¶¶190, 332.

**May 9, 2023**. The Company disclosed first quarter 2023 weaker-than-expected diabetes growth and Defendant Griggs' resignation. Analysts saw the signs as news that patients were switching from AdaptHealth to other channels and that Grigg's resignation was a sign of issues at the Company. ¶¶195-96. AdaptHealth's common stock dropped 6% in response. ¶¶197, 332.

**November 7, 2023.** AdaptHealth wrote down hundreds of millions of dollars in "goodwill" accumulated from its acquisitions, resulting in a net loss of over $400 million. ¶¶198-203. On this final alleged disclosure, AdaptHealth's common stock dropped 9.9% on November 7 and 15.5% on November 8, from $8.45 to $6.50. ¶¶202, 332.

### B.    Defendants' Loss Causation Arguments Are Unavailing

Each of Defendants' challenges to loss causation fail. *First*, Defendants claim that Plaintiffs' disclosures "did not reveal the falsity of [the alleged misstatements]," insisting that the disclosures must "*actually* disclose the *very* information allegedly concealed." MTD at 34-35 n.42 (emphasis in original). Defendants misstate the law and the facts. As an initial matter, a "***corrective disclosure only needs to relate to the same subject as the misrepresentation*** and there is no requirement that the disclosure mirror the earlier misrepresentation." *Eros*, 2021 WL 1560728, at *15. Further, each of the alleged corrective disclosures deal with the same subject matter as the

misrepresentations. *See* ¶¶169-70 (KPMG's March 2, 2022 internal controls report flagged "implicit price concessions" from third-party payors); ¶183 (Griggs' February 27, 2023 concession that the Company was "under pressure from payer mix, essentially lower price points depending on the payer"); ¶¶189-90 (March 3, 2023 RBC report disclosed for the first time that "material weakness" in internal controls had caused earnings miss); ¶¶192-94 (Defendants attributed earnings miss to customers shifting away from AdaptHealth's diabetes products, reflecting exasperation with AdaptHealth's billing practices); ¶¶198-202 (November 7, 2023 $511.9 million goodwill write-down, a direct result of the "business acquisitions the Company has made").[13]

Defendants also ignore the analyst reaction, indicating the alleged disclosures corrected earlier misrepresentations. *See Westley v. Oclaro, Inc.*, 897 F. Supp. 2d 902, 932 (N.D. Cal. 2012) (crediting analyst reports connecting stock price drop to the subject of the misrepresentations).

**Second**, Defendants argue that the disclosures "did not consist of any new information." MTD at 36. Defendants first argue the Capitol Forum investigative reports revealed the fraud in November 2022 and, second, that the March 3, 2023 RBC report merely repeated already public information. *Id.* This argument, known as the "truth on the market" defense, is "intensely fact-specific and is rarely an appropriate basis for dismissing a § 10(b) complaint." *Roofer's Pension Fund v. Papa*, 2018 WL 3601229, at *9 (D.N.J. July 27, 2018). Defendants must "demonstrate that any such corrective information had been conveyed to the public with a degree of intensity

---

[13] Defendants' cases are readily distinguishable. *See, e.g.*, *In re Intelligroup Sec. Litig.*, 527 F. Supp. 2d 262, 326 (D.N.J. 2007) (losses attributable to "errors committed prior to the Class Period"); *In re Aurora Cannabis Inc. Sec. Litig.*, 2023 WL 5508831, at *4 (D.N.J. Aug. 24, 2023) (no allegations that disclosures related to actionable misstatements); *Nat'l Junior Baseball League v. Pharmanet Dev. Grp. Inc.*, 720 F. Supp. 2d 517, 561 (D.N.J. 2010) (no allegation that fraudulent practices caused the alleged corrective contract cancellations); *Payne v. DeLuca*, 433 F. Supp. 2d 547, 611 (W.D. Pa. 2006) (wrongdoing was revealed two months after plaintiff's losses); *In re Tellium, Inc. Sec. Litig.*, 2005 WL 2090254, at *4 (D.N.J. Aug. 26, 2005) (stock drop "coincide[d] with a marketwide phenomenon causing comparable losses to other investors").

and credibility sufficient to counter-balance effectively any misleading information created by the alleged misstatements." *Energy Transfer*, 532 F. Supp. 3d at 241. They fall far short.

As for the Capital Forum reports, there is no evidence they were disseminated widely or counteracted the misstatements. Unlike Defendants' false statements, the reports were distributed behind a paywall to the small universe of Capital Forum subscribers. ¶85. Notably, Defendants could not even obtain the reports except through Plaintiffs. *See* Exs. 55-56 (under seal); *Puddu v. 6D Glob. Techs., Inc.,* 2021 WL 1198566, at *7 (S.D.N.Y. Mar. 30, 2021) ("isolated news articles published before the start of the Class Period" did not counterbalance misrepresentation).

The RBC report revealed to the market—for the first time—management's admission to RBC that the lack of visibility causing the February 27, 2023 earnings miss was tied to "material weaknesses in the company's control environment," which, unlike the revelation of the Capitol Forum reports, caused AdaptHealth's stock price to dive almost six percent. ¶¶189-90.[14] Defendants do not identify any information in this disclosure that had already been made public.

**Finally,** Defendants claim that certain of the disclosures lack a "plausible connection to any stock decline," which "coincided with other developments." MTD at 36-37.[15] But "[a]t the motion to dismiss stage, Plaintiffs do not need to explain why other market forces did not affect the share price." *Eros*, 2021 WL 1560728, at *15. Notably, Defendants do not even attempt to

---

[14] The cases Defendants cite in support of this argument are distinguishable: In *Lau v. Opera Ltd.*, the alleged disclosure "merely analyzed" public data. 527 F. Supp. 3d 537, 560 (S.D.N.Y. 2021). Similarly, in *In re MINISO Grp. Holding Ltd. Sec. Litig.*, the disclosing report itself stated it "did not disclose any new facts." 2024 WL 759246, at *20 (S.D.N.Y. Feb. 23, 2024).

[15] Once again, Defendants' cases are distinguishable. In *In re Intelligroup Sec. Litig.*, the stock price moved *before* the alleged corrective disclosure. 468 F. Supp. 2d 670, 695 (D.N.J. 2006). In contrast, Defendants acknowledge the drops happened shortly after the disclosures. MTD at 36-37. In *In re Merrill Lynch & Co. Rsch. Reps. Sec. Litig.*, the stock price fell with "the collapse of the internet sector." 568 F. Supp. 2d 349, 360 (S.D.N.Y. 2008). Defendants do not point to any dramatic intervening event impacting the entire market, or market sector, in this case.

identify any non-fraud related event that could cause the stock price drop.

## VII.    PLAINTIFFS HAVE ADEQUATELY ALLEGED A SCHEME LIABILITY CLAIM AND DEFENDANTS FAILED TO MOVE TO DISMISS THE CLAIM

In addition to Section 10(b) claims based on Rule 10b-5(b) (a "misrepresentation or omission" claim), Plaintiffs have stated a claim based on Rule 10b-5(a) and (c), which is often referred to as a "scheme liability" claim. To state a claim for 'scheme liability' under Rule 10b–5(a) or (c), a plaintiff must allege (1) that the defendant committed a deceptive or manipulative act, (2) in furtherance of the alleged scheme to defraud, (3) with scienter, and (4) reliance." *Cognizant*, 2020 WL 3026564, at *16. Here, Plaintiffs plead "a scheme to defraud investors in violation of Rule 10b-5(a) and (c)," which included multiple deceptive steps in furtherance of their scheme, including "knowingly using older and more expensive billing codes, altering prescriber prescriptions, shipping CGMS that patients did not order, and misleading Medicare patients. ¶352. These illicit billing practices allowed AdaptHealth to book more revenue, and appear more successful, than it otherwise was. *Id*.

Defendants say nothing about Plaintiffs' scheme liability claim and cite no precedent for its dismissal. Given that, and given the strength of the allegations, the claim should stand. *Akil v. City of Philadelphia*, 2024 WL 1252882, at *4 (E.D. Pa. Mar. 22, 2024) (claims survived "because the Defendants failed to address them in their motion to dismiss").

## VIII.    PLAINTIFFS HAVE SUFFICIENTLY ALLEGED SECTION 20(a) CLAIMS

To successfully state a Section 20(a), or control person claim, Plaintiffs must plead that "(1) the defendant controlled another person or entity; (2) the controlled person or entity committed a primary violation of the securities laws; and (3) the defendant was a culpable participant in the fraud. *Energy Transfer*, 532 F. Supp. 3d at 243. As an initial matter, for the reasons stated above, Plaintiffs have successfully pled AdaptHealth committed a primary violation

of the securities laws, and Defendants' contention otherwise (MTD at 37) should be rejected.

**The Exchange Act Defendants**. The Exchange Act Defendants are liable as control persons because each were members of senior management who controlled the operations of the Company (¶39), and took part in the fraud, including by making alleged false statements to the public. *See, e.g.*, ¶¶ 206 (Griggs, McGee, and Clemens signed SEC filings); 213 (Parnes statement); 222-23 (Russalesi and Carson statements); 251 (Rietkerk statement). This is sufficient to state a control person claim. *See Gorlamari v. Verrica Pharms., Inc.*, 2024 WL 150341, at *14 (E.D. Pa. Jan. 11, 2024) (denying motion to dismiss Section 20(a) claim against CEO who "personally made many of the challenged statements"). Thus, Defendants' argument that the Complaint is "silent" on each Defendant's control over AdaptHealth falls flat. MTD at 37, 40.[16]

**Defendant Quasha**. Plaintiffs alleged that Defendant Quasha exercised control over AdaptHealth through his roles as a Director of AdaptHealth's Board and CEO of Quadrant Management, where Defendant McGee was a principal and AdaptHealth was formerly a portfolio company. ¶¶41, 44. AdaptHealth admitted Quasha, through his and his brother Wayne Quasha's interest in the Everest Trust, controlled a substantial portion of AdaptHealth common stock and therefore possessed "significant influence" over the Company. ¶41; *see also* Ex. 6 at 39. Courts have found such allegations sufficient at the pleading stage to establish control. *See In re Franklin Bank Corp. Sec. Litig.*, 782 F. Supp. 2d 364, 380 (S.D. Tex. 2011) (control demonstrated through "ownership of voting securities, by contract, business relationships, interlocking directors, family relations, or the power to influence and control the activities of another"); *Harriman v. E. I. DuPont*

---

[16] None of the cases Defendants cite (MTD at 38 n.44), dismissed Section 20(a) claims against officers who made an alleged misrepresentation and are therefore easily distinguishable. *See, e.g., In re Alstom SA*, 406 F. Supp. 2d 433, 487 (S.D.N.Y. 2005) (dismissing control claims against officers that did not make the alleged misstatements or otherwise participate in the fraud).

*De Nemours & Co.*, 372 F. Supp. 101, 105 (D. Del. 1974) (control "may arise from other business relationships, interlocking directors, family relationships and a myriad of other factors").

Defendants argue that the Section 20(a) claim against Quasha fails because being a director or minority shareholder is insufficient for liability. MTD at 39-40. As an initial matter, Defendants' claim that Quasha's share is inflated (*id*. at 39 n.45) ignores the shares controlled through family-run entities. While Quasha controlled a minority share, this court should not view that in isolation but must consider the "[t]otal effect of the various indicia of control in combination." *In re Leslie Fay Companies, Inc. Sec. Litig.*, 918 F. Supp. 749, 763 (S.D.N.Y. 1996). Defendants' cited cases (MTD at 39-40) concern either the liability of directors *or* minority shareholders, and none of them concerned a defendant, like Quasha, who was: 1) a director; 2) in control over a substantial number of voting shares through various entities; and 3) in control of the company where the corporate defendants' CEO (McGee) was a principal. Taken together, these allegations raise an inference that Quasha had control, and the issue is inappropriate for resolution on a motion to dismiss.

## IX.  PLAINTIFFS HAVE SUFFICIENTLY ALLEGED SECURITIES ACT CLAMS

### A.  Plaintiffs' Claims Are Governed By The Rule 8 Notice Pleading Standard

To state a cause of action under Section 11 of the Securities Act, "plaintiffs must establish that the registration statement, as of its effective date, contained an untrue statement of material fact, omitted a material fact that was required to be stated, or omitted a material fact necessary to make the statement not misleading." *SEB Inv. Mgmt. AB v. Endo Int'l, PLC*, 351 F. Supp. 3d 874, 910 (E.D. Pa. 2018). Further, Section 11 "is virtually an absolute liability statute that does not require allegations of scienter." *Id.* Where, as here, a complaint "affirmatively pleads negligence, not fraud," the heightened pleading standard under Rule 9(b) does not apply. *Id.* Because Plaintiffs have clearly disclaimed any allegations of fraud, the notice pleading standard of Rule 8 applies to Plaintiffs' claims. *See Suprema*, 438 F.3d at 273.

Defendants admit that Plaintiffs have "undertaken great lengths to disclaim any connection between the Securities Act Claims and the Exchange Act Claims." MTD at 44. They nevertheless argue that the Rule 9(b) standard applies to Plaintiffs' Securities Act claims, because the claims rely on the same misstatements and underlying conduct to establish falsity as the Section 10(b) claims. MTD at 44. This argument has been expressly rejected by the Third Circuit, which allows Plaintiffs to plead Section 11 claims under Rule 8 even where Plaintiffs "repeat and reallege" allegations from Section 10b claims as long as Plaintiffs expressly disclaim allegations of fraud or intentional or reckless misconduct. *See Suprema*, 438 F.3d at 273 n.6 (rejecting Defendants argument that Section 11 and 12 claims "sound in fraud" where, as here, plaintiffs segregate such claims from claims under Section 10(b)); *Endo*, 351 F. Supp. 3d at 910 (evaluating Section 11 claims based on "same misrepresentations and omissions" alleged actionable under Section 10(b) under Rule 8 where the Securities Act section "affirmatively pleads negligence, not fraud").

Defendants rely on *Cal. Pub. Emps. Ret. Sys. v. Chubb Corp.*, 394 F.3d 126, 158 (3d Cir. 2004) ("*CALPERS*"), but the Third Circuit explained that—unlike here—the plaintiffs in *CALPERS* failed to "expressly [plead] negligence in connection with their Section 11 and 12(a)(2) claims." *Suprema,* 438 F.3d at 272 ("In *CALPERS*, we subjected the plaintiff's pleading to the strictures of Rule 9(b) because the complaint was 'completely devoid of any allegations that Defendants acted negligently.'"); *see contra, e.g.*, ¶¶406, 414, 418 (Securities Act claims are "are based exclusively on strict liability and negligence").[17]

---

[17] Defendants' other cases are easily distinguishable because plaintiffs in each case failed to allege negligence. *See In re Bare Escentuals, Inc. Sec. Litig.*, 745 F. Supp. 2d 1052, 1068 (N.D. Cal. 2010); *Rubke v. Capitol Bancorp Ltd.*, 551 F.3d 1156, 1161 (9th Cir. 2009) (no separate allegations that defendants acted negligently); *Rigel Pharms., Inc. Sec. Litig. v. Deleage*, 697 F.3d 869, 885-86 (9th Cir. 2012) (same); *In re Vonage IPO Sec. Litig.*, 2009 WL 936872, at *5-7 (D.N.J. Apr. 6, 2009) (unlike here, Section 11 claims "allege[d] intentional, knowing, or reckless conduct").

### B.    Plaintiffs Have Sufficiently Traced Their Shares To The SPO

Under well-established Third Circuit law, plaintiffs may allege that their purchases of stock were "in or traceable" to the relevant stock offering, without providing additional detail. *Suprema*, 438 F.3d at 274 n.7 (assertions of purchases "in" and "traceable to" secondary stock offerings were sufficient at the pleading stage). Plaintiffs allege that Plaintiffs ACERS and Tallahassee purchased shares in the SPO, the number of shares purchased, and that they purchased their shares from Underwriter Defendant Jefferies.[18]  ¶¶371-72. Plaintiffs also alleged that they purchased their shares on the offering date of January 6, 2021 at the offering price of $33 per share. *See* ECF No. 17-3 at 3, 9. Those allegations far surpass the Third Circuit's pleading requirement.[19]

Defendants claim that *Suprema* has been abrogated by the Supreme Court. MTD at 42 n.49. But courts in this circuit have rejected such arguments. *See Vrakas v. United States Steel Corp.*, 2018 WL 4680314, at *15 n.14 (W.D. Pa. Sept. 29, 2018) (holding that *Suprema* is "controlling" and noting that Supreme Court precedent post-*Suprema* did not dictate a different result). Further,

Moreover, in *Suprema*, the Third Circuit rejected the reasoning in *Rombach v. Chang*, 355 F.3d 164, 172 (2d Cir. 2004) that Rule 9 applies simply because, for example, the complaint alleged a "massive fraud." *Suprema*, 438 F.3d at 272. Similarly, the "examples" of complaints that supposedly "sound in fraud" are unhelpful as none allege negligence beyond the allegations of fraud. MTD at 44 n.52 (citing Exs. 33-36).

[18] The Underwriter Defendants are named as Defendants under Section 12(a)(2). ¶¶446-51. Defendants' sole attack on that claim is that it fails for the same reasons as the Section 11 claim. MTD at 43 n.51. For the reasons set forth above, Defendants' arguments against both claims fail.

[19] These allegations also distinguish cases relied upon by Defendants. *See, e.g.*, *In re Century Aluminum Co. Sec. Litig.*, 729 F.3d 1104, 1106 (9th Cir. 2013) (the complaint "acknowledged that plaintiffs did not buy their shares directly from the underwriters, and none of the plaintiffs bought shares at the offering price of $4.50 per share"); *De Vito v. Liquid Holdings Grp., Inc.*, 2018 WL 6891832, at *17 (D.N.J. Dec. 31, 2018) (aftermarket purchasers "allege[d] only that they purchased stock 'pursuant to and/or traceable to the IPO'"); *Jedrzejczyk v. Skillz Inc.*, 2022 WL 2441563, at *7 (N.D. Cal. July 5, 2022) (plaintiff did "not allege direct purchases from the secondary offering"); *Thomas v. Magnachip Semiconductor Corp.*, 167 F. Supp. 3d 1029, 1055 (N.D. Cal. 2016) (same); *Plichta v. SunPower Corp.*, 790 F. Supp. 2d 1012, 1022 (N.D. Cal. 2011) (same); *Johnson v. CBD Energy Ltd.*, 2016 WL 3654657, at *3 (S.D. Tex. July 6, 2016) (same).

questions of fact like whether the shares were held by DTC in "fungible bulk," MTD at 42 (citing Ex. 41), are improperly raised on a motion to dismiss and must be resolved through discovery. *Suprema*, 438 F.3d at 274 n.7 (whether plaintiffs could trace their shares to the offering could not be resolved on a motion to dismiss).

### C. The Securities Act Claims Alleged Untrue And Misleading Statements

#### 1. The SPO Offering Materials Contained Misstatements

Plaintiffs plead untrue and misleading statements in the SPO Offering Materials. **First**, Plaintiffs plead that the Registration Statement incorporated untrue and misleading revenue statements, including that AdaptHealth reported Second Quarter 2020 revenue of $232.1 million and EBITDA of $42.6 million. ¶¶403-04. Plaintiffs plead that these revenue figures, which AdaptHealth attributed to legitimate processes, were inflated by improper practices such as upcoding, altering prescriptions, and shipping customers supplies they did not order. ¶¶405-10. Those statements are untrue and misleading for the reasons set forth above in §IV.C, and Defendants adopt the same failed arguments.

**Second**, Plaintiffs allege untrue statements regarding AdaptHealth's ability to bill clients accurately. Specifically, the SPO Offering Materials stated that the Company's "revenue cycle management and billing processes . . . are designed to maintain the integrity of revenue and accounts receivable," that the platform "improved compliance, and automated, integrated workflow." ¶¶411-412. Defendants also stated that the platform allowed "for timely onboarding of acquisitions." ¶412. These statements were untrue and misleading, as AdaptHealth's systems enabled practices like upcoding, altering prescriptions, and shipping customers supplies they did not order, and AdaptHealth otherwise failed to integrate acquisitions. ¶413; *see supra* §IV.E.

**Third**, Plaintiffs plead misstatements in incorporated SOX Certifications signed by Defendants McGee and Clemons. For each incorporated certification, they represented that: 1) the

56

"report does not contain any untrue statement of a material fact" (or omit material facts); and 2) that they had designed AdaptHealth's internal controls to "provide reasonable assurance regarding the reliability of financial reporting and the preparation of the financial statements for external purposes in accordance with generally accepted accounting principles." ¶415. Those statements are untrue and misleading for the reasons set forth in §IV.G.

**Fourth**, the SPO Offering Materials trumpeted AdaptHealth's ability to "execute upon acquisitions," and claimed that it expected these acquisitions will be a "source of continued growth for AdaptHealth." ¶419. Those statements are untrue and misleading for the reasons set forth in § IV.E, as AdaptHealth failed to merge billing systems and gutted compliance processes.

**Finally,** the SPO Offering Materials discussed "risks" to the Company, treating such risks as AdaptHealth lacking the "ability to manage the complex and lengthy reimbursement process" as hypothetical and contingent risks when, in fact, those risks had already materialized. ¶¶422-23. For the reasons discussed in §IV.F above, those statements were untrue and misleading.

Defendants' Section 11 arguments largely mirror their arguments regarding the Section 10(b) statements and doubly fail here, where particularized pleading is not required. Defendants first argue that the claim fails because there was "no voluntary obligation for AdaptHealth" to disclose its misconduct. MTD at 45. But is well established that "[a]n issuer of a registration statement is liable not only for a misrepresentation of a material fact, but also for an omission of a material fact necessary to make statements not misleading." *Endo*, 351 F. Supp. 3d at 910.

For example, Plaintiffs do not allege that Defendants failed to disclose "uncharged wrongdoing and/or internal personnel matters" (MTD at 45); Plaintiffs allege, among other things, that Defendants' failure to disclose the illicit practices made Defendants' statements materially misleading. *In re Sotheby's Holdings, Inc.*, 2000 WL 1234601, at *4 (S.D.N.Y. Aug. 31, 2000)

(rejecting an argument like Defendants' because the duty to make statements complete and accurate "exists even where the omitted information relates to allegedly illegal conduct").[20]

Defendants next argue that the SPO Offering Materials were not actionable because they "accurately described the relevant [incorporated] SEC filing." MTD at 45-46. But misstatements in SEC filings incorporated in the SPO Offering Materials are actionable under the Securities Act as if they were restated in full in the SPO Offering Materials. *See In re Merck & Co., Inc. Sec., Derivative, & ERISA Litig.*, 2011 WL 3444199, at *37-38 (D.N.J. Aug. 8, 2011) (refusing to dismiss Securities Act claims where offering materials "contained materially false and misleading statements, including statements incorporated by reference from other . . . public filings").

To the extent that the statements were opinions (MTD at 46), opinions are actionable under Section 11 if "the facts embedded within the opinion are untrue" or if the "registration statement omits material facts about the issuer's inquiry" that "conflict with what a reasonable investor would take from the statement itself." *Endo*, 351 F. Supp. 3d at 911. Here, Defendants' statements, such as AdaptHealth had "demonstrate[d] its ability to execute upon acquisitions," and its platform provides "improved compliance," omit the material facts, among others, that AdaptHealth failed to integrate acquisitions and gutted compliance systems. *In re Envision Healthcare Corp. Sec. Litig.*, 2019 WL 6168254, at *11 (M.D. Tenn. Nov. 19, 2019) ("A statement couched as an opinion can be misleading if it omits material facts about the basis for the opinion.").

Defendants' remaining arguments as to falsity mirror their arguments for the Exchange Act claims and fail for the same reasons. MTD at 46-47 (falsity challenges to Technology, Compliance,

---

[20] Defendants' cases (MTD at 45) are inapposite. *See In re AT&T/DirectTV Now Sec. Litig.*, 470 F. Supp. 3d 507, 528, 538 (S.D.N.Y. Aug. 18, 2020) (aggressive tactics were public, immaterial, and not in effect at the offering);*In re Sanofi Sec. Litig.*, 155 F. Supp. 3d 386, 403 (S.D.N.Y. 2016) (kickback scheme did not affected reported sales); *Plumber & Steamfitters Loc. 773 Pension Fund v. Danske Bank A/S*, 11 F.4th 90, 99 (2d Cir. 2021) (revenue figures were not manipulated).

and Risk Statements addressed in *supra* §IV).

### 2. Plaintiffs Have Alleged Violations Of Item S-K

Regulation S-K imposes certain disclosure obligations on the issuers of registration statements. Specifically, Item 303 requires issuers to "[d]escribe any known trends or uncertainties that have had or that the registrant reasonably expects will have a material . . . impact" on the company, 17 C.F.R. § 229.303(a)(3)(ii). A failure to disclose fraud that implicated a company's operations violates Item 303. *Indiana Pub. Ret. Sys. v. SAIC, Inc.*, 818 F.3d 85, 95 (2d Cir. 2016). Item 105 requires "a discussion of the material factors that make an investment in the registrant or offering speculative or risky." 17 C.F.R. § 229.105. Under Item 105, a plaintiff must plead that "(1) a risk factor existed; (2) the risk factor could adversely affect the registrant's present or future business expectations; and (3) the offering documents failed to disclose the risk factor." *Silverstrand Invs. v. AMAG Pharms., Inc.*, 707 F.3d 95, 103 (1st Cir. 2013) (discussing Item 503(c), which was changed to Item 105). Defendants here failed to disclose the improper billing practices and integration failures, which adversely affected the Company. ¶¶425-32.

Defendants' arguments under Regulation S-K regurgitate their arguments that Plaintiffs fail to allege sufficiently widespread misconduct and fail to allege the Individual Defendants' knowledge. MTD at 47-48. These arguments fail for the reasons discussed above (*supra* §V).

### D. Plaintiffs Sufficiently Plead A Section 15 Claim

"Section 15 of the Securities Act imposes joint and several liability on any person who controls anyone liable under § 11 of the Securities Act." *Endo*, 351 F. Supp. 3d at 910-11. For the reasons explained in §VIII above, the Securities Act Officer Defendants who signed the registration statement are liable as control persons. Because there is primary liability under Section 11, Defendants argument that there is no primary liability should be rejected.

Among other things, the Complaint alleges that the Director Defendants "signed the SPO

Registration Statement" and "participated in the solicitation and sale of AdaptHealth common stock to investors in the IPO" ¶385. Such allegations are sufficient to plead Section 15 claims. *In re Am. Bus. Fin. Servs., Inc. Sec. Litig.*, 2007 WL 81937, at *12 (E.D. Pa. Jan. 9, 2007); *see also Se. Pennsylvania Transp. Auth. v. Orrstown Fin. Servs., Inc.*, 2022 WL 3572474, at *57 (M.D. Pa. Aug. 18, 2022) (control person claim pled against directors "based on their having signed the Registration Statement and having otherwise participated in the process that allowed the March 2010 Offering to be successfully completed").

Most courts do not require "culpable participation" when pleading Section 15 claims. *In re NIO, Inc. Sec. Litig.*, 2021 WL 3566300, at *12 (E.D.N.Y. Aug. 12, 2021) ("majority of judges" in district found culpable participation not required and joining those decisions); *In re Mills Corp. Sec. Litig.*, 257 F.R.D. 101, 105 (E.D. Va. 2009) (culpable participation required "[t]o make out a claim under Section 20(a), *but not Section 15*"); *contra* MTD at 49-50. As one court explained, "[i]t would place an unreasonable burden on the claimant to require a pleading of culpable participation because the facts establishing culpable participation can only be expected to emerge after discovery," which are "within the defendant's control." *In re Washington Mut., Inc.*, 462 B.R. 137, 143 (Bankr. D. Del. 2011); *In re Measurement Specialties, Inc.*, 2003 WL 27398420, at *13 (D.N.J. Sept. 29, 2003) (culpable participation is a question of fact that cannot be resolved on the pleadings). This Court should reach the same conclusion.

The Section 15 claim should be sustained for all Defendants.

## X.    CONCLUSION

The motion to dismiss should be denied in its entirety. If the Court determines to dismiss any portion of the Complaint, Plaintiffs request leave to amend, which is routinely granted in securities class actions. *See, e.g.*, *Utesch v. Lannett Co., Inc.*, 316 F. Supp. 3d 895, 907-08 (E.D. Pa. 2018) (granting leave to amend) *later sustained at* 385 F. Supp. 3d 408 (E.D. Pa. 2019).

DATED: October 1, 2024.    Respectfully submitted,

**BERNSTEIN LITOWITZ BERGER
   & GROSSMANN LLP**

/s/ *Katherine M. Sinderson*
Hannah Ross
John Rizio-Hamilton (*pro hac vice*)
Katherine M. Sinderson (*pro hac vice*)
John J. Esmay (*pro hac vice*)
Timothy Fleming (*pro hac vice*)
Sarah K. Schmidt (*pro hac vice*)
1251 Avenue of the Americas
New York, New York 10020
Telephone: (212) 554-1400
Facsimile: (212) 554-1444
hannah@blbglaw.com
johnr@blbglaw.com
katiem@blbglaw.com
john.esmay@blbglaw.com
timothy.fleming@blbglaw.com
sarah.schmidt@blbglaw.com

*Counsel for Lead Plaintiffs*

**KASKELA LAW LLC**

D. Seamus Kaskela (No. 204351)
Adrienne Bell (No. 202231)
18 Campus Boulevard, Suite 100
Newtown Square, PA 19073
Telephone: (484) 258-1401
skaskela@kaskelalaw.com
abell@kaskelalaw.com

*Liaison Counsel for Lead Plaintiffs*

## <u>CERTIFICATE OF SERVICE</u>

I, Katherine M. Sinderson, hereby certify that on October 1, 2024, a true and correct copy of the foregoing was served electronically via the Court's ECF system, where this document is available for downloading and viewing.


<u>*/s/ Katherine M. Sinderson*</u>
Katherine M. Sinderson