**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| *In re AdaptHealth Corp. Securities Litigation* | Case No. 2:23-cv-04104-MRP |

**DECLARATION OF KATHERINE M. SINDERSON IN SUPPORT OF**
**(I) LEAD PLAINTIFFS' MOTION FOR FINAL APPROVAL OF SETTLEMENT**
**AND PLAN OF ALLOCATION, AND (II) LEAD COUNSEL'S**
**MOTION FOR ATTORNEYS' FEES AND LITIGATION EXPENSES**

**TABLE OF CONTENTS**

**Page**

I.      INTRODUCTION ................................................................................................ 1

II.     HISTORY OF THE ACTION ............................................................................. 6

        A.      Background and the Claims Asserted .................................................... 6

        B.      The Commencement of the Action and the Appointment of Lead Plaintiffs
                and Lead Counsel .................................................................................... 7

        C.      The Investigation and Filing of the Complaint ...................................... 7

        D.      Defendants' Motion to Dismiss .............................................................. 9

        E.      Work with Experts ................................................................................ 10

        F.      The Settling Parties' Mediation Efforts and Settlement of the Action ................. 11

        G.      The Court Grants Preliminary Approval of the Settlement ................... 12

III.    RISKS OF CONTINUED LITIGATION ......................................................... 13

        A.      General Risks in Prosecuting Securities Class Actions ....................... 14

        B.      Specific Risks Concerning this Action ................................................ 16

                1.      Risks Concerning Liability ........................................................ 17

                2.      Risks Concerning Loss Causation and Damages ....................... 19

                3.      Risks Related to Class Certification .......................................... 21

                4.      Ability-to-Pay Risks .................................................................. 22

        C.      The Settlement Amount Compared to the Likely Maximum Damages that
                Could Be Proved at Trial ...................................................................... 22

IV.     LEAD PLAINTIFFS' COMPLIANCE WITH THE COURT'S PRELIMINARY
        APPROVAL ORDER REQUIRING ISSUANCE OF NOTICE ...................... 24

V.      THE PROPOSED PLAN OF ALLOCATION OF THE PROCEEDS OF THE
        SETTLEMENT .................................................................................................. 26

VI.     THE FEE AND EXPENSE APPLICATION .................................................... 29

        A.      The Fee Application .............................................................................. 30

1.    Lead Plaintiffs Have Authorized and Support the Fee Application ......... 31

2.    The Time and Labor of Lead Plaintiffs' Counsel ..................................... 31

3.    The Skill and Experience of Lead Plaintiffs' Counsel .............................. 33

4.    Standing and Caliber of Defendants' Counsel ......................................... 33

5.    The Risks of Litigation and the Need to Ensure the Availability of
      Competent Counsel in High-Risk Contingent Cases ................................ 33

6.    The Reaction of the Settlement Class to the Fee Application .................. 35

B.    The Litigation Expense Application ...................................................................... 35

VII.    CONCLUSION ................................................................................................................. 38

**TABLE OF EXHIBITS**

**Exhibit 1**    Declaration of David M. Murphy in Support of Lead Plaintiffs' Motion for Final Approval of Settlement

**Exhibit 2**    Declaration of Walter Szymanski, Administrative Officer of the Allegheny County Employees' Retirement System, in Support of (I) Lead Plaintiffs' Motion for Final Approval of Settlement and Plan of Allocation; and (II) Lead Counsel's Motion for Attorneys' Fees and Litigation Expenses

**Exhibit 3**    Declaration of Virgil Nosè, on Behalf of International Union of Operating Engineers, Local No. 793, Members Pension Benefit Trust of Ontario, in Support of (I) Lead Plaintiffs' Motion for Final Approval of Settlement and Plan of Allocation; and (II) Lead Counsel's Motion for Attorneys' Fees and Litigation Expenses

**Exhibit 4**    Declaration of Amy M. Toman, on Behalf of the City of Tallahassee Pension Plan, in Support of (I) Lead Plaintiffs' Motion for Final Approval of Settlement and Plan of Allocation; and (II) Lead Counsel's Motion for Attorneys' Fees and Litigation Expenses

**Exhibit 5**    CORNERSTONE RESEARCH, SECURITIES CLASS ACTION FILINGS: 2025 YEAR IN REVIEW (2026)

**Exhibit 6**    CORNERSTONE RESEARCH, SECURITIES CLASS ACTION SETTLEMENTS: 2025 REVIEW AND ANALYSIS (2026)

**Exhibit 7**    Declaration of Lindsey Marquez of Kroll Settlement Administration LLC Regarding: (A) Mailing of the Notice and Claim Form; (B) Publication of the Summary Notice; and (C) Report on Requests for Exclusion Received to Date

**Exhibit 8**    Summary of Lead Plaintiffs' Counsel's Hours, Lodestar, and Expenses

   **Exhibit 8A**    Declaration of Katherine M. Sinderson in Support of Lead Counsel's Motion for Attorneys' Fees and Litigation Expenses on Behalf of Bernstein Litowitz Berger & Grossmann LLP

   **Exhibit 8B**    Declaration of D. Seamus Kaskela in Support of Lead Counsel's Motion for Attorneys' Fees and Litigation Expenses on Behalf of Kaskela Law LLC

   **Exhibit 8C**    Declaration of Mark Zigler in Support of Lead Counsel's Motion for Attorneys' Fees and Litigation Expenses on Behalf of Koskie Minsky LLP

**Exhibit 9**    Breakdown of Lead Plaintiffs' Counsel's Expenses by Category

**Exhibit 10**    Compendium of Unpublished Opinions and Authority Cited in Fee Memorandum

I, KATHERINE M. SINDERSON, declare as follows:

1.      I am an attorney admitted *pro hac vice* to this Court. I am a partner in the law firm of Bernstein Litowitz Berger & Grossmann LLP ("BLB&G" or "Lead Counsel"). BLB&G serves as Lead Counsel for Lead Plaintiffs Allegheny County Employees' Retirement System ("ACERS"), International Union of Operating Engineers, Local No. 793, Members Pension Benefit Trust of Ontario ("Local 793"), and City of Tallahassee Pension Plan ("Tallahassee," and, collectively, "Lead Plaintiffs"), and as Lead Counsel for the Settlement Class in the above-captioned action (the "Action"). I submit this declaration in support of Lead Plaintiffs' Motion for Final Approval of Settlement and Plan of Allocation (the "Settlement Motion"), and Lead Counsel's Motion for Attorneys' Fees and Litigation Expenses (the "Fee Motion"). I have personal knowledge of the matters set forth herein based on my active participation in the prosecution and settlement of this action and could and would testify competently thereto.[1]

## I.      INTRODUCTION

2.      The proposed Settlement before the Court provides for the resolution of all claims in the Action in exchange for a cash payment of $35,000,000, plus interest, for the benefit of the Settlement Class. The Settlement Amount has been paid into an escrow account and is earning

---

[1] All capitalized terms that are not otherwise defined herein shall have the meanings provided in the Stipulation and Agreement of Settlement dated December 18, 2025 (ECF No. 94-2) (the "Stipulation"), which was entered into by and among (i) Lead Plaintiffs, on behalf of themselves and the Settlement Class, and (ii) Defendants AdaptHealth Corp. ("AdaptHealth" or the "Company"), Luke McGee, Stephen P. Griggs, Joshua Parnes, Jason A. Clemens, Shaw Rietkerk, Wendy Russalesi, Rodney Carson, Alan Quasha, Frank J. Mullen, Richard Barasch, Terence Connors, Dr. Susan Weaver, Dale Wolf, Bradley Coppens, and David S. Williams III (collectively, the "Individual Defendants," and, together with AdaptHealth, the "AdaptHealth Defendants"), and Deutsche Bank Securities Inc., Jefferies LLC, BofA Securities, Inc., Truist Securities, Inc., Robert W. Baird & Co. Incorporated, RBC Capital Markets, LLC, Stifel, Nicolaus & Company, Incorporated, UBS Securities LLC, Canaccord Genuity LLC, and Leerink Partners LLC (collectively, the "Underwriter Defendants," and, together with the AdaptHealth Defendants, "Defendants").

interest. As detailed below, the Settlement provides a significant and immediate benefit to the

Settlement Class by conferring a substantial, certain, and near-term recovery while avoiding the

considerable risks and uncertainties of continued litigation—including the real possibility that the

Settlement Class could recover nothing, or far less than the Settlement Amount, after years of

additional litigation, appeals, and delay.

3.      The proposed Settlement is the result of extensive efforts by Lead Plaintiffs and

Lead Counsel over the past two years, which included, among other things:

- conducting an extensive investigation into the alleged fraud, including interviews with over 90 potential witnesses, and a thorough review of publicly available information about the claims, including AdaptHealth's filings with the U.S. Securities and Exchange Commission ("SEC"), analyst reports, conference call transcripts, and news articles;

- drafting the detailed 176-page Amended Class Action Complaint for Violations of the Federal Securities Laws (ECF No. 59) (the "Complaint") based on Lead Counsel's extensive factual investigation;

- opposing Defendants' motion to dismiss the Complaint;

- preparing for a mediation session before David Murphy of Phillips ADR, including preparing a submission on potential damages;

- engaging in vigorous arm's-length negotiations through Mr. Murphy; and

- drafting and negotiating the Stipulation setting out the terms of the Settlement and related documentation.

4.      As a result of these extensive efforts, Lead Plaintiffs and Lead Counsel were

thoroughly informed of the strengths and weaknesses of the claims and defenses in the Action at

the time they achieved the proposed Settlement, including the risk that there might be no recovery

at all. At the time of settlement, the Court had not yet decided Defendants' pending motion to

dismiss, which could have resulted in a dismissal of the Complaint in its entirety without any

discovery whatsoever. As discussed further below, even assuming that Lead Plaintiffs largely

prevailed on that pending motion, Lead Plaintiffs would still have faced formidable risks in

establishing all elements of their claims through continued litigation, including falsity, scienter, loss causation, and damages. Defendants have vigorously denied that they made any false or misleading statements and omissions or that they acted with scienter. Defendants argued, among other things, that the challenged financial figures were accurate, that the allegations in the Complaint were based on reports from a few low-level employees without access to the Individual Defendants, and that many of the challenged statements constituted inactionable puffery or opinion. In addition, Defendants contested Lead Plaintiffs' loss causation arguments and damages calculations, claiming that the alleged corrective disclosures are not actionable because they did not reveal any new information or were unrelated to the alleged fraud. If successful, those arguments could have eliminated or substantially reduced the total potential recovery for the Settlement Class. In light of these significant risks of continued litigation, Lead Plaintiffs and Lead Counsel firmly believe that the proposed $35,000,000 Settlement represents a highly favorable result for the Settlement Class.

5.     The Settlement was achieved only after arm's-length negotiations which included an in-person mediation session with David Murphy of Phillips ADR Enterprises LLC on October 8, 2025. In advance of the scheduled mediation, Lead Plaintiffs prepared and submitted a statement concerning damages in the action. The Settling Parties then engaged in a day-long mediation and subsequent discussions facilitated by Mr. Murphy before reaching an agreement. Mr. Murphy has submitted a declaration in support of the Settlement, which states that the Settlement "was the product of arm's-length, adversarial negotiation by seasoned, well-informed counsel." Declaration of David Murphy in Support of Lead Plaintiffs' Motion for Final Approval of Settlement ("Murphy Decl."), attached hereto as Exhibit 1, at ¶ 10.

6.      Lead Plaintiffs endorse the Settlement. Lead Plaintiffs are institutional investors that actively participated in the Action and closely monitored the work of Lead Counsel, and they fully endorse approval of the Settlement. *See* Declaration of Walter Szymanski on behalf of ACERS, attached hereto as Exhibit 2 ("Szymanski Decl."), at ¶¶ 3-6; Declaration of Virgil Nosè, on behalf of Local 793, attached hereto as Exhibit 3 ("Nosè Decl."), at ¶¶ 3-6; Declaration of Amy M. Toman, on behalf of Tallahassee ("Toman Decl."), ¶¶ 3-6. In enacting the Private Securities Litigation Reform Act of 1995 (the "PSLRA"), Congress expressly intended to give control over securities class actions to sophisticated institutional investors like Lead Plaintiffs and noted that increasing the role of institutional investors in class actions would benefit shareholders and assist courts by improving the quality of representation in this type of case. H.R. Conf. Rep. No. 104-369, at \*34 (1995), *reprinted in* 1995 U.S.C.C.A.N. 730, 733. Accordingly, Lead Plaintiffs' approval of the Settlement supports the reasonableness of the Settlement.

7.      In sum, Lead Plaintiffs and Lead Counsel are well-informed of the strengths and weaknesses of the Action, and they believe that the Settlement is fair and reasonable and represents a favorable outcome for the Settlement Class.

8.      Lead Plaintiffs also request that the Court approve the proposed Plan of Allocation for the settlement funds. As discussed in further detail below, the proposed Plan of Allocation, which was developed with the assistance of Lead Plaintiffs' damages expert, provides for the equitable distribution of the Net Settlement Fund to Settlement Class Members who submit Claim Forms that are approved for payment by the Court. The proposed Plan of Allocation provides for distribution to eligible claimants on a *pro rata* basis, based on losses attributable to the allegations in the Complaint.

9.    Lead Counsel worked diligently and efficiently to achieve the proposed Settlement in the face of substantial risks. Lead Counsel and the other Lead Plaintiffs' Counsel, which includes Kaskela Law LLC, liaison counsel for Lead Plaintiffs and the Settlement Class, and Koskie Minsky LLP, additional counsel for Lead Plaintiff Local 793 (collectively with Lead Counsel, "Lead Plaintiffs' Counsel") prosecuted this case on a fully contingent basis and advanced all litigation-related expenses, and thus bore the risk of an unfavorable result. Lead Counsel is applying for an award of attorneys' fees in the amount of 25% of the Settlement Fund for all Lead Plaintiffs' Counsel. The requested fee has been approved by Lead Plaintiffs and is well within the range of fees that courts in this Circuit and elsewhere have awarded in securities class actions and other complex class actions with comparable recoveries.

10.    Lead Counsel's Fee and Expense Application also seeks payment of $191,222.40 in Litigation Expenses incurred by Lead Plaintiffs' Counsel in connection with the institution, prosecution, and settlement of the Action.

11.    For all the reasons discussed in this Declaration and in the accompanying motions, including the quality of the result obtained and the meaningful litigation risks discussed below, Lead Plaintiffs and Lead Counsel respectfully submit that the Settlement and the Plan of Allocation are "fair, reasonable, and adequate," and that the Court should approve them under Federal Rule of Civil Procedure 23(e). For similar reasons, and for the additional reasons discussed below, we respectfully submit that Lead Counsel's Fee and Expense Application is also fair and reasonable and should be approved.

## II.   HISTORY OF THE ACTION

### A.   Background and the Claims Asserted

12.   AdaptHealth is a home medical equipment supplier providing devices for diabetes, sleep apnea, and wound care. AdaptHealth's common stock trades on NASDAQ under the symbol "AHCO."

13.   In this litigation, Lead Plaintiffs assert that Defendants made false and misleading statements in violation of the Securities Act of 1933 and the Securities Exchange Act of 1934. Specifically, Lead Plaintiffs allege that from August 4, 2020 through November 7, 2023, inclusive (the "Settlement Class Period"), Defendants made three broad categories of misstatements.

14.   *First*, the Complaint alleges that, while Defendants claimed that AdaptHealth had a vigorous compliance system and technology that prevented misconduct and mitigated business risks, in reality the Company failed to maintain a compliance system, discontinued or dismantled compliance systems at companies it acquired, and engaged in various illicit billing practices including using outdated, more lucrative billing codes and billing patients for medical supplies they did not order.

15.   *Second*, the Complaint alleges that the Company consistently reported increasing revenue across the Settlement Class Period and attributed that success to its compliance and billing systems, when in fact those revenue figures were inflated by the Company's allegedly illicit billing practices.

16.   *Finally*, the Complaint alleges that Defendants claimed that AdaptHealth successfully integrated over 80 acquisitions during the Settlement Class Period, implementing its compliance and revenue management systems, when in reality AdaptHealth failed to implement a compliance system or common revenue cycle platform.

17.     Lead Plaintiffs further allege that these misstatements caused the price of AdaptHealth's common stock to be artificially inflated and that the Company's stock price declined when the truth was revealed on five dates between March 1, 2022 and November 7, 2023.

**B.      The Commencement of the Action and the Appointment of Lead Plaintiffs and Lead Counsel**

18.     The initial complaint in the Action was filed on October 24, 2023 by Lead Plaintiff ACERS. ECF No. 1. On the same day, a notice was published in a national newswire service, in accordance with the PSLRA, advising potential class members of the pendency of the action, the claims asserted, and the deadline by which putative class members could move the Court for appointment as lead plaintiff. ECF No. 17-6.

19.     On December 26, 2023, ACERS, Local 793, and Tallahassee moved for appointment as Lead Plaintiffs pursuant to the Private Securities Litigation Reform Act of 1995. ECF No. 17. Four other investors filed separate motions for appointment as lead plaintiff (ECF Nos. 14-16, 18), but subsequently filed notices of non-opposition to the motion of ACERS, Local 793, and Tallahassee, recognizing that those entities had the largest financial interest in the Action among the movants (ECF Nos. 19-22).

20.     On January 23, 2024, the Court appointed ACERS, Local 793, and Tallahassee as Lead Plaintiffs for the Action, and approved their selection of Bernstein Litowitz Berger & Grossmann LLP ("BLB&G") as Lead Counsel. ECF No. 33.

**C.      The Investigation and Filing of the Complaint**

21.     In connection with this matter, Lead Counsel undertook an extensive investigation into the alleged fraud and potential claims that could be asserted in the Action. The investigation included a thorough review of public information such as AdaptHealth's SEC filings; Defendants' additional public statements, including those made in press releases, at investor conferences, and

on earnings calls; analyst and press reports concerning AdaptHealth; and other publicly available information regarding the Company.

22.     In connection with its investigation, Lead Counsel and its in-house investigators also conducted an extensive search to locate former employees of AdaptHealth and other industry participants who might have relevant information pertaining to the claims asserted in the Action. This included speaking to over 90 former AdaptHealth employees that they believed possessed relevant information about their claims, and included information from 15 of those individuals in the Complaint.

23.     On May 23, 2024, Lead Plaintiffs filed and served the Complaint based on this thorough investigation.[2] ECF No. 59. The detailed, 461-paragraph Complaint alleges that (a) AdaptHealth and individual defendants Luke McGee, Stephen P. Griggs, Joshua Parnes, Jason A. Clemens, Shaw Rietkerk, Wendy Russalesi, and Rodney Carson (collectively, the "Individual Exchange Act Defendants") violated Section 10(b) of the Exchange Act and U.S. Securities and Exchange Commission ("SEC") Rule 10b-5(a)–(c) thereunder; (b) the Individual Exchange Act Defendants and Alan Quasha violated Section 20(a) of the Exchange Act; (c) AdaptHealth, individual defendants Luke McGee, Joshua Parnes, Jason A. Clemens, Frank Mullen, Richard Barasch, Alan Quasha, Terence Connors, Dr. Susan Weaver, Dale Wolf, Bradley Coppens, and David S. Williams III (collectively, the "Individual Securities Act Defendants"), and the Underwriter Defendants violated Section 11 of the Securities Act in connection with AdaptHealth's secondary offering of common stock that closed on January 5, 2021 (the

---

[2] Lead Plaintiffs initially filed their Complaint on May 14, 2024, but refiled on May 23, 2024 at the Court's instruction to list all Defendants in the caption.

"Secondary Offering"); (d) the Underwriter Defendants violated Section 12(a)(2) of the Securities Act; and (e) the Individual Securities Act Defendants violated Section 15 of the Securities Act.

24.    The Complaint alleges that Defendants made false and misleading statements concerning AdaptHealth's (i) billing practices, (ii) compliance systems and technology, (iii) ability to integrate its acquisitions into AdaptHealth's existing compliance program and systems, and (iv) revenues and EBITDA. Lead Plaintiffs ACERS and Tallahassee allege that similar false and misleading statements were made in connection with the Secondary Offering.

### D.    Defendants' Motion to Dismiss

25.    On July 23, 2024, Defendants filed a motion to dismiss the Complaint (the "Motion to Dismiss") and an accompanying declaration attaching 66 exhibits totaling over 3,000 pages, including six summary documents created in connection with the litigation. ECF Nos. 65-66. Defendants' motion challenged virtually every aspect of the Complaint. These core arguments included, *inter alia*, that:

a)    the Complaint failed to sufficiently allege false and misleading statements because the allegations concerning the alleged illicit billing practices were based on the reports of a few low-level employees that could not report on practices Company-wide;

b)    the alleged false and misleading statements constituted inactionable puffery and opinion, and did not contain any statement of verifiable fact concerning AdaptHealth's billing or acquisition practices;

c)    the statements were protected by the PSLRA's "safe harbor provision";

d)    the Complaint failed to allege scienter because it failed to establish that the Individual Defendants learned about illicit billing practices, as none of the confidential witnesses substantially interacted with those Defendants; and

e)    Lead Plaintiffs failed to sufficiently plead loss causation because the Complaint did not sufficiently link the five disclosure events to any price decline, arguing instead that the declines were related to other more plausible causes such as the CEO's departure, disappointing financial results, guidance revisions, and inflation.

26.     On July 24, 2024, Defendants also requested that the Court take judicial notice of certain exhibits submitted with their Motion to Dismiss. ECF No. 67.

27.     On October 1, 2024, Lead Plaintiffs filed their opposition to Defendants' Motion to Dismiss. ECF No. 72. Lead Plaintiffs' opposition challenged every argument raised by Defendants' motion, including among other things arguing that Lead Plaintiffs sufficiently alleged the falsity of Defendants' three categories of statements and that the allegations of the Complaint, taken together, sufficiently alleged scienter. Lead Plaintiffs also argued that the corrective disclosures were sufficiently related to alleged false and misleading statements. Lead Plaintiffs also opposed Defendants' request for judicial notice. ECF No. 73.

28.     Defendants filed their reply papers in further support of the Motion to Dismiss and the request for judicial notice on November 15, 2024. ECF Nos. 79-81.

29.     On May 28, 2025, Lead Plaintiffs submitted a letter to the Court, on behalf of all Settling Parties, requesting that the Court hold any ruling on the Motion to Dismiss in abeyance pending the conclusion of their upcoming mediation. ECF No. 85. The Court agreed (ECF No. 86) and, accordingly, the Motion to Dismiss was still pending at the time the Settlement was reached.

### E.     Work with Experts

30.     During their investigation of the claims and the preparation of the Complaint, Lead Plaintiffs retained and consulted with experts who provided critical insights and assistance to Lead Plaintiffs and Lead Counsel in the successful prosecution of this case. First, Lead Plaintiffs consulted an accounting expert, Harris Devor of Marcum LLP. Prior to filing their Complaint, Lead Plaintiffs consulted Marcum LLP concerning their claims that Defendants misstated AdaptHealth's revenue and EBITDA when reporting the Company's financial results for each quarter during the Class Period. Marcum LLP assisted Lead Plaintiffs and Lead Counsel with reviewing AdaptHealth's financial statements, including through analyzing trends in the

Company's accounts receivable reserves throughout the Class Period and understanding the Company's disclosures concerning the same.

31.    In addition, Lead Plaintiffs consulted financial economics experts, Chad Coffman and Mark Hedstrom of Peregrine Economics, concerning loss causation and damages issues, including concerning market reactions to each of the alleged misstatements and corrective disclosures and potential issues disaggregating the full impact of confounding information unrelated to the alleged fraud. Throughout the course of this Action, Lead Plaintiffs further consulted with Peregrine Economics in connection with settlement negotiations and preparing their submission on damages to the mediator. After the Settlement was reached, Lead Counsel worked with these same damages experts at Peregrine in developing the proposed Plan of Allocation. These experts provided critical insights and assistance to Lead Plaintiffs and Lead Counsel in the successful prosecution and resolution of this case.

**F.    The Settling Parties' Mediation Efforts and Settlement of the Action**

32.    The Settling Parties first discussed the possibility of mediation in the spring of 2025. On May 27, 2025, the Settling Parties agreed to mediate. As noted above, the following day Lead Plaintiffs filed a letter with the Court in which the Settling Parties jointly requested that any decision on the Motion to Dismiss be held in abeyance as the Settling Parties attempted to resolve the Action. ECF No. 85.

33.    On October 8, 2025, the Settling Parties participated in a full-day mediation session before Mr. Murphy. In advance of the mediation, the Settling Parties provided Mr. Murphy with all of the materials submitted to the Court in connection with the pending Motion to Dismiss. In addition, both Lead Plaintiffs and Defendants provided Mr. Murphy with a statement concerning their view of potential damages in the Action. While no agreement was reached at that mediation

11

session, following the mediation, the Settling Parties participated in additional settlement negotiations with Mr. Murphy's assistance.

34.    Following an additional two weeks of negotiations, on October 23, 2025, the Settling Parties reached an agreement-in-principle to settle the Action for releases and a cash payment of $35,000,000, subject to negotiation of the terms of a stipulation of settlement and approval by the Court.

35.    On December 18, 2025, the Settling Parties entered into the Stipulation, which sets forth the terms of the Settlement. ECF No. 94-2. The same day, Lead Plaintiffs and AdaptHealth also entered into a Supplemental Agreement, which provides that AdaptHealth has the right to terminate the Settlement if the persons who request exclusion from the Settlement Class reach a certain threshold. *See id.* at ¶ 12.2.

**G.    The Court Grants Preliminary Approval of the Settlement**

36.    On December 19, 2025, Lead Plaintiffs filed a motion for preliminary approval of the Settlement. ECF No. 94.

37.    On February 2, 2026, the Court entered the Order Preliminarily Approving Settlement and Providing for Notice (ECF No. 96) ("Preliminary Approval Order"), which, among other things: (a) preliminarily approved the Settlement; (b) approved the form of Notice, Summary Notice, and Claim Form, and authorized notice of the Settlement to be given to potential Settlement Class Members through mailing of the Notice and Claim Form, posting the Notice and Claim Form on a Settlement website, and publication of the Summary Notice in *The Wall Street Journal* and over a national newswire service; (c) established procedures and deadlines by which Settlement Class Members could participate in the Settlement, request exclusion from the Settlement Class, or object to the Settlement, the proposed Plan of Allocation, and/or the Fee and Expense

12

Application; and (d) set a schedule for the filing of opening papers and reply papers in support of the proposed Settlement, Plan of Allocation, and the Fee and Expense Application. The Preliminary Approval Order also scheduled the Final Approval Hearing for May 13, 2026 at 10:00 a.m. to determine, among other things, whether the Settlement should be finally approved.

## III.    RISKS OF CONTINUED LITIGATION

38.    The Settlement provides a certain and substantial benefit to the Settlement Class in the form of a $35,000,000 cash payment. Lead Plaintiffs and Lead Counsel believe that the proposed Settlement is a highly favorable result for the Settlement Class, considering the substantial risks of continuing to litigate. As explained below, at the time of settlement, Lead Plaintiffs faced the very real risk of losing at the pleadings stage, and, even if they overcame Defendants' motion to dismiss in whole or in part, Lead Plaintiffs faced serious risks related to proving liability and establishing loss causation and damages throughout the various later stages of litigation, including at class certification, summary judgment, and trial. Lead Plaintiffs negotiated the Settlement on the assumption that Lead Plaintiffs would defeat Defendants' pending motion to dismiss in meaningful part, but took into account the significant risks relating to falsity, scienter, loss causation, and damages that Lead Plaintiffs would face in continued litigation, as well as potential ability-to-pay risks that could arise if the Company's available insurance was reduced or depleted. Moreover, Lead Plaintiffs were aware that, even if Lead Plaintiffs defeated Defendants' motion for summary judgment and prevailed at trial, they would have faced post-trial motions, including a potential motion for judgment as a matter of law, as well as further appeals that could have prevented Lead Plaintiffs from obtaining any recovery for the Settlement Class— or, at the very least, delayed recovery for years.

### A.    General Risks in Prosecuting Securities Class Actions

39.    Absent settlement, Lead Plaintiffs faced a substantial risk of the claims being dismissed entirely, leaving the Settlement Class with no recovery whatsoever. According to a review by Cornerstone Research, for federal securities class actions filed each year from 2015 through 2023, roughly half (ranging from 46% to 61%) were dismissed. *See* CORNERSTONE RESEARCH, SECURITIES CLASS ACTION FILINGS: 2025 YEAR IN REVIEW (2026), attached hereto as Exhibit 5, at 16. Here, Defendants challenged falsity, scienter, and loss causation—each of which is an element that Lead Plaintiffs must prove, and each of which can and has been dispositive. *See, e.g.*, *Holland v. Standley*, 2025 WL 2434230, at *20 (E.D. Pa. Aug. 21, 2025) (dismissing for failure to plead falsity or loss causation); *Handal v. Innovative Indus. Props., Inc.*, 157 F.4th 279, 304 (3d Cir. 2025) (affirming dismissal of statement that was false or misleading on loss causation grounds). Even if a complaint survives the pleadings stage in part, one or more of the corrective events could be eliminated on loss causation grounds, potentially reducing damages significantly. *See, e.g.*, *In re Five Below, Inc. Sec. Litig.*, 2025 WL 2447794, at *31, *34 (E.D. Pa. Aug. 25, 2025) (denying motion to dismiss in part but dismissing one of three corrective disclosures).

40.    Even if the case survived the pleading stage, it could be dismissed in whole or in part later in the litigation. In recent years, securities class actions have faced greater risks than in prior years, and it is not uncommon for district courts to dismiss securities class actions at the summary judgment stage after years of litigation. *See, e.g.*, *In re Mylan N.V. Sec. Litig.*, 2023 WL 2711552 (S.D.N.Y. Mar. 30, 2023) (defendants prevailed at summary judgment in a securities class action against Mylan arising out of misstatements concerning the company's EpiPen product and other generic drugs), *cert. denied*, 145 S. Ct. 436 (2024); *Murphy v. Precision Castparts Corp.*, 2021 WL 2080016, at *1 (D. Or. May 24, 2021) (granting defendants' renewed motion for summary judgment based on recent Ninth Circuit decision on forward-looking statements), *aff'd*

14

*sub nom. AMF Pensionsforsakring AB v. Precision Castparts Corp.*, 2022 WL 2800825 (9th Cir. July 18, 2022); *see also Fosbre v. Las Vegas Sands Corp.*, 2017 WL 55878, at \*28 (D. Nev. Jan. 3, 2017), *aff'd sub nom. Pompano Beach Police & Firefighters' Ret. Sys. v. Las Vegas Sands Corp.*, 732 F. App'x 543 (9th Cir. 2018); *In re Omnicom Grp., Inc. Sec. Litig.*, 541 F. Supp. 2d 546, 554-55 (S.D.N.Y. 2008), *aff'd*, 597 F.3d 501 (2d Cir. 2010); *In re Xerox Corp. Sec. Litig.*, 935 F. Supp. 2d 448, 496 (D. Conn. 2013), *aff'd sub nom. Dalberth v. Xerox*, 766 F.3d 172 (2d Cir. 2014). Even in cases that survive summary judgment in part, certain categories of statements and disclosure events may be eliminated, potentially curtailing damages. *See, e.g.*, *Allegheny Cnty. Emps.' Ret. Sys. v. Energy Transfer LP*, 744 F. Supp. 3d 350, 393 (E.D. Pa. 2024) (only two categories of statements survived).

41.    Cases that have survived summary judgment can also be dismissed prior to trial in connection with *Daubert* motions, such as those that were likely to be filed by Defendants here. *See, e.g.*, *Bricklayers & Trowel Trades Int'l Pension Fund v. Credit Suisse First Boston*, 853 F. Supp. 2d 181, 197-98 (D. Mass. 2012), *aff'd* 752 F.3d 82 (1st Cir. 2014) (granting summary judgment *sua sponte* in favor of the defendants after finding that the event study offered by plaintiffs' expert was unreliable and that there was accordingly no evidence that the market reacted negatively to disclosures).

42.    Finally, even when securities class action plaintiffs successfully overcome multiple substantive and procedural hurdles before trial, there remain significant risks that a jury will not find the defendants liable or award expected damages. *See, e.g.*, *In re Tesla Inc., Sec. Litig.*, 2023 WL 4032010 (N.D. Cal. June 14, 2023) (defense verdict in securities class action even though the court had already found the statements were false and defendant had acted recklessly in issuing

15

them, and the same conduct had resulted in SEC charges and a settlement), *aff'd*, 2024 WL 4688894 (9th Cir. Nov. 6, 2024).

43.	Further, post-trial motions, based on a complete record, also present risks. For example, in *In re BankAtlantic Bancorp, Inc.*, following a jury verdict in the plaintiffs' favor, the district court granted the defendants' motion for judgment as a matter of law and entered judgment in favor of the defendants on all claims. 2011 WL 1585605, at *14-22 (S.D. Fla. Apr. 25, 2011), *aff'd*, 688 F.3d 713 (11th Cir. 2012) (finding that there was insufficient trial evidence to support a finding of loss causation). Intervening changes in the law may also impact a successful trial verdict. For example, a district court in Oregon reconsidered its order denying defendants' motion for summary judgment and granted the motion more than a year later based on a new decision by the Ninth Circuit. *See Precision Castparts*, 2021 WL 2080016, at *6.

44.	Accordingly, securities class actions face serious risks of dismissal and non-recovery at all stages of litigation.

### B.	Specific Risks Concerning this Action

45.	Lead Plaintiffs and Lead Counsel believe the claims asserted against Defendants in this action are meritorious. They recognize, however, that this Action presented substantial risks to establishing liability. As discussed further below, Defendants have vigorously and consistently denied that their challenged statements were false or misleading, were actionable misstatements as opposed to immaterial puffery, or were made with scienter. They also challenged whether the stock price declines were sufficiently related to the alleged fraud for Lead Plaintiffs to establish loss causation. Therefore, the risks of continued litigation were substantial, and the class's ultimate potential for recovery was far from certain.

1.      **Risks Concerning Liability**

a.      **Falsity and Materiality**

46.      Defendants raised several arguments as to the falsity and materiality of the alleged false and misleading statements. Each of those could have been convincing to a Court either at the pleadings stage or later in the litigation.

47.      For example, Lead Plaintiffs' theory of falsity is premised on underlying allegations of widespread billing misconduct at AdaptHealth. In their Motion to Dismiss, Defendants contend that these allegations are insufficiently pled because they are based on the "personal experiences" of low-level employees who could not attest to how frequently the conduct was occurring over the Settlement Class Period and whether it was truly Company-wide misconduct. While some courts have found that the consistent accounts of multiple low-level employees, taken collectively, can support allegations of company-wide misconduct, others have looked to the employees' positions to support findings that they lacked sufficient information to support their allegations.

48.      Moving beyond the pleading stage, proving the extent of billing misconduct and the exact nature of AdaptHealth's compliance program through discovery would be challenging and the result would be uncertain. There was a risk that, on a fully developed factual record, the admissible evidence of billing misconduct at AdaptHealth would not be sufficient to establish that such misconduct was so widespread or systemic as to render Defendants' challenged statements false or misleading. Moreover, there has been no federal, state, or local government action taken against AdaptHealth based on conduct during the Settlement Class Period, which Defendants would argue undermines any claim that there was widespread misconduct.

49.      In addition, specifically, with regard to the revenue statements, Defendants have argued that AdaptHealth's methods for recording revenue would have assured that the alleged billing misconduct was not reflected in the Company's overall results. While Lead Plaintiffs

17

argued that it was inappropriate to draw that inference in Defendants' favor at the motion to dismiss stage, subsequent discovery might have resulted in evidence supporting Defendants' contentions.

50.    Defendants also assert that many of the alleged false or misleading statements are immaterial puffery. They argue that the challenged statements are simply general statements of optimism or aspirational goals regarding the Company's compliance systems and technology that are not actionable under securities law. Compliance-related statements have a mixed record in courts, with some finding that repeated assertions touting the strength of a business practice that is actually deficient are actionable, while others finding that more general compliance claims do not amount to actionable misstatements.

51.    Defendants also argue that the alleged misstatements were not false or misleading because—even if the course of conduct alleged was ongoing—Defendants' statements were not sufficiently related to the billing conduct of individual low-level employees, and Defendants did not expressly state that no billing misconduct was occurring. Thus, there was risk that Lead Plaintiffs would not be able to make a sufficiently direct connection between the alleged misconduct and the alleged misstatements.

52.    Finally, Defendants argue that certain of the challenged statements regarding risks were forward-looking statements protected by the PSLRA safe harbor. The Court may have dismissed claims relating to some or all of these statements as being focused on future events, accompanied by appropriate cautionary language.

### b.    Scienter

53.    Even if Lead Plaintiffs can establish that Defendants made actionable misstatements, they would also face the challenge of proving that Defendants made those misstatements with scienter, the requisite state of mind for the Exchange Act claims.

54. Throughout the litigation, Defendants have vigorously argued that the Individual Defendants lacked any intent to mislead investors. Defendants had contended (and would contend) that Lead Plaintiffs could only identify "isolated incidents" of improper billing practices and issues integrating acquisitions that did not come to the attention of the Individual Defendants, and thus Lead Plaintiffs would not be able to establish scienter. Specifically, in the Motion to Dismiss, Defendants had argued that Lead Plaintiffs' allegations of scienter were largely based on the accounts of relatively low-level former employees; that these former employees lacked any direct contact with the Individual Defendants; and that Lead Plaintiffs were not able to allege a specific instance in which the Individual Defendants learned about the billing misconduct. Lead Plaintiffs had strong responses at the pleading stage, as they could point to substantial bases for inferring scienter based on the Individual Defendants' access to relevant information and other factors. However, assuming that Lead Plaintiffs prevailed on the pending Motion to Dismiss, this issue would continue to pose significant risks in continued litigation, when Lead Plaintiffs would have to prove the Individual Defendants' relevant knowledge through documentary evidence and testimony. This might prove difficult here, especially because most of the individuals with direct knowledge of the facts would be AdaptHealth employees who would likely be hostile witnesses.

55. Another challenge in proving scienter is the fact that Lead Plaintiffs had not identified certain traditional indications of motive, such as suspiciously timed stock sales. In short, if litigation had continued, Lead Plaintiffs would have faced substantial risks in proving Defendants' scienter.

### 2.    Risks Concerning Loss Causation and Damages

56. In addition to the risks related to liability (such as falsity and scienter), Lead Plaintiffs also faced significant additional risks related to loss causation and damages. Defendants had argued, and would continue to argue, that (a) Lead Plaintiffs cannot establish loss causation

because the alleged corrective disclosures—the disclosures that caused the price of AdaptHealth common stock to decline—were not directly related to Defendants' alleged misrepresentations, and (b) Lead Plaintiffs could not establish damages because they would not be able to appropriately disaggregate the impact of information that was unrelated to the alleged false and misleading statements on the price declines at issue (as compared to the impact, if any, of the disclosures that related to the challenged misstatements).

57.    The Complaint alleges there are five corrective events (on March 1, 2022, February 27, 2023, March 3, 2023, May 9, 2023, and November 7, 2023) that each partially revealed the truth concerning Defendants' alleged misstatements to the market. Defendants argue that the news released on these days that caused the stock price declines was in most instances not sufficiently connected to the alleged fraud. In response, Lead Plaintiffs have argued the corrective events do not need to be mirror images of the alleged misrepresentations. Therefore, Lead Plaintiffs argue that, even if the disclosures did not contain explicit admissions that AdaptHealth's compliance systems were deficient or that AdaptHealth did not effectively integrate its acquisitions, the disclosures concerning deficient internal controls, disappointing results due to customers switching from AdaptHealth, and goodwill write-downs were on the same subject as the alleged misstatements. However, even if Lead Plaintiffs prevailed on this argument at the pleading stage, Defendants could raise the issue again at summary judgment.

58.    Defendants also argue that the stock price declines at issue were attributable to confounding factors not connected to the alleged fraud, such as the announcement of the departure of the Company's CEO, disappointing financial results, and inflation. In their opposition to the Motion to Dismiss, Lead Plaintiffs argued, citing case law, that at the pleadings stage they are not required to disaggregate damages and show exactly what percentage of their loss is attributable to

20

the fraud. While Lead Plaintiffs expected this argument to be successful against Defendants' Motion to Dismiss, Defendants might have had greater success with this argument at summary judgment and at trial, where expert testimony would be required to quantify the losses specifically related to the fraud. Lead Plaintiffs anticipated that there would be competing expert analyses, and Lead Plaintiffs might have faced challenges in proving what portion of the price decline on each of the five disclosure events resulted from the revelation of the alleged misstatements—rather than confounding non-fraud or "mismatching" information. In addition, given the likely presence of such confounding information, the damages that would be recoverable at trial would likely be only a fraction of the full stock price declines on the days in question.

59.     Finally, Defendants argue that even if some of the alleged events were corrective, the relevant truth had already been "revealed" in the earlier disclosures, such that the later events could not have caused Defendants' losses. If the Court or a jury concluded that one or more of the corrective events did not reveal any new information to the market, Lead Plaintiffs would not be able to recover with respect to that decline, which had the potential to dramatically reduce the potential damages for the class.

60.     Accordingly, these loss causation and damages challenges would have provided Defendants with strong arguments for reducing the ultimate maximum damages that Lead Plaintiffs could obtain, even if they succeeded on all liability issues.

### 3.     Risks Related to Class Certification

61.     Lead Plaintiffs believe that the Court would have certified the proposed class. However, they also expect that Defendants would have mounted several challenges to class certification. In particular, given recent trends in securities class action litigation, Lead Plaintiffs expected challenges to their expert's damages methodology and, mirroring Defendants' loss causation challenges, the argument that there was a "mismatch" between the alleged misstatements

and the corrective disclosures that successfully rebutted the presumption of reliance in securities class actions. Thus, there was a risk that the Court would have accepted Defendants' view and either declined to certify a class or certified a shorter class period.

### 4.     Ability-to-Pay Risks

62.     Finally, Lead Plaintiffs also believed there were potential risks regarding AdaptHealth's ability to pay a judgment substantially larger than the $35 million settlement. These concerns arose from limits on the amount of available insurance as well as potential concerns about the Company's future financial condition. AdaptHealth's insurance coverage was expected to be substantially depleted—if not entirely exhausted—if the litigation proceeded to trial. In contrast, the $35 million Settlement obtains all of the Company's available insurance, before the most significant litigation costs began. With respect to the Company's own ability to pay, at the time the agreement to settlement was reached in October 2025, AdaptHealth's common stock was trading at under $10 per share—as compared to a Settlement Class Period high of $40.15. This substantial decline supported Lead Plaintiffs' concerns about the Company's potential financial condition at the time—likely years in the future—when any litigated judgment might be obtained. Accordingly, these practical considerations further supported Lead Plaintiffs' determination that the immediate $35 million Settlement was a favorable result.

### C.     The Settlement Amount Compared to the Likely Maximum Damages that Could Be Proved at Trial

63.     The Settlement Amount—$35,000,000 in cash, plus interest—represents a substantial and meaningful recovery for the Settlement Class. Notably, the Settlement is nearly four times the size of the median securities class-action settlement in the Third Circuit from 2016-2025 ($9.2 million). *See* CORNERSTONE RESEARCH, SECURITIES CLASS ACTION SETTLEMENTS: 2025 REVIEW AND ANALYSIS (2026), attached hereto as Exhibit 6, at 19.

64.    The $35,000,000 Settlement is also a favorable result when compared to the likely maximum damages that could be recovered for the Settlement Class. Lead Plaintiffs' damages expert has estimated the maximum reasonably recoverable damages in this case to be approximately $451.6 million. This estimate assumes complete success on liability on all alleged misstatements and inclusion of damages for all corrective disclosures, but includes adjustments on certain of the disclosures to disaggregate the impact of information that was not related to the alleged false and misleading statements.[3]

65.    The $35,000,000 recovery under the Settlement therefore represents approximately 7.8% of the reasonably recoverable maximum damages—a highly favorable result for the Settlement Class in light of the significant risks of continued litigation. *See, e.g.*, *In re Wilmington Tr. Sec. Litig.*, 2018 WL 6046452, at *8 (D. Del. Nov. 19, 2018) (noting "Third Circuit median recovery of 5% of damages in class action securities litigation."); *Schuler v. Medicines Co.*, 2016 WL 3457218, at *8 (D.N.J. June 24, 2016) (4% recovery "falls squarely within the range of previous settlement approvals."); *In re Hemispherx Biopharma, Inc., Sec. Litig.*, 2011 WL 13380384, at *6 (E.D. Pa. Feb. 14, 2011) (approving settlement representing 5.2% of the maximum damages and finding that it "falls squarely within the range of reasonableness approved in other securities class action settlements."); *In re AT & T Corp. Sec. Litig.*, 455 F.3d 160, 169 (3d Cir. 2006) (affirming settlement for 4% of total damages). The 7.8% recovery achieved here compares favorably to these benchmarks and demonstrates the significant value obtained for the Settlement Class.

---

[3] The total potential damages without accounting for disaggregation (*i.e.*, without determining what portion of AdaptHealth's stock price decline was attributable to the revelation of the alleged misstatements, as opposed to other "mismatching" factors) was approximately $833 million. This maximum theoretical damages amount assumes that the entire stock price decline on all five disclosure dates was attributable to the alleged fraud and was foreseeable.

66. Given the meaningful litigation risks, the immediacy of the $35,000,000 recovery, and the substantial value it provides to the Settlement Class, Lead Plaintiffs and Lead Counsel firmly believe that the Settlement is fair, reasonable, and adequate, and is in the best interest of the Settlement Class.

## IV. LEAD PLAINTIFFS' COMPLIANCE WITH THE COURT'S PRELIMINARY APPROVAL ORDER REQUIRING ISSUANCE OF NOTICE

67. The Court's Preliminary Approval Order directed that the Notice of Pendency and Proposed Settlement of Class Action (the "Notice") and Proof of Claim and Release Form ("Claim Form") be disseminated to the Settlement Class. The Preliminary Approval Order also set an April 22, 2026 deadline for Settlement Class Members to submit objections to the Settlement, the Plan of Allocation, and/or the Fee and Expense Application or to request exclusion from the Settlement Class, and set a final approval hearing date of May 13, 2026.

68. Pursuant to the Preliminary Approval Order, Lead Counsel instructed Kroll Settlement Administration LLC ("Kroll"), the Court-approved Claims Administrator, to begin disseminating copies of the Notice and the Claim Form by mail and to publish the Summary Notice. The Notice contains, among other things, a description of the Action, the Settlement, the proposed Plan of Allocation, and Settlement Class Members' rights to participate in the Settlement, object to the Settlement, the Plan of Allocation and/or the Fee and Expense Application, or exclude themselves from the Settlement Class. The Notice also informs Settlement Class Members of Lead Counsel's intent to apply for an award of attorneys' fees in an amount not to exceed 25% of the Settlement Fund, and for Litigation Expenses in an amount not to exceed $350,000. To disseminate the Notice, Kroll obtained information from AdaptHealth and from banks, brokers, and other nominees regarding the names and addresses of potential Settlement Class Members. *See* Declaration of Lindsey Marquez of Kroll Settlement Administration LLC Regarding: (A) Mailing

24

of the Notice and Claim Form; (B) Publication of the Summary Notice; and (C) Report on Requests for Exclusion Received to Date ("Marquez Decl."), attached hereto as Exhibit 7, at ¶¶ 3-9.

69.     Kroll began mailing copies of the Notice and Claim Form (together, the "Notice Packet") to potential Settlement Class Members and nominee owners on February 25, 2026. *See* Marquez Decl. ¶¶ 3-8. As of April 7, 2026, Kroll had disseminated a total of 61,216 Notice Packets to potential Settlement Class Members and nominees. *Id*. ¶ 10.

70.     On March 9, 2026, in accordance with the Preliminary Approval Order, Kroll caused the Summary Notice to be published in *The Wall Street Journal* and to be transmitted over the *PR Newswire*. *Id*. ¶ 11.

71.     Lead Counsel also caused Kroll to establish a dedicated settlement website, www.AdaptHealth2025SecuritiesLitigation.com, to provide potential Settlement Class Members with information concerning the Settlement and access to copies of the Notice and Claim Form, as well as the Stipulation, Preliminary Approval Order, and Complaint. *See* Marquez Decl. ¶ 12. That website became operational on February 25, 2026. *Id*. Lead Counsel also made copies of the Notice and Claim Form and other documents available on its own website, www.blbglaw.com.

72.     As set forth above, the deadline for Settlement Class Members to file objections to the Settlement, Plan of Allocation, and/or Fee and Expense Application, or to request exclusion from the Settlement Class is April 22, 2026. To date, no requests for exclusion have been received. *See* Marquez Decl. ¶ 14. In addition, no objections to the Settlement, Plan of Allocation, or Lead Counsel's Fee and Expense Application have been received. Lead Counsel will file reply papers on or before May 6, 2026 that will address any requests for exclusion or objections that may be received.

## V.     THE PROPOSED PLAN OF ALLOCATION OF THE PROCEEDS OF THE SETTLEMENT

73.     Pursuant to the Preliminary Approval Order, and as set forth in the Notice, all Settlement Class Members who want to be eligible to participate in the distribution of the Net Settlement Fund must submit a valid Claim Form with all required information postmarked (if mailed) or submitted online no later than July 2, 2026. As set forth in the Notice, the Net Settlement Fund will be distributed among Settlement Class Members who submit eligible claims according to the plan of allocation approved by the Court.

74.     Lead Counsel consulted with Lead Plaintiffs' damages expert, Chad Coffman, in developing the proposed plan of allocation for the Net Settlement Fund (the "Plan of Allocation"). Lead Counsel believes that the Plan of Allocation provides a fair and reasonable method to equitably allocate the Net Settlement Fund among Settlement Class Members who suffered losses as result of the conduct alleged in the Action.

75.     The Plan of Allocation is set forth at pages 16 to 21 of the Notice. *See* Marquez Decl., Ex. A at pp. 16-21. As described in the Notice, the objective of the Plan of Allocation is to distribute the Settlement proceeds equitably among those Settlement Class Members who suffered economic losses as a proximate result of the alleged securities law violations. *See* Notice ¶ 66. The calculations under the Plan of Allocation are intended as a method to weigh the claims of Settlement Class Members against one another for the purposes of making an equitable allocation of the Net Settlement Fund. *Id.*

76.     In developing the Plan of Allocation, Lead Plaintiffs' damages expert calculated the estimated amount of artificial inflation in the per-share price of AdaptHealth common stock that was allegedly proximately caused by Defendants' alleged materially false and misleading statements or omissions. *See* Notice ¶ 67. In calculating the estimated artificial inflation allegedly

caused by those misrepresentations and omissions, Lead Plaintiffs' damages expert considered the price changes in AdaptHealth common stock in reaction to the public disclosures that allegedly corrected the alleged misrepresentations and omissions, adjusting for price changes on those days that were attributable to market or industry forces. *Id.*

77.    In order to have recoverable damages in connection with purchases or acquisitions of AdaptHealth common stock during the Settlement Class Period, the disclosure of the alleged misrepresentations or omissions must be the cause of the decline in the price of the AdaptHealth common stock. In this case, Lead Plaintiffs alleged that Defendants made false statements and omitted material facts from August 4, 2020 through November 6, 2023, which had the effect of artificially inflating the price of AdaptHealth common stock. Lead Plaintiffs further allege that corrective information was released to the market on March 1, 2022, February 27, 2023, May 9, 2023, and November 7, 2023, which removed the artificial inflation from the price of AdaptHealth common stock on March 2, 2022, February 28, 2023, March 1, 2023, May 9, 2023, November 7, 2023, and November 8, 2023. *See* Notice ¶ 68. In order to be eligible under the Plan of Allocation, shares of AdaptHealth common stock must have been purchased or otherwise acquired during the Settlement Class Period and held through the issuance of at least one alleged corrective disclosure. *Id.* ¶ 69.

78.    Recognized Loss Amounts are calculated under the Plan of Allocation for each purchase or acquisition of AdaptHealth common stock during the Settlement Class Period that is listed on a Claimant's Claim Form and for which adequate documentation is provided. For shares purchased during the Class Period and sold prior to the close of trading on March 1, 2022, the Recognized Loss Amount is zero because, as discussed above, those shares were not damaged by the alleged misstatements. *See* Notice ¶ 71A. For shares purchased during the Settlement Class

27

Period and sold from March 2, 2022 through November 6, 2023, the Recognized Loss Amount is calculated as the lesser of: (i) the amount of artificial inflation on the date of purchase/acquisition minus the amount of artificial inflation per share on the date of sale; or (ii) the purchase price minus the sale price. *Id*. ¶ 71B. For shares sold on November 7, 2023, the Recognized Loss is the lesser of (i) artificial inflation on the date of purchase/acquisition, or (ii) the purchase price *minus* the sale price. *Id*. ¶ 71C. For shares sold during the 90-day period after the Settlement Class Period, the Recognized Loss Amount is the least of: (i) the artificial inflation on the date of purchase/acquisition; (ii) the purchase price minus the sale price; or (iii) the purchase price minus the average closing price between November 7, 2023 and the date of sale. *Id*. ¶ 71D. For shares purchased during the Settlement Class Period and held until the end of the 90-day period after the Settlement Class Period (February 2, 2024) or longer, the Recognized Loss Amount is the lesser of: (i) the artificial inflation on the date of purchase/acquisition; or (ii) the purchase price minus $7.63, the average closing price for AdaptHealth stock from November 7, 2023 through February 2, 2024. *Id*. ¶ 71E.

79.   The sum of a Claimant's Recognized Loss Amounts for all of his, her, or its purchases of AdaptHealth common stock during the Settlement Class Period is the Claimant's "Recognized Claim." Notice ¶ 73. The Plan of Allocation also limits Claimants' Recognized Claim based on whether they had an overall market loss in their transactions in AdaptHealth common stock during the Settlement Class Period. A Claimant's Recognized Claim will be limited to the amount of his, her, or its market loss in AdaptHealth common stock transactions during the Settlement Class Period, and Claimants who have an overall market gain are not eligible for a recovery. *Id*. ¶¶ 80-81.

28

80.     The Net Settlement Fund will be allocated to Authorized Claimants on a *pro rata* basis based on the relative size of their Recognized Claims. Notice ¶ 82. If an Authorized Claimant's *pro rata* distribution amount calculates to less than ten dollars, no payment will be made to that Authorized Claimant. *Id*. ¶ 83. Those funds will be included in the distribution to the Authorized Claimants whose payments exceed the ten-dollar minimum. *Id*.

81.     One hundred percent of the Net Settlement Fund will be distributed to Authorized Claimants. If any funds remain after the initial *pro rata* distribution, as a result of uncashed or returned checks or other reasons, subsequent cost-effective distributions to Authorized Claimants will be conducted. Notice ¶ 84. Only when the residual amount left for re-distribution to Settlement Class Members is so small that a further re-distribution would not be cost effective (for example, where the administrative costs of conducting the additional distribution would largely subsume the funds available) will those funds be donated to one or more non-sectarian, not-for-profit, 501(c)(3) organizations to be selected by Lead Counsel and approved by the Court. *See id*.

82.     In sum, the Plan of Allocation was designed to fairly and rationally allocate the proceeds of the Net Settlement Fund among Settlement Class Members based on damages they suffered on purchases of AdaptHealth common stock that were attributable to the misconduct alleged in the Action. Accordingly, Lead Counsel respectfully submits that the Plan of Allocation is fair and reasonable and should be approved by the Court. To date, no objections to the proposed Plan of Allocation have been received.

## VI.     THE FEE AND EXPENSE APPLICATION

83.     In addition to seeking final approval of the Settlement and Plan of Allocation, Lead Counsel is applying to the Court, on behalf of all Lead Plaintiffs' Counsel, for an award of

29

attorneys' fees of 25% of the Settlement Fund (the "Fee Application").[4] Lead Counsel also requests payment for litigation expenses incurred by Lead Plaintiffs' Counsel in connection with the prosecution and settlement of the Action in the amount of $191,222.40. Lead Counsel further requests reimbursement to Lead Plaintiffs of a total of $41,208.30 in costs and expenses that Lead Plaintiffs incurred directly related to their representation of the Settlement Class, as permitted by the PSLRA, 15 U.S.C. § 78u-4(a)(4). The requested attorneys' fees, litigation expenses, and PSLRA awards are to be paid from the Settlement Fund. The legal authorities supporting the requested fee and expenses are discussed in Lead Counsel's Fee Memorandum. The primary factual bases for the requested fee and expenses are summarized below.

A.    **The Fee Application**

84.    Lead Counsel is applying for a fee award to be paid from the Settlement Fund on a percentage basis. As set forth in the accompanying Fee Memorandum, the percentage method is the appropriate method of fee recovery because it aligns the lawyers' interest in being paid a fair fee with the interest of the Lead Plaintiffs and the Settlement Class in achieving the maximum recovery in the shortest amount of time required under the circumstances and taking into account the litigation risks faced in a class action. Use of the percentage method has been recognized as appropriate by the Third Circuit in comparable cases.

85.    Based on the quality of the result achieved, the extent and quality of the work performed by Lead Plaintiffs' Counsel, the significant risks of the litigation, and the fully contingent nature of the representation, Lead Counsel respectfully submits that the requested fee award is reasonable and should be approved. As discussed in the Fee Memorandum, a 25% fee

---

[4] As noted above, "Lead Plaintiffs' Counsel" are (a) Lead Counsel BLB&G; (b) Kaskela Law LLC, liaison counsel for Lead Plaintiffs and the Settlement Class, and (c) Koskie Minsky LLP, additional counsel for Lead Plaintiff Local 793.

award is fair and reasonable for attorneys' fees in common fund cases such as this and is well within the range of percentages awarded in securities class actions in this Circuit with comparable settlements.

### 1. Lead Plaintiffs Have Authorized and Support the Fee Application

86. Lead Plaintiffs are sophisticated institutional investors that closely supervised and monitored the prosecution and settlement of the Action. *See* Szymanski Decl. (Ex. 2), at ¶¶ 3-5; Nosè Decl. (Ex. 3), at ¶¶ 3-5; Toman Decl. (Ex. 4), at ¶¶ 3-5. Lead Plaintiffs fully support Lead Counsel's requested fee of 25% of the Settlement Fund. Lead Plaintiffs have evaluated the Fee Application and believe that it is fair and reasonable in light of the result obtained for the Settlement Class, the substantial risks in the litigation, and the work performed by Lead Plaintiffs' Counsel. *See* Szymanski Decl. (Ex. 2), at ¶ 7; Nosè Decl. (Ex. 3), at ¶ 7; Toman Decl. (Ex. 4), at ¶ 7. Lead Plaintiffs' endorsement of Lead Counsel's Fee Application further demonstrates its reasonableness and should be given weight in the Court's consideration of the fee award.

### 2. The Time and Labor of Lead Plaintiffs' Counsel

87. The time and labor expended by Lead Plaintiffs' Counsel in pursuing this Action and achieving the Settlement also support the reasonableness of the requested fee. Attached in support of the motion for attorneys' fees and litigation expenses as Exhibits 8A, 8B, and 8C are my declaration on behalf of BLB&G, the declaration of D. Seamus Kaskela on behalf of Liaison Counsel Kaskela Law LLC, and the declaration of Mark Zigler on behalf of Koskie Minsky LLP, additional counsel for Lead Plaintiff Local 793 (collectively, the "Fee and Expense Declarations"). The Fee and Expense Declarations indicate the amount of time spent by each attorney and the professional support staff employed by each firm on the Action from its inception through March 15, 2026, and the lodestar calculations based on their current hourly rates. The Fee and Expense Declarations also include schedules of expenses incurred by each firm, delineated by category.

These Declarations were prepared from contemporaneous daily time records and expense records regularly maintained and prepared by the respective firms, which are available at the request of the Court.

88.    As set forth in the Fee and Expense Declarations, Lead Plaintiffs' Counsel have collectively expended 3,644.45 hours in the prosecution of this Action, with a total lodestar of $3,300,117.02. If the Court awards the Litigation Expenses as requested, the requested fee of 25% of the Settlement Fund will be $8,750,000, plus interest. Accordingly, the requested fee represents a 2.65 multiplier on Lead Plaintiffs' Counsel's lodestar. As discussed in the Fee Memorandum, this multiplier is well within the range of multipliers awarded in comparable cases and thus supports the reasonableness of the requested fee.

89.    As described above in greater detail, the work that Lead Plaintiffs' Counsel performed in this Action included: (i) conducting a thorough investigation into the class's claims, which involved a detailed review of publicly available information, interviews with former AdaptHealth employees, and extensive legal research to confirm the theories of liability that Lead Plaintiffs could pursue on behalf of the class and satisfy the applicable pleading standards; (ii) drafting and filing the detailed Complaint based on this investigation; (iii) briefing in opposition to Defendants' motion to dismiss; (iv) working with experts; and (v) engaging in vigorous arm's-length negotiations (including a full-day in-person mediation session) to achieve the Settlement. At all times throughout the Action, Lead Plaintiffs' Counsel's efforts were driven and focused on advancing the litigation to achieve the most successful outcome for the class, whether through settlement or trial, by the most efficient means possible.

90.    Throughout the litigation, Lead Plaintiffs' Counsel maintained an appropriate level of staffing that avoided unnecessary duplication of effort and ensured the efficient prosecution of this litigation.

### 3.    The Skill and Experience of Lead Plaintiffs' Counsel

91.    The skill and expertise of Lead Plaintiffs' Counsel also support the requested fee. As demonstrated by the firm resume attached as Exhibit 8A-3, Lead Counsel is among the most experienced and skilled law firms in the securities litigation field, with a long and successful track record representing investors in such cases. Liaison Counsel Kaskela is also highly skilled and extremely knowledgeable counsel, and Koskie Minsky LLP has worked extensively with Lead Plaintiff Local 793, including assisting in its representation in prior securities class actions. We believe Lead Plaintiffs' Counsel's skill and their willingness and ability to prosecute the claims vigorously through trial, if necessary, added valuable leverage in the settlement negotiations.

### 4.    Standing and Caliber of Defendants' Counsel

92.    The quality of the work performed by Lead Plaintiffs' Counsel in attaining the Settlement should also be evaluated in light of the caliber of opposing counsel. Defendants were represented by attorneys from Willkie Farr & Gallagher LLP and A&O Shearman—two highly experienced and well-resourced law firms that zealously represented their clients. In the face of this formidable opposition, Lead Counsel was nonetheless able to develop a case that was sufficiently strong to persuade Defendants to settle the case on terms that will significantly benefit the Settlement Class.

### 5.    The Risks of Litigation and the Need to Ensure the Availability of Competent Counsel in High-Risk Contingent Cases

93.    The prosecution of these claims was undertaken entirely on a contingent-fee basis, and the considerable risks assumed by Lead Counsel in bringing this Action to a successful

33

conclusion are described above. Those risks are relevant to the Court's evaluation of an award of attorneys' fees. Here, the risks assumed by Lead Counsel, and the time and expenses incurred without any payment, were extensive.

94.    From the outset, Lead Counsel understood that it was embarking on a complex, expensive, lengthy, and hard-fought litigation with no guarantee of ever being compensated for the substantial investment of time and the significant outlay of money that vigorous prosecution of the case would require. In undertaking that responsibility, Lead Counsel was obligated to ensure that sufficient resources (in terms of attorney and support staff time) were dedicated to the litigation, and that Lead Counsel would further advance all of the costs necessary to pursue the case vigorously on a fully contingent basis, including funds to compensate vendors and consultants and to cover the considerable out-of-pocket costs that a case such as this typically demands. Because complex securities litigation often proceeds for several years before reaching any resolution, the financial burden on contingent-fee counsel is significantly greater than on a firm that is paid on an ongoing basis. Indeed, Lead Plaintiffs' Counsel have received no compensation during the more than two-year duration of this Action and no reimbursement of out-of-pocket expenses, yet they have devoted more than 3,600 hours and incurred more than $190,000 in expenses in prosecuting this Action for the benefit of AdaptHealth investors.

95.    Lead Plaintiffs' Counsel also bore the risk that no recovery would be achieved. As discussed above, from the outset this case presented a number of significant risks and uncertainties.

96.    As noted above, the Settlement was reached only after the Lead Counsel had conducted a thorough investigation and drafted a detailed Complaint and the Settling Parties had fully briefed Defendants' motion to dismiss. However, had the Settlement not been reached when it was and this litigation continued, Lead Counsel would have been required to conduct substantial

34

fact and expert discovery; brief a motion for class certification; oppose Defendants' expected motions for summary judgment; and prepare and take the case to trial. Moreover, even if the jury returned a favorable verdict after trial, it is likely that any verdict would be the subject of post-trial motions and appeals.

97.    Lead Counsel's persistent efforts in the face of significant risks and uncertainties have resulted in a significant and certain recovery for the Settlement Class. In light of this recovery and Lead Plaintiffs' Counsel's investment of time and resources over the course of the litigation, Lead Counsel believes the requested attorneys' fee is fair and reasonable and should be approved.

### 6.    The Reaction of the Settlement Class to the Fee Application

98.    As noted above, as of April 7, 2026, over 61,000 Notice Packets had been sent to potential Settlement Class Members advising them that Lead Counsel would apply for attorneys' fees in an amount not to exceed 25% of the Settlement Fund. *See* Marquez Decl. ¶ 10 and Ex. A (Notice ¶¶ 5, 46). In addition, the Court-approved Summary Notice has been published in *The Wall Street Journal* and transmitted over the *PR Newswire*. *See* Marquez Decl. ¶ 11. To date, no objections to the request for attorneys' fees have been received.

99.    In sum, Lead Counsel accepted this case on a contingency basis, committed significant resources to it, and prosecuted it diligently without any compensation or guarantee of success. Based on the highly favorable result obtained, the quality of the work performed, the substantial risks of the Action, and the contingent nature of the representation, Lead Counsel respectfully submits that the requested fee is fair and reasonable.

### B.    The Litigation Expense Application

100.    Lead Counsel also seek payment from the Settlement Fund of $191,222.40 for litigation expenses reasonably incurred by Lead Plaintiffs' Counsel in connection with the prosecution and resolution of the Action (the "Expense Application").

101.    From the outset of the Action, Lead Plaintiffs' Counsel have been aware that they might not recover any of their expenses (if the litigation was unsuccessful), and, further, if there were to be reimbursement of expenses, it would not occur until the Action was successfully resolved, often a period lasting several years. Lead Plaintiffs' Counsel also understood that, even assuming that the case was ultimately successful, reimbursement of expenses would not necessarily compensate them for the lost use of funds advanced by them to prosecute the Action. Consequently, Lead Plaintiffs' Counsel were motivated to, and did, take significant steps to minimize expenses whenever practicable without jeopardizing the vigorous and efficient prosecution of the case.

102.    As set forth in the Fee and Expense Declarations included in Exhibit 8, Lead Plaintiffs' Counsel have incurred a total of $191,222.40 in unreimbursed litigation expenses in connection with the prosecution of the Action. The expenses are summarized in Exhibit 9, which identifies each category of expense, *e.g.*, expert costs, mediation fees, on-line legal and factual research, telephone, and travel costs, and the amount incurred for each category. These expenses are reflected on the books and records maintained by Lead Plaintiffs' Counsel, which are prepared from expense vouchers, check records, and other source materials and are an accurate record of the expenses incurred. These expenses are recorded separately by Lead Plaintiffs' Counsel and are not duplicated by the firms' hourly rates.

103.    Of the total amount of expenses, $96,521.25, or approximately 50%, was expended for the retention of experts. As discussed above, Lead Counsel consulted with an accounting expert and a financial economics expert (concerning loss causation and damages issues) during its investigation and the preparation of the Complaint, and in preparation for settlement negotiations.

36

These experts' advice was instrumental in Lead Counsel's appraisal of the claims and in helping achieve the favorable result in the Action.

104.    Lead Counsel also incurred a total of $47,109.73 for the costs of online factual and legal research, which together accounted for approximately 25% of the total expenses.

105.    Lead Plaintiffs' share of the mediation costs paid to Phillips ADR for the services of Mr. Murphy was $41,125.00 or 21.5% of the total expenses.

106.    The other expenses for which Lead Plaintiffs' Counsel seek payment are the types of expenses that are necessarily incurred in litigation and routinely charged to clients billed by the hour. These expenses include, among others, court fees, service of process, travel costs, and telephone charges.

107.    In addition, Lead Plaintiffs seek reimbursement of a total of $41,208.30 for the reasonable costs and expenses that they incurred directly in connection with their representation of the Settlement Class, based on the time dedicated to the Action by their employees. Specifically, Lead Plaintiff ACERS seeks $5,730.80 based on the 45.25 hours that its employees and counsel dedicated to the Action. *See* Szymanski Decl. ¶¶ 9-10. Lead Plaintiff Local 793 requests $28,140 in compensation for 69.8 hours dedicated by its employees and trustees. See Nosè Decl. ¶¶ 9-10. Lead Plaintiff Tallahassee requests $7,337.50 in compensation for the 26.75 hours devoted by attorneys in the Tallahassee City Attorney's office. *See* Toman Decl. ¶¶ 9-10. Such payments are expressly authorized and anticipated by the PSLRA, as more fully discussed in the Fee Memorandum at 17-19.

108.    The Notice informed potential Settlement Class Members that Lead Counsel would be seeking reimbursement of Litigation Expenses in an amount not to exceed $350,000, which might include PSLRA awards for Lead Plaintiffs. Notice ¶¶ 5, 46. The total amount requested,

37

$232,430.70, which includes $191,222.40 for Lead Plaintiffs' Counsel's litigation expenses and a total of $41,208.30 for Lead Plaintiffs' requested PSLRA awards, is well below the $350,000 that Settlement Class Members were advised could be sought. To date, no objection has been raised as to the maximum amount of expenses set forth in the Notice.

109.    The expenses incurred by Lead Plaintiffs' Counsel and Lead Plaintiffs were reasonable and necessary to represent the Settlement Class and achieve the Settlement. Accordingly, Lead Counsel respectfully submits that the application for payment of Litigation Expenses from the Settlement Fund should be approved.

110.    Attached hereto as Exhibit 10 is a compendium of true and correct copies of the following unpublished opinions and authority cited in the Fee Memorandum.

## VII.    CONCLUSION

111.    For all the foregoing reasons, Lead Plaintiffs respectfully submit that the Settlement and Plan of Allocation should be approved as fair, reasonable, and adequate. Lead Counsel further submit that the requested fee in the amount of 25% of the Settlement Fund should be approved as fair and reasonable, and the request for payment of Lead Plaintiffs' Counsel's expenses in the amount of $191,222.40 should also be approved, as well as Lead Plaintiffs' request for reimbursement of total of $41,208.30 in reasonable costs that were directly related to their representation of the Settlement Class, as authorized by the PSLRA.

I declare, under penalty of perjury, that the foregoing is true and correct.

Executed this 8th day of April, 2026.

/s/ *Katherine M. Sinderson*
Katherine M. Sinderson

38

## CERTIFICATION OF SERVICE

I HEREBY CERTIFY that on April 8, 2026, I caused the Declaration of Katherine M. Sinderson in Support of (I) Lead Plaintiffs' Motion for Final Approval of Settlement and Plan of Allocation and its exhibits to be electronically filed with the Clerk of the Court using the ECF system. Notice of this filing will be sent to all counsel of record by operation of the Court's electronic filing system and the filing will be available for viewing and downloading from the CM/ECF system.

/s/ *Katherine M. Sinderson*
Katherine M. Sinderson